# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------X

In the Matter of an Article 78 Proceeding     Index No. 7738/12

MARIO CAPOGROSSO,     **VERIFIED PETITION**

            Petitioner,

     -against-

NEW YORK STATE DEPARTMENT OF MOTOR
VEHICLES,

            Respondent.

------------------------------------------------------------X

     Petitioner, MARIO CAPOGROSSO, by his attorneys, MCDONOUGH & MCDONOUGH, LLP, petitioning the court, allege upon information and belief:

     1.     That at all times hereinafter mentioned, petitioner, MARIO CAPOGROSSO (hereinafter "CAPOGROSSO"), was and still is a resident of the State of New York.

     2.     That at all times hereinafter mentioned, respondent, the NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES, was and is a department, agency or board with powers and duties derived from the laws of the State of New York.

     3.     In accordance with the laws of the State of New York, the Traffic Violations Bureau was and is an agency that was created to assume jurisdiction over traffic infractions.

     4.     That in accordance with the powers given to it by the laws of the State of New York, the Traffic Violations Bureau maintains adjudication centers throughout the

3

State of New York including, including an adjudication center in Brooklyn South which handles traffic infraction matters.

5.   On September 22, 2004, CAPOGROSSO was admitted to practice law in the Appellate Division Second Department and is and was at all relevant times an attorney in good standing.

6.   In or about 2005, CAPOGROSSO began practicing as an attorney in the Traffic Violations Bureau representing individuals and corporations charged with various traffic infractions.

7.   The majority of CAPOGROSSO'S work takes place in the Traffic Violations Bureau adjudication center located in Brooklyn South.

8.   From the onset of his practice in the Traffic Violations Bureau adjudication centers, CAPOGROSSO has zealously represented his clients and has never had any founded complaints or grievances regarding his work. He has had nothing but a stellar record and his practice has grown in his chosen area of practice as his clients appreciate his hard work and routinely seek out his representation and refer him to others.

9.   On December 22, 2011, CAPOGROSSO was in the attorneys' room at the Brooklyn South Traffic Violations Bureau adjudication center when an altercation took place between another attorney and himself.

10.   Shortly after entering the attorneys' room, CAPOGROSSO put his coffee cup down to the side of a table and thereafter asked another attorney, Yakov Brody, Esq., who regularly practices at the same center, "Excuse me, can I get my coffee."

11. In response, and without provocation, Mr. Brody started screaming and spewing ethnically based expletives at CAPOGROSSO; which will not be repeated herein. Mr. Brody was yelling at the top of his voice. CAPOGROSSO initially walked away in an effort to end the onslaught, but Mr. Brody resumed his rant of racially charged expletives at CAPOGROSSO, for which Mr. Brody had no cause. At this point of the continuing attack, CAPOGROSSO responded in kind.

12. CAPOGROSSO realizes his outburst was ill considered and unprofessional and he is extremely ashamed at his resort to lowering himself to the level of his attacker. However, his response was a reaction to an unprovoked and relentless ethnic and vile verbal attack by Mr. Brody, which Mr. Brody initiated without cause and refused to end even when CAPOGROSSO backed away from the initial attack.

13. One of the managers of the Brooklyn South center, Danielle Calvo, heard the exchange (again, Mr. Brody was yelling at the top of his lungs) and came into the room. In front of CAPPOGROSO she stated: "Now's our chance to get rid of him", referring to CAPOGROSSO.

14. After Ms. Calvo and Mr. Brody had left the room, Jeffrey Myers, Esq. entered the room and sat where Mr. Brody had been sitting. He told CAPOGROSSO that he overheard the exchange and told CAPOGROSSO that he would have been justified in striking Mr. Brody. CAPOGROSSO responded in the heat of the moment: "This is what I would have done" and punched the air.

15. CAPOGROSSO never punched anyone or touched anyone during the entire exchange.

16. Meanwhile, apparently Mr. Brody and Ms. Calvo had called the police and Bushra Vahat, the supervising Administrative Law Judge, with regard to the situation.

