Exhibit 1

1        UNITED STATES DISTRICT COURT

         EASTERN DISTRICT OF NEW YORK

2        ------------------------------------------X

3        MARIO H. CAPOGROSSO

4                          Plaintiff,

5                                      Case No:

            - against -              1:18-CV-02710

6                                      (EKLB)

7        ALAN GELBSTEIN, et al.,

8                          Defendants.

9        ------------------------------------------X

10

11                       December 18, 2020

                         9:45 a.m.

12

13

14

15

16

17         VIRTUAL VIDEOTAPED EXAMINATION BEFORE TRIAL OF

18

19       MARIO H. CAPOGROSSO, the Plaintiff, pursuant to

20

21       Notice, taken at the above date and time, before

22

23       MARIA ACOCELLA, a Notary Public within and for the

24

25       State of New York.

Page 2

1      A P P E A R A N C E S:

2

3

4         MARIO H. CAPOGROSSO, ESQ., Pro Se

5              21 Sheldrake Place

6              New Rochelle, New York 10804

7

8

9

10        STATE OF NEW YORK

11        OFFICE OF THE ATTORNEY GENERAL

12        LETITIA JAMES

13             Attorneys for Defendants

14             28 Liberty Street

15             New York, New York 10005

16        BY:  JAMES THOMPSON, ESQ.,

17             Assistant Attorney General

18             Litigation Bureau

19

20

21

22

23     ALSO PRESENT:  Howard Brodsky, Videographer

24

25

1          Mario H. Capogrosso

2   Terry Kalker, who is a lawyer down there who

3   was looking for a lawyer.  I sent him [sic]

4   my resume.  She [sic] responded.  I said, you

5   know, I don't know what type of work she did.

6          But I went down, started working

7   for her as one of her attorneys.

8      Q.      And how do you spell Ms. Kalker's

9   name?

10     A.      K-A -- I think K-A-L-K-E-R.

11     Q.      And so can you tell me a little

12  bit about working for Ms. Kalker?

13     A.      Well, when I worked for her, it

14  seemed fine when I first started.  When I

15  first started, it seemed fine.

16          But she made certain

17  representations to me that she didn't

18  fulfill.  Now I was getting -- now medical

19  insurance is very important to me, and making

20  a representation of following through with it

21  is very important to me.

