Exhibit 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------X
MARIO H. CAPOGROSSO,

                                  PLAINTIFF,

   -against-        Case No.:
                     18 CV 2710 (EK) (LB)

ALAN GELBSTEIN, in his individual capacity,
IDA TRASCHEN, in her individual capacity,
DANIELLE CALVO, in her capacity, SADIQ
TAHIR, in his individual capacity, PEC
GROUP OF NY, INC., DAVID SMART, and DMV
COMMISSIONER MARK SCHROEDER, in his
official capacity,

                                DEFENDANTS.
---------------------------------------------X
                   DATE:  December 17, 2020
                   TIME:  1:24 P.M.

      DEPOSITION of the Defendant,
DANIELLE CALVO, taken by the Plaintiff,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held VIA ZOOM
VIDEOCONFERENCE, before Jamie Newman, a
Notary Public of the State of New York.

```
 1
 2    A P P E A R A N C E S:
 3
 4    THE LAW FIRM OF MARIO H. CAPOGROSSO
         PLAINTIFF PRO SE
 5       21 Sheldrake Place
         New Rochelle, New York 10804
 6       Capogrossom@aol.com
 7
 8    OFFICE OF THE NEW YORK STATE ATTORNEY
      GENERAL
 9       Attorneys for the Defendants
         ALAN GELBSTEIN, in his individual
10       capacity, IDA TRASCHEN, in her individual
         capacity, DANIELLE CALVO, in her
11       capacity, SADIQ TAHIR, in his individual
         capacity, PEC GROUP OF NY, INC., DAVID
12       SMART, and DMV COMMISSIONER MARK
         SCHROEDER, in his official capacity
13       28 Liberty Street, 17th Floor
         New York, New York 10005
14       BY:   JAMES THOMPSON, ESQ.
         james.thompson@ag.ny.gov
15
16
      DMV LEGAL BUREAU
17       Attorneys for the Defendant
         DMV COMMISSIONER MARK SCHROEDER, in his
18       official capacity
         6 Empire State Plaza, Room 522A
19       Albany, New York 11228
         BY:   BARBARA MONTENA, ESQ.
20       File #:  18CV2710
         barbara.montena@dmv.nyc.gov
21
22                  *     *     *     *
23
24
25
```

```
 1
 2              (Whereupon, all 86 exhibits
 3         were previously marked by Counsel,
 4         Mark Capogrosso.
 5  D A N I E L L E    C A L V O, called as a
 6  witness, having been first duly sworn by a
 7  Notary Public of the State of New York, was
 8  examined and testified as follows:
 9  EXAMINATION BY
10  MR. CAPOGROSSO:
11       Q.     Please state your name for the
12  record.
13       A.     Danielle Calvo.
14       Q.     What is your address?
15       A.     9952 Fort Hamilton Parkway,
16  Brooklyn, New York 11209.
17       Q.     All right.
18              Mario Capogrosso, I'm just
19  going to ask you a couple of questions.  I
20  just want the truth, I want to get to the
21  truth.
22              Now, you had me removed, you
23  came to me on the morning of May 11, 2015
24  at the Brooklyn TVB and you asked me to
25  leave in the presence of police officers.
```

```
 1                  Danielle Calvo
 2             Am I right in saying that?
 3       A.    That's correct.
 4       Q.    Who told you to do that?
 5       A.    I was told by my supervisors.
 6       Q.    Which supervisor?
 7       A.    I was told by Ida Traschen.
 8       Q.    On the morning of May 11, 2015?
 9       A.    What is --
10             MR. THOMPSON:  Is that a
11       question?
12       Q.    On the morning of May 11, 2015
13   you had a telephone conversation with Ida
14   Traschen?
15       A.    If that is the day you were
16   asked to leave?  Yes.
17       Q.    Now, for what reason did you
18   have me removed?
19       A.    It wasn't my decision, it was
20   my supervisor's decision.
21       Q.    It was Ida Traschen's decision?
22       A.    Yes.
23       Q.    Now, what made you have -- who
24   called whom, did Ida Traschen call you or
25   you called Ida Traschen?
```

```
 1                Danielle Calvo
 2      A.    I was directed to call her.
 3      Q.    By whom?
 4      A.    Judge Gelbstein.
 5      Q.    Was Judge Gelbstein in the
 6 building that morning?
 7      A.    No, he was not.
 8      Q.    Did you view any of the
 9 videotape of the alleged incident between
10 myself and Defendant Smart?
11            MR. THOMPSON:  Objection to the
12        form of the question.  You can
13        answer.
14      A.    Not that I recall, no.
15      Q.    How did you get notice of the
16 fact that there was an incident between
17 myself and Defendant Smart?
18      A.    Someone came into the office
19 and told me.
20      Q.    Who?
21      A.    I don't recall who.
22      Q.    Was it Defendant Smart?
23      A.    I don't recall.
24      Q.    And based on their testimony to
25 you, you decided that there was an incident
```

