UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MARIO H. CAPOGROSSO,

                Plaintiff,

       -against-                             Case No. 18 Civ. 2710 (EK)(LB)

ALAN GELBSTEIN, *in his individual capacity*, IDA
TRASCHEN, *in her individual capacity*, DANIELLE
CALVO, *in her individual capacity*, MARK J.F.
SCHROEDER, *in his official capacity as Commissioner
of the New York State Department of Motor Vehicles*,
SADIQ TAHIR, *in his individual capacity*, PEC GROUP
OF NY, INC., and DAVID SMART,

                Defendants.
------------------------------------------------------------------X

## STATE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General of the State of New York
Attorney for the State Defendants
28 Liberty Street
New York, New York 10005
(212) 416-6556

James M. Thompson
Assistant Attorney General
Of Counsel

Date of Service: May 17, 2021

1

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 2

    The Brooklyn South TVB, And Its Place In DMV's System Of Administrative Courts .......... 2

    Capogrosso's History Of Abusive Behavior And His First Suspension From Practice ............ 3

    Capogrosso Is Reinstated After His Lawsuit Is Settled, After Anger Management Classes
    And A Warning About Future Aggressive Behavior ............................................................ 6

    Capogrosso Relapses Into Abusive And Threatening Behavior ............................................ 8

    Capogrosso Writes a Letter to the Attorney General's Office .............................................. 9

    The May 5, 2015 Incident ................................................................................................... 11

    Capogrosso Fights Officer Smart And Is Again Barred From Practice Before the TVB ......... 12

    Capogrosso Sues, but Judges Brodie and Bloom Dismiss Most Claims and Defendants ........ 13

    Capogrosso's Obstreperous and Abusive Litigation Conduct ............................................ 15

STANDARD OF REVIEW .................................................................................................... 16

ARGUMENT ......................................................................................................................... 16

    I.    THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE BARRED BY
        ABSOLUTE JUDICIAL AND QUASI-JUDICIAL IMMUNITY .......................................... 17

        A.  The Law of Judicial and Quasi-Judicial Immunity ......................................... 17

        B.  Each of the Individual Defendants Was A Judicial Officer ............................. 19

        C.  Attorney Discipline Is A Core Judicial Function ........................................... 20

    II.   THE RETALIATION CLAIM FAILS ON THE LAW AND THE FACTS ..................... 21

        A.  Capogrosso's Letter to AAG Morgan Is Not Protected Speech That Could Support A
        First Amendment Retaliation Claim ............................................................ 21

        B.  No Rational Jury Could Find The AG Letter To Be A But-For Cause Of Capogrosso's
        Expulsion From the TVB .......................................................................... 24

            1.  Capogrosso Has Not Adduced Evidence That Could Support a Jury Finding of But-
            For Causation ....................................................................................... 24

i

2. Capogrosso Would Have Been Barred From the TVB Even If He Had Never Sent the AG Letter.................................................................................................29

III.   INJUNCTIVE RELIEF IS BARRED BY § 1983 BECAUSE CAPOGROSSO COULD HAVE SOUGHT DECLARATORY RELIEF ........................................................................ 31

IV.   THE STATE DEFENDANTS ARE PROTECTED BY QUALIFIED IMMUNITY.... 33

CONCLUSION................................................................................................................. 35

## **TABLE OF AUTHORITIES**

**Cases**

Agosto v. N.Y. City Dep't of Educ., 982 F.3d 86 (2d Cir. 2020)..................................... 23

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)................................................ 16

Anghel v. N.Y. State Dep't of Health, 947 F. Supp. 2d 284 (E.D.N.Y. 2013)........................... 18

Ashmore v. New York, No. 12 Civ. 3032, 2012 WL 2377403 (E.D.N.Y. June 25, 2012) ......... 32

Bacon v. Phelps, 961 F.3d 533 (2d Cir. 2020)................................................................ 34

Berlyavsky v. N.Y.C. Dep't of Env'tl Protection, No. 14 Civ. 3217, 2015 WL 5772266
    (E.D.N.Y. Aug. 28, 2015)....................................................................................... 32

Bloom v. N.Y. State Com'r of Health, 573 F. Supp. 2d 732 (E.D.N.Y. 2004) ........................... 19

Bobrowsky v. Yonkers Courthouse, 777 F. Supp. 2d 692 (S.D.N.Y. 2011) ............................... 21

Butz v. Economeu, 438 U.S. 478 (1978) ........................................................................ 19

Capogrosso v. Gelbstein, No. 18 Civ. 2710, 2019 WL 4686448 (E.D.N.Y. Sept. 25, 2019)
    ("Capogrosso II")................................................................................................ 14

Capogrosso v. Gelbstein, No. 18 Civ. 2710, 2019 WL 6406444 (E.D.N.Y. Jan. 30, 2019)
    ("Capogrosso I") ............................................................................................ passim

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................................. 16

Champion v. Artuz, 76 F.3d 483 (2d Cir. 1996)............................................................. 27

Chris H. v. New York, 764 F. App'x 53 (2d Cir. 2019) ...................................................... 17, 18

Coleman v. Tucker, No. 19 Civ. 4857, 2019 WL 2918130 (S.D.N.Y. July 8, 2019)................... 32

Connick v. Myers, 461 U.S. 138 (1983) ........................................................................ 22

District of Columbia v. Wesby, 138 S.Ct. 577 (2018).................................................... 34

Finn v. Anderson, 592 F. App'x 16 (2d Cir. 2014) ......................................................... 18, 21

Fishman v. Office of Ct. Administration, No. 18 Civ. 282, 2020 WL 1082560
    (S.D.N.Y. Mar. 5, 2020) ....................................................................................... 20

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219 (2d Cir. 1994) ....................... 16

Gentile v. State Bar of Nev., 501 U.S. 1030 (1991) ....................................................... 22, 23, 34

Gollomp v. Spitzer, 568 F.3d 355 (2d Cir. 2009) ........................................................... 20

Gonzalez v. City of Schenectady, 728 F.3d 149 (2d Cir. 2013) ............................................. 33, 35

Gross v. Rell, 585 F.3d 72 (2d Cir. 2009) ................................................................ 18

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ................................................................ 33

Hartman v. Moore, 547 U.S. 250 (2006) ........................................................ 24, 27, 31

Higazy v. Templeton, 505 F.3d 161 (2d Cir. 2007) ............................................................ 34

Higginbotham v. Sylvester, 741 F. App'x 28 (2d Cir. 2018) ................................................... 24

Howard v. N.Y. State Div. of Parole, No. 15 Civ 5317, 2018 WL 4636951
   (E.D.N.Y. Sept. 26, 2018) ................................................................ 32

Jackson v. Pfau, 523 F. App'x 736 (2d Cir. 2013) ................................................................ 19, 20

Jackson v. Ramirez, 691 F. App'x 45 (2d Cir. 2017) ................................................................ 18

Jeffreys v. City of N.Y., 426 F.3d 549 (2d Cir. 2005) ................................................................ 28

Jewish Press, Inc. v. NYPD, 190 A.D.3d 490 (1st Dep't 2021) ................................................................ 18

Johnson-El v. DeProspo, No. 20 Civ. 2878, 2020 WL 5350487 (S.D.N.Y. Sept. 3, 2020) ......... 32

Laurent v. Edwin, No. 17 Civ. 3300, 2021 WL 1152962 (E.D.N.Y. Mar. 25, 2021) ................. 34

Libertarian Party of Erie Cty. v. Cuomo, 970 F.3d 106 (2d Cir. 2020) ..................... 18, 19, 21, 32

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ................................. 16

Matusick v. Erie Cty. Water Auth., 757 F.3d 31 (2d Cir. 2014) ................................................. 29

McHerron v. Burnt Hills – Ballston Lake Cent. Sch. Dist., 778 F. App'x 54 (2d Cir. 2019) ...... 22

McKeown v. N.Y. State Comm'n on Judicial Conduct, 377 F. App'x 121 (2d Cir. 2010) ... 20, 21

McNamara v. Kaye, No. 06 Civ. 5169, 2008 WL 3836024 (E.D.N.Y. Aug. 13, 2008) ......... 21, 32

Mellenix v. Luna, 577 U.S. 7 (2015) ................................................................ 35

Michaelidis v. Barry, 502 F. App'x 94 (2d Cir. 2012) ................................................................ 27

Montero v. City of Yonkers, 890 F.3d 386 (2d Cir. 2018) ................................................................ 23

Montero v. Travis, 171 F.3d 757 (2d Cir. 1999) ................................................................ 17

Nieves v. Bartlett, 139 S.Ct. 1715 (2019) ........................................................ 24, 31

iv

Ojeda v. Mendez, No. 20 Civ. 3910, 2021 WL 66265 (E.D.N.Y. Jan. 7, 2021) .......................... 17

Pearl v. City of Long Beach, 296 F.3d 76 (2d Cir. 2002)............................................................ 14

Raymond v. City of New York, 317 F. Supp. 3d 746 (S.D.N.Y. 2018) ....................................... 17

Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98 (2d Cir. 2011) ............................. 28

Rosenthal v. Hartnett, 36 N.Y.2d 269 (1975) ............................................................................... 2

Rossbach v. Montefiore Med. Ctr., No. 19 Civ. 5758, 2021 WL 930710
   (S.D.N.Y. Mar. 11, 2021) .............................................................................. 17, 27, 29

Savino v. City of New York, 331 F.3d 63 (2d Cir. 2003) ............................................................. 16

Skates v. Inc. Vill. of Freeport, 265 F. Supp. 3d 222 (E.D.N.Y. 2017)....................................... 26

Smith v. County of Suffolk, 776 F.3d 114 (2d Cir. 2015) ............................................................ 24

Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020)................................................................... 26

Taravella v. Town of Wolcott, 599 F.3d 129 (2d Cir. 2010) ....................................................... 33

Van Oss v. New York, 783 F. Supp. 2d 681 (S.D.N.Y. 2011) ..................................................... 32

## **Statutes**

42 U.S.C. § 1983 .................................................................................................................... 31, 32

N.Y. Vehicle & Traffic Law § 225 ............................................................................................... 2

N.Y. Vehicle & Traffic Law § 227 ............................................................................................... 2

## **Rules**

Fed. R. Civ. P. 25 ........................................................................................................................ 32

Fed. R. Civ. P. 56 ........................................................................................................................ 16

## **Regulations**

15 N.Y.C.R.R. § 121.3 ........................................................................................................... 2, 20

15 N.Y.C.R.R. § 124.2 ........................................................................................................ 1, 2, 21

Defendants Danielle Calvo, Alan Gelbstein, and Ida Traschen, in their individual capacities (the "Individual Defendants"), and New York State Department of Motor Vehicles ("DMV") Commissioner Mark J.F. Schroeder, in his official capacity (collectively, the "State Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment against the remaining claims brought by Plaintiff Mario Capogrosso ("Capogrosso" or the "Plaintiff").

