UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MARIO H. CAPOGROSSO,

        Plaintiff,

    -against-                                Case No. 18 Civ. 2710 (EK)(LB)

ALAN GELBSTEIN, *in his individual capacity*, IDA
TRASCHEN, *in her individual capacity*, DANIELLE       **STATE DEFENDANTS' LOCAL**
CALVO, *in her individual capacity*, MARK J.F.            **CIVIL RULE 56.1 STATEMENT**
SCHROEDER, *in his official capacity as Commissioner
of the New York State Department of Motor Vehicles*,
SADIQ TAHIR, *in his individual capacity*, PEC GROUP
OF NY, INC., and DAVID SMART,

        Defendants.
------------------------------------------------------------------X

        Pursuant to Local Civil Rule 56.1, Defendants Alan Gelbstein, Ida Traschen, and Danielle Calvo, in their individual capacities, and Mark J.F. Schroeder, in his official capacity as Commissioner of the New York State Department of Motor Vehicles (collectively, the "State Defendants") submit this statement of material facts as to which it is contended there is no genuine issue to be tried, in support of the State Defendants' motion for summary judgment, filed contemporaneously herewith.

<u>The TVB's Adjudication of Noncriminal Traffic Violations</u>

        1.       In the five counties that comprise New York City, noncriminal traffic violations are adjudicated in the "Traffic Violations Bureau," commonly known as the "TVB," a system of administrative courts established by State law and overseen by the Department of Motor Vehicles ("DMV"). See N.Y. Vehicle & Traffic Law §§ 225 *et seq*.

        2.       Although the TVB exclusively adjudicates traffic violations, the adjudicative process parallels what would take place in a criminal court: cases are heard by an impartial

1

Administrative Law Judge ("ALJ"), the People bear the burden of proof, and motorists appearing before the TVB have the right to be represented by an attorney. See N.Y. Vehicle & Traffic Law § 227; 15 N.Y.C.R.R. § 124.2(a).

3. The TVB is "made up of those administrative law judges, supervisors and clerical personnel assigned by the commissioner." 15 N.Y.C.R.R. § 121.3.

4. Defendant Alan Gelbstein, now retired, was the Senior Administrative Law Judge of the Brooklyn South TVB office at the time of the events at issue in this case. ALJ Gelbstein's role involved hearing cases and helping to oversee the Bureau's legal work more broadly, including the other ALJs, in a manner analogous to the Chief Judge of a federal court. Declaration of Alan Gelbstein (the "Gelbstein Dec.") ¶¶ 1, 4.

5. Defendant Ida Traschen, also now retired, was DMV's First Assistant Counsel at the time of the events at issue in this case, and was responsible for overseeing the entire TVB system. Declaration of Ida Traschen (the "Traschen Dec.") ¶¶ 5-6; Traschen Dec. Ex. 1; Gelbstein Dec. Ex. 5.

6. ALJ Gelbstein reported to Supervising ALJ Bushra Vahdatlamas (who oversaw all Downstate TVBs), who in turn reported to Ms. Traschen. Gelbstein Dec. ¶ 5; Traschen Dec. ¶ 6.

7. Defendant Danielle Calvo, now a Senior Court Clerk with the New York State Unified Court System, was a supervising clerk at the Brooklyn South TVB at the time of the events at issue in this case, carrying out the day-to-day functions of the Bureau with the help of a small staff. Declaration of Danielle Calvo (the "Calvo Dec.") ¶ 3.

8. The regulations governing the TVB state that "[a]ny person representing the motorist must conform to the standards of conduct required of attorneys appearing before State

courts, and failure to conform to these standards will be grounds for declining to permit his or her continued appearance in the proceeding. 15 N.Y.C.R.R. § 124.2(a).

The Plaintiff's History of Abusive Behavior and His First Suspension from the TVB

9. Beginning in 2009 and continuing until his eventual TVB Practice Bar in 2015, TVB officials received a string of complaints regarding the Plaintiff's aggressive or threatening conduct, often (but not always) towards women. See, e.g., Gelbstein Dec. Exs. 1-4, 7-10, 12-26; Calvo Dec. Exs. 2-6; see also Gelbstein Dec. ¶¶ 8-9; Calvo Dec. ¶ 4; Traschen Dec. ¶ 7.

