UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MARIO H. CAPOGROSSO,

                      Plaintiff,

       -against-                              Case No. 18 Civ. 2710 (EK)(LB)

ALAN GELBSTEIN, *in his individual capacity*, IDA TRASCHEN, *in her individual capacity*, DANIELLE CALVO, *in her individual capacity*, MARK J.F. SCHROEDER, *in his official capacity as Commissioner of the New York State Department of Motor Vehicles*, SADIQ TAHIR, *in his individual capacity*, PEC GROUP OF NY, INC., and DAVID SMART,

                      Defendants.
------------------------------------------------------------X

       ALAN GELBSTEIN hereby declares, pursuant to 28 U.S.C. § 1746, that:

       1.     I am an attorney licensed to practice law in New York State. In May of 2019 I retired from service as Senior Administrative Law Judge at the New York State Department of Motor Vehicles' ("DMV") Brooklyn South Traffic Violations Bureau ("TVB"), located at 2875 West 8th Street in Coney Island.

       2.     I submit this declaration in support of the State Defendants' motion for summary judgment in this matter. The contents of this declaration are based on my own personal knowledge, my review of files kept by the DMV, my review of files produced in this litigation, and my review of files in my personal possession.

## The TVB System

       3.     The Traffic Violations Bureau is a network of offices where administrative law judges hear cases involving non-criminal traffic violations. Although the procedures are streamlined from what would take place in a federal court, cases are adjudicated in similar

manner: the judge is impartial, the prosecution has the burden of proof, and the motorists have a right to be represented by a lawyer. Attorneys appearing before the TVB are required by regulation to "conform to the standards of conduct required of attorneys appearing before State courts." 15 N.Y.C.R.R. 124.2(a).

4. As Senior Administrative Law Judge, I was responsible for overseeing and managing the legal work at the South Brooklyn TVB, including the work of other Administrative Law Judges, in a manner similar to the Chief Judge of a federal court. I also heard and adjudicated cases myself. When complaints arose regarding the conduct of an attorney appearing at the TVB, it was my role as Senior Administrative Law Judge to investigate and respond to them.

5. I reported to Supervising Administrative Law Judge Bushra Vahdatlamas (also known as Bushra Vahdat), who oversaw all downstate TVB offices. Ms. Vahdatlamas reported to DMV's First Assistant Counsel, who oversaw the entire TVB system. During the relevant time period, the First Assistant Counsel was Ida Traschen.

Capogrosso's Background And Disruptive Activity

6. The Plaintiff was one of the lawyers who sometimes represented motorists at the Brooklyn South TVB. He appeared before me regularly in administrative proceedings.

7. I received many complaints about the Plaintiff's conduct. In fact, I received more complaints about Plaintiff than I received about any other attorney in my entire time at DMV. Whenever a significant complaint came in regarding the Plaintiff's actions, it was my practice to investigate the allegations of the complaint and, if possible, speak with the complaining party and any witnesses. If he was available, I would then call the Plaintiff into my office to discuss the substance of the complaint, and try to get him to cease and desist with any aggressive or

2

inappropriate behavior. The Plaintiff would routinely promise to stop the behavior, but before long, I would receive new complaints about his conduct and behavior, and the cycle would continue.

8. On numerous occasions, I personally observed the Plaintiff harass TVB employees, motorists, and attorneys. He often used anti-Semitic language when referring or speaking to Jewish attorneys, and once called me a "beanie-wearing kike." When I observed the Plaintiff behave in an aggressive or disturbing way, I would warn him to exercise a calmer demeanor. However, despite repeated warnings, I continued to receive complaints regarding his conduct.

9. Capogrosso's cycle of inappropriate behavior at the TVB dates back to at least 2009, and I have regularly received written complaints about his conduct from numerous attorneys, motorists and TVB staff since that time.

10. For example, attached as Exhibit 1 is a written complaint I received from a witness who observed the Plaintiff yell obscenities at a lawyer's assistant named Tanya Rabinovich on April 21, 2009, and then physically bump into her. Attached as Exhibit 2 is another complaint made to me by a different witness regarding the same incident.

11. On or around June 19, 2009, I received a complaint, attached hereto as Exhibit 3, from Marisol Cervoni, one of the clerks at the Brooklyn South TVB, complaining of aggressive behavior from the Plaintiff, including "yelling, cursing and insulting me." Ms. Cervoni wrote that she "can no longer interact with Mr. Capogrosso . . . because I fear for my safety. On many occasions I have observed him display aggressive behavior towards my co-workers, his clients, the other attorneys and their assistants."

