**EXHIBIT A**

December 17, 2020

---

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
MARIO H. CAPOGROSSO.

PLAINTIFF,

-against-      Case No.:
18 CV 2710 (EK) (LB)

ALAN GELBSTEIN, in his individual capacity,
IDA TRASCHEN, in her individual capacity,
DANIELLE CALVO, in her capacity, SADIQ
TAHIR, in his individual capacity, PEC
GROUP OF NY, INC., DAVID SMART, and DMV
COMMISSIONER MARK SCHROEDER, in his
official capacity,
                    DEFENDANTS.
------------------------------X
        DATE: December 17, 2020
        TIME: 10:16 A.M.

        DEPOSITION of the Defendant,
ALAN GELBSTEIN, taken by the Plaintiff,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held VIA ZOOM
VIDEOCONFERENCE, before Jamie Newman, a
Notary Public of the State of New York.

---

**Page 2**

APPEARANCES:

THE LAW FIRM OF MARIO H. CAPOGROSSO
    PLAINTIFF PRO SE
    21 Sheldrake Place
    New Rochelle, New York 10804
    capogrossom@aol.com

OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL
    Attorneys for the Defendants
    ALAN GELBSTEIN, in his individual
    capacity, IDA TRASCHEN, in her individual
    capacity, DANIELLE CALVO, in her
    capacity, SADIQ TAHIR, in his individual
    capacity, PEC GROUP OF NY, INC., DAVID
    SMART, and DMV COMMISSIONER MARK
    SCHROEDER, in his official capacity
    28 Liberty Street, 17th Floor
    New York, New York 10005
    BY: JAMES THOMPSON, ESQ.
    james.thompson@ag.ny.gov

DMV LEGAL BUREAU
    Attorneys for the Defendant
    DMV COMMISSIONER MARK SCHROEDER, in his
    official capacity
    6 Empire State Plaza, Room 522A
    Albany, New York 11228
    BY: BARBARA MONTENA, ESQ.
    File #: 18CV2710
    barbara.montena@dmv.nyc.gov

            *   *   *   *

---

**Page 3**

1          ALAN GELBSTEIN
2      (Whereupon, all 86 exhibits
3    were previously marked by Counsel,
4    Mr. Capogrosso.)
5    A L A N   G E L B S T E I N, called as a
6    witness, having been first duly affirmed by
7    a Notary Public of the State of New York,
8    was examined and testified as follows:
9    EXAMINATION BY
10   MR. CAPOGROSSO:
11       Q.   Please state your name for the
12   record.
13       A.   Alan Gelbstein.
14       Q.   What is your address?
15       A.   1570 East 7th Street, Brooklyn,
16   New York 11230.
17       Q.   Defendant Gelbstein we're here
18   today because I need to take your
19   deposition concerning the action filed
20   against you, myself and several other
21   defendants.
22       THE COURT REPORTER:  Wait,
23   wait, you're breaking up Counsel.
24   Counsel, you're breaking up so I
25   can't hear you.

---

**Page 4**

1          ALAN GELBSTEIN
2      MR. CAPOGROSSO:  Can you hear
3    me now?
4      THE COURT REPORTER:  You are
5    still breaking up, it's not the best
6    connection.  I could hear you, but it
7    goes in and out.
8      MR. CAPOGROSSO:  Can you hear
9    me now?
10     THE COURT REPORTER:  It goes in
11   and out.
12     MR. CAPOGROSSO:  Let me ask a
13   few more questions and see how we do.
14   Is that all right?
15     THE COURT REPORTER:  That's
16   fine.
17       Q.   These questions are all going
18   to be directed to Defendant, Gelbstein.
19       Were you in the Brooklyn
20   Traffic Violation Bureau on the morning of
21   May 11, 2015?
22       A.   At some point, yes.
23       Q.   At what point did you arrive at
24   the Brooklyn Traffic Violation Bureau on
25   that day?

---

1  (Pages 1 to 4)

December 17, 2020

Page 5

ALAN GELBSTEIN

1          ALAN GELBSTEIN
2     A.  I arrived late, I don't recall
3  the time.
4     Q.  Did you arrive after my removal
5  on that day?
6     A.  Yes.
7     Q.  What are your normal business
8  hours at the Brooklyn TVB?
9     A.  Business hours I believe are
10  8:30 to 4:30.
11     Q.  So, why were you late that day?
12     A.  I had some personal things to
13  attend to.
14     Q.  Did you not want to be in the
15  building that day for any reason?
16     A.  No, sir.
17     Q.  Now, I was removed that day on
18  May 11, 2015 under your direction?
19     A.  I beg your pardon.
20     MR. THOMPSON:  Objection to the
21  form of the question.
22     Q.  I was removed that day from the
23  Brooklyn TVB by your direction, do you
24  recall doing that?
25     MR. THOMPSON:  Objection to the

Page 6

1          ALAN GELBSTEIN
2  form of the question.  You can
3  answer.
4     Q.  Do you recall having me removed
5  from the Brooklyn TVB on May 11, 2015?
6     A.  I don't believe that is
7  correct.
8     Q.  You don't recall having me
9  removed?
10     A.  I did not have you removed.
11     Q.  You did not?
12     A.  No.
13     Q.  Let me take you back -- lets
14  goes to Exhibit 70.  Exhibit 70 that I have
15  marked, Plaintiff's Exhibit 70.
16     Are you in possession of
17  Plaintiff's Exhibit 70?
18     A.  I am not.
19     Q.  Is your attorney, Thompson, in
20  possession of it?
21     MR. THOMPSON:  My understanding
22  and Madame Court Reporter correct me
23  if I'm wrong, you're going to be
24  putting the exhibits up on the
25  screen; is that correct?

Page 7

1          ALAN GELBSTEIN
2     THE COURT REPORTER:  That's my
3  impression, but if I put it on the
4  screen you have to wait because I
5  can't have my hands off the machine,
6  but yeah, if that's what you want me
7  to do.
8     MR. CAPOGROSSO:  Well, I
9  already forwarded all the exhibits to
10  counsel, attorney Thompson.  So,
11  attorney Thompson, do you not have
12  this exhibit?
13     MR. THOMPSON:  I do have the
14  exhibit, but I think it would be best
15  if it were put on the screen so
16  everyone can see it.
17     MR. CAPOGROSSO:  Well, it's
18  actually Exhibit 69.  Exhibit 69.
19     THE COURT REPORTER:  Is that
20  what you would like me to put up?
21     MR. CAPOGROSSO:  No, actually,
22  it's Exhibit 68.  Exhibit 68, let's
23  start with that one.
24     THE COURT REPORTER:  Are these
25  already marked, Counsel?

Page 8

1          ALAN GELBSTEIN
2     MR. CAPOGROSSO:  It's marked as
3  Plaintiff's Exhibit 68.  Scroll down
4  to the first page.
5     (Whereupon, Plaintiff's Exhibit
6  68, previously marked, was
7  introduced.)
8     Q.  This is a work violence police
9  report, are you familiar with this document
10  Exhibit 68?
11     A.  Yes, I am.
12     Q.  Are you familiar with the
13  person at the top David Smart?
14     A.  Yes.
15     Q.  Now, I ask you take a look at
16  the second page.
17     Right there under additional
18  comments and I would like you to take note
19  of the third line of that page which reads
20  "I was told by Judge Gelbstein to go with
21  officers from the police room to tell Mr.
22  Capogrosso that he must leave the building
23  and give him a legal phone number for any
24  further details.  I did that and he left
25  the building."

December 17, 2020

Page 9

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2        Now, that is a statement made
3    by Danielle Calvo, would you agree to that?
4        A.   Yes.
5        Q.   And you're saying that you did
6    not order Danielle Calvo to have me
7    removed?
8        A.   I may have, I -- I may have,
9    yes.
10       Q.   So, which one is it, you had me
11   removed on that day?
12       A.   I didn't physically remove you,
13   I was, as I recall vaguely, I can't say
14   with absolute certainty, that they called
15   me telephonically and relayed what occurred
16   and at some point I imagine because it says
17   so here, I must have told her to have you
18   removed and to give you legal counsel's
19   phone number.
20       Q.   Well, who called you on that
21   morning?
22       A.   I believe it was Danielle.
23       Q.   Danielle.
24            And what time did she call you?
25       A.   I beg your pardon.

Page 10

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2        Q.   And what time did she call you?
3        A.   I don't recall the time.
4        Q.   Now, there was a videotape of
5    this alleged altercation between myself and
6    Defendant Smart, did you observe that
7    videotape?
8            MR. THOMPSON:  I'm going to
9        object to the form of the question.
10       Q.   Did you observe the video --
11   you still have to -- did you observe the
12   videotape of the alleged push?
13           MR. THOMPSON:  Note my
14       objection, you can answer.
15       A.   I don't recall whether I did or
16   not.
17       Q.   So, you don't recall ever
18   observing the videotape?
19       A.   I don't recall, no.
20       Q.   Did you keep possession of that
21   videotape?
22       A.   I personally did not.
23       Q.   At any point in time did you
24   view that videotape?
25       A.   I don't recall.

Page 11

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2            MR. THOMPSON:  Objection, asked
3        and answered.
4        Q.   Did you have me removed from
5    the Brooklyn TVB based on that videotape,
6    did you?
7        A.   I would have -- assuming that I
8    saw it, which I don't recall I did, it
9    would have been probably well after the
10   fact.
11       Q.   So, you're having me thrown out
12   based on an allegation made by Danielle
13   Calvo, is that it?
14           MR. THOMPSON:  Objection to the
15       form of the question.
16       Q.   Is that correct?
17       A.   I believe based on what she
18   told me, we took action.
19       Q.   And did you ask Danielle Calvo
20   if she viewed the videotape?
21       A.   Did I ask her if she viewed it?
22       Q.   Yes.
23       A.   I did not ask her.
24       Q.   Did you approach me on the
25   afternoon May 8th and said, "I saw what you

Page 12

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2    wrote about me," concerning a letter I
3    wrote to Attorney General Pricket-Morgan
4    that I called you complacent, incompetent
5    and incapable.
6            Do you recall approaching me on
7    the afternoon of May 8th?
8        A.   I do not.
9        Q.   And did you say to me on the
10   afternoon of May 8th, "can't you go
11   practice somewhere else"?
12       A.   I don't remember saying that to
13   you at all.
14       Q.   Were you predisposed to having
15   me removed from the Brooklyn TVB?
16       A.   I was not.
17       Q.   Were you conveniently not
18   present at the Brooklyn TVB on the morning
19   of May 11th; sir, did you not happen to
20   view the videotape or the incident between
21   myself and Defendant Smart?
22           MR. THOMPSON:  Objection.
23       A.   I'm not sure I understand the
24   question.
25       Q.   Were you purposefully not

3  (Pages 9 to 12)

December 17, 2020

## Page 13

ALAN GELBSTEIN

1        ALAN GELBSTEIN
2 available at the Brooklyn TVB on the
3 morning of May 11, 2015?
4        MR. THOMPSON: Objection.
5        (Whereupon, there was
6        cross-talk, so Counsel re-asked the
7        question.)
8        Q.  Were you purposefully not
9 available on the morning of May 11, 2015?
10       A.  No.
11       Q.  Did you tell Defendant Smart to
12 approach me on the morning of May 11, 2015
13 and create an incident between myself and
14 him?
15       MR. THOMPSON: Objection,
16       compound. You can answer.
17       THE WITNESS: I didn't hear
18       you, Counsel?
19       Q.  Did you tell?
20       THE WITNESS: I heard you, I
21       didn't hear Mr. Thompson said
22       something.
23       MR. THOMPSON: Objection,
24       compound, but you can answer the
25       question.

## Page 14

ALAN GELBSTEIN

1        ALAN GELBSTEIN
2       A.  Repeat the question, please.
3       Q.  Did you tell Defendant Smart to
4 approach me on the morning of May 11, 2015?
5       A.  No.
6       Q.  Do you have authority over the
7 actions of Defendant Smart at the Brooklyn
8 TVB?
9       MR. THOMPSON: Objection to the
10       form of question, you can answer.
11       A.  I do.
12       Q.  You do?
13       A.  Yes.
14       Q.  Who viewed the evidence on the
15 morning of May 11, 2015 of this alleged
16 push, other than Danielle Calvo?
17       MR. THOMPSON: I'm having a
18       hard time hearing what you're saying,
19       Mr. Capogrosso.
20       Q.  Who viewed the evidence of this
21 alleged push, who viewed the videotape on
22 the morning of May 11, 2015, other than
23 Danielle Calvo?
24       MR. THOMPSON: Objection,
25       assumes facts not in evidence. You

## Page 15

ALAN GELBSTEIN

1        ALAN GELBSTEIN
2 can answer.
3       A.  I don't know who viewed it.
4       Q.  Did Ida Traschen view the
5 videotape before she had me removed --
6 before she told me that I was not allowed
7 to practice law in the Brooklyn TVB or any
8 New York TVB?
9       MR. THOMPSON: Objection to the
10       form.
11       A.  I don't know if Ida Traschen
12 observed it.
13       Q.  Did you have a conversation
14 with Ida Traschen on the morning of May 11,
15 2015?
16       A.  I do not recall with certainty
17 whether I did or not.
18       Q.  Ida Traschen did not call you
19 and question you concerning my removal on
20 the morning of May 11, 2015?
21       MR. THOMPSON: I'm going to
22       object on the basis of
23       attorney/client privilege and work
24       product, the contents of any
25       conversation between Judge Gelbstein

## Page 16

ALAN GELBSTEIN

1        ALAN GELBSTEIN
2       and Ida Traschen who is counsel of
3       DMV that is a legal conversation.
4       And so, Judge Gelbstein I'll
5       instruct you not to answer any
6       question what you said to Ida and
7       what Ida said to you.
8       Q.  You still have to answer the
9 question, did you have a conversation with
10 Ida Traschen?
11       A.  I don't recall.
12       Q.  Were you in possession of a
13 letter that I wrote on March 20, 2015, to
14 Attorney General Pricket-Morgan?
15       A.  I believe I was furnished a
16 copy of that letter.
17       Q.  When were you furnished a copy
18 of that letter?
19       A.  I don't know the date, it was
20 part of an e-mail.
21       Q.  Was it prior to the event, the
22 alleged push on May 11, 2015?
23       A.  I couldn't tell you, I don't
24 know.
25       THE COURT REPORTER: What is

4 (Pages 13 to 16)

Page 17

```
 1          ALAN GELBSTEIN
 2    Cricket's last name?
 3          MR. CAPOGROSSO:
 4    Pricket-Morgan, M-O-R-G-A-N.  Pricket
 5    is also her last name.
 6          MR. THOMPSON: It's hyphenated,
 7    Pricket-Morgan.
 8          Q.  You don't recall when you came
 9    in possession of a letter of May 11, 2015?
10          A.  Not at this time.  It's been
11    five years and I did not review it, I
12    couldn't tell you.
13          Q.  Was that letter forwarded to
14    you directly by Attorney General
15    Pricket-Morgan?
16          A.  No.
17          Q.  Did you address any of the
18    complaints that I made in that letter of
19    March 20, 2015?
20          A.  I don't remember with
21    specificity what the complaints were.
22          Q.  Well, I will get that letter
23    for you now, but did you take any action
24    with respect to that letter?
25          A.  Again, if I don't know -- if I
```

Page 18

```
 1          ALAN GELBSTEIN
 2    don't recall the contents, I couldn't tell
 3    you what my reaction would be.
 4          Q.  Fine, let me get you the
 5    letter.  Let's go to Exhibit 15.
 6          (Whereupon, Plaintiff's Exhibit
 7    15, previously marked, was
 8    introduced.)
 9          Q.  Defendant Gelbstein, do you
10    recall receiving this letter?
11          A.  Yes, I saw this letter.
12          Q.  When did you see it?
13          A.  I don't recall the first time I
14    saw it.  As I said, it was attached to an
15    e-mail I received.
16          Q.  And it's dated March 20th; is
17    that correct?
18          A.  Yes.
19          Q.  2015?
20          A.  Yes.
21          Q.  The incident between myself and
22    Defendant Smart, this alleged push occurred
23    on May 11th, am I right?
24          A.  I don't know what you're
25    looking at.  I beg your pardon.
```

Page 19

```
 1          ALAN GELBSTEIN
 2          MR. CAPOGROSSO: I'll withdraw
 3    that question.
 4          Q.  Now, I made certain complaints
 5    against Defendant Smart which I brought to
 6    your attention in this letter.  I ask you
 7    to look down that page.
 8          MR. CAPOGROSSO:  If you can
 9    scroll down the page, please.
10          THE COURT REPORTER:  Sure.
11          Q.  Now, Item Number 1, I'll draw
12    your attention to Item Number 1, I state
13    that your security guard David Sparks to me
14    repeated times "to go fuck myself."
15          Do you see that statement?
16          A.  I do.
17          Q.  You did.
18          Did you take any action in
19    response to that statement, did you rectify
20    it?
21          A.  Your statement does not seem to
22    be addressed to me for me to take action
23    upon David Sparks.
24          Q.  Did I ever make a complaint to
25    your office concerning that type of
```

Page 20

```
 1          ALAN GELBSTEIN
 2    behavior?
 3          A.  You have come in to my office
 4    to complain about security guard David
 5    Sparks, yes.
 6          Q.  And what did you do in response
 7    to those complaints?
 8          A.  On each -- well, I don't know
 9    how many times you came in.  I remember you
10    coming in, I called David Sparks in and I
11    told him that if he said anything
12    derogatory or had an altercation with you,
13    he has to keep far away from you.  Whenever
14    he sees you, he should go in the opposite
15    direction.
16          Q.  But, he didn't obey that order,
17    did he?
18          A.  I don't know that to be
19    correct, sir.
20          Q.  Well, he did approach me on the
21    morning of May 11, 2015; right?
22          A.  I don't know that to be the
23    case, sir.
24          Q.  The police reports -- you
25    didn't -- I mean, after Defendant Smart
```

5  (Pages 17 to 20)

December 17, 2020

---

Page 21

ALAN GELBSTEIN
1
2 approached me on May 11, 2015, you didn't
3 view that videotape at any point
4 thereafter?
5        MR. THOMPSON: Objection to the
6 form of the question.
7        THE WITNESS: Answer?
8        MR. THOMPSON: You may answer.
9     Q.  After he approached me on
10 May 11th --
11        THE COURT REPORTER: Wait, the
12 connection is not good. This is not
13 a good connection.
14        MR. CAPOGROSSO: Give me one
15 minute, maybe if I move my laptop to
16 a different location maybe I can get
17 a better connection. Can you give me
18 one minute to do that?
19        THE COURT REPORTER: Sure.
20        MR. CAPOGROSSO: Can you hear
21 me better, Ma'am?
22        THE COURT REPORTER: Yes, I
23 can. The witness was trying to
24 answer, but the connection got all
25 messed up.

---

Page 22

ALAN GELBSTEIN
1
2     A.  The answer is, I don't recall
3 ever seeing the tape.
4     Q.  All right.
5        Directing your attention to the
6 that third question that I made complaints
7 to the office that your security guard
8 stared and glared at me and would get in my
9 face and say FU.
10        Do you recall that?
11     A.  I missed the question, say it
12 again, please.
13     Q.  I made a complaint that your
14 security guard Defendant Smart would get in
15 my face and stare and glare at me.
16        Do you recall me making a
17 complaint to your office concerning that?
18     A.  I just read Number 3 and what
19 is your question with regard to Number 3?
20     Q.  Do you recall me making that
21 complaint to your office?
22     A.  No, I do not.
23     Q.  At one point in time did you
24 laugh and giggle at me when I was telling
25 you about these complaints concerning

---

Page 23

ALAN GELBSTEIN
1
2 Defendant Smart and telling me "a spade is
3 a spade"?
4     A.  Are you reading something else
5 in the letter now?
6     Q.  Yes, the second page down.
7     A.  I see the paragraph.
8     Q.  Do you recall laughing and
9 giggling at me and telling me "a spade is a
10 spade" when I complained about Defendant
11 Smart's action?
12     A.  I didn't hear you. Can you
13 repeat the question?
14     Q.  Do you recall laughing and
15 giggling at me and telling me "a spade is a
16 spade" when I complained of Defendant's
17 Smart's actions?
18     A.  No.
19     Q.  Many Affidavits were written by
20 your clerks, by attorneys, by a judge
21 against me and they were all presented to
22 me for the first time in Defendant's Motion
23 to Dismiss.
24        Are you familiar with those
25 complaints and Affidavits of misconduct?

