**EXHIBIT C**

December 17, 2020

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
MARIO H. CAPOGROSSO,

PLAINTIFF,

-against-                Case No.:
                         18 CV 2710 (EK) (LB)

ALAN GELBSTEIN, in his individual capacity,
IDA TRASCHEN, in her individual capacity,
DANIELLE CALVO, in her capacity, SADIQ
TAHIR, in his individual capacity, PEC
GROUP OF NY, INC., DAVID SMART, and DMV
COMMISSIONER MARK SCHROEDER, in his
official capacity,
                    DEFENDANTS.
-----------------------------------X

DATE: December 17, 2020
TIME: 1:24 P.M.

DEPOSITION of the Defendant,
DANIELLE CALVO, taken by the Plaintiff,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held VIA ZOOM
VIDEOCONFERENCE, before Jamie Newman, a
Notary Public of the State of New York.

## Page 2

```
 1
 2
 3     APPEARANCES:
 4
       THE LAW FIRM OF MARIO H. CAPOGROSSO
       PLAINTIFF PRO SE
       21 Sheldrake Place
 5     New Rochelle, New York 10804
       Capogrosso@aol.com
 6
 7
 8     OFFICE OF THE NEW YORK STATE ATTORNEY
       GENERAL
 9     Attorneys for the Defendants
       ALAN GELBSTEIN, in his individual
10     capacity, IDA TRASCHEN, in her individual
       capacity, DANIELLE CALVO, in her individual
       capacity, SADIQ TAHIR, in his individual
11     capacity, PEC GROUP OF NY, INC., DAVID
       SMART, and DMV COMMISSIONER MARK
12     SCHROEDER, in his official capacity
       28 Liberty Street, 17th Floor
13     New York, New York 10005
       BY: JAMES THOMPSON, ESQ.
14     james.thompson@ag.ny.gov
15
16     DMV LEGAL BUREAU
       Attorneys for the Defendant
17     DMV COMMISSIONER MARK SCHROEDER, in his
       official capacity
18     6 Empire State Plaza, Room 522A
       Albany, New York 11228
19     BY: BARBARA MONTENA, ESQ.
       File #: 18CV2710
20     barbara.montena@dmv.nyc.gov
21
22            * * * *
23
24
25
```

## Page 3

```
 1               (Whereupon, all 86 exhibits
 2     were previously marked by Counsel,
 3     Mark Capogrosso.
 4        D A N I E L L E   C A L V O, called as a
 5     witness, having been first duly sworn by a
 6     Notary Public of the State of New York, was
 7     examined and testified as follows:
 8     EXAMINATION BY
 9     MR. CAPOGROSSO:
10        Q.  Please state your name for the
11     record.
12        A.  Danielle Calvo.
13        Q.  What is your address?
14        A.  9952 Fort Hamilton Parkway,
15     Brooklyn, New York 11209.
16        Q.  All right.
17            Mario Capogrosso, I'm just
18     going to ask you a couple of questions. I
19     just want the truth, I want to get to the
20     truth.
21            Now, you had me removed, you
22     came to me on the morning of May 11, 2015
23     at the Brooklyn TVB and you asked me to
24     leave in the presence of police officers.
25
```

## Page 4

```
                   Danielle Calvo
 1            Am I right in saying that?
 2        A.  That's correct.
 3        Q.  Who told you to do that?
 4        A.  I was told by my supervisors.
 5        Q.  Which supervisor?
 6        A.  I was told by Ida Traschen.
 7        Q.  On the morning of May 11, 2015?
 8        A.  What is --
 9            MR. THOMPSON:  Is that a
10     question?
11        Q.  On the morning of May 11, 2015
12     you had a telephone conversation with Ida
13     Traschen?
14        A.  If that is the day you were
15     asked to leave?  Yes.
16        Q.  Now, for what reason did you
17     have me removed?
18        A.  It wasn't my decision, it was
19     my supervisor's decision.
20        Q.  It was Ida Traschen's decision?
21        A.  Yes.
22        Q.  Now, what made you have -- who
23     called whom, did Ida Traschen call you or
24     you called Ida Traschen?
25
```

1 (Pages 1 to 4)

December 17, 2020

## Page 5

Danielle Calvo

1
2    A.   I was directed to call her.
3    Q.   By whom?
4    A.   Judge Gelbstein.
5    Q.   Was Judge Gelbstein in the
6  building that morning?
7    A.   No, he was not.
8    Q.   Did you view any of the
9  videotape of the alleged incident between
10  myself and Defendant Smart?
11    MR. THOMPSON:  Objection to the
12    form of the question.  You can
13    answer.
14    A.   Not that I recall, no.
15    Q.   How did you get notice of the
16  fact that there was an incident between
17  myself and Defendant Smart?
18    A.   Someone came into the office
19  and told me.
20    Q.   Who?
21    A.   I don't recall who.
22    Q.   Was it Defendant Smart?
23    A.   I don't recall.
24    Q.   And based on their testimony to
25  you, you decided that there was an incident

## Page 6

Danielle Calvo

1
2  and an altercation between myself and
3  Defendant Smart?
4    MR. THOMPSON:  Objection to the
5    form of the question.  You can
6    answer.
7    A.   I didn't decide anything.  I
8  just called Judge Gelbstein and let him
9  know what happened and then that was it.
10    Q.   But, you didn't observe what
11  happened; right?
12    A.   No, I did not.
13    Q.   And you didn't look at any
14  videotape; right?
15    A.   Not that I recall, no.
16    Q.   And you had the ability to look
17  at the videotape, but you didn't?
18    A.   I don't know if that incident
19  was videotaped.  I don't know what position
20  on the floor it happened, so I couldn't
21  say.
22    Q.   You're taking somebody's
23  witness -- some witness observation as to
24  what happened as to the truth; right?
25    MR. THOMPSON:  Objection to the

## Page 7

Danielle Calvo

1
2  form of the question, you can answer.
3    A.   I didn't make any decision
4  whether it was the truth or not, I just
5  reported what I was told.
6    Q.   By some person you don't know
7  their name?
8    A.   I don't remember, no.
9    Q.   Can you tell me exactly what
10  that person said to you, exact nature of
11  that conversation, the exact words used?
12    A.   I can't tell you the exact
13  words, no.
14    Q.   But, based on that testimony,
15  you made a decision to call Judge
16  Gelbstein; is that right?
17    A.   Yes.
18    MR. THOMPSON:  Objection to the
19    form of the question.  You can
20    answer.
21    Q.   And Judge Gelbstein made a
22  decision to call who, to call Ida Traschen?
23    A.   Judge Gelbstein told me to call
24  Ida Traschen.
25    Q.   And based on that observation

## Page 8

Danielle Calvo

1
2  -- based on that testimony from a
3  third-party, I was removed from the
4  practice of law in all New York TVBs?
5    Is that fair?
6    MR. THOMPSON:  Objection to the
7    form of the question.  You can
8    answer.
9    A.   At that time I had no idea what
10  was going to happen, I was just reporting
11  to my supervisor what I was told.
12    Q.   And you don't recall what you
13  were told exactly?
14    A.   No.
15    MR. THOMPSON:  Objection, asked
16    and answered.
17    Q.   You don't recall the alleged
18  incident or what was said concerning the
19  incident?
20    MR. THOMPSON:  Same objection.
21    Q.   Did you ever talk to Defendant
22  Smart concerning the incident?
23    A.   I don't recall if I had any
24  particular conversation with him afterwards
25  or during, but I'm sure we did at some

December 17, 2020

## Page 9

Danielle Calvo

1  point.
2
3      Q.   So, you never asked him what
4  was the nature of the incident between
5  myself and him, as to what factually
6  occurred?
7      MR. THOMPSON:  Objection to the
8      form of the question.  You can
9      answer.
10     A.   I may have asked him at the
11  time, but I don't recall what he said to me
12  or...
13     Q.   Did you ask him before I was
14  removed, or after I was removed?
15     A.   I don't know.
16     Q.   You don't know.
17         Did you ever ask me as to what
18  happened concerning that alleged incident?
19     A.   I don't remember having any
20  conversation with you, no.
21     Q.   You don't recall the
22  particulars of the incident, you don't
23  recall talking to Defendant Smart
24  concerning the incident, and you didn't
25  talk to me concerning the accident.

## Page 10

Danielle Calvo

1
2      Yet you make a phone call to
3  Defendant Gelbstein concerning the incident
4  who tells you to call Ida Traschen
5  concerning the incident; is that fair to
6  say?
7      MR. THOMPSON:  Object to the
8      form, you can answer.
9      A.   Yes.
10     Q.   And as a result of that phone
11  call, I'm not allowed to practice at the
12  New York TVB, you know that; right?
13     MR. THOMPSON:  Object to the
14     form, you can answer.
15     A.   I was not aware at that moment
16  that that was what was going to happen, but
17  I am aware of that afterwards, yes.
18     Q.   Did you approach me on the
19  afternoon of May 8th in the attorneys' room
20  in the presence of the Defendant Gelbstein,
21  did you and him approach me in the
22  afternoon of May 8, 2015?
23     A.   I don't know if we did or not.
24     Q.   Do you recall Defendant
25  Gelbstein saying to me, "I read what you

## Page 11

Danielle Calvo

1
2  wrote about me, that I'm complicit,
3  incapable and incompetent, can't you go
4  practice somewhere else."
5      Do recall that statement by
6  Defendant Gelbstein?
7      A.   No, I do not.
8      Q.   Do you have any knowledge as to
9  whether Defendant Gelbstein or Ida Traschen
10  had Defendant Smart approach me on the
11  morning of May 11, 2015?
12     A.   No, I do not.
13     Q.   Are you privy or knowledgeable
14  of the letter that I wrote to the attorney
15  general's office on March 20, 2015, were
16  you knowledgeable about that?
17     MR. THOMPSON:  Objection to the
18     form, you can answer.
19     A.   I did know about it.  I don't
20  know if I ever saw it or who told me about
21  it, but I was aware that something was
22  written.
23     Q.   Did you ever read it?
24     A.   To my knowledge, I don't
25  remember.

## Page 12

Danielle Calvo

1
2      Q.   Were you knowledgeable of any
3  of the complaints I had against Defendant
4  Smart at the Brooklyn TVB that I followed
5  with Defendant Gelbstein, were you
6  knowledgeable of any of those complaints?
7      A.   I know you made a lot of
8  complaints about a lot of different people,
9  particularly and specifically, no.
10     Q.   I only make complaints about
11  Defendant Smart.
12         The only thing that was in
13  writing was to Defendant Smart and I'm
14  asking very specifically, did you have any
15  knowledge of any of those complaints?
16     MR. THOMPSON:  Objection, asked
17     and answered.  You can answer.
18     A.   I don't recall specifically,
19  but I may have known at the time.
20     Q.   Did you have supervisory
21  authority over the actions of Defendant
22  Smart at the Brooklyn TVB?
23     MR. THOMPSON:  Objection to the
24     form.  You can answer.
25     A.   To some extent we could ask him

3 (Pages 9 to 12)

Page 13

Danielle Calvo

1
2  to do certain things, but he worked for an
3  outside company.
4      Q.   So, who did he report to on a
5  daily basis?
6      A.   He had to call into his office
7  every morning and he submitted his time
8  cards to them, but we had to know he was
9  there.
10     Q.   Who governed his day-to-day
11 activities at the Brooklyn TVB?
12         MR. THOMPSON:  Objection to the
13     form.  You can answer.
14     A.   We would tell him what we
15 wanted done as far as opening, closing.
16 Things like that.
17     Q.   You governed his day-to-day
18 activities?
19         MR. THOMPSON:  Same objection.
20     Q.   Clerical staff, the clerical
21 supervisors governed his day-to-day
22 activities; is that correct?
23         MR. THOMPSON:  Same objection.
24     A.   To some extent, yes.
25     Q.   And did you receive complaints

Page 14

Danielle Calvo

1
2  with respect to Defendant Smart, did they
3  go to your office as a clerical supervisor?
4          MR. THOMPSON:  Object as to
5      form.  You can answer.
6      A.   It depends on who the complaint
7  was made to specifically.
8      Q.   If I submitted a complaint to
9  Defendant Gelbstein, would become
10 knowledgeable of it and have authority to
11 act upon it?
12     A.   If you made the complaint to
13 him, he may have told me about them, yes,
14 but if you made it to him, then it would be
15 up to him to make any decisions.
16     Q.   Now, in June of 2012 Defendant
17 Smart pushed me from behind, assaulted me
18 from behind reaching for my cell phone.
19         Were you aware of that complaint
20 that I filed with Defendant Gelbstein, were
21 you aware of that?
22         MR. THOMPSON:  Objection to the
23     form.
24     A.   Not that I recall, but it's
25 possible at the time I did.