17. The police and Judge Vahat allegedly obtained affidavits from everyone in the courtroom; including people who did not even witness the exchange.

18. Neither Judge Vahat nor the police took any statement from CAPOGROSSO regarding his version of the events.

19. The next day, December 23, 2010, CAPOGROSSO arrived at the Brooklyn South adjudication center ready to appear for the clients he was meeting there. When he arrived he encountered chaos. There were "police" in the courtroom taking affidavits from attorneys who were not even present the day before.

20. Senior ALJ Gelbstein, the supervising Administrative Judge of the center, met CAPOGROSSO in the courtroom and asked to see him in his office. When CAPOGROSSO arrived in the office there were two "officers" in blue uniforms and Judge Vahat in the office. CAPOGROSSO was told by Judge Gelpstein "You have to leave and if you come back here you are going to be arrested." Judge Vahat added "If you go into any Department of Motor Vehicle center you are going to be arrested."

21. After Judge Vahat proclaimed this *ad hoc* expulsion, CAPOGROSSO started to speak and ask what was going on. Judge Vahat told him that he wasn't wanted there and to get out. CAPOGROSSO left the Brooklyn South adjudication center immediately thereafter.

22. CAPOGROSSO never received anything in writing with respect to this *ad hoc* ban issued by Judge Vahat and Judge Gelbstein without benefit of any hearing of any sort, which ban applied not only to the Brooklyn South adjudication center, but

6

purportedly to all Traffic Violations Bureau adjudication centers, until a letter response was received on February 8, 2012 (described in more detail below).

23. Two weeks after the December 23, 2011 ouster, CAPOGROSSO contacted Judge Vahat and asked her to explain her determination. She advised that if CAPOGROSSO was "good" and "stayed quiet" she would reconsider her determination in three months, and at that time determine *if* he could go back *into other* Department of Motor Vehicle adjudication centers, but that she would not allow him to practice again in the Brooklyn South center at that time.

24. She further stated that he *might* eventually work his way back into the Brooklyn South center at some unspecified date in the future, but that for an *indefinite* period of time he was prohibited from entering that center.

25. By letter dated January 25, 2012, CAPOGROSSO'S counsel wrote to the Commissioner of the NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES advising that the handling of matters on December 23, 2011 and the ban on CAPOGROSSO'S right to practice law in Brooklyn South adjudication center without an unbiased investigation and the right to be heard before and unbiased arbiter on the issues, was arbitrary and capricious, and violated CAPOGROSSO'S constitutional right to due process of law. A copy of that correspondence dated January 25, 2012 is annexed hereto as **Exhibit "A"**.

26. By letter dated February 8, 2012, the NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES responded to CAPOGROSSO'S request for reconsideration advising that it was adhering to the decision to ban CAPOGROSSO from all Traffic Violations Bureau centers for an indefinite period of time (a copy of the correspondence

dated February 8, 2012 is annexed hereto as **Exhibit "B"**) apparently without unconcerned about the requirements of due process of law.

27. The New York State Department of Motor Vehicles in its letter, alleged other incidents involving CAPOGROSSO as justification for their actions. The February 8, 2012, setting forth these other incidents, contains untruths and mischaracterizations regarding CAPOGROSSO'S behavior and interactions.

28. Significantly, CAPOGROSSO was never before advised of any of these other alleged complaints against him nor was he provided with any of the alleged "evidence" supporting them nor given a chance to respond or defend himself against the charges.

29. No hearing was ever conducted with respect to any of these allegations and CAPOGROSSO was never given an opportunity to respond to the allegations being made against him.

30. CAPOGROSSO'S Livelihood is based in the Brooklyn South adjudication center. That is where his clients are and that is where the cases he handles are venued.

31. CAPOGROSSO currently has approximately 496 clients, and someone has to appear on their matters. This illegal and improper prohibition is preventing CAPOGROSSO from representing his clients, has deprived him of his livelihood and has interfered with his clients' rights to be represented properly, zealously and by an experienced attorney of their choosing who is familiar with their businesses, their histories, and the pending charges.