22          She made a representation that I

23  would have medical insurance after three

24  months.  I worked for her for three months,

25  and I said, where is my medical insurance?

```
                                            Page 18
 1               Mario H. Capogrosso
 2   Because I had it in my previous job.
 3               Working for an engineer, if they
 4   say something, they do it.
 5               Terry Kalker didn't do that.  She
 6   said, well, you will get medical insurance a
 7   year and three months from now, which upset
 8   me greatly, very greatly.
 9               So at that point I said, all
10   right, you don't want to pay me medical
11   insurance, you are not upholding what you
12   said you were going to do.
13               I left her and went into practice
14   for myself.  And that is what I started doing
15   in June, June of 2005.  I started work for
16   Terry Kalker in April 2005, April or March of
17   2005.  I only spent three or four months with
18   her.
19        Q.    And how did she respond when you
20   objected?
21        A.    She continued with that
22   affirmation, you will get your insurance from
23   a year.  I said, that is unacceptable.  I
24   said, you can't make a representation and
25   don't follow through with it.
```

```
                                        Page 19
 1                Mario H. Capogrosso
 2             So at that point I really -- I
 3    started not to trust this woman anymore.  I
 4    said, that is enough.  She was sent in -- I
 5    normally, with my engineering firm, if they
 6    sent me someplace, they always paid my
 7    expenses.
 8             She said she was going to pay
 9    expenses, and then she decided not to pay
10    expenses.  And she sending me to all
11    different courts, all over Long Island and
12    Upstate New York.  I said, I can't afford
13    this.  I can't afford it.  Gas, tolls.
14             So at that point I said, you
15    know, you are not going to truthful with me,
16    I don't feel comfortable working with you.  I
17    decided to end it.
18             My clients who I was representing
19    liked me, liked my representation, so I said,
20    I will do this on my own, which is what I
21    did.
22        Q.    So what was your salary with
23    Ms. Kalker?
24        A.    That beginning salary, what I
25    recall was $40,000 a year, back in 2005.
```

```
                                          Page 79
 1              Mario H. Capogrosso
 2              If you see ticket brokers -- if I
 3   see ticket brokers in your office, and you
 4   tell me you don't know what they are doing
 5   for a living, I see you pleading guys in the
 6   GE and rescheduling cases, and if another
 7   attorney tells me he is covering a case for
 8   you, my opinion -- and only my opinion, which
 9   I am entitled to -- you got a caseload.  You
10   got a caseload, and you are trying to get a
11   piece of the action.  That is my opinion.
12        Q.     When you say you have got a
13   caseload, you think he is practicing law as
14   an attorney at the TVB?
15        A.     As well as being a judge.  Yeah,
16   that is my opinion.  That is my opinion.  I
17   don't know if it is true or not.  That is not
18   my job.  That is my opinion.  I don't know if
19   it is true.  I don't know if that is true.  I
20   reported what I saw and what I heard.
21        Q.     But you never saw Judge Gelbstein
22   arguing a case at the TVB or representing a
23   client at THE TVB; is that correct?
24        A.     No, I never saw him do that.  No.
25        Q.     Let's take a step back,
```

```
                                        Page 80
 1                 Mario H. Capogrosso
 2    Mr. Capogrosso.
 3                 Why did you decide to sue in this
 4    case?
 5        A.     I want to go back to practicing
 6    law at New York TVB.  I want to clear my
 7    name.  I want to clear my name.
 8                 I was removed from the Brooklyn
 9    TVB on May 11, 2015.  Nobody looked at this
10    videotape, which we established that
11    yesterday.  Nobody looked at it.
12                 Did an Danielle Calvo, somebody
13    told her that there was an incident between
14    me and Smart.  Danielle Calvo makes a call to
15    Judge Gelbstein.  Gelbstein calls Traschen,
16    and Traschen tells Calvo to have me removed.
17                 Nobody looks at the videotape.
18    The videotape was never kept.  It is lost.
19    There is affidavit and affidavit and
20    accusations made against me and my name and
21    my reputation as a lawyer that I was never
22    served with so I could respond.
23                 I asked yesterday, how come you
24    didn't file an affidavit?  I never received a
25    complaint.  I can't respond to a complaint if
```

```
                                           Page 81

 1                  Mario H. Capogrosso

 2    I never received it.

 3                  I wrote to -- and nobody is --

 4    and I wrote to Traschen.  I wrote to Bushra

 5    Vahdat.  And I wrote to Judge Gelbstein, and

 6    I wrote to your office.

 7                  And when I write to your office

 8    concerning my concern -- detailing my

 9    concerns what is going on, I get no response

10    from any of these offices.

11                  And then I have some security

12    guard approach me on the morning of May 11th,

13    instigates an altercation, and I am removed

14    within five minutes.

15                  I want to clear my name.  I think

16    I was set up.  I think Judge Gelbstein and

17    all these other parties wanted me out because

18    I wasn't playing the game.

19                  And I want to clear my name.  I

20    want to get back to work.  I want the money

21    that I lost.  And I think whoever did this,

22    especially if they are judges, should get

23    punished.  They should not be a judges, and

24    they should not be represented --

25         Q.      When you say they wanted you out
```

Page 125

1

2      UNITED STATES DISTRICT COURT

       EASTERN DISTRICT OF NEW YORK

3      CASE NO. CV-18-2710

4      ------------------------------------x

5      MARIO H. CAPOGROSSO,

6

                              Plaintiff,

7

8             -against-

9      ALAN GELBSTEIN, et al.,

10                            Defendants.

11     ------------------------------------x

12

                              December 18, 2020

13                            11:48 a.m.

14

15        VIDEO EXAMINATION BEFORE TRIAL of

16     MARIO H. CAPOGROSSO, the Plaintiff

17     herein, taken by the Defendants, pursuant

18     to Notice, before Lisa H. MacDonald, RPR,

19     and Notary Public of the State of New

20     York.

21

22                    VOLUME II

23

24

25

Page 126

1
2    A P P E A R A N C E S :
3
4

     MARIO H. CAPOGROSSO, ESQ.
5    21 Sheldrake Place
     New Rochelle, New York 10804
6              Plaintiff Pro Se
7
8

     STATE OF NEW YORK, OFFICE OF THE ATTORNEY
9    GENERAL, LETITIA JAMES
     28 Liberty Street
10   New York, New York 10005
               Attorneys for Defendants
11   BY:       JAMES THOMPSON, ASSISTANT
               ATTORNEY GENERAL
12
13

     ALSO PRESENT:
14

     Howard Brodsky, Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 233

1              M.H. Capogrosso

2    and that's what I'll hold to.