1              Danielle Calvo

2    Q.    Were you knowledgeable of any

3 of the complaints I had against Defendant

4 Smart at the Brooklyn TVB that I followed

5 with Defendant Gelbstein, were you

6 knowledgeable of any of those complaints?

7    A.    I know you made a lot of

8 complaints about a lot of different people,

9 particularly and specifically, no.

10    Q.    I only make complaints about

11 Defendant Smart.

12         The only thing that was in

13 writing was to Defendant Smart and I'm

14 asking very specifically, did you have any

15 knowledge of any of those complaints?

16        MR. THOMPSON:  Objection, asked

17    and answered.  You can answer.

18    A.    I don't recall specifically,

19 but I may have known at the time.

20    Q.    Did you have supervisory

21 authority over the actions of Defendant

22 Smart at the Brooklyn TVB?

23        MR. THOMPSON:  Objection to the

24    form.  You can answer.

25    A.    To some extent we could ask him

```
 1                Danielle Calvo
 2   to do certain things, but he worked for an
 3   outside company.
 4        Q.   So, who did he report to on a
 5   daily basis?
 6        A.   He had to call into his office
 7   every morning and he submitted his time
 8   cards to them, but we had to know he was
 9   there.
10        Q.   Who governed his day-to-day
11   activities at the Brooklyn TVB?
12             MR. THOMPSON:  Objection to the
13        form.  You can answer.
14        A.   We would tell him what we
15   wanted done as far as opening, closing.
16   Things like that.
17        Q.   You governed his day-to-day
18   activities?
19             MR. THOMPSON:  Same objection.
20        Q.   Clerical staff, the clerical
21   supervisors governed his day-to-day
22   activities; is that correct?
23             MR. THOMPSON:  Same objection.
24        A.   To some extent, yes.
25        Q.   And did you receive complaints
```

```
 1              Danielle Calvo
 2     Q.    Did you observe Defendant
 3  Gelbstein viewing that videotape in your
 4  presence?
 5           MR. THOMPSON:  Objection to the
 6       form.  You can answer.
 7     A.    Not that I recall.
 8     Q.    Did you ever observe Ida
 9  Traschen observe that videotape in your
10  presence?
11     A.    No.
12     Q.    Now, there were many complaints
13  written against me and my office while I
14  was there at Brooklyn TVB by the clerical
15  staff at the Brooklyn TVB.
16           Is that fair to say -- is that
17  a fair statement?
18     A.    Yes.
19     Q.    Is that a fair statement, they
20  didn't like me?
21     A.    I can't say what they felt
22  about it, I can only speak for myself.
23     Q.    Well, they made many complaints
24  about me, that's fair, I mean, I have them.
25  They were all kept by Defendant Gelbstein,
```

```
1              Danielle Calvo
2      sure I got everything.  Give me a few
3       more minutes.
4      Q.    Did you tell Defendant Smart to
5  approach me on the morning of May 11, 2015?
6      A.    I never told him to approach
7  you for anything.
8      Q.    Did you attempt to curtail my
9  exercise of freedom of speech by having me
10 removed from the Brooklyn TVB?
11           MR. THOMPSON:  Objection to the
12      form of the question.  You can
13      answer.
14     A.    No.
15     Q.    Did you ever observe ticket
16 brokers going to Defendant Gelbstein's
17 office, ticket brokers, you know what a
18 ticket broker is, right?
19           Did you ever observe ticket
20 brokers in Defendant Gelbstein's office?
21           MR. THOMPSON:  Objection to the
22      form, you can answer.
23     A.    Rumor to be, yes.  Do I have
24 proof what they were?  No.
25     Q.    But, you saw them in his
```