## PRELIMINARY STATEMENT

Capogrosso's last remaining claim against the State Defendants, for First Amendment retaliation, fails as a matter of both law and fact.  There is no evidence for the Plaintiff's contention that his expulsion from practice before DMV's administrative traffic court was caused by a letter he wrote to the Attorney General months beforehand; instead, his ouster was the final event in a years-long saga of aggressive and inappropriate behavior, characterized by repeated verbal outbursts, incidents of ethnic harassment, physical threats, and occasional bouts of violence, all unbecoming of an attorney practicing before a tribunal where lawyers "must conform to the standards of conduct required of attorneys appearing before State courts." 15 N.Y.C.R.R. § 124.2(a).  Capogrosso had been suspended for such behavior once before, and was warned when returning to practice that "in the event that [he] commits an act of physical violence, he shall be immediately and permanently barred from appearing on behalf of DMV licensees at TVB offices."  When DMV was informed that Capogrosso had gotten in a fight with a security guard, it barred him from practice, as promised.

As a threshold matter, Capogrosso's claim must fail as a matter of law because the decision to bar him from practice was attorney discipline, a judicial act under the settled law of the Second Circuit, and the State Defendants are accordingly protected by judicial and quasi-

1

judicial immunity.  Moreover, the Plaintiff cannot make out the required elements of a First

Amendment retaliation claim: the letter at issue was not protected speech, and he cannot adduce

evidence sufficient for a jury to find that his speech was a but-for cause of his expulsion,

particularly given his threatening and violent behavior well after it was sent.  And even if the

Plaintiff could make a case for relief, it would be unavailable to him: any injunctive relief would

be barred by the text of § 1983 itself, since he could have sought declaratory relief but chose not

to, and money damages against the Individual Defendants are barred by qualified immunity.

## STATEMENT OF FACTS

### The Brooklyn South TVB, And Its Place In DMV's System Of Administrative Courts

In the five counties that comprise New York City, noncriminal traffic violations are

adjudicated in the "Traffic Violations Bureau," commonly known as the "TVB," a system of

administrative courts established by State law and overseen by DMV.  See N.Y. Vehicle &

Traffic Law §§ 225 et seq.  Although the TVB exclusively adjudicates traffic violations, the

adjudicative process parallels what would take place in a criminal court: cases are heard by an

impartial Administrative Law Judge ("ALJ"), the People bear the burden of proof, and motorists

appearing before the TVB have the right to be represented by an attorney.  See N.Y. Vehicle &

Traffic Law § 227; 15 N.Y.C.R.R. § 124.2(a).  Moreover, the controlling regulations expressly

require that "any person representing the motorist must conform to the standards of conduct

required of attorneys appearing before State courts," and that an attorney's "failure to conform to

these standards will be grounds for declining to permit his or her continued appearance in the

proceeding." 15 N.Y.C.R.R. § 124.2(a); see also Rosenthal v. Hartnett, 36 N.Y.2d 269, 272-74

(1975) (discussing the enactment of the TVB and holding its procedures satisfy due process).

The TVB is "made up of those administrative law judges, supervisors and clerical

personnel assigned by the commissioner."  15 N.Y.C.R.R. § 121.3.  The three Individual

Defendants each represented one of those categories during the relevant time period.  Defendant

Alan Gelbstein, now retired, was the Senior Administrative Law Judge of the Brooklyn South

TVB, hearing cases and helping to oversee the Bureau's legal work, including the other ALJs, in

a matter analogous to the Chief Judge of a federal court.  Declaration of Alan Gelbstein (the

"Gelbstein Dec.") ¶¶ 1, 4.  Defendant Ida Traschen, also retired, was DMV's First Assistant

Counsel, responsible for overseeing the entire TVB system.[1]  Declaration of Ida Traschen (the

"Traschen Dec.") ¶¶ 5-6.  Defendant Danielle Calvo, meanwhile, was a supervising clerk at the

Brooklyn South TVB, carrying out the day-to-day functions of the Bureau with the help of a

small staff.  Declaration of Danielle Calvo (the "Calvo Dec.") ¶ 3.

**Capogrosso's History Of Abusive Behavior And His First Suspension From Practice**

Capogrosso began practicing at the Brooklyn South TVB in 2005 – first as an assistant to

another attorney, and then, after a falling-out with his employer, on his own.  See Capogrosso

Deposition Transcript, Thompson Dec. Exs. 1&2 (The "Capogrosso Tr."),[2] 16:25-18:18.  As far

back as 2009, DMV began receiving an escalating series of complaints about Capogrosso's

threatening behavior, particularly (but not exclusively) towards women.  Examples include:

- On April 21, 2009, the TVB received written complaints from two different third-party witnesses stating that Capogrosso had an altercation with a lawyer's assistant named Tanya Rabinovich, in which he was "screaming and yelling profanities and obscenities, after which he approached her and "he bumped real hard into her . . . which was very unnecessary given he had plenty of room to walk around her."  Gelbstein Dec. Exs. 1 & 2.  Capogrosso does not deny that this confrontation occurred, and admits that "I was loud," and that "I did get up" to shout at her, but claims that he did not use obscenity.  Capogrosso Tr. 148:15-150:6.  As to whether Capogrosso made physical contact with Ms. Rabinovich, he first testified "not that I recall, no. . . I do not recall hitting her," but later claiming "She bumped into me" after being confronted with corroboration.  Id.

---

[1] ALJ Gelbstein reported to Supervising ALJ Bushra Vahdatlamas (who oversaw all Downstate TVBs), who in turn reported to Ms. Traschen.  Gelbstein Dec. ¶ 5; Traschen Dec. ¶ 6.

[2] The Plaintiff's deposition is memorialized in two separate, consecutively-paginated volumes, as the court reporter changed during a late-morning break.  See Capogrosso Tr. at 123, 125.  For ease of reading, this memorandum of law refers to the two transcripts interchangeably as the "Capogrosso Tr.".

3

- On June 9, 2009, TVB clerk Marisol Cervoni filed a complaint stating that Capogrosso had approached her counter as she handled a motorist's ticket and then began "yelling, cursing and insulting me."  Gelbstein Dec. Ex. 3.  The clerk wrote that she "can no longer interact with Mr. Capogrosso . . . because I fear for my safety.  On many occasions I have observed him display aggressive behavior towards my co-workers, his clients, the other attorneys and their assistants."  Id.  Capogrosso did not deny that this interaction occurred, admitting that he "might have been loud" and that he refused to leave her station, suggesting only that Ms. Cervoni was "oversensitive."  Capogrosso Tr. 168:22-24, 175:11-176:8.

- On August 5, 2009, paralegal Agnes Paez – who was six months pregnant at the time – submitted a written complaint to ALJ Gelbstein stating that Capogrosso "called me a variety of vulgar and profane names and threatened me with violence to stay away from the Dept. of Motor Vehicles," ultimately requiring the intervention of court staff.  Gelbstein Dec. Ex. 4.  Capogrosso admitted that he disapproved of the fact that Ms. Paez was, according to him, "soliciting motorists on the DMV floor," but claimed that he "d[id]n't recall having any altercation with [her]." Capogrosso Tr. 206:16-23.

The incidents only continued from there.  Finally, on January 6, 2011, *eighteen* different Brooklyn South TVB employees, including Ms. Calvo, signed a petition stating that they "feel the presence of attorney Mario Capogrosso on our premises constitutes a threat to our physical safety."  Petition, Calvo Dec. Ex. 1.  They wrote that "Mr. Capogrosso's behavior is unstable" and that "he has gotten into confrontations with many of us in the past years."  Id.  The eighteen employees stated that "[t]hese confrontations have been escalating" and then "request[ed] that Mr. Capogrosso's behavior be dealt with and that the management of this agency alleviates the threat to our physical safety."  Id.  Capogrosso admits that there was an altercation between him and a TVB employee on January 5, 2011 that precipitated the petition, that people "might have" "view[ed] [him] as a threat to their physical safety," and that he is "not afraid to confront [people]."  Tr. 211:9-212: 215:2-11.  Shortly thereafter, ALJ Gelbstein and Supervising ALJ Vahdatlamas met with Capogrosso where, according to Ms. Vahdatlamas' contemporaneous account, "[w]e explained to him that his behavior was not professional and if he did not stop his foul language and threats we would have to take action and bar him from the TVB building.  At

4

that point he promised us that he would conduct himself according to the rules of conduct for attorneys."  Vahdatlamas Email to File, Gelbstein Dec. Ex. 6; <u>see</u> Gelbstein Dec. ¶ 14; Gelbstein Dec. Ex. 11 ¶ 11.

Capogrosso broke that promise.  On December 21, 2011, Capogrosso approached a lawyer named Yaakov Brody, who was sitting in the TVB's attorney's room, and demanded that he move.  Brody Statement, Gelbstein Dec. Ex. 7.  When Brody told him that he had enough room, Capogrosso "lashed out" and said next time he would just hit him.  <u>Id.</u>  Shortly afterward, Capogrosso returned to the attorneys' room, threw a partially-full coffee cup towards Brody, and then, according to Brody, "went on a rant on how I was a '[J]ew fucking cunt' a phrase which he repeated about six or seven times.  He went on to say how this place was 'run by [J]ews.'"  <u>Id.</u>  Brody's account was corroborated by other third-party witnesses.  <u>See</u> Maher Statement, Gelbstein Dec. Ex. 8 ("Nothing Brody did or said during Capagrosso's [sic] verbal attack was in any way provocative or confrontational.  Everyone in the room except Capagrosso seemed to understand he was losing self-control for no reason."); Tahir Statement, Gelbstein Dec. Ex. 9.  Capogrosso acknowledges that this confrontation occurred and admits that he may have used the slur.  <u>See</u> Capogrosso Tr. 260:18-21 ("Did I call him a fucking Jew cunt?  I probably called him a fucking something.  I don't remember exactly the words I did.").