10. On April 21, 2009, the TVB received written complaints from two different third-party witnesses stating that the Plaintiff had an altercation with a lawyer's assistant named Tanya Rabinovich, in which he was "screaming and yelling profanities and obscenities," after which he approached her and "he bumped real hard into her . . . which was very unnecessary given he had plenty of room to walk around her." Gelbstein Dec. Exs. 1 & 2; see Gelbstein Dec. ¶ 10. The Plaintiff does not deny that this confrontation occurred, and admits that "I was loud," and that "I did get up" to shout at her, but claims that he did not use obscenity. Capogrosso Tr. 148:15-150:6. As to whether the Plaintiff bumped into or otherwise made physical contact with Ms. Rabinovich, he inconsistently testified "not that I recall, no. She would have filed a police report against me that I hit her and none was filed. I do not recall hitting her," while later claiming "She bumped into me" after being confronted with the corroborating complaint. Id.

11. On June 9, 2009, TVB clerk Marisol Cervoni filed a complaint stating that the Plaintiff had approached her counter as she handled a motorist's ticket and then began "yelling, cursing and insulting me." Gelbstein Dec. Ex. 3; see Gelbstein Dec. ¶ 11. The clerk wrote that she "can no longer interact with Mr. Capogrosso . . . because I fear for my safety. On many occasions I have observed him display aggressive behavior towards my co-workers, his clients,

3

the other attorneys and their assistants." Id. The Plaintiff did not deny that this interaction occurred and admitted that he "might have been loud" and that he refused to leave her station, suggesting only that Ms. Cervoni was "oversensitive." Capogrosso Tr. 168:22-24, 175:11-176:8.

12. On August 5, 2009, paralegal Agnes Paez – who is not employed by the TVB and was six months pregnant at the time – submitted a written complaint to ALJ Gelbstein stating that the Plaintiff "called me a variety of vulgar and profane names and threatened me with violence to stay away from the Dept. of Motor Vehicles," ultimately requiring the intervention of court staff. Gelbstein Dec. Ex. 4; see Gelbstein Dec. ¶ 12. The Plaintiff admitted that he disapproved of the fact that Ms. Paez was, according to him, "soliciting motorists on the DMV floor," but claimed that he "d[id]n't recall having any altercation with [her]." Capogrosso Tr. 206:16-23.

13. On January 6, 2011, eighteen different Brooklyn South TVB employees, including Ms. Calvo, signed a petition stating that they "feel the presence of attorney Mario Capogrosso on our premises constitutes a threat to our physical safety," that "Mr. Capogrosso's behavior is unstable," and that "the confrontations have been escalating." The staff members asked "that Mr. Capogrosso's behavior be dealt with and that the management of this agency alleviates the threat to our physical safety." Petition, Calvo Dec. Ex. 1; Calvo Dec. ¶ 6; Gelbstein Dec. ¶ 13 & Ex. 5.

14. On December 21, 2011, the Plaintiff was involved in an altercation with an attorney named Yaakov Brody. According to a statement Brody provided to TVB officials, the Plaintiff approached Brody, who was sitting in the TVB's attorney's room, and even though there was plenty of space, the Plaintiff demanded that Brody move. Brody Statement, Gelbstein Dec. Ex. 7. According to Brody, when Brody told the Plaintiff that he had enough room, the

4

Plaintiff "lashed out" and said next time he would just hit him. Id.

15. Brody further reported that shortly afterward, the Plaintiff returned to the attorneys' room, threw a partially-full coffee cup towards Brody, and then, according to Brody, "went on a rant on how I was a '[J]ew fucking cunt' a phrase which he repeated about six or seven times. He went on to say how this place was 'run by [J]ews.'" Id. Brody's account was corroborated by other third-party witnesses who likewise provided statements to the TVB. See Maher Statement, Gelbstein Dec. Ex. 8 ("Nothing Brody did or said during Capagrosso's [sic] verbal attack was in any way provocative or confrontational. Everyone in the room except Capagrosso seemed to understand he was losing self-control for no reason."); see also Tahir Statement, Gelbstein Dec. Ex. 9.