12. Attached as Exhibit 4 is a complaint dated August 5, 2009, made to me by

Diantha Fuller, an attorney practicing at the TVB. Fuller's complaint indicated that her assistant, Agnes Paez, had advised her that the Plaintiff approached her and "called me a variety of vulgar and profane names and threatened me with violence," and that she "was especially nervous because I am 6 months pregnant and I was in fear his outbursts would turn violent."

13. Because of incidents like the foregoing examples, the Plaintiff's aggressive and hostile behavior was deeply concerning to the TVB staff. In January 2011, eighteen TVB employees signed a petition stating that "we feel the presence of attorney Mario Capogrosso on our premises constitutes a threat to our physical safety," that "Mr. Capogrosso's behavior is unstable," and that "the confrontations have been escalating." The staff members asked "that Mr. Capogrosso's behavior be dealt with and that the management of this agency alleviates the threat to our physical safety." A copy of that employee petition is attached as <u>Exhibit 5</u>.

14. After receiving the petition, I met with the Plaintiff and Supervising ALJ Bushra Vahdatlamas in my office. We emphasized that his aggressive behavior was unacceptable, and that if he did not conduct himself appropriately, he would not be allowed to appear on behalf of motorists at the TVB. During this conversation, the Plaintiff admitted that he sometimes loses his temper, but he agreed to calm down and cease his threatening behavior. He also told us that he would voluntarily stop appearing at the TVB if he had another altercation with anyone.

<u>The Plaintiff's 2011 Suspension From Practice</u>

15. On December 21, 2011, the Plaintiff was involved in a verbal altercation with an attorney at the TVB in which he used profane and anti-Semitic language. Later that same day, he threw a punch into the air inches away from another attorney. Accordingly, the Plaintiff was told that his remaining cases for the day were adjourned and that he needed to leave the building immediately.

4

16. On the next day, December 22, 2011, Supervising ALJ Vahdatlamas and I interviewed four attorneys who were present at the TVB during the incidents in question. Attached as <u>Exhibit 6</u> is a December 23, 2011 email from ALJ Vahdatlamas, which memorializes our investigation of the facts and our discussions with the Plaintiff.

17. As set forth below, the four attorneys also submitted written statements, which comport with what they told me in their interviews. ALJ Vahdatlamas and I also spoke with several of the TVB clerks regarding the incident.

18. Attached as <u>Exhibit 7</u> is a statement from Yaakov Brody, one of the attorneys who was harassed by the Plaintiff during the incident. The statement was given to me on or around December 22, 2011.

19. Attached as <u>Exhibit 8</u> is a statement from Richard Maher, who witnessed the Plaintiff's harassment of Mr. Brody. The statement was given to me on or around December 22, 2011.

20. Attached as <u>Exhibit 9</u> is a statement from Sadiq Tahir, who witnessed the Plaintiff's harassment of Mr. Brody and his subsequent threatening behavior toward another fellow attorney named Jeffrey Meyers. The statement was given to me on or around December 22, 2011.

21. Attached as <u>Exhibit 10</u> is a statement from Mr. Meyers, who overheard the Plaintiff's harassment of Mr. Brody and was later physically threatened by the Plaintiff. The statement was given to me on or around December 23, 2011.

22. Later on December 22, 2011, Supervising ALJ Vahdatlamas and I met with the Plaintiff in my office to obtain his version of the incidents. The Plaintiff claimed that everyone in the Brooklyn South TVB hated him because he is not Jewish, and admitted that he had

5

shouted anti-Semitic statements at Mr. Brody and punched "the air in front of Mr. Meyers' face." The Plaintiff did not seem to feel any remorse about his conduct.

23. After the meeting with the Plaintiff, I consulted with Supervising ALJ Vahdatlamas and Neil Schoen, the Deputy Commissioner for Legal Affairs. We concluded that the Plaintiff should be indefinitely suspended from practicing at the TVB (the "Suspension"), based on the seriousness of the incident, the Plaintiff's history of aggressive and threatening conduct, and the need to provide a safe environment for motorists, attorneys, and TVB staff.