---

Page 24

ALAN GELBSTEIN
1
2        MR. THOMPSON: Objection to
3 form, you can answer.
4     A.  I don't know which ones
5 specifically you are referring to, but yes,
6 I did receive complaints.
7     Q.  All right, fine.
8        Did you ever give me an
9 opportunity to response to any of those
10 complaints?
11     A.  I'm not sure if -- I need
12 clarification on your question. If the
13 question is if there were specificity in
14 the particular complaint, is it your
15 question did I ask you --
16     Q.  I'll rephrase the question.
17        Did you ever approach me with a
18 complaint and ask me to respond to it?
19     A.  Yes.
20     Q.  You presented me with a written
21 complaint and asked me to respond?
22     A.  No. I never gave you a written
23 complaint to respond to.
24     Q.  You did not?
25     A.  No.

6 (Pages 21 to 24)

December 17, 2020

Page 25

ALAN GELBSTEIN

1  ALAN GELBSTEIN
2      Q.   So, I had no opportunity to
3  respond to any of these complaints that
4  either your clerks were making or attorneys
5  were making or even a judge made, you gave
6  me no opportunity to respond before having
7  me removed; is that fair?
8          MR. THOMPSON:  Objection to
9      form.
10     A.   No, it's not fair.
11     Q.   At what point in time did you
12 give me an opportunity to respond?
13     A.   As complaints came in over a
14 period of time, whenever there was a
15 complaint lodged and it was more serious,
16 there were complaints I thought pay, but it
17 was a more serious, I would call you in and
18 I would tell you other complaints and I
19 would tell you to cease and desist and you
20 would promise that you would.
21         And that was the end of the
22 discussion with any particular complaint.
23     Q.   Well, tell me which complaint
24 you did that because I don't recall it,
25 tell me, tell me the exact complaint?

Page 26

1  ALAN GELBSTEIN
2      A.   At this time I don't recall
3  specificity, but as I said before, whenever
4  I felt a complaint and not a minor
5  complaint, a serious complaint required my
6  intervention, I called you in and we had a
7  discussion in my office.
8      Q.   But, you don't recall the date
9  that you called me in or the complaint that
10 you asked me to address?
11     A.   Right.
12     Q.   And you never asked me for a
13 written reply to any complaint; is that
14 fair?
15     A.   That's fair.
16     Q.   Did you ever investigate the
17 voracity or truthfulness of any of these
18 complaints?
19     A.   I did.
20     Q.   Or did you just accept them as
21 truthful?
22     A.   I investigated to the best of
23 my recollection every serious complaint.
24     Q.   And you used these complaints
25 of misconduct to have me removed from the

Page 27

1  ALAN GELBSTEIN
2  Brooklyn TVB?
3      A.   Could you repeat the question?
4      Q.   Did you use these complaints to
5  have me removed from the Brooklyn TVB?
6          MR. THOMPSON:  I object to the
7      form, you can answer.
8      A.   From the cumulative complaints,
9  no one complaint in and of itself was the
10 deciding factor.  It was a cumulation of
11 complaints over a period of time.
12     Q.   And you just accepted all those
13 complaints as true without asking for my
14 affidavit in response; is that a fair
15 statement?
16     A.   I did not ask for an affidavit
17 in response.
18     Q.   Well, let me draw your
19 attention to a couple of those complaints
20 that you said you investigated the
21 truthfulness and voracity of if I may for
22 which you had me removed from the Brooklyn
23 TVB.
24         I'll ask you to take a look at
25 specifically one that was made by your

Page 29

1  ALAN GELBSTEIN
2  chief clerk, your chief clerk which is
3  Exhibit -- let's see -- 84?  84.  Can we go
4  to Exhibit 85, I'm sorry, 85.
5          (Whereupon, Plaintiff's Exhibit
6      85, previously marked, was
7      introduced.)
8      Q.   Are you familiar with Melanie
9  Levine?
10     A.   Yes.
11     Q.   Who is Melanie, M-E-L-A-N-I-E,
12 Levine?
13     A.   She, at the time, was a
14 supervisor in the clerical office.
15     Q.   So, she was a supervisor of
16 your clerks, am I right in saying that?
17     A.   She was a supervisor of some of
18 the clerks.  She was not the head clerk,
19 she was a principal clerk.
20         MR. CAPOGROSSO:  Can you please
21     scroll down, Ma'am, to the next page.
22         (Whereupon, the Court Reporter
23     complied.)
24     Q.   I'll direct you to the first
25 paragraph on the next page, right there,

7  (Pages 25 to 28)

December 17, 2020

---

Page 29

```
 1          ALAN GELBSTEIN
 2    thank you.  Now, I'll direct you to first
 3    paragraph where your clerk of supervisors
 4    states, "attorney Capogrosso represented
 5    Mr. Perez at trial for three violations on
 6    January 21, 2015."
 7          MR. THOMPSON:  I think he's
 8       referring to the previous page,
 9       Page 3.
10          THE COURT REPORTER:  That's
11       what I thought, but his connection is
12       slower.  This, this is Page 3, so
13       give it a second to catch up.  You
14       want Page 4, the handwritten portion.
15          MR. CAPOGROSSO:  The one before
16       that, Ma'am.  Further up Ma'am --
17       right there.
18       Q.    Did you investigate that
19    complaint, Defendant Gelbstein?
20       A.    I don't recall if I
21    specifically investigated this complaint.
22       Q.    So.  You don't know the
23    voracity or truthfulness of that complaint;
24    is that a fair statement?
25       A.    I don't recall at this time.
```

Page 31

```
 1          ALAN GELBSTEIN
 2       Q.    Well, let me tell you what
 3    happened with this complaint, Mr. Perez did
 4    not hire me to represent him on three
 5    violations, he did not.  He hired me on
 6    appeal the day after he lost and was
 7    suspended in a courthouse by one of your
 8    judges on these violations, that's what
 9    happened.
10          And he hired me on the appeal
11    and I took the appeal and then he came back
12    the next day and what he told me was that
13    his license got suspended and revoked.  And
14    he said to me I want my --
15          MR. THOMPSON:  Note my
16       objection.
17       Q.    -- Mr. Perez did not hire me on
18    those violations and you never investigated
19    that now, did you Mr. Gelbstein?
20          MR. THOMPSON:  Note my
21       objection, you can answer.
22       A.    I don't recall with specificity
23    what I did at the time.  I'm aware of the
24    complaint, I don't remember if I spoke to
25    him or not.  I don't recall.
```

---

Page 30

```
 1          ALAN GELBSTEIN
 2       Q.    But, you used this as one of
 3    the complaints of misconduct to have me
 4    removed; is that right?
 5       A.    This is one of many, yes.
 6       Q.    And you know I never
 7    represented Mr. Perez on January 11, 2015,
 8    you know that; right?
 9       A.    I do not.
10       Q.    Well, she's making a false
11    statement.  You could have investigated it,
12    but you didn't investigate it now, did you?
13          MR. THOMPSON:  Objection to the
14       form of the question.  You can
15       answer.
16       A.    I don't recall the particular
17    complaint now with specificity and what
18    actions I took with regard to this.  I
19    don't recall whether I spoke to Paul Perez
20    or not.  I may have, I don't recall.
21       Q.    Did you ever talk to me about
22    this complaint?
23       A.    Again, I don't remember with
24    specificity with this particular complaint
25    whether I spoke to you on it or not.
```

Page 32

```
 1          ALAN GELBSTEIN
 2       Q.    But, you never took my
 3    affidavit in response; right?
 4          MR. THOMPSON:  Objection, asked
 5       and answered, you can respond.
 6       Q.    Now, you know what happened
 7    that day Mr. Perez approached me, after I
 8    gave him his money back and he told me he
 9    was going to cut me with a knife and the
10    slash the tires of my car, you understand
11    that, that's what he said to me?
12          MR. THOMPSON:  Objection,
13       assumes fact not in evidence.
14       A.    I wasn't there when you had the
15    conversation, I don't know what he said to
16    nor do I know what you said to him.
17       Q.    But, you never took my
18    statement in reference to that complaint
19    now did you?
20       A.    Again, I don't recall the
21    specific conversation we had with regard to
22    it, if we didn't have a conversation.
23       Q.    You never had a conversation
24    with me concerning this complaint because
25    there's no affidavit attached to this
```

---

8 (Pages 29 to 32)

December 17, 2020

Page 33

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2    complaint concerning my statement, now is
3    there?
4        MR. THOMPSON: Objection,
5    argumentative. You can answer.
6        A.  I don't know whether or not
7    there was something attached now to the
8    filings of the legal papers.
9        Q.  Did you take an affidavit in
10   response to that complaint?
11       A.  Did I take an affidavit from
12   you?
13       Q.  From me.
14       A.  I don't believe you offered me
15   an affidavit.
16       Q.  Did you ask me for one?
17       A.  I don't believe I did.
18       Q.  Now, on that day in question
19   when Mr. Perez told me was going to cut me
20   with a knife and then slash the tires of my
21   car, your Defendant Smart was never there,
22   your security guard was never there to take
23   any action.
24       Is that a fair statement?
25       MR. THOMPSON:  Objection to

Page 34

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2    form.
3        A.  I wouldn't know.
4        Q.  Do you know if the police came
5    to investigate that complaint?
6        A.  I do not know.
7        Q.  And yet, at one point in time,
8    you told me and I believe you told all the
9    other attorneys, that if you have an unruly
10   client you're supposed to speak to them
11   outside the courthouse.
12       Did you not tell us all that?
13       A.  Let me see if I understand, are
14   you saying that -- is the question, did I
15   speak to all the attorneys that if you have
16   an unruly client you should to talk to them
17   outside?
18       Q.  Yes, outside the courtroom, did
19   you not tell me that at one point in time?
20       A.  It sounds like something I
21   might have said.
22       Q.  All right, fine.
23       Let me draw your attention to
24   another exhibit which I have to ask,
25   Exhibit 81. Can we go to Exhibit 81?

Page 35

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2        (Whereupon, Plaintiff's Exhibit
3        81, previously marked, was
4        introduced.)
5        Q.  I'm going to direct you to that
6    first paragraph. There's a lot of things
7    that I could talk to you about, but time is
8    short.
9        I'll direct you to that first
10   paragraph and it says in part -- and this
11   is a letter written by Bushra Vahdat who
12   happens to be whom, do you know who Bushra
13   Vahdat is?
14       A.  I do.
15       Q.  Who is it Bushra Vahdat?
16       A.  She was my immediate
17   supervisor.
18       Q.  Now, she made a complaint --
19   she made an affidavit concerning my
20   behavior.
21       Did you have an opportunity to
22   look at this complaint?
23       A.  I'm trying to read it now.  Is
24   there anything specific, it seems to be --
25   should I zoom in on a particular paragraph?

Page 36

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2        Q.  I'll address your attention to
3    that first paragraph that begins "when I
4    was first appointed to the position of
5    supervising ALJ."
6        Are you there?
7        A.  Yes.
8        Q.  Fine.
9        She indicates on the fourth
10   line down, she indicates "I verbally abused
11   the clerks on many occasions and followed a
12   clerk with his car and stopped the car from
13   moving. He then asked the clerk to get of
14   the car and fight it out with him."
15       Now, did you investigate the
16   truth and voracity of that statement?
17       A.  I don't recall.
18       Q.  You don't?
19       A.  No.
20       Q.  Do you know who that clerk
21   might have been that she's talking about?
22       A.  I do not.
23       Q.  Could it have been a George Han
24   that was a clerk at your court?
25       A.  Could have been.

9  (Pages 33 to 36)

December 17, 2020

## Page 37

ALAN GELBSTEIN

2 Q. Okay, fine. Can we go to
3 Exhibit 82?
4 (Whereupon, Plaintiff's Exhibit
5 82, previously marked, was
6 introduced.)
7 Q. Do you recognize George Han's
8 name there?
9 A. I see the name George Han.
10 Q. It indicates here a little bit
11 further down if I could. It indicates on
12 that second paragraph down I'm going to
13 read it to you, "George -- C was waiting at
14 the entrance at the parking lot in his car.
15 He was in his car, it says. George stopped
16 behind him."
17 A. I'm not following -- from --
18 the paragraph starting "Wednesday he
19 paragraph C approached G, is that where you
20 are reading?
21 Q. I'm talking about the last
22 paragraph on that page, "he approached G
23 again and said" -- do you see that?
24 A. I see that.
25 Q. Fine.

## Page 38

ALAN GELBSTEIN

2 And George says, "that
3 Capogrosso was at the entrance of the
4 parking lot in his car."
5 Do you see that written?
6 A. "Mr. C was waiting at the
7 entrance of the parking lot in his car," I
8 see that, yes.
9 Q. Fine.
10 "In his car and George stopped
11 him -- George stopped behind him."
12 Do you see that statement?
13 A. I do.
14 Q. And then both got out of the
15 car.
16 Do you see that statement?
17 A. I do.
18 Q. Let me ask you a question, as
19 an attorney. after a full day of work in
20 your courthouse and you know house busy it
21 gets down there, am I allowed as an
22 attorney to sit in my car and make phone
23 calls?
24 A. I imagine anybody could sit in
25 a car and make phone calls.

## Page 39

ALAN GELBSTEIN

2 Q. Now, Bushra Vahdat says I got
3 in a car and I followed this clerk, right,
4 in the last exhibit that we just looked at;
5 is that correct?
6 A. What are you reading?
7 Q. The last exhibit "that he
8 followed clerk with his car and stopped the
9 clerk's car from moving."
10 Do you remember that, the last
11 exhibit, Exhibit 81?
12 A. Is it in the same paragraph
13 that I just read?
14 Q. No, it's the previous
15 exhibit, Exhibit 81.
16 A. I honestly don't recall. I
17 don't know, I'll take your word for it,
18 it's there, I don't know.
19 Q. Fine. That's what Bushra
20 Vahdat said concerning that incident.
21 That Mr. Capogrosso followed
22 him in his car and stopped the clerk's car
23 from moving.
24 Is Bushra Vahdat lying there?
25 A. I have no way of knowing.

## Page 40

ALAN GELBSTEIN

2 Q. Was that a true and accurate
3 affidavit as to what happened?
4 A. I didn't write the affidavit, I
5 don't know -- I wasn't there when, you
6 know, when the incident occurred.
7 Q. Did you investigate the
8 voracity and truthfulness of that
9 affidavit?
10 A. I don't question my supervisor.
11 She did independent work, she did
12 independent work.
13 Q. So, you just accepted that as
14 truthful, that complaint is just accepted
15 by you as truthful; is that correct?
16 MR. THOMPSON: Objection to the
17 form of the connection. You can
18 answer.
19 A. I accepted it for what it was
20 worth.
21 Q. But, you didn't know whether it
22 was truthful or not, and you gave me no
23 opportunity to respond; is that true?
24 A. I didn't ask you anything that
25 I recall. I may have, I don't recall

10 (Pages 37 to 40)

December 17, 2020

Page 41

ALAN GELBSTEIN
1
2    whether I asked you anything about it or
3    not.
4        Q.   And you received nothing in
5    terms of an affidavit from me to your
6    office in response to that, now did you?
7        A.   I don't believe I received an
8    affidavit from you in response.
9        Q.   You have all the affidavits
10    that were filed in your office, do you not?
11        A.   I don't know if I received all
12    of the affidavits, I don't know.
13        Q.   Let's go to one more if I
14    could.  I have to question you on this one,
15    I really do.  I have to question you on
16    this one.  Give me one moment.  Exhibit 73.
17        (Whereupon, Plaintiff's Exhibit
18        73, previously marked, was
19        introduced.)
20        Q.   Are you familiar with that
21    document, Defendant Gelbstein?
22        A.   I see it's an Affirmation that
23    I made.
24        Q.   With respect to my conduct at
25    the Brooklyn TVB; am I right?

Page 42

ALAN GELBSTEIN
1
2        A.   I assume -- not reading it, but
3    I assume if you tell me that's what it is,
4    that's what it is.
5        Q.   It's your signature at the
6    bottom of that page, is it not?
7        A.   I don't see the signature.
8        Q.   Can we please go down to the
9    end of that page, Ma'am?
10        (Whereupon, the Court Reporter
11        scrolled to the bottom of the page.)
12        Q.   Do you see your signature at
13    the bottom of that page?
14        A.   Yes, that's my signature.
15        Q.   So, that is your Affirmation?
16        A.   Yes.
17        Q.   I'm going to direct your
18    attention to Paragraph 2.
19        "On numerous occasions I
20    personally warned petitioner of threatening
21    behavior."
22        Can you tell me the dates that
23    you warned me?
24        A.   No.
25        Q.   Did you put anything in writing

Page 43

ALAN GELBSTEIN
1
2    to my office that I could respond to?
3        A.   Nothing in writing.
4        Q.   Did you ever spell out what the
5    threatening behavior was so I could respond
6    to it?
7        A.   Whenever I called you in, it
8    was with a specific occasion and we spoke
9    about that particular occasion.
10        Q.   Can you give me one occasion
11    that you spoke to me about, just one?
12        A.   I don't recall at this time any
13    specific one.
14        Q.   But, you had me removed based
15    on these alleged threatening behavior; am I
16    right?
17        A.   Yes.
18        Q.   So, you can't recall just one
19    instance?
20        A.   No, not at this time.  There
21    were so many, I don't know, I just can't
22    tell you with specificity.
23        MR. CAPOGROSSO:  I'll question
24        you more at trial, it's okay.  I
25        don't have enough time right now,

Page 44

ALAN GELBSTEIN
1
2    I'll question you at trial.
3        MR. THOMPSON:  Objection.
4        MR. CAPOGROSSO:  That's fine,
5    I'll withdraw it.
6        Q.   I direct your attention to Item
7    Number 6, Paragraph Number 6 because I have
8    to question you on this one.
9        You indicate in Paragraph 6,
10    "Petitioner often uses anti-Semitic
11    languages when referring or speaking to
12    Jewish attorneys."
13        Can you tell me when I did
14    this?
15        A.   I don't recall the dates.
16        Q.   You don't?
17        A.   No.
18        Q.   But, you're using this an
19    allegation to get me removed; right?
20        A.   As one of the allegations.
21        Q.   All right.
22        This one you got to remember
23    Defendant Gelbstein, you also state,
24    "Petitioner called me a beanie wearing
25    kyke."