Page 15

Danielle Calvo

1
2      Q.   Did you take any action and
3  response to it?
4      A.   Not that I remember.
5      Q.   So, you didn't try to curtail
6  that threat or respond to it in any way?
7          MR. THOMPSON:  Object to the
8      form, you can answer.
9      A.   I don't know if I knew about it
10 and I don't know if I did, if I spoke to
11 him or not.
12     Q.   In December of 2014 Defendant
13 Smart stood up from where he was sitting,
14 pointed directly at me with a spear hand
15 and gave me the sign of the cross.
16         Were you aware of that
17 complaint that I filed with Defendant
18 Gelbstein?
19         MR. THOMPSON:  Objection to the
20     form.  You can answer.
21     A.   I don't recall.
22     Q.   Do you recall reviewing any
23 videotape with respect to that complaint?
24     A.   No, I don't recall.
25     Q.   Did you take any action in

Page 16

Danielle Calvo

1
2  response to that complaint?
3      A.   That I don't recall.
4      Q.   In June of 2012, Defendant
5  Smart -- between December 11, 2011 and
6  December 12, 2012, Defendant Smart stole
7  $80 on a $150 fee.
8          Were you aware of that, that he
9  stole $80 on a fee that was owed to me?
10         MR. THOMPSON:  Object to the
11     form, you can answer.
12     A.   No, I was not.
13     Q.   Did you take any action in
14 response to that complaint that I made to
15 Defendant Gelbstein concerning that theft?
16     A.   I don't recall.
17     Q.   Was there an investigation made
18 by your office, the clerical -- you, as a
19 supervisor, with respect to that theft?
20     A.   I don't recall.
21     Q.   I made complaints to Defendant
22 Gelbstein concerning that Defendant Smart,
23 after I reported this theft, would get in
24 my face, within several inches of my face
25 and I would ask him what was the problem

**Page 17**

Danielle Calvo
1
2 and he would respond "fuck you, you are the
3 problem."
4      Did you investigate any of
5 those complaints?
6      A.  I don't recall.
7      Q.  So, pretty much Defendant Smart
8 was given carte blanche to act as he wanted
9 to in the Brooklyn TVB with respect to your
10 office?
11      MR. THOMPSON:  Objection to the
12      form of the question.  You can
13      answer.
14      Q.  You took no action and response
15 to any of the threats of violence or
16 harassment by Defendant Smart with respect
17 to my person; is that fair to say?
18      MR. THOMPSON:  Same objection,
19      you can answer.
20      A.  I don't recall what was done
21 about any of those incidents.
22      Q.  I'm asking if you took any
23 response, you made --
24      A.  I don't remember.
25      Q.  So, you gave Defendant Smart

**Page 18**

Danielle Calvo
1
2 carte blanche, freedom, to act the way he
3 wanted to act; is that fair?
4      MR. THOMPSON:  Objection, asked
5      and answered.  Argumentative.  You
6      can answer.
7      A.  No, I did not.
8      Q.  Who is in control of the
9 videotape at the Brooklyn TVB?
10      MR. THOMPSON:  Object to the
11      form, you can answer.
12      A.  The cameras themselves -- um --
13 the monitor was in the back office.  There
14 was no tape, it was directly to some type
15 of hard drive.
16      Q.  Did you request that any of the
17 videotape of May 11th be preserved or kept?
18      A.  Not that I recall.
19      Q.  So, you kept none of the
20 evidence that would have shown the alleged
21 altercation between myself and Defendant
22 Smart on May 11, 2015?
23      MR. THOMPSON:  Objection to the
24      form of the question.  You can
25      answer.

**Page 19**

Danielle Calvo
1
2      A.  Can you repeat that, I didn't
3 understand?
4      Q.  You made no attempt to keep or
5 preserve that evidence, that videotape of
6 the alleged altercation between myself and
7 Defendant Smart?
8      MR. THOMPSON:  Same objection.
9      A.  I don't know if it was
10 videotaped and I don't recall what was --
11 there is no way for me to keep or erase
12 anything on there, unless someone would
13 have told us how to do it.
14      Q.  So, you made no attempt to
15 preserve it, you didn't make any phone
16 calls to the security people who monitor
17 these cameras to preserve that evidence,
18 did you?
19      MR. THOMPSON:  Objection to the
20      form.
21      A.  Not that I know of.
22      Q.  Did you ever view that
23 videotape of the alleged incident between
24 myself and Defendant Smart?
25      A.  Not that I recall.

**Page 20**

Danielle Calvo
1
2      Q.  Did you observe Defendant
3 Gelbstein viewing that videotape in your
4 presence?
5      MR. THOMPSON:  Objection to the
6      form.  You can answer.
7      A.  Not that I recall.
8      Q.  Did you ever observe Ida
9 Traschen observe that videotape in your
10 presence?
11      A.  No.
12      Q.  Now, there were many complaints
13 written against me and my office while I
14 was there at Brooklyn TVB by the clerical
15 staff at the Brooklyn TVB.
16      Is that fair to say -- is that
17 a fair statement?
18      A.  Yes.
19      Q.  Is that a fair statement, they
20 didn't like me?
21      A.  I can't say what they felt
22 about it, I can only speak for myself.
23      Q.  Well, they made many complaints
24 about me, that's fair, I mean, I have them.
25 They were all kept by Defendant Gelbstein,

December 17, 2020

Page 21

Danielle Calvo

they were all made by clerks, some by
attorneys, one by a judge at the Brooklyn
TVB and the clerks were under your
supervision; right?

MR. THOMPSON: Object to the
form of the question, it's compound.
You can answer.

A.  The clerks were under my
supervision, but I did not ever tell them
what to write.

Q.  But, you were privy to the
complaints they made against me; am I
right?

A.  I'm sure I was at that time,
yes.

MR. THOMPSON: Objection.

Q.  Did you investigate at any
point the voracity or truthfulness of any
of these complaints?

A.  I may have, I don't know.

Q.  You don't know.

So, you don't know whether
they're truthful or not; is that a fair
statement?

Page 22

Danielle Calvo

MR. THOMPSON: Objection to the
form.  You can answer.

A.  It depends on what exactly
we're talking about, I don't know.
Specific incidents?  I don't remember
specific incidents, but in general, I know
that there was many times that there was
problems.

Q.  Well, tell me one of the
problems, please, tell me one; I want you
to tell me one?

MR. THOMPSON: Is that a
question?

Q.  Yeah, tell me one of the
problems that you experienced with me and
your clerical staff, tell me one?

A.  That you would get aggressive
with them, yelling at them.

Q.  Who, who, tell me who?

A.  I can't name specific names,
you had a problem with everyone.

Q.  Well, tell me who, can you name
one; can you name one and tell me a
specific date and a specific instance, tell

Page 23

Danielle Calvo

me --

A.  I can't.  I can't give you --

MR. THOMPSON: Objection to the
form of answer.  You can answer.

A.  I can't give you a specific
time or incident, but I remember speaking
to you personally myself, asking you that
if you had a problem with any of the
clerks, to come speak to me directly as a
supervisor and I told you that many times.

Q.  I never had a problem with any
of your clerks, never.

A.  Excuse me?

Q.  Your clerks had a problem with
me, they didn't like me.  I'll get into
that, but you can't give me one specific
instance and one specific occurrence?

MR. THOMPSON: Object to the
form, asked and answered.

Q.  Can you give me one specific
instance of where I verbally abused one of
your clerks, the date, the time and exactly
what I said, I'd like to know?

A.  No, I can't.

Page 24

Danielle Calvo

Q.  Are you familiar with
corruption at the New York TVB, are you
familiar corruption and allegations of
corruption at the New York TVBs?

MR. THOMPSON: Objection to the
form of the question, you can answer.

A.  No.

Q.  You're not.

Let me direct you to Exhibit 4.
Let me show you Exhibit 4.

(Whereupon, Plaintiff's Exhibit
4, previously marked, was
introduced.)

Q.  Are you familiar with this
article, DMV clerk accused of taking bribes
for years in ticket fixing schemes.

Do you have any knowledge of
this article?

A.  It does not look familiar, no.

Q.  Are you familiar with ticket
fixing schemes at the TVB in New York?

A.  Am I?  No, I'm not.

Q.  As a clerical supervisor,
you're not familiar with the clerks taking

December 17, 2020

## Page 25

Danielle Calvo

1
2 bribes to fix tickets?
3      A.   No.  If I was aware of that, I
4 would have turned them in.
5      Q.   Let me read a couple of
6 statements out of this article that I
7 found, this investigation that I made.
8          Directing your attention to the
9 first paragraph which reads, "my
10 investigation found a Traffic Violation
11 Bureau mired in corrupt practices, from
12 public employees taking cash in fixing
13 tickets from attorneys offering clerks
14 improper payments in gifts to garner new
15 clients all under woefully deficient direct
16 oversight Inspector General, IG, Leahy
17 Scott."
18          Are aware of such allegations
19 at the TVB?
20          MR. THOMPSON:  Objection to the
21      form of the question.
22      Q.   Are you aware of such ticket
23 fixing complaints at the TVB?
24      A.   No.
25      Q.   Are you aware that clerks

## Page 26

Danielle Calvo

1
2 received money in gifts from --
3      A.   No, if I was aware of that I
4 would --
5          MR. THOMPSON:  Same objection.
6      A.   -- have reported them.
7      Q.   That same report, if you go up
8 to Page 2.  And I'll direct your attention
9 to the fourth paragraph down, "Alexis,
10 Eddie and one former clerk were also
11 accused of steering motorists to certain
12 defense lawyers in exchange for cash or
13 meals.  Officials said they often texted or
14 called attorneys throughout the day --
15 workday to make the referrals."
16          Are you aware of such
17 allegations?
18      A.   This does not stay Brooklyn
19 South TVB, this says Northern Manhattan
20 Traffic Violation.
21      Q.   I understand, but at the TVB in
22 general, are you aware of such things going
23 on; are you aware of it?
24      A.   No.
25      Q.   You're a supervisor of clerks,

## Page 27

Danielle Calvo

1
2 you're not aware of clerks receiving gifts
3 in cash?
4      A.   If I --
5          MR. THOMPSON:  Objection.
6      Object to the form.  Objection, asked
7      and answered.  You can answer.
8      A.   If I was aware, I would have
9 reported them.  I don't do illegal things,
10 so...
11      Q.   Were there attorneys giving
12 gifts in money and meals to your clerks at
13 the TVB?
14      A.   Not that I know of, no.
15      Q.   Jeffrey Zift (phonetic) wasn't
16 buying your clerks lunch and breakfast in
17 the morning?
18      A.   If they were, then I was not
19 told of it.
20      Q.   And attorneys weren't giving
21 them money in cash for Christmas, was that
22 happening?
23      A.   Not that I was aware of, no.
24      Q.   Was there a clerk doing work
25 for another attorney and would do work for

## Page 28

Danielle Calvo

1
2 him?
3      A.   That should not have not
4 occurred and if it did, and I did not know
5 about it.
6      Q.   Well, I was privy to all of
7 this.  The attorneys were asking me how
8 much money was I giving the clerks this
9 Christmas, I said none.
10          But you weren't aware of any of
11 that, money going back and forth?
12          MR. THOMPSON:  Objection to the
13      form of the question.
14      A.   No.
15      Q.   Were there parties given for
16 the clerks by certain attorneys?
17      A.   I wouldn't -- sometimes at
18 Christmas Judge Gelbstein allowed them to
19 not give a party, but like contribute to
20 the Christmas party they were also allowed
21 to attend.
22      Q.   Did Terry Kalker give parties
23 for the clerks during the holidays?
24      A.   I believe she was one of the
25 people who supplied Kosher food items to

7  (Pages 25 to 28)

December 17, 2020

**Page 29**

Danielle Calvo

1  holiday parties.
2      Q.   So, she was supplying meals to
3  your clerks?
4      A.   I wouldn't say it was --
5          MR. THOMPSON: Objection.
6      A.   -- a day-to-day occurrence, it
7  was allowed.
8      Q.   And were those attorneys given
9  preferential treatment?
10     A.   No, they were not.
11     Q.   They were not.
12         Did you think that there was an
13 appearance -- that it was improper for your
14 clerks to receive money, cash, meals --
15         MR. THOMPSON: Object to the
16         form of the question.
17     Q.   -- by attorneys, was it
18 improper; was it an improper act for your
19 clerks to receive such gratuities?
20         MR. THOMPSON: Same objection.
21     A.   If I would have known about
22 them receiving any gratuities or anything
23 improper, I would have reported it.
24     Q.   All right.
25

**Page 30**

Danielle Calvo

1      Let me direct your attention to
2  Exhibit 35, lets go through some of these
3  complaints by your clerks. Actually, Can
4  we go to Exhibit 6 -- it's not Exhibit 6.
5  Give me one minute. Exhibit 11.
6          (Whereupon, Plaintiff's Exhibit
7          11, previously marked, was
8          introduced.)
9      Q.   Directing your attention to
10 this exhibit, Exhibit 11.
11         Is Danielle there?
12     A.   Yes.
13     Q.   All right, fine.
14         Are you familiar with this
15 exhibit?
16     A.   I don't know if I've seen this
17 before or not.
18     Q.   Well, it's telling you that I
19 have to restrain from threatening conduct.
20         Can you tell me what
21 threatening conduct I exhibited towards
22 your clerks, can you tell me exactly what I
23 did?
24         MR. THOMPSON: Objection to the

**Page 31**

Danielle Calvo

1  form.
2      Q.   I was given this letter in June
3  of 2012, can you tell me what the
4  threatening conduct I ever exhibited with
5  one of your clerks?
6          MR. THOMPSON: Same objection,
7          you can answer.
8      A.   It's not up to me to decide
9  what is threatening conduct.  If they feel
10 like they were threatened, then they
11 reported it.  If not...
12     Q.   Well, what threatening conduct
13 was ever reported to you by one of your
14 clerks, tell me?
15     A.   I don't recall specific
16 incidents.
17     Q.   Tell me what verbal threat of
18 physical violence I ever made to one of
19 your clerks, can you tell me the date and
20 time I made it?
21         MR. THOMPSON: Objection, asked
22         and answered.
23     Q.   Tell me one time I verbally
24 abused one of your clerks, the date, the