32. Since the date of this incident and determination, CAPOGROSSO has been forced to hire other attorneys to handle his cases in the Brooklyn South center so that no defaults or other negative results occur.

33. Since December 23, 2011, Mr. Capogrosso has lost and continues to lose significant income as a result of this unjustified and unlawful banning of him from the Traffic Violations Bureau adjudication centers.

34. Respondent's unjustified, improper and unlawful banning of him from the Traffic Violations Bureau adjudication centers has caused CAPOGROSSO to incur excessive and unnecessary financial expenses in hiring covering attorneys, which he can ill-afford given his current loss of income due to respondent's decision and determination.

35. The banning of CAPOGROSSO from Traffic Violations Bureau adjudication centers was in violation of lawful procedure in that Mr. CAPOGROSSO was not provided with the alleged "evidence" used against him, was not given an opportunity to confront his accusers and was never given the opportunity of a fair and unbiased hearing on the charges.

36. Moreover, if there is any substance whatever to the allegations made against CAPOGROSSO, they are so trivial under the circumstances that under no reasonable view do they justify the measure of punishment or penalty adopted and such measure of punishment or penalty clearly constitutes an abuse of discretion on the part of the Respondent.

37. The banning of CAPOGROSSO from Traffic Violations Bureau adjudication centers was illegal, arbitrary and capricious, and an abuse of discretion.

38. It is respectfully submitted that a temporary restraining order is required on these facts if justice is ever to be reached as allowing this unauthorized ban on a licensed attorney in good standing, to continue his practice without *any* due process of law as a predicate, violates the fundamental constitutional protections due the citizens of this country.

39. This unwarranted and constitutionally defective ban on CAPOGROSSO, interfering with the highest concentration of his legal practice, and preventing him from appearing in any Traffic Violations Bureau in the State has far reaching consequences.

40. CAPOGROSSO has been forced to suffer grave financial loss and to incur significant unwarranted expenses in meeting his obligations to defend his clients in pending matters; he has suffered great harm to his professional reputation in the venue where his practice is concentrated , which continues so long as the ban is in place; he has suffered and continues to suffer a loss of new clientele and of new matters from established clientele; his reputation and relationship with his existing client base, built up over many years, has been imperiled by his inability to service their legal needs; and, most importantly, CAPOGROSSO'S clients have been negatively impacted on matters pending before the very Bureau that has improperly and directly interfered with COMPASSO'S representation on those pending charges.

41. The Traffic Violations Bureau interfered with the attorney-client relationships between CAPOGROSSO and his clients and prevented them from being represented by the counsel of their choice, a zealously guarded right under our jurisprudence. They did so without even the indicia, let alone the reality of due process of law: an opportunity to be heard; an opportunity to be apprised of the evidence against

you; an opportunity to confront the evidence against you; and the opportunity to prevent evidence in defense.

42. As none of these occurred in this instance and as basic rights have been denied the Petitioner and his clients without due process of law, the temporary restraining order must be issued precluding the proliferation of the ban pending the resolution of this proceeding.

43. Petitioner therefore further prays for an Order of this Court staying and restraining the Respondent from taking any action pursuant to the decision and determination dated February 8, 2012 until a final decision is rendered in regard to all matters and all issues raised herein.

44. No previous application has been made for the relief requested herein.

**WHEREFORE**, pursuant to CPLR §7803(3) Petitioner prays that this Court review the aforesaid decision and determination of Respondent and grant a final judgment pursuant to CPLR §7806 as follows:

A. Annulling and setting aside Respondent's determination of punishment and penalty in banning Petitioner from all Traffic Violations Bureau adjudication centers for an indefinite period of time as being arbitrary, capricious, illegal, unlawful and an abuse of discretion;

B. Compelling Respondent to forthwith restore and reinstate Petitioner's privileges to enter Traffic Violations Bureau adjudication centers to perform his business of acting as an attorney to clients in said centers;

C. Directing Respondent to pay Petitioner his lost wages as a result of this arbitrary, capricious, illegal and unlawful banning of Petitioner in an amount to be determined by the Court; and,

D. Granting such other, further and different incidental relief as this Court deems just and appropriate including, but not limited to, reasonable attorneys' fees and the costs and disbursements of this action.