3         Q        So your testimony is that

4    Mr. Brody just said fuck you, you Jew

5    hater anti-Semite out of nowhere?

6         A        Yeah.  I walked in in the

7    morning as I always did.  I get coffee at

8    the deli.  I get a paper at the deli.  I

9    like the Post.  I take my coffee, before

10   I go in the courtroom I put it under the

11   bench.  I do it the same way all the

12   time.

13              I was reaching for my

14   coffee, for whatever reason he decided to

15   come at me this morning.  Do I think he

16   was put up to it?  I think so.  I think

17   Bushra Vahdat who had just come on maybe

18   wanted me out, I don't know and this was

19   her opportunity to get me out.  So she

20   created this incident, that's my opinion.

21              I was blindsided.  I can

22   have an opinion though.  But this is the

23   first time I think I was blindsided.

24   That's my opinion.  Vahdat, Gelbstein

25   wanted me out and maybe they put this

Page 234

1             M.H. Capogrosso

2    attorney up to it because out of the blue

3    he just happens to say this.

4                   My mind was --

5         Q       Why would --

6         A       You got to let me finish.

7    My mind was someplace else.  It was right

8    around Christmas time.  I'm not really

9    thinking.  I'm thinking about I got to

10   buy Christmas presents and what I'm

11   buying for who.  That's where my mind was

12   on that morning.  But that's what

13   happened.

14        Q       Why would Bushra Vahdat and

15   Alan Gelbstein want you out?

16        A       Bushra Vahdat -- well, they

17   had complaints against me from the

18   clerical staff, right and they had to

19   have a reason to have me removed and this

20   would have been an excellent reason,

21   right.  They had all these complaints

22   that they were filing against me.  There

23   was no sum and substance to any of them,

24   right.

25                   But in order to get me

Page 235

```
 1              M.H. Capogrosso
 2   removed they needed an incident like
 3   this, so they created one.  They
 4   didn't -- they didn't have no -- they had
 5   no basis to grieve me.  There was no
 6   grievance filed against me.  They grieved
 7   in Emig Tieg (phonetic) in Manhattan
 8   North because they had a basis for that,
 9   but they had no basis to grieve me
10   because there was no sum or substance to
11   any of these complaints, otherwise they
12   would have, so they created an incident.
13   That's my opinion.
14              And I was blindsided.  My
15   mind was someplace else, it was Christmas
16   time and I took the bait.  I did the
17   right thing.  I did throw a punch at a
18   wall.  I didn't hit the wall because I
19   was upset.  What makes me a Jew hater
20   anti-Semite?  What nerve does this
21   attorney have to call me a Jew hater
22   anti-Semite?  I'm working down there 10
23   years.  There's not one complaint from a
24   motorist or a client that I used an
25   anti-Semitic remark or a racist remark.
```

Page 236

```
 1            M.H. Capogrosso
 2              What right does this man
 3   have to call me an anti-Semite Jew hater?
 4       Q       So why would he think that
 5   you're a Jew hater anti-Semite?  Why
 6   would he say that out of nowhere?
 7       A       Let me know.  I'd like --
 8   why don't you ask him?  Why don't you ask
 9   him?  Ask this Mr. Yaakov Brody.
10       Q       Had you ever --
11       A       I'm making too much money in
12   his presence?  I don't know.  I'm an
13   Italian America down there.  I'm
14   surrounded by Jewish lawyers.  Most of
15   the lawyers down there are Jewish.  Most
16   of the judges are Jewish.
17              Maybe I'm making too much
18   money.  I don't know.  Maybe I saw what
19   Judge Gelbstein was doing with the ticket
20   brokers.  I don't know.  But this guy had
21   it in for me --
22       Q       Had --
23       A       -- and I took the bait.
24       Q       Had you ever discussed Jews
25   or Judaism with Mr. Brody before this?
```

Page 237

1              M.H. Capogrosso

2       A          Absolutely not.  Listen, I

3    was there 10 years, 10 years I was there.