Later that day, after another attorney named Jeffrey Meyers suggested to Capogrosso that he should apologize, Capogrosso "suddenly became enraged and lunged at me with his fists with great speed and then smacked his firsts against his other hand in a marshal arts [sic] form coming within 12 inches of my face."  Meyers statement, Gelbstein Dec. Ex. 10.  Meyers wrote that Capogrosso bragged that "I could put you in the hospital with just one punch," and that he "later told me that he envisioned all of us (Jews) and didn't mean to single me out."  <u>Id.</u>  This

altercation was also observed and corroborated by others.  See Tahir Statement, Gelbstein Dec. Ex. 9 (stating that Capogrosso "tried to hit Mr. Meyers," and that Capogrosso "said to Mr. Meyers that I will send you to the hospital.").  Capogrosso then stormed out of the room and started punching a wall with his fists.  Id.  Capogrosso acknowledges that this altercation occurred and that "I got upset [and] threw the punch at the wall."  Capogrosso Tr. 272:18-22.

After Supervising ALJ Vahdatlamas was informed of the incident, she asked Ms. Calvo to tell Capogrosso to "leave the building at once."  Vahdatlamas Email to File, Gelbstein Dec. Ex. 6.  Ms. Vahdatlamas and ALJ Gelbstein then interviewed the witnesses to the incident and conferred with DMV's Deputy Commissioner for Legal Affairs.  Id.  ALJ Vahdatlamas and ALJ Gelbstein then spoke with Capogrosso, who "admitted to shouting the religious obscenities and trying to punch, as he put it, the air in front of Mr. Mayer's face."  Id.  According to ALJ Vahdatlamas, "[h]e was not remorseful and claimed that he needs to punch the walls in our office to let out steam.  I also observed that his knuckles were severely bruised."  Id.  ALJs Vahdatlamas and Gelbstein "felt that the wellbeing of the office was at risk," and therefore asked Capogrosso to leave "and not to return till further notice."  Id.  ALJ Vahdatlamas later informed Capogrosso by telephone that he was suspended from practicing at TVB locations for three months, and suspended indefinitely from practicing at the Brooklyn South location (the "Suspension").  Letter from Plaintiff's counsel, Thompson Dec. Ex. 3 at 2.

**Capogrosso Is Reinstated After His Lawsuit Is Settled, After Anger Management Classes And A Warning About Future Aggressive Behavior**

On April 12, 2012, Capogrosso commenced an Article 78 special proceeding, Capogrosso v. N.Y. State Dep't of Motor Vehicles, Index No. 7738/2012 (Sup. Ct. Kings Cty.), challenging the Suspension.  Verified Petition, Thompson Dec. Ex. 4.  In his Verified Petition, he acknowledged both his verbal rant at Mr. Brody, id. ¶ 12 ("CAPOGROSSO realizes his

outburst was ill considered and unprofessional and he is extremely ashamed"), and his agitated speech and physically intimidating behavior toward Mr. Meyers.  Id. ¶ 14 (acknowledging that the Plaintiff spoke to Meyers "in the heat of the moment" and that he "punched the air").  DMV maintained that the Suspension was justified "in light of petitioner's pattern of disruptive and threatening conduct," including the December 21, 2011 incident, and "given the DMV's . . . duty to ensure a safe workplace."  Gelbstein Affirmation, Gelbstein Dec. Ex. 11.

The parties ultimately settled Capogrosso's Article 78 proceeding, with DMV agreeing to lift the Suspension upon his successful completion of an anger management course.  Capogrosso Tr. 321:12-322:20.  According to an attestation from the treating psychologist, Dr. John McCann, "Mr. Capogrosso has gained insight into the reasons that caused him to act unprofessionally," and that because of "his successful completion of the program it is highly unlikely that Mr. Capogrosso would be in a situation like this again."  McCann Attestation, Thompson Dec. Ex. 5 at 1.  Eight days after McCann's attestation, the parties stipulated to dismissal of the proceeding.  See Stipulation of Discontinuance, Thompson Dec. Ex. 6.

In connection with the settlement, DMV's litigation counsel advised Capogrosso that his Suspension would be lifted effective June 27, 2012.  But she also cautioned that "if and when Mr. Capogrosso appears at a TVB office, he must strictly adhere to the standards of conduct required of attorneys appearing before State courts."  Letter to Plaintiff's Counsel, Traschen Dec. Ex. 2 (emphasis in the original).  Capogrosso was explicitly warned that "[t]hreatening conduct[,] . . . verbal threats of physical violence, and verbal abuse including the use of ethnic slurs will not be tolerated," and that "in the event that Mr. Capogrosso commits an act of physical violence, he shall be immediately and permanently barred from appearing on behalf of DMV licensees at TVB offices."  Id. at 2.  Capogrosso acknowledges that his counsel informed

him that further violent or aggressive behavior would lead to his expulsion.  Capogrosso Tr.

414:4-6 ("Chris did tell me if you sneeze the wrong way, they're going to throw you out again.").

**Capogrosso Relapses Into Abusive And Threatening Behavior**

Capogrosso avoided any major incidents for a period after his return to practice, but

beginning in mid-2014 the series of complaints began again:

- On May 5, 2014, a TVB clerk filed a workplace violence incident report stating that Capogrosso "accused [security officer] David Smart of looking at him [and] there were heated words exchanged," requiring a police officer to intervene.  Piparo workplace violence report, Gelbstein Dec. Ex. 12.

- On October 29, 2014, a clerk named Wanda Alford submitted a report to ALJ Gelbstein stating that a motorist had approached her counter to tell her that Capogrosso had "told me to give you an attitude."  Alford Report, Gelbstein Dec. Ex. 13.  When asked why he had done that, Capogrosso replied, "I wanted to get a reaction out of you."  Id.

- On February 3, 2015, Officer Smart submitted a complaint to ALJ Gelbstein stating that Capogrosso "deliberately walked into me."  Smart complaint, Gelbstein Dec. Ex. 14.

- On February 5, 2015, a motorist named Paul Perez, who apparently had retained Capogrosso to represent him, filed a complaint stating that after a disagreement with Capogrosso regarding his representation, Capogrosso "told me to go fuck my self [sic] and that we can take it outside."  Perez complaint, Gelbstein Dec. Ex. 15.  TVB Clerks Melissa Vergara and Melanie Levine submitted statements corroborating Mr. Perez's complaint.  See Levine workplace violence report, Gelbstein Dec. Ex. 17 (stating that Capogrosso and Perez "engaged in a very loud verbal argument . . . with threats of escalating to a physical altercation," and that "Attorney Capogrosso continued to verbally provoke Mr. Perez into going outside . . . throughout his experience at the service counter"); see also Vergara Statement, Gelbstein Dec. Ex. 16.  Capogrosso acknowledges the incident but depicts Perez as the aggressor.  Capogrosso Tr. 361:6-364:4.

- On February 9, 2015 TVB clerk Geri Piparo submitted a report to ALJ Gelbstein stating that Capogrosso complained when she put a paperclip on a garbage pail after hanging the day's case dockets, and then told her "Geri[,] stick it where the sun don't shine."  Piparo email complaint, Gelbstein Dec. Ex. 18.  According to Ms. Piparo, when she went to ALJ Gelbstein, Capogrosso "verbally attacked Judge Gelbstein and me, cursing."  Id.

- Then on March 19, 2015, two attorneys, Diantha Fuller and Sadiq Tahir, filed a complaint stating that Capogrosso "has repeatedly said 'shit' to me whenever he passed by me."  Fuller statement, Gelbstein Dec. Ex. 19.  They reported that Capogrosso had continued to exhibit "bizarre behavior" even after returning from his Suspension, and concluded that they "simply have endured this harassing [sic] behavior from him daily

8

for the past 6 months and simply want him to stop doing it." Id. Fuller wrote that she had filed the complaint because "without memorializing this incident, he will continue unfettered in his harassment of me and other attorneys, such as Sadiq Tahir."[3] Id.

**Capogrosso Writes a Letter to the Attorney General's Office**

In the middle of this string of incidents, on March 20, 2015, Capogrosso sent a letter to Assistant Attorney General ("AAG") Elizabeth Prickett-Morgan at the Office of the New York State Attorney General, complaining that "I have been harassed, threatened and now currently my files are being left tampered with while they are left unprotected in the attorneys room." See Letter to AAG Prickett-Morgan, Thompson Dec. Ex. 7 (the "AG Letter"). Specifically, he claimed that Officer Smart, (repeatedly referred to as "your security guard Dave Sparks"): (1) "told me to go F___ myself," (2) "redirected other clients . . . to other attorneys or has interfered with my conversations while speaking to a clients [sic]" (3) "has approached me, gotten in my face, stared and glared, I asked him what was the problem was [sic] and he told me I was the problem, F___ you" (4) "has stood looked [sic] at me directly while I was standing on the DMV traffic line gave me the sign of the cross twice and directed a spear hand in my direction, "[4] and (5) "is entering the attorney's room and tampering with my files." Id. at 1-2. Capogrosso did not provide any further specifics or any timeframe with respect to these allegations. Id. Capogrosso's AG Letter also included a handful of allegations about ALJ Gelbstein's alleged failure to act on his complaints about "Sparks."[5] Capogrosso said that he had "made numerous

---

[3] For his part, Capogrosso does not deny the incidents, except that he claims that he said not "shit" but "eesha," which he described as "a motivational phrase that I say to myself" that he heard when he "was training in a martial arts gym a long time ago." Capogrosso Tr. 401:25-402:01, 402:25-403:3. Capogrosso could not or would not define "eesha," instead saying only that "It just means something to me. It keeps me motivated," and "[i]t's just a little something I say." Capogrosso Tr. 401:12-22.

[4] According to Mr. Capogrosso a "spear hand" is a martial arts technique where a hand is held rigidly straight. Capogrosso said that a spear hand is "something that can be very deadly," and that "you can actually take a guy's eye out with it if you do it right." Capogrosso Tr. 436:3-10. Capogrosso bragged that he himself had the ability to take someone's eye out with a spear hand ("Oh, absolutely. Would I, no. Could, I, yes, if I had to."), but that he had "no idea" whether Mr. Smart practiced such a martial art. Id. 436:11-14, 436:22-25.