16. The Plaintiff acknowledges that this confrontation occurred and admits that he may have used an anti-Semitic slur. See Capogrosso Tr. 260:18-21 ("Did I call him a fucking Jew cunt? I probably called him a fucking something. I don't remember exactly the words I did."); see also Capogrosso Petition, Thompson Dec. Ex. 4 ¶ 12.

17. According to another statement received by TVB from an attorney named Jeffrey Meyers, when Meyers suggested to the Plaintiff later that day that he should apologize, the Plaintiff "suddenly became enraged and lunged at me with his fists with great speed and then smacked his firsts against his other hand in a marshal arts [sic] form coming within 12 inches of my face." Meyers statement, Gelbstein Dec. Ex. 10. Meyers wrote that the Plaintiff bragged that "I could put you in the hospital with just one punch," and that he "later told me that he envisioned all of us (Jews) and didn't mean to single me out." Id. This altercation was also observed and corroborated by others, according to statements received by the TVB at that time. See Tahir Statement, Gelbstein Dec. Ex. 9 (stating that the Plaintiff "tried to hit Mr. Meyers," but

that he might have been trying just to "give some message," and that the Plaintiff "said to Mr. Meyers that I will send you to the hospital."). The Plaintiff then stormed out of the room and started punching a wall with his fists. Id. The Plaintiff acknowledges that the altercation occurred and that "I got upset [and] threw the punch at the wall." Capogrosso Tr. 272:18-22; see also Thompson Dec. Ex. 4 ¶ 14.

18. ALJs Vahdatlamas and Gelbstein then spoke with the witnesses to the incident and obtained statements from them. Gelbstein Dec. ¶¶ 16-17; Vahdatlamas Email to File, Gelbstein Dec. Ex. 6; see Gelbstein Dec. Exs. 7-10 (witness statements).

19. ALJs Vahdatalamas and Gelbstein consulted with Neil Schoen, the Deputy Commissioner for Legal Affairs, and the three officials determined that the Plaintiff should be suspended from practice for an indefinite period. Gelbstein Dec. ¶ 23. ALJ Vahdatlamas later informed the Plaintiff by telephone that because of the incident he was suspended from practicing at TVB locations for three months, and suspended indefinitely from practicing at the Brooklyn South location (the "Suspension"). Letter from Plaintiff's counsel, Thompson Dec. Ex. 3 at 2.

The Plaintiff Is Reinstated After His Lawsuit Is Settled, After Anger Management Classes And A Warning About Any Future Aggressive Behavior

20. In 2012, the Plaintiff filed an Article 78 special proceeding in state court to challenge his Suspension. Verified Petition, Thompson Dec. Ex. 4. In the Plaintiff's Verified Petition, he acknowledged both his verbal rant at Mr. Brody, id. ¶ 12 ("CAPOGROSSO realizes his outburst was ill considered and unprofessional and he is extremely ashamed"), and his agitated speech and physically intimidating behavior toward Mr. Meyers. Id. ¶ 14 (acknowledging that the Plaintiff spoke to Meyers "in the heat of the moment" and that he "punched the air").

6

21. The parties ultimately settled the Plaintiff's Article 78 proceeding, with DMV agreeing to lift the Suspension upon his successful completion of an anger management course. Capogrosso Tr. 321:12-322:20; Traschen Dec. ¶ 8; see Attestation of Dr. John McCann, Thompson Dec. Ex. 5.