<u>Capogrosso Is Conditionally Reinstated, But The Disturbing Behavior Continues</u>

24. On or around April 12, 2012, Petitioner brought an Article 78 proceeding in state court challenging the Suspension. DMV opposed the Plaintiff's petition, and I provided an affirmation in support of their opposition, which is attached as <u>Exhibit 11</u>.

25. I understand that DMV and the Plaintiff settled his Article 78 proceeding on the condition that DMV would lift the Suspension upon the Plaintiff's completion of anger management course, that he subsequently did so, and that the Suspension was thereby lifted in or around June 2012.

26. I am aware that Plaintiff was advised that upon his return to practice before the TVB, he would be required to strictly adhere to the standards of conduct required of attorneys appearing before State courts, and that threatening conduct, verbal abuse or the use of ethnic slurs would not be tolerated. The Plaintiff was also warned that any future misconduct could result in the Plaintiff being immediately and permanently barred from practicing before the TVB.

27. For a year or two, I did not receive any notable complaints about the Plaintiff. However, I became aware that his behavior began to deteriorate again in 2014.

28. On or around May 5, 2014, Geri Piparo, one of the TVB clerks, filed a workplace

violence report stating that the Plaintiff accused David Smart, a security officer, "of looking at him" and "there were heated words exchanged," requiring a police officer to intervene. A copy of that Workplace Violence Report is attached as Exhibit 12.

29. On or around October 29, 2014, I received a written complaint from a clerk named Wanda Alford that the Plaintiff had told a motorist to "give [her] an attitude," and when asked why he did it, responded "I wanted to get a reaction out of you. A copy of the written complaint is attached as Exhibit 13.

30. On or around February 3, 2015, Officer Smart submitted a complaint to me stating that the Plaintiff "deliberately walked into me." A copy of the written complaint is attached as Exhibit 14.

31. On or around February 5, 2015, a motorist named Paul Perez, who was apparently one of the Plaintiff's clients, filed a complaint stating that after a disagreement the Plaintiff "told me to go fuck my self and that we can take it outside." Two TVB clerks, Melissa Vergara and Melanie Levine, also filed reports stating that the Plaintiff engaged in a verbal altercation with Mr. Perez and tried to get him to fight. A copy of Mr. Perez' statement is attached as Exhibit 15. A copy of Ms. Vergara's statement is attached as Exhibit 16. A copy of Ms. Levine's workplace violence report is attached as Exhibit 17.

32. On or around February 9, 2015, a TVB clerk named Geri Piparo sent a complaint to me by email, stating that the Plaintiff had objected that she left a paperclip on a garbage pail, and that he told her to "stick it where the sun don't shine." A copy of Ms. Piparo's email is attached as Exhibit 18.

33. On or around March 19, 2015, attorneys Diantha Fuller and Sadiq Tahir sent me a memo regarding incidents in which the Plaintiff would repeatedly say "shit" at them whenever

he passed them. Ms. Fuller wrote that she "simply ha[s] endured this harassing behavior from him daily for the past 6 months and simply want him to stop doing it so that I may not be harmed or hindered in my right to practice here." A copy of the memo is attached as <u>Exhibit 19</u>.

34. I was aware of these and other, more informal, complaints regarding the Plaintiff's behavior in late 2014 and early 2015. Based on what I had seen and heard, it was clear to me that the Plaintiff was once again making the motorists, staff, and attorneys at the TVB feel threatened and insecure. Like many at the TVB, I was seriously concerned about his aggressive and inappropriate behavior, which had already reached a level and frequency that similar to or even exceeded the conduct that had previously resulted in his Suspension.

<u>The Plaintiff's Letter To OAG</u>

35. I understand that at some point in March 2015 the Plaintiff sent a letter to the Office of the Attorney General complaining about Officer Smart, the security guard, and making allegations about me as well.

36. The Plaintiff did not send me a copy of the letter. I believe I was informed of the letter at some point after it was received at the Attorney General's office, but I do not recall when.

37. I do not recall reading the Plaintiff's letter, and sitting here today I do not view the letter as particularly relevant to me or my duties. My recollection is that I did not view the letter as particularly significant, as it was directed to the Attorney General, not DMV, and primarily consisted of rehash of certain stale grievances and unsubstantiated complaints about Officer Smart that the Plaintiff had already communicated to me on a number of occasions, and which had been appropriately considered. The fact that the Plaintiff had criticized me was also not particularly notable, given his history. As a TVB ALJ, receiving occasional criticism from

unhappy litigants or attorneys was part of the job and certainly not noteworthy.