11  (Pages 41 to 44)

December 17, 2020

|  | Page 45 |
|---|---|
| 1 | ALAN GELBSTEIN |
| 2 | When did I say that? |
| 3 | A.   I don't remember the date, but |
| 4 | I will tell you exactly where you told me |
| 5 | because I was a little shocked.  We were |
| 6 | outside my office to the right about, I |
| 7 | would say, maybe 12 feet from my door, |
| 8 | about midway in the hallway between the |
| 9 | clerical office door building and let's say |
| 10 | my office. |
| 11 | Just midway about 12 feet |
| 12 | towards the beach.  I was facing you and |
| 13 | you were facing me and it was part of a |
| 14 | conversation.  I don't remember the rest of |
| 15 | the conversation, but that particular part, |
| 16 | you know, kind of seared into my brain. |
| 17 | Q.   Seared into you and you didn't |
| 18 | write it down, did you? |
| 19 | A.   No, sir. |
| 20 | Q.   You didn't do -- you didn't |
| 21 | formalize this in any written document or |
| 22 | any written complaint? |
| 23 | A.   Not that I recall. |
| 24 | Q.   And why didn't you? |
| 25 | A.   I didn't think it was |

|  | Page 47 |
|---|---|
| 1 | ALAN GELBSTEIN |
| 2 | absolute lie. |
| 3 | MR. THOMPSON:  Objection. |
| 4 | Q.   And you don't recall the |
| 5 | circumstances that precipitated that or |
| 6 | initiated that? |
| 7 | A.   No, I don't. |
| 8 | Q.   Now, you wrote this affidavit |
| 9 | on May 3, 2012; is that right? |
| 10 | A.   If that's what it says, that's |
| 11 | when I wrote it. |
| 12 | Q.   And that's when I was removed |
| 13 | from the Brooklyn TVB and that was when I |
| 14 | was removed from the Brooklyn TVB in |
| 15 | December of 2011. |
| 16 | It was after that date; right? |
| 17 | A.   I don't recall when you were |
| 18 | removed.  I don't know the dates. |
| 19 | Q.   Well, I had an incident with a |
| 20 | Yakov Brody on December 22, 2011, do you |
| 21 | remember that? |
| 22 | A.   I remember -- I know of the |
| 23 | incident. |
| 24 | Q.   Did you ever ask for my |
| 25 | affidavit with respect to that incident? |

|  | Page 46 |
|---|---|
| 1 | ALAN GELBSTEIN |
| 2 | necessary. |
| 3 | Q.   But, you used it to get me |
| 4 | removed from the Brooklyn TVB, are you not? |
| 5 | A.   Not for that particular |
| 6 | statement.  It was just one of many, what I |
| 7 | would call, offenses.  It wasn't because of |
| 8 | that, that I had you removed. |
| 9 | Q.   You don't -- and this -- what |
| 10 | precipitated that conversation, do you |
| 11 | remember that? |
| 12 | A.   No. |
| 13 | Q.   Do you have any complaints from |
| 14 | a motorist or a client that I ever used an |
| 15 | anti-Semitic or racist remark? |
| 16 | A.   Not from a motorist. |
| 17 | Q.   Or from a client; is that |
| 18 | right? |
| 19 | A.   From a client I don't believe |
| 20 | so. |
| 21 | Q.   But, I happen to call a Judge a |
| 22 | beanie wearing kyke, is that your |
| 23 | testimony? |
| 24 | A.   You called me. |
| 25 | Q.   I don't believe you.  That's an |

|  | Page 48 |
|---|---|
| 1 | ALAN GELBSTEIN |
| 2 | A.   I did not ask you for an |
| 3 | affidavit. |
| 4 | Q.   So, you just assumed what Yakov |
| 5 | Brody was saying was the truth; right? |
| 6 | MR. THOMPSON:  Objection to the |
| 7 | form.  You can answer. |
| 8 | A.   Again, I don't recall with |
| 9 | specificity, but I'm sure that I spoke to |
| 10 | all the parties involved. |
| 11 | Q.   Did you think my affidavit |
| 12 | because you took Yakov Brody's affidavit |
| 13 | and every other attorney in the Brooklyn |
| 14 | TVB's affidavit, but you didn't take mine. |
| 15 | So, why wouldn't you take mine? |
| 16 | MR. THOMPSON:  Objection. |
| 17 | A.   Had you proffered one, I would |
| 18 | have taken one. |
| 19 | Q.   You never gave me the |
| 20 | opportunity to and never asked for one, but |
| 21 | you asked every attorney to give you one? |
| 22 | A.   Excuse me, I didn't ask anybody |
| 23 | for an affidavit.  They came to me and they |
| 24 | presented me with one. |
| 25 | Q.   On December -- after the |

12  (Pages 45 to 48)

December 17, 2020

Page 49

ALAN GELBSTEIN
1
2     incident with Yakov Brody you told me I was
3     not welcome in the Brooklyn TVB any longer;
4     is that correct?
5         A.   I don't recall saying that.
6         Q.   How was I going to get you an
7     affidavit?
8         A.   I leave you to your devices how
9     you get affidavits to anybody.
10        Q.   You gave my no opportunity to
11    respond, is that true, by way of affidavit?
12        A.   No, that's not true.
13        Q.   What opportunity did you give
14    me to respond?
15        A.   Had you presented me with an
16    affidavit, I would have taken it.
17        Q.   Did you give me a hearing on
18    any of these allegations against me, did
19    you give me a hearing?
20        A.   I did not give you a hearing.
21        Q.   Did you give me the opportunity
22    to present testimony?
23        A.   I didn't.  There was no
24    hearing, there was no testimony.
25        Q.   Did you give me the opportunity

Page 50

ALAN GELBSTEIN
1
2     to present evidence in response?
3         A.   You could have presented
4     evidence like every other attorney who
5     presented evidence.
6         Q.   Did you show me the affidavit
7     that was being used against me, did you
8     ever show me Yakov Brody's affidavit?
9         A.   I did not.
10        Q.   So, how could I have responded
11    to what he said against me; you are a judge
12    am I right?
13        A.   I'm not a judge with regard to
14    interactions between the various attorneys
15    in the office.  I'm a judge with regard to
16    motorists, police officers and specific
17    charges against them.
18        Q.   But, you had me removed on all
19    those affidavits and all those allegations
20    against my conduct without ever giving me
21    an opportunity to present an affidavit in
22    response.
23             Is that fair?
24             MR. THOMPSON:  Objection to
25        form.

Page 51

ALAN GELBSTEIN
1
2         A.   No, that's not fair.
3         Q.   When did you receive an
4     affidavit in response?
5         A.   I never received one from you.
6         Q.   So, you're saying I'm allowing
7     you to remove me from the Brooklyn TVB and
8     I'm not going to file an affidavit in
9     response, is that what you're telling me?
10             MR. THOMPSON:  Objection,
11        assumes --
12        A.   I can't tell you what you're
13    going to do.
14        Q.   Now, let me get to some of the
15    more -- were you personally involved,
16    Defendant Gelbstein, in my removal from the
17    DMV, Brooklyn TVB and from the practice of
18    law in all New York TVBs on the morning of
19    May 11, 2015?
20             MR. THOMPSON:  Objection.
21        A.   I don't know what you mean by
22    personally involved.
23        Q.   Did you have Defendant Calvo
24    remove me?
25        A.   I don't remember with

Page 52

ALAN GELBSTEIN
1
2     specificity, but certainly you were
3     removed.
4         Q.   And that was by your direction,
5     was it not?
6             MR. THOMPSON:  Objection, asked
7        and answered.  You can respond.
8             THE WITNESS:  I beg your
9        pardon, Counselor?
10            MR. THOMPSON:  You can answer.
11        A.   Yeah, I don't know if it was my
12    ultimate direction or I was taking counsel
13    from others above me who gave me direction
14    to do it.
15        Q.   Are you throwing Danielle under
16    the bus, is that what you're doing
17    Defendant Gelbstein?
18            MR. THOMPSON:  Objection to the
19        form of the question.
20        Q.   Are you letting Defendant Calvo
21    take the blame for this incident, is that
22    what you're doing?
23            MR. THOMPSON:  Same objection.
24        You can answer.
25        A.   Absolutely not.

13  (Pages 49 to 52)

December 17, 2020

## Page 53

ALAN GELBSTEIN

2   Q.   Because the police report that
3   I showed you earlier indicated that Judge
4   Gelbstein, it indicated, that I was told by
5   Judge Gelbstein to go to the police room
6   and have the police officers remove me from
7   the Brooklyn TVB, right, you saw that --
8       A.   I did.
9       Q.   -- police report.
10      So, you're stating now that you
11  are not personally involved in my removal,
12  is that what you are stating?
13      A.   No, that's not what I'm
14  stating.
15      Q.   I'll ask it again.
16      Were you personally involved in
17  my removal from the Brooklyn TVB?
18      MR. THOMPSON: Objection, asked
19  and answered. You can answer.
20      A.   I certainly had involvement.
21      Q.   Now, did you have me removed
22  because you read the letter of March 20th
23  of 2015 which I complained about your
24  actions and your conduct at the Brooklyn
25  TVB?

## Page 54

ALAN GELBSTEIN

2       A.   Which letter is that?
3       Q.   The March 20, 2015 letter that
4   I wrote to Pricket-Morgan?
5       A.   No, it had nothing to do with
6   that letter.
7       Q.   Were you offended by that
8   letter that I called you -- that I told you
9   that you were incapable, incompetent and
10  complicit?
11      A.   Not at all. No, I was not
12  offended.
13      Q.   You were not offended?
14      A.   No, sir.
15      Q.   You were not mad at that?
16      A.   No, sir.
17      Q.   You had no animus against me
18  because of that letter?
19      A.   None whatsoever.
20      Q.   You're a better man than I am.
21      Were you negligent in the
22  supervision of Defendant Smart?
23      MR. THOMPSON: Objection, calls
24  for a legal conclusion. You can
25  answer.

## Page 55

ALAN GELBSTEIN

2       A.   No.
3       Q.   Did you have the ability to
4   control the actions of Defendant Smart?
5       A.   In theory I could control him
6   totally, but I did not direct his
7   day-to-day activity.
8       Q.   Who directed his day-to-day
9   activities?
10      A.   The clerical supervisor.
11      Q.   Who is she?
12      A.   Either the two principal clerks
13  at the time, or the supervising clerk.
14      Q.   What's their names?
15      A.   Danielle was the chief clerk
16  and the other one was Levine at the time.
17      Q.   Now, I made complaints against
18  Defendant Smart, written complaints to your
19  office, did you pass those complaints onto
20  the clerical supervisors?
21      A.   No, I personally called him
22  into my office when you complained about
23  him.
24      Q.   I made a complaint, I made
25  several complaints. I made one complaint

## Page 56

ALAN GELBSTEIN

2   that Defendant Smart stole $80 on a $100
3   fee.
4       Do you recall me making that
5   complaint to you?
6       A.   Not that specific complaint.
7       Q.   In June of 2012 I made a
8   complaint that Defendant Smart stole a fee,
9   you don't recall me making that complaint
10  to you?
11      A.   You might have.
12      Q.   Was an investigation made
13  concerning the theft by your office?
14      A.   I don't recall at this time.
15      Q.   So, an investigation might have
16  been made, is that what you're saying?
17      A.   Might have been.
18      Q.   Do you recall the results of
19  that investigation?
20      A.   No, I don't remember the
21  results of any investigation.
22      Q.   So, it's fair to say that --
23  I'm saying that Defendant Smart stole $80
24  on a $150 and you allowed Defendant Smart
25  to remain in the Brooklyn TVB after my

14  (Pages 53 to 56)

December 17, 2020

Page 57

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2  complaint concerning the theft; is that
3  correct?
4        MR. THOMPSON:  Objection to
5  form, you can answer.
6        A.  Well, again, I don't recall the
7  complaint with particularity nor my
8  investigation of such an event nor my
9  conclusions based on my investigation had I
10  indeed investigated.
11        Q.  So, you swept my complaint
12  under the rug, is that a fair statement?
13        MR. THOMPSON:  Objection to
14  form.
15        A.  No, it's not a fair statement.
16        Q.  What did you do in reference to
17  my complaint that he stole $80?
18        A.  I don't recall the specific
19  complaint.  I don't recall the result of an
20  investigation and I don't recall any
21  conclusion I may have reached at the time.
22  You're talking about something that
23  occurred in 2012, when we're now in the
24  cusp of 2021.
25        Q.  But, after I made that

Page 58

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2  complaint it's fair to say that Defendant
3  Smart is still working at the Brooklyn TVB?
4        A.  Yes.
5        Q.  And after that complaint, that
6  is when Defendant Smart harassment began,
7  is that a fair statement?
8        A.  No.
9        MR. THOMPSON:  Objection to
10  form.
11        Q.  Well, were there complaints of
12  harassments and threats and threats of
13  physical contact on my person, after I made
14  that complaint to your office?
15        A.  I don't recall.
16        Q.  Were there complaints made to
17  your office after that report of theft to
18  you?
19        A.  I don't remember the sequences
20  of events, whether it was before or after.
21  I don't recall.
22        Q.  I'll bring them to your
23  attention.
24        Do you recall in December of
25  2014 that I made a complaint to you that

Page 59

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2  Defendant Smart stood up, gave me a spear
3  hand and the sign of the cross and pointed
4  it directly at me.
5        Do you recall that complaint to
6  your office?
7        A.  No.
8        Q.  Did you take any action with
9  respect to that complaint?
10        A.  I don't recall.
11        Q.  Did you look at the videotape
12  with respect to that complaint?
13        A.  I don't recall.
14        Q.  Do you recall that I made a
15  complaint to your office that I was
16  standing near one of your trash cans in the
17  Brooklyn TVB and there was an umbrella
18  laying on the can?
19        A.  I kind of remember that, yes.
20        Q.  And Defendant Smart said,
21  "don't touch it or else," do you recall
22  that?
23        A.  No, he didn't say it in my
24  presence.
25        Q.  But, you recall me complaining

Page 60

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2  to you of that?
3        A.  I remember there was a to-do
4  with you, I don't remember with Smart so
5  much as it was one of my principal clerks
6  that brought the complaint to my attention.
7        Q.  That I moved an umbrella?
8        A.  An umbrella or a clip.  I'm
9  trying -- a paper clip, it was something, I
10  don't remember what it was.  I remember it
11  was what I had in my estimation a
12  ridiculous argument about a garbage can and
13  being it moved and something above it.
14        Q.  It had nothing to do with a
15  garbage can, it was a threat by Mr. Smart
16  -- Defendant Smart, upon my person?
17        A.  I don't remember that aspect of
18  it.  I just remember there was a garbage
19  can and stuff on it, as you say, either an
20  umbrella or it might have been a paper
21  clip, but something to do about you and a
22  garbage can, that's what I recall.
23        Q.  It was an umbrella that I was
24  told not to move or else by your security
25  guard Defendant Smart?

15  (Pages 57 to 60)

Page 61

ALAN GELBSTEIN

1
2    A.   I don't recall.
3         MR. THOMPSON:  Objection to
4    form.
5    A.   I don't recall that aspect of
6    it.
7    Q.   Did you have a deliberate
8    indifference and callousness to my
9    complaints?
10   A.   I'm sorry, repeat?
11        MR. THOMPSON:  Objection to the
12   form of the question.
13   Q.   Did you have an deliberate
14   indifference and callousness to my
15   complaints?
16   A.   Callousness?
17   Q.   To responding to my complaints?
18        MR. THOMPSON:  Objection to the
19   form, you can answer.
20   A.   I don't understand the
21   question.
22   Q.   Were you indifferent to my
23   complaints?
24   A.   No, I take every complaint from
25   every individual.

Page 62

ALAN GELBSTEIN

1
2    Q.   But, after I made the
3    complaints, the harassment continued, is
4    that fair to say?
5         MR. THOMPSON:  Objection to
6    form, you can answer.
7    A.   That your harassment or being
8    harassed?
9    Q.   My harassment by Defendant
10   Smart, is that fair to say?
11   A.   No.
12   Q.   Defendant Smart approach me on
13   the morning of May 11, 2015 unprovoked?
14   A.   I don't know.
15   Q.   The police report indicates I
16   told him to "back up, back up"; is that
17   fair to say?
18   A.   I wasn't there, I could not
19   tell you.
20   Q.   Did you read the police report?
21   A.   At the time, yes.
22   Q.   And did it mention the fact
23   that I said to Defendant Smart, "back up,
24   back up"?
25   A.   You might have, I don't recall.

Page 63

ALAN GELBSTEIN

1
2    Q.   Well, let me show you the
3    police report.  Let me show you the police
4    report.
5         Can we go to Exhibit 67?
6         (Whereupon, Plaintiff's Exhibit
7    67, previously marked, was
8    introduced.)
9    Q.   Now, do you know who that name
10   is at the top Danielle Calvo?
11   A.   Yes.
12   Q.   Is she your clerk supervisor?
13   A.   Yes.
14   Q.   I'll direct your attention to
15   the third page of that exhibit, Ma'am, if
16   we could.
17        I ask you to look at this first
18   paragraph and I direct your attention to
19   this first paragraph it says, "Mr.
20   Capogrosso said back up, back up."
21        Did you take note of that
22   police report when I said "back up, back
23   up"?
24   A.   Yes, I see it.
25   Q.   What was your opinion of that

Page 64

ALAN GELBSTEIN

1
2    report?
3    A.   My opinion?  My opinion was
4    that regardless of whatever words were
5    spoken, no one showed ever make contact
6    physically with another individual.
7    Q.   Did you know or did you look at
8    the tape that Defendant Smart approached me
9    from about 20 feet away?
10        MR. THOMPSON:  Objection,
11   argumentative, asked and answered.
12   Q.   Do you have any knowledge as to
13   how Defendant Smart approached me?
14   A.   I was not there, I have no
15   idea.
16   Q.   And you didn't look at the
17   videotape that morning, did you?
18   A.   I don't recall if I did or not.
19   Q.   Well, what if I was to tell you
20   that Defendant Smart crossed over two
21   security barriers, two, and got with within
22   three inches of my face with a clenched
23   fist and a dipped head, what would you
24   think of that, what would be your opinion?
25        MR. THOMPSON:  Objection to

December 17, 2020

Page 65

1          ALAN GELBSTEIN
2     form, you can answer.
3          THE WITNESS: Answer that?
4          MR. THOMPSON: I object to the
5     form of the question, but yes, you
6     can answer the question.
7          A.   It calls for my speculation, I
8     don't know what I would have thought at the
9     time.
10         Q.   So, you're saying you condone
11    the behavior of Defendant Smart getting
12    within three inches of my face, clenching
13    his fist and dipping his head?
14         MR. THOMPSON: Objection to the
15    form.
16         A.   Had he done that, I would have
17    not been happy with his action.
18         Q.   But, you never confirmed what
19    he did because you never look at the
20    videotape; right?
21         A.   I don't recall.
22         Q.   Judge what do you get paid to
23    do at the Brooklyn TVB?
24         A.   I get paid to manage the
25    office, to supervise principally the judges

Page 66

1          ALAN GELBSTEIN
2     at the office.
3          Q.   Do you have control of the
4     actions of everybody in that office?
5          A.   There's a hierarchy and as I
6     said, my principal job was to take care of
7     the legal side, take care of the judges.
8     There's questions about questions of law,
9     that type of thing.  That was my bailiwick,
10    most everything else was delegated to the
11    clerical supervisory staff including the
12    direct supervision of David Smart.
13         Q.   So, Danielle Calvo is
14    responsible for the supervision of
15    Defendant Smart's action, is that what
16    you're saying?
17         A.   I'm saying that she, too.  I
18    am, every supervisor is.
19         Q.   Now, Defendant Smart also had
20    another altercation with another security
21    guard at some point in time in 2013?
22         A.   I don't recall such a --
23         Q.   Well, let me draw your
24    attention to it.  Can we to Exhibit 79.
25         (Whereupon, Plaintiff's Exhibit

Page 67

1          ALAN GELBSTEIN
2     79, previously marked, was
3     introduced.)
4          Q.   Do you recall that report?
5          A.   No, I don't.
6          Q.   Was that report made under your
7     watch, under your term?
8          MR. THOMPSON: Objection to
9     form.
10         A.   It occurred on May 16th of
11    2013, so it would have occurred while I was
12    the supervising judge -- senior judge in
13    that office.
14         Q.   But you had no knowledge of
15    that report?
16         A.   I don't recall it.  I don't
17    recall this document coming to me.  It
18    seems that Mrs. Burke who was the
19    supervisor of the other part of the
20    building, the DMV, is involved with this
21    one.  I don't believe I am.
22         Q.   Well, obviously if there's an
23    altercation or a confrontation to the
24    people at Brooklyn TVB in some manner or
25    respect between a security guard and

Page 68

1          ALAN GELBSTEIN
2     another security guard, PEC Group who was
3     the employer of Defendant Smart who
4     Defendant Smart worked for, could be called
5     in to rectify it.
6          Is that fair?
7          MR. THOMPSON: Objection to
8     form, you can answer.
9          A.   Should be called in?  I'm not
10    sure I understand the question.
11         Q.   Did you ever call PEC Group
12    with respect to my complaints to you of the
13    harassment and threats by Defendant Smart?
14         A.   I don't believe I have ever
15    spoke to PEC Group of New York, Inc.
16         Q.   You never called them?
17         A.   I don't believe I've ever
18    spoken to them.
19         Q.   So you took responsibility of
20    the actions of Defendant Smart, not PEC
21    Group?
22         MR. THOMPSON: Objection to
23    form.
24         A.   No, that's not true.
25         Q.   All right.