**Page 32**

Danielle Calvo

1  time, the occurrence, exactly what I said?
2          MR. THOMPSON: Objection.
3      A.   No, I cannot tell you that.
4      Q.   Can you tell me what ethnic
5  slur I ever made with respect to one of
6  your clerks?
7          MR. THOMPSON: Same objection,
8          you can answer.
9      A.   I can't tell you specifically
10 any incident, date, time.  I don't have
11 that information.
12     Q.   They didn't like me because I
13 wasn't buying them presents or buying them
14 meals or giving them cash for the holidays.
15         Would that be a fair statement?
16     A.   No, I would say not.
17         MR. THOMPSON: Objection to the
18         form of the question.
19     Q.   So, tell me the reasons they
20 didn't like me?
21     A.   I can't tell you, I can only
22 speak for myself.
23     Q.   Did you ever make an
24 investigation to any of these complaints

8  (Pages 29 to 32)

December 17, 2020

## Page 33

Danielle Calvo

1 Danielle Calvo
2 against me by your clerks?
3 A. If I did, I don't recall, but I
4 may have.
5 Q. Can you tell me the results of
6 that investigation?
7 A. I can't tell you because I
8 don't recall.
9 Q. But, those complaints of
10 misconduct were used to get me removed from
11 the Brooklyn TVB and from all TVBs; is that
12 fair to say?
13 MR. THOMPSON: Objection to the
14 form of the question. You can
15 answer.
16 A. I can't say that what -- they
17 were incidents that they reported. They
18 were -- there was not a specific reason why
19 that they reported them. They felt that it
20 was an incident, so I can't say why they
21 reported it or not.
22 Q. But, they were all used against
23 me and they were all used against me to
24 have me removed and you made no
25 investigation as to whether they were true

## Page 34

Danielle Calvo

1 Danielle Calvo
2 or not; is that fair?
3 MR. THOMPSON: Objection.
4 A. I didn't say that, I said I
5 don't recall.
6 Q. You gave me no opportunity to
7 respond to any of these complaints; right?
8 A. I don't recall.
9 MR. THOMPSON: Objection to the
10 form.
11 Q. Now, you didn't like me either
12 at the Brooklyn TVB; is that fair, you
13 wanted me out of there?
14 A. You were a problem and I felt
15 that you threatened the staff, yes.
16 Q. You wanted me removed; right?
17 A. But it was not my decision in
18 any form because you would have been out
19 way sooner.
20 Q. But you wanted me out of there,
21 didn't you?
22 A. I wanted you to stop what you
23 were doing and if you could have stopped,
24 then you wouldn't have had to be...
25 Q. Stop what, tell me exactly what

## Page 35

Danielle Calvo

1 Danielle Calvo
2 I did?
3 A. Aggressive behavior.
4 Q. Tell me the aggressive
5 behavior, tell me what I did?
6 A. I can't give you specific
7 instances. You were argumentative,
8 yelling, always aggressive, always
9 complaining. We didn't have this many
10 problems with anyone else. So I can't tell
11 you specific incidents. You have the
12 reports, so you must know what they are.
13 Q. All I know is Mr. Capogrosso is
14 the problem and that's all I know and there
15 is no investigation made. This is the
16 voracity of the complaints to the
17 allegations and Mr. Capogrosso is given no
18 opportunity to respond.
19 That's all I know that he's the
20 problem and that's it. Is that your
21 position?
22 MR. THOMPSON to the form of the
23 question.
24 A. I did not say that I never did
25 anything about any of the complaints. I

## Page 36

Danielle Calvo

1 Danielle Calvo
2 don't remember.
3 Q. Did you ever give me an
4 opportunity to respond to one of these
5 complaints so I could resolve the issue?
6 MR. THOMPSON: Objection, asked
7 and answered. You can answer.
8 Q. What opportunity did you give
9 me to respond to any one of the complaints
10 by your clerks?
11 A. I don't know specifically about
12 those complaints, but I know I spoke to you
13 on many occasions asking you not to direct
14 any issues with the clerks whatsoever.
15 Q. Concerning what?
16 A. Concerning anything. If you
17 had a problem --
18 MR. THOMPSON: Objection, you
19 asked this question over and over
20 again.
21 THE COURT REPORTER: Hold on,
22 my hands are off the record. It's
23 physically impossible on a Zoom to
24 get all three of you at the same
25 time.

December 17, 2020

Page 37

Danielle Calvo

```
 1                   Danielle Calvo
 2         Q.   You can't identify one specific
 3    instance of misconduct with respect to your
 4    clerks; is that fair today?
 5         A.   From memory?  No.
 6         Q.   Can I direct you to Exhibit 7.
 7              (Whereupon, Plaintiff's Exhibit
 8              7, previously marked, was
 9              introduced.)
10         Q.   And I'll direct you to
11    Paragraph 13.
12              Are you there?
13         A.   I'm here, but I don't see
14    Paragraph 13.
15         Q.   Now, this was a petition that
16    was submitted -- that was written by my
17    attorney in an Article 78 proceeding.
18    Capogrosso versus the Department of Motor
19    Vehicles.  And in that petition in
20    Paragraph 13 I indicate that I had an
21    incident with Yakov Brody.
22              Do you recall that incident?
23         A.   I recall there was an incident,
24    but I don't remember specifics.
25         Q.   And it happened in
```

Page 38

```
 1                   Danielle Calvo
 2    December 2011.
 3              Did you ever give me an
 4    opportunity to file my affidavit as to what
 5    happened with respect to that incident?
 6         A.   I didn't ask you for anything,
 7    but if you want to write something, you
 8    could have.
 9         Q.   But, you took Yakov Brody's
10    statement; right?
11         A.   Anyone who wants to make a
12    statement, makes a statement.  If they
13    don't want -- if someone doesn't give me
14    one, I don't ask for something unless I'm
15    told that we need it.
16         Q.   And you illicited the
17    statements of all the other attorneys
18    concerning this one incident; right?
19              MR. THOMPSON:  Objection to the
20    form of the question, you can answer.
21         A.   I don't remember.
22         Q.   You don't remember.
23              But, you never illicited my
24    affidavit, right, as to what happened?
25              MR. THOMPSON:  Same objection,
```

Page 39

```
 1                   Danielle Calvo
 2    you can answer.
 3         A.   I also don't remember.
 4         Q.   But, you wanted me out because
 5    that's what that Paragraph 13 says, "now's
 6    our chance to get rid of him."
 7              Did you make that statement
 8    concerning --
 9         A.   I'm sure I did not.
10         Q.   -- concerning the incident with
11    Yakov Brody on December 22, 2011, did you
12    make that statement?
13         A.   Not that I recall, no.
14         Q.   You don't remember making it?
15         A.   No.
16         Q.   But, you wanted me out, right,
17    from the DMV?
18              MR. THOMPSON:  Objection, asked
19    and answered.  You can answer.
20         Q.   Did you want me out because I
21    wasn't giving cash and meals and presents
22    to your clerks?
23              MR. THOMPSON:  Objection, asked
24    and answered.  Don't badger the
25    witness.
```

Page 40

```
 1                   Danielle Calvo
 2         Q.   Did you want me out because I
 3    wasn't giving cash and meals and gratuities
 4    to you as a clerical supervisor?
 5         A.   No, I did not.
 6              MR. THOMPSON:  Objection, asked
 7    and answered.
 8         Q.   You did not want me out for
 9    that reason?
10         A.   No.
11         Q.   Were you receiving gifts and
12    gratuities and meals from the other
13    attorneys?
14         A.   No, I did not.
15         Q.   Did you have any specific
16    complaints from motorists or clients of
17    mine to your office that I behaved
18    improperly, rudely or threatened them in
19    any way, by motorists or clients, other
20    than your clerks?
21              MR. THOMPSON:  Objection, asked
22    and answered.
23         Q.   I haven't heard that one.
24              Did you receive any complaints
25    from motorists or clients that I threatened
```

DEITZ Court Reporting... A Lexitas Company
800-678-0166

December 17, 2020

## Page 41

```
 1              Danielle Calvo
 2    them or I abused them -- verbally abused
 3    them, did you receive any such complaints
 4    from motorist or clients?
 5         A.   Not that I recall.
 6         Q.   So the only complaints that you
 7    are getting are from your clerks?
 8              MR. THOMPSON:  Objection to the
 9         form of the question.  You can
10         answer.
11         A.   Whatever complaints are on
12    file, I don't remember.
13         Q.   Right.
14              And it's because I didn't give
15    those clerks money for Christmas and I
16    wasn't buying them breakfast?
17              MR. THOMPSON:  Objection, asked
18         and answered.  I think four times
19         now.
20         Q.   Now, there was an incident with
21    Yakov Brody on December 11, 2011 and Brody
22    states that I threw a coffee cup, an empty
23    coffee cup in a garbage can that he was
24    sitting next to.
25              Were you familiar with that
```

## Page 42

```
 1              Danielle Calvo
 2    complaint?
 3         A.   Specifically I don't remember
 4    that date or an incident about a coffee
 5    cup.
 6         Q.   But, you never took my
 7    affidavit with respect to that alleged
 8    incident with Yakov Brody; right?
 9              MR. THOMPSON:  Objection, asked
10         and answered.  You can answer.
11         Q.   All I said to Yakov Brody that
12    day was "excuse me, can I get my coffee."
13    And he told me, "excuse yourself, go fuck
14    yourself, you Jew hater anti-Semite."  You
15    know that's what Yakov Brody told me that
16    day twice.  "Excuse yourself, go fuck
17    yourself, you Jew hater anti-Semite.  And
18    then I leave to get away from the
19    situation, I come back and he is still
20    blocking the coffee and he says that again
21    to me.
22              Did you ever take my affidavit
23    with respect to what happened that day?
24              MR. THOMPSON:  Objection to the
25         form of the question.  Asked and
```

## Page 43

```
 1              Danielle Calvo
 2    answered, you can answer.
 3         A.   Not that I recall.  I don't
 4    remember.
 5         Q.   But, it was okay for attorney
 6    Brody to give you his affidavit as to what
 7    happened?
 8              MR. THOMPSON:  Objection to the
 9         form, you can answer.
10         A.   Anyone who wanted to make a
11    report, could have made a report.  If you
12    wanted to make a report, Mr. Capogrosso,
13    you could have made a report.
14         Q.   I was removed from the Brooklyn
15    TVB based on that incident, so I didn't
16    have the opportunity to make a report;
17    right?
18              MR. THOMPSON:  Objection to the
19         form, you can answer.
20         A.   I don't know.  If you say you
21    didn't have an opportunity, than you
22    didn't, I have no idea.
23         Q.   Did you ever question me
24    concerning that incident?
25         A.   I don't remember.
```

## Page 44

```
 1              Danielle Calvo
 2         Q.   Was any of it grieved or sent
 3    to the grievance committee of the State of
 4    New York by one of your clerks; did they
 5    ever bring a grievance against me
 6    personally to the grievance committee to
 7    the State of New York?
 8         A.   Not that I'm aware of, no.
 9         Q.   But, you're aware that another
10    attorney was grieved who worked at the
11    Department of Motor Vehicles, an attorney
12    named Eamon Teague?
13              MR. THOMPSON:  Objection to the
14         form of the question.
15         A.   An attorney who?
16         Q.   Eamon Teague that he was
17    grieved for an inappropriate conduct?
18         A.   No, I don't even know who that
19    person is.
20         Q.   Why didn't you grieve me for
21    any of these acts that I committed with
22    your clerks, why didn't you ever grieve me;
23    why didn't you bring a complaint to the
24    grievance committee?
25         A.   You're asking me that.  I have
```

December 17, 2020

Page 45

Danielle Calvo

1
2  no idea because I don't even know what that
3  process is. We went through our own DMV
4  reporting, not to any outside other things.
5  I don't know what that is that you're
6  talking about.
7      Q. And you never questioned the
8  truth or voracity of any of those reports;
9  right?
10     MR. THOMPSON: Objection to the
11  form. Objection, asked and answered.
12  You can answer.
13     Q. Are you familiar with, let's
14  see, Melanie Levine; are you familiar with
15  Melanie Levine, does that name ring a bell?
16     A. Yes, she was a supervisor in
17  our office at one point.
18     Q. And she filed a complaint
19  against me too, are you aware of that; she
20  filed a work violence incident report, are
21  you familiar with that?
22     A. I may have been, but I don't
23  recall right now.
24     Q. Can pull up Exhibit 85.
25        (Whereupon, Plaintiff's Exhibit

Page 46

Danielle Calvo

1
2  85 previously marked, was
3  introduced.)
4      Q. Are you familiar with this
5  workplace violence incident?
6      A. I don't -- I may have seen it
7  before, I don't remember.
8      Q. Were you a supervisor at the
9  DMV, Brooklyn DMV on February 5, 2015?
10     A. Yes.
11     Q. Did you ever investigate the
12  facts and allegations of this incident
13  report as a supervisor?
14     A. I don't know what the incident
15  was because I only see the top part of it.
16     Q. Let's go to the second page.
17  This is a clerical supervisor, like
18  yourself, writing about me.
19     "Attorney Capogrosso had
20  represented Mr. Perez at trial for three
21  violations on January 22, 2015." Did you
22  investigate the validity of that statement,
23  the truthfulness of that statement as to
24  whether I actually represented them at
25  trial?