Dated: Garden City, New York
   March 1 , 2012

         Yours, etc.,

         McDONOUGH & McDONOUGH, LLP
         Attorneys for Petitioner

By: _____
    Chris G. McDonough
    401 Franklin Avenue, Suite 210
    Garden City, New York 11530
    (516) 33-2006

## VERIFICATION

STATE OF NEW YORK )
) ss.:
COUNTY OF ~~KINGS~~ Westchester )

I, MARIO CAPOGROSSO, am the Petitioner in the above entitled action. I have read the foregoing petition and know the contents thereof. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

MARIO CAPOGROSSO

Sworn to before me this 29 day
of February, 2012.

_____
Notary Public

MARYANN PRATA
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01PR6004623
QUALIFIED IN WESTCHESTER COUNTY
My Commission Expires March 23, 20__

13

January 25, 2012

Barbara J. Fiala, Commissioner
Department of Motor Vehicles
6 Empire State Plaza
Albany, New York 12228

        Re:    Improper Expulsion of Mario Capogrosso, Esq.

Dear Ms. Fiala:

      This office represents Mario Capogrosso, Esq. in connection with his unilateral expulsion from the Brooklyn South DMV Adjudication center, and suspension from all DMV Adjudication centers. The purpose of this submission is to request reconsideration of the decision of December 23, 2011, as that decision was arbitrary and capricious, violated his constitutional rights of due process and has severely impacted his professional and personal lives.

      Mr. Capogrosso has been practicing in the New York State Department of Motor Vehicle adjudication centers since 1995. He has mainly practiced in the Brooklyn South location. He has practiced by zealously representing his clients and has never had any founded complaints or grievances regarding his work. He has had nothing but a stellar record and his practice has grown as his clients appreciate his hard work and routinely seek out his representation.

      On December 22, 2011, Mr. Capogrosso was in the attorneys' room at the Brooklyn adjudication center. He put his coffee down to the side of a table and thereafter asked another attorney, who regularly practices at the same center, Yakov Brody, Esq., "Excuse me, can I get my coffee." Out of nowhere Mr. Brody started screaming and spewing ethnically based expletives at Mr. Capogrosso; which will not be repeated here. Mr. Brody was yelling at the top of his voice. Mr. Capogrosso backed away, but thereafter Mr. Brody again began screaming racially expletives at him without cause. Feeling attacked Mr. Capogrosso responded in kind. While Mr. Capogrosso realizes his outburst was uncalled for and unprofessional, and is extremely shameful that he stooped to the level of his attacker, his response was in retaliation to the out of the blue verbal attack by Mr. Brody, which started the whole situation.

      One of the managers of the center, Danielle, heard the exchange (again, Mr. Brody was yelling at the top of his lungs) and came into the room. In front of Mr. Cappagroso She stated "now's our chance to get rid of him", referring to Mr. Capogrosso. After she and Mr. Brody had left the room, Jeffrey Myers, Esq. then entered the room and sat where Mr. Brody had been sitting. He told Mr. Capogrosso that he overheard the exchange and said that Mr. Capogrosso should have hit Mr. Brody. Mr. Capogrosso responded "This is what I would have done" and punched the air. He **never** punched anyone or touched anyone during this whole exchange.

Meanwhile, apparently Mr. Brody and Danielle had called both the police and Bushra Vahat, the supervising Administrative Law Judge, with regard to the situation. The police and Ms. Vahat obtained affidavits from everyone in the courtroom, even people who did not witness the exchange. They did **not** take a statement from Mr. Capogrosso or ask for his version of events.