4    Look at the complaints against me.  Not

5    one client or motorist made a statement

6    that I made an anti-Semitic or a racist

7    remark, not one.

8                   Now I have to have this

9    lawyer call me a Jew hater anti-Semite.

10   For what reason?

11      Q          So had you had conversations

12   with Jews -- about Jews or Judaism at all

13   with anyone previous to this?

14      A          No.  I don't -- no, no.  I

15   don't care who you are, what religion you

16   are.  I'm Catholic.  I don't care what

17   you want to be.  You're Jewish, fine.  Do

18   whatever you like.  God bless.  I could

19   care less.

20                  You look at the motorists

21   and the clients that I represented,

22   they're all nationalities, all races, all

23   of them.  Not one indicated I made an

24   anti-Semitic or a racist remark and I'm

25   dealing with thousands, almost 850

Page 238

```
1              M.H. Capogrosso
2    clients I had on the docket.  I'm dealing
3    with hundreds of clients on a monthly
4    basis.  Not one made a statement that I
5    made any type of statement, any type of
6    racist or anti-Semitic statement, not
7    one.
8                I took this very personally
9    and I had to go to an anger management
10   course because I did take it personally.
11      Q       So Mr. Brody writes that
12   "Mr. Capogrosso lashed out at me and said
13   he was being nice by saying excuse me and
14   next time he would simply hit me with his
15   briefcase" and you said you never said
16   that; correct?
17      A       I would never hit you with
18   my briefcase.  If I'm going to hit you,
19   I'm going to hit you.  If I'm going to --
20   if I have to -- if it comes to the point
21   where I've got to hit you, I'm going to
22   hit you.  All right.
23              If I have to defend myself
24   against a physical attack, a knife, a
25   gun, I'm going to hit you or I'm going to
```

```
 1              M.H. Capogrosso
 2   get hit, but I'm not going to hit you
 3   with my briefcase.  That's not something
 4   I would do.
 5              This guy, Yaakov Brody, I
 6   don't know what type of man he is, but
 7   I'm not going to hit you with my
 8   briefcase.  That's an absolute lie.  I am
 9   not the type of guy who's going to hit
10   you with a briefcase.
11       Q       So he writes that you
12   proceeded to tell him that the next time
13   you see him you better get out of his
14   way.
15       A       That's not true.
16       Q       Did you say that?
17       A       No, absolutely not.  Get out
18   of my way for what reason?  We are both
19   working in the same building.  How is he
20   going to get out of my way?  We are both
21   attorneys at the same location.  How is
22   he going to get out of my way?
23       Q       He writes that there were
24   three other attorneys in the room.  Do
25   you remember there being anyone else in
```

```
                                        Page 343
 1              M.H. Capogrosso
 2    recognize this document?
 3        A        It's a Work Violence Report.
 4        Q        And what is it?
 5        A        It's a Work Violence Report
 6    by one of your -- by one of your
 7    representatives at the DMV, by -- Calvo's
 8    name is on it.  That's the name I
 9    recognize.
10        Q        Do you recognize Geri
11    Piparo?
12        A        No.
13                 MR. THOMPSON:  All right.
14         Ms. MacDonald, can I ask you to mark
15         this as Exhibit 20?
16                 (The above-referred-to
17         report was marked as Exhibit 20 for
18         identification as of this date.)
19        Q        So, Mr. Capogrosso, do you
20    know who Geri Piparo is?
21        A        No.  I never heard --
22        Q        I'll represent to you --
23        A        -- of that name.
24        Q        I'll represent to you that
25    she's one of the clerks and that she
```

1          M.H. Capogrosso

2    signed the petition regarding you in

3    2011.

4         A          All right.  Fine.

5         Q          On page 2 she writes "Mario

6    Capogrosso accused David Smart of looking

7    at him and there were heated words

8    exchanged.  PO Nielsen intervened."

9               Can you tell me what

10   happened?

11        A          Well, there was a hell of a

12   lot more than looking at me.  When I came

13   back from the -- my anger management

14   course, which I came back in June, I had

15   to leave in December of 2011, I was told

16   by one of the clerks, Cindy, the lady I

17   was talking to who liked me I guess a

18   little bit, that a motorist came down

19   looking for me, came down looking for me

20   to give me a fee because he owed me money

21   on a case and that she was told by the

22   motorist that David took the fee.  It was

23   $80 and a $150 fee, right.  So I report

24   that to Judge Gelbstein because he stole

25   it.  You steal money, you should get

Page 345

1              M.H. Capogrosso

2     reported.