[5] While Capogrosso's letter asserts that he complained to ALJ Gelbstein about his conflicts with Smart, his letter

complaints to Judge Gelbstein," but that Gelbstein's "response has been 'a spade is a spade'" and that "he laughs and giggles." Id. Capogrosso concluded that "Judge Gelbstein is either complicit, incapable, or incompetent to handle this issue." Id.

Capogrosso's explanation for why he wrote the AG Letter and sent it to AAG Morgan makes little sense. He testified that he did not know whether AAG Morgan had any connection with his Article 78 proceeding, Capogrosso Tr. 413:12-18, and that he sent the AG Letter to her because "that was the correspondence address when I looked you up on the website." Capogrosso Tr. 410:17-21; see also id. 413:19-22 ("When I looked you up on the – on Google for a correspondence address, Prickett-Morgan's name was attached to it. That's why I wrote that."). He testified that he contacted the Attorney General's Office because he believed "they're the ones who put all these conditions on me, right, and I had to act in a certain way, right," id. 411:22-24, a statement that is at odds with his testimony at the same deposition that he was subject to no conditions after his State proceeding other than taking anger management training. See id. 322:3-6 ("I agreed to take an anger management course, that's all I agreed to, that's it. I signed no other stipulation. I agreed to nothing."). Near the end of his deposition, Capogrosso was asked the key question: "you wrote this letter to the office that represented DMV in the case three years ago [and] to an attorney who wasn't even on the case. Why do you think anyone would care about this letter?" Id. 414:7-13. Capogrosso had no answer, merely reiterating his grievances and saying "[w]ho else do you want me writing to?" Id. 414:14-415:18.

---

also makes clear that he understood that Smart was not a DMV employee and did not report to Gelbstein. See AG Letter at 2 ("After several complaints to Administrative Judge Gelbstein, the Senior judge at the Brooklyn TVB, I called Sparks [sic] employer. Subsequently, your security guard Sparks [sic] was relieved from his duties at the Brooklyn DMV for two weeks (proof to be provided).").

**The May 5, 2015 Incident**

After sending the AG Letter, in which he falsely claimed that "[t]o date, I have been a perfect gentleman," AG Letter at 2, Capogrosso's erratic and aggressive behavior only grew worse. On May 5, 2015, Danielle Calvo heard the Plaintiff screaming "don't touch my stuff" over and over again, and went to the lawyers' room at the TVB. Calvo Dec. ¶ 13. She found the Plaintiff screaming at Sadiq Tahir, who had apparently touched his bag. Id. She told the Plaintiff that he had to stop screaming and he complied, but after Ms. Calvo went to get ALJ Gelbstein and came back, the Plaintiff became enraged again, screaming that he did not want anyone touching his belongings. Id.; see Gelbstein Dec. ¶ 39; Calvo Dec. Ex. 3.

Mr. Tahir submitted a statement to ALJ Gelbstein recounting that earlier that day, he had moved the Plaintiff's bag from one bench to another, when the Plaintiff became agitated and started yelling at him, necessitating intervention by Ms. Calvo. Tahir complaint, Gelbstein Dec. Ex. 20. Tahir said that after Ms. Calvo left, the Plaintiff "again started shouting and called me 'Shit.'" See Id. ("[w]henever he [Capogrosso] passes me he always said 'Shit.' He is more powerful and strong than me and I am afraid that one day he can physically hurt me.") Id. TVB clerk Kimberly Rivers corroborated Tahir's account, stating that she "witnessed the lawyer Mario Capogrosso confront Sadiq Tahir," that "Capogrosso went in there yelling and cursing in Mr. Tahir's face," that "Mr. Tahir remained seated as Mr. Capogross[o] continued to scream obscenities and threats," and that "Mr. Capogross[o] is more often than not a menace to the office staff, customers, as well as the other attorneys who practice in this office." Rivers complaint, Gelbstein Dec. Ex. 21.

A third eyewitness account of this incident, a letter submitted to ALJ Gelbstein by attorney Michael Beer, provides even more detail about Capogrosso's conduct. Beer stated that Capogrosso repeatedly shouted "don't touch my fucking stuff, don't touch my fucking stuff,"

and then "piece of shit, piece of shit," and that he "witnessed Mario Capogrosso yelling at Mr. Tahir to not touch his fucking stuff."  Beer Statement, Gelbstein Dec. Ex. 22.  In addition, Beer stated that he "returned to the [attorneys'] room and was again alone with Mario Capogrosso when he start[ed] ranting" about ALJ Gelbstein, saying,

> [h]ow dare [Gelbstein] do that and if [Gelbstein] was a man he would put a gun to his own head.  Thereafter he also began ranting that he should never have plead to the deal [to resolve his Suspension], he should have fought those guys."

Id.  Beer concluded by writing, "[i]t appears to me that over the past few weeks Mario Capogrosso has become more aggressive in both his words and demeanor and has been creating an atmosphere of fear and threatening both attorneys and DMV staff."  Id.  Capogrosso's erratic and aggressive conduct in the May 5, 2015 incident, combined with the complaints regarding it and the dozens of other complaints previously received regarding the Plaintiff's behavior, were key to the state of mind of ALJ Gelbstein and Ms. Traschen when they made the decision to impose the TVB Practice Bar after Capogrosso's altercation with Mr. Smart on May 11, 2015, less than a week later.  See Gelbstein Dec. ¶¶ 44, 46-47; Traschen Dec ¶¶ 12-13.

**Capogrosso Fights Officer Smart And Is Again Barred From Practice Before the TVB**

Capogrosso's aggressive behavior finally boiled over on May 11, 2015.  According to a workplace violence report filed by Officer Smart and Ms. Calvo, Capogrosso approached Officer Smart and said, "are you looking at me?," to which Smart replied, "You are looking at me." Workplace violence report, Calvo Dec. Ex. 4.  Capogrosso then told Smart "back up, back up," and then "pushed David in his chest."  Id.  Smart corroborated this report under oath in open court, testifying that after this brief verbal exchange, "all of the sudden [sic], . . [h]e just punched me in the chest and I had to hold on to the rail.  I had to hold onto the rail and then some police officers came, everybody came around."  Conference Transcript, Thompson Dec. Ex. 8 at 7:20-

25.  Two other eyewitnesses submitted corroborating accounts to Ms. Calvo shortly after the incident, stating that "Attorney Mario Capogrosso yelled at and pushed the Security Guard, David," and that "[t]he attack seemed to be unsolicited." Adinolfi Statement, Calvo Dec. Ex. 5, and that "I saw Mr. Capogrosso shove the security guard, David was pushed back, it was a hard push."  Han statement, Calvo Dec. Ex. 6.

After being informed of the incident, Ms. Calvo called ALJ Gelbstein, who was out of the office, and informed him that there had been a physical altercation between Capogrosso and the security guard.  Calvo Dec. ¶ 14; Gelbstein Dec. ¶ 45.  ALJ Gelbstein told her to call Ms. Traschen, who instructed Ms. Calvo to have Capogrosso escorted out of the TVB, which she did with the assistance of NYPD officers.  Traschen Dec. ¶ 11; Calvo Dec. ¶ 14.  Ms. Calvo also provided Capogrosso with Ms. Traschen's telephone number at DMV's headquarters in Albany.  See Calvo Dec. ¶ 14.  ALJ Gelbstein then conferred by phone with Ms. Traschen, and the two decided that Capogrosso should be removed from the premises at that time, given his lengthy history of aggressive conduct and their duty to ensure the safety of motorists, attorneys and staff at the TVB.  Gelbstein Dec. ¶ 46; Traschen Dec. ¶¶ 12-13.  Ms. Calvo played no role in the decision.  Calvo Dec. ¶ 16; see Traschen Dec. ¶¶ 12-13; Gelbstein Dec. ¶¶ 46-47.  During a subsequent phone call, Ms. Traschen informed Capogrosso that because of his inability to conform his conduct appropriately and the safety concerns presented in light of both this incident and prior incidents, he was permanently barred from appearing before the TVB (the "TVB Practice Bar").  See Traschen Dec. ¶ 14; See Capogrosso Tr. 134:6-8, 136:20-21.

**Capogrosso Sues, but Judges Brodie and Bloom Dismiss Most Claims and Defendants**

After being informed of the TVB Practice Bar, Capogrosso took no legal action.  He did not file an Article 78 proceeding in State court, as he had in 2012 after his Suspension for previous violent and aggressive behavior.  Capogrosso Tr. 89:17-90:8.  When asked at his

13

deposition why he chose not to do so, Capogrosso gave a straightforward answer: "[b]ecause I couldn't get money."  Id.

On May 8, 2018, just days before Section 1983's three-year statute of limitations would run, see Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002), Capogrosso filed the instant action.  See Complaint, Dkt. No. 1.  In addition to naming ALJ Gelbstein, Ms. Traschen, and Ms. Calvo as defendants, Capogrosso also sued Supervising ALJ Vahdatlamas; Jean Flanagan and Vincent Palmieri (two TVB supervisors); Officer Smart; PEC Group of NY, Inc. (Officer Smart's employer); attorney Sadiq Tahir; several John and Jane Does; and AAG Morgan, who had done nothing other than being the addressee on his AG Letter.  See generally id.  As regards the State Defendants, the Complaint alleged two claims: (1) First Amendment retaliation, based on Capogrosso's speculation that the Defendants instituted the TVB Practice Bar in retaliation for his AG Letter (rather than as a consequence of his repeated violent and abusive behavior, including the May 5, 2015 incident and his confrontation with Officer Smart on the day the TVB Practice Bar was instituted), see id. ¶¶ 42, 59, 71-75; and (2) a denial of due process theory based on Capogrosso's assertion that the Defendants did not provide him with an adequate procedure to contest the TVB Practice Bar.[6]  See id. ¶¶ 77-85.