22. In connection with the settlement, DMV's litigation counsel advised the Plaintiff that his Suspension would be lifted effective June 27, 2012. But she also cautioned that "if and when Mr. Capogrosso appears at a TVB office, he must strictly adhere to the standards of conduct required of attorneys appearing before State courts." Letter to Plaintiff's Counsel, Traschen Dec. Ex. 2. The Plaintiff was explicitly warned that "[t]hreatening conduct[,] . . . verbal threats of physical violence, and verbal abuse including the use of ethnic slurs will not be tolerated," and that "in the event that Mr. Capogrosso commits an act of physical violence, he shall be immediately and permanently barred from appearing on behalf of DMV licensees at TVB offices." Id. at 2. The Plaintiff acknowledges that his counsel informed him that further violent or aggressive behavior would lead to his expulsion. Capogrosso Tr. 414:4-6 ("Chris did tell me if you sneeze the wrong way, they're going to throw you out again.").

The Plaintiff Relapses Into Abusive And Threatening Behavior

23. The Plaintiff resumed practicing at the Brooklyn South TVB, but beginning in mid-2014, DMV began receiving an escalating series of complaints regarding his aggressive or threatening behavior. See Gelbstein Dec. Exs. 12-26; Gelbstein Dec. ¶¶ 27-34; Calvo Dec. ¶ 10; Traschen Dec. ¶ 9.

24. On or around May 5, 2014, a TVB clerk filed a workplace violence incident report stating that the Plaintiff "accused [security officer] David Smart of looking at him [and] there were heated words exchanged," requiring a police officer to intervene. Piparo workplace

7

violence report, Gelbstein Dec. Ex. 12; Calvo Dec. ¶ 11 & Ex. 2.

25. On or around October 29, 2014, a clerk named Wanda Alford submitted a report to ALJ Gelbstein stating that a motorist had approached her counter to tell her that the Plaintiff had "told me to give you an attitude." Alford Report, Gelbstein Dec. Ex. 13. According to the report, when Calvo asked the Plaintiff why he had done that, he replied, "I wanted to get a reaction out of you." Id.

26. On or around February 3, 2015, Officer Smart submitted a complaint to ALJ Gelbstein stating that the Plaintiff "deliberately walked into me." Smart complaint, Gelbstein Dec. Ex. 14.

27. On or around February 5, 2015, a motorist named Paul Perez, who apparently had retained the Plaintiff to represent him before the TVB, filed a complaint stating that after he had a disagreement with the Plaintiff regarding his representation on a case, the Plaintiff "told me to go fuck my self [sic] and that we can take it outside." Perez complaint, Gelbstein Dec. Ex. 15. TVB Clerk Melissa Vergara submitted a statement corroborating Mr. Perez's complaint. See Vergara Statement, Gelbstein Dec. Ex. 16. TVB Clerk Melissa Levine likewise corroborated this account in a workplace violence incident report she submitted. Levine workplace violence report, Gelbstein Dec. Ex. 17 (stating that the Plaintiff and Perez "engaged in a very loud verbal argument . . . with threats of escalating to a physical altercation," and that "Attorney Capogrosso continued to verbally provoke Mr. Perez into going outside . . . throughout his experience at the service counter"). The Plaintiff acknowledges the incident but depicts Perez as the aggressor, and acknowledges that he told Perez to come outside, but says that Judge Gelbstein told him to do so. Capogrosso Tr. 361:6-364:4.

28. On or around February 9, 2015 TVB clerk Geri Piparo submitted a report to ALJ

8

Gelbstein stating that the Plaintiff complained when she put a paperclip on a garbage pail after hanging the day's case dockets, and then told her "Geri[,] stick it where the sun don't shine." Piparo email complaint, Gelbstein Dec. Ex. 18. According to Ms. Piparo, when she went to ALJ Gelbstein for assistance, the Plaintiff "verbally attacked Judge Gelbstein and me, cursing." Id.

29. On or around March 19, 2015, two attorneys, Diantha Fuller and Sadiq Tahir, filed a complaint stating that the Plaintiff "has repeatedly said 'shit' to me whenever he passed by me." Fuller statement, Gelbstein Dec. Ex. 19. They reported that the Plaintiff had continued to exhibit "bizarre behavior" even after returning from his Suspension, and concluded that they "simply have endured this harassing [sic] behavior from him daily for the past 6 months and simply want him to stop doing it." Id. Fuller wrote that she had filed the complaint because "without memorializing this incident, he will continue unfettered in his harassment of me and other attorneys, such as Sadiq Tahir." Id.