38. I never spoke to the Plaintiff about the letter. The Plaintiff's allegation that I told him that I did not like what he wrote about me and asked him to practice somewhere else is not true.

The May 5, 2015 Incident

39. On or around May 5, 2015, the Plaintiff was involved in another aggressive incident. The Plaintiff became enraged when another attorney, Sadiq Tahir, touched his bag, and began yelling and cursing at him. Danielle Calvo informed me of the incident, and I went out and attempted to mediate the situation, but the Plaintiff repeatedly interrupted the conversation, overcome with anger against Mr. Tahir.

40. Mr. Tahir filed a complaint about the incident on or around May 5, 2015, a copy of which is attached as Exhibit 20. He writes about how Mr. Capogrosso became enraged, how I attempted to calm the tensions, and says that the Plaintiff threatened him again afterwards. Mr. Tahir writes that the Plaintiff "is more powerful and strong than me and I am afraid that one day he can physically hurt me."

41. One of the clerks, Kimberly Rivers, made a written statement regarding the incident, which is attached as Exhibit 21. She wrote that the Plaintiff "scream[ed] obscenities and threats," and that the Plaintiff "is more often than not a menace to the office staff, customers, as well as the other attorneys who practice in this office."

42. Another attorney, Michael Beer, wrote a statement to me regarding what he witnessed. He describes how the Plaintiff became angry at him as well, repeating "don't touch my fucking stuff," and that he then "witnessed Mario Capogrosso yelling at Mr. Tahir not to touch his fucking stuff." Mr. Beer also witnessed the Plaintiff make threatening statements about

me, saying "if he (I assume Judge Gelbstein) was a man he would put a gun to his own head." Mr. Beer concluded that "[i]t appears to me that over the past few weeks Mario Capogrosso has become more aggressive in both his words and demeanor and has been creating an atmosphere of fear and threatening both attorneys and DMV Staff." A copy of Mr. Beer's statement is attached as Exhibit 22.

43. Ms. Calvo also filed a workplace violence report regarding the incident, which is attached as Exhibit 23.

44. I found the Plaintiff's erratic and aggressive behavior in the May 5, 2015 incident very disturbing. The circumstances of this incident, along with the many other complaints received over the previous months and years, were on my mind after hearing about the Plaintiff's confrontation with Officer Smart less than a week later on May 11, 2015, and when Ida Traschen and I subsequently determined that he should be permanently barred from practice at the TVB.

The Plaintiff's Fight With Officer Smart, And the Decision to Bar the Plaintiff From the TVB

45. I was out of the office on a personal matter on the morning of May 11, 2015, when I received a call from Danielle Calvo, informing me that the Plaintiff had been in a physical confrontation with Officer Smart. I told her to call First Assistant Ida Traschen, who oversaw the TVB system, and who was aware of the Plaintiff's recurring incidents of aggressive behavior. It is my understanding that Ms. Traschen later advised Ms. Calvo to escort the Plaintiff out of the TVB.

46. Later that day, I spoke with Ms. Traschen. After a lengthy discussion, we concluded that the Plaintiff should be barred from practice at the TVB because of his long history of aggressive behavior, which seemed to only be getting worse, because the prior Suspension and required anger management classes had not been sufficient to resolve his

conduct issues and because the incident with Officer Smart involved physical violence, which the Plaintiff had been previously warned would lead to his being barred from practice before the TVB. I understand that Ms. Traschen informed the Plaintiff of the decision by phone.

47. The Plaintiff's letter to the Attorney General's Office was not discussed and played no role in that decision. We could not ignore the Plaintiff's history, the multitude of complaints that had accumulated about him, his increasingly hostile behavior, or the fact that he had become violent. We would have taken the same action whether or not he had sent a letter to the Attorney General months before.

48. By the time I physically returned to the office that day, the Plaintiff had already been escorted out. Although I was not personally present for the incident where the Plaintiff pushed Officer Smart, it is recorded in several eyewitness statements. Attached as Exhibit 24 is a workplace violence report filed by Ms. Calvo. Attached as Exhibit 25 is a statement by Anthony Adinolfi, who witnessed the incident. Attached as Exhibit 26 is a statement by George Han, a TVB employee who also saw the incident. All of the reports indicate that it was the Plaintiff who assaulted Officer Smart.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 14, 2021
Brooklyn, New York

ALAN GELBSTEIN