17 (Pages 65 to 68)

Page 69

ALAN GELBSTEIN

1
2    To whom, to whom do threats of
3    violence and harassment and theft get
4    reported to, if not PEC Group and not to
5    you?
6        A.   Oh, I get reported to when my
7    supervisors bring something to me. If they
8    don't bring something to me or Mrs. Burke
9    who is a director of the DMV doesn't bring
10   it to me, I would not be aware of it. I'm
11   only aware of what people bring to me.
12       Q.   And so my complaint that I
13   brought to you, you never brought to PEC
14   Group, is that fair?
15       MR. THOMPSON: Objection, asked
16   and answered.
17       A.   I did not bring it to PEC
18   Group.
19       Q.   You took responsibility for
20   Defendant Smart's actions; is that fair?
21       A.   No, that's not fair.
22       Q.   Who took responsibility if the
23   complaints were brought to your office?
24       A.   As I said earlier --
25       MR. THOMPSON: Objection to

Page 70

ALAN GELBSTEIN

1
2    form.
3        A.   -- when you made a complaint to
4    me about David Smart, I spoke to him about
5    the complaint.
6        Q.   Were you anticipating
7    litigation between myself and the DMV?
8        A.   Did I anticipate litigation?
9        Q.   Yes.
10       A.   No.
11       Q.   Were you having conversations
12   with Defendant Traschen and who was a
13   Defendant in this case, Bushra Vahdat,
14   about anticipated litigation with Mario
15   Capogrosso?
16       MR. THOMPSON: Objection to the
17   form, you can answer.
18       A.   No.
19       Q.   You did not.
20       Did you have e-mails going back
21   and forth between yourself, Defendant
22   Traschen and Bushra Vahdat concerning
23   possible litigation between the DMV and
24   myself, Mario Capogrosso?
25       A.   At some point we might have, I

Page 71

ALAN GELBSTEIN

1
2    don't specifically recall.
3        Q.   I'll direct your attention to
4    Exhibit 39.
5        (Whereupon, Plaintiff's Exhibit
6        39, previously marked, was
7        introduced.)
8        Q.   Are you familiar with this
9    document?
10       A.   I don't know what it is.
11       Q.   It says, "Capogrosso v.
12   Gelbstein," at the top, states defendant's
13   privilege log.
14       Are you familiar with that?
15       A.   No.
16       Q.   Let me direct your attention
17   down to the fourth row, the fourth row.
18       MR. THOMPSON: Mr. Capogrosso
19   let me just put down a marker. We
20   produced this privilege log to you
21   because these conversations are
22   privileged and so, it's not in bounds
23   to ask about them.
24       Any question as to these
25   conversations, any questions to

Page 72

ALAN GELBSTEIN

1
2    communications is objectionable and
3    we object to it and I'll instruct the
4    witness not to answer.
5        MR. CAPOGROSSO: In not
6    questioning concerning the content,
7    in questioning concerning the log.
8    There's a difference.
9        MR. THOMPSON: I'll listen to
10   your question if you pose one, but --
11       MR. CAPOGROSSO: I understand.
12   I'm not going to question about the
13   content, I'm going to question about
14   the log. There's a log at the top,
15   sent from.
16       MR. THOMPSON: He didn't
17   produce the log, I did.
18       MR. CAPOGROSSO: All right.
19       Q.   There was correspondence
20   between yourself, Bushra Vahdat, Alan
21   Gelbstein, Ida Traschen look at the fourth
22   row down?
23       A.   I see it.
24       Q.   Fine.
25       Now, the description of that

18  (Pages 69 to 72)

December 17, 2020

| Page 73 |
|---|

ALAN GELBSTEIN

1
2  states, "e-mail correspondence with DMV
3  regarding incident with Capogrosso prepared
4  in anticipation of litigation."
5       Prepared in anticipation of
6  litigation, this is a log created by the
7  DMV, right, and that entry was made on
8  5/18/2014.
9       Now, I'm going not going to ask
10  you what the e-mail stated, but why were
11  you anticipating litigation on May 8, 2014?
12       MR. THOMPSON: I'm going to
13       object to -- I'm going to object this
14       question and instruct the witness not
15       to answer.
16       There are a number of things
17       that are wrong with that question.
18       As I said, the privilege log was
19       created by our office, not by DMV and
20       not by Mr. Gelbstein, and I don't
21       think it's an appropriate thing to
22       question him on.
23       Q.  So, what your testimony here is
24  today, is that there was no -- that you not
25  anticipate litigation with myself and the

| Page 74 |
|---|

ALAN GELBSTEIN

1
2  DMV, prior to the event of May 11, 2015.
3  Is that your testimony?
4       MR. THOMPSON: Is that your
5       question to Mr. Gelbstein?
6       MR. CAPOGROSSO: Yes.
7       MR. THOMPSON: I object to the
8       form, but you can answer that.
9       A.  I don't believe that anything
10  that we did was in anticipation of
11  litigation, but that could have changed
12  somewhere down the line.  I couldn't tell
13  you when the anticipation began, but it
14  certainly wasn't my worry about litigation
15  one way or the other.
16       Q.  Wasn't your worry about
17  litigation.
18       So, you allowed the harassment
19  of Defendant Smart to continue, it wasn't
20  your worry to resolve it, and that wasn't
21  your issue; is that right?
22       MR. THOMPSON: I'll object to
23       the form of the question, you can
24       answer.
25       A.  The answer is no.

| Page 75 |
|---|

ALAN GELBSTEIN

1
2       Q.  Let me direct your attention to
3  Exhibit 36.
4       (Whereupon, Plaintiff's Exhibit
5       36, previously marked, was
6       introduced.)
7       Q.  Now, this is a docket in the
8  matter of Teague -- this is an attorney,
9  matter of Teague, Eamon Teague who also
10  happens to be a lawyer in the traffic
11  violations bureau.
12       Are you familiar with Eamon
13  Teague?
14       A.  No.
15       Q.  Are you familiar with the
16  matter of Teague?
17       A.  No.
18       Q.  Are you familiar that the DMV
19  brought a grievance against Eamon Teague to
20  the grievance committee?
21       MR. THOMPSON: Objection to the
22       form.
23       A.  No.
24       Q.  Are you familiar with an
25  investigation by the grievance committee

| Page 76 |
|---|

ALAN GELBSTEIN

1
2  concerning the actions of Eamon Teague?
3       MR. THOMPSON: Objection, asked
4       and answered.
5       Q.  I can't hear the answer, are
6  you familiar with it?
7       A.  I don't know anything about
8  this particular --
9       Q.  So, you're not familiar with
10  the grievance that the DMV brought against
11  Eamon Teague; is that fair?
12       A.  Am I aware of an action that
13  the DMV brought against who?
14       Q.  Eamon Teague an attorney who
15  worked at the TVB?
16       A.  No, I don't know anything about
17  this.
18       Q.  Did you ever grieve my office
19  for my actions at the Brooklyn TVB or any
20  TVB?
21       A.  I did not.
22       Q.  Why did you not?
23       A.  Why did I not grieve you?
24       Q.  Yeah, why didn't you grieve me?
25       A.  Because I don't grieve any

19 (Pages 73 to 76)

Page 77

ALAN GELBSTEIN

1
2  attorney whose livelihood depends on a
3  practice of law. I know the severity of
4  grievance committees and what an attorney
5  goes through and so if there's a problem, I
6  try to help resolve the issues without
7  going to the grievance committee.
8       I very -- it has to be
9  something really, really terribly severe
10 for me to go to the appellate division.
11      Q.   So you, the DMV, Ida Traschen
12 rather just have me banned from the
13 practice of law at all TVBs, right, as
14 opposed to going to the grievance
15 committee, how is that helping me?
16      MR. THOMPSON:  Objection to the
17 form, you can answer.
18      A.   That wasn't my decision.
19      Q.   I was banned from the practice
20 of law at all TVBs and you had no input in
21 that decision?
22      A.   No, sir.
23      MR. THOMPSON:  Objection.
24      A.   I don't have the authority to
25 ban you in any other office, other than my

Page 78

ALAN GELBSTEIN

1
2  own.
3       Q.   But your office never grieved
4  me?
5       A.   I never grieved you, no.
6       Q.   And your office therefore never
7  gave me an opportunity because I would have
8  rather have been grieved to present my
9  argument and my case before a grievance
10 committee.
11      A.   Is that a question?
12      Q.   Is it fair that there was no
13 basis or merit, no basis or merit for any
14 of the complaints filed against me?
15      A.   That's not the case.
16      MR. THOMPSON:  Objection to
17 form.
18      A.   That's not the case.
19      Q.   You liked me, that's why you
20 didn't grieve me, is that it?
21      A.   I didn't like you and I didn't
22 dislike you.
23      Q.   But, you just banned me from
24 the practice of law from the Brooklyn TVB?
25      A.   That's correct.

Page 79

ALAN GELBSTEIN

1
2       Q.   So, what you're saying in
3  essence is none of the complaints or
4  affidavits would have had any merit or
5  weight before the grievance committee, is
6  that fair to say?
7       MR. THOMPSON:  Objection.
8       A.   No.
9       Q.   Is that the reason you didn't
10 bring me before the grievance committee?
11      A.   No.
12      Q.   Now, you're familiar with the
13 42SC1983 with the U.S. statute which is one
14 of the basis for my complaint.
15      Are you familiar with it?
16      A.   No.
17      Q.   You're not, you didn't read my
18 complaint?
19      A.   I did read your complaint.
20      Q.   You're not familiar with
21 42SC1983?
22      A.   No.
23      Q.   It states in part, "every
24 person under the color of statute
25 ordinance, regulation of state or

Page 80

ALAN GELBSTEIN

1
2  territory."
3       Now, under the color of state
4  law, that's what it begins with.  Was
5  Defendant Smart acting as a security guard
6  for the DMV?
7       MR. THOMPSON:  Objection.
8  Withdrawn.
9       Q.   Was he acting as a security
10 guard for the DMV?
11      A.   Yes.
12      Q.   Who is the employer of
13 Defendant Smart?
14      A.   Either P-E-C that you indicated
15 earlier.
16      Q.   Who paid Defendant Smart's
17 salary?
18      A.   I don't know with specificity,
19 but I would assume it was PEC.
20      Q.   Did the DMV have a contract
21 with PEC Group?
22      A.   I never saw one, I would assume
23 so.
24      Q.   How did Defendant Smart show up
25 at your Brooklyn TVB?

December 17, 2020

Page 81

ALAN GELBSTEIN

1
2   A.   I'm sorry?
3   Q.   How did he show up; who hired
4   him?
5   A.   He was hired I assume by PEC.
6   Q.   And he had a contract and PEC
7   had a contract with the DMV to supply his
8   service?
9   A.   I don't know for sure, I only
10  assume so.
11  Q.   And you don't know who paid PEC
12  for his services?
13  A.   Who paid PEC?
14  Q.   For Defendant Smart service?
15  A.   I assume the State paid PEC.
16  Q.   And you had the authority to
17  regulate the actions of Defendant Smart, is
18  that fair to say?
19       MR. THOMPSON:  Objection to
20  form, you can answer.
21  A.   Yes.
22       MR. THOMPSON:  While we're at a
23       bit of a lull Mr. Capogrosso, just so
24       you're aware Ms. Traschen is at her
25       computer and ready to join whenever

Page 82

ALAN GELBSTEIN

1
2   we're ready to start that.
3       MR. CAPOGROSSO:  I have eight
4       more minutes.
5   Q.   Now, I was removed from the
6   Brooklyn TVB on May 11, 2015, the police
7   report then indicates that Danielle Calvo
8   told you -- was told by you to have me
9   removed.
10       You were possession of a letter
11  that I wrote on March 20, 2015.  I showed
12  you that letter that I sent to
13  Pricket-Morgan.  You indicated that you
14  received that letter and then I was removed
15  on May 11, 2015.
16       Were you attempting to chill my
17  first amendment right to freedom of speech
18  by having me removed, Defendant Gelbstein?
19  A.   No.
20  Q.   You didn't want me writing any
21  more letters concerning your conduct at the
22  Brooklyn TVB; am I right?
23  A.   No.
24  Q.   You did not want me writing any
25  more letters; is that true?

Page 83

ALAN GELBSTEIN

1
2       MR. THOMPSON:  Objection, asked
3       and answered.
4   A.   No.
5   Q.   Now, I observed you having
6   Jewish ticket brokers, you know what a
7   ticket broker is, right, Judge Gelbstein?
8   A.   Yes.
9   Q.   And I observed them in your
10  office on a weekly basis; is that true, I
11  observed them in your office; do you have
12  Jewish ticket brokers in your office on a
13  weekly basis?
14  A.   No.
15  Q.   You have Jewish ticket brokers
16  visiting your office?
17  A.   I've had people visit my
18  office, yes.
19  Q.   Were they ticket brokers?
20  A.   They could have been ticket
21  brokers.  I believe I know what you're
22  referring to, yes, it was a Jewish -- it
23  was one that you would perhaps call a
24  Jewish ticket broker.
25  Q.   And they're in your office on a

Page 84

ALAN GELBSTEIN

1
2   weekly basis or in your office fairly
3   often; is that fair to say?
4   A.   No.
5   Q.   For what reason are they in
6   your office?
7       MR. THOMPSON:  Objection to
8       form.
9   A.   They may have had a question or
10  maybe I called them in because there was a
11  time where they were all permitted and then
12  there was a time when they weren't
13  permitted.  Once they were not permitted,
14  no ticket brokers that I was able to catch
15  as it were, were permitted in the premises.
16  Q.   Now, at what point in time --
17  didn't you tell me that these ticket
18  brokers that are in your office on a
19  habitual basis, that they're friends of
20  your wife and I have dinner with them, but
21  I don't know what they do for a living.
22       Did you not tell me that at one
23  point?
24  A.   No.
25  Q.   Were you in the GE pleading

21  (Pages 81 to 84)

Page 85

ALAN GELBSTEIN

2  motorists guilty on a sidebar and
3  rescheduling case on a sidebar before ALJ
4  Gelbstein?
5       MR. THOMPSON: Objection to the
6    form of the question.
7    Q.  Did you ever plead motorists
8  guilty at the Brooklyn TVB before ALJ
9  Bohmstein, B-O-H-M-S-T-E-I-N, did you ever
10 enter guilty pleas on before of motorists?
11   A.  Ever?
12   Q.  In the GE?
13   A.  I'm sure I did.
14   Q.  For what reason?
15   A.  For various reasons.
16   Q.  For what reason?
17      MR. THOMPSON: Objection, asked
18    and answered.
19   Q.  Are you acting as a lawyer, did
20 you have your own caseload?
21   A.  No, I did not.  I mean, I had
22 cases when there were occasions when I
23 covered rooms, yes.
24   Q.  No, did you have individual
25 clients that you were representing down at

Page 86

ALAN GELBSTEIN

2  the Brooklyn TVB?
3    A.  No, I never represented a
4  client in the TVB.
5    Q.  But, you were pleading clients
6  guilty in the general requirements room; is
7  that fair?
8    A.  No.
9    Q.  Did you ever reschedule
10 clients' cases in the general requirements
11 room?
12   A.  No.
13   Q.  Before Judge Bohmstein, you
14 never did that?
15   A.  No.
16   Q.  Did you ever have Eugene
17 Gervazi cover cases for you in the Brooklyn
18 TVB?
19   A.  Did I ever have?
20   Q.  Eugene Gervazi, an attorney
21 that works at the Brooklyn TVB as myself
22 was doing cover cases for you?
23      MR. THOMPSON: Objection to the
24    form of question, you can answer.
25   A.  No.

Page 87

ALAN GELBSTEIN

2    Q.  You didn't give him cases for
3  him to handle?
4    A.  I might have asked him to
5  handle a case if another attorney calls in
6  the office and says I can't make it and
7  he's not -- I wouldn't grand him another
8  adjournment and he says, "could you give it
9  to somebody," I probably would do that.
10 Ask another attorney if they would want to
11 handle another attorney's case.
12   Q.  When Eugene Gervazi tells me he
13 is covering a case for Judge Gelbstein,
14 he's covering one of your cases, is that
15 what he's doing?
16   A.  No --
17      MR. THOMPSON: Objection to the
18    form of the question.
19   A.  No, I don't have cases.
20   Q.  There was a lady called Tanya
21 Rabinowitz down at the Brooklyn TVB that
22 was calling herself a lawyer on a repeated
23 basis.
24      Was she removed from the
25 Brooklyn TVB at some point?

Page 88

ALAN GELBSTEIN

2    A.  Yes.
3    Q.  At what point in time was she
4  removed?
5    A.  I don't recall.
6    Q.  Do you recall calling the
7  District Attorney and telling her -- and
8  telling the District Attorney that we have
9  a person down here calling herself a lawyer
10 at Judge Gelbstein's courtroom, did you
11 have any notification of that?
12   A.  Not that I recall.
13   Q.  And did you approach me at some
14 point in time and tell me "who are you, Don
15 Quixote," when you found out that I called
16 District Attorney about Tanya Rabinowitz?
17   A.  I don't believe that is true.
18   Q.  You never said "who are you,
19 Don Quixote"?
20      MR. THOMPSON: Objection, asked
21    and answered.  You can respond.
22   A.  No, I don't believe I ever said
23 that to you.
24   Q.  Do you believe you acted
25 lawfully in having me removed from the

December 17, 2020

Page 89

```
1          ALAN GELBSTEIN
2   Brooklyn TVB on May 11, 2015?
3          MR. THOMPSON:  Objection, calls
4   for a legal conclusion.  You can
5   answer.
6       A.   I believe it was a lawful
7   action.
8       Q.   Under what law, under what
9   statute, under what authority did you make
10  that decision?
11         MR. THOMPSON:  Same objection.
12      A.   I don't believe it was my
13  decision.
14      Q.   Whose decision was it?
15      A.   I believe it was done in
16  consultation with people above me.
17      Q.   But, you were personally
18  involved in the removal; right?
19      A.   Yes, I was.
20      Q.   Can I ask that we go to
21  Exhibit 12.
22         (Whereupon, Plaintiff's Exhibit
23  12, previously marked, was
24  introduced.)
25      Q.   Are you familiar with that
```

Page 90

```
1          ALAN GELBSTEIN
2   letter of complaint that I submitted to
3   your office?
4       A.   You submitted it?
5       Q.   Yeah, I did.
6          It was produced by your
7   attorney, attorney Thompson, are you
8   familiar with it?
9       A.   No.
10      Q.   You're not.
11         Did you take any action in
12  response to that letter?
13      A.   I'm not sure what the letter
14  is.  Could I see the rest of the letter?
15         (Whereupon, the Court Reporter
16  scrolled down so the witness can see
17  the rest of the exhibit.)
18      Q.   It's a complaint made about
19  Defendant Smart that he gets in my face and
20  tells me to "fuck you."
21         You don't recall seeing that
22  letter?
23      A.   I may have seen it, I honestly
24  don't recall it.
25      Q.   And you don't recall what you
```

Page 91

```
1          ALAN GELBSTEIN
2   did in response to it, is that fair?
3       A.   I don't recall the incident or
4   what I did about it.  What is the date of
5   this letter?
6       Q.   May 14th.
7          You don't recall it?
8       A.   What year?
9       Q.   2014.
10      A.   I don't recall it.
11      Q.   In June of 2012 Defendant Smart
12  approached me from the rear and pushed me
13  in the rear attempting to get my cell
14  phone.  Pretty much he assaulted me.
15         Do you recall that complaint to
16  your office?
17         MR. THOMPSON:  I object to the
18  form of the question, you can answer.
19      A.   I don't recall it.
20      Q.   You don't recall that one.
21         You don't recall the incident
22  of the spear hand and the sign of the
23  cross.  You don't recall this letter of
24  complaint.  You don't recall the theft that
25  Defendant Smart made of $80 on a $150 fee.
```

Page 92

```
1          ALAN GELBSTEIN
2          Is that fair?
3       A.   Yes, that's fair.
4          MR. THOMPSON:  Objection to the
5   form of the question.
6       Q.   And you never reviewed the
7   videotape of Defendant Smart approaching me
8   on the morning of May 11, 2015; is that
9   right?
10      A.   I don't recall if I did or not.
11      Q.   Why did you keep the evidence,
12  why did you keep the videotape of the
13  alleged push on Defendant Smart on the
14  morning of May 11, 2015, why you didn't
15  keep --
16         MR. THOMPSON:  Objection to the
17  form of the question, you can answer.
18      A.   I was never instructed on the
19  use of the machine.  I believe it was a
20  tape that goes around and around, you know,
21  and re-records on itself.  I would have no
22  idea how to take a piece of it off, if it
23  were to occur to me to want to take a piece
24  of it off, I would not know how to do that.
25      Q.   Did you deliberately lose the
```

23 (Pages 89 to 92)

December 17, 2020

## Page 93

1        ALAN GELBSTEIN
2   evidence, Judge Gelbstein?
3        A.   No.
4        MR. THOMPSON: Objection to the
5   form.
6        Q.   Did you want to sweep this
7   complaint under the rug by losing the
8   evidence?
9        MR. THOMPSON: Same objection.
10       A.   I didn't lose any evidence.
11       Q.   But you didn't keep or maintain
12  the evidence; right?
13       MR. THOMPSON: Same objection.
14       A.   I kept any evidence that was
15  presented to me.
16       Q.   But you didn't keep the
17  evidence of the videotape now, did you?
18       MR. THOMPSON: Objection.
19       A.   It wasn't in my direct control
20  and it didn't occur to me until you brought
21  it up that it's evidence one way or the
22  other what regard to this case.
23       Q.   That evidence would have shown
24  who provoked that incident, would that be
25  fair to say?