Page 47

Danielle Calvo

1
2      A. I don't know if I did at the
3  time.
4      Q. Could you have investigated the
5  truth, the validity of this report?
6      A. I could have, but it depends on
7  what my supervisor told me to do.
8      Q. So, you don't know whether I
9  represented this Mr. Perez on January 21,
10  2015, because I never did. I was never in
11  court with him, you know that; right?
12     A. I don't know that.
13     MR. THOMPSON: Objection to the
14  form. You can answer.
15     A. I don't know that. I don't
16  recall that.
17     Q. So, you don't know whether it's
18  true or not because -- you don't know the
19  -- you never took my statement with respect
20  to this work incident report, did you, as
21  to what happened?
22     A. I don't remember if I did or
23  not.
24     Q. Well, let me tell you what
25  happened that day because I never

Page 48

Danielle Calvo

1
2  represented Mr. Perez in court on these
3  three violations that you could have
4  checked out. Mr. Perez got his own license
5  suspended before Judge Waltrus (phonetic)
6  and he came out and hired me on an appeal
7  and then he went home and found out his
8  license was suspended and then he came back
9  to court.
10     And you know what he did when
11  he came back to court, he demanded his
12  money back and you know what I did, I gave
13  his money back. And you know what he did
14  after that, he threatened me with a knife.
15  He was going to cut me and stab me with a
16  knife and then slash the tires of my care.
17     MR. THOMPSON: Objection.
18  Who's testifying here?
19     Q. I'm prefacing my question.
20     Did you ever investigate the
21  actual complaint as to what actually
22  happened with me concerning this event?
23     A. I do not recall.
24     Q. But you never took my statement
25  with this report as to what happened, this

12  (Pages 45 to 48)

December 17, 2020

Page 49

Danielle Calvo
1
2       is a clerical supervisor making this
3       report?
4           A.   Anyone could make any report
5       they want to.
6           Q.   So, a false report that is
7       submitted to your office and you accept it
8       as truth; is that a fair statement?
9               MR. THOMPSON:  Objection to the
10          form of the question.  You can
11          answer.
12          Q.   You accept this report as true?
13          A.   Is that report sent to me?
14          Q.   It's written in big Melanie
15      Levine.
16          A.   All right, but who is it sent
17      to?
18          Q.   It's written by a clerical
19      supervisor, did you not have access to this
20      report?
21          A.   All right, but I can't stop
22      anyone from making whatever report they
23      want.
24          Q.   You don't investigate the
25      truthfulness of any of these reports?

Page 50

Danielle Calvo
1
2           A.   I don't recall what I did at
3       that time in regards to that report, but
4       anyone could make whatever report they
5       want.
6           Q.   Anybody could say whatever they
7       want, say it whether it has any truth or
8       not with respect to your office and you
9       don't care, you let them write whatever
10      they want?
11              MR. THOMPSON:  Objection,
12          argumentative?
13          Q.   I'm not being argumentative, is
14      that your position?
15          A.   I never said I don't care, but
16      I can't block someone from making a work
17      place violence report.
18          Q.   Fine.
19              You don't investigate the truth
20      of that report now, do you?
21          A.   I'm not an investigator, I was
22      a supervisor.
23          Q.   But, you're using those reports
24      to get me removed from the Brooklyn TVB,
25      are you not?

Page 51

Danielle Calvo
1
2               MR. THOMPSON:  Objection to
3           form, you can answer.
4           A.   I was not doing anything.  If
5       they made the reports they made the
6       reports.  I was not amassing any kind of
7       thing against you.
8           Q.   You didn't investigate the
9       truth and you didn't give me any
10      opportunity to respond, so pretty much any
11      report that is written is accepted as truth
12      in your office; right?
13              MR. THOMPSON:  Objection.
14          Object to the form.  Objection, asked
15          and answered.  Objection, badgering
16          the witness.
17          Q.   At what point in time did you
18      give me an opportunity to respond to that
19      report --
20              MR. THOMPSON:  Objection to the
21          form.
22          Q.   -- at what point in time did
23      you give me an opportunity to respond to
24      that report?
25              MR. THOMPSON:  You can answer.

Page 52

Danielle Calvo
1
2           A.   It's a report, it's not a
3       question and answer --
4           Q.   That was used --
5           A.   -- it's a report made by a DMV
6       employee.
7           Q.   To get me removed from
8       practicing law in all New TVBs.  You don't
9       investigate the truth of it, you give me no
10      opportunity to respond to it --
11              MR. THOMPSON:  Objection, asked
12          and answered.
13          Q.   -- is that a fair statement?
14              MR. THOMPSON:  Same objection.
15          Object as to form, you can answer.
16          A.   No, it's not a fair statement.
17          Q.   At what point in time did I get
18      to see this work incident report prior to
19      my removal of May 11, 2015, when?
20          A.   That would have been up to
21      Albany, not to me.
22          Q.   Where is this report sent to?
23          A.   Look at the top of the page, I
24      don't know.
25          Q.   And you also sent work violence

13  (Pages 49 to 52)

December 17, 2020

Page 53

Danielle Calvo

1
2  reports up to the chain, right; you sent
3  them to Albany work violence reports, did
4  you not?
5     A.   I'm sure I have, yes.
6     Q.   Concerning me?
7     A.   I don't recall.
8     Q.   Did you ever give me an
9  opportunity to supply my version of the
10 story as to what happened to any of these
11 work violence reports?
12    A.   A workplace violence report is
13 a report by someone who has an issue.  It
14 is not up for me to decide whether or not
15 it's true or whether or not I want to send
16 it.
17    Q.   Anybody in your office can
18 write whatever they want whether it's true
19 or not --
20       MR. THOMPSON:  Objection, you
21 keep --
22    Q.   -- and it gets accepted --
23       MR. THOMPSON:  You keep making
24 these laud statement.
25    Q.   Anybody gets to write whatever

Page 54

Danielle Calvo

1
2  they want on a work incident report, is
3  that true and make whatever statements they
4  want without any review by your office?
5       MR. THOMPSON:  Object to the
6  form.  You can answer.
7     A.   Anyone could make any kind of
8  statement, yes.  If they feel that it was
9  workplace violence they are allowed to make
10 a report.
11    Q.   And your office does no review
12 of it?
13    A.   What we did or did not do at
14 that time, I don't remember.  But, this
15 report was not to me.  If you go back to
16 the top of the page, I believe it's to
17 someone in Albany, whatever department.
18    Q.   Were you personally involved in
19 my removal on May 11, 2015?
20       MR. THOMPSON:  Object to the
21 form, you can answer.
22    Q.   Were personally involved in my
23 removal on the morning of May 11, 2015?
24    A.   My only involvement was to give
25 you the information that Ida Traschen told

Page 55

Danielle Calvo

1
2  me to give you, and to have the police
3  escort me to let you know to call Albany.
4  What they were going to do with you after
5  that or what they were going to allow, was
6  not ever my decision.
7     Q.   But, you personally approached
8  me on the morning of May 11th; right?
9     A.   Yes, as told by my supervisor
10 to do.
11    Q.   And that was whom?
12    A.   Ida Traschen is the one who
13 told me to do that.
14    Q.   After consulting with Judge
15 Gelbstein that morning.
16       Now, you didn't like me, right,
17 you didn't like me as an attorney working
18 down there; is that true?
19       MR. THOMPSON:  Objection, asked
20 and answered.
21    Q.   You didn't like me as an
22 attorney?
23    A.   I didn't like the things you
24 did.
25    Q.   And you wanted me out of there;

Page 56

Danielle Calvo

1
2  right?
3       MR. THOMPSON:  Objection, asked
4  and answered.
5     A.   I wanted you to stop what you
6  were doing.  I didn't care one way if you
7  were out of there or not.  I just needed to
8  have certain order in the place and --
9     Q.   You never explained exactly
10 what I was doing?
11       MR. THOMPSON:  You cannot keep
12 asking the same question over and
13 over in a louder and louder tone of
14 voice and hoping to get a different
15 answer.  That's badgering the
16 witness, it's not acceptable as the
17 Federal rules and I'd ask you to cut
18 it out, please.
19       MR. CAPOGROSSO:  It's a
20 different context that I asked that
21 question.  Different context.
22       This is in respect to the
23 morning of May 11th.  That question
24 was asked with respect to another
25 incident.  That question was asked

14  (Pages 53 to 56)

December 17, 2020

Page 57

Danielle Calvo

1
2  with respect to the incident on the
3  morning -- the incident of May 11,
4  2015.
5       MR. THOMPSON:  Go ahead and ask
6  your question.
7       Q.  Did you an opportunity to read
8  the police report that was written by
9  Defendant Smart on the morning of May 11,
10  2015, did you not?
11      A.  I don't recall.
12      Q.  Let me find that police report,
13  it's Exhibit 67.
14          (Whereupon, Plaintiff's Exhibit
15          67, previously marked, was
16          introduced.)
17      Q.  Now, this is a police officer
18  writing the first paragraph.  "Mr.
19  Capogrosso" --
20      MR. THOMPSON:  Object to the
21  form of the question.
22      Q.  Well, this is a workplace
23  violence incident report.  The top portion
24  indicates, "Mr. Capogrosso said "back up,
25  back up," that would be to Defendant Smart.

Page 58

Danielle Calvo

1
2       Did you ever tell Defendant
3  Gelbstein and Defendant Traschen that I
4  told Smart to back up, back up?
5       A.  I don't even see where you're
6  looking at because --
7       Q.  The top paragraph description
8  of events leading to the incident.  Second
9  line, "Mr. Capogrosso said back up, back up
10  to David Smart."
11      Did you ever tell Defendant
12  Gelbstein or Defendant Traschen that I said
13  to Smart "back up, back up"?
14      MR. THOMPSON:  Let me just say
15  before you answer the question, I'm
16  going to instruct you not to say
17  anything about any conversation you
18  had with Ida Traschen on the basis of
19  attorney/client privilege.  You can
20  answer the question.
21      A.  I don't recall.
22      Q.  So, you never told either
23  Gelbstein or Traschen that I'm telling
24  Smart to get away from them?
25      A.  I have no idea.

Page 59

Danielle Calvo

1
2       Q.  But, then on the following
3  paragraph down below you state, "I was
4  told" -- you went to Judge Gelbstein at
5  some point that I couldn't get arrested
6  because I used an open hand which is what I
7  did, I put my hand up, not a closed fist.
8  I was told by Judge Gelbstein your writing
9  this Danielle Calvo, to go with officers
10  from the police room to tell Mr. Capogrosso
11  to leave the building, but you don't recall
12  telling Gelbstein that I told him to back
13  up?
14      A.  I don't recall.
15      Q.  Yet this report gets me removed
16  from the practice of law at all New York
17  TVBs; is that fair?
18      MR. THOMPSON:  Objection to the
19  form of question.  You can answer.
20      Q.  So, you refused to give
21  Defendant Gelbstein and Defendant Traschen
22  my version of what happened; is that a fair
23  statement?
24      A.  I have no idea if they asked me
25  or what -- if I didn't see exactly what

Page 60

Danielle Calvo

1
2  happened, how am I going to tell them
3  anything.  Whatever report they were given,
4  I don't...
5       Q.  Why didn't you ask me what
6  happened that day and take my statement
7  before you --
8       A.  I recorded what happened to my
9  supervisor and this is what they told me to
10  do.
11      Q.  Somebody who came and told you
12  and you never questioned Smart and you
13  never questioned me; right?
14      MR. THOMPSON:  Object to the
15  form.
16      Q.  Is that what happened?
17      A.  I don't remember.
18      Q.  Do you believe you acted
19  lawfully that day?
20      A.  Do I believe that I acted
21  lawfully, me?
22      Q.  Yes.
23      A.  Yes.
24      Q.  And what authority or right did
25  you act that day?