The next day, December 23, 2010, Mr. Capogrosso arrived at the Brooklyn South center ready to work for the clients he was meeting there. When he arrived he encountered chaos. There were "police" in the courtroom taking affidavits from attorneys who were not even present the day before. Judge Gelpstein, the supervising Administrative Judge of the center, met Mr. Capogrosso in the courtroom and asked to see him in his office. When Mr. Capogrosso arrived in the office there were two "officers" in blue uniforms and Judge Vahat in the office. Mr. Capogrosso was told by Judge Gelpstein "You have to leave and if you come back here you are going to be arrested." Judge Vahat added "If you go into any Department of Motor Vehicle center you are going to be arrested." After Judge Vahat proclaimed this ad hoc expulsion, Mr. Capogrosso started to speak and ask what was going on. Judge Vahat told him that he wasn't wanted there and to get out. Mr. Capogrosso left the Brooklyn South adjudication center immediately thereafter.

Two weeks later Mr. Capogrosso contacted Judge Vahat and asked her to explain her determination. She advised that if Mr. Capogrosso was "good" and "stayed quiet" she would *reconsider* her determination three months later, and at that time determine *if* he can go back *into other* Department of Motor Vehicle adjudication centers, but he would not be allowed back into the Brooklyn South center. She further stated that he *might* eventually work his way back into the Brooklyn South center, but for an *indefinite* period of time he was prohibited from entering that center.

Mr. Capogrosso's livelihood is based in the Brooklyn South adjudication center. That is where his clients are, that is where the cases he handles are venued. He has approximately 496 clients currently, and someone has to appear on their matters. This illegal and improper prohibition is preventing Mr. Capogrosso from representing his clients and has deprived him of his livelihood. Since the date of this incident and determination, Mr. Capogrosso has been forced to hire other attorneys to handle his cases in the Brooklyn South center so that no defaults or other negative results occur.

To date, Mr. Capogrosso has not received anything in writing with respect to this determination. Moreover, as stated above, no hearing was ever conducted in connection with this matter nor was Mr. Capogrosso even heard with respect to the facts surrounding the incident that led to the determination to prohibit Mr. Capogrosso from the adjudication centers. Clearly, the determination of Judge Gelpstein and Judge Vahat was arbitrary and capricious and violated Mr. Capogrosso's constitutional due process rights.

This matter is akin to that in *Lindemann v. American Horse Shows Association*, 164 Misc.2d 937, 624 N.Y.S.2d 723 (Sup.Ct. N.Y.Cty. 1994). In *Lindemann* the defendant banned members from participation in equestrian sporting events, initiated after the members' indictment for alleged participation in a scheme to electrocute horses. The Court therein held "[u]nder New York law a fair hearing involving the possible suspension of a property right is 'an obligation imposed ... by those fundamental principles of basic justice and fair play which underlie our entire system of jurisprudence (citation omitted)." *Id* at 730. Moreover, the Court found that "[t]here can be no fair and impartial hearing unless the person charged is accorded a meaningful opportunity to respond to the charges and to rebut them." *Id* at 731. "As noted by our Court of Appeals in *Saumell v. N.Y. Racing Association, Inc.*, 58 N.Y.2d at 242, supra, while the association "was not obligated to resolve questions of credibility

before denying petitioner access to its facilities, the evidence ... was at best equivocal and, in light of the 20-day delay and importance of access to petitioner's livelihood, an insufficient basis for exclusion without a hearing." *Id* at 733.

In the instant matter, Mr. Cappagosso was similarly banned indefinitely from his livelihood, without a hearing and without decision makers even hearing Mr. Capogrosso's side of the story. No affidavit was taken from Mr. Capogrosso nor was he entitled to view the alleged 'evidence' against him. Yet, summarily, the supervising Administrative Judges banned him from entering the centers at which he practices law.