3                   After that there was a

4     series of harassments by David Smart

5     against my person.  I've gone into them

6     with you.  I've gone into them.  He's

7     pushed me from behind.  He gave me the

8     sign of the cross and the spear hand one

9     day.  He would get in my face, a couple

10    of inches, but the same David Smart that

11    approached me on May 11 after he stole

12    the money and I reported him.  Get in my

13    face.  What's the problem?  Fuck you,

14    you're the problem.  Again, fuck you,

15    you're the problem, two, three, four

16    times.

17                   So I tell -- I must have

18    told this woman, you know, this guy

19    doesn't want to leave me alone.  Doesn't

20    want to leave me alone.  Why do I have

21    to --

22         Q          And is this --

23         A          -- be harassed because I

24    report a theft which should have been

25    reported, which is the right thing to do,

Page 346

1          M.H. Capogrosso

2    so that's what was going on.

3          Q          Is this incident, May 5th of

4    2014, is this the first incident or

5    confrontation you had with Mr. Smart?

6          A          No, no.  Like I said, I

7    walked away a million times.  I have no

8    reason to have a beef with a security

9    guard.  I'm a lawyer.  I got two licenses

10   I have to protect.  I spent a lot of

11   money, a lot of time getting this

12   license.  I don't need a beef with a

13   security guard.  I don't need it.  I

14   walked away.

15         Q          What was --

16         A          Let me finish.  It's not the

17   first time, no, not the first time.

18         Q          When was the first time?

19         A          June of 2012.  As soon as I

20   got back in, he comes up from behind me

21   and pushes me from behind.  He's like --

22   pushes me.

23                I tell Gelbstein about it.

24   He looks at the security tape I think and

25   he says you don't need this down here.  I

```
                                            Page 347
 1                 M.H. Capogrosso
 2      said the man just assaulted me from
 3      behind.  Are you going to do anything
 4      about it?  And that was the end of it.
 5      He pushes me from behind, June of 2012
 6      when I -- first week I was back in there.
 7                 I reported it to Gelbstein.
 8      He looked at the videotape.  He did
 9      nothing about it.  Did I go to the cops,
10      no, I don't go to the cops.  I'm not
11      going to complain about a cop and get a
12      guy arrested.  I'm not doing it.  That's
13      not who I am.
14                 But should he have been
15      removed from the DMV at that point in
16      time, absolutely and he wasn't.
17         Q      Mr. Capogrosso, I'm bringing
18      up another document.
19                 And can you see the
20      document?  Can you see it okay,
21      Mr. Capogrosso?
22         A      Yeah.  I can't see the whole
23      thing.  You have to go down.
24         Q      Yeah, sure.  Actually, let
25      me zoom out a little bit.  Is that
```

```
                                          Page 351

 1              M.H. Capogrosso
 2    a -- excuse my language.  That's a
 3    ridiculous accusation against me,
 4    ridiculous, but these are the type of
 5    clerks I have to deal with.
 6        Q        So the question was do you
 7    believe that she's lying here?
 8        A        I did not tell a motorist to
 9    give a clerk an attitude.  I did not.
10    Now --
11        Q        I understand that, but yes
12    or no?
13        A        Maybe she -- I don't know
14    what she's thinking, but I did not tell a
15    clerk -- a motorist to give a clerk an
16    attitude.  First of all, I don't even
17    know how to do that or how a motorist
18    would know how to do that.  How would a
19    motorist know how to give a clerk an
20    attitude?
21        Q        So why would she write this?
22        A        I don't know.  I don't know.
23    They didn't want me there.  I don't know.
24    Maybe you got a bunch of crazy clerks
25    down there.
```

```
                                            Page 352
 1                M.H. Capogrosso
 2       Q        Did Ms. Alford not want you
 3    there?
 4       A        Who's Ms. Alford?  Wanda?
 5       Q        Wanda Alford who --
 6       A        I don't know.
 7       Q        -- wrote the letter.
 8       A        I don't know.  This is the
 9    first -- the first time I saw this
10    complaint that I have an opportunity to
11    respond to is when you sent it to me and
12    I don't even know how to respond to it.
13    I wouldn't know how to deal with this.
14    I'm accused of telling a motorist to give
15    a clerk an attitude.
16                MR. THOMPSON:  And,
17       Ms. MacDonald, if we didn't do that
18       already, let's mark that as Exhibit
19       21.
20       A        Is that threatening conduct
21    or verbal abuse?
22       Q        Mr. Capogrosso, can you see
23    the document that I just put up?
24       A        Yeah.  This is something
25    David Smart wrote.
```

```
                                        Page 353

 1                 M.H. Capogrosso
 2        Q         Do you recognize this?
 3        A         Yeah.  I saw it when you
 4    gave it to me, yes.  He signed something.
 5    It's an unsigned note of David Smart.
 6        Q         And this is -- this document
 7    is marked Gelb-0000059; correct?
 8        A         Yeah.
 9        Q         What is this document?
10        A         Some type of complaint by --
11    on February 3, I don't know what year,
12    9:15 a.m.  Smarts telling me that I
13    deliberately walked into him.  I am --
14    there's a board --
15        Q         Mr. Capogrosso, I'm sorry,
16    we lost your audio for a second there.
17    Can you restate that?
18        A         Yeah.  This is -- I'm being
19    accused -- I'm being accused of walking
20    into a security guard.  Now, at the DMV
21    there's a board that was hanging up when
22    I was there and every day there was a
23    calendar on the board as in most
24    courthouses that tell you where each case
25    is going to be heard.
```