Most of Capogrosso's claims and the majority of the defendants were dismissed on the pleadings via a report and recommendation from Magistrate Judge Bloom, Capogrosso v. Gelbstein, No. 18 Civ. 2710, 2019 WL 6406444 (E.D.N.Y. Jan. 30, 2019) ("Capogrosso I"), which was adopted by Judge Brodie, 2019 WL 4686448 (E.D.N.Y. Sept. 25, 2019) ("Capogrosso II").  The Court dismissed Mr. Palmieri and Ms. Flanagan for lack of proper service, Capogrosso I, 2019 WL 6406444 at *6, and dismissed ALJ Vahdatlamas and AAG Morgan for lack of

---

[6] Capogrosso also included a request for prospective injunctive relief based on those two theories, which he denominated as a separate claim.  Compl. ¶¶ 86-88.

personal involvement.  Id. at *7-8.  The Court dismissed Capogrosso's due process claim because he had no protected property or liberty interest in practicing before the TVB, id. at *10-11, and because he could have challenged the TVB Practice Bar in an Article 78 proceeding, but chose not to, thereby failing to utilize the process available to him.  Id. at *11.  Accordingly, the only State Defendants remaining in the case were ALJ Gelbstein, Ms. Traschen and Ms. Calvo, and the only potential claim remaining against them was for First Amendment retaliation.

**Capogrosso's Obstreperous and Abusive Litigation Conduct**

Capogrosso's own conduct in representing himself before this Court does much to corroborate the reasons for the TVB Practice Bar.  Indeed, this action had scarcely commenced before Capogrosso's conduct required Judge Bloom to caution him to "be aware of [] professional courtesy and conduct himself accordingly."  Dkt. No. 12.  Capogrosso responded by baselessly (and unsuccessfully) moving for Judge Bloom's recusal and "question[ed] Magistrate Bloom's ability to afford me a fair hearing." Dkt. No. 16 at 2, 3.  And after Magistrate Judge Bloom issued her Report and Recommendation, Capogrosso sent a nine-page invective-laden letter to then-Chief Judge Irizarry complaining that "I am not being treated fairly by this Court."  Dkt. No. 70.

Later, Capogrosso appeared—unannounced—at the Brooklyn South TVB on July 18, 2018, despite his lifetime ban, purporting to be seeking "witness statements" even though discovery had not yet begun.  See Dkt. No. 23.  He would do the same again on December 16, 2019, falsely claiming that he had a Court order allowing him to depose the TVB's clerks.  Dkt. No. 101 at 2; see Declaration of Claudio Collins, Dkt. No. 101 Ex. 2.

Capogrosso has also moved (unsuccessfully) for sanctions against every person litigating against him: first against AAG Mark Siegmund, Dkt. No. 25, then against the undersigned, who replaced AAG Siegmund as lead counsel when he left government service, Dkt. No. 120, and

15

then against Officer Smart, who was litigating *pro se*, Dkt. No. 157.  Each of these motions was

soundly rejected by Judges Brodie or Bloom.  See, e.g., Dkt. Nos. 127, 159.  Now, after a

lengthy and vituperative discovery process, the State Defendants move for summary judgment.

Because his sole remaining claim of First Amendment retaliation is manifestly insufficient as a

matter of either law or fact, summary judgment should be granted and the Complaint dismissed.

## STANDARD OF REVIEW

Summary judgment must be granted if there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Savino v.

City of New York, 331 F.3d 63, 71 (2d Cir. 2003). Summary judgment is not a "disfavored

procedural shortcut," but rather an integral part of the Federal Rules' goal of securing the "just,

speedy and inexpensive determination of every action." See Celotex Corp. v. Catrett, 477 U.S.

317, 327 (1986).  In order to avoid summary judgment, the nonmoving party must do more than

show "some metaphysical doubt" as to the material facts.  Rather, the party must come forward

with admissible evidence sufficient to raise a genuine issue of fact, and may not rely upon

speculation or conjecture.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (the party opposing

summary judgment "may not rest upon mere allegation or denials of his pleading, but must set

forth specific facts.").  "When no rational jury could find in favor of the nonmoving party

because the evidence to support its case is so slight, there is no genuine issue of material fact and

a grant of summary judgment is proper."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22

F.3d 1219, 1224 (2d Cir. 1994).

## ARGUMENT

With respect to the State Defendants, Capogrosso's sole remaining claim is First

Amendment retaliation against Ms. Calvo, ALJ Gelbstein, and Ms. Traschen, in their individual capacities, as well against the Commissioner in his official capacity.  In order to prove a First Amendment retaliation claim, a plaintiff must show that "(1) [their] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [them]; and (3) there was a causal connection between this adverse action and the protected speech." Raymond v. City of New York, 317 F. Supp. 3d 746, 772 (S.D.N.Y. 2018).  "But even when the protected activity is followed closely in time by an adverse employment action, an intervening event between the protected activity and the adverse employment action may defeat an inference of causation."  Rossbach v. Montefiore Med. Ctr., No. 19 Civ. 5758, 2021 WL 930710, at *6–7 (S.D.N.Y. Mar. 11, 2021).

II.     **THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE BARRED BY ABSOLUTE JUDICIAL AND QUASI-JUDICIAL IMMUNITY**

A.     **The Law of Judicial and Quasi-Judicial Immunity**

Capogrosso's claims are barred by absolute judicial and quasi-judicial immunity because the Individual Defendants were all officials in DMV's administrative courts, and because the action complained of – barring Capogrosso from practicing due to aggressive and unprofessional behavior – is attorney discipline, a core judicial function.  "'Judges generally have absolute immunity from suits for money damages for their judicial actions,' and 'even allegations of bad faith or malice cannot overcome judicial immunity.'"  Chris H. v. New York, 764 F. App'x 53, 55 (2d Cir. 2019) (summary order); accord Ojeda v. Mendez, No. 20 Civ. 3910, 2021 WL 66265, at *2 (E.D.N.Y. Jan. 7, 2021) (Komitee, J.).  This immunity "acts as a complete shield to claims for money damages," Montero v. Travis, 171 F.3d 757, 760 (2d Cir. 1999), and "is conferred in order to insure that a judicial officer, in exercising the authority vested in him shall be free to act upon his own convictions, without apprehension of personal consequences to himself."

Libertarian Party of Erie Cty. v. Cuomo, 970 F.3d 106, 123 (2d Cir. 2020).

"Similarly, 'quasi-judicial' immunity applies to a person whose role is 'functionally comparable to that of a judge.'" Chris H., 764 F. App'x at 55.[7] "Entitlement to absolute immunity does not depend on the individual's title or on the office itself.  A judge may perform tasks that are not essentially judicial, such as supervising and managing court employees, which do not warrant absolute immunity; on the other hand, such immunity may be warranted for a person who is not a judge but whose duties are quasi-judicial." Libertarian Party, 970 F.3d at 123 (quotations and citations omitted).  "Nor does a determination as to whether a proceeding is judicial in nature depend on the formality or informality with which it was conducted, or on whether the proceeding was adversary or *ex parte*."[8] Id.  These doctrines extend to officials in administrative law proceedings such as the TVB because "administrative law proceedings function in a comparable atmosphere and adjudicate similar issues to those settled in judicial proceedings," and because the proceedings "are similar to judicial proceedings in that the disappointment occasioned by an adverse decision[] often finds vent in imputations of malice." Anghel v. N.Y. State Dep't of Health, 947 F. Supp. 2d 284, 299-300 (E.D.N.Y. 2013); accord Jackson v. Ramirez, 691 F. App'x 45, 46 (2d Cir. 2017) (summary order) (dismissing claim against ALJ based on quasi-judicial immunity).  The New York Supreme Court Appellate Division, First Department, recently reiterated that "Traffic Violations Bureau [] hearings are 'judicial proceedings'" as a matter of State law.  Jewish Press, Inc. v. NYPD, 190 A.D.3d 490, 490 (1st Dep't 2021).

---

[7] "[F]ederal law on quasi-judicial immunity applies to state officials sued in federal court on federal claims." Gross v. Rell, 585 F.3d 72, 81 (2d Cir. 2009).

[8] This immunity can be lost only if a defendant acts "in the clear absence of all jurisdiction' . . . . Mere evidence that an official's action 'was in error, was done maliciously, or was in excess of [his or] her authority' does not undermine [the] claim to absolute immunity so long as it did not fall clearly outside all official authority." Finn v. Anderson, 592 F. App'x 16, 19 (2d Cir. 2014) (summary order).

**B.**     **Each of the Individual Defendants Was A Judicial Officer**

Although, "[e]ntitlement to absolute [judicial] immunity does not depend on the individual's title or on the office itself," Libertarian Party, 970 F.3d at 123, each of the three Individual Defendants occupied a position and performed a function that federal courts have traditionally held to be entitled to the protection of judicial or quasi-judicial immunity.

As an Administrative Law Judge, **ALJ Gelbstein** falls within a half-century of case law establishing that judges in administrative tribunals are entitled to absolute immunity on the same basis as a judge in a federal or state court.  See Butz v. Economeu, 438 U.S. 478, 513 (1978) (noting that "[t]here can be little doubt that the role of the modern [] hearing examiner or administrative law judge within this framework is 'functionally comparable' to that of a judge"); Gelbstein Dec. ¶ 4 (describing ALJ Gelbstein's job duties).  This immunity applies to ALJs in State agencies on the same basis as those who work in a federal system.  See, e.g., Bloom v. N.Y. State Com'r of Health, 573 F. Supp. 2d 732, 740 (E.D.N.Y. 2004).

As stated above, **Ms. Traschen** served as DMV's First Assistant Counsel, and was the official in charge of the entire TVB administratrive court system.  See Traschen Dec. ¶¶ 5-6 (describing Ms. Traschen's job duties); Traschen Dec. Ex. 1 (job announcement from DMV Commissioner, explaining that as First Assistant Counsel, Ms. Traschen "becomes responsible for the Traffic Violation Bureau").  Ms. Traschen operated in a position similar to senior employees of the New York State Office of Court Administration ("OCA"), or the Administrative Office of the U.S. Courts on the federal level.  See Traschen Dec. ¶¶ 6-7.  The Second Circuit has repeatedly confirmed that such employees are entitled to judicial immunity because their work is "judicial in nature or closely related to the judicial process," particularly where their decisions come in the context of attorney discipline.  See, e.g., Jackson v. Pfau, 523 F. App'x 736, 737 (2d Cir. 2013) (summary order) (affirming dismissal of claims against OCA

19

attorneys and other court administrative personnel); McKeown v. N.Y. State Comm'n on Judicial Conduct, 377 F. App'x 121, 124 (2d Cir. 2010) (summary order) (affirming dismissal of claim against OCA attorneys based on decision regarding attorney discipline).