The Plaintiff Writes A Letter To The Attorney General's Office, Complaining About Officer Smart

30. On or around March 20, 2015, the Plaintiff sent a letter to Assistant Attorney General Elizabeth Prickett-Morgan at the Office of the New York State Attorney General complaining about Officer Smart, (whom he repeatedly referred to as "your security guard Dave Sparks"). AG Letter, Thompson Dec. Ex. 7. The letter accused Officer Smart of various personal confrontations, including that he "told me to go F__ myself," that he "got[] in my face, stared and glared, I asked him what was the problem was [sic] and he told me I was the problem, F___ you," that he "has stood looked [sic] at me directly while I was standing on the DMV traffic line gave me the sign of the cross twice and directed a spear hand in my direction," and that he "is entering the attorney's room and tampering with my files." Id.

31. While the Plaintiff's letter asserts that he complained to ALJ Gelbstein about his

9

conflicts with Smart, his letter also makes clear that he understood that Smart was not a DMV employee and did not report to Gelbstein. See id. at 2 "After several complaints to Administrative Judge Gelbstein, the Senior judge at the Brooklyn TVB, I called Sparks [sic] employer. Subsequently, your security guard Sparks [sic] was relieved from his duties at the Brooklyn DMV for two weeks (proof to be provided)."

32.     The Plaintiff did not send the letter to DMV, although ALJ Gelbstein and Ms. Traschen later became aware of it. Because the letter contained stale claims that the Plaintiff had previously raised with ALJ Gelbstein, no one at DMV felt that any action was necessary in response to the letter. See Gelbstein Dec. ¶¶ 36-37; Traschen Dec. ¶ 10.

The March 5, 2015 Incident

33.     On May 5, 2015, Danielle Calvo heard the Plaintiff screaming "don't touch my stuff" over and over again, and went to the lawyers' room at the TVB. Calvo Dec. ¶ 13. She found the Plaintiff screaming at Sadiq Tahir, another attorney, who had apparently touched his bag. Id. She told the Plaintiff that he had to stop screaming and he complied, but after Ms. Calvo went to get ALJ Gelbstein and came back, the Plaintiff became enraged again, screaming that he did not want anyone touching his belongings. Id.; see Gelbstein Dec. ¶ 39; Calvo Dec. Ex. 3.

34.     Mr. Tahir submitted a statement to ALJ Gelbstein recounting that earlier that day, he had moved the Plaintiff's bag from one bench to another, when the Plaintiff became agitated and started yelling at him, necessitating intervention by Ms. Calvo. Tahir complaint, Gelbstein Dec. Ex. 20. Tahir stated that after Ms. Calvo left, the Plaintiff "again started shouting and called me 'Shit.'" Id. Tahir also referenced the earlier March 19, 2015 complaint he had submitted jointly with Ms. Fuller, reiterating that "[w]henever he [Capogrosso] passes me he

always said 'Shit.' He is more powerful and strong than me and I am afraid that one day he can physically hurt me." Id.

35. TVB clerk Kimberly Rivers corroborated Tahir's account in a contemporaneous statement, writing that she "witnessed the lawyer Mario Capogrosso confront Sadiq Tahir," that "Capogrosso went in there yelling and cursing in Mr. Tahir's face," that "Mr. Tahir remained seated as Mr. Capogross[o] continued to scream obscenities and threats," and that "Mr. Capogross[o] is more often than not a menace to the office staff, customers, as well as the other attorneys who practice in this office." Rivers complaint, Gelbstein Dec. Ex. 21.