## Page 94

1        ALAN GELBSTEIN
2        MR. THOMPSON: Objection.
3        A.   I would say that it would show
4   conclusively what occurred.
5        Q.   And you made the decision not
6   to keep it.
7        Who's in control of the
8   videotape at the Brooklyn TVB?
9        MR. THOMPSON: Objection to the
10  form.
11       A.   I beg your pardon?
12       Q.   Who's in control of the
13  videotape at the Brooklyn TVB?
14       A.   It was in the clerical office.
15       Q.   Who's in control of it, who's
16  the person in control of it?
17       A.   I don't know which clerk or
18  supervisor was directly responsible for
19  its recording. I believe there was some
20  kind of protocol, but I don't know what it
21  was.
22       Q.   You had no control of the
23  videotape from the Brooklyn TVB?
24       MR. THOMPSON: Objection to the
25  form of the question, you can answer.

## Page 95

1        ALAN GELBSTEIN
2        A.   Ultimately it was I guess under
3   my control, but I had no direct supervision
4   and never did.
5        Q.   Who recommended that security
6   cameras be put up in the Brooklyn TVB,
7   whose recommendation was that?
8        MR. THOMPSON: Objection to the
9   form, you can answer.
10       A.   It was based on an audit by the
11  auditors of the DMV. They had recommended
12  it or it would have been our security
13  people that recommended it, I don't know.
14  One of those two field investigations might
15  have done it or the regular audit people
16  might have done it as part of an audit, one
17  of those two.
18       Q.   And you don't know how long
19  that videotape lasts; is that right?
20       A.   No, I don't.
21       MR. THOMPSON: While we're at a
22  bit of a pause, I would just say it's
23  12:07 right now, Ms. Traschen has
24  been waiting by her computer since
25  11:45.

## Page 96

1        ALAN GELBSTEIN
2        Do you intend to go forward
3   with her deposition Mr. Capogrosso?
4        MR. CAPOGROSSO: Just give me
5   -- because we had problems. I'll ask
6   for eight more minutes and then I
7   will stop. In eight more minutes I
8   will stop.
9        MR. THOMPSON: All right, I'll
10  let her know.
11       MR. CAPOGROSSO: And I'll do
12  everything to keep to my schedule and
13  I will. Just give me eight more
14  minutes and I will stop precisely at
15  12:15.
16       Can we go to Exhibit 66.
17       (Whereupon, Plaintiff's Exhibit
18  66, previously marked, was
19  introduced.)
20       Q.   Now, are you familiar with this
21  document?
22       A.   I only see that it was
23  addressed to me, so I don't know.
24       Q.   You do note the big blackout
25  spaces in the document; am I right?

24 (Pages 93 to 96)

December 17, 2020

## Page 97

ALAN GELBSTEIN

1
2     A.   Yes, I see that.
3     Q.   Was that redacted footage of
4  the alleged incident between myself and
5  Smart; do you know?
6     A.   I have no idea what is
7  redacted.
8     Q.   Was that information
9  purposefully redacted?
10    A.   I have no way of knowing.
11    Q.   Do those blackouts show the
12 alleged incident between myself and
13 Defendant Smart?
14    A.   I have no way of knowing.
15    Q.   When you worked at the
16 administrative law judge, you were a state
17 agent; is that fair?
18        MR. THOMPSON:  Objection, calls
19    for a legal conclusion.
20    Q.   Were you operating under color
21 of state law?
22        MR. THOMPSON:  Same objection.
23    A.   Repeat the question?
24    Q.   Were you operating under color
25 of state law, under the direction of state

## Page 98

ALAN GELBSTEIN

1
2  law?
3     A.   I believe so.
4     Q.   You indicated you had
5  supervisory authority over the actions of
6  Defendant Smart; is that right?
7     A.   Yes.
8         MR. THOMPSON:  Objection to the
9     form of the question.
10    A.   Yes.
11    Q.   And you had the ability to have
12 me removed from the Brooklyn TBV; is that
13 right?
14    A.   I'm not sure if I did or not.
15    Q.   But, you did have me removed
16 from the Brooklyn TVB; right?
17    A.   Oh, I'm sorry did you say
18 removed David Smart or removed you?
19    Q.   Removed me from the Brooklyn
20 TVB because that's what you did, am I
21 right?
22    A.   Yes.
23        MR. CAPOGROSSO:  I have three
24    more minutes.  Let me see if I'm
25    missing anything.

## Page 99

ALAN GELBSTEIN

1
2     Q.   I wasn't given any due process
3  was I, is that a fair statement?
4         MR. THOMPSON:  Objection to the
5     form of the question.  It calls for a
6     legal conclusion.
7     Q.   What is a due process, you're a
8  Judge, what is due process?
9         MR. THOMPSON:  Same objection.
10        THE WITNESS:  I can answer
11    that.
12        MR. THOMPSON:  Subject to the
13    objection, yes.
14    A.   Due process is giving somebody
15 an opportunity to respond to a complaint I
16 would think.
17    Q.   And you gave me no such
18 opportunity, did you?
19    A.   I did.
20    Q.   Explain how you did?
21    A.   You could have given me an
22 affidavit.  In all our conversations that
23 you and I have had, I gave you information
24 that I was given by countless people with
25 regard to singular incidents and you gave

## Page 100

ALAN GELBSTEIN

1
2  me your version of the story.
3         And because of the great volume
4  of witnesses who reported to me, I found
5  their story more credible than I found your
6  story on any one of the occasions that
7  occurred.
8     Q.   You illicited the affidavits of
9  other attorneys, did you not?
10        MR. THOMPSON:  Objection to the
11    form, you can answer.
12    A.   No.
13    Q.   Did you illicit affidavits of
14 other attorneys?
15    A.   No.
16    Q.   You did not; not of Jeff Myer
17 err, Yakov Brody, you did not illicit their
18 affidavits?
19        MR. THOMPSON:  Objection, asked
20    and answered.
21    A.   I don't recall if I ever asked
22 anybody for an affidavit.
23    Q.   I was never presented with the
24 affidavits or the complaints against me and
25 my office at the Brooklyn TVB by your

25  (Pages 97 to 100)

December 17, 2020

## Page 101

```
1              ALAN GELBSTEIN
2   office which I could respond individually
3   by you to which I could respond.
4         Is that fair?
5     A.  Yes.
6         MR. THOMPSON:  Objection to the
7   form.
8         MR. CAPOGROSSO:  That's it.  I
9   have nothing further.
10        (Whereupon, at 12:15 P.M., the
11  Examination of this witness was
12  concluded.)
13
14          o    o    o    o
15
16
17
18
19
20
21
22
23
24
25
```

## Page 103

```
1              ALAN GELBSTEIN
2              E X H I B I T S
3
4   PLAINTIFF'S EXHIBITS (Previously marked)
5
6   EXHIBIT  EXHIBIT              PAGE
7   NUMBER   DESCRIPTION
8     68    Two-page of workplace
            violence incident      8
9
      15    Two-page letter dated
10          May 20, 2015           18
11    85    Four-page workplace
            violence incident      28
12
      81    One-page e-mail from
13          Bushra Vahdat          33
14    82    Four-page attorney/client
            privilege notes        37
15
16    73    Four-page ALJ Affirmation  41
17    67    Three-page workplace
            violence incident      63
18    79    Five-page PEC Group
            incident summary       67
19
      39    16-page State Defendants'
20          privilege log          71
21    36    Five-page Matter of Teague  75
22    12    One-page notes         89
23    66    Three-page memorandum   96
24
      (Exhibits retained by Counsel.)
25
```

## Page 102

```
1              ALAN GELBSTEIN
2            D E C L A R A T I O N
3
4       I hereby certify that having been
5   first duly sworn to testify to the truth, I
6   gave the above testimony.
7
8       I FURTHER CERTIFY that the foregoing
9   transcript is a true and correct transcript
10  of the testimony given by me at the time
11  and place specified hereinbefore.
12
13
14
         _____
15           ALAN GELBSTEIN
16
17
18  Subscribed and sworn to before me
19  this _____ day of _____ 20___.
20
21
    _____
22    NOTARY PUBLIC
23
24
25
```

## Page 104

```
1              ALAN GELBSTEIN
2              I N D E X
3
4   EXAMINATION BY              PAGE
5   MR. CAPOGROSSO              3
6
7
8   INFORMATION AND/OR DOCUMENTS REQUESTED
9   INFORMATION AND/OR DOCUMENTS    PAGE
10  (None)
11
12
13
14
15  QUESTIONS MARKED FOR RULINGS
16  PAGE LINE QUESTION
17  (None)
18
19
20
21
22
23
24
25
```

26 (Pages 101 to 104)

December 17, 2020



Page 105

1        ALAN GELBSTEIN
2       C E R T I F I C A T E
3
4    STATE OF NEW YORK    )
                : SS.:
5    COUNTY OF KINGS      )
6
7        I, JAMIE NEWMAN, a Notary Public for
8    and within the State of New York, do hereby
9    certify:
10        That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14        I further certify that I am not
15    related to any of the parties to this
16    action by blood or by marriage and that I
17    am in no way interested in the outcome of
18    this matter.
19        IN WITNESS WHEREOF, I have hereunto
20    set my hand this 31st day of December 2020.
21
22
23
          JAMIE NEWMAN
24
25

27 (Page 105)

December 17, 2020

Page 106

| A | | | | |
|---|---|---|---|---|
| **A.M (1)** | 3:14 17:17 | 18:1 19:1 | 2:18 | 89:5 91:18 |
| 1:13 | 26:10 36:2 | 20:1 21:1 | **ALJ (4)** | 92:17 94:25 |
| **ability (2)** | **addressed (2)** | 22:1 23:1 | 36:5 85:3,8 | 95:9 99:10 |
| 55:3 98:11 | 19:22 96:23 | 24:1 25:1 | 103:15 | 100:11 |
| **able (1)** | **adjournment...** | 26:1 27:1 | **allegation (2)** | **answered (11)** |
| 84:14 | 87:8 | 28:1 29:1 | 11:12 44:19 | 11:3 32:5 52:7 |
| **absolute (2)** | **administrati...** | 30:1 31:1 | **allegations (3)** | 53:19 64:11 |
| 9:14 47:2 | 97:16 | 32:1 33:1 | 44:20 49:18 | 69:16 76:4 |
| **Absolutely (1)** | **affidavit (30)** | 34:1 35:1 | 50:19 | 83:3 85:18 |
| 52:25 | 27:14,16 32:3 | 36:1 37:1 | **alleged (10)** | 88:21 100:20 |
| **abused (1)** | 32:25 33:9,11 | 38:1 39:1 | 10:5,12 14:15 | **anti-Semitic ...** |
| 36:10 | 33:15 35:19 | 40:1 41:1 | 14:21 16:22 | 44:10 46:15 |
| **accept (1)** | 40:3,4,9 41:5 | 42:1 43:1 | 18:22 43:15 | **anticipate (2)** |
| 26:20 | 41:8 47:8,25 | 44:1 45:1 | 92:13 97:4,12 | 70:8 73:25 |
| **accepted (4)** | 48:3,11,12,14 | 46:1 47:1 | **allowed (4)** | **anticipated (1)** |
| 27:12 40:13,14 | 48:23 49:7,11 | 48:1 49:1 | 15:6 38:21 | 70:14 |
| 40:19 | 49:16 50:6,8 | 50:1 51:1 | 56:24 74:18 | **anticipating ...** |
| **accurate (1)** | 50:21 51:4,8 | 52:1 53:1 | **allowing (1)** | 70:6 73:11 |
| 40:2 | 99:22 100:22 | 54:1 55:1 | 51:6 | **anticipation ...** |
| **acted (1)** | **affidavits (11)** | 56:1 57:1 | **altercation (4)** | 73:4,5 74:10 |
| 88:24 | 23:19,25 41:9 | 58:1 59:1 | 10:5 20:12 | 74:13 |
| **acting (3)** | 41:12 49:9 | 60:1 61:1 | 66:20 67:23 | **anybody (4)** |
| 80:5,9 85:19 | 50:19 79:4 | 62:1 63:1 | **amendment (...** | 38:24 48:22 |
| **action (14)** | 100:8,13,18 | 64:1 65:1 | 82:17 | 49:9 100:22 |
| 3:19 11:18 | 100:24 | 66:1 67:1 | **AND/OR (1)** | **appeal (3)** |
| 17:23 19:18 | **Affirmation ...** | 68:1 69:1 | 104:8,9 | 31:6,10,11 |
| 19:22 23:11 | 41:22 42:15 | 70:1 71:1 | **animus (1)** | **appellate (1)** |
| 33:23 59:8 | 103:15 | 72:1,20 73:1 | 54:17 | 77:10 |
| 65:17 66:15 | **affirmed (1)** | 74:1 75:1 | **answer (47)** | **appointed (1)** |
| 76:12 89:7 | 3:6 | 76:1 77:1 | 6:3 10:14 | 36:4 |
| 90:11 105:16 | **afternoon (3)** | 78:1 79:1 | 13:16,24 | **approach (7)** |
| **actions (12)** | 11:25 12:7,10 | 80:1 81:1 | 14:10 15:2 | 11:24 13:12 |
| 14:7 23:17 | **against- (1)** | 82:1 83:1 | 16:5,8 21:7,8 | 14:4 20:20 |
| 30:18 53:24 | 1:6 | 84:1 85:1 | 21:24 22:2 | 24:17 62:12 |
| 55:4 66:4 | **agent (1)** | 86:1 87:1 | 24:3 27:7 | 88:13 |
| 68:20 69:20 | 97:17 | 88:1 89:1 | 30:15 31:21 | **approached (...** |
| 76:2,19 81:17 | **agree (1)** | 90:1 91:1 | 33:5 40:18 | 21:2,9 32:7 |
| 98:5 | 9:3 | 92:1 93:1 | 48:7 52:10,24 | 37:19,22 64:8 |
| **activities (1)** | **Alan (109)** | 94:1 95:1 | 53:19 54:25 | 64:13 91:12 |
| 55:9 | 1:8,15 2:9 3:1 | 96:1 97:1 | 57:5 61:19 | **approaching ...** |
| **activity (1)** | 3:13 4:1 5:1 | 98:1 99:1 | 62:6 65:2,3,6 | 12:6 92:7 |
| 55:7 | 6:1 7:1 8:1 | 100:1 101:1 | 68:8 70:17 | **appropriate ...** |
| **additional (1)** | 9:1 10:1 11:1 | 102:1,15 | 72:4 73:15 | 73:21 |
| 8:17 | 12:1 13:1 | 103:1 104:1 | 74:8,24,25 | **argument (2)** |
| **address (4)** | 14:1 15:1 | 105:1 | 76:5 77:17 | 60:12 78:9 |
| | 16:1 17:1 | **Albany (1)** | 81:20 86:24 | **argumentati...** |

33:5 64:11
**arrive (2)**
4:23 5:4
**arrived (1)**
5:2
**asked (20)**
11:2 24:21
26:10,12 32:4
36:13 41:2
48:20,21 52:6
53:18 64:11
69:15 76:3
83:2 85:17
87:4 88:20
100:19,21
**asking (1)**
27:13
**aspect (2)**
60:17 61:5
**assaulted (1)**
91:14
**assume (7)**
42:2,3 80:19
80:22 81:5,10
81:15
**assumed (1)**
48:4
**assumes (3)**
14:25 32:13
51:11
**assuming (1)**
11:7
**attached (3)**
18:14 32:25
33:7
**attempting (2)**
82:16 91:13
**attend (1)**
5:13
**attention (16)**
19:6,12 22:5
27:19 34:23
36:2 42:18
44:6 58:23
60:6 63:14,18
66:24 71:3,16

75:2
**attorney (25)**
2:8 6:19 7:10
7:11 12:3
16:14 17:14
29:4 38:19,22
48:13,21 50:4
75:8 76:14
77:2,4 86:20
87:5,10 88:7
88:8,16 90:7
90:7
**attorney's (1)**
87:11
**attorney/clie...**
15:23 103:14
**attorneys (10)**
2:8,16 23:20
25:4 34:9,15
44:12 50:14
100:9,14
**audit (3)**
95:10,15,16
**auditors (1)**
95:11
**authority (5)**
14:6 77:24
81:16 89:9
98:5
**available (2)**
13:2,9
**aware (5)**
31:23 69:10,11
76:12 81:24

_____

**B**
**B (2)**
3:5 103:2
**B-O-H-M-S-...**
85:9
**back (12)**
6:13 31:11
32:8 62:16,16
62:23,24
63:20,20,22
63:22 70:20

**bailiwick (1)**
66:9
**ban (1)**
77:25
**banned (3)**
77:12,19 78:23
**BARBARA (1)**
2:18
**barbara.mon...**
2:19
**barriers (1)**
64:21
**based (6)**
11:5,12,17
43:14 57:9
95:10
**basis (9)**
15:22 78:13,13
79:14 83:10
83:13 84:2,19
87:23
**beach (1)**
45:12
**beanie (2)**
44:24 46:22
**beg (5)**
5:19 9:25
18:25 52:8
94:11
**began (2)**
58:6 74:13
**begins (2)**
36:3 80:4
**behavior (6)**
20:2 35:20
42:21 43:5,15
65:11
**believe (25)**
5:9 6:6 9:22
11:17 16:15
33:14,17 34:8
41:7 46:19,25
67:21 68:14
68:17 74:9
83:21 88:17
88:22,24 89:6

89:12,15
92:19 94:19
98:3
**best (3)**
4:5 7:14 26:22
**better (3)**
21:17,21 54:20
**big (1)**
96:24
**bit (3)**
37:10 81:23
95:22
**blackout (1)**
96:24
**blackouts (1)**
97:11
**blame (1)**
52:21
**blood (1)**
105:16
**Bohmstein (2)**
85:9 86:13
**bottom (3)**
42:6,11,13
**bounds (1)**
71:22
**brain (1)**
45:16
**breaking (3)**
3:23,24 4:5
**bring (7)**
58:22 69:7,8,9
69:11,17
79:10
**Brody (4)**
47:20 48:5
49:2 100:17
**Brody's (2)**
48:12 50:8
**broker (2)**
83:7,24
**brokers (7)**
83:6,12,15,19
83:21 84:14
84:18
**Brooklyn (51)**

3:15 4:19,24
5:8,23 6:5
11:5 12:15,18
13:2 14:7
15:7 27:2,5
27:22 41:25
46:4 47:13,14
48:13 49:3
51:7,17 53:7
53:17,24
56:25 58:3
59:17 65:23
67:24 76:19
78:24 80:25
82:6,22 85:8
86:2,17,21
87:21,25 89:2
94:8,13,23
95:6 98:12,16
98:19 100:25
**brought (9)**
19:5 60:6
69:13,13,23
75:19 76:10
76:13 93:20
**building (5)**
5:15 8:22,25
45:9 67:20
**bureau (4)**
2:15 4:20,24
75:11
**Burke (2)**
67:18 69:8
**bus (1)**
52:16
**Bushra (10)**
35:11,12,15
39:2,19,24
70:13,22
72:20 103:13
**business (2)**
5:7,9
**busy (1)**
38:20