15  (Pages 57 to 60)

December 17, 2020

Page 61

Danielle Calvo

1
2       MR. THOMPSON: Objection, calls
3   for a legal conclusion.
4       A.   I was a supervisor and I was
5   told by my supervisors what to do and
6   that's what I did.  I asked you to leave
7   the building.
8       Q.   And you never followed up as to
9   look to the videotape as to what happened
10  that day?
11      MR. THOMPSON: Objection, asked
12  and answered.
13      Q.   Did you look at the videotape
14  after I was removed?
15      MR. THOMPSON: Objection as to
16  form.  Objection, asked and answered,
17  you can answer.
18      A.   I don't remember if I did, but
19  at that point that you were gone, it's out
20  of my hands what they decided to do as far
21  as that goes, had nothing to do with me.
22  No one asked me my opinion.
23      Q.   But it was your report to
24  Gelbstein and then to Traschen based on
25  what you said somebody told you, that got

Page 62

Danielle Calvo

1
2   me removed; but you didn't verify that
3   story by looking at the videotape, now did
4   you?
5       MR. THOMPSON: Objection as to
6   form.  Objection, asked and answered,
7   you can answer.
8       A.   I reported what I was told and
9   what happened as far as I know it.
10      Q.   But you didn't verify --
11      A.   Any investigation is not to be
12  done by me.  I'm not the legal division of
13  the Department of Motor Vehicles.  I'm not
14  an investigator.
15      Q.   But you're the one telling
16  Gelbstein and you're the one telling
17  Traschen of this alleged incident of what
18  happened?
19      MR. THOMPSON: Objection,
20  argumentative.
21      Q.   But you never verified that
22  what you told them was actually true, now
23  did you?
24      MR. THOMPSON: Objection, asked
25  and answered.  You've asked this

Page 63

Danielle Calvo

1
2   question at this point eight or nine
3   times.
4       Q.   You never verified what you saw
5   or what you were told, did you, at any
6   point in time?
7       MR. THOMPSON: Object to the
8   form of the question.  You can answer
9   and Mr. Capogrosso I would ask you to
10  not ask the same question again for
11  time Number 10.
12      Q.   I'm waiting, did you ever
13  verify what you were told was truthful?
14      A.   Nobody asked me to verify it.
15  So, if someone asked me to that's not part
16  of my job, I'm not an investigator.  We
17  have a whole DMV investigation unit if they
18  wanted to investigate an incident or a
19  police report or anything else.
20      Q.   So, you didn't feel any
21  compulsion just to verify the truthfulness
22  of what somebody told you?
23      MR. THOMPSON: Objection.
24      Q.   The first party that you know
25  who it is and you felt no compulsion to

Page 64

Danielle Calvo

1
2   verify that?
3       MR. THOMPSON: You've already
4   asked this question, she's already
5   answered it.
6       Q.   That's the way business is
7   handled at the Brooklyn TVB.  What
8   everybody says that's acceptable as truth,
9   right; is that how business is handled down
10  there?
11      MR. THOMPSON: Objection,
12  compound.  Why don't you pick one
13  question and ask it.
14      Q.   Is that how business is handled
15  at the Brooklyn TVB?
16      MR. THOMPSON: Objection to the
17  form.
18      Q.   Miss, you have to answer it.
19  That's how business is handled,
20  people make complaints --
21      MR. THOMPSON: Mr. Capogrosso
22  that is not even a question.  Are we
23  done here?  What are we doing?
24      MR. CAPOGROSSO: Give me
25  another three minutes, let me make

16  (Pages 61 to 64)

December 17, 2020

## Page 65

Danielle Calvo

1
2    sure I got everything.  Give me a few
3    more minutes.
4        Q.   Did you tell Defendant Smart to
5    approach me on the morning of May 11, 2015?
6        A.   I never told him to approach
7    you for anything.
8        Q.   Did you attempt to curtail my
9    exercise of freedom of speech by having me
10   removed from the Brooklyn TVB?
11       MR. THOMPSON:  Objection to the
12   form of the question.  You can
13   answer.
14       A.   No.
15       Q.   Did you ever observe ticket
16   brokers going to Defendant Gelbstein's
17   office, ticket brokers, you know what a
18   ticket broker is, right?
19       Did you ever observe ticket
20   brokers in Defendant Gelbstein's office?
21       MR. THOMPSON:  Objection to the
22   form, you can answer.
23       A.   Rumor to be, yes.  Do I have
24   proof what they were?  No.
25       Q.   But, you saw them in his

## Page 66

Danielle Calvo

1
2    office; right?
3        A.   Yes.
4        Q.   Did you question him why they
5    were in his office?
6        A.   Question him?
7        Q.   Yes.
8        A.   He's my supervisor, I wasn't in
9    a position to question him.
10       Q.   Did you ever see defendant
11   Gelbstein in the GE room pleading motorists
12   guilty or have any knowledge to that
13   effect?
14       A.   No.
15       Q.   Did you ever see Defendant
16   Gelbstein in the GE room rescheduling
17   motorists cases, did you ever see him doing
18   that?
19       A.   No.
20       Q.   Did you have any knowledge of
21   any attorneys covering cases for Defendant
22   Gelbstein while they were working at the
23   Brooklyn TVB?
24       A.   No.
25       Q.   Arguing cases on his behalf?

## Page 67

Danielle Calvo

1
2        A.   No.
3        Q.   Do you have any knowledge that
4    Defendant Gelbstein had his own caseload
5    down there at the Brooklyn TVB?
6        A.   No.
7        Q.   Did you think it was suspicious
8    that ticket brokers were in his office on a
9    routine basis?
10       MR. THOMPSON:  Objection to the
11   form, you can answer.
12       Q.   Was it suspicious to you?
13       A.   Yes.
14       Q.   It was suspicious.
15       Were you concerned about it;
16   were you concerned about it that he was
17   doing something wrong?
18       A.   I was concerned about it, but I
19   had no proof, so...
20       Q.   But you didn't do anything
21   about it, right, you didn't file any
22   complaint with anybody; you see, I did and
23   I got removed.
24       MR. THOMPSON:  Objection to the
25   form of the question.

## Page 68

Danielle Calvo

1
2        Q.   I did complain, I saw what was
3    going on and I complained.
4        MR. THOMPSON:  Same objection.
5        Q.   And I got removed, but you
6    didn't do anything; right?
7        MR. THOMPSON:  Objection to the
8    form of the question.
9        Q.   But you saw the activities of
10   Defendant Gelbstein and what he was doing?
11       MR. THOMPSON:  Mr. Capogrosso
12   can you ask one question and if
13   you're just going to pontificate
14   instead of asking questions then
15   maybe we should be done.  If you have
16   a question to ask, ask it.
17       Q.   You saw the action of Defendant
18   Gelbstein, right, after what he was doing?
19       A.   If I can't say what he was
20   actually doing.  Did I see people go into
21   his office that I didn't think should be
22   there, yeah, but I can't say what they were
23   doing.
24       MR. CAPOGROSSO:  All right.
25   Okay.  That's it.  Okay, thank you

17 (Pages 65 to 68)

December 17, 2020

Page 69

```
1              Danielle Calvo
2      very much.  I'm done.
3          (Whereupon, at 2:37 P.M., the
4      Examination of this witness was
5      concluded.)
6
7              o      o      o      o
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 71

```
1              Danielle Calvo
2              E X H I B I T S
3
4      PLAINTIFF'S EXHIBITS (Previously marked)
5
6      EXHIBIT  EXHIBIT              PAGE
7      NUMBER   DESCRIPTION
8      4      Three-page DMV article    24
9      11     One-page letter dated
10            June 20, 2012        30
11     7      11-page Verified Petition  37
12     85     Four-page workplace
13            violence incident       45
14     67     Three-page workplace
15            violence incident     67
16
17     (Exhibits retained by Court Reporter.)
18
19
20
21
22
23
24
25
```

Page 70

```
1
2      D E C L A R A T I O N
3
4          I hereby certify that having been
5      first duly sworn to testify to the truth, I
6      gave the above testimony.
7
8          I FURTHER CERTIFY that the foregoing
9      transcript is a true and correct transcript
10     of the testimony given by me at the time
11     and place specified hereinbefore.
12
13
14
15            _____
                  DANIELLE CALVO
16
17
18     Subscribed and sworn to before me
19     this _____ day of _____ 20___.
20
21
22     _____
           NOTARY PUBLIC
23
24
25
```

Page 72

```
1              Danielle Calvo
2              I N D E X
3
4      EXAMINATION BY              PAGE
5      MR. CAPOGROSSO               3
6
7
8      INFORMATION AND/OR DOCUMENTS REQUESTED
9      INFORMATION AND/OR DOCUMENTS      PAGE
10     (None)
11
12
13
14
15
16     QUESTIONS MARKED FOR RULINGS
17     PAGE LINE QUESTION
18     (None)
19
20
21
22
23
24
25
```

18  (Pages 69 to 72)

December 17, 2020

Page 73