Putting aside the violation of Mr. Capogrosso's constitutional rights in the matter, and the arbitrary and capricious nature of the determination, the penalty imposed was so disproportionate to the alleged offense as to shock the conscience. If sanction imposed 'shocks the judicial conscience" it "constitutes an abuse of discretion as a matter of law" (citations omitted). *Diefenthaler v. Klein*, 27 A.D.3d 347, 811 N.Y.S.2d 653 (1st Dept. 2006). In the instant matter, the expulsion of Mr. Capogrosso from all adjudication centers for a three month period of time and from the Brooklyn South center at which he makes his living indefinitely based upon the incident that occurred is shocking to the conscience and clearly an abuse of discretion. Mr. Capogrosso did not start the verbal assault. While he now recognizes that he shouldn't have verbally struck back, it was not he who first used ethnic comments and profanity in a professional setting. Indeed, Mr. Brody was not punished in the same way (or at all), yet he created this whole situation and made similar types of improper comments. Moreover, while Mr. Capogrosso realizes he should not have even intimated how he would have punched by swinging at the air, he did not touch or strike any person; a demonstration which took place when Mr. Brody was not in the room.

In sum, Mr. Capogrosso was verbally attacked while merely trying to do his job. He reacted to the attack and went on the defensive. The situation never should have occurred, and unfortunately escalated out of control - but this situation occurred due in no part to the actions of Mr. Capogrosso. He was the victim of a horrible verbal assault; yet he has been the one prejudiced. To ban him from entering any adjudication center for three months and from indefinitely entering the Brooklyn South center where he earns his livelihood is so disproportionate to the offense it is shocking and abusive.

By reason of all of the foregoing, it is respectfully requested that the prohibition imposed upon Mr. Capogrosso be reversed. He should be allowed to enter any adjudication center he needs to in order to continue representing his clients forthwith.

As this matter has had a direct and substantial impact upon Mr. Capogrosso's practice and income, we await your prompt response to this submission.

Very truly yours,

Chris McDonough

CGM/hs



**STATE OF NEW YORK**
**DEPARTMENT OF MOTOR VEHICLES**

6 EMPIRE STATE PLAZA, ALBANY, NY 12228

BARBARA J. FIALA
Commissioner

NEAL W. SCHOEN
Deputy Commissioner and Counsel

IDA L. TRASCHEN
First Assistant Counsel
Legal Bureau

February 8, 2012

Mr. Chris McDonough, Esq.
McDonough & McDonough LLP
401 Franklin Avenue, Suite 210
Garden City, New York  11530

Re:  Mario Capogrosso, Esq.

Dear Mr. McDonough:

Your letter of January 25, 2012 to Commissioner Fiala, concerning Mr. Capogrosso, has been referred to me for a response.

As the summary of events below documents, the decision to ban Mr. Capograsso from appearing at any of our Traffic Violations Bureau ("TVB") offices was neither capricious nor arbitrary, but rather, was made in the best interests of both the agency and motorists and attorneys appearing at the TVBs.

On January 6, 2011, Supervising ALJ Vahdat received a petition signed by eighteen employees of Brooklyn South TVB, asking her to address Mr. Capogrosso's behavior. The employees stated that Mr. Capogrosso's presence on the premises of Brooklyn South TVB constituted a threat to their physical safety. They explained that Mr. Capogrosso's behavior was unstable and that he had confrontations with many TVB employees during the previous year. One incident nearly escalated to a physical altercation between Mr. Capogrosso and a TVB employee whom Mr. Capogrosso had threatened.

On January 10, 2011, Supervising ALJ Vahdat visited the Brooklyn South TVB to discuss this situation with Senior ALJ Gelbstein. He expressed concern about Mr. Capogrosso's behavior over the past year. Senior ALJ Gelbstein had previously notified the Division of Field Investigation about Mr. Capogrosso's behavior. In addition, Senior ALJ Gelbstein had a letter of complaint from George Han (a clerical employee) and a letter of complaint from an attorney whose assistant had been pushed by Mr. Capogrosso. Senior ALJ Gelbstein stated that he had spoken to Mr. Capogrosso on many occasions and asked him to exercise a calmer demeanor when dealing with the staff, other attorneys practicing at TVB and his own clients. Senior ALJ Gelbstein concluded that his many conversations with Mr. Capogrosso had not resulted in a change in Mr. Capogrosso's behavior and he continued to be concerned for his staff's safety.