Page 354

1                 M.H. Capogrosso

2                 I go in the morning, right.

3      David would put up or somebody would put

4      up the calendar.  Most times it was David

5      Smart and in the afternoon he would take

6      it down.  So I have to go to the calendar

7      to look at the calendar because in the

8      morning there's a lot of people and

9      everybody's rushing around here and

10     there.  You have to know what courtroom

11     to go in.

12                So I'm walking to the

13     calendar and he tells -- and I'm trying

14     to go to the calendar and he tells me I

15     deliberately walked into him.  I mean

16     that's just stupid.  We are both working

17     in the same location.  We both have to go

18     to the calendar.  He has to hang it up

19     and I have to look at it.

20                I'm deliberately walking

21     into a security?  I have to work in this

22     courthouse.  I'm sorry.  As a lawyer I

23     have to go to the board and look at the

24     docket to see where my case is being

25     held.  This is what I'm being accused of,

Page 355

1              M.H. Capogrosso

2     deliberately walking into a guard.

3                   We work in the same

4     building.  We both have to go to the --

5     to the board in the morning, to the

6     docket.  He has to hang it up.  I got to

7     look at it to see where my case is.

8     That's all I have to say about this.

9          Q       So is Mr. Smart lying?

10         A       That I deliberately walked

11    into him, yes, absolutely.  I don't

12    need --

13         Q       Why is he --

14         A       -- this beef with a security

15    guard.  I don't need a beef with a

16    security guard at a courthouse that I'm

17    trying to make a living at.

18         Q       And why do you think he's

19    lying?

20         A       I don't know.  Why would I

21    deliberately walk into a security -- I'm

22    going to the board to check the calendar.

23         Q       Did he have any animis

24    towards you?

25         A       I told you, I reported to

```
                                        Page 356
  1              M.H. Capogrosso
  2    Gelbstein that he stole $80 and a $150
  3    fee and I found that out when I got back
  4    after taking my anger management course.
  5    I told you that.  Cindy told --
  6         Q       And --
  7         A         And then I wrote to the
  8    motorist.  The motorist confirmed it.  I
  9    didn't go to the police because that's
 10    not what I do.  I'm not going to get the
 11    guy arrested.  Like maybe I should have
 12    looking back on this thing now.
 13         Q       And would you have --
 14         A         Gelbstein investigated it.
 15    Gelbstein admits to me that Smart said he
 16    took the money and he gave it to me,
 17    which is an absolute lie.  First of all,
 18    I authorized nobody to take money on my
 19    behalf, collect money on my behalf.  He
 20    had no authority to collect a fee on my
 21    behalf, this security guard, Smart and
 22    Gelbstein believes it, that he gave me
 23    the money.  Gelbstein believes this.
 24                   I told him the security
 25    guard had no authority to take the money,
```

Page 427

1              M.H. Capogrosso

2    correct?