As a supervising clerk at the Brooklyn South TVB, **Ms. Calvo** is likewise covered by judicial immunity.  See Calvo Dec. ¶ 3 (describing her job responsibilities).  "'[C]ourts have granted absolute immunity to court clerks where they were performing discretionary acts of a judicial nature,' because their 'duties and responsibilities are most intimately connected with the judge's own exercise of the judicial function,' and because they 'are simply extensions of the judges at whose pleasure they serve.'"[9] Fishman v. Office of Ct. Administration, No. 18 Civ. 282, 2020 WL 1082560, at *6 (S.D.N.Y. Mar. 5, 2020); see, e.g., Jackson, 523 F. App'x at 737-38 (dismissing claims against court clerks and OCA personnel).

Each of the three individual defendants fulfilled a key role within the TVB system of administrative adjudications, see 15 N.Y.C.R.R. § 121.3 (TVB "shall be made up of those administrative law judges, supervisors and clerical personnel"), and fell within a category traditionally recognized as entitled to judicial immunity.  Accordingly, they are immune from suit when they are "perform[ing] functions closely associated with the judicial process," McKeown, 377 F. App'x at 124, such as expelling an attorney from practice.

C.    **Attorney Discipline Is A Core Judicial Function**

The decision at issue in this case – DMV's determination to bar Capogrosso from practicing in its administrative tribunal due to his history of aggressive and unprofessional

---

[9] The logic extends to both clerks who perform adjudicative functions, such as traditional law clerks who help judges decide cases, and to clerks who perform administrative functions, so long as the function at issue is one that is "judicial in nature of closely related to the judicial process."  See Jackson, 523 F. App'x at 737 (affirming immunity-based dismissal of claims against both "a judicial law clerk" and chief and associate clerks of county courts); see also Gollomp v. Spitzer, 568 F.3d 355, 363, 365 (2d Cir. 2009) (affirming determination that defendant "was entitled to absolute judicial immunity for his role as a Law Secretary." (quotation omitted)).

conduct – was attorney discipline, a fundamentally judicial function to which absolute judicial and quasi-judicial immunity apply.  See Libertarian Party, 970 F.3d at 124 ("[T]he act of disbarring an attorney as a sanction for the attorney's contumacious conduct . . . is a judicial act.").  "'[W]hether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself,' such as 'whether it is a function normally performed by a judge,' and 'whether [the parties] dealt with the judge in his judicial capacity.'"  Bobrowsky v. Yonkers Courthouse, 777 F. Supp. 2d 692, 712 (S.D.N.Y. 2011).

Federal courts have repeatedly held that attorney discipline is such a judicial function. See, e.g, Finn, 592 F. App'x at 19 (affirming dismissal of claim against staff attorney for grievance committee) McKeown, 377 F. App'x at 124 ("Prosecutors, hearing examiners, and law clerks are eligible for absolute immunity, and those involved in preparing and adjudicating attorney discipline proceedings share analogous roles."); McNamara v. Kaye, No. 06 Civ. 5169, 2008 WL 3836024, at *6-7 (E.D.N.Y. Aug. 13, 2008) (rejecting argument that "attorney disciplinary proceedings are essentially administrative in nature and, thus, are not 'judicial acts'" as "without merit" and granting absolute immunity to "all of the judicial officers mentioned in plaintiff's complaint").  Moreover, the State Defendants are expressly empowered to ensure that "any person representing the motorist must conform to the standards of conduct required of attorneys appearing before State courts," and an attorney's "failure to conform to these standards will be grounds for declining to permit his or her continued appearance in the proceeding."  15 N.Y.C.R.R. § 124.2(a).  The nature of Capogrosso's TVB Practice Bar was attorney discipline, and immunity attaches accordingly.

**III.    THE RETALIATION CLAIM FAILS ON THE LAW AND THE FACTS**

      **A.    Capogrosso's Letter to AAG Morgan Is Not Protected Speech That Could**

### Support A First Amendment Retaliation Claim

As a threshold legal matter, it appears unlikely that the AG Letter could qualify as protected speech to support a claim of First Amendment retaliation.  Cf. McHerron v. Burnt Hills – Ballston Lake Cent. Sch. Dist., 778 F. App'x 54, 55 (2d Cir. 2019) ("It is well established that speech that principally focuses on an issue that is personal in nature and generally related to the speaker's own situation, or that is calculated to redress personal grievances – even if touching on a matter of general importance – does not qualify for First Amendment protections." (cleaned up)).  As Magistrate Judge Bloom noted at the motion to dismiss stage, in order "[t]o determine the elements required to state a First Amendment claim under Section 1983, the court must first consider whether the claim is being made by a public employee or a private citizen." Capogrosso I, 2019 WL 640644 at *8.  The problem is that Capogrosso, as an attorney practicing before a State administrative tribunal, does not fall into either category.  Cf. id. at *15 ("Plaintiff's retaliation claim wades in the muddy First Amendment delta between public employees and private citizens.").  He was never employed by DMV, and so is not subject to the limited First Amendment protections applicable to government workers.  Cf. Connick v. Myers, 461 U.S. 138, 146 (1983) ("government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.").  But nor was he a private citizen who "could not be denied any of the common rights of citizens." See Gentile v. State Bar of Nev., 501 U.S. 1030, 1074 (1991) (recognizing "the long-established principle" that a practicing attorney stands "in another quite different capacity" for First Amendment purposes as "an officer of the court" (quotation omitted)).

Instead, Capogrosso was an attorney practicing before a tribunal, and the Supreme Court has noted that its precedents "rather plainly indicate that the speech of lawyers . . . may be regulated under a less demanding standard." Gentile, 501 U.S. 1074; see id. at 1071 (majority of

22

the Supreme Court found that "[e]ven outside the courtroom . . . lawyers in pending cases were subject to ethical restrictions on speech to which no ordinary citizen would be.").  To counsel's knowledge, there is no controlling case establishing what this "less demanding standard" would be in the context of First Amendment retaliation when the speech at issue is directed at a judge. Cf. Capogrosso I, 2019 WL 6406444 at *15 (noting that the Court had not "found[] case law on point with the facts presented herein" and that "few, if any, First Amendment retaliation cases involve private citizens in similar contexts to plaintiff here").

If the AG Letter is subject to the test applicable to public employees, or even to some "less demanding" formulation of it, Gentile, 501 U.S. 1074, Capogrosso's AG Letter is not protected speech.  In such cases, the First Amendment only applies if the speaker "'spoke as a private citizen and the speech at issue addressed a matter of public concern' – that is, the speech must be 'fairly considered as relating to any matter of political, social, or other concern to the community' and be of 'general interest' or of 'legitimate news interest.'"  Agosto v. N.Y. City Dep't of Educ., 982 F.3d 86, 95 (2d Cir. 2020) (quoting Montero v. City of Yonkers, 890 F.3d 386, 394 (2d Cir. 2018)).  In contrast, "speech that 'principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection."  Id.

Here, the AG Letter manifestly "related to the speaker's own situation" or was "calculated to redress personal grievances," id., in that it focused virtually exclusively on his altercations with "your security guard Sparks" and ALJ Gelbstein's alleged failure to address Capogrosso's complaints.  See AG Letter.  His First Amendment retaliation claim should accordingly fail as a matter of law.  And even if the Court were to disagree as to the applicability

23

of the First Amendment, the unclear standard for First Amendment retaliation in the context of attorney speech, combined with the lack of controlling case law on the subject, should entitle the individual defendants to qualified immunity, as discussed further in Section IV, below.  Cf. Capogrosso I, 2019 WL 6406444 at *15 (finding a ruling on qualified immunity to be "premature" at the pleading stage, but that given ambiguity regarding the standard applicable to Capogrosso's speech, "it seems unlikely that the law was clearly established law in 2015.").

B. **No Rational Jury Could Find The AG Letter To Be A But-For Cause Of Capogrosso's Expulsion From the TVB**

1. Capogrosso Has Not Adduced Evidence That Could Support a Jury Finding of But-For Causation

Capogrosso's claim of First Amendment retaliation also fails because "on the record developed here, a reasonable fact finder could not find that [Capogrosso]'s exercise of his first Amendment right . . . was the 'but-for' cause" of his expulsion.  Higginbotham v. Sylvester, 741 F. App'x 28, 31 (2d Cir. 2018) (summary order).  To have a viable claim of First Amendment retaliation, "a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury."  Nieves v. Bartlett, 139 S.Ct. 1715, 1722 (2019) (quotation omitted).  "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured – the motive must *cause* the injury."  Id. (emphasis in the original).  "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  Id. (citing Hartman v. Moore, 547 U.S. 250, 260 (2006)).  Even if Capogrosso could make such a showing – which he cannot, as set forth below – a defendant will "still be entitled to summary judgment . . . by demonstrating by a preponderance of the evidence that it would have taken the same adverse [] action even in the absence of the protected conduct."  Smith v. County of Suffolk, 776 F.3d 114, 119 (2d Cir. 2015).

24

The purported factual bases for Capogrosso's First Amendment retaliation claim make little sense, and virtually all of them occurred *before* he even sent the AG Letter that serves as the purported protected activity.  <u>Cf.</u> Compl. ¶¶ 71-72 (specifying the letter as the First Amendment activity at issue).  When asked in an interrogatory to identify the basis of his contention that the State Defendants were motivated by retaliatory animus, Capogrosso pointed to seven items: (1) ALJ Gelbstein allegedly saying "how do I get a piece of the action;" (2) ALJ Gelbstein allegedly "regularly having lunch with several Jewish ticket brokers;" (3) allegedly seeing ALJ Gelbstein "rescheduling a multitude of cases and enter [sic] guilty pleas on some of them;" (4) ALJ Gelbstein allegedly condoning the presence of Tanya Rabinovich and saying "what are you Don Quixote;" (5) the State Defendants' alleged failure to address complaints Capogrosso made about Officer Smart; (6) an alleged incident where "Defendant Gelbstein approaches me on May 8, 2015 and states, '[c]an't you go practice somewhere else, I saw what you wrote about me that I am complicit and incapable,'" an incident supported only by a citation to Capogrosso's Complaint; and (7) an incident when Ms. Calvo allegedly said "[n]ow's our chance to get rid of him."  Interrogatory Responses, Thompson Dec. Ex. 9 at 13-14.