36. A third eyewitness account of this incident, contained in a letter submitted to ALJ Gelbstein by attorney Michael Beer, provides even more detail about the Plaintiff's conduct. Attorney Beer stated that the Plaintiff repeatedly shouted "don't touch my fucking stuff, don't touch my fucking stuff," and then "piece of shit, piece of shit," and that he "witnessed Mario Capogrosso yelling at Mr. Tahir to not touch his fucking stuff." Beer Statement, Gelbstein Dec. Ex. 22. In addition, Beer stated that he "returned to the [attorneys'] room and was again alone with Mario Capogrosso when he start[ed] ranting" about ALJ Gelbstein, saying, "[h]ow dare [Gelbstein] do that and if [Gelbstein] was a man he would put a gun to his own head. Thereafter he also began ranting that he should never have plead to the deal [to resolve his Suspension], he should have fought those guys." Id. Beer concluded by writing, "[i]t appears to me that over the past few weeks Mario Capogrosso has become more aggressive in both his words and demeanor and has been creating an atmosphere of fear and threatening both attorneys and DMV staff." Id.

37. The Plaintiff's erratic and aggressive conduct in the May 5, 2015 incident, combined with the complaints received regarding it and the dozens of other complaints previously received regarding the Plaintiff's behavior, were key to the state of mind of ALJ

11

Gelbstein and Ms. Traschen when they made the decision to impose the TVB Practice Bar on the Plaintiff after his altercation with Mr. Smart on May 11, 2015, less than a week later. See Gelbstein Dec. ¶¶ 44, 46-47; Traschen Dec ¶¶ 12-13.

The May 11, 2015 Incident And The TVB Practice Bar

38. On May 11, 2015, a TVB coworker ran and told Ms. Calvo that the Plaintiff had gotten into a fight with Officer Smart. Ms. Calvo contacted ALJ Gelbstein, who was out of the office, but told her to call Ida Traschen. Ms. Traschen told Ms. Calvo to have the Plaintiff escorted out of the building, and that he could call her for any further details. Ms. Calvo did so. Calvo Dec. ¶ 14; see Calvo Dec. Ex. 4; Traschen Dec. ¶ 11; Gelbstein Dec. ¶ 45.

39. DMV collected statements from people who had witnessed the confrontation between the Plaintiff and Mr. Smart, all of which indicated that the Plaintiff had been the aggressor. See Calvo Dec. ¶15; Gelbstein Dec. ¶ 48; Calvo Dec. Exs. 4-6.

40. Ms. Traschen and ALJ Gelbstein conferred by telephone and determined that due to the Plaintiff's history of hostile and unprofessional behavior, the fact that he had been suspended from practice once before, the increasing pattern of aggression in late 2014 and early 2015, and the physically violent nature of the altercation with Officer Smart, the Plaintiff should be barred from practicing at the TVB on a permanent basis. Traschen Dec. ¶ 12; Gelbstein Dec. ¶ 46.

41. Ms. Calvo played no role in the decision to bar the Plaintiff from practice. Calvo Dec. ¶ 16; see Traschen Dec. ¶¶ 12-13; Gelbstein Dec. ¶¶ 46-47. Ms. Traschen and ALJ Gelbstein made the decision without consulting her. See id.

42. The Plaintiff's March 2015 letter to AAG Prickett-Morgan played no role in that decision. Ms. Traschen and ALJ Gelbstein decided to institute the TVB Practice Bar based on

12

the Plaintiff's own actions and his long history of aggressive and unprofessional behavior – including the disturbing incident on May 5, 2015 and his physical confrontation with Officer Smart earlier on May 11, 2015. Ms. Traschen and ALJ Gelbstein would have made the same decision even if the Plaintiff had never sent his letter. Traschen Dec. ¶¶ 12-13; Gelbstein Dec. ¶¶ 46-47.

Dated: New York, New York
       May 17, 2021

                                LETITIA JAMES
                                Attorney General of the State of New York
                                <u>Attorney for the Defendants</u>

By: _____
       JAMES M. THOMPSON
       Assistant Attorney General
       28 Liberty Street
       New York, New York 10005
       james.thompson@ag.ny.gov
       (212) 416-6556