_____

**C**

December 17, 2020

Page 108

| | | | | |
|---|---|---|---|---|
| **C (7)** | 8:22 14:19 | 52:2 53:20 | 85:25 86:5 | 40:14 45:22 |
| 2:2 37:13,19 | 17:3 19:2,8 | 74:14 | **clients' (1)** | 55:24,25 56:5 |
| 38:6 102:2 | 21:14,20 | **certainty (2)** | 86:10 | 56:6,8,9 57:2 |
| 105:2,2 | 28:20 29:4,15 | 9:14 15:16 | **clip (3)** | 57:7,11,17,19 |
| **call (8)** | 38:3 39:21 | **certify (4)** | 60:8,9,21 | 58:2,5,14,25 |
| 9:24 10:2 | 43:23 44:4 | 102:4,8 105:9 | **color (4)** | 59:5,9,12,15 |
| 15:18 25:17 | 63:20 70:15 | 105:14 | 79:24 80:3 | 60:6 61:24 |
| 46:7,21 68:11 | 70:24 71:11 | **changed (1)** | 97:20,24 | 69:12 70:3,5 |
| 83:23 | 71:18 72:5,11 | 74:11 | **come (1)** | 79:14,18,19 |
| **called (18)** | 72:18 73:3 | **charges (1)** | 20:3 | 90:2,18 91:15 |
| 3:5 9:14,20 | 74:6 81:23 | 50:17 | **coming (2)** | 91:24 93:7 |
| 12:4 20:10 | 82:3 96:3,4 | **chief (3)** | 20:10 67:17 | 99:15 |
| 26:6,9 43:7 | 96:11 98:23 | 28:2,2 55:15 | **comments (1)** | **complaints (...** |
| 44:24 46:24 | 101:8 104:5 | **chill (1)** | 8:18 | 17:18,21 19:4 |
| 54:8 55:21 | **capogrossom...** | 82:16 | **COMMISSI...** | 20:7 22:6,25 |
| 68:4,9,16 | 2:5 | **circumstance...** | 1:10 2:11,16 | 23:25 24:6,10 |
| 84:10 87:20 | **car (18)** | 47:5 | **committee (7)** | 25:3,13,16,18 |
| 88:15 | 32:10 33:21 | **Civil (1)** | 75:20,25 77:7 | 26:18,24 27:4 |
| **calling (3)** | 36:12,12,14 | 1:16 | 77:15 78:10 | 27:8,11,13,19 |
| 87:22 88:6,9 | 37:14,15 38:4 | **clarification ...** | 79:5,10 | 30:3 46:13 |
| **callousness (3)** | 38:7,10,15,22 | 24:12 | **committees (1)** | 55:17,18,19 |
| 61:8,14,16 | 38:25 39:3,8 | **clenched (1)** | 77:4 | 55:25 58:11 |
| **calls (8)** | 39:9,22,22 | 64:22 | **communicati...** | 58:16 61:9,15 |
| 38:23,25 54:23 | **care (2)** | **clenching (1)** | 72:2 | 61:17,23 62:3 |
| 65:7 87:5 | 66:6,7 | 65:12 | **complacent (i)** | 68:12 69:23 |
| 89:3 97:18 | **case (11)** | **clerical (6)** | 12:4 | 78:14 79:3 |
| 99:5 | 1:6 20:23 | 28:14 45:9 | **complain (1)** | 100:24 |
| **Calvo (13)** | 70:13 78:9,15 | 55:10,20 | 20:4 | **complicit (1)** |
| 1:9 2:10 9:3,6 | 78:18 85:3 | 66:11 94:14 | **complained (4)** | 54:10 |
| 11:13,19 | 87:5,11,13 | **clerk (15)** | 23:10,16 53:22 | **complied (1)** |
| 14:16,23 | 93:22 | 28:2,2,18,19 | 55:22 | 28:23 |
| 51:23 52:20 | **caseload (1)** | 29:3 36:12,13 | **complaining ...** | **compound (2)** |
| 63:10 66:13 | 85:20 | 36:20,24 39:3 | 59:25 | 13:16,24 |
| 82:7 | **cases (7)** | 39:8 55:13,15 | **complaint (69)** | **computer (2)** |
| **cameras (1)** | 85:22 86:10,17 | 63:12 94:17 | 19:24 22:13,17 | 81:25 95:24 |
| 95:6 | 86:22 87:2,14 | **clerk's (2)** | 22:21 24:14 | **concerning (...** |
| **cans (1)** | 87:19 | 39:9,22 | 24:18,21,23 | 3:19 12:2 |
| 59:16 | **catch (2)** | **clerks (7)** | 25:15,22,23 | 15:19 19:25 |
| **capacity (11)** | 29:13 84:14 | 23:20 25:4 | 25:25 26:4,5 | 22:17,25 |
| 1:8,8,9,9,11 | **cease (1)** | 28:16,18 | 26:5,9,13,23 | 32:24 33:2 |
| 2:9,10,10,11 | 25:19 | 36:11 55:12 | 27:9 29:19,21 | 35:19 39:20 |
| 2:12,17 | **cell (1)** | 60:5 | 29:23 30:17 | 56:13 57:2 |
| **Capogrosso (...** | 91:13 | **client (6)** | 30:22,24 31:3 | 70:22 72:6,7 |
| 1:3 2:3 3:4,10 | **certain (1)** | 34:10,16 46:14 | 31:24 32:18 | 76:2 82:21 |
| 4:2,8,12 7:8 | 19:4 | 46:17,19 86:4 | 32:24 33:2,10 | **concluded (1)** |
| 7:17,21 8:2 | **certainly (3)** | **clients (2)** | 34:5 35:18,22 | 101:12 |

conclusion (5)
54:24 57:21
89:4 97:19
99:6
conclusions (1)
57:9
conclusively ...
94:4
condone (1)
65:10
conduct (4)
41:24 50:20
53:24 82:21
confirmed (1)
65:18
confrontatio...
67:23
connection (7)
4:6 21:12,13
21:17,24
29:11 40:17
consultation ...
89:16
contact (2)
58:13 64:5
content (2)
72:6,13
contents (2)
15:24 18:2
continue (1)
74:19
continued (1)
62:3
contract (3)
80:20 81:6,7
control (10)
55:4,5 66:3
93:19 94:7,12
94:15,16,22
95:3
conveniently ...
12:17
conversation...
15:13,25 16:3
16:9 32:15,21
32:22,23

45:14,15
46:10
conversation...
70:11 71:21,25
99:22
copy (2)
16:16,17
correct (12)
6:7,22,25
11:16 18:17
20:19 39:5
40:15 49:4
57:3 78:25
102:9
corresponde...
72:19 73:2
counsel (10)
3:3,23,24 7:10
7:25 13:6,18
16:2 52:12
103:24
counsel's (1)
9:18
Counselor (1)
52:9
countless (1)
99:24
COUNTY (1)
105:5
couple (1)
27:19
court (19)
1:2 3:22 4:4,10
4:15 6:22 7:2
7:19,24 16:25
19:10 21:11
21:19,22
28:22 29:10
36:24 42:10
90:15
courthouse (3)
31:7 34:11
38:20
courtroom (2)
34:18 88:10
cover (2)

86:17,22
covered (1)
85:23
covering (2)
87:13,14
create (1)
13:13
created (2)
73:6,19
credible (1)
100:5
Cricket's (1)
17:2
cross (2)
59:3 91:23
cross-talk (1)
13:6
crossed (1)
64:20
cumulation (1)
27:10
cumulative (1)
27:8
cusp (1)
57:24
cut (2)
32:9 33:19
CV (1)
1:6

---

**D**

D (2)
102:2 104:2
Danielle (15)
1:9 2:10 9:3,6
9:22,23 11:12
11:19 14:16
14:23 52:15
55:15 63:10
66:13 82:7
date (6)
1:13 16:19
26:8 45:3
47:16 91:4
dated (2)
18:16 103:9

dates (3)
42:22 44:15
47:18
David (10)
1:10 2:11 8:13
19:13,23 20:4
20:10 66:12
70:4 98:18
day (14)
4:25 5:5,11,15
5:17,22 9:11
31:6,12 32:7
33:18 38:19
102:19
105:20
day-to-day (2)
55:7,8
December (6)
1:13 47:15,20
48:25 58:24
105:20
deciding (1)
27:10
decision (6)
77:18,21 89:10
89:13,14 94:5
Defendant (69)
1:15 2:16 3:17
4:18 10:6
12:21 13:11
14:3,7 18:9
18:22 19:5
20:25 22:14
23:2,10 29:19
33:21 41:21
44:23 51:16
51:23 52:17
52:20 54:22
55:4,18 56:2
56:8,23,24
58:2,6 59:2
59:20 60:16
60:25 62:9,12
62:23 64:8,13
64:20 65:11
66:15,19 68:3

68:4,13,20
69:20 70:12
70:13,21
74:19 80:5,13
80:16,24
81:14,17
82:18 90:19
91:11,25 92:7
92:13 97:13
98:6
defendant's (3)
23:16,22 71:12
defendants (3)
1:12 2:8 3:21
Defendants' ...
103:19
delegated (1)
66:10
deliberate (2)
61:7,13
deliberately (...
92:25
depends (1)
77:2
deposition (3)
1:15 3:19 96:3
derogatory (1)
20:12
description (2)
72:25 103:7
desist (1)
25:19
details (1)
8:24
devices (1)
49:8
difference (1)
72:8
different (1)
21:16
dinner (1)
84:20
dipped (1)
64:23
dipping (1)
65:13

direct (15)
28:24 29:2
35:5,9 42:17
44:6 55:6
63:14,18
66:12 71:3,16
75:2 93:19
95:3
directed (2)
4:18 55:8
Directing (1)
22:5
direction (7)
5:18,23 20:15
52:4,12,13
97:25
directly (3)
17:14 59:4
94:18
director (1)
69:9
discussion (2)
25:22 26:7
dislike (1)
78:22
Dismiss (1)
23:23
District (5)
1:2,2 88:7,8,16
division (1)
77:10
DMV (23)
1:10 2:11,15
2:16 16:3
51:17 67:20
69:9 70:7,23
73:2,7,19
74:2 75:18
76:10,13
77:11 80:6,10
80:20 81:7
95:11
docket (1)
75:7
document (7)
8:9 41:21

45:21 67:17
71:9 96:21,25
DOCUMEN...
104:8,9
doing (5)
5:24 52:16,22
86:22 87:15
Don (2)
88:14,19
door (2)
45:7,9
draw (4)
19:11 27:18
34:23 66:23
due (4)
99:2,7,8,14
duly (3)
3:6 102:5
105:11

_____

E

E (9)
2:2,2 3:5,5
102:2 103:2
104:2 105:2,2
e-mail (5)
16:20 18:15
73:2,10
103:12
e-mails (1)
70:20
Eamon (6)
75:9,12,19
76:2,11,14
earlier (3)
53:3 69:24
80:15
East (1)
3:15
EASTERN (1)
1:2
eight (4)
82:3 96:6,7,13
either (4)
25:4 55:12
60:19 80:14

EK (1)
1:6
Empire (1)
2:17
employer (2)
68:3 80:12
enter (1)
85:10
entrance (3)
37:14 38:3,7
entry (1)
73:7
err (1)
100:17
ESQ (2)
2:13,18
essence (1)
79:3
estimation (1)
60:11
Eugene (3)
86:16,20 87:12
event (3)
16:21 57:8
74:2
events (1)
58:20
everybody (1)
66:4
evidence (16)
14:14,20,25
32:13 50:2,4
50:5 92:11
93:2,8,10,12
93:14,17,21
93:23
exact (1)
25:25
exactly (1)
45:4
examination ...
3:9 101:11
104:4 105:10
105:12
examined (1)
3:8

Excuse (1)
48:22
exhibit (48)
6:14,14,15,17
7:12,14,18,18
7:22,22 8:3,5
8:10 18:5,6
28:3,4,5
34:24,25,25
35:2 37:3,4
39:4,7,11,11
39:15,15
41:16,17 63:5
63:6,15 66:24
66:25 71:4,5
75:3,4 89:21
89:22 90:17
96:16,17
103:6,6
exhibits (5)
3:2 6:24 7:9
103:4,24
Explain (1)
99:20

_____

F

F (1)
105:2
face (5)
22:9,15 64:22
65:12 90:19
facing (2)
45:12,13
fact (3)
11:10 32:13
62:22
factor (1)
27:10
facts (1)
14:25
fair (34)
25:7,10 26:14
26:15 27:14
29:24 33:24
50:23 51:2
56:22 57:12

57:15 58:2,7
62:4,10,17
68:6 69:14,20
69:21 76:11
78:12 79:6
81:18 84:3
86:7 91:2
92:2,3 93:25
97:17 99:3
101:4
fairly (1)
84:2
false (1)
30:10
familiar (19)
8:9,12 23:24
28:8 41:20
71:8,14 75:12
75:15,18,24
76:6,9 79:12
79:15,20
89:25 90:8
96:20
far (1)
20:13
Federal (1)
1:16
fee (2)
56:3,8 91:25
feet (3)
45:7,11 64:9
felt (1)
26:4
field (1)
95:14
fight (1)
36:14
file (2)
2:19 51:8
filed (1)
3:19 41:10
78:14
filings (1)
33:8
fine (11)
4:16 18:4 24:7

34:22 36:8
37:2,25 38:9
39:19 44:4
72:24
**FIRM (1)**
2:3
**first (14)**
3:6 8:4 18:13
23:22 28:24
29:2 35:6,9
36:3,4 63:17
63:19 82:17
102:5
**fist (2)**
64:23 65:13
**five (1)**
17:11
**Five-page (2)**
103:18,21
**Floor (1)**
2:12
**followed (4)**
36:11 39:3,8
39:21
**following (1)**
37:17
**follows (1)**
3:8
**footage (1)**
97:3
**foregoing (1)**
102:8
**form (52)**
5:21 6:2 10:9
11:15 14:10
15:10 21:6
24:3 25:9
27:7 30:14
34:2 40:17
48:7 50:25
52:19 57:5,14
58:10 61:4,12
61:19 62:6
65:2,5,15
67:9 68:8,23
70:2,17 74:8

74:23 75:22
77:17 78:17
81:20 84:8
85:6 86:24
87:18 91:18
92:5,17 93:5
94:10,25 95:9
98:9 99:5
100:11 101:7
**formalize (1)**
45:21
**forth (2)**
70:21 105:11
**forward (1)**
96:2
**forwarded (2)**
7:9 17:13
**found (3)**
88:15 100:4,5
**Four-page (3)**
103:11,14,15
**fourth (4)**
36:9 71:17,17
72:21
**freedom (1)**
82:17
**friends (1)**
84:19
**FU (1)**
22:9
**fuck (2)**
19:14 90:20
**full (1)**
38:19
**furnished (2)**
16:15,17
**further (6)**
8:24 29:16
37:11 101:9
102:8 105:14

---

**G**

**G (3)**
3:5 37:19,22
**garbage (4)**
60:12,15,18,22

**GE (2)**
84:25 85:12
**Gelbstein (13...**
1:8,15 2:9 3:1
3:13,17 4:1
4:18 5:1 6:1
7:1 8:1,20 9:1
10:1 11:1
12:1 13:1
14:1 15:1,25
16:1,4 17:1
18:1,9 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1,19
30:1 31:1,19
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1,21
42:1 43:1
44:1,23 45:1
46:1 47:1
48:1 49:1
50:1 51:1,16
52:1,17 53:1
53:4,5 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1,12 72:1
72:21 73:1,20
74:1,5 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1,18 83:1
83:7 84:1

85:1,4 86:1
87:1,13 88:1
89:1 90:1
91:1 92:1
93:1,2 94:1
95:1 96:1
97:1 98:1
99:1 100:1
101:1 102:1
102:15 103:1
104:1 105:1
**Gelbstein's (1)**
88:10
**general (6)**
2:8 12:3 16:14
17:14 86:6,10
**George (8)**
36:23 37:7,9
37:13,15 38:2
38:10,11
**Gervazi (2)**
86:17,20 87:12
**getting (1)**
65:11
**giggle (1)**
22:24
**giggling (2)**
23:9,15
**give (20)**
8:23 9:18
21:14,17 24:8
25:12 29:13
41:16 43:10
48:21 49:13
49:17,19,20
49:21,25 87:2
87:8 96:4,13
**given (5)**
99:2,21,24
102:10
105:13
**giving (2)**
50:20 99:14
**glare (1)**
22:15
**glared (1)**

22:8
**go (16)**
8:20 12:10
18:5 19:14
20:14 28:3
34:25 37:2
41:13 42:8
53:5 63:5
77:10 89:20
96:2,16
**goes (5)**
4:7,10 6:14
77:5 92:20
**going (21)**
4:17 6:23 10:8
15:21 32:9
33:19 35:5
37:12 42:17
49:6 51:8,13
70:20 72:12
72:13 73:9,9
73:12,13 77:7
77:14
**good (2)**
21:12,13
**grand (1)**
87:7
**great (1)**
100:3
**grievance (10)**
75:19,20,25
76:10 77:4,7
77:14 78:9
79:5,10
**grieve (5)**
76:18,23,24,25
78:20
**grieved (3)**
78:3,5,8
**Group (11)**
1:10 2:11 68:2
68:11,15,21
69:4,14,18
80:21 103:18
**guard (11)**
19:13 20:4

22:7,14 33:22
60:25 66:21
67:25 68:2
80:5,10
**guess (1)**
95:2
**guilty (4)**
85:2,8,10 86:6

---
**H**

**H (3)**
1:3 2:3 103:2
**habitual (1)**
84:19
**hallway (1)**
45:8
**Han (2)**
36:23 37:9
**Han's (1)**
37:7
**hand (3)**
59:3 91:22
105:20
**handle (3)**
87:3,5,11
**hands (1)**
7:5
**handwritten ...**
29:14
**happen (2)**
12:19 46:21
**happened (4)**
31:3,9 32:6
40:3
**happens (2)**
35:12 75:10
**happy (1)**
65:17
**harassed (1)**
62:8
**harassment (7)**
58:6 62:3,7,9
68:13 69:3
74:18
**harassments ...**
58:12

**hard (1)**
14:18
**head (3)**
28:18 64:23
65:13
**hear (9)**
3:25 4:2,6,8
13:17,21
21:20 23:12
76:5
**heard (1)**
13:20
**hearing (5)**
14:18 49:17,19
49:20,24
**held (1)**
1:16
**help (1)**
77:6
**helping (1)**
77:15
**hereinbefore...**
102:11 105:11
**hereunto (1)**
105:19
**hierarchy (1)**
66:5
**hire (2)**
31:4,17
**hired (4)**
31:5,10 81:3,5
**honestly (2)**
39:16 90:23
**hours (2)**
5:8,9
**house (1)**
38:20
**hyphenated (1)**
17:6

---
**I**

**Ida (12)**
1:8 2:9 15:4,11
15:14,18 16:2
16:6,7,10
72:21 77:11

**idea (3)**
64:15 92:22
97:6
**illicit (2)**
100:13,17
**illicited (1)**
100:8
**imagine (2)**
9:16 38:24
**immediate (1)**
35:16
**impression (1)**
7:3
**incapable (2)**
12:5 54:9
**inches (2)**
64:22 65:12
**incident (20)**
12:20 13:13
18:21 39:20
40:6 47:19,23
47:25 49:2
52:21 73:3
91:3,21 93:24
97:4,12 103:8
103:11,17,18
**incidents (1)**
99:25
**including (1)**
66:11
**incompetent ...**
12:4 54:9
**independent ...**
40:11,12
**indicate (1)**
44:9
**indicated (5)**
53:3,4 80:14
82:13 98:4
**indicates (6)**
36:9,10 37:10
37:11 62:15
82:7
**indifference ...**
61:8,14
**indifferent (1)**

**61:22**
**individual (9)**
1:8,8,9 2:9,9
2:10 61:25
64:6 85:24
**individually ...**
101:2
**information ...**
97:8 99:23
104:8,9
**initiated (1)**
47:6
**input (1)**
77:20
**instance (1)**
43:19
**instruct (3)**
16:5 72:3
73:14
**instructed (1)**
92:18
**intend (1)**
96:2
**interactions (...**
50:14
**interested (1)**
105:17
**intervention ...**
26:6
**introduced (...**
8:7 18:8 28:7
35:4 37:6
41:19 63:8
67:3 71:7
75:6 89:24
96:19
**investigate (6)**
26:16 29:18
30:12 34:5
36:15 40:7
**investigated ...**
26:22 27:20
29:21 30:11
31:18 57:10
**investigation...**
56:12,15,19,21