```
 1              Danielle Calvo
 2          C E R T I F I C A T E
 3
 4   STATE OF NEW YORK    )
                          : SS.:
 5   COUNTY OF KINGS      )
 6
 7        I, JAMIE NEWMAN, a Notary Public for
 8   and within the State of New York, do hereby
 9   certify:
10        That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 31st day of December 2020.
21
22
23        _____
               JAMIE NEWMAN
24
25
```

19  (Page 73)

**A**

ability (1)
6:16
abused (4)
23:22 31:25
41:2,2
accept (2)
49:7,12
acceptable (2)
56:16 64:8
accepted (2)
51:11 53:22
access (1)
49:19
accident (1)
9:25
accused (2)
24:16 26:11
act (6)
14:11 17:8
18:2,3 29:19
60:25
acted (2)
60:18,20
action (6)
15:2,25 16:13
17:14 68:17
73:16
actions (1)
12:21
activities (4)
13:11,18,22
68:9
acts (1)
44:21
actual (1)
48:21
address (1)
3:14
affidavit (5)
38:4,24 42:7
42:22 43:6
afternoon (2)
10:19,22
against- (1)
1:6

aggressive (4)
22:18 35:3,4,8
ahead (1)
57:5
ALAN (2)
1:8 2:9
Albany (5)
2:19 52:21
53:3 54:17
55:3
Alexis (1)
26:9
allegations (5)
24:4 25:18
26:17 35:17
46:12
alleged (8)
5:9 8:17 9:18
18:20 19:6,23
42:7 62:17
allow (1)
55:5
allowed (5)
10:11 28:18,20
29:8 54:9
altercation (3)
6:2 18:21 19:6
amassing (1)
51:6
AND/OR (2)
72:8,9
answer (60)
5:13 6:6 7:2,20
8:8 9:9 10:8
10:14 11:18
12:17,24
13:13 14:5
15:8,20 16:11
17:13,19 18:6
18:11,25 20:6
21:8 22:3
23:5,5 24:7
27:7 31:8
32:9 33:15
36:7 38:20
39:2,19 41:10

42:10 43:2,9
43:19 45:12
47:14 49:11
51:3,25 52:3
52:15 54:6,21
56:15 58:15
58:20 59:19
61:17 62:7
63:8 64:18
65:13,22
67:11
answered (24)
8:16 12:17
18:5 23:20
27:7 31:23
36:7 39:19,24
40:7,22 41:18
42:10 43:2
45:11 51:15
52:12 55:20
56:4 61:12,16
62:6,25 64:5
anti-Semite (2)
42:14,17
anybody (4)
50:6 53:17,25
67:22
appeal (1)
48:6
appearance (1)
29:14
approach (5)
10:18,21 11:10
65:5,6
approached (...
55:7
Arguing (1)
66:25
argumentati...
18:5 35:7
50:12,13
62:20
arrested (1)
59:5
article (5)
24:16,19 25:6

37:17 71:8
asked (38)
3:24 4:16 8:15
9:3,10 12:16
18:4 23:20
27:6 31:22
36:6,19 39:18
39:23 40:6,21
41:17 42:9,25
45:11 51:14
52:11 55:19
56:3,20,24,25
59:24 61:6,11
61:16,22 62:6
62:24,25
63:14,15 64:4
asking (8)
12:14 17:22
23:8 28:7
36:13 44:25
56:12 68:14
assaulted (1)
14:17
attempt (3)
19:4,14 65:8
attend (1)
28:21
attention (4)
25:8 26:8 30:2
30:10
attorney (11)
2:8 11:14
27:25 37:17
43:5 44:10,11
44:15 46:19
55:17,22
attorney/clie...
58:19
attorneys (14)
2:9,17 21:3
25:13 26:14
27:11,20 28:7
28:16 29:9,18
38:17 40:13
66:21
attorneys' (1)

10:19
authority (3)
12:21 14:10
60:24
aware (22)
10:15,17 11:21
14:19,21
15:16 16:8
25:3,18,22,25
26:3,16,22,23
27:2,8,23
28:10 44:8,9
45:19

**B**

B (1)
71:7
back (17)
18:13 28:11
42:19 48:8,11
48:12,13
54:15 57:24
57:25 58:4,4
58:9,9,13,13
59:12
badger (1)
39:24
badgering (2)
51:15 56:15
BARBARA (1)
2:19
barbara.mon...
2:20
based (6)
5:24 7:14,25
8:2 43:15
61:24
basis (3)
13:5 58:18
67:9
behalf (1)
66:25
behaved (1)
40:17
behavior (2)
35:3,5

December 17, 2020

Page 75

believe (4)
28:24 54:16
  60:18,20
bell (1)
45:15
big (1)
49:14
blanche (2)
17:8 18:2
block (1)
50:16
blocking (1)
42:20
blood (1)
73:16
breakfast (2)
27:16 41:16
bribes (2)
24:16 25:2
bring (2)
44:5,23
Brody (8)
37:21 39:11
  41:21,21 42:8
  42:11,15 43:6
Brody's (1)
38:9
broker (1)
65:18
brokers (4)
65:16,17,20
  67:8
Brooklyn (21)
3:16,24 12:4
  12:22 13:11
  17:9 18:9
  20:14,15 21:3
  26:18 33:11
  34:12 43:14
  46:9 50:24
  64:7,15 65:10
  66:23 67:5
building (3)
5:6 59:11 61:7
Bureau (2)
2:16 25:11

business (4)
64:6,9,14,19
buying (4)
27:16 32:14,14
  41:16

—— C ——

C (5)
2:2 3:5 70:2
  73:2,2
call (11)
4:24 5:2 7:15
  7:22,22,23
  10:2,4,11
  13:6 55:3
called (5)
3:5 4:24,25 6:8
  26:14
calls (2)
19:16 61:2
Calvo (75)
1:9,17 2:10
  3:13 4:1 5:1
  6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1
  14:1 15:1
  16:1 17:1
  18:1 19:1
  20:1 21:1
  22:1 23:1
  24:1 25:1
  26:1 27:1
  28:1 29:1
  30:1 31:1
  32:1 33:1
  34:1 35:1
  36:1 37:1
  38:1 39:1
  40:1 41:1
  42:1 43:1
  44:1 45:1
  46:1 47:1
  48:1 49:1
  50:1 51:1
  52:1 53:1

54:1 55:1
56:1 57:1
58:1 59:1,9
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:15 71:1
72:1 73:1
cameras (2)
18:12 19:17
capacity (11)
1:8,8,9,9,11
  2:10,10,11,11
  2:12,18
Capogrosso (...
1:3 2:4 3:4,10
  3:18 35:13,17
  37:18 43:12
  46:19 56:19
  57:19,24 58:9
  59:10 63:9
  64:21,24
  68:11,24 72:5
Capogrosso...
2:6
cards (1)
13:8
care (4)
48:16 50:9,15
  56:6
carte (2)
17:8 18:2
Case (1)
1:6
caseload (1)
67:4
cases (3)
66:17,21,25
cash (8)
25:12 26:12
  27:3,21 29:15
  32:15 39:21
  40:3
cell (1)

14:18
certain (4)
13:2 26:11
  28:16 56:8
certify (4)
70:4,8 73:9,14
chain (1)
53:2
chance (1)
39:6
checked (1)
48:4
Christmas (5)
27:21 28:9,18
  28:20 41:15
Civil (1)
1:19
clerical (11)
13:20,20 14:3
  16:18 20:14
  22:17 24:24
  40:4 46:17
  49:2,18
clerk (3)
24:16 26:10
  27:24
clerks (37)
21:2,4,9 23:10
  23:13,15,23
  24:25 25:13
  25:25 26:25
  27:2,12,16
  28:8,16,23
  29:4,15,20
  30:4,23 31:6
  31:15,20,25
  32:7 33:2
  36:10,14 37:4
  39:22 40:20
  41:7,15 44:4
  44:22
clients (5)
25:15 40:16,19
  40:25 41:4
closed (1)
59:7

closing (1)
13:15
coffee (5)
41:22,23 42:4
  42:12,20
come (2)
23:10 42:19
COMMISSI...
1:10 2:12,17
committed (1)
44:21
committee (3)
44:3,6,24
company (1)
13:3
complain (1)
68:2
complained (1)
68:3
complaining ...
35:9
complaint (13)
14:6,8,12,19
  15:17,23 16:2
  16:14 42:2
  44:23 45:18
  48:21 67:22
complaints (...
12:3,6,8,10,15
  13:25 16:21
  17:5 20:12,23
  21:13,20
  25:23 30:4
  32:25 33:9
  34:7 35:16,25
  36:5,9,12
  40:16,24 41:3
  41:6,11 64:20
complicit (1)
11:2
compound (2)
21:7 64:12
compulsion (2)
63:21,25
concerned (3)
67:15,16,18

December 17, 2020

concerning (...
8:18,22 9:18
9:24,25 10:3
10:5 16:15,22
36:15,16
38:18 39:8,10
43:24 48:22
53:6
concluded (1)
69:5
conclusion (1)
61:3
conduct (6)
30:20,22 31:5
31:10,13
44:17
consulting (1)
55:14
context (2)
56:20,21
contribute (1)
28:19
control (1)
18:8
conversation...
4:13 7:11 8:24
9:20 58:17
correct (3)
4:3 13:22 70:9
corrupt (1)
25:11
corruption (3)
24:3,4,5
Counsel (1)
3:3
COUNTY (1)
73:5
couple (2)
3:19 25:5
court (7)
1:2 36:21
47:11 48:2,9
48:11 71:17
covering (1)
66:21
cross (1)

15:15
cup (3)
41:22,23 42:5
curtail (2)
15:5 65:8
cut (2)
48:15 56:17
CV (1)
1:6

───── D ─────

D (3)
3:5 70:2 72:2
daily (1)
13:5
Danielle (76)
1:9,17 2:10
3:13 4:1 5:1
6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1,12 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1,9
60:1 61:1
62:1 63:1

64:1 65:1
66:1 67:1
68:1 69:1
70:15 71:1
72:1 73:1
date (7)
1:13 22:25
23:23 31:20
31:25 32:11
42:4
dated (1)
71:9
David (3)
1:10 2:11
58:10
day (12)
4:15 26:14
42:12,16,23
47:25 60:6,19
60:25 61:10
70:19 73:20
day-to-day (4)
13:10,17,21
29:7
December (8)
1:13 15:12
16:5,6 38:2
39:11 41:21
73:20
decide (3)
6:7 31:9 53:14
decided (2)
5:25 61:20
decision (8)
4:19,20,21 7:3
7:15,22 34:17
55:6
decisions (1)
14:15
defendant (55)
1:16 2:17 5:10
5:17,22 6:3
8:21 9:23
10:3,20,24
11:6,9,10
12:3,5,11,13

12:21 14:2,9
14:16,20
15:12,17 16:4
16:6,15,21,22
17:7,16,25
18:21 19:7,24
20:2,25 57:9
57:25 58:2,3
58:11,12
59:21,21 65:4
65:16,20
66:10,15,21
67:4 68:10,17
Defendants (2)
1:12 2:9
defense (1)
26:12
deficient (1)
25:15
demanded (1)
48:11
department (4)
37:18 44:11
54:17 62:13
depends (3)
14:6 22:4 47:6
DEPOSITIO...
1:16
description (2)
58:7 71:7
different (4)
12:8 56:14,20
56:21
direct (7)
24:10 25:15
26:8 30:2
36:13 37:6,10
directed (1)
5:2
Directing (2)
25:8 30:10
directly (3)
15:14 18:14
23:10
DISTRICT (2)
1:2,2

division (1)
62:12
DMV (12)
1:10 2:12,16
2:17 24:16
39:17 45:3
46:9,9 52:5
63:17 71:8
DOCUMEN...
72:8,9
doing (12)
27:24 34:23
51:4 56:6,10
64:23 66:17
67:17 68:10
68:18,20,23
drive (1)
18:15
duly (3)
3:6 70:5 73:11

───── E ─────

E (9)
2:2,2 3:5,5
70:2 71:2
72:2 73:2,2
Eamon (2)
44:12,16
EASTERN (1)
1:2
Eddie (1)
26:10
effect (1)
66:13
eight (1)
63:2
either (2)
34:11 58:22
EK (1)
1:6
Empire (1)
2:18
employee (1)
52:6
employees (1)
25:12

empty (1)
41:22
erase (1)
19:11
escort (1)
55:3
ESQ (2)
2:14,19
ethnic (1)
32:5
event (1)
48:22
events (1)
58:8
everybody (1)
64:8
evidence (3)
18:20 19:5,17
exact (3)
7:10,11,12
exactly (9)
7:9 8:13 22:4
23:23 30:23
32:2 34:25
56:9 59:25
examination ...
3:9 69:4 72:4
73:10,12
examined (1)
3:8
exchange (1)
26:12
excuse (4)
23:14 42:12,13
42:16
exercise (1)
65:9
exhibit (19)
24:10,11,12
30:3,5,5,6,7
30:11,11,16
37:6,7 45:24
45:25 57:13
57:14 71:6,6
exhibited (2)
30:22 31:5

exhibits (3)
3:2 71:4,17
experienced ...
22:16
explained (1)
56:9
extent (2)
12:25 13:24

___ F ___

F (1)
73:2
face (2)
16:24,24
fact (1)
5:16
facts (1)
46:12
factually (1)
9:5
fair (19)
8:5 10:5 17:17
18:3 20:16,17
20:19,24
21:24 32:16
33:12 34:2,12
37:4 49:8
52:13,16
59:17,22
false (1)
49:6
familiar (12)
24:2,4,15,20
24:21,25
30:15 41:25
45:13,14,21
46:4
far (3)
13:15 61:20
62:9
February (1)
46:9
Federal (2)
1:18 56:17
fee (2)
16:7,9

feel (3)
31:10 54:8
63:20
felt (4)
20:21 33:19
34:14 63:25
file (2)
2:20 38:4
41:12 67:21
filed (4)
14:20 15:17
45:18,20
find (1)
57:12
fine (2)
30:14 50:18
FIRM (1)
2:4
first (5)
3:6 25:9 57:18
63:24 70:5
fist (1)
59:7
fix (1)
25:2
fixing (4)
24:17,22 25:12
25:23
floor (2)
2:13 6:20
followed (2)
12:4 61:8
following (1)
59:2
follows (1)
3:8
food (1)
28:25
foregoing (1)
70:8
form (63)
5:12 6:5 7:2,19
8:7 9:8 10:8
10:14 11:18
12:24 13:13
14:5,23 15:8

15:20 16:11
17:12 18:11
18:24 19:20
20:6 21:7
22:3 23:5,20
24:7 25:21
27:6 28:13
29:17 31:2
32:19 33:14
34:10,18
35:22 38:20
41:9 42:25
43:9,19 44:14
45:11 47:14
49:10 51:3,14
51:21 52:15
54:6,21 57:21
59:19 60:15
61:16 62:6
63:8 64:17
65:12,22
67:11,25 68:8
former (1)
26:10
Fort (1)
3:15
forth (2)
28:11 73:11
found (3)
25:7,10 48:7
four (1)
41:18
Four-page (1)
71:12
fourth (1)
26:9
freedom (2)
18:2 65:9
fuck (3)
17:2 42:13,16
further (2)
70:8 73:14

___ G ___

garbage (1)
41:23

garner (1)
25:14
GE (2)
66:11,16
Gelbstein (38)
1:8 2:9 5:4,5
6:8 7:16,21
7:23 10:3,20
10:25 11:6,9
12:5 14:9,20