On that day, Supervising ALJ Vahdat also interviewed five TVB employees who expressed deep concern for their safety when dealing with Mr. Capogrosso. One employee stated, "I can no longer interact with Mr. Capogrosso at the service counter because I fear for my safety.....he even went so far as to assault a female assistant who works for another lawyer". On that day, Supervising ALJ Vahdat also spoke with three attorneys who shared the staff's concerns for the safety of all employees and attorneys due to Mr. Capogrosso's behavior.

Following these conversations, Supervising ALJ Vahdat and Senior ALJ Gelbstein spoke to Mr. Carogrosso concerning his behavior. Mr. Capogrosso admitted that, "I sometimes lose my temper and need to blow off steam". Supervising ALJ Vahdat and Senior ALJ Gelbstein warned Mr. Capogrosso that

Mr. Chris McDonough, Esq.
Page 2
8 February 2012

he must conduct himself in a professional manner; otherwise he would not be allowed to practice at TVB. Mr. Capogrosso agreed to calm down and stop his abusive behavior. When Supervising ALJ Vahdat explained to him that if his behavior did not improve she would have to report him to the Grievance Committee, he stated that, "If I have any more altercations with anyone here I will just stop coming here myself".

On December 22, 2011, Supervising ALJ Vahdat received an e-mail from Danielle Calvo, SMVRI at Brooklyn South TVB, informing her that Mr. Capogrosso was screaming in the attorney's room and shouting religious slurs at attorneys of the Jewish faith. Ms. Calvo had asked all the other attorneys to step away from Mr. Capogrosso and leave him to himself. Half an hour later, Ms. Calvo called Supervising ALJ Vahdat and informed her that Mr. Capogrosso had thrown his coffee cup (still half full) at one of the other attorneys and when a third attorney had tried to calm down Mr. Capogrosso, he had thrown a punch that had missed the third attorney by about an inch. Supervising ALJ Vahdat asked Ms. Calvo to escort Mr. Capogrosso out of the building and tell him not to come back until the next day. That same day three attorneys who had witnessed this altercation called Supervising ALJ Vahdat about this incident. Their recitation of the facts matched Ms. Calvo's.

The next morning, the above mentioned three attorneys met with Supervising ALJ Vahdat and Senior ALJ Gelbstein and submitted affidavits elucidating the facts. In addition, TVB staff, the police room staff and other attorneys notified Supervising ALJ Vahdat that Mr. Capogrosso regularly punches the walls and steel poles of the TVB office with his fists. The sounds from these punches at times are so loud that the police room employees are startled and run out of the room to see what has happened. Mr. Capogrosso admitted to this odd behavior and stated, "I do it to let off steam, otherwise I could hurt someone". Supervising ALJ Vahdat observed that Mr. Capogrosso's knuckles were all bruised, black and blue. Mr. Capogrosso's behavior is clearly in contravention of 15 NYCRR 124.2, which provides, in part:

(a) The motorist may be represented by an attorney or, in the administrative law judge's discretion, by any other person the motorist chooses. **Any person representing the motorist must conform to the standards of conduct required of attorneys appearing before State courts, and failure to conform to these standards will be grounds for declining to permit his or her continued appearance in the proceeding.** (Emphasis added.)

Based upon this regulation and the fact that Mr. Capogrosso's behavior is disruptive of the TVB process and induces fear in its employees, attorneys and motorists who work at and use the TVB, a decision was made to ban Mr. Capogrosso from all TVB offices for an indeterminate time period.

It is the policy of the New York State Department of Motor Vehicles to preserve the safety and well-being of its employees and visitors. DMV will strive to ensure that its workplace is free from violence, threats of violence, harassment and intimidation. Until such time that it can be determined that Mr. Capogrosso is no longer a threat to the safety and well-being of TVB employees and visitors, he will not be allowed to practice at any of Department of Motor Vehicles' TVB offices.

I trust this information assists you.

Very truly yours,

*[signature]*

Ida L. Traschen
First Assistant Counsel

ILT/mjs