3         A       That was my assumption, yes.

4         Q       You say it was your

5    assumption.   What do you mean by that?

6         A       I'm a lawyer.  I'm licensed

7    in the State of New York.  I should be

8    treated like every other lawyer.  I see

9    no reason why I shouldn't be.  I should

10   be held to the same standard as every

11   other lawyer practicing, no different.  I

12   took my course that I needed to take.  I

13   should be held on the same standard as

14   every other lawyer.

15        Q       But, in fact, you weren't

16   quite on the same standing because you

17   had been warned that any further incident

18   would lead to your expulsion; isn't that

19   true?

20        A       Well, that was an improper

21   warning in my opinion.  I should be

22   treated like any other lawyer, any other

23   lawyer.

24        Q       So why was it improper for

25   DMV to warn you that further incidents

Page 428

```
 1                  M.H. Capogrosso
 2    would lead to an expulsion?
 3         A        Well, I don't know why they
 4    threw that letter to me.  Like I said,
 5    they threw it at me two days before I was
 6    to go back to the DMV.  I agreed to
 7    nothing but to take an anger management
 8    course, that's it.
 9         Q        Well, once again --
10         A        I took the course.  I should
11    be treated like every other lawyer, not
12    on a special, you know, special -- I
13    should be treated like every other
14    lawyer.  That's all I agreed to was take
15    a course.
16                  I wouldn't have agreed to
17    anything else if I knew this letter was
18    going to be thrown at me.
19         Q        Mr. Capogrosso, you write
20    that "On numerous occasions your security
21    guard Dave Sparks told me to go F
22    myself."
23         A        I didn't know his name at
24    that point.  It's Smart, not Sparks.  I
25    didn't know his last name.
```

```
                                              Page 429
 1                 M.H. Capogrosso
 2        Q          How did you not know his
 3    last name at this point?
 4        A          I didn't know it.
 5        Q          You had been interacting
 6    with him for years you said.
 7        A          We all knew him by David.  I
 8    never talked to him about his last name.
 9    I know people said S Smart something or
10    Smarks or something.  I thought it was
11    Sparks.
12                   I knew him -- I knew him as
13    the security guard, that's it.  I know
14    his first name was David.
15        Q          When you --
16        A          That's what I knew.
17        Q          When you write,
18    Mr. Capogrosso, when you write "Will
19    provide proof upon request," what proof
20    would you have provided?
21        A          I sent you all my letters,
22    all my -- all the complaints I filed with
23    Gelbstein.
24        Q          So the proof would have been
25    your own letters to Judge Gelbstein?
```

Page 430

1              M.H. Capogrosso

2        A        Yes and my testimony.  The

3    fact that there was a video --

4        Q        Okay.

5        A        That I stated to Gelbstein

6    the man pushed me from behind in June of

7    2012.  They stole money from me.

8        Q        And the same question for

9    item number 2 when you talk about

10   instances where Sparks redirected other

11   clients who had come looking for you to

12   other attorneys or interfered with his

13   conversations, the proof there would have

14   been your statements as well?

15       A        Yeah.  I had an affidavit I

16   filed with -- I think I sent it to you

17   also, yes and I saw him doing it.

18       Q        So here on page 2 you see

19   and I'm going to highlight your

20   statement.

21       A        Yeah.  Go ahead.

22       Q        "I've made numerous

23   complaints to Judge Gelbstein.  His

24   response has been a spade is a spade.

25   His words not mine.  He laughs and

Page 431

```
 1              M.H. Capogrosso
 2   giggles."
 3       A       That's true.  That's
 4   absolutely a true statement, absolutely
 5   true.
 6       Q       Well, he denied it
 7   yesterday; didn't he?
 8       A       It's an absolutely true
 9   statement.  He took no action in response
10   to these.  He knew what I had to go
11   through back in 2011 with Yaakov Brody
12   and that incident.
13       Q       Mr. Capogrosso, that's not
14   the question.
15       A       He took no action --
16       Q       The question --
17       A       -- to respond to this.
18       Q       Sir, the question is he
19   denies it; correct?
20       A       I don't know if he denied
21   it.  That an absolutely true statement.
22   That's what he said to me.
23       Q       Were you not at the
24   deposition yesterday when he denied it?
25       A       I'm sure he denied it at the
```