The first five alleged items are simply complaints about ALJ Gelbstein, with no obvious (or conceivable) connection to the AG Letter.  Moreover, Capogrosso's interrogatory responses and deposition testimony make clear that all of these purported incidents occurred *prior* to the AG Letter, and therefore cannot constitute evidence that the State Defendants possessed retaliatory animus *as a result* of the letter.  <u>See, e.g.</u>, Capogrosso Tr. 53:18-54:12 (comment about "piece of the action" occurred in "July, August" of "2005"); <u>id.</u> 67:14-20-24 (Gelbstein met with Jewish ticket brokers "the first day I got there . . . I saw them right from day one.") <u>id.</u> 66:16-67:13 (cannot remember year of complaint about Rabinovich, but it was "absolutely"

25

before 2015); see also id. 73:3-74:14 (testifying that he reported the incident with ALJ Gelbstein rescheduling cases and entering pleas in the "letter to Prickett Morgan, March 20th [2015],"). Likewise, ALJ Gelbstein's alleged refusal to respond to Capogrosso's complaints about Officer Smart cannot be evidence of retaliation for the AG Letter, when it is referenced in the letter itself, and therefore must have occurred beforehand.  See AG Letter at 2 (alleging that "I have made numerous complaints to Judge Gelbstein").  Similarly, the incident where Ms. Calvo allegedly said "now's our chance to get rid of him" allegedly took place in 2011, well before the AG Letter.  See Capogrosso Article 78 Petition, Thompson Dec. Ex. 4 ¶ 13 (dated March 1, 2012); see also Capogrosso Tr: 313:15-16, 22-23; 314:14-17 (repeating three times that the alleged statement was made "in 2012" or before).  It cannot serve as evidence that Calvo was motivated by animus regarding a letter that Capogrosso would not send for another three years. Cf. AG Letter at 1 (dated March 20, 2015).

In any event, Capogrosso's claim against Ms. Calvo fails for a separate reason: he adduced no evidence that she was even aware of the AG Letter at the time that the TVB Practice Bar was instituted.  Skates v. Inc. Vill. of Freeport, 265 F. Supp. 3d 222, 239 (E.D.N.Y. 2017) (the "claim for First Amendment retaliation fails as a matter of law as there is no evidence that the individuals taking any such adverse employment actions were aware of Plaintiff's constitutionally protected activity"); cf. Calvo Dec. ¶ 12.  In addition, the evidence adduced in discovery demonstrates that the decision to institute the TVB Practice Bar was made solely by ALJ Gelbstein and Ms. Traschen after consultation with each other.  Calvo Dec. ¶ 16; see Traschen Dec. ¶¶ 12-13; Gelbstein Dec. ¶¶ 46-47.  Accordingly, Ms. Calvo must also be dismissed for lack of personal involvement.  See Tangreti v. Bachmann, 983 F.3d 609, 612 (2d Cir. 2020) ("the plaintiff must directly [] prove that each government official-defendant, through

the official's own individual actions, has violated the Constitution.").

Finally, Capogrosso alleges that ALJ Gelbstein "approaches me on May 8, 2015 and states, '[c]an't you go practice somewhere else, I saw what you wrote about me that I am complicit and incapable.'"  Interrogatory Responses, Thompson Dec. Ex. 9 at 14.  However, this statement is insufficient to establish that ALJ Gelbstein (or anyone else) acted with retaliatory animus as a result of the AG Letter when the TVB Practice Bar was instituted.  First, the only evidentiary basis Capogrosso provides for that statement is a citation to his own complaint, and "[a] plaintiff opposing summary judgment may not rely on his complaint to defeat the motion." Michaelidis v. Barry, 502 F. App'x 94, 96 (2d Cir. 2012) (summary order) (quoting Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996)).

Second, even if ALJ Gelbstein had made this alleged statement, the most it would show is that ALJ Gelbstein was upset about the AG Letter, i.e., the animus prong.[10]  It does nothing to establish the causation prong, let alone show that the AG Letter was a but-for cause of DMV's decision to institute the TVB Practice Bar.  See Hartman, 547 U.S. at 260 ("If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between the unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.").  This is particularly true given the fact the AG Letter was sent well before two unrelated intervening events: the May 5 incident where Capogrosso screamed at attorneys Tahir and Beer before saying that "if [Gelbstein] was a man he would put a gun to his own head," Gelbstein Dec. Ex. 22; see also Calvo Dec. ¶ 13; Gelbstein Dec. ¶ 39; Gelbstein Dec. Exs. 20-21, and the May 11, 2015 altercation Capogrosso precipitated with Officer Smart.  See Calvo Dec. Exs. 4-6; Rossbach, 2021 WL 930710 at *6–7 (observing that "in

---

[10] In addition, the purported statement is relevant only to the claim as against ALJ Gelbstein; Capogrosso has provided no evidence whatsoever of retaliatory animus on the part of Ms. Traschen or Ms. Calvo.

the context of a First Amendment retaliation claim under § 1983, . . . an intervening event [is] sufficient to defeat an inference of causation").

And third, where there is "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony," and "no reasonable person could believe [that] testimony," summary judgment is appropriate. Jeffreys v. City of N.Y., 426 F.3d 549, 555 (2d Cir. 2005). Capogrosso's testimony has been a series of disconnected rants, half-baked grievances, and dubious conspiracy theories; in order to credit it, the Court would need to disregard complaints from over two dozen different clients, clerks, lawyers, TVB staffers, and members of the general public, see Gelbstein Dec. Exs. 1-4, 7-10, 12-26; Calvo Dec. Exs. 2-6; see also Gelbstein Dec. ¶¶ 8-9, 44, 46-47; Calvo Dec. ¶ 4; Traschen Dec. ¶¶ 7, 12-13, in favor of Capogrosso's contentions that all the complaints are lies for one reason or another, such as his unsupported speculation that the TVB staff "wanted me out" because "I was not paying off the clerks," Capogrosso Tr. 81:16-18, 81:25-82:8, or his theory that his fellow attorneys disliked him because he was making too much money. Id. 277:19-25 ("if people aren't making enough money and they see other people making money, they get jealous and attorneys . . . that's the game down there."); see also id. 236:12-18 ("I'm an Italian America[n] down there. I'm surrounded by Jewish lawyers. Most of the lawyers down there are Jewish. Most of the judges are Jewish. Maybe I'm making too much money. I don't know."). No rational juror would do so. See Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 106 (2d Cir. 2011) ("To hold otherwise, and require district courts to allow parties to defeat summary judgment simply by testifying to the allegations in their pleadings . . . would license the mendacious to seek windfalls in the litigation lottery.").

> 2. Capogrosso Would Have Been Barred From the TVB Even If He Had Never Sent the AG Letter

"[T]he defendant [in a First Amendment retaliation case] has the opportunity to demonstrate by a preponderance of the evidence that it would have undertaken the same adverse [] action even in the absence of the protected conduct." Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 47 (2d Cir. 2014). Here, the evidence adduced in discovery shows that Capogrosso's TVB Practice Bar was manifestly caused by his own aggressive and erratic behavior, and that he would have been barred from practice before the TVB even if he never sent the AG Letter.

First, the evidence demonstrates that the TVB Practice Bar was triggered by Capogrosso's May 5, 2015 incident and the May 11, 2015 physical altercation with Officer Smart, not the AG Letter. Cf. Rossbach, 2021 WL 930710 at *6–7 ("an intervening event [is] sufficient to defeat an inference of causation"). Capogrosso sent the AG Letter on March 20, 2015, AG Letter at 1, but neither ALJ Gelbstein nor DMV took action against Capogrosso for months after the letter was sent, undermining any claim of a causal nexus. Then, on May 5, 2015, Capogrosso began screaming and cursing at fellow attorneys Sadiq Tahir and Michael Beer about allegedly touching his bags, and later told Beer that if "Judge Gelbstein[] was a man he would put a gun to his own head." Gelbstein Dec. Ex. 22; see also Gelbstein Dec. Ex. 20 at 1 (Tahir writing that Capogrosso "is more powerful and strong than me and I am afraid that one day he can physically hurt me."); Gelbstein Dec. Ex. 22 (Beer writing that "over the past few weeks Mario Capogrosso has become more aggressive in both his words and demeanor and has been creating an atmosphere of fear and threatening both attorneys and DMV staff."). These events and complaints were weighing heavily on ALJ Gelbstein's mind even before the Plaintiff's assault on Mr. Smart. See Gelbstein Dec. ¶ 44. And then, on May 11, 2015, ALJ Gelbstein and Ms. Traschen were informed that Capogrosso became physically violent, and statements from the people who saw the incident demonstrated that Capogrosso was the

aggressor.  See, e.g., Workplace violence report, Gelbstein  Dec. Ex. 24 ("he then pushed David

in his chest"); Adinolfi statement, Gelbstein Dec. Ex. 25 ("The attack seemed to be unsolicited

and David did not defend himself or push Mr. Capogrosso back at all.").  It was these incidents

of hostile and violent behavior that led ALJ Gelbstein and Ms. Traschen to institute the TVB

Practice Ban – not because of a letter that was sent to an unrelated state official months earlier.

Gelbstein Dec. ¶¶ 46-47; Traschen Dec. ¶¶ 12-13; see 15 N.Y.C.R.R. 124.2(a) (attorneys at the

TVB must "conform to the standards of conduct required of attorneys appearing before State

courts," and will not be permitted to represent clients if they fail to do so).

        The lack of any connection between Capogrosso's expulsion by DMV and his letter to

the OAG is further underscored by the fact that ALJ Gelbstein (in conjunction with ALJ

Vahdatlamas and Neil Schoen, DMV's Deputy Commissioner for Legal Affairs) took essentially

the same action, in the same manner, the last time Capogrosso's behavior crossed the line from

inappropriate to violent.  See Gelbstein Dec. ¶ 23; Vahdatlamas email to file, Gelbstein Dec. Ex.