**57:8,9,20**
75:25
**investigation...**
95:14
**involved (7)**
48:10 51:15,22
53:11,16
67:20 89:18
**involvement ...**
53:20
**issue (1)**
74:21
**issues (1)**
77:6
**Item (3)**
19:11,12 44:6

---
**J**

**JAMES (1)**
2:13
**james.thomp...**
2:14
**Jamie (3)**
1:17 105:7,23
**January (2)**
29:6 30:7
**Jeff (1)**
100:16
**Jewish (6)**
44:12 83:6,12
83:15,22,24
**job (1)**
66:6
**join (1)**
81:25
**judge (21)**
8:20 15:25
16:4 23:20
25:5 46:21
50:11,13,15
53:3,5 65:22
67:12,12 83:7
86:13 87:13
88:10 93:2
97:16 99:8
**judges (3)**

31:8 65:25
66:7
**Junc (2)**
56:7 91:11

---
**K**
**keep (9)**
10:20 20:13
92:11,12,15
93:11,16 94:6
96:12
**kept (1)**
93:14
**kind (3)**
45:16 59:19
94:20
**KINGS (1)**
105:5
**knife (2)**
32:9 33:20
**know (59)**
15:3,11 16:19
16:24 17:25
18:24 20:8,18
20:22 24:4
29:22 30:6,8
32:6,15,16
33:6 34:3,4,6
35:12 36:20
38:20 39:17
39:18 40:5,6
40:21 41:11
41:12 43:21
45:16 47:18
47:22 51:21
52:11 62:14
63:9 64:7
65:8 71:10
76:7,16 77:3
80:18 81:9,11
83:6,21 84:21
92:20,24
94:17,20
95:13,18
96:10,23 97:5
**knowing (3)**

39:25 97:10,14
**knowledge (2)**
64:12 67:14
**kykc (2)**
44:25 46:22

---
**L**
**L (3)**
3:5,5 102:2
**lady (1)**
87:20
**languages (1)**
44:11
**laptop (1)**
21:15
**lasts (1)**
95:19
**late (2)**
5:2,11
**laugh (1)**
22:24
**laughing (2)**
23:8,14
**law (3)**
2:3 15:7 51:18
66:8 77:3,13
77:20 78:24
80:4 89:8
97:16,21,25
98:2
**lawful (1)**
89:6
**lawfully (1)**
88:25
**lawyer (4)**
75:10 85:19
87:22 88:9
**laying (1)**
59:18
**LB (1)**
1:6
**leave (2)**
8:22 49:8
**left (1)**
8:24
**legal (10)**

2:15 8:23 9:18
16:3 33:8
54:24 66:7
89:4 97:19
99:6
**let's (5)**
7:22 18:5 28:3
41:13 45:9
**letter (32)**
12:2 16:13,16
16:18 17:9,13
17:18,22,24
18:5,10,11
19:6 23:5
35:11 53:22
54:2,3,6,8,18
82:10,12,14
90:2,12,13,14
90:22 91:5,23
103:9
**letters (2)**
82:21,25
**letting (1)**
52:20
**Levine (3)**
28:9,12 55:16
**Liberty (1)**
2:12
**license (1)**
31:13
**lie (1)**
47:2
**liked (1)**
78:19
**line (4)**
8:19 36:10
74:12 104:16
**listen (1)**
72:9
**litigation (11)**
70:7,8,14,23
73:4,6,11,25
74:11,14,17
**little (2)**
37:10 45:5
**livelihood (1)**

77:2
**living (1)**
84:21
**location (1)**
21:16
**lodged (1)**
25:15
**log (9)**
71:13,20 72:7
72:14,14,17
73:6,18
103:20
**long (1)**
95:18
**longer (1)**
49:3
**look (10)**
8:15 19:7
27:24 35:22
59:11 63:17
64:7,16 65:19
72:21
**looked (1)**
39:4
**looking (1)**
18:25
**lose (2)**
92:25 93:10
**losing (1)**
93:7
**lost (1)**
31:6
**lot (4)**
35:6 37:14
38:4,7
**lull (1)**
81:23
**lying (1)**
39:24

---
**M**
M-E-L-A-N-...
28:11
M-O-R-G-A-...
17:4
**Ma'am (6)**

21:21 28:21
29:16,16 42:9
63:15
**machine (2)**
7:5 92:19
**mad (1)**
54:15
**Madame (1)**
6:22
**maintain (1)**
93:11
**making (7)**
22:16,20 25:4
25:5 30:10
56:4,9
**man (1)**
54:20
**manage (1)**
65:24
**manner (1)**
67:24
**March (6)**
16:13 17:19
18:16 53:22
54:3 82:11
**Mario (4)**
1:3 2:3 70:14
70:24
**MARK (3)**
1:10 2:11,16
**marked (18)**
3:3 6:15 7:25
8:2,6 18:7
28:6 35:3
37:5 41:18
63:7 67:2
71:6 75:5
89:23 96:18
103:4 104:15
**marker (1)**
71:19
**marriage (1)**
105:16
**matter (5)**
75:8,9,16
103:21

December 17, 2020

Page 114

| | | | | |
|---|---|---|---|---|
| 105:18 | **Motion (1)** | 1:2,17 2:5,5,7 | 13:4,15,23 | **occasions (4)** |
| **mean (3)** | 23:22 | 2:13,13,18 | 14:9,24 15:9 | 36:11 42:19 |
| 20:25 51:21 | **motorist (2)** | 3:7,16 15:8 | 21:5 24:2 | 85:22 100:6 |
| 85:21 | 46:14,16 | 51:18 68:15 | 25:8 30:13 | **occur (2)** |
| **Melanie (2)** | **motorists (4)** | 105:4,8 | 31:16,21 32:4 | 92:23 93:20 |
| 28:8,11 | 50:16 85:2,7 | **Newman (3)** | 32:12 33:4,25 | **occurred (8)** |
| **memorandu...** | 85:10 | 1:17 105:7,23 | 40:16 44:3 | 9:15 18:22 |
| 103:23 | **move (2)** | **normal (1)** | 47:3 48:6,16 | 40:6 57:23 |
| **mention (1)** | 21:15 60:24 | 5:7 | 50:24 51:10 | 67:10,11 94:4 |
| 62:22 | **moved (2)** | **Notary (4)** | 51:20 52:6,18 | 100:7 |
| **merit (3)** | 60:7,13 | 1:17 3:7 | 52:23 53:18 | **offended (3)** |
| 78:13,13 79:4 | **moving (3)** | 102:22 105:7 | 54:23 57:4,13 | 54:7,12,13 |
| **messed (1)** | 36:13 39:9,23 | **note (6)** | 58:9 61:3,11 | **offenses (1)** |
| 21:25 | **Myer (1)** | 8:18 10:13 | 61:18 62:5 | 46:7 |
| **midway (2)** | 100:16 | 31:15,20 | 64:10,25 | **offered (1)** |
| 45:8,11 | | 63:21 96:24 | 65:14 67:8 | 33:14 |
| **mine (2)** | ———— | **notes (2)** | 68:7,22 69:15 | **office (47)** |
| 48:14,15 | **N** | 103:14,22 | 69:25 70:16 | 2:7 19:25 20:3 |
| **minor (1)** | **N (5)** | **Notice (1)** | 75:21 76:3 | 22:7,17,21 |
| 26:4 | 2:2 3:5,5 102:2 | 1:16 | 77:16,23 | 26:7 28:14 |
| **minute (2)** | 104:2 | **notification (1)** | 78:16 79:7 | 41:6,10 43:2 |
| 21:15,18 | **name (6)** | 88:11 | 80:7 81:19 | 45:6,9,10 |
| **minutes (5)** | 3:11 17:2,5 | **number (10)** | 83:2 84:7 | 50:15 55:19 |
| 82:4 96:6,7,14 | 37:8,9 63:9 | 8:23 9:19 | 85:5,17 86:23 | 55:22 56:13 |
| 98:24 | **names (1)** | 19:11,12 | 87:17 88:20 | 58:14,17 59:6 |
| **misconduct (3)** | 55:14 | 22:18,19 44:7 | 89:3,11 92:4 | 59:15 65:25 |
| 23:25 26:25 | **near (1)** | 44:7 73:16 | 92:16 93:4,9 | 66:2,4 67:13 |
| 30:3 | 59:16 | 103:7 | 93:13,18 94:2 | 69:23 73:19 |
| **missed (1)** | **necessary (1)** | **numerous (1)** | 94:9,24 95:8 | 76:18 77:25 |
| 22:11 | 46:2 | 42:19 | 97:18,22 98:8 | 78:3,6 83:10 |
| **missing (1)** | **need (2)** | **NY (2)** | 99:4,9,13 | 83:11,12,16 |
| 98:25 | 3:18 24:11 | 1:10 2:11 | 100:10,19 | 83:18,25 84:2 |
| **moment (1)** | **negligent (1)** | | 101:6 | 84:6,18 87:6 |
| 41:16 | 54:21 | ———— | **objectionabl...** | 90:3 91:16 |
| **money (1)** | **never (27)** | **O** | 72:2 | 94:14 100:25 |
| 32:8 | 24:22 26:12 | **O (1)** | **observe (3)** | 101:2 |
| **MONTENA ...** | 30:6 31:18 | 102:2 | 10:6,10,11 | **officers (3)** |
| 2:18 | 32:2,17,23 | **obey (1)** | **observed (4)** | 8:21 50:16 |
| **morning (17)** | 33:21,22 | 20:16 | 15:12 83:5,9 | 53:6 |
| 4:20 9:21 | 48:19,20 51:5 | **object (10)** | 83:11 | **official (3)** |
| 12:18 13:3,9 | 65:18,19 | 10:9 15:22 | **observing (1)** | 1:11 2:12,17 |
| 13:12 14:4,15 | 68:16 69:13 | 27:6 65:4 | 10:18 | **Oh (2)** |
| 14:22 15:14 | 78:3,5,6 | 72:3 73:13,13 | **obviously (1)** | 69:6 98:17 |
| 15:20 20:21 | 80:22 86:3,14 | 74:7,22 91:17 | 67:22 | **okay (2)** |
| 51:18 62:13 | 88:18 92:6,18 | **objection (87)** | **occasion (3)** | 37:2 43:24 |
| 64:17 92:8,14 | 95:4 100:23 | 5:20,25 10:14 | 43:8,9,10 | **Once (1)** |
| | **New (15)** | 11:2,14 12:22 | | |

84:13
**One-page (2)**
103:12,22
**ones (1)**
24:4
**operating (2)**
97:20,24
**opinion (4)**
63:25 64:3,3
64:24
**opportunity ...**
24:9 25:2,6,12
35:21 40:23
48:20 49:10
49:13,21,25
50:21 78:7
99:15,18
**opposed (1)**
77:14
**opposite (1)**
20:14
**order (2)**
9:6 20:16
**ordinance (1)**
79:25
**outcome (1)**
105:17
**outside (4)**
34:11,17,18
45:6

─────────
**P**

**P (2)**
2:2,2
**P-E-C (1)**
80:14
**P.M (1)**
101:10
**page (22)**
8:4,16,19 19:7
19:9 23:6
28:21,25 29:8
29:9,12,14
37:22 42:6,9
42:11,13
63:15 103:6

104:4,9,16
**paid (6)**
65:22,24 80:16
81:11,13,15
**paper (2)**
60:9,20
**papers (1)**
33:8
**paragraph (1...**
23:7 28:25
29:3 35:6,10
35:25 36:3
37:12,18,19
37:22 39:12
42:18 44:7,9
63:18,19
**pardon (5)**
5:19 9:25
18:25 52:9
94:11
**parking (3)**
37:14 38:4,7
**part (7)**
16:20 35:10
45:13,15
67:19 79:23
95:16
**particular (9)**
24:14 25:22
30:16,24
35:25 43:9
45:15 46:5
76:8
**particularity...**
57:7
**parties (2)**
48:10 105:15
**pass (1)**
55:19
**Paul (1)**
30:19
**pause (1)**
95:22
**pay (1)**
25:16
**PEC (17)**

1:9 2:11 68:2
68:11,15,20
69:4,13,17
80:19,21 81:5
81:6,11,13,15
103:18
**people (7)**
67:24 69:11
83:17 89:16
95:13,15
99:24
**Perez (7)**
29:5 30:7,19
31:3,17 32:7
33:19
**period (2)**
25:14 27:11
**permitted (4)**
84:11,13,13,15
**person (6)**
8:13 58:13
60:16 79:24
88:9 94:16
**personal (1)**
5:12
**personally (8)**
10:22 42:20
51:15,22
53:11,16
55:21 89:17
**petitioner (3)**
42:20 44:10,24
**phone (5)**
8:23 9:19
38:22,25
91:14
**physical (1)**
58:13
**physically (2)**
9:12 64:6
**piece (2)**
92:22,23
**place (2)**
2:4 102:11
**Plaintiff (3)**
1:4,15 2:4

**Plaintiff's (16)**
6:15,17 8:3,5
18:6 28:5
35:2 37:4
41:17 63:6
66:25 71:5
75:4 89:22
96:17 103:4
**Plaza (1)**
2:17
**plead (1)**
85:7
**pleading (2)**
84:25 86:5
**pleas (1)**
85:10
**please (6)**
3:11 14:2 19:9
22:12 28:20
42:8
**point (16)**
4:22,23 9:16
10:23 21:3
22:23 25:11
34:7,19 66:21
70:25 84:16
84:23 87:25
88:3,14
**pointed (1)**
59:3
**police (15)**
8:8,21 20:24
34:4 50:16
53:2,5,6,9
62:15,20 63:3
63:3,22 82:6
**portion (1)**
29:14
**pose (1)**
72:10
**position (1)**
36:4
**possession (6)**
6:16,20 10:20
16:12 17:9
82:10

**possible (1)**
70:23
**practice (7)**
12:11 15:7
51:17 77:3,13
77:19 78:24
**precipitated ...**
46:10 47:5
**precisely (1)**
96:14
**predisposed ...**
12:14
**premises (1)**
84:15
**prepared (2)**
73:3,5
**presence (1)**
59:24
**present (5)**
12:18 49:22
50:2,21 78:8
**presented (8)**
23:21 24:20
48:24 49:15
50:3,5 93:15
100:23
**Pretty (1)**
91:14
**previous (2)**
29:8 39:14
**previously (14)**
3:3 8:16 8:7
28:6 35:3
37:5 41:18
63:7 67:2
71:6 75:5
89:23 96:18
103:4
**Pricket (1)**
17:4
**Pricket-Mor...**
12:3 16:14
17:4,7,15
54:4 82:13
**principal (4)**
28:19 55:12

60:5 66:6
**principally (1)**
65:25
**prior (2)**
16:21 74:2
**privilege (6)**
15:23 71:13,20
73:18 103:14
103:20
**privileged (1)**
71:22
**PRO (1)**
2:4
**probably (2)**
11:9 87:9
**problem (1)**
77:5
**problems (1)**
96:5
**Procedure (1)**
1:16
**process (4)**
99:2,7,8,14
**produce (1)**
72:17
**produced (2)**
71:20 90:6
**product (1)**
15:24
**proffered (1)**
48:17
**promise (1)**
25:20
**protocol (1)**
94:20
**provoked (1)**
93:24
**Public (4)**
1:17 3:7
102:22 105:7
**purposefully ...**
12:25 13:8
97:9
**pursuant (1)**
1:16
**push (6)**

10:12 14:16,21
16:22 18:22
92:13
**pushed (1)**
91:12
**put (6)**
7:3,15,20
42:25 71:19
95:6
**putting (1)**
6:24

---

**Q**

**question (61)**
5:21 6:2 10:9
11:15 12:24
13:7,25 14:2
14:10 15:19
16:6,9 19:3
21:6 22:6,11
22:19 23:13
24:12,13,15
24:16 27:3
30:14 33:18
34:14 38:18
40:10 41:14
41:15 43:23
44:2,8 52:19
61:12,21 65:5
65:6 68:10
71:24 72:10
72:12,13
73:14,17,22
74:5,23 78:11
84:9 85:6
86:24 87:18
91:18 92:5,17
94:25 97:23
98:9 99:5
104:16
**questioning (2)**
72:6,7
**questions (6)**
4:13,17 66:8,8
71:25 104:15
**Quixote (2)**

88:15,19

---

**R**

**R (3)**
2:2 102:2
105:2
**Rabinowitz (2)**
87:21 88:16
**racist (1)**
46:15
**re-asked (1)**
13:6
**re-records (1)**
92:21
**reached (1)**
57:21
**reaction (1)**
18:3
**read (8)**
22:18 35:23
37:13 39:13
53:22 62:20
79:17,19
**reading (4)**
23:4 37:20
39:6 42:2
**reads (1)**
8:19
**ready (2)**
81:25 82:2
**really (3)**
41:15 77:9,9
**rear (2)**
91:12,13
**reason (5)**
5:15 79:9 84:5
85:14,16
**reasons (1)**
85:15
**recall (92)**
5:2,24 6:4,8
9:13 10:3,15
10:17,19,25
11:8 12:6
15:16 16:11
17:8 18:2,10

18:13 22:2,10
22:16,20 23:8
23:14 25:24
26:2,8 29:20
29:25 30:16
30:19,20
31:22,25
32:20 36:17
39:16 40:25
40:25 43:12
43:18 44:15
45:23 47:4,17
48:8 49:5
56:4,9,14,18
57:6,18,19,20
58:15,21,24
59:5,10,13,14
59:21,25
60:22 61:2,5
62:25 64:18
65:21 66:22
67:4,16,17
71:2 88:5,6
88:12 90:21
90:24,25 91:3
91:7,10,15,19
91:20,21,23
91:24 92:10
100:21
**receive (2)**
24:6 51:3
**received (6)**
18:15 41:4,7
41:11 51:5
82:14
**receiving (1)**
18:10
**recognize (1)**
37:7
**recollection (1)**
26:23
**recommenda...**
95:7
**recommende...**
95:5,11,13
**record (2)**