15:18 16:15
16:22 20:3,25
28:18 55:15
58:3,12,23
59:4,8,12,21
61:24 62:16
66:11,16,22
67:4 68:10,18
Gelbstein's (2)
65:16,20
general (4)
2:8 22:7 25:16
26:22
general's (1)
11:15
getting (1)
41:7
gifts (5)
25:14 26:2
27:2,12 40:11
give (24)
23:3,6,17,21
28:19,22 30:6
35:6 36:3,8
38:3,13 41:14
43:6 51:9,18
51:23 52:9
53:8 54:24
55:2 59:20
64:24 65:2
given (8)
17:8 28:15
29:9 31:3
35:17 60:3
70:10 73:13
giving (6)

27:11,20 28:8
32:15 39:21
40:3
**go (12)**
11:3 14:3 26:7
30:3,5 42:13
42:16 46:16
54:15 57:5
59:9 68:20
**goes (1)**
61:21
**going (13)**
3:19 8:10
10:16 26:22
28:11 48:15
55:4,5 58:16
60:2 65:16
68:3,13
**governed (3)**
13:10,17,21
**gratuities (4)**
29:20,23 40:3
40:12
**grievance (4)**
44:3,5,6,24
**grieve (2)**
44:20,22
**grieved (3)**
44:2,10,17
**GROUP (2)**
1:10 2:11
**guilty (1)**
66:12

**————— H —————**
**H (3)**
1:3 2:4 71:2
**Hamilton (1)**
3:15
**hand (4)**
15:14 59:6,7
73:20
**handled (4)**
64:7,9,14,19
**hands (2)**
36:22 61:20

**happen (2)**
8:10 10:16
**happened (23)**
6:9,11,20,24
9:18 37:25
38:5,24 42:23
43:7 47:21,25
48:22,25
53:10 59:22
60:2,6,8,16
61:9 62:9,18
**happening (1)**
27:22
**harassment (1)**
17:16
**hard (1)**
18:15
**hater (2)**
42:14,17
**heard (1)**
40:23
**held (1)**
1:19
**hereinbefore...**
70:11 73:11
**hereunto (1)**
73:19
**hired (1)**
48:6
**Hold (1)**
36:21
**holiday (1)**
29:2
**holidays (2)**
28:23 32:15
**home (1)**
48:7
**hoping (1)**
56:14

**————— I —————**
**Ida (15)**
1:8 2:10 4:7,13
4:21,24,25
7:22,24 10:4
11:9 20:8

54:25 55:12
58:18
**idea (5)**
8:9 43:22 45:2
58:25 59:24
**identify (1)**
37:2
**IG (1)**
25:16
**illegal (1)**
27:9
**illicited (2)**
38:16,23
**impossible (1)**
36:23
**improper (5)**
25:14 29:14,19
29:19,24
**improperly (1)**
40:18
**inappropriat...**
44:17
**incapable (1)**
11:3
**inches (1)**
16:24
**incident (44)**
5:9,16,25 6:18
8:18,19,22
9:4,18,22,24
10:3,5 19:23
23:7 32:11
33:20 37:21
37:22,23 38:5
38:18 39:10
41:20 42:4,8
43:15,24
45:20 46:5,12
46:14 47:20
52:18 54:2
56:25 57:2,3
57:23 58:8
62:17 63:18
71:13,15
**incidents (6)**
17:21 22:6,7

31:17 33:17
35:11
**incompetent...**
11:3
**indicate (1)**
37:20
**indicates (1)**
57:24
**individual (6)**
1:8,8,9 2:9,10
2:11
**information ...**
32:12 54:25
72:8,9
**Inspector (1)**
25:16
**instance (4)**
22:25 23:18,22
37:3
**instances (1)**
35:7
**instruct (1)**
58:16
**interested (1)**
73:17
**introduced (5)**
24:14 30:9
37:9 46:3
57:16
**investigate (1...**
17:4 21:18
46:11,22
48:20 49:24
50:19 51:8
52:9 63:18
**investigated ...**
47:4
**investigation...**
16:17 25:7,10
32:25 33:6,25
35:15 62:11
63:17
**investigator (...**
50:21 62:14
63:16
**involved (2)**

54:18,22
**involvement ...**
54:24
**issue (2)**
36:5 53:13
**issues (1)**
36:14
**items (1)**
28:25

**————— J —————**
**JAMES (1)**
2:14
**james.thomp...**
2:14
**Jamie (3)**
1:20 73:7,23
**January (2)**
46:21 47:9
**Jeffrey (1)**
27:15
**Jew (2)**
42:14,17
**job (1)**
63:16
**judge (12)**
5:4,5 6:8 7:15
7:21,23 21:3
28:18 48:5
55:14 59:4,8
**June (4)**
14:16 16:4
31:3 71:10

**————— K —————**
**Kalker (1)**
28:22
**keep (5)**
19:4,11 53:21
53:23 56:11
**kept (3)**
18:17,19 20:25
**kind (2)**
51:6 54:7
**KINGS (1)**
73:5

73:5
**knew (1)**
15:9
**knife (2)**
48:14,16
**know (52)**
6:9,18,19 7:6
9:15,16 10:12
10:23 11:19
11:20 12:7
13:8 15:9,10
19:9,21 21:21
21:22,23 22:5
22:7 23:24
27:14 28:4
30:17 35:12
35:13,14,19
36:11,12
42:15 43:20
44:18 45:2,5
46:14 47:2,8
47:11,12,15
47:17,18
48:10,12,13
52:24 55:3
62:9 63:24
65:17
**knowledge (7)**
11:8,24 12:15
24:18 66:12
66:20 67:3
**knowledgeab...**
11:13,16 12:2
12:6 14:10
**known (2)**
12:19 29:22
**Kosher (1)**
28:25

**L**

**L (4)**
3:5,5,5 70:2
**laud (1)**
53:24
**law (4)**
2:4 8:4 52:8

59:16
**lawfully (2)**
60:19,21
**lawyers (1)**
26:12
**LB (1)**
1:6
**leading (1)**
58:8
**Leahy (1)**
25:16
**leave (5)**
3:25 4:16
42:18 59:11
61:6
**legal (3)**
2:16 61:3
62:12
**let's (2)**
45:13 46:16
**letter (3)**
11:14 31:3
71:9
**Levine (3)**
45:14,15 49:15
**Liberty (1)**
2:13
**license (2)**
48:4,8
**line (2)**
58:9 72:17
**look (6)**
6:13,16 24:20
52:23 61:9,13
**looking (2)**
58:6 62:3
**lot (2)**
12:7,8
**louder (2)**
56:13,13
**lunch (1)**
27:16

**M**

**making (5)**
39:14 49:2,22

50:16 53:23
**Manhattan (1)**
26:19
**March (1)**
11:15
**Mario (3)**
1:3 2:4 3:18
**Mark (4)**
1:10 2:12,17
3:4
**marked (8)**
3:3 24:13 30:8
37:8 46:2
57:15 71:4
72:16
**marriage (1)**
73:16
**matter (1)**
73:18
**meals (8)**
26:13 27:12
29:3,15 32:15
39:21 40:3,12
**mean (1)**
20:24
**Melanie (3)**
45:14,15 49:14
**memory (1)**
37:5
**mine (1)**
40:17
**minute (1)**
30:6
**minutes (2)**
64:25 65:3
**mired (1)**
25:11
**misconduct (2)**
33:10 37:3
**moment (1)**
10:15
**money (9)**
26:2 27:12,21
28:8,11 29:15
41:15 48:12
48:13

**monitor (2)**
18:13 19:16
**MONTENA ...**
2:19
**morning (14)**
3:23 4:8,12 5:6
11:11 13:7
27:17 54:23
55:8,15 56:23
57:3,9 65:5
**Motor (3)**
37:18 44:11
62:13
**motorist (1)**
41:4
**motorists (6)**
26:11 40:16,19
40:25 66:11
66:17

**N**

**N (4)**
2:2 3:5 70:2
72:2
**name (6)**
3:11 7:7 22:21
22:23,24
45:15
**named (1)**
44:12
**names (1)**
22:21
**nature (2)**
7:10 9:4
**need (1)**
38:15
**needed (1)**
56:7
**never (21)**
9:3 23:12,13
35:24 38:23
42:6 45:7
47:10,10,19
47:25 48:24
50:15 56:9
58:22 60:12

60:13 61:8
62:21 63:4
65:6
**new (22)**
1:2,21 2:5,5,8
2:13,13,19
3:7,16 8:4
10:12 24:3,5
24:22 25:14
44:4,7 52:8
59:16 73:4,8
**Newman (3)**
1:20 73:7,23
**nine (1)**
63:2
**Northern (1)**
26:19
**Notary (4)**
1:21 3:7 70:22
73:7
**notice (2)**
1:18 5:15
**now's (1)**
39:5
**Number (2)**
63:11 71:7
**NY (2)**
1:10 2:11

**O**

**O (2)**
3:5 70:2
**Object (17)**
10:7,13 14:4
15:7 16:10
18:10 21:6
23:19 27:6
29:16 51:14
52:15 54:5,20
57:20 60:14
63:7
**objection (92)**
5:11 6:4,25
7:18 8:6,15
8:20 9:7
11:17 12:16

12:23 13:12 13:19,23 14:22 15:19 17:11,18 18:4 18:23 19:8,19 20:5 21:17 22:2 23:4 24:6 25:20 26:5 27:5,6 28:12 29:6,21 30:25 31:7,22 32:3,8,18 33:13 34:3,9 36:6,18 38:19 38:25 39:18 39:23 40:6,21 41:8,17 42:9 42:24 43:8,18 44:13 45:10 45:11 47:13 48:17 49:9 50:11 51:2,13 51:14,15,20 52:11,14 53:20 55:19 56:3 59:18 61:2,11,15,16 62:5,6,19,24 63:23 64:11 64:16 65:11 65:21 67:10 67:24 68:4,7
**observation (2)** 6:23 7:25
**observe (6)** 6:10 20:2,8,9 65:15,19
**occasions (1)** 36:13
**occurred (2)** 9:6 28:4
**occurrence (3)** 23:18 29:7 32:2
**offering (1)** 25:13
**office (23)** 2:8 5:18 11:15 13:6 14:3 16:18 17:10 18:13 20:13 40:17 45:17 49:7 50:8 51:12 53:17 54:4,11 65:17 65:20 66:2,5 67:8 68:21
**officer (1)** 57:17
**officers (2)** 3:25 59:9
**official (3)** 1:11 2:12,18
**Officials (1)** 26:13
**okay (3)** 43:5 68:25,25
**One-page (1)** 71:9
**open (1)** 59:6
**opening (1)** 13:15
**opinion (1)** 61:22
**opportunity ...** 34:6 35:18 36:4,8 38:4 43:16,21 51:10,18,23 52:10 53:9 57:7
**order (1)** 56:8
**outcome (1)** 73:17
**outside (2)** 13:3 45:4
**oversight (1)** 25:16
**owed (1)** 16:9

**P**

**P (2)** 2:2,2
**P.M (2)** 1:14 69:3
**page (8)** 26:8 46:16 52:23 54:16 71:6 72:4,9 72:17
**paragraph (9)** 25:9 26:9 37:11,14,20 39:5 57:18 58:7 59:3
**Parkway (1)** 3:15
**part (2)** 46:15 63:15
**particular (1)** 8:24
**particularly ...** 12:9
**particulars (1)** 9:22
**parties (4)** 28:15,22 29:2 73:15
**party (3)** 28:19,20 63:24
**payments (1)** 25:14
**PEC (2)** 1:9 2:11
**people (5)** 12:8 19:16 28:25 64:20 68:20
**Perez (4)** 46:20 47:9 48:2,4
**person (4)** 7:6,10 17:17 44:19
**personally (5)** 23:8 44:6 54:18,22 55:7
**petition (3)** 37:15,19 71:11
**phone (4)** 10:2,10 14:18 19:15
**phonetic (2)** 27:15 48:5
**physical (1)** 31:19
**physically (1)** 36:23
**pick (1)** 64:12
**place (4)** 2:5 50:17 56:8 70:11
**Plaintiff (3)** 1:4,17 2:4
**Plaintiff's (6)** 24:12 30:7 37:7 45:25 57:14 71:4
**Plaza (1)** 2:18
**pleading (1)** 66:11
**please (3)** 3:11 22:11 56:18
**point (10)** 9:2 21:19 45:17 51:17 51:22 52:17 59:5 61:19 63:2,6
**pointed (1)** 15:14
**police (7)** 3:25 55:2 57:8 57:12,17 59:10 63:19
**pontificate (1)** 68:13
**portion (1)** 57:23
**position (4)** 6:19 35:21 50:14 66:9
**possible (1)** 14:25
**practice (4)** 8:4 10:11 11:4 59:16
**practices (1)** 25:11
**practicing (1)** 52:8
**prefacing (1)** 48:19
**preferential (...** 29:10
**presence (4)** 3:25 10:20 20:4,10
**presents (2)** 32:14 39:21
**preserve (3)** 19:5,15,17
**preserved (1)** 18:17
**pretty (2)** 17:7 51:10
**previously (7)** 3:3 24:13 30:8 37:8 46:2 57:15 71:4
**prior (1)** 52:18
**privilege (1)** 58:19
**privy (3)** 11:13 21:12 28:6
**PRO (1)** 2:4
**problem (10)** 16:25 17:3 22:22 23:9,12 23:15 34:14 35:14,20 36:17

December 17, 2020

problems (4)
22:9,11,16
35:10
Procedure (1)
1:19
proceeding (1)
37:17
process (1)
45:3
proof (2)
65:24 67:19
public (5)
1:21 3:7 25:12
70:22 73:7
pull (1)
45:24
pursuant (1)
1:18
pushed (1)
14:17
put (1)
59:7

**Q**

question (51)
4:11 5:12 6:5
7:2,19 8:7 9:8
17:12 18:24
21:7 22:14
24:7 25:21
28:13 29:17
32:19 33:14
35:23 36:19
38:20 41:9
42:25 43:23
44:14 48:19
49:10 52:3
56:12,21,23
56:25 57:6,21
58:15,20
59:19 63:2,8
63:10 64:4,13
64:22 65:12
66:4,6,9
67:25 68:8,12
68:16 72:17

questioned (3)
45:7 60:12,13
questions (3)
3:19 68:14
72:16

**R**

R (3)
2:2 70:2 73:2
reaching (1)
14:18
read (4)
10:25 11:23
25:5 57:7
reads (1)
25:9
reason (3)
4:17 33:18
40:9
reasons (1)
32:20
recall (45)
5:14,21,23
6:15 8:12,17
8:23 9:11,21
9:23 10:24
11:5 12:18
14:24 15:21
15:22,24 16:3
16:16,20 17:6
17:20 18:18
19:10,25 20:7
31:16 33:3,8
34:5,8 37:22
37:23 39:13
41:5 43:3
45:23 47:16
48:23 50:2
53:7 57:11
58:21 59:11
59:14
receive (5)
13:25 29:15,20
40:24 41:3
received (1)
26:2

receiving (3)
27:2 29:23
40:11
record (3)
3:12 36:22
73:12
recorded (1)
60:8
referrals (1)
26:15
refused (1)
59:20
regards (1)
50:3
related (1)
73:15
remember (22)
7:8 9:19 11:25
15:4 17:24
22:6 23:7
36:2 37:24
38:21,22 39:3
39:14 41:12
42:3 43:4,25
46:7 47:22
54:14 60:17
61:18
removal (3)
52:19 54:19,23
removed (17)
3:22 4:18 8:3
9:14,14 33:10
33:24 34:16
43:14 50:24
52:7 59:15
61:14 62:2