6.  After the December 21, 2011 incident in which Capogrosso called a fellow attorney a "Jew

fucking cunt," threw a coffee cup at him, and then punched the air in front of another attorney's

face, ALJs Gelbstein and Vahdatlamas "asked Ms. Calvo to speak to Mr. Capogrosso and inform

him that the rest of his cases for the day were being adjourned and that he had to leave the

building at once."  Id.  They then spoke with people who witnessed the incident, consulted with

Mr. Schoen, and asked Capogrosso "not to return till further notice."  Id.  Capogrosso was later

informed by phone about the Suspension.  Thompson Dec. Ex. 3 at 2.  The only difference

between the 2011 Suspension and the 2015 TVB Practice Bar is that the latter was permanent, as

Capogrosso had been warned it would be – again, years before he sent his letter.  May 15, 2012

letter to Plaintiff's counsel, Traschen Dec. Ex. 2 at 1-2 ("[I]n the event that Mr. Capogrosso

commits an act of physical violence, he shall be immediately and permanently barred from appearing on behalf of DMV licensees at TVB offices.").

The Court need not ignore – and must not ignore – all of these facts simply because Capogrosso claims that ALJ Gelbstein once suggested he should "go practice somewhere else," an alleged fact supported by no evidence other than Capogrosso's own say-so.  Instead, it was Capogrosso's burden to "establish a 'causal connection' between the government defendant's 'retaliatory animus' and [his] 'subsequent injury.'"  Nieves, 139 S.Ct. at 1722 (quoting Hartman, 547 U.S. at 259).  This he has not done: even if the Court were to infer retaliatory animus on ALJ Gelbstein's part, Capogrosso has not shown any evidence connecting the purported protected activity with the TVB Practice Bar, and even if he had, the evidence is overwhelming that the State Defendants would have expelled him even if his letter had never been filed.  Cf. Nieves, 139 S.Ct. at 1722 ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." (emphasis in the original); Hartman, 547 U.S. at 260 ("[A]ction colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway.").  Because Capogrosso has not adduced sufficient evidence to support a jury finding that the AG Letter was a but-for cause of his expulsion from practice, summary judgment must be granted against his retaliation claim.

## IV.   INJUNCTIVE RELIEF IS BARRED BY § 1983 BECAUSE CAPOGROSSO COULD HAVE SOUGHT DECLARATORY RELIEF

Even if Capogrosso could establish his entitlement to relief, it would be unavailable to him as a matter of law.  Capogrosso's demand for a federal injunction is barred by the express terms of 42 U.S.C. § 1983, which provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."  See also

31

Ashmore v. New York, No. 12 Civ. 3032, 2012 WL 2377403, at *3 (E.D.N.Y. June 25, 2012)

("Congress statutorily provided for such immunity" from prospective injunctive relief). As

discussed in Section I, above, each of the Individual Defendants[11] – an Administrative Law

Judge, a clerk, and the official overseeing the administrative court system – was a "judicial

officer" at the time of the incidents that gave rise to this lawsuit.[12]  Similarly, federal courts have

repeatedly held that expelling an attorney from practice is a judicial act.  See, e.g., Libertarian

Party, 970 F.3d at 124 ("the act of disbarring an attorney as a sanction for the attorney's

contumacious conduct . . . is a judicial act."); McNamara, 2008 WL 3836024 at *7 ("disciplinary

proceedings such as those that are the subject of this litigation are 'judicial acts'").

Here, the decision to revoke Capogrosso's right to practice before the TVB was

reviewable, and declaratory relief was available, by filing an Article 78 proceeding in New York

Supreme Court, as Capogrosso had done once before.  See Article 78 petition, Thompson Dec.

Ex. 4; May 15, 2012 letter to Plaintiff's Article 78 counsel, Traschen Dec. Ex. 2; cf. Johnson-El

v. DeProspo, No. 20 Civ. 2878, 2020 WL 5350487, at *5 n.3 (S.D.N.Y. Sept. 3, 2020)

---

[11] The Plaintiff's third claim, the only one seeking injunctive relief, was alleged against the Individual Defendants in their official capacities.  See Complaint ¶¶ 86-88.  Although DMV Commissioner Mark Schroeder was later substituted for Defendants Gelbstein, Calvo, and Traschen on the injunctive relief claim because all three defendants had left their previous positions in the DMV administrative court system, see Dkt. No. 104, Commissioner Schroeder was substituted as their "successor" pursuant to Fed. R. Civ. P. 25(d), and the substitution should therefore have no effect on the analysis.  Moreover, even if the Plaintiff had alleged a claim for injunctive relief against Commissioner Schroeder directly, § 1983 would bar any putative injunction because it would affect the judicial officers who work for him.  See Van Oss v. New York, 783 F. Supp. 2d 681, 694-95 (S.D.N.Y. 2011) (denying claim for injunctive relief against Commissioner and senior officers of state agency due to § 1983's injunctive relief bar because "to the extent that the relief requested by plaintiffs does, in fact, implicate the conduct of the ALJs, such relief must be denied and any claims requesting such relief must be dismissed.").

[12] Federal courts have repeatedly held that State administrative law personnel are "judicial officers" for the purpose of § 1983's bar against injunctive relief.  See, e.g., Coleman v. Tucker, No. 19 Civ. 4857, 2019 WL 2918130, at *1 (S.D.N.Y. July 8, 2019) (dismissing claim for injunctive relief against ALJ at Rikers Island); Howard v. N.Y. State Div. of Parole, No. 15 Civ. 5317, 2018 WL 4636951, at *3 (E.D.N.Y. Sept. 26, 2018) ("Plaintiff cannot seek injunctive relief against the ALJ because [§ 1983] bars all claims for injunctive relief against a judicial officer . . ."); see also Berlyavsky v. N.Y.C. Dep't of Env'tl Protection, No. 14 Civ. 3217, 2015 WL 5772266, at *19 n.19 (E.D.N.Y. Aug. 28, 2015) (injunctive relief unavailable against City administrative law judges and related personnel where Plaintiff had not shown declaratory relief to be unavailable).

(injunctive relief precluded "because Plaintiff can seek judicial review of [the challenged] decision in a proceeding under Article 78 of the New York Civil Practice Law and Rules in the New York Supreme Court").  Magistrate Judge Bloom noted as much in Capogrosso I, writing that "[t]he opportunity to pursue an Article 78 proceeding in New York State Supreme Court constitutes a wholly adequate post-deprivation hearing."  2019 WL 6406444 at *11; see also id. (noting that Capogrosso "clearly knew such a proceeding was available to him as he had pursued an Article 78 proceeding after his suspension in 2011.  He simply chose not to do so.").  Capogrosso explained at his deposition why he decided not to seek Article 78 relief: "[b]ecause I couldn't get money."  Capogrosso Tr. 89:17-19.  Having consciously decided not to seek declaratory or injunctive relief in the appropriate forum, Capogrosso cannot obtain it in this one.

## V.     THE STATE DEFENDANTS ARE PROTECTED BY QUALIFIED IMMUNITY

Any claim for money damages against the Individual Defendants would be barred by the doctrine of qualified immunity, which "protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the [defendant] to believe the conduct at issue was lawful."  Id. (quoting Taravella v. Town of Wolcott, 599 F.3d 129, 133-34 (2d Cir. 2010)).

Capogrosso has not shown facts making out a violation of a constitutional right, as detailed in Section II, above.  But even if he had, the nature of the First Amendment right in this context is anything but "clearly established."  "'To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing

33

violates that right.'  In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"   Bacon v. Phelps, 961 F.3d 533, 545 (2d Cir. 2020) "The Supreme Court repeatedly has instructed that courts must not define clearly established law at 'a high level of generality.'"  Id. (collecting cases).  Instead, "[t]he 'clearly established' standard [] requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him."  District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018); see also Laurent v. Edwin, No. 17 Civ. 3300, 2021 WL 1152962, at *15 (E.D.N.Y. Mar. 25, 2021) ("This standard is deliberately forgiving in order to give public officials breathing room to make reasonable but mistaken judgments without fear of disabling liability.").

As Magistrate Judge Bloom noted in Capogrosso I, "Plaintiff's retaliation claim wades in the muddy First Amendment delta between public employees and private citizens."  2019 WL 6406444.  The Supreme Court has laid out clear standards for First Amendment retaliation claims by persons in those two categories, but Capogrosso fits into neither: he was not a DMV employee or a private citizen, but rather an attorney practicing before a State administrative tribunal, and the applicable precedents "rather plainly indicate that the speech of lawyers . . . may be regulated under a less demanding standard."  Gentile, 501 U.S. at 1074.  There is no clear standard applicable to such a claim established in the case law, see Capogrosso I, 2019 WL 6406444 at *15 ("The parties do not point us to, nor has the Court found, case law on point with the facts presented herein."); cf. Higazy v. Templeton, 505 F.3d 161, 169 (2d Cir. 2007) ("the decisional law of the Supreme Court and the applicable circuit court [must] support the existence of the right in question"), and as discussed in Section II(A), above, Capogrosso's speech was not protected under the standard applicable to public employees, or even some "less demanding" version of it.  Gentile, 501 U.S. at 1074.

And "even if the right was 'clearly established,' . . . it was 'objectively reasonable' for the [Individual Defendants] to believe the conduct at issue was lawful." Gonzalez, 728 F.3d at 154. Capogrosso's AG Letter was not made to any authority within DMV – not to the Brooklyn South TVB, not to ALJ Gelbstein, who supervised it, not to DMV Counsel's Office, which supervised the operations of TVBs statewide, not to any inspector general or any other agency or entity that handles complaints of malfeasance. Instead, it was sent to outside counsel on a long-closed case, who had never represented the Individual Defendants, and who had no authority to remedy anything Capogrosso complained of. The subject matter was similarly irrelevant to the Individual Defendants, concerned primarily with conflicts with "your security guard Dave Sparks." See Gelbstein Dec. ¶ 37 (recounting that ALJ Gelbstein "did not view the letter as particularly significant," for a host of reasons); see also Traschen Dec. ¶ 10 (DMV did not view the letter as important because it "contained nothing more than a rehash of certain grievances that . . . DMV was already aware of"). It was "objectively reasonable" for them to conclude that the letter had no legal significance, and that alone is enough for qualified immunity. Cf. Mellenix v. Luna, 577 U.S. 7, 12 (2015) ("qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.").

## CONCLUSION

For the reasons set forth above, the State Defendants respectfully request that the Court grant summary judgment in their favor, dismiss the Complaint with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      May 17, 2021

                              LETITIA JAMES
                              Attorney General of the State of New York

                              By:

                              James M. Thompson
                              Assistant Attorney General
                              28 Liberty Street
                              New York, NY  10005
                              (212) 416-6556
                              james.thompson@ag.ny.gov

                              *Attorney for the State Defendants*