3:12 105:12
**recording (1)**
94:19
**rectify (2)**
19:19 68:5
**redacted (3)**
97:3,7,9
**reference (2)**
32:18 57:16
**referring (4)**
24:5 29:8
44:11 83:22
**regard (7)**
22:19 30:18
32:21 50:13
50:15 93:22
99:25
**regarding (1)**
73:3
**regardless (1)**
64:4
**regular (1)**
95:15
**regulate (1)**
81:17
**regulation (1)**
79:25
**related (1)**
105:15
**relayed (1)**
9:15
**remain (1)**
56:25
**remark (1)**
46:15
**remember (22)**
12:12 17:20
20:9 30:23
31:24 39:10
44:22 45:3,14
46:11 47:21
47:22 51:25
56:20 58:19
59:19 60:3,4
60:10,10,17
60:18

| | | | | |
|---|---|---|---|---|
| removal (6) | 19:10 21:11 | 90:12 91:2 | 2:5 | scroll (3) |
| 5:4 15:19 | 21:19,22 | responsibile ... | room (5) | 8:3 19:9 28:21 |
| 51:16 53:11 | 28:22 29:10 | 94:18 | 2:17 8:21 53:5 | scrolled (2) |
| 53:17 89:18 | 42:10 90:15 | responsibilit... | 86:6,11 | 42:11 90:16 |
| remove (4) | reports (1) | 68:19 69:19,22 | rooms (1) | SE (1) |
| 9:12 51:7,24 | 20:24 | responsible (1) | 85:23 | 2:4 |
| 53:6 | represent (1) | 66:14 | row (3) | seared (2) |
| removed (38) | 31:4 | rest (3) | 71:17,17 72:22 | 45:16,17 |
| 5:17,22 6:4,9 | represented (... | 45:14 90:14,17 | rug (2) | second (4) |
| 6:10 9:7,11 | 29:4 30:7 86:3 | result (1) | 57:12 93:7 | 8:16 23:6 |
| 9:18 11:4 | representing ... | 57:19 | Rules (1) | 29:13 37:12 |
| 12:15 15:5 | 85:25 | results (2) | 1:16 | security (14) |
| 25:7 26:25 | REQUESTE... | 56:18,21 | RULINGS (1) | 19:13 20:4 |
| 27:5,22 30:4 | 104:8 | retained (1) | 104:15 | 22:7,14 33:22 |
| 43:14 44:19 | required (1) | 103:24 | _____ | 60:24 64:21 |
| 46:4,8 47:12 | 26:5 | review (1) | S | 66:20 67:25 |
| 47:14,18 | requirement... | 17:11 | S (3) | 68:2 80:5,9 |
| 50:18 52:3 | 86:6,10 | reviewed (1) | 2:2 3:5 103:2 | 95:5,12 |
| 53:21 82:5,9 | reschedule (1) | 92:6 | SADIQ (2) | see (24) |
| 82:14,18 | 86:9 | revoked (1) | 1:9 2:10 | 4:13 7:16 |
| 87:24 88:4,25 | rescheduling... | 31:13 | salary (1) | 18:12 19:15 |
| 98:12,15,18 | 85:3 | ridiculous (1) | 80:17 | 23:7 28:3 |
| 98:18,19 | resolve (2) | 60:12 | saw (6) | 34:13 37:9,23 |
| repeat (5) | 74:20 77:6 | right (47) | 11:8,25 18:11 | 37:24 38:5,8 |
| 14:2 23:13 | respect (7) | 4:14 8:17 | 18:14 53:7 | 38:12,16 |
| 27:3 61:10 | 17:24 41:24 | 18:23 20:21 | 80:22 | 41:22 42:7,12 |
| 97:23 | 47:25 59:9,12 | 22:4 24:7 | saying (14) | 63:24 72:23 |
| repeated (2) | 67:25 68:12 | 26:11 28:16 | 9:5 12:12 | 90:14,16 |
| 19:14 87:22 | respond (17) | 28:25 29:17 | 14:18 28:16 | 96:22 97:2 |
| rephrase (1) | 24:18,21,23 | 30:4,8 32:3 | 34:14 48:5 | 98:24 |
| 24:16 | 25:3,6,12 | 34:22 39:3 | 49:5 51:6 | seeing (2) |
| reply (1) | 32:5 40:23 | 41:25 43:16 | 56:16,23 | 22:3 90:21 |
| 26:13 | 43:2,5 49:11 | 43:25 44:19 | 65:10 66:16 | seen (1) |
| report (14) | 49:14 52:7 | 44:21 45:6 | 66:17 79:2 | 90:23 |
| 8:9 53:2,9 | 88:21 99:15 | 46:18 47:9,16 | says (10) | sees (1) |
| 58:17 62:15 | 101:2,3 | 48:5 50:12 | 9:16 35:10 | 20:14 |
| 62:20 63:3,4 | responded (1) | 53:7 65:20 | 37:15 38:2 | senior (1) |
| 63:22 64:2 | 50:10 | 68:25 72:18 | 39:2 47:10 | 67:12 |
| 67:4,6,15 | responding (1) | 73:7 74:21 | 63:19 71:11 | sent (2) |
| 82:7 | 61:17 | 77:13 82:17 | 87:6,8 | 72:15 82:12 |
| reported (3) | response (15) | 82:22 83:7 | schedule (1) | sequences (1) |
| 69:4,6 100:4 | 19:19 20:6 | 89:18 92:9 | 96:12 | 58:19 |
| Reporter (17) | 24:9 27:14,17 | 93:12 95:19 | SCHROEDE... | serious (4) |
| 3:22 4:4,10,15 | 32:3 33:10 | 95:23 96:9,25 | 1:10 2:12,16 | 25:15,17 26:5 |
| 6:22 7:2,19 | 41:6,8 50:2 | 98:6,13,16,21 | screen (3) | 26:23 |
| 7:24 16:25 | 50:22 51:4,9 | Rochelle (1) | 6:25 7:4,15 | service (2) |

December 17, 2020

Page 118

81:8,14
services (1)
81:12
sct (2)
105:11,20
severe (1)
77:9
severity (1)
77:3
Sheldrake (1)
2:4
shocked (1)
45:5
short (1)
35:8
show (8)
50:6,8 63:2,3
80:24 81:3
94:3 97:11
showed (3)
53:3 64:5
82:11
shown (1)
93:23
side (1)
66:7
sidebar (2)
85:2,3
sign (2)
59:3 91:22
signature (4)
42:5,7,12,14
singular (1)
99:25
sir (8)
5:16 12:19
20:19,23
45:19 54:14
54:16 77:22
sit (2)
38:22,24
slash (2)
32:10 33:20
slower (1)
29:12
Smart (58)

1:10 2:11 8:13
10:6 12:21
13:11 14:3,7
18:22 19:5
20:25 22:14
23:2 33:21
54:22 55:4,18
56:2,8,23,24
58:3,6 59:2
59:20 60:4,15
60:16,25
62:10,12,23
64:8,13,20
65:11 66:12
66:19 68:3,4
68:13,20 70:4
74:19 80:5,13
80:24 81:14
81:17 90:19
91:11,25 92:7
92:13 97:5,13
98:6,18
Smart's (5)
23:11,17 66:15
69:20 80:16
somebody (2)
87:9 99:14
sorry (4)
28:4 61:10
81:2 98:17
sounds (1)
34:20
spaces (1)
96:25
spade (6)
23:2,3,9,10,15
23:16
Sparks (4)
19:13,23 20:5
20:10
speak (2)
34:10,15
speaking (1)
44:11
spear (2)
59:2 91:22

specific (7)
32:21 35:24
43:8,13 50:16
56:6 57:18
specifically (4)
24:5 27:25
29:21 71:2
specificity (10)
17:21 24:13
26:3 30:17,24
31:22 43:22
48:9 52:2
80:18
specified (1)
102:11
speculation (1)
65:7
speech (1)
82:17
spell (1)
43:4
spoke (8)
30:19,25 31:24
43:8,11 48:9
68:15 70:4
spoken (2)
64:5 68:18
SS (1)
105:4
staff (1)
66:11
standing (1)
59:16
stare (1)
22:15
stared (1)
22:8
start (2)
7:23 82:2
starting (1)
37:18
state (17)
1:17 2:7,17 3:7
3:11 19:12
44:23 79:25
80:3 81:15

97:16,21,25
97:25 103:19
105:4,8
statcd (1)
73:10
statement (18)
9:2 19:15,19
19:21 27:15
29:24 30:11
32:18 33:2,24
36:16 38:12
38:16 46:6
57:12,15 58:7
99:3
states (5)
1:2 29:4 71:12
73:2 79:23
stating (3)
53:10,12,14
statute (3)
79:13,24 89:9
stole (4)
56:2,8,23
57:17
stood (1)
59:2
stop (3)
96:7,8,14
stopped (6)
36:12 37:15
38:10,11 39:8
39:22
story (3)
100:2,5,6
Street (2)
2:12 3:15
stuff (1)
60:19
Subject (1)
99:12
submitted (2)
90:2,4
Subscribed (1)
102:18
summary (1)
103:18

supervise (1)
65:25
supervising (3)
36:5 55:13
67:12
supervision (4)
54:22 66:12,14
95:3
supervisor (10)
28:14,15,17
35:17 40:10
55:10 63:12
66:18 67:19
94:18
supervisors (3)
29:3 55:20
69:7
supervisory (2)
66:11 98:5
supply (1)
81:7
supposed (1)
34:10
sure (10)
12:23 19:10
21:19 24:11
48:9 68:10
81:9 85:13
90:13 98:14
suspended (2)
31:7,13
sweep (1)
93:6
swept (1)
57:11
sworn (3)
102:5,18
105:11

_____

T

T (5)
3:5 102:2
103:2 105:2,2
TAHIR (2)
1:9 2:10
take (23)

3:18 6:13
8:15,18 17:23
19:18,22
27:24 33:9,11
33:22 39:17
48:14,15
52:21 59:8
61:24 63:21
66:6,7 90:11
92:22,23
**taken (3)**
1:15 48:18
49:16
**talk (3)**
30:21 34:16
35:7
**talking (3)**
36:21 37:21
57:22
**Tanya (2)**
87:20 88:16
**tape (3)**
22:3 64:8
92:20
**TBV (1)**
98:12
**Teague (10)**
75:8,9,9,13,16
75:19 76:2,11
76:14 103:21
**telephonicall...**
9:15
**tell (27)**
8:21 13:11,19
14:3 16:23
17:12 18:2
25:18,19,23
25:25,25 31:2
34:12,19 42:3
42:22 43:22
44:13 45:4
51:12 62:19
64:19 74:12
84:17,22
88:14
**telling (7)**

22:24 23:2,9
23:15 51:9
88:7,8
**tells (2)**
87:12 90:20
**term (1)**
67:7
**terms (1)**
41:5
**terribly (1)**
77:9
**territory (1)**
80:2
**testified (1)**
3:8
**testify (1)**
102:5
**testimony (8)**
46:23 49:22,24
73:23 74:3
102:6,10
105:13
**thank (1)**
29:2
**theft (5)**
56:13 57:2
58:17 69:3
91:24
**theory (1)**
55:5
**thing (2)**
66:9 73:21
**things (3)**
5:12 35:6
73:16
**think (7)**
7:14 29:7
45:25 48:11
64:24 73:21
99:16
**third (3)**
8:19 22:6
63:15
**Thompson (1...**
2:13 5:20,25
6:19,21 7:10

7:11,13 10:8
10:13 11:2,14
12:22 13:4,15
13:21,23 14:9
14:17,24 15:9
15:21 17:6
21:5,8 24:2
25:8 27:6
29:7 30:13
31:15,20 32:4
32:12 33:4,25
40:16 44:3
47:3 48:6,16
50:24 51:10
51:20 52:6,10
52:18,23
53:18 54:23
57:4,13 58:9
61:3,11,18
62:5 64:10,25
65:4,14 67:8
68:7,22 69:15
69:25 70:16
71:18 72:9,16
73:12 74:4,7
74:22 75:21
76:3 77:16,23
78:16 79:7
80:7 81:19,22
83:2 84:7
85:5,17 86:23
87:17 88:20
89:3,11 90:7
91:17 92:4,16
93:4,9,13,18
94:2,9,24
95:8,21 96:9
97:18,22 98:8
99:4,9,12
100:10,19
101:6
**thought (3)**
25:16 29:11
65:8
**threat (1)**
60:15

**threatening (3)**
42:20 43:5,15
**threats (4)**
58:12,12 68:13
69:2
**three (5)**
29:5 31:4
64:22 65:12
98:23
**Three-page (2)**
103:16,23
**throwing (1)**
52:15
**thrown (1)**
11:11
**ticket (9)**
83:6,7,12,15
83:19,20,24
84:14,17
**time (37)**
1:13 5:3 9:24
10:2,3,23
14:18 17:10
18:13 22:23
23:22 25:11
25:14 26:2
27:11 28:13
29:25 31:23
34:7,19 35:7
43:12,20,25
55:13,16
56:14 57:21
62:21 65:9
66:21 84:11
84:12,16 88:3
88:14 102:10
**times (2)**
19:14 20:9
**tires (2)**
32:10 33:20
**to-do (1)**
60:3
**today (2)**
3:18 73:24
**told (18)**
8:20 9:17

11:18 15:6
20:11 31:12
32:8 33:19
34:8,8 45:4
49:2 53:4
54:8 60:24
62:16 82:8,8
**top (4)**
8:13 63:10
71:12 72:14
**totally (1)**
55:6
**touch (1)**
59:21
**traffic (3)**
4:20,24 75:10
**transcript (2)**
102:9,9
**Traschen (14)**
1:8 2:9 15:4,11
15:14,18 16:2
16:10 70:12
70:22 72:21
77:11 81:24
95:23
**trash (1)**
59:16
**trial (3)**
29:5 43:24
44:2
**true (11)**
27:13 40:2,23
49:11,12
68:24 82:25
83:10 88:17
102:9 105:12
**truth (3)**
36:16 48:5
102:5
**truthful (4)**
26:21 40:14,15
40:22
**truthfulness ...**
26:17 27:21
29:23 40:8
**try (1)**

| | | | | |
|---|---|---|---|---|
| 77:6 | **understand (6)** | 95:19 | **watch (1)** | **work (5)** |
| **trying (3)** | 12:23 32:10 | **view (4)** | 67:7 | 8:8 15:23 |
| 21:23 35:23 | 34:13 61:20 | 10:24 12:20 | **way (7)** | 38:19 40:11 |
| 60:9 | 68:10 72:11 | 15:4 21:3 | 39:25 49:11 | 40:12 |
| **TVB (50)** | **understandi...** | **viewed (6)** | 74:15 93:21 | **worked (3)** |
| 5:8,23 6:5 11:5 | 6:21 | 11:20,21 14:14 | 97:10,14 | 68:4 76:15 |
| 12:15,18 13:2 | **UNITED (1)** | 14:20,21 15:3 | 105:17 | 97:15 |
| 14:8 15:7,8 | 1:2 | **Violation (2)** | **we're (5)** | **working (1)** |
| 27:2,5,23 | **unprovoked ...** | 4:20,24 | 3:17 57:23 | 58:3 |
| 41:25 46:4 | 62:13 | **violations (5)** | 81:22 82:2 | **workplace (3)** |
| 47:13,14 49:3 | **unruly (2)** | 29:5 31:5,8,18 | 95:21 | 103:8,11,16 |
| 51:7,17 53:7 | 34:9,16 | 75:11 | **wearing (2)** | **works (1)** |
| 53:17,25 | **use (2)** | **violence (5)** | 44:24 46:22 | 86:21 |
| 56:25 58:3 | 27:4 92:19 | 8:8 69:3 103:8 | **Wednesday (1)** | **worry (3)** |
| 59:17 65:23 | **uses (1)** | 103:11,17 | 37:18 | 74:14,16,20 |
| 67:24 76:15 | 44:10 | **visit (1)** | **weekly (3)** | **worth (1)** |
| 76:19,20 | | 83:17 | 83:10,13 84:2 | 40:20 |
| 78:24 80:25 | ———— **V** ———— | **visiting (1)** | **weight (1)** | **wouldn't (3)** |
| 82:6,22 85:8 | **v (1)** | 83:16 | 79:5 | 34:3 48:15 |
| 86:2,4,18,21 | 71:11 | **volume (1)** | **welcome (1)** | 87:7 |
| 87:21,25 89:2 | **vaguely (1)** | 100:3 | 49:3 | **write (2)** |
| 94:8,13,23 | 9:13 | **voracity (5)** | **weren't (1)** | 40:4 45:18 |
| 95:6 98:16,20 | **Vahdat (10)** | 26:17 27:21 | 84:12 | **writing (4)** |
| 100:25 | 35:11,13,15 | 29:23 36:16 | **whatsoever (1)** | 42:25 43:3 |
| **TVB's (i)** | 39:2,20,24 | 40:8 | 54:19 | 82:20,24 |
| 48:14 | 70:13,22 | | **WHEREOF ...** | **written (9)** |
| **TVBs (3)** | 72:20 103:13 | ———— **W** ———— | 105:19 | 23:19 24:20,22 |
| 51:18 77:13,20 | **various (2)** | **wait (4)** | **wife (1)** | 26:13 35:11 |
| **two (5)** | 50:14 85:15 | 3:22,23 7:4 | 84:20 | 38:5 45:21,22 |
| 55:12 64:20,21 | **verbally (1)** | 21:11 | **withdraw (2)** | 55:18 |
| 95:14,17 | 36:10 | **waiting (3)** | 19:2 44:5 | **wrong (2)** |
| **Two-page (2)** | **version (1)** | 37:13 38:6 | **Withdrawn (1)** | 6:23 73:17 |
| 103:8,9 | 100:2 | 95:24 | 80:8 | **wrote (7)** |
| **type (2)** | **video (1)** | **want (9)** | **witness (15)** | 12:2,3 16:13 |
| 19:25 66:9 | 10:10 | 5:14 7:6 29:14 | 3:6 13:17,20 | 47:8,11 54:4 |
| | **VIDEOCON...** | 31:14 82:20 | 21:7,23 52:8 | 82:11 |
| ———— **U** ———— | 1:17 | 82:24 87:10 | 65:3 72:4 | |
| **U.S (1)** | **videotape (22)** | 92:23 93:6 | 73:14 90:16 | ———— **X** ———— |
| 79:13 | 10:4,7,12,18 | **warned (2)** | 99:10 101:11 | **X (4)** |
| **ultimate (1)** | 10:21,24 11:5 | 42:20,23 | 105:10,13,19 | 1:3,12 103:2 |
| 52:12 | 11:20 12:20 | **wasn't (11)** | **witnesses (1)** | 104:2 |
| **Ultimately (1)** | 14:21 15:5 | 32:14 40:5 | 100:4 | |
| 95:2 | 21:3 59:11 | 46:7 62:18 | **word (1)** | ———— **Y** ———— |
| **umbrella (5)** | 64:17 65:20 | 74:14,16,19 | 39:17 | **Yakov (6)** |
| 59:17 60:7,8 | 92:7,12 93:17 | 74:20 77:18 | **words (1)** | 47:20 48:4,12 |
| 60:20,23 | 94:8,13,23 | 93:19 99:2 | 64:4 | 49:2 50:8 |
| | | | | 100:17 |

yeah (4)
7:6 52:11
  76:24 90:5
ycar (1)
91:8
years (1)
17:11
York (14)
1:2,17 2:5,7,13
  2:13,18 3:7
  3:16 15:8
  51:18 68:15
  105:4,8

_____ Z _____
zoom (2)
1:16 35:25

_____ 0 _____

_____ 1 _____
1 (2)
19:11,12
10:16 (1)
1:13
100 (1)
56:2
10005 (1)
2:13
10804 (1)
2:5
11 (24)
4:21 5:18 6:5
  13:3,9,12
  14:4,15,22
  15:14,20
  16:22 17:9
  20:21 21:2
  30:7 51:19
  62:13 74:2
  82:6,15 89:2
  92:8,14
11:45 (1)
95:25
11228 (1)
2:18
11230 (1)

3:16
11th (3)
12:19 18:23
  21:10
12 (5)
45:7,11 89:21
  89:23 103:22
12:07 (1)
95:23
12:15 (2)
96:15 101:10
14th (1)
91:6
15 (3)
18:5,7 103:9
150 (2)
56:24 91:25
1570 (1)
3:15
16-page (1)
103:19
16th (1)
67:10
17 (1)
1:13
17th (1)
2:12
18 (2)
1:6 103:10
18CV2710 (1)
2:19

_____ 2 _____
2 (1)
42:18
20 (7)
16:13 17:19
  54:3 64:9
  82:11 102:19
  103:10
2011 (2)
47:15,20
2012 (4)
47:9 56:7
  57:23 91:11
2013 (2)

66:21 67:11
2014 (3)
58:25 73:11
  91:9
2015 (32)
4:21 5:18 6:5
  13:3,9,12
  14:4,15,22
  15:15,20
  16:13,22 17:9
  17:19 18:19
  20:21 21:2
  29:6 30:7
  51:19 53:23
  54:3 62:13
  74:2 82:6,11
  82:15 89:2
  92:8,14
  103:10
2020 (2)
1:13 105:20
2021 (1)
57:24
20th (2)
18:16 53:22
21 (2)
2:4 29:6
22 (1)
47:20
2710 (1)
1:6
28 (2)
2:12 103:11

_____ 3 _____
3 (6)
22:18,19 29:9
  29:12 47:9
  104:5
31st (1)
105:20
35 (1)
103:13
36 (3)
75:3,5 103:21
37 (1)

103:14
39 (3)
71:4,6 103:19

_____ 4 _____
4 (1)
29:14
4:30 (1)
5:10
41 (1)
103:15
42SC1983 (2)
79:13,21

_____ 5 _____
5/18/2014 (1)
73:8
522A (1)
2:17

_____ 6 _____
6 (4)
2:17 44:7,7,9
63 (1)
103:17
66 (3)
96:16,18
  103:23
67 (4)
63:5,7 103:16
  103:18
68 (6)
7:22,22 8:3,6
  8:10 103:8
69 (2)
7:18,18

_____ 7 _____
70 (4)
6:14,14,15,17
71 (1)
103:20
73 (3)
41:16,18
  103:15
75 (1)
103:21

79 (3)
66:24 67:2
  103:18
7th (1)
3:15

_____ 8 _____
8 (2)
73:11 103:8
8:30 (1)
5:10
80 (4)
56:2,23 57:17
  91:25
81 (6)
34:25,25 35:3
  39:11,15
  103:12
82 (3)
37:3,5 103:14
84 (2)
28:3,3
85 (4)
28:4,4,6
  103:11
86 (1)
3:2
89 (1)
103:22
8th (3)
11:25 12:7,10

_____ 9 _____
96 (1)
103:23