65:10 67:23
68:5
repeat (1)
19:2
report (42)
13:4 26:7
43:11,11,12
43:13,16
45:20 46:13
47:5,20 48:25

49:3,4,6,12
49:13,20,22
50:3,4,17,20
51:11,19,24
52:2,5,18,22
53:12,13 54:2
54:10,15 57:8
57:12,23
59:15 60:3
61:23 63:19
reported (11)
7:5 16:23 26:6
27:9 29:24
31:12,14
33:17,19,21
62:8
Reporter (2)
36:21 71:17
reporting (2)
8:10 45:4
reports (9)
35:12 45:8
49:25 50:23
51:5,6 53:2,3
53:11
represented (...
46:20,24 47:9
48:2
request (1)
18:16
REQUESTE...
72:8
rescheduling...
66:16
resolve (1)
36:5
respect (15)
14:2 15:23
16:19 17:9,16
32:6 37:3
38:5 42:7,23
47:19 50:8
56:22,24 57:2
respond (10)
15:6 17:2 34:7
35:18 36:4,9

51:10,18,23
52:10
response (5)
15:3 16:2,14
17:14,23
restrain (1)
30:20
result (1)
10:10
results (1)
33:5
retained (1)
71:17
review (2)
54:4,11
reviewing (1)
15:22
rid (1)
39:6
right (39)
3:17 4:2 6:11
6:14,24 7:16
10:12 21:5,14
29:25 30:14
34:7,16 38:10
38:18,24
39:16 41:13
42:8 43:17
45:9,23 47:11
49:16,21
51:12 53:2
55:8,16 56:2
60:13,24 64:9
65:18 66:2
67:21 68:6,18
68:24
ring (1)
45:15
Rochelle (1)
2:5
room (5)
2:18 10:19
59:10 66:11
66:16
routine (1)
67:9

**rudely (1)**
40:18
**rules (2)**
1:19 56:17
**RULINGS (1)**
72:16
**Rumor (1)**
65:23

**S**

**S (2)**
2:2 71:2
**SADIQ (2)**
1:9 2:11
**saw (6)**
11:20 63:4
65:25 68:2,9
68:17
**saying (2)**
4:2 10:25
**says (4)**
26:19 39:5
42:20 64:8
**schemes (2)**
24:17,22
**SCHROEDE...**
1:10 2:12,17
**Scott (1)**
25:17
**SE (1)**
2:4
**second (2)**
46:16 58:8
**security (1)**
19:16
**see (11)**
37:13 45:14
46:15 52:18
58:5 59:25
66:10,15,17
67:22 68:20
**seen (2)**
30:17 46:6
**send (1)**
53:15
**sent (6)**

44:2 49:13,16
52:22,25 53:2
**set (2)**
73:11,20
**Sheldrake (1)**
2:5
**show (1)**
24:11
**shown (1)**
18:20
**sign (1)**
15:15
**sitting (2)**
15:13 41:24
**situation (1)**
42:19
**slash (1)**
48:16
**slur (1)**
32:6
**Smart (33)**
1:10 2:12 5:10
5:17,22 6:3
8:22 9:23
11:10 12:4,11
12:13,22 14:2
14:17 15:13
16:5,6,22
17:7,16,25
18:22 19:7,24
57:9,25 58:4
58:10,13,24
60:12 65:4
**somebody (3)**
60:11 61:25
63:22
**somebody's (1)**
6:22
**sooner (1)**
34:19
**South (1)**
26:19
**speak (3)**
20:22 23:10
32:23
**speaking (1)**

23:7
**spear (1)**
15:14
**specific (15)**
22:6,7,21,25
22:25 23:6,17
23:18,21
31:16 33:18
35:6,11 37:2
40:15
**specifically (7)**
12:9,14,18
14:7 32:10
36:11 42:3
**specifics (1)**
37:24
**specified (1)**
70:11
**speech (1)**
65:9
**spoke (2)**
15:10 36:12
**SS (1)**
73:4
**stab (1)**
48:15
**staff (4)**
13:20 20:15
22:17 34:15
**state (10)**
1:21 2:8,18 3:7
3:11 44:3,7
59:3 73:4,8
**statement (21)**
11:5 20:17,19
21:25 32:16
38:10,12,12
39:7,12 46:22
46:23 47:19
48:24 49:8
52:13,16
53:24 54:8
59:23 60:6
**statements (3)**
25:6 38:17
54:3

**states (2)**
1:2 41:22
**stay (1)**
26:18
**steering (1)**
26:11
**stole (2)**
16:6,9
**stood (1)**
15:13
**stop (4)**
34:22,25 49:21
56:5
**stopped (1)**
34:23
**story (2)**
53:10 62:3
**Street (1)**
2:13
**submitted (4)**
13:7 14:8
37:16 49:7
**Subscribed (1)**
70:18
**supervision (2)**
21:5,10
**supervisor (20)**
4:6 8:11 14:3
16:19 23:11
24:24 26:25
40:4 45:16
46:8,13,17
47:7 49:2,19
50:22 55:9
60:9 61:4
66:8
**supervisor's ...**
4:20
**supervisors (3)**
4:5 13:21 61:5
**supervisory (1)**
12:20
**supplied (1)**
28:25
**supply (1)**
53:9

**supplying (1)**
29:3
**sure (5)**
8:25 21:15
39:9 53:5
65:2
**suspended (2)**
48:5,8
**suspicious (3)**
67:7,12,14
**sworn (4)**
3:6 70:5,18
73:11

**T**

**T (4)**
70:2 71:2 73:2
73:2
**TAHIR (2)**
1:9 2:11
**take (5)**
15:2,25 16:13
42:22 60:6
**taken (1)**
1:17
**talk (2)**
8:21 9:25
**talking (3)**
9:23 22:5 45:6
**tape (1)**
18:14
**Teague (2)**
44:12,16
**telephone (1)**
4:13
**tell (37)**
7:9,12 13:14
21:10 22:10
22:11,12,15
22:17,20,23
22:24,25
30:21,23 31:4
31:15,18,20
31:24 32:4,5
32:10,20,22
33:5,7 34:25

35:4,5,10
47:24 58:2,11
59:10 60:2
65:4
**telling (5)**
30:19 58:23
59:12 62:15
62:16
**tells (1)**
10:4
**Terry (1)**
28:22
**testified (1)**
3:8
**testify (1)**
70:5
**testifying (1)**
48:18
**testimony (6)**
5:24 7:14 8:2
70:6,10 73:13
**texted (1)**
26:13
**thank (1)**
68:25
**theft (3)**
16:15,19,23
**thing (2)**
12:12 51:7
**things (6)**
13:2,16 26:22
27:9 45:4
55:23
**think (4)**
29:13 41:18
67:7 68:21
**third-party (1)**
8:3
**THOMPSO...**
2:14 4:10 5:11
6:4,25 7:18
8:6,15,20 9:7
10:7,13 11:17
12:16,23
13:12,19,23
14:4,22 15:7

15:19 16:10
17:11,18 18:4
18:10,23 19:8
19:19 20:5
21:6,17 22:2
22:13 23:4,19
24:6 25:20
26:5 27:5
28:12 29:6,16
29:21 30:25
31:7,22 32:3
32:8,18 33:13
34:3,9 35:22
36:6,18 38:19
38:25 39:18
39:23 40:6,21
41:8,17 42:9
42:24 43:8,18
44:13 45:10
47:13 48:17
49:9 50:11
51:2,13,20,25
52:11,14
53:20,23 54:5
54:20 55:19
56:3,11 57:5
57:20 58:14
59:18 60:14
61:2,11,15
62:5,19,24
63:7,23 64:3
64:11,16,21
65:11,21
67:10,24 68:4
68:7,11
**threat (2)**
15:6 31:18
**threatened (5)**
31:11 34:15
40:18,25
48:14
**threatening (5)**
30:20,22 31:5
31:10,13
**threats (1)**
17:15

**three (4)**
36:24 46:20
48:3 64:25
**Three-page (2)**
71:8,14
**threw (1)**
41:22
**ticket (8)**
24:17,21 25:22
65:15,17,18
65:19 67:8
**tickets (2)**
25:2,13
**time (23)**
1:14 8:9 9:11
12:19 13:7
14:25 21:15
23:7,23 31:21
31:24 32:2,11
36:25 47:3
50:3 51:17,22
52:17 54:14
63:6,11 70:10
**times (4)**
22:8 23:11
41:18 63:3
**tires (1)**
48:16
**today (1)**
37:4
**told (35)**
4:4,5,7 5:19
7:5,23 8:11
8:13 11:20
14:13 19:13
23:11 27:19
38:15 42:13
42:15 47:7
54:25 55:9,13
58:4,22 59:4
59:8,12 60:9
60:11 61:5,25
62:8,22 63:5
63:13,22 65:6
**tone (1)**
56:13

**top (5)**
46:15 52:23
54:16 57:23
58:7
**Traffic (2)**
25:10 26:20
**transcript (2)**
70:9,9
**Traschen (20)**
1:8 2:10 4:7,14
4:24,25 7:22
7:24 10:4
11:9 20:9
54:25 55:12
58:3,12,18,23
59:21 61:24
62:17
**Traschen's (1)**
4:21
**treatment (1)**
29:10
**trial (2)**
46:20,25
**true (10)**
33:25 47:18
49:12 53:15
53:18 54:3
55:18 62:22
70:9 73:12
**truth (14)**
3:20,21 6:24
7:4 45:8 47:5
49:8 50:7,19
51:9,11 52:9
64:8 70:5
**truthful (2)**
21:24 63:13
**truthfulness ...**
21:19 46:23
49:25 63:21
**try (1)**
15:5
**turned (1)**
25:4
**TVB (26)**
3:24 10:12

12:4,22 13:11
17:9 18:9
20:14,15 21:4
24:3,22 25:19
25:23 26:19
26:21 27:13
33:11 34:12
43:15 50:24
64:7,15 65:10
66:23 67:5
**TVBs (5)**
8:4 24:5 33:11
52:8 59:17
**twice (1)**
42:16
**type (1)**
18:14

---
**U**

**um (1)**
18:12
**understand (2)**
19:3 26:21
**unit (1)**
63:17
**UNITED (1)**
1:2

---
**V**

**V (1)**
3:5
**validity (2)**
46:22 47:5
**Vehicles (3)**
37:19 44:11
62:13
**verbal (1)**
31:18
**verbally (3)**
23:22 31:24
41:2
**verified (3)**
62:21 63:4
71:11
**verify (6)**
62:2,10 63:13
63:14,21 64:2

December 17, 2020

Page 84

**version (2)**
53:9 59:22
**versus (1)**
37:18
**VIDEOCON...**
1:20
**videotape (13)**
5:9 6:14,17
   15:23 18:9,17
   19:5,23 20:3
   20:9 61:9,13
   62:3
**videotaped (2)**
6:19 19:10
**view (2)**
5:8 19:22
**viewing (1)**
20:3
**Violation (2)**
25:10 26:20
**violations (2)**
46:21 48:3
**violence (13)**
17:15 31:19
   45:20 46:5
   50:17 52:25
   53:3,11,12
   54:9 57:23
   71:13,15
**voice (1)**
56:14
**veracity (3)**
21:19 35:16
   45:8

**W**

**waiting (1)**
63:12
**Waltrus (1)**
48:5
**want (17)**
3:20,20 22:11
   38:7,13 39:20
   40:2,8 49:5
   49:23 50:5,7
   50:10 53:15

53:18 54:2,4
**wanted (14)**
13:15 17:8
   18:3 34:13,16
   34:20,22 39:4
   39:16 43:10
   43:12 55:25
   56:5 63:18
**wants (1)**
38:11
**wasn't (7)**
4:19 27:15
   32:14 39:21
   40:3 41:16
   66:8
**way (8)**
15:6 18:2
   19:11 34:19
   40:19 56:6
   64:6 73:17
**we're (1)**
22:5
**went (3)**
45:3 48:7 59:4
**weren't (2)**
27:20 28:10
**whatsoever (1)**
36:14
**WHEREOF ...**
73:19
**witness (10)**
3:6 6:23,23
   39:25 51:16
   56:16 69:4
   73:10,13,19
**woefully (1)**
25:15
**words (2)**
7:11,13
**work (10)**
27:24,25 45:20
   47:20 50:16
   52:18,25 53:3
   53:11 54:2
**workday (1)**
26:15

**worked (2)**
13:2 44:10
**working (2)**
55:17 66:22
**workplace (6)**
46:5 53:12
   54:9 57:22
   71:12,14
**wouldn't (3)**
28:17 29:5
   34:24
**write (5)**
21:11 38:7
   50:9 53:18,25
**writing (4)**
12:13 46:18
   57:18 59:8
**written (7)**
11:22 20:13
   37:16 49:14
   49:18 51:11
   57:8
**wrong (1)**
67:17
**wrote (2)**
11:2,14

**X**

**X (4)**
1:3,12 71:2
   72:2

**Y**

**Yakov (7)**
37:21 38:9
   39:11 41:21
   42:8,11,15
**yeah (2)**
22:15 68:22
**years (1)**
24:17
**yelling (2)**
22:19 35:8
**York (19)**
1:2,21 2:5,8,13
   2:13,19 3:7
   3:16 8:4

10:12 24:3,5
24:22 44:4,7
59:16 73:4,8

**Z**

**Zift (1)**
27:15
**Zoom (2)**
1:19 36:23

**0**

**1**

**1:24 (1)**
1:14
**10 (1)**
63:11
**10005 (1)**
2:13
**10804 (1)**
2:5
**11 (17)**
3:23 4:8,12
   11:11 16:5
   18:22 30:6,8
   30:11 41:21
   52:19 54:19
   54:23 57:3,9
   65:5 71:9
**11-page (1)**
71:11
**11209 (1)**
3:16
**11228 (1)**
2:19
**11th (3)**
18:17 55:8
   56:23
**12 (1)**
16:6
**13 (4)**
37:11,14,20
   39:5
**150 (1)**
16:7
**17 (1)**
1:13

**17th (1)**
2:13
**18 (1)**
1:6
**18CV2710 (1)**
2:20

**2**

**2 (1)**
26:8
**2:37 (1)**
69:3
**20 (3)**
11:15 70:19
   71:10
**2011 (4)**
16:5 38:2
   39:11 41:21
**2012 (5)**
14:16 16:4,6
   31:4 71:10
**2014 (1)**
15:12
**2015 (16)**
3:23 4:8,12
   10:22 11:11
   11:15 18:22
   46:9,21 47:10
   52:19 54:19
   54:23 57:4,10
   65:5
**2020 (2)**
1:13 73:20
**21 (2)**
2:5 47:9
**22 (2)**
39:11 46:21
**24 (1)**
71:8
**2710 (1)**
1:6
**28 (1)**
2:13

**3**

**3 (1)**

| | |
|---|---|
| 72:5 | 10:19 |
| **30 (1)** | |
| 71:10 | **9** |
| **31st (1)** | **9952 (1)** |
| 73:20 | 3:15 |
| **35 (1)** | |
| 30:3 | |
| **37 (1)** | |
| 71:11 | |
| **4** | |
| **4 (4)** | |
| 24:10,11,13 | |
| 71:8 | |
| **45 (1)** | |
| 71:13 | |
| **5** | |
| **5 (1)** | |
| 46:9 | |
| **522A (1)** | |
| 2:18 | |
| **6** | |
| **6 (3)** | |
| 2:18 30:5,5 | |
| **67 (4)** | |
| 57:13,15 71:14 | |
| 71:15 | |
| **7** | |
| **7 (3)** | |
| 37:6,8 71:11 | |
| **78 (1)** | |
| 37:17 | |
| **8** | |
| **8 (1)** | |
| 10:22 | |
| **80 (2)** | |
| 16:7,9 | |
| **85 (3)** | |
| 45:24 46:2 | |
| 71:12 | |
| **86 (1)** | |
| 3:2 | |
| **8th (1)** | |