18-cv-2710

**EXHIBIT E**

Rec'd 7/12/2021

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 29 2021 ★

BROOKLYN OFFICE

Page 1

1    UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF NEW YORK

2    -----------------------------------------------X

3    MARIO H. CAPOGROSSO

4                     Plaintiff,

5                                   Case No:

            - against -            1:18-CV-02710

6                                   (EKLB)

7    ALAN GELBSTEIN, et al.,

8                     Defendants.

9    -----------------------------------------------X

10

11                   December 18, 2020

                     9:45 a.m.

12

13

14

15

16

17       VIRTUAL VIDEOTAPED EXAMINATION BEFORE TRIAL OF

18

19   MARIO H. CAPOGROSSO, the Plaintiff, pursuant to

20

21   Notice, taken at the above date and time, before

22

23   MARIA ACOCELLA, a Notary Public within and for the

24

25   State of New York.

Page 1

1      UNITED STATES DISTRICT COURT

       EASTERN DISTRICT OF NEW YORK

2      ------------------------------------------------X

3      MARIO H. CAPOGROSSO

4                          Plaintiff,

5                                        Case No:

          - against -                    1:18-CV-02710

6                                        (EKLB)

7      ALAN GELBSTEIN, et al.,

8                          Defendants.

9      ------------------------------------------------X

10

11                      December 18, 2020

                        9:45 a.m.

12

13

14

15

16

17          VIRTUAL VIDEOTAPED EXAMINATION BEFORE TRIAL OF

18

19     MARIO H. CAPOGROSSO, the Plaintiff, pursuant to

20

21     Notice, taken at the above date and time, before

22

23     MARIA ACOCELLA, a Notary Public within and for the

24

25     State of New York.

Page 2

```
 1   A P P E A R A N C E S:
 2
 3
 4   MARIO H. CAPOGROSSO, ESQ., Pro Se
 5       21 Sheldrake Place
 6       New Rochelle, New York 10804
 7
 8
 9
10   STATE OF NEW YORK
11   OFFICE OF THE ATTORNEY GENERAL
12   LETITIA JAMES
13       Attorneys for Defendants
14       28 Liberty Street
15       New York, New York 10005
16   BY: JAMES THOMPSON, ESQ.,
17       Assistant Attorney General
18       Litigation Bureau
19
20
21
22
23   ALSO PRESENT: Howard Brodsky, Videographer
24
25
```

Page 3

```
 1       Mario H. Capogrosso
 2   THE VIDEOGRAPHER: Good morning. Here
 3   begins the video recorded virtual
 4   remote deposition of Mario H.
 5   Capogrosso, appearing from his location
 6   in New Rochelle, New York.
 7       This deposition is taken by the
 8   Defendants in the matter of Mario H.
 9   Capogrosso, Plaintiff, against Alan
10   Gelbstein, et al. defendants, Case
11   Number 1:18-CV-02710 and KBLB in the
12   United States District Court for the
13   Eastern District of New York.
14       Today is Friday, December 18,
15   2020. The time is approximately 9:45
16   a.m. eastern standard time.
17       My name is Howard Brodsky, and I
18   am the legal video specialist in
19   association with Veritext Legal
20   Solutions with offices, located in
21   New York, New York. The court reporter
22   is Maria Acocella, in association with
23   Veritext.
24       Will counsel please state their
25   appearances for the record.
```

Page 4

```
 1       Mario H. Capogrosso
 2       MR. THOMPSON: Yes. James M.
 3   Thompson, from the Office of the
 4   Attorney General, Letitia James,
 5   Attorney General of the State of
 6   New York, 28 Liberty Street, New York,
 7   New York 10005 on behalf of the State
 8   Defendants.
 9       THE WITNESS: I am Mario
10   Capogrosso, Pro Se Plaintiff who happens
11   to also be an attorney; 21 Sheldrake
12   Place, New Rochelle, New York 10804.
13       THE VIDEOGRAPHER: Thank you,
14   Counsel.
15       I am sorry. Go ahead.
16       MR. THOMPSON: One slight
17   correction, Mr. Brodsky, on the case
18   number. The suffix is now -- the case
19   number is correct, but the suffix is now
20   EKLB. A couple of months ago we were
21   assigned a different judge.
22       THE VIDEOGRAPHER: Thank you very
23   much for that correction, Counsel.
24       The parties have stipulated and
25   agreed that the court reporter may take
```

Page 5

```
 1       Mario H. Capogrosso
 2   the witness's oath remotely.
 3       Will the court reporter please
 4   swear in the witness.
 5       THE COURT REPORTER: Can you
 6   raise your right hand for me.
 7       Do you solemnly swear the
 8   testimony you are about to give will be
 9   the whole truth and nothing but the
10   truth, so help you God?
11       THE WITNESS: Yes, I do.
12       THE COURT REPORTER: Thank you.
13       MR. THOMPSON: Thank you very
14   much, Mr. Capogrosso.
15   M A R I O   H.   C A P O G R O S S O, the
16   Plaintiff herein, having been first duly
17   sworn by a Notary Public within and for the
18   State of New York, was examined and
19   testified as follows:
20   EXAMINATION BY
21   MR. THOMPSON:
22       Q.    My name is James Thompson. I am
23   Assistant Attorney General, and I represent
24   the defendants in this lawsuit.
25       So during the deposition there is
```

2 (Pages 2 - 5)

Page 6

Mario H. Capogrosso

1  a couple of preliminaries. I am going to be
2  asking you a number of questions, and there
3  is a handful of things that are helpful to
4  remember for the benefit of the transcript
5  and the court reporter, first of which is
6  when I ask a question, please wait until the
7  end of my question before beginning your
8  answer. That way, we don't have the two of
9  us talking at the same time.
10      If I ask a question that you
11 don't understand, please ask me clarify it.
12 If you give me an answer, I will assume that
13 you understood the question.
14      Similarly, please make all your
15 answers are verbal. In regular conversation
16 you have people respond by nodding their head
17 or shaking their head and saying uh-huh or
18 uh-uh, and that can make the transcript
19 difficult, even in a case like this one,
20 where we have a videographer.
21      And if at any point in the
22 deposition you feel like you need a break,
23 just ask me, and we will take one. I may ask
24 you to finish answering the question that I

Page 7

Mario H. Capogrosso

1  posed or a short line of questioning. But if
2  you need a break, just let me know, and we
3  will definitely take it.
4      Does all of that make sense?
5  A.  Yes.
6  Q.  Great. So Mr. Capogrosso, what
7  is your full name?
8  A.  Mario H -- Mario Henry
9  Capogrosso.
10 Q.  And what is your date of birth,
11 sir?
12 A.  July 4, 1961.
13 Q.  And have you ever been deposed
14 before?
15 A.  No.
16 Q.  And do you understand that you
17 are under oath today?
18 A.  Yes.
19 Q.  And what is your understanding of
20 what that means?
21 A.  That I will tell the truth, as I
22 always have.
23 Q.  Are you suffering from any
24 illness or other condition that could affect

Page 8

Mario H. Capogrosso

1  your ability to answer questions truthfully
2  today?
3  A.  No.
4  Q.  Did you take any medication that
5  could affect your ability to answer questions
6  today?
7  A.  No.
8  Q.  Is there any other reason why you
9  might not be able to give complete and
10 truthful answers to the questions that you
11 are asked today?
12 A.  Absolutely not.
13 Q.  Great. Sir, are you represented
14 by counsel?
15 A.  I am representing myself. I am
16 an attorney. I am representing myself.
17 Q.  And have you ever been
18 represented by counsel in this case?
19 A.  No.
20 Q.  So what did you do to prepare for
21 today's deposition?
22 A.  I read -- I read my complaint. I
23 read all the pleadings that were filed in my
24 complaint. I read all the exhibits that I

Page 9

Mario H. Capogrosso

1  filed, all the response to discovery that you
2  provided; and that was it.
3  Q.  Have you discussed this
4  deposition with anyone?
5  A.  No.
6  Q.  All right. So, Mr. Capogrosso,
7  where did you grow up?
8  A.  In the Bronx, New York.
9  Q.  And where did you go to high
10 school?
11 A.  Iona Prep in New Rochelle.
12 Q.  And college?
13 A.  I went to three colleges. I have
14 a bachelor's of art from Columbia University
15 in 1983. And in 1992 I got a bachelor's of
16 science in mechanical engineering from
17 Manhattan College School of Engineering. And
18 I graduated from Quinnipiac School of Law in
19 May of 2000.
20 Q.  So tell me about that.
21      You graduated from college in
22 1983m and what did you do after you
23 graduated?
24 A.  I worked -- let me look at my

3 (Pages 6 - 9)

Page 10

Mario H. Capogrosso

1
2 resume.
3           I worked as a laborer in a
4 construction, which my father was a project
5 manager for -- i.e., executive in the
6 construction company. I worked for him for
7 several years because I enjoyed it, truly
8 liked being outside, after sitting in a
9 classroom. And I didn't know which direction
10 to take my career in. I worked as a laborer.
11          Then I worked for a construction
12 company as draftsman and as a project
13 engineer out in the field.
14          Then I went -- decided to get my
15 engineering degree, and I went to engineering
16 school and finished my engineering degree.
17    Q.    So why did you decide to get an
18 engineering degree?
19    A.    Because I was working in the
20 engineering field. I enjoyed it. I enjoyed
21 it very much. I enjoyed the guys I was
22 working with. I enjoyed the people I was
23 working with. And I enjoyed working with my
24 dad very much. And wanted to go back and get
25 my engineering degree, which I did.

Page 11

Mario H. Capogrosso

1
2    Q.    And did you like engineering
3 school?
4    A.    I liked -- well, it was fun. I
5 mean, I enjoyed the mathematical part of it,
6 yes. I enjoyed the people, and I enjoyed
7 the -- I was good at it. I was a good
8 engineer. I still am a good engineer.
9    Q.    So how long -- well, actually, I
10 am getting ahead of myself.
11          What did you do after you
12 graduated engineering school?
13    A.    I worked for an engineering
14 company, several engineering companies.
15    Q.    What did your duties there
16 entail?
17    A.    Well, I was hired by Ebasco
18 Engineering. I worked at a nuclear power
19 plant as a project engineer, Nuclear power
20 planet design engineer.
21          I did both design work and
22 project work. I was responsible for the
23 design work at several nuclear power plants,
24 and I enjoyed it. I liked it. It was fun.
25 I enjoyed it. I traveled a lot. I had to go

Page 12

Mario H. Capogrosso

1
2 to different job sites, nuclear sites.
3          So -- and the one thing that I
4 was taught at these job sites, nuclear sites,
5 is that you tell the truth. You be very
6 truthful and very direct, because if you
7 don't, there are severe consequences. So
8 that is my personality.
9    Q.    Okay.
10    A.    I worked at nuclear power plants
11 and in various parts of the country. It was
12 design work and engineering work.
13    Q.    And you said the name of that
14 company was Ebasco Company, I am sorry?
15    A.    Ebasco, E-B-A-S-C-O, Esbaso,
16 which later became Racions (phonetic)
17 Engineers and Constructors.
18          Actually, before then it was
19 Washington Group International.
20    Q.    And --
21    A.    Go ahead.
22    Q.    How long did you work for them?
23    A.    I worked at -- let me see -- I
24 worked between 1992 and 1996 at various
25 engineering companies.

Page 13

Mario H. Capogrosso

1
2          No, I worked -- no, I am sorry.
3 1992 to 1994 I worked for Ebasco Engineers,
4 then I worked from '94 to '96 with a
5 construction company that was doing retrofit
6 work on power plants. Then I worked for --
7 as a mechanical engineer to 2001, Washington
8 Group International, at various other nuclear
9 power plants.
10          And then I worked for BGA
11 Consulting Engineers, which we did also work
12 at nuclear plants, because they liked my work
13 in 2003.
14    Q.    And, Mr. Capogrosso, you look
15 from the picture as if you are looking at a
16 document there; is that correct?
17    A.    My resume.
18    Q.    Can I ask for a copy of that to
19 be produced to us?
20    A.    Yeah, sure.
21    Q.    Do you have any other documents
22 that you are looking at, as you are giving
23 testimony today?
24    A.    Well, I have all the exhibits
25 that I provided to you yesterday and I

4 (Pages 10 - 13)

Page 14

Mario H. Capogrosso

1            Mario H. Capogrosso
2  provided in this case, and I have all your
3  discovery.  That is what I have to refresh my
4  recollection.
5      Q.    Okay.  So can you list for me the
6  documents you have in front of you?  Because
7  normally when you do a deposition, there is
8  no documents in front of the witness other
9  than what is put in front of them as an
10 exhibit.
11     A.    Well, I do have certain exhibits.
12 I have all the exhibits that were provided to
13 you yesterday.  That is what I have.  That is
14 what I have in front me.
15     Q.    Okay.
16     A.    There are 86 exhibits.  I have
17 all 86 exhibits.  You don't want me to refer
18 to them to refresh my recollection, well,
19 then you have to make an objection, but that
20 is what I have in front me.
21     Q.    The problem is that since we are
22 on Zoom, I can't see what is in front of you
23 in the way I could if we were all around the
24 table together.  So can I ask you to please
25 clear the desk in front of you.

Page 15

Mario H. Capogrosso

1            Mario H. Capogrosso
2      A.    It is cleared.  It is cleared.
3      Q.    Thank you.
4            So, Mr. Capogrosso, why did you
5  decide to go to law school?
6      A.    I liked learning.  I liked, you
7  know, pursuing academic endeavors.
8            And truthfully, I was married and
9  divorced, and I was sitting in my apartment
10 all alone.  I said -- I had nothing to do at
11 night.  Let me go to law school; it will give
12 me something to do.
13            I put in an application.  I take
14 the exam.  And I didn't study very long for
15 the exam; took the book, I read through it.
16            They accepted me into law school.
17 So rather than sitting at home in the
18 apartment, I figured let me sit in a law
19 school.  So I worked as an engineer during
20 the day, and at night I went to law school,
21 for four years.  Helped me get through my
22 divorce, kept me busy.
23     Q.    And did you have a particular
24 career intention when you applied to law
25 school?

Page 16

Mario H. Capogrosso

1            Mario H. Capogrosso
2      A.    Not really.  Not really.
3            I worked as an engineer after I
4  graduated.  I graduated in 2000.  I still
5  enjoyed working as an engineer.
6            But the company I worked for
7  wanted me to travel, and I didn't want to
8  travel anymore.  They wanted me to go to the
9  west coast, California, and be an engineer in
10 one of the power -- out in Washington State,
11 actually, not California.
12            I didn't want to go to Washington
13 State.  I just didn't.  I said, let me -- I
14 passed two bars, New York and Connecticut,
15 but I was still working as an engineer.
16            I said, all right.  Let me send
17 out a resume, see if somebody gives me a job.
18 I got a job offer, and I went and took it.
19     Q.    And where -- where was that job
20 offer?
21     A.    That job offer was at the
22 Brooklyn TVB.
23     Q.    Okay.  So you applied to work at
24 the Brooklyn TVB?
25     A.    No.  I applied to an attorney,

Page 17

Mario H. Capogrosso

1            Mario H. Capogrosso
2  Terry Kalker, who is a lawyer down there who
3  was looking for a lawyer.  I sent him [sic]
4  my resume.  She [sic] responded.  I said, you
5  know, I don't know what type of work she did.
6            But I went down, started working
7  for her as one of her attorneys.
8      Q.    And how do you spell Ms. Kalker's
9  name?
10     A.    K-A -- I think K-A-L-K-E-R.
11     Q.    And so can you tell me a little
12 bit about working for Ms. Kalker?
13     A.    Well, when I worked for her, it
14 seemed fine when I first started.  When I
15 first started, it seemed fine.
16            But she made certain
17 representations to me that she didn't
18 fulfill.  Now I was getting -- now medical
19 insurance is very important to me, and making
20 a representation of following through with it
21 is very important to me.
22            She made a representation that I
23 would have medical insurance after three
24 months.  I worked for her for three months,
25 and I said, where is my medical insurance?

5 (Pages 14 - 17)

Page 18

Mario H. Capogrosso

1  Because I had it in my previous job.
2  Working for an engineer, if they
3  say something, they do it.
4  Terry Kalker didn't do that. She
5  said, well, you will get medical insurance a
6  year and three months from now, which upset
7  me greatly, very greatly.
8  So at that point I said, all
9  right, you don't want to pay me medical
10  insurance, you are not upholding what you
11  said you were going to do.
12  I left her and went into practice
13  for myself. And that is what I started doing
14  in June, June of 2005. I started work for
15  Terry Kalker in April 2005, April or March of
16  2005. I only spent three or four months with
17  her.
18  Q. And how did she respond when you
19  objected?
20  A. She continued with that
21  affirmation, you will get your insurance from
22  a year. I said, that is unacceptable. I
23  said, you can't make a representation and
24  don't follow through with it.

Page 19

Mario H. Capogrosso

1  So at that point I really -- I
2  started not to trust this woman anymore. I
3  said, that is enough. She was sent in -- I
4  normally, with my engineering firm, if they
5  sent me someplace, they always paid my
6  expenses.
7  She said she was going to pay
8  expenses, and then she decided not to pay
9  expenses. And she sending me to all
10  different courts, all over Long Island and
11  Upstate New York. I said, I can't afford
12  this. I can't afford it. Gas, tolls.
13  So at that point I said, you
14  know, you are not going to truthful with me,
15  I don't feel comfortable working with you. I
16  decided to end it.
17  My clients who I was representing
18  liked me, liked my representation, so I said,
19  I will do this on my own, which is what I
20  did.
21  Q. So what was your salary with
22  Ms. Kalker?
23  A. That beginning salary, what I
24  recall was $40,000 a year, back in 2005.

Page 20

Mario H. Capogrosso

1  Q. And that is without expenses?
2  A. Without expenses. Without
3  medical insurance. No, maybe it was 50. I
4  am not sure. I think maybe it was 50. Maybe
5  it was 50. I think she offered 40, and I got
6  her up to 50, something like that, between 40
7  and 50. It was either 40 or 50. I am not
8  exactly sure. I don't remember. She paid
9  me, you know, a weekly check. It might have
10  been 50. Might have been.
11  Q. And how did that compare to your
12  engineer -- your work at the engineering
13  firm? What were you paid there?
14  A. I was paid more, and they were
15  paying expenses. I don't recall the exact
16  last salary I had as an engineer, but it was
17  more than that.
18  Q. Do you have a ballpark figure,
19  approximately?
20  A. Maybe 57 or 80, plus they gave me
21  per diem, which means when I went to a job
22  site, which I often did, they gave me a daily
23  per diem.
24  Or if I had to stay there for

Page 21

Mario H. Capogrosso

1  several months, they gave me per diem to pay
2  for my living expenses. They treated their
3  employees very well.
4  But I made the decision to try to
5  be a lawyer, because I went to law school at
6  night. I didn't want to do any more
7  traveling. I made that decision, and I
8  wanted to stay in one place for a while.
9  And my company wanted me to
10  travel, and I didn't want to travel anymore,
11  and so I said, let me give it -- I went to
12  law school and I passed two exams, so let me
13  try it. And I did, and my clients liked me.
14  Q. And so you started your practice
15  before TVB, your solo practice before the TVB
16  at -- in summer of 2005, correct?
17  A. June, early July, late June,
18  early July 2005.
19  Q. And can you sort of describe your
20  practice to me.
21  A. I represented motorists at
22  hearings, traffic violation hearings. The
23  clients loved me. Police officers didn't
24  like me because I really grilled them, did

6 (Pages 18 - 21)

Page 22

Mario H. Capogrosso

1          Mario H. Capogrosso
2 grill them. I went after them.
3          My clients loved me; they did.
4          I submitted several reviews to
5 you, many reviews. My clients really liked
6 me as an attorney, they did. Police officers
7 didn't. I really went after a police officer
8 in the court, I did. It was my obligation.
9 I felt an obligation to my clients to
10 zealously defend.
11          I remember taking that oath when
12 I got admitted into the bar, you have an
13 obligation to zealously defend, and that is
14 what I did.
15     Q.    Was your practice primarily in
16 the South Brooklyn TVB?
17     A.    Yes, pretty much. Occasionally I
18 would get -- what happens is you get a ticket
19 that sometimes go to other courts, another
20 tribunal, so if you took it -- you take it,
21 you went. Sometimes you get one Upstate,
22 Upstate New York or Long Island. And you
23 took the case, you had to go, and I went.
24 Predominately it was in Brooklyn South.
25     Q.    If you have to put a percentage

Page 23

Mario H. Capogrosso

1          Mario H. Capogrosso
2 on that, what percent of your work would you
3 say was in the South Brooklyn TVB?
4     A.    Ninety percent. 90 percent.
5     Q.    Did you practice before any other
6 administrative tribunals other than the TVB?
7     A.    Let me think. Other
8 administrative.
9          I went to criminal court, 346
10 Broadway, which is down in New York City. I
11 went to criminal court often. Occasionally.
12          Sometimes they had a pink ticket,
13 which is not a yellow ticket, and I would
14 have to go down to criminal court. But that
15 wasn't a --
16     Q.    Can you explain that to me?
17     A.    Well, sometimes some of these
18 motorists would get, as opposed to a yellow
19 ticket, they would get a pink ticket, which
20 was covered by the penal code of New York
21 State, and it is a little more graver
22 implications.
23          Normally everything got pled out.
24 But I would go down to certain criminal
25 courts. That's where police officers gave

Page 24

Mario H. Capogrosso

1          Mario H. Capogrosso
2 violations, summons that had criminal
3 implications. They were held at a different
4 court, and I went there. But for the most
5 part, that was it.
6     Q.    Did you do any other criminal
7 work outside of the pink tickets?
8     A.    I had one where a guy was accused
9 of stealing some groceries from a grocery
10 store, and another one where a man got
11 involved in an altercation with his --
12 another man concerning parking his truck in
13 front of his business.
14          And I went down to Red Hook
15 Criminal Court in Red Hook. I went out to
16 immigration court once, and I represented a
17 client there who never showed up for his
18 hearing, and the case got thrown out. That
19 is what I recall. That is what I recall.
20     Q.    And so no other administrative
21 tribunal other than TVB?
22     A.    No. That would be it.
23     Q.    Did you ever practice before the
24 OATH, the Office of Administrative Trials and
25 Hearings for New York City?

Page 25

Mario H. Capogrosso

1          Mario H. Capogrosso
2     A.    No. I would have remembered
3 that.
4     Q.    So you said that you had
5 litigated a couple of criminal cases in
6 New York State Court and one immigration
7 case.
8          Have you litigated any other
9 cases in State court, criminal or civil?
10     A.    Well, after that point in time I
11 worked for an attorney down in Brooklyn, so
12 yes, there were other cases I have litigated.
13          I worked for an attorney in
14 Connecticut after I was removed from the
15 Brooklyn TVB system, the New York TVB system.
16 I worked for an attorney in Connecticut.
17          I worked for an attorney -- as an
18 independent -- well, and I worked for an
19 attorney in Brooklyn.
20     Q.    So let's step back to the TVB for
21 a second.
22          Did you like practicing at TVB?
23     A.    I loved it. I loved it. They
24 were short: Got there at 8:30 the day was
25 over by 4:00. I loved it. I loved my

7 (Pages 22 - 25)

Mario H. Capogrosso

1
2 clients. My clients loved me. I liked it.
3 It wasn't a whole bunch of preparation for
4 it.
5        It was the same defenses, for the
6 most part. I liked being the courtroom. I
7 liked to speak. My clients liked me.
8        I was right down by the water. I
9 loved going to the beach. Afterwards, I
10 would go to beach. I loved it. It was a
11 short day. It was nice. I loved it.
12    Q.    You said a short day.
13        What were your average hours?
14    A.    8:30. Court opened at 8:30. Got
15 there right at 8:30 or 8:15. The doors
16 opened right at 8:30, and the day ended
17 Monday, Tuesday, Wednesday, Friday by 4:00.
18 All cases are wrapped up by 3:30. On
19 Thursday it went later, until 6:00. That was
20 a late day.
21        All you had to make sure was that
22 your calendar was kept properly. Calendar
23 was very important. You had to make sure
24 your calendar was right, and you had to make
25 sure you stayed in contact with these

Mario H. Capogrosso

1
2 motorists.
3        They wanted to know what
4 happened. I would make phone calls all the
5 time, whether I won, I lost. I always told
6 them to show up. I always wanted my client
7 with me in a courtroom, always. I wanted
8 them to hear what I did and what I said. I
9 wanted them to know, if they gave me money, I
10 was defending them. I wanted them to know
11 that.
12        A lot of other motorists -- other
13 attorneys didn't like that. They didn't want
14 their motorists showing up. I wanted my
15 guys --
16    Q.    So did you ever --
17    A.    Go ahead.
18    Q.    Did you ever consider taking
19 another job while you were at the TVB?
20    A.    No. I liked it. No, I really
21 liked it. I enjoyed. I enjoyed it.
22        I know there were other aspects
23 of law, but I know it would have taken a
24 commitment. I enjoyed it.
25    Q.    And if you had to estimate, how

Mario H. Capogrosso

1
2 long were you planning on continuing to
3 practice at the TVB? Were you thinking of
4 retiring at some point?
5    A.    I am a working man. I am going
6 to die -- I am going to work until I die. I
7 am a working man. I was brought up that way.
8        I told you after I left Columbia,
9 my father put me as a laborer, and I worked
10 as a laborer. I am a working man. I am
11 going to work until I can't work anymore. I
12 don't believe in retirement. I am going to
13 work until I can't work any longer. That is
14 my opinion. That is how I --
15    Q.    All right. So after you were
16 expelled from practicing before the TVB in
17 2015, what did you do for work?
18    A.    Afterwards, very difficult to
19 find work. I am not a youngster. Very
20 difficult finding work. I sent out resumes.
21        First of all, first of all, the
22 most important thing I did is I called every
23 one of my clients. I had 850 clients. I
24 called every one of them. I said, give me
25 your address, and I have to return money.

Mario H. Capogrosso

1
2 Because everybody who paid me a fee, and I
3 didn't complete that case, their money got
4 returned. Everyone got their money back.
5 Everyone. Give me an address, and for the
6 most part, for a long time, long time, I was
7 writing checks to return money.
8        I am not going to be called a
9 thief. I am no thief. I returned money. I
10 did that for a long time. And I don't think
11 you have one complaint from a motorist I
12 didn't return a fee to, not one. I returned
13 every fee that I did not earn because I
14 didn't complete the case.
15        Then when that got completed --
16 that took some time -- motorists were calling
17 me daily, daily: Where are you? Why aren't
18 you showing up? It was a real headache.
19 They were calling me daily, all hours of the
20 night, where is my money? How come you
21 didn't return my money? I did return your
22 money.
23        Well, how come I didn't get it
24 yet? Give it a couple of days in the mail.
25        I returned every dollar. It took

Veritext Legal Solutions

212-267-6868                                   516-608-2400

Page 30

Mario H. Capogrosso

1       Mario H. Capogrosso
2 a long time to tell my clients, I am not
3 practicing this type of law right now. A lot
4 were asking, why not? Well, that was it.
5       So I did that for a while. That
6 took a long time, a good portion of time to
7 clear all the cases up.
8       And then I put out resumes, and I
9 got an offer in Connecticut. I worked from
10 Connecticut. And then I got the offer in
11 Brooklyn; I worked in Brooklyn.
12      Q.    So tell me about the position in
13 Connecticut. What organization was that
14 with?
15      A.    It was for a law firm in
16 Connecticut.
17      Q.    And what was the name of that law
18 firm?
19      A.    Law Firm of Frank Peluso,
20 P-E-L-U-S-O.
21      Q.    P-E-L-U-S-O.
22      And when did you start working
23 there?
24      A.    You don't want me referring to my
25 resume. Let me think. 2015, this happened.

Page 31

Mario H. Capogrosso

1       Mario H. Capogrosso
2 I don't know. Two thousand --
3       Q.    You can look at your resume if
4 you want; that is fine. Just please provide
5 us with a copy of it after.
6       A.    2016, I think. I think it was
7 2016, I believe.
8       Q.    Do you know what month in 2016?
9       A.    No. I was working as an
10 independent contractor. He paid me on a
11 1099. So everything was always paid on 1099.
12      So was I officially with the
13 firm. I reported to the firm every day. I
14 reported to him every day.
15      Was I under -- was I salaried
16 employed? No, I was being paid on 1099.
17      Q.    Do you remember sort of what time
18 of the year it was that you started working
19 there?
20      A.    No.
21      Q.    Spring, summer, fall?
22      A.    Had to be in -- let me think. I
23 think it was May. May 2016, I think.
24      Q.    Okay. And what did your work for
25 the Peluso firm consist of?

Page 32

Mario H. Capogrosso

1       Mario H. Capogrosso
2       A.    We had personal injury cases. I
3 had one in New York, one in Connecticut,
4 several in New York, several in Connecticut.
5 I am licensed in both states. He liked that.
6       I represented some criminal
7 defendants in criminal matters. I think we
8 had a couple of divorce cases. He was a
9 general practitioner.
10      Q.    And how much were you paid for
11 that work?
12      A.    I don't recall the exact salary.
13 I don't. I know he paid me on a weekly
14 basis. Might have been -- I don't know. Let
15 me think. 1100 to 1200. Thousand or 1100 a
16 week, something like that. 200 a day, 250 a
17 day, something like that. He paid me on a
18 weekly basis, you know, 200 to $250 a day,
19 from what I recall.
20      Q.    And so why did you stop working
21 for the Peluso firm?
22      A.    He lost his malpractice
23 insurance. It was an issue. I am not going
24 to go into the details of it, but he lost his
25 malpractice insurance.

Page 33

Mario H. Capogrosso

1       Mario H. Capogrosso
2       I said Frank, I can't work for a
3 person that doesn't have malpractice, I
4 can't. I said, do you want to pay for my
5 malpractice insurance? I didn't feel
6 comfortable with that, because then it is not
7 under my license. I am really practicing
8 under my license.
9       I said, Frank, you gotta get
10 malpractice. You lost it. I said, I don't
11 feel comfort. I have to leave you. If you
12 don't have malpractice -- he had a problem or
13 issue; I don't want to get into it.
14      But he couldn't get malpractice
15 insurance. I said, I can't take a chance,
16 Frank.
17      Q.    Can you give me a quick summary
18 of what the issue was?
19      A.    I don't recall the -- you know,
20 you have to ask -- I don't know the issue. I
21 know one day he told me he had no
22 malpractice.
23      Frank, I can't work. I am sorry.
24      I don't know what his issue was.
25 I didn't get into it. I know he had

9 (Pages 30 - 33)

Page 34

1        Mario H. Capogrosso
2 litigation going on, and the insurance
3 company decided to drop him, and he couldn't
4 get it anyplace else.
5    Q.    Did the issue have anything to do
6 with any of the cases you were working on?
7    A.    No, no. Before I got there, he
8 had an issue on a matter.
9        No, not me. Not me. No, I
10 wasn't involved in the malpractice suit.
11 Didn't mention my name at any point. Didn't
12 mention me. Mentioned him. And then he
13 showed up.
14    Q.    Um --
15    A.    -- go ahead.
16    Q.    I am sorry. I didn't mean to cut
17 you off.
18    A.    Well, before I took the job, I
19 didn't know he had this issue. I had no
20 idea. No idea. So I took the job.
21        Then I am into the job, and he
22 tells me, well, they dropped me. Well, what
23 do you want me to do, Frank? Had nothing to
24 do with what I did. I was never named in any
25 grievance or anything like that. Not.

Page 35

1        Mario H. Capogrosso
2    Q.    And if you had to estimate, how
3 many personal injury cases did you do while
4 you were there?
5    A.    Oh, I don't know. Personal
6 injury, maybe -- oh, I don't know. The cases
7 were all -- he had a lot of them. The ones I
8 actually bring to complete -- I worked on a
9 lot of them. Do I recall?
10        You know, he had a lot -- he had
11 cases. But the ones I actually brought to
12 completion while I was there, maybe three or
13 four.
14    Q.    And cases you worked on, in
15 total? Just estimate.
16    A.    At least 50. At least 50 cases
17 that I had. But I only brought to completion
18 maybe three or four, in terms of --
19    Q.    How many criminal cases would you
20 say you worked on with the Peluso firm?
21    A.    Oh, he had cases, five or six
22 that I completed. I said they were ongoing.
23 They don't get completed overnight. They
24 were ongoing.
25    Q.    Yeah. Five or six that you

Page 36

1        Mario H. Capogrosso
2 completed.
3        And what is an estimate of how
4 many that you worked on at one point or
5 another?
6    A.    He had a caseload. He had at
7 least 75 cases in the office that I touched,
8 that I had to get some type -- you know, that
9 I was working, that he was throwing at me on
10 different levels.
11    Q.    The Peluso Firm, did you do any
12 legal work other than personal injury and
13 criminal defense?
14    A.    We had a land dispute, a land
15 dispute that I helped resolve. We settled
16 that between parties, between two parties.
17 Somebody putting up a fence, that I remember.
18        What else? Divorce case that I
19 helped work on. And that was it.
20    Q.    Okay. And when did you stop
21 working for the Peluso Firm?
22    A.    When I found out that he lost the
23 malpractice.
24    Q.    And when was that?
25    A.    That would have been -- let me

Page 37

1        Mario H. Capogrosso
2 see. Probably in '17. The beginning of
3 2017. Beginning of 2017. Yeah, 2017.
4    Q.    Okay. And what did you do after
5 you stopped working with the Peluso Firm?
6    A.    Well, then I was looking for
7 work. It is not easy, finding a job at my
8 age. I am 59 years old, not easy. I started
9 looking for work.
10        So I was taking whatever I could.
11 I was doing per diem work. I was sent out
12 to -- they have this thing called Attorneys
13 on Demand, AOD. I put my resume out there.
14 So I would go -- for a while I was doing
15 that, Attorneys on Demand. If they had a
16 case, I would go out to the case and do an
17 appearance and pay me for the appearance. I
18 did that for a while.
19    Q.    And about how much were you paid
20 by AOD?
21    A.    Oh, geez, it was substance level.
22 You had to bargain with them, too. You know,
23 there was a lot of attorneys. You know,
24 everybody -- if you were an attorney that
25 regularly went there, they gave it to them

10 (Pages 34 - 37)

Page 38

1      Mario H. Capogrosso
2 first. It was nothing, 50, $75 maybe.
3    Q.   For an appearance?
4    A.   Yeah, hundred dollars an
5 appearance, maybe. Hundred dollars an
6 appearance was max.
7         But you took what you could get.
8 I gotta eat. You took what you could get.
9    Q.   And other than for AOD, did you
10 work at any other organizations at this time
11 before you joined the Brooklyn firm?
12   A.   I did some per diem work for a
13 couple of lawyers who needed some help on
14 certain things. I forgot their names. I
15 really did forget their names.
16        It wasn't a long time that I
17 worked for them. It was per diem. They --
18 work who needed some extra help. I forget
19 their names, I do.
20        And then I got the opportunity to
21 work with -- in Brooklyn in 2018, and I took
22 that position.
23   Q.   Did you -- you know, before we
24 get to the Brooklyn position, did you do any
25 cases yourself? Did you have any of your own

Page 39

1      Mario H. Capogrosso
2 clients?
3    A.   No, no. All my clients got
4 returned to me.
5         My reputation in Brooklyn got
6 ruined. My reputation in Brooklyn got ruined
7 because of this.
8         And I didn't want to go out on my
9 own yet until this got resolved. I wanted
10 this put to an end. I wanted my reputation
11 reestablished. I want to tell my clients,
12 yeah, I won this case, and I am back to
13 practicing law, and I am a good lawyer. And
14 I wanted this case resolved before I went
15 back on my own on a full-time basis, because
16 my reputation got ruined, and I wanted this
17 resolved.
18   Q.   So you said you took a job in
19 2018 with a firm in Brooklyn; is that
20 correct?
21   A.   The law firm of Yuan Jiang.
22   Q.   And can you spell Yuan Jiang?
23   A.   Yuan, Y-U-A-N, Jiang, J-I-A-N-G.
24   Q.   And how did you get connected to
25 the job with the Yuan Jiang firm?

Page 40

1      Mario H. Capogrosso
2    A.   I went on Craigslist he had
3 posted a job offering. I sent out my resume.
4         He was a nice guy, Yuan. I got
5 nothing bad to say about him. He is a really
6 nice guy. I sent out my resume. He was a
7 nice guy, Yuan, and he gave me a job. And I
8 am thankful for it, very thankful.
9    Q.   And when did you start working
10 with the Jiang firm?
11   A.   Once again, he paid me on a 1099.
12 But I was with the firm. I was. He paid me
13 on a 1099. It was his firm. I started in
14 March. I know the exact date, actually. I
15 think it was March 26, 2018.
16   Q.   And what did your duties consist
17 of at the Jiang firm?
18   A.   Well, one of his lead attorneys.
19 It was me, him, in the office. There was
20 another attorney who left right away.
21 Another attorney came in. And then there was
22 about three paralegals. And his wife was
23 there. She ran the front desk. But I was
24 one of the attorneys.
25   Q.   So what did you do for them?

Page 41

1      Mario H. Capogrosso
2    A.   Drafted complaints, personal
3 injuries cases, drafted complaints, filed
4 complaints, answered complaints. Had
5 criminal cases we did that. What else?
6 Personal injury and criminal complaint work.
7         He had immigration work, which I
8 did a little bit of, but then he brought
9 somebody in who had a lot of experience in
10 immigration. I didn't have the experience.
11 I had one experience with immigration. But
12 he brought somebody in who was pretty good
13 with immigration. And that was it.
14   Q.   And if you had to estimate, you
15 know, how many personal injury cases and how
16 many criminal cases -- let ask one at a time.
17        How many personal injury cases
18 did you work on for the Jiang firm?
19   A.   Like I said, probably touched --
20 you know, he had a lot of cases coming in.
21 He had a lot; 45, 40 to 45. You know, I
22 would say about 40 cases. And criminal work,
23 another 15.
24   Q.   And anything other than criminal
25 and personal injury?

11 (Pages 38 - 41)

Page 42

Mario H. Capogrosso

1
2    A.    We had a matrimonial case. I
3 enjoyed that one. And I thought the lady was
4 being treated very badly. It was a lady that
5 had been treated very, very badly. I wanted
6 a nice settlement for her, and I was very
7 happy with that case. We had a -- I had a
8 divorce case -- we actually had a couple of
9 divorce cases. The one I actually settled,
10 and I got a nice settlement on, I was very
11 happy with.
12    Q.    And so what was your compensation
13 while you were at the Jiang firm?
14    A.    It was 85,000 a year. 85,000.
15 But I was paid on a weekly basis.
16    Q.    Did that include benefits?
17    A.    No benefits, no.
18    Q.    No insurance?
19    A.    No. He covered my malpractice
20 insurance. He covered the malpractice, and I
21 was -- it was great. But other than that,
22 nothing, no.
23    Q.    And so how long were you at the
24 Jiang firm for?
25    A.    Until COVID 19 hit. The last day

Page 43

Mario H. Capogrosso

1
2 he closed the firm down, in March, what was
3 it 2020. March 17th, put a notice on the
4 front door said, we are closed right now. He
5 had me working from home like a week or two,
6 and said, this is not working, and put a
7 notice on the door and said we are closed.
8 It was exactly March 17, 2020.
9    Q.    So March 17th was your last day
10 working for the Jiang firm?
11    A.    Yes.
12    Q.    And it was an amicable
13 separation?
14    A.    Yeah. You know, he closed the
15 door down. Thank you. Thank you very much,
16 you know.
17    Q.    At the point when -- at the point
18 where the COVID crisis is over, do you expect
19 that you will go back to work for the Jiang
20 firm?
21    A.    I think he has moved on. I
22 haven't really spoken to him. I think he is
23 open now, and he hasn't reached out to me.
24 So I am sure he has moved on.
25        I don't want to go back into a

Page 44

Mario H. Capogrosso

1
2 situation where I am meeting clients and
3 interacting with clients. I am fearful. I
4 am 59 years old, I am and I have had two
5 relatives who have died of this disease
6 already.
7    Q.    I am very sorry.
8    A.    Thank you. I am sorry. Thank
9 you.
10        I am fearful of interacting with
11 clients on a daily basis, I am. So until I
12 get vaccinated --
13        And I think Jiang has moved on.
14 I did drive by the office, and I saw it was
15 open. So at some level, he is open.
16        But I don't know what his
17 caseload is like, and I don't know if he is
18 generating any revenue.
19    Q.    And you haven't reached out to
20 him about that?
21    A.    No. I do wish him the best. He
22 is nice guy, Yuan. He is a nice guy and nice
23 wife. And I do wish him the best, yes.
24    Q.    So what you are doing for work
25 currently?

Page 45

Mario H. Capogrosso

1
2    A.    Nothing. Nothing. Nothing.
3 Nothing.
4    Q.    You don't have any clients of
5 your own?
6    A.    No, nope. I told you, I need
7 this resolved. I need this resolved. One
8 way or the other, I need this resolved.
9 Either my name gets cleared as an attorney,
10 my name gets cleared and my reputation gets
11 reestablished as an attorney, or I move on in
12 another direction, because I am -- or I move
13 on. That is my feeling on this.
14    Q.    You said move on in another
15 direction. What would that be?
16    A.    I don't know. I don't know. I
17 will go out and do something to make a
18 living.
19        I do get made pandemic
20 assistance. I do. I am not going to lie
21 about that; I do get pandemic assistance. It
22 is going to run out very shortly; it will.
23 At that point, I don't know what I am going
24 to do. I will have to figure it out.
25    Q.    When you say pandemic assistance,

12 (Pages 42 - 45)

Mario H. Capogrosso

1  you mean unemployment?
2
3     A.    Yes.
4     Q.    And this is under the -- what is
5  it, the Cares Act that they passed?
6     A.    Yeah.  I am not sure under what
7  act it was.  But I do get PUA, pandemic
8  unemployment assistance.  But it is going to
9  be running out.  You get 39 weeks of it.
10    Q.    So you haven't done any legal or
11 other work since leaving the Jiang firm in
12 March; is that correct?
13    A.    Other than the work on my case,
14 and other than work on this case, no.
15          Wait, no.  I had one client.  He
16 is a friend, not really a client.  He was a
17 friend that I talked to about a case.
18          Other than that, no.
19    Q.    All right.  Was that -- did he
20 pay you for that legal advice?
21    A.    No.  Nope.  It was friend.  A
22 friend.  He was going -- he wanted to try to
23 establish visitation rights with his child.
24          First of all, I don't think it is
25 appropriate to represent friends or family.

Mario H. Capogrosso

1
2  You get too emotionally involved.  Especially
3  me, I get too emotionally involved.
4          He has another attorney now, and
5  I wish him the best.  I hope he gets
6  visitation, because he is a nice guy.  And
7  that is it.
8     Q.    And do you have any other sources
9  of income at this time?
10    A.    No.  I day trade a little bit,
11 making some money day trading.  That is very
12 chancy.  I have to resort to that, but I did
13 make some money day trading.
14    Q.    About how much money did you make
15 day trading?
16    A.    Oh, I don't know.  How much money
17 do you lose day trading, is more like it.
18 There is no guaranteed money day trading.
19    Q.    Are you good at it?  Do you win
20 more than you lose?
21    A.    There is no way to generate an
22 income.  I am okay, but I don't generate any
23 significant -- first of all, you need money
24 to day trade.
25          I am okay.  I am okay.  I am not

Mario H. Capogrosso

1
2  great, but I to have resort to that right
3  now, but --
4     Q.    Would you say you make a couple
5  of thousand a year, more or less?
6     A.    I don't know.  I don't know.  I
7  really don't know.
8          It is not a thing I do often.  It
9  is not something I can rely on, let me say
10 that.  It is not something I can rely on.
11          I prefer being an engineer or
12 being a lawyer.  You know, I enjoyed what I
13 was doing down in Brooklyn.  I enjoyed being
14 an engineer.
15          I want this resolved.  And once
16 this is resolved, I will make the decision
17 what direction to go in.
18    Q.    And you had mentioned that if you
19 don't prevail in the case, you would be
20 looking to do something else.  Do you mean
21 something nonlegal, or do you have an idea in
22 mind?
23    A.    I don't know.  I don't like the
24 way the legal professional acts.  I don't --
25 I worked for an engineer a long time in my

Mario H. Capogrosso

1
2  life, nuclear -- at a nuclear -- if I lied
3  once, I was off the job.  Once.  Good-bye.
4          If I said inappropriate -- if I
5  didn't know anything, I kept my mouth shut.
6  But I would never say -- I would never lie.
7  I mean, it is not accepted.
8          I have dealt with more lawyers
9  and judges who have lied, who have not
10 investigated facts.  Terry Kalker, who I
11 started out with, who told me, you will have
12 medical insurance in three months, which was
13 a lie, which is why I left her.
14          Yuan didn't do it.  Yuan was a
15 straight guy.
16          Frank Peluso, who lost his
17 malpractice insurance.
18          I dealt with more lawyers who
19 have lied that I can -- it just disturbed the
20 heck out of me.  It does.  It does disturb
21 it.  I am a very truthful guy.
22          In engineering, you cannot be
23 non-truthful.  So I do want to stay in this
24 professional -- I don't know.  I don't know
25 at this point.

Mario H. Capogrosso

1
2      I want to clear my name; that is
3  what I do know.
4      Q.    So that is what this case is
5  about for you, clearing your name?
6      A.    Clearing my name and getting the
7  money that I lost that I could have made.
8          I am a working man.  Like I told
9  you, I am a working man.
10          I had to return a lot of fees, a
11  lot of fees, and I was put out of work
12  wrongly.  Wrongly I was put out of work.
13      Q.    So can you summarize for me what
14  this case is about?
15      A.    Vindication of my name, my
16  reputation as an attorney.  To getting the
17  money that I lost because I couldn't work as
18  an attorney.  The money I had to return.
19          And for a Brooklyn jury to make a
20  decision, whether there are judges and
21  lawyers who have lied on my behalf to get rid
22  of me, because Judge Gelbstein needed a piece
23  of the action.  Because he has lunch with
24  ticket brokers on a weekly basis.  He has
25  other attorneys covering for him on cases

Mario H. Capogrosso

1
2  down there, and he wanted me out.
3          And judges like that shouldn't be
4  practicing, and he shouldn't be covered for
5  by his superiors.  And complaints should not
6  be made against a hard working attorney like
7  myself, which is what I was.
8          There was not one grievance from
9  a motorist or a client against -- what he did
10  for them, not one grievance.
11          And my reputation has to be
12  besmirched, and they wanted me out of there
13  because I told the truth and reported what I
14  saw and heard, and they wanted me out of
15  there.
16          And they set me up.  Not only the
17  incident with Yaakov Brody, which I think I
18  was set up on, but with these two who --
19  David Smart.
20          And then repeated it -- repeated
21  pleas for help, not only with your office,
22  where my complaint was lost and was never
23  responded to in my letter of March 20, 2015;
24  it was lost.
25          And I believe I was set up, and I

Mario H. Capogrosso

1
2  believe a Brooklyn jury has to hear it.  And
3  people should be punished for their actions.
4  And how I was treated, they should be
5  punished.  That is what this case is about.
6      Q.    So I mean, so some of this is
7  items that I intend to get to a little later
8  in the deposition.
9          You mentioned a couple of
10  incidents just now regarding Judge Gelbstein
11  and some allegations that you feel are valid.
12  You said something about a piece of the
13  action.  Can you explain that to me?
14      A.    First meeting with Judge
15  Gelbstein, first meeting when I arrived, we
16  had a meeting.  He arrived pretty much a
17  couple weeks or months after I arrived.  He
18  has a meeting with all the lawyers.
19          And one of the first things I
20  remember -- I have a very good memory.  I
21  have a very good memory -- how do I get a
22  piece of the action?  How do I get a piece of
23  action?  This is judge asking for a piece of
24  the action.
25      Q.    So can you explain to me sort of

Mario H. Capogrosso

1
2  the context in which that came up, like what
3  was said before that?
4      A.    I don't know if he is saying it
5  in what respect.  But if you say to another
6  attorney, how do I get a piece of the action,
7  and you are a judge, and you think you are
8  saying this facetiously or being funny, I
9  don't accept it that way.
10          I don't -- I am a young attorney
11  down there.  I am just kind of observing.  It
12  hit me the wrong way, for a judge to say, how
13  do I get a piece of the action?
14          He had an attorney's meeting with
15  all the attorneys down there, all the regular
16  attorneys he calls it.  He wanted a meeting
17  with everybody when I first arrived.
18      Q.    And when was this, what year?
19      A.    Well, I started working down in
20  June of -- like I said, June of 2005.  So it
21  was right at that point, after that point, a
22  couple of months afterwards, he arrived;
23  July, August.
24      Q.    July, August 2005?
25      A.    Yes.  He had the first meeting

14 (Pages 50 - 53)

| Page 54 | Page 56 |
|---|---|

Mario H. Capogrosso

1        Mario H. Capogrosso
2 with all the regular attorneys down there,
3 and I was one of them at that point.
4    Q.   And can you tell me what happened
5 in the meeting?
6    A.   He was introducing himself as
7 Judge Gelbstein, and he makes this remark.
8        And I didn't know how this game
9 was played down there. And eventually I
10 found out what is going on.
11       And looking around, I said, this
12 judge might be getting a piece of the action.
13       Was I upset about it?
14 Absolutely.
15    Q.   So going back to the meeting, he
16 just said out of nowhere -- was anything said
17 before he said that? Did someone ask him a
18 question? Or was he talking about something
19 else?
20    A.   No, no. No, just makes the
21 remark, how do I get a piece of the action?
22    Q.   Just out of nowhere, how do I get
23 a piece of the action?
24    A.   Yeah.
25       Then I see a meeting with ticket

1        Mario H. Capogrosso
2 a lawyer.
3       You say that, and you expect me
4 to not accept it as truth? I don't know how
5 he meant or said it. I know he said it. I
6 am testifying to what I heard. I am not
7 getting paid --
8    Q.   Did he say --
9    A.   I am not getting paid to do the
10 Attorney General -- I shouldn't be looking
11 into this. This is not my responsibility to
12 be looking into, if a judge says how do I get
13 a piece of the action. I don't think it is
14 my responsibility. I reported what I heard.
15    Q.   Was there any other context
16 about, you know, that indicated what he might
17 have meant, that you recall?
18    A.   No. He said, I hope you guys all
19 make a lot of money. I know that, something
20 to that effect, that -- you know, I hope all
21 you attorneys make money.
22       He was introducing himself to the
23 attorneys. And he ended it with how do I get
24 a piece of the action?
25    Q.   All right. So the second item

| Page 55 | Page 57 |
|---|---|

1        Mario H. Capogrosso
2 brokers on a weekly basis.
3       Ticket brokers is a guy who comes
4 down there; that is what happens. They give
5 summons to lawyers, and these ticket brokers
6 are in his office every week.
7       And I asked -- walked in one day
8 said, what is going on?
9    Q.   Let's take a step back to the
10 initial meeting that we are talking about
11 here, if you would.
12       You had said you didn't think it
13 was funny, or that he was being facetious.
14       Was he joking when he said this?
15    A.   I don't know. I don't know.
16    Q.   Do you think he thought he was
17 joking?
18    A.   I don't know.
19       Listen, I came from a background,
20 if a man said something, you held him to his
21 word. That is the background I came from. I
22 came from an engineering background.
23       If a judge says something -- we
24 are all adults here, and he is a judge. He
25 is not a guy; you know, he is a judge. He is

1        Mario H. Capogrosso
2 that you raised was something to do with
3 ticket brokers. Can you explain that to me?
4    A.   Ticket brokers are guys that
5 gather tickets from the community: Cab
6 drivers, motorists. And they would bring the
7 ticket down to lawyers. The lawyers would
8 take the ticket and argue the case on behalf
9 of the ticket broker and the client without
10 ever meeting the client himself.
11       And they would get a piece of the
12 action, the ticket brokers.
13    Q.   So the ticket broker would get a
14 cut of the legal fee?
15    A.   The ticket broker would collect
16 the legal fee, which I thought was terrible,
17 and they would pay the lawyer. The ticket
18 broker would take 200 for a ticket, call
19 himself a lawyer. I don't what he was
20 calling himself. Then they would come down
21 to the courthouse, and every -- all the
22 attorneys had them. And the ticket broker
23 would give the lawyer money, and then the
24 lawyer would argue the case, take the case
25 on.

15 (Pages 54 - 57)

Page 58

```
1              Mario H. Capogrosso
2     Q.   You said he -- at one point in
3  that description, is there one specific
4  ticket broker you are thinking about?
5     A.   There were a lot of ticket
6  brokers, a lot of ticket brokers: Chinese
7  ticket brokers, Jewish ticket brokers.
8         I felt terrible about it.  To me,
9  I called the bar association about it.  I
10 said, is this wrong, for ticket brokers to
11 come down and pay lawyers to do tickets for
12 people who are not themselves?
13        The bar association couldn't give
14 me a straight answer.  So, you know, for the
15 longest time -- first of all, they were
16 taking money out of the attorney's pocket,
17 which I didn't like.
18        And I did call the bar
19 association, and they didn't give me a
20 straight answer, or they didn't understand
21 it.  So that was it.
22    Q.   And you indicated that you found
23 something objectionable about the way Judge
24 Gelbstein handled ticket brokers.  Can you
25 explain that?
```

Page 59

```
1              Mario H. Capogrosso
2     A.   They were in his office.  They
3  were in his office on a weekly basis.
4         And I walked into -- I knocked on
5  his door one day, and I said, do you know who
6  you are having lunch with here?  He says, he
7  is a friend of my wife.  I have dinner with
8  him, but I don't know what he does for
9  living.
10    Q.   Who is this, that we are talking
11 about?
12    A.   This is one of the Jewish ticket
13 brokers.
14    Q.   Do you know his name, sir?
15    A.   No.  I didn't want to know his
16 name.
17        I didn't want to deal with these
18 guys; I really didn't.  I really didn't want
19 to deal with them.  I thought what they did
20 was wrong.  They were taking money out of the
21 attorney's pocket, number one.  Number two, I
22 don't know what kind of representations they
23 were making.  They were making
24 representations in order to get these monies
25 from these clients and these motorists.  They
```

Page 60

```
1              Mario H. Capogrosso
2  were saying something to them, and I don't
3  know what they were saying.
4         But to me, there was an
5  appearance of impropriety.  I didn't want to
6  get involved with it.  I felt it was
7  abhorrent that ticket brokers would be in his
8  office, abhorrent.
9     Q.   Is it correct to say there is one
10 particular ticket broker who was in his
11 office, the one who he said was a friend of
12 his wife's?
13    A.   I think there was a father and a
14 son.  They were related on some basis.  They
15 were related.  I don't know any names.
16    Q.   Do you know anything else that
17 would identify them, of description or other,
18 you know, information?
19    A.   No, no.  They had the Jewish --
20 one man has the traditional Jewish, I don't
21 know, garb that Jewish people wear.  Another
22 person didn't.
23        But I know what they did.  They
24 weren't lawyers.  I knew the lawyers down
25 there.  They were not lawyers.  And I knew
```

Page 61

```
1              Mario H. Capogrosso
2  what they did.
3     Q.   And so Judge Gelbstein was having
4  lunch with them?
5     A.   They were in his office on a
6  weekly basis.  In his office on a weekly
7  basis.
8         Now, I do --
9     Q.   Um -- I am sorry, continue.
10    A.   Well, there was another lady,
11 Tanya Rabinovich who I mentioned, who was
12 down there, actually in the courtroom,
13 calling herself a lawyer.
14        But clients, motorists, would
15 approach me and say, where is Tanya, the
16 lawyer?  I said, she is not a lawyer.  She is
17 not a lawyer.  Where is Tanya the lawyer?
18 Where is Tanya the lawyer?  She is not a
19 lawyer.
20        She had an office right near the
21 DMV at one point, right near the DMV
22 upstairs.  Where is Tanya, the lawyer?  I
23 said, she is not a lawyer.
24        I called the district attorney
25 one day.  I said, you have a woman down here
```

16 (Pages 58 - 61)

Mario H. Capogrosso

1
2 calling herself a lawyer.  Does anybody care?
3 She is making representations that she has a
4 legal degree, and she is not a lawyer.
5        You know, I went to law school at
6 night for four years while I worked during
7 the day, a full day as an engineer at a
8 nuclear power plant.  I worked at night.  I
9 went a hundred grand in debt to go to this
10 law school.
11       And I paid off every dollar.
12 Every dollar got paid off.  I didn't renege
13 on any loans that I took.  Every dollar got
14 paid off.  I passed two bar exams.
15       And she gets to call herself a
16 lawyer in his courtroom, so I called the
17 district attorney concerning her.  There is
18 an investigation made.
19       Next thing I know, she is not
20 there any more.  And Gelbstein -- Judge
21 Gelbstein approaches me and says, who are
22 you, Don Quixote?  I said, now I know this
23 guy is on the take.  Now I know it.  He wants
24 everybody to be quiet.  He wants everything
25 to go on as is.

Mario H. Capogrosso

1
2        It is in my opinion, and I am
3 entitled to my opinion.  Now I know this guy
4 is on the take.
5    Q.    And so let's take a step back.
6        This conversation where he said,
7 who are you, Don Quixote, when did that
8 happen?
9    A.    That is after I called the
10 district attorney on this woman, then I don't
11 see her anymore.
12   Q.    Do you know when that was?
13   A.    You know, when I first got there,
14 I didn't understand the game, who all the
15 players were.  But after I started practicing
16 down there, it is when the clerks started not
17 to like me.
18       They liked Tanya.  And I have an
19 understanding why they might have like her.
20 She was probably paying them off.  She was
21 going to the counter and doing business with
22 them on a daily basis.  She was going up to
23 the counter, and she would put in and ask for
24 tickets.  She was given -- the clerks were
25 giving her tickets, summons for the clients

Mario H. Capogrosso

1
2 she had.
3        I said, how does this woman, who
4 is not a lawyer, and clerks are giving her
5 the summons that she is asking for, and she
6 is not a lawyer?  How is she doing this?
7        And she would be rescheduling
8 these cases for these people.  So obviously
9 she was giving these clerks something, for
10 them to do this.
11       I said, this is wrong.  I said,
12 this is wrong.  And the clerks were doing her
13 business.
14       I called the district attorney,
15 yeah, I did.  I made that statement.
16       Next thing I know, the clerks
17 don't like me.  The clerks don't like me at
18 this point.
19   Q.    When was this?  Do you remember
20 what year?
21   A.    If I can refer to my document, I
22 can probably look at.  It is in one of my
23 exhibits.
24       One of the clerks said I pushed
25 her.  She actually came up to me -- it is in

Mario H. Capogrosso

1
2 one of the documents, one of the exhibits I
3 gave you.  You can look it up.  In my
4 affirmation in response, one of them said I
5 assaulted them.
6        There is no assault.  I called
7 the district attorney.  She comes over,
8 yelling and screaming, did you call the
9 district attorney?  I could have denied it.
10 I could have denied that I didn't call.
11       I didn't deny it.  I told her the
12 truth: Yeah, I called.  You are calling
13 yourself a lawyer.  You are doing business
14 down here as a lawyer.
15       She starts yelling and screaming
16 at me.  I tried to get away from her, and I
17 walk away from her.  We might have brushed
18 shoulders.  I don't know.  I didn't do
19 anything to her, but she is right on top of
20 me.
21       Now these clerks didn't like me
22 for that.  I have a feeling for that, I
23 really do, that I called the district
24 attorney.
25       Judge Gelbstein didn't like it.

17 (Pages 62 - 65)

Mario H. Capogrosso
1
2  Clerks probably didn't like it.  Go ahead.
3     Q.   So, Mr. Capogrosso, you said you
4  called the district attorney, and then there
5  was an investigation, and then she wasn't
6  there any more; is that correct?
7     A.   I don't know if there was an
8  investigation.  Nobody ever reported anything
9  to me.
10        To me, I did my job.  I saw --
11    Q.   So you called the district
12  attorney, and she was not there anymore?
13    A.   Yes.
14    Q.   Do you know -- do you know if she
15  was kicked out?
16    A.   All I know is Gelbstein
17  approaches me and says, who are you, Don
18  Quixote?
19        I have no idea.  Nobody gave me a
20  report as to what happened.  I told the
21  district attorney what I saw; I told them.
22  And after that, I don't see her anymore.
23        And that is -- if you look at the
24  exhibits, the date of that alleged incident
25  between me and her is the date I made the

Mario H. Capogrosso
1
2  call, I believe, right around that date.
3     Q.   And sitting here today, do you
4  remember what year that was?
5     A.   Well, I am not going to look at
6  my exhibits; so no, I don't recall.
7     Q.   Was it before that first lawsuit
8  that you had in 2012?
9     A.   Like I said, I don't remember.
10        And I am not going to look at the
11  exhibit.  You told me not to.
12    Q.   All right.  Was it before 2015?
13    A.   Absolutely, yes.
14    Q.   Okay.  And similarly, the time
15  when Judge Gelbstein was having the two
16  Jewish ticket brokers, the father and son, in
17  his office, do you remember when that was,
18  what year?
19    A.   Oh, I sure do.  That is the first
20  day I got there.
21        And I understood who the players
22  were, who were the brokers, who these ticket
23  brokers were and what they did.  I saw them
24  right from day one.
25    Q.   And was there a time that it

Mario H. Capogrosso
1
2  stopped, him seeing those two Jewish ticket
3  brokers?
4     A.   No.  Up until the date May
5  11th -- up until May 11th, I still saw them
6  down there.  Up to May 11th, they were still
7  there.
8     Q.   Okay.
9     A.   Let me tell you the worst thing,
10  because I gotta get this one out.  The worst
11  thing that really got me about this is when I
12  saw Gelbstein in the GE on a side bar, on a
13  side bar with Judge Bohmstein, ALJ Bohmstein,
14  pleading motorists guilty and rescheduling
15  cases.  Then I just threw my hands up.  I
16  said, this is terrible.
17    Q.   What is it that you saw?  Can you
18  describe it to me in a little more detail?
19    A.   Judge Gelbstein, I had some
20  tickets GE, general -- waiting to be heard.
21  I am sitting there.  He walks in with about
22  10 or 15, 20 tickets in the thing, before ALJ
23  Bohmstein sitting there.
24        I am entering a guilty plea on
25  this ticket, this ticket, this ticket, five

Mario H. Capogrosso
1
2  or six or seven.  What the heck is going on
3  down here?  This is a judge who has access to
4  every, every ticket in the system in his
5  office.  On a computer system, he has access.
6  He has access to all of them.
7         If he needs to reschedule a case
8  because something -- he can do it in office.
9  He is doing GE before another judge, not on
10  the record.  There was no appearance made.
11        I said -- I throw my hands up.  I
12  can't work in this type -- I can't work here.
13  This is terrible.
14    Q.   I am sorry, I may not understand
15  this.  But if Judge Gelbstein is talking with
16  this other judge, you said Judge Bohmstein?
17    A.   Yeah, on a side bar.
18    Q.   How do you spell Bohmstein?
19    A.   B-O-H-M-S-T-E-I-N,
20  B-O-H-M-S-T-E-I-N.
21        THE COURT REPORTER:  Counselor?
22    Q.   So?
23        THE COURT REPORTER:  Counselor?
24  Counselor?
25        THE WITNESS:  Yes.

18 (Pages 66 - 69)

Page 70

Mario H. Capogrosso

1        Mario H. Capogrosso
2        THE COURT REPORTER: I need to go
3  off the record.
4        MR. THOMPSON: Yes.
5        THE COURT REPORTER: You need to
6  go off the record for two minutes.
7        THE VIDEOGRAPHER: The time is
8  10:48 a.m. we are off the record.
9        (Discussion off the record).
10       THE VIDEOGRAPHER: The time is
11  10:50. We are on the record.
12       Q.    So, Mr. Capogrosso, we were
13  discussing an instance when you saw Judge
14  Gelbstein in the GE room rescheduling cases.
15  And I may not understand it.
16       But what is wrong with him
17  rescheduling cases, as a judge?
18       A.    If you are carrying a caseload --
19  this is what I am thinking. If you are
20  carrying a caseload, let me tell you how the
21  game is played. Attorneys take tickets in,
22  and they would push the tickets out,
23  reschedule three, four, five, six times,
24  stretch the money, they would call. They
25  would stretch the money. You get $200 a

Page 71

Mario H. Capogrosso

1        Mario H. Capogrosso
2  ticket, you stretch it out for two years, and
3  plead the guy guilty, and you give the guy no
4  points. You give the motorist no points.
5        It is called stretching the
6  money, which is what the attorneys were
7  doing. A lot of attorneys would go to the
8  courtroom and enter a guilty plea, which is
9  one way of handling a ticket.
10       If you stretch it out 18 months,
11  the points don't show up on your license. If
12  you reschedule a whole bunch of cases, and
13  you push them out 18 months, and then you
14  enter a guilty plea for the guy, and he
15  doesn't get suspended, and they waive the
16  STV, and they give them a minimum fine, you
17  know, the motorist goes home happy.
18       My license is still good. I am
19  happy I got a minimum fine. I am not
20  suspended. That is one way you can play the
21  game.
22       Did I play it like that? No.
23  They hired me to fight a ticket, I fought a
24  ticket; so my clients liked me.
25       Q.    So, Mr. Capogrosso, I guess I

Page 72

Mario H. Capogrosso

1        Mario H. Capogrosso
2  still don't understand what you contend is
3  wrong about what Judge Gelbstein did.
4  Because if he is a judge, and he is talking
5  to another judge to set up the docket, and
6  when cases will be heard, is there anything
7  wrong with that?
8        A.    I am told -- I don't know. I
9  don't know. I am -- I reported what I saw
10  and what I heard. I don't know. I reported
11  what -- if you reschedule things on a sidebar
12  without putting in an appearance, and you are
13  entering guilty pleas without putting in an
14  authorization, to me, there is something
15  wrong.
16       I don't know. Maybe he had a
17  legitimate purpose. I reported what I saw
18  and what I heard.
19       I know I had a conflict with
20  another attorney over a ticket that we were
21  put in a room. We bought, put the same one
22  in I want to speak with him about.
23       He says, I am covering the case
24  for Gelbstein.
25       Q.    So let's put a pin on that one

Page 73

Mario H. Capogrosso

1        Mario H. Capogrosso
2  and come to that in just a second.
3        This instance when you saw Judge
4  Gelbstein rescheduling tickets with judge
5  Bohmstein --
6        A.    And entering guilty pleas.
7        Q.    -- and entering guilty pleas.
8        First of all, you said you
9  reported that.
10       Who did you report that to?
11       A.    Who did I report it to? No, at
12  that point I said, I can't work here anymore.
13  At that point after I was removed, after I
14  was removed, there is nobody to report it to.
15  Nobody is listening.
16       I write to your office. Your
17  office doesn't respond to me in my letter of
18  complaint. I wrote a letter to Pricket
19  Morgan, March 20th. I got no response.
20       I have written to the grievance
21  committee. I explained this in the grievance
22  committee. They don't care. They said they
23  have no authority over this.
24       I have wrote to the Inspector
25  General's office. They told me it is an

19 (Pages 70 - 73)

Page 74

1          Mario H. Capogrosso
2  internal review. I wrote to the Commission
3  of Judicial Conduct. They have no control
4  over what goes on at the TVB, because it is
5  not a recognized tribunal.
6          I forgot who else I wrote to, but
7  I wrote and I explained everything that I
8  saw. And they all told me they have no
9  jurisdiction over this tribunal and what goes
10 on.
11     Q.    And so my next question is, this
12 time when you saw Judge Gelbstein speaking
13 with Judge Bohmstein and doing this with the
14 cases, when was that, approximately?
15     A.    That was right before this
16 happened that I got removed. It was maybe a
17 month or less before I got removed, May 11,
18 2015.
19     Q.    So April or May of 2015?
20     A.    Yeah. The first time I ever --
21     Q.    Do you have any reason to believe
22 that the adjournments and guilty pleas that
23 you saw were not valid, were not correct?
24     A.    As an attorney, if you to tell me
25 how do I get a piece of the action, if you

Page 75

1          Mario H. Capogrosso
2  have ticket brokers in your office, and you
3  tell me you don't know what they do for a
4  living, but they are friends of your wife,
5  and you don't know what they do for a living;
6  when you have a discrepancy with another
7  lawyer, and he tells me I am covering the
8  case for Gelbstein, and then you see this
9  happening in the GE, and then I make
10 complaints and complaints and complaints
11 against concerning the action of Defendant
12 Smart, right, and he laughs and giggles and
13 tells me a spade is a spade, and he doesn't
14 respond to any of the complaints, right.
15         The harassment continues. The
16 man wants me out. The man wants me out. He
17 doesn't me to see what he is doing. He wants
18 me out, and he got me there.
19     Q.    I appreciate that,
20 Mr. Capogrosso, but the question was a little
21 bit more narrow than that.
22         These specific adjournments and
23 these specific guilty pleas in this
24 conversation between Judge Gelbstein and
25 Judge Bohmstein, do you know whether or not

Page 76

1          Mario H. Capogrosso
2  those adjournments and guilty pleas were
3  correct?
4      A.    No, I said I have no idea. I
5  reported what I saw and heard. That is it.
6          I have no idea what he was doing.
7  I don't know. I never questioned him about
8  it. At that point, I just threw my hands up.
9  I don't know what he was doing. I reported
10 truthfully what I heard and what I saw. That
11 is not my job to make this investigation. It
12 is not my job.
13     Q.    So lastly you mentioned one other
14 incident, when you say someone said that he
15 was covering a case for Judge Gelbstein.
16         Can you explain to me what you
17 are discussing there?
18     A.    We both put a ticket in.
19 Sometimes clients they hired two lawyers
20 because they lose track of something. They
21 got two lawyers on the same summons. We both
22 put the ticket into GE, into the courtroom.
23         I go in the courtroom, the clerk
24 or the court -- and it has happened several
25 times. There is a lot of clients, a lot of

Page 77

1          Mario H. Capogrosso
2  motorists. Sometimes they hire the same
3  lawyer. There are lawyers on both -- there
4  is two lawyers on the same ticket, for
5  whatever reason.
6          So I will go up to this other
7  attorney. I said, what is going on? And he
8  tells me, I am covering the case for
9  Gelbstein. I said, do what you gotta do.
10         And I pulled off my ticket, and I
11 said, you want to cover it, go ahead.
12         And then I am thinking back to
13 myself, what is going on here? You are
14 covering the case for Gelbstein. Who am I
15 going to report it to? I am going to report
16 it to Judge Gelbstein. Who is listening to
17 these complaints?
18         I reported it to Bushra Vahdat.
19 Who wants to listen to these complaints, so I
20 let it go.
21     Q.    So, Mr. Capogrosso, first of all,
22 who is the attorney who said he was covering
23 the case for Judge Gelbstein?
24     A.    Eugene Gerbasi.
25     Q.    Eugene Gerbasi.

20 (Pages 74 - 77)

Page 78

Mario H. Capogrosso

1       Mario H. Capogrosso
2       Can you spell Gerbasi for me?
3   A.   I believe G-E-R-B-A-S-I.
4   Q.   And so when he said was covering
5  the case, what did that mean?
6   A.   That means he was going to argue
7  the case. In my opinion, that is what it
8  meant.
9   Q.   Okay. So let me ask, what's --
10 what's wrong with him arguing a case?
11  A.   You are arguing a case for a
12 judge.
13       I don't know. I don't know.
14 Maybe there is nothing wrong with it. I
15 reported what I heard. I don't know. You do
16 your investigation. That is not my job. I
17 reported truthfully what I heard, what I saw.
18 I don't know.
19  Q.   So he said he was covering -- he
20 said he was covering a case.
21       You know, was Judge Gelbstein the
22 person with the ticket, or I guess what is
23 your concern about?
24  A.   I don't know. He said he is
25 covering a case for Gelbstein.

Page 79

Mario H. Capogrosso

1       Mario H. Capogrosso
2       If you see ticket brokers -- if I
3  see ticket brokers in your office, and you
4  tell me you don't know what they are doing
5  for a living, I see you pleading guys in the
6  GE and rescheduling cases, and if another
7  attorney tells me he is covering a case for
8  you, my opinion -- and only my opinion, which
9  I am entitled to -- you got a caseload. You
10 got a caseload, and you are trying to get a
11 piece of the action. That is my opinion.
12  Q.   When you say you have got a
13 caseload, you think he is practicing law as
14 an attorney at the TVB?
15  A.   As well as being a judge. Yeah,
16 that is my opinion. That is my opinion. I
17 don't know if it is true or not. That is not
18 my job. That is my opinion. I don't know if
19 it is true. I don't know if that is true. I
20 reported what I saw and what I heard.
21  Q.   But you never saw Judge Gelbstein
22 arguing a case at the TVB or representing a
23 client at THE TVB; is that correct?
24  A.   No, I never saw him do that. No.
25  Q.   Let's take a step back,

Page 80

Mario H. Capogrosso

1       Mr. Capogrosso.
2       Why did you decide to sue in this
3  case?
4       Why did you decide to sue in this
5  case?
6   A.   I want to go back to practicing
7  law at New York TVB. I want to clear my
8  name. I want to clear my name.
9       I was removed from the Brooklyn
10 TVB on May 11, 2015. Nobody looked at this
11 videotape, which we established that
12 yesterday. Nobody looked at it.
13       Did an Danielle Calvo, somebody
14 told her that there was an incident between
15 me and Smart. Danielle Calvo makes a call to
16 Judge Gelbstein. Gelbstein calls Traschen,
17 and Traschen tells Calvo to have me removed.
18       Nobody looks at the videotape.
19 The videotape was never kept. It is lost.
20 There is affidavit and affidavit and
21 accusations made against me and my name and
22 my reputation as a lawyer that I was never
23 served with so I could respond.
24       I asked yesterday, how come you
25 didn't file an affidavit? I never received a
    complaint. I can't respond to a complaint if

Page 81

Mario H. Capogrosso

1       Mario H. Capogrosso
2  I never received it.
3       I wrote to -- and nobody is --
4  and I wrote to Traschen. I wrote to Bushra
5  Vahdat. And I wrote to Judge Gelbstein, and
6  I wrote to your office.
7       And when I write to your office
8  concerning my concern -- detailing my
9  concerns what is going on, I get no response
10 from any of these offices.
11      And then I have some security
12 guard approach me on the morning of May 11th,
13 instigates an altercation, and I am removed
14 within five minutes.
15      I want to clear my name. I think
16 I was set up. I think Judge Gelbstein and
17 all these other parties wanted me out because
18 I wasn't playing the game.
19      And I want to clear my name. I
20 want to get back to work. I want the money
21 that I lost. And I think whoever did this,
22 especially if they are judges, should get
23 punished. They should not be a judges, and
24 they should not be represented --
25  Q.   When you say they wanted you out

21 (Pages 78 - 81)

Mario H. Capogrosso

1
2 because you weren't playing the game, what do
3 you mean?
4       A.    I was not playing off the clerks.
5 I was not paying off the clerks. I was not
6 dealing with ticket brokers. I was not
7 giving the clerks part of this court money
8 and cash for the holidays.
9           The other attorneys were.
10 Several attorneys walked up to me, how much
11 you giving the clerks for Christmas? I said,
12 I am giving them nothing. I am giving them
13 nothing.
14          I gotta pay them. They have a
15 job to do. They get paid. I am not giving
16 them any more money.
17          Attorney said, why don't you buy
18 them breakfast? I am not going to buy them
19 breakfast in the morning. I am not doing
20 that. There is an appearance of impropriety.
21 I refuse to participate.
22          There was an appearance. I don't
23 know if you are allowed to do it or not. I
24 don't know if you are allowed to give the
25 clerks money. I don't know if you are

Mario H. Capogrosso

1
2 allowed to give them breakfast, give them
3 parties. There was appearance of
4 impropriety.
5           I chose not to participate. I
6 chose not to.
7       Q.    And you think that everyone
8 wanted to get rid of you because you weren't
9 paying money for the clerks?
10      A.    I don't know why they wanted to
11 get rid -- they didn't like me. They didn't
12 like my approach, my style, whatever. They
13 didn't like me, I knew that.
14          My clients loved me. My clients
15 loved me. You don't have one grievance from
16 or complaint from a client over ten years of
17 service in this tribunal. Ten years I was
18 down there, from motorist or a client. Other
19 than maybe a fee dispute or something, that
20 is it. Other than this one to Mr. Perez, I
21 never got -- I can't explain what happened
22 there. Not one complaint --
23      Q.    We will discuss Mr. Perez in a
24 bit later today.
25          Taking a step back, you mentioned

Mario H. Capogrosso

1
2 ticket brokers.
3           Let me ask you, the practice of
4 ticket brokers, people who bring cases in in
5 exchange for a cut of the attorney's fees, is
6 that legal or is that illegal?
7       A.    I have no idea. I don't know.
8           I think if you are calling
9 yourself a lawyer, and you are taking a the
10 fee and representing that you are an
11 attorney, and you take that fee, I think that
12 is terrible. I think that is wrong.
13          I think if you go into the ticket
14 counter, like Tanya Rabinovich was doing, and
15 the clerks were giving a whole of bunch
16 summons for the day and rescheduling cases
17 for her, and she is not a lawyer, I think
18 that is practicing law.
19          I think that is wrong. I think
20 that is wrong. Absolutely wrong. Because
21 now you are acting -- now you are taking an
22 authority over that summons.
23          I don't know. And you are --
24 and maybe you are even pleading guilty.
25 Maybe she was pleading them guilty, too. You

Mario H. Capogrosso

1
2 can do that at the counter.
3       Q.    But, Mr. Capogrosso, assuming
4 that the ticket broker isn't holding
5 themselves out to be anything but a ticket
6 broker, is there anything illegal or
7 unethical about the practice?
8       A.    I don't know. I don't know. If
9 you are calling yourself a ticket broker, I
10 don't know. I don't know.
11          I think if you make the
12 representation that you are lawyer, that is
13 wrong, or you are making --
14      Q.    And --
15      A.    I think that is wrong. I think
16 if you come down to the DMV with a ticket,
17 and the attorney takes the ticket and doesn't
18 talk to the client directly, directly, I
19 think that is wrong. Because then you don't
20 know what the client expectation is under.
21          The attorney is not talking to
22 the client himself, he is talking to an
23 intermediary, and I think that is wrong. You
24 should have some type of interaction with the
25 lawyer directly.

22 (Pages 82 - 85)

Page 86

1          Mario H. Capogrosso
2          I don't know if it is right or
3  wrong.  You are the Attorney General; that is
4  your decision.
5          I am telling you what I saw and
6  what I heard.  I am telling you that I didn't
7  feel comfortable dealing with these people.
8  I did not.
9     Q.   Mr. Capogrosso, sitting here
10 today, you are not aware of any statute or
11 regulation or source of authority that says
12 that ticket brokers are not legal or
13 permissible; is that correct?
14    A.   I think you can't make a
15 representation that you are a lawyer when you
16 are not a lawyer and collect a fee.
17    Q.   But --
18    A.   I think that is wrong.
19    Q.   Leaving aside if they don't
20 represent that they are a lawyer, you are not
21 aware of any statute prohibiting ticket
22 brokers, correct?
23    A.   I don't know.
24    Q.   Statute or --
25    A.   I didn't think its ever been

Page 87

1          Mario H. Capogrosso
2  broached, this question.
3     Q.   Okay.
4     A.   I don't think the question has
5  ever been looked at.
6     Q.   Mr. Capogrosso, did there come a
7  time when ticket brokers were banned from the
8  TVB?
9     A.   I saw ticket brokers there up
10 until the day I left, so obviously they were
11 not banned.  I saw them up till the day -- I
12 know some paralegals were banned because they
13 were taking money, stealing money, but I
14 didn't see ticket brokers banned.
15    Q.   So your testimony is no, there
16 was never a ban on ticket brokers?
17    A.   Not that I was aware of.  I
18 always saw them down there, even up to the
19 day I was asked to leave.
20    Q.   All right.  So a couple more
21 questions about bringing the case.
22         You were expelled from practice
23 in 2015.  You brought this case in 2018.
24         Why did you wait so long to bring
25 the case?

Page 88

1          Mario H. Capogrosso
2     A.   I wanted to see if they had
3  anything against me.  Seriously.  I gave them
4  three years to bring their case against me.
5  They wanted to sweep my complaints and
6  everything I had under the rug.  If there was
7  a complaint against me or my office, you
8  could have aggrieved me.
9          I was waiting for a grievance.  I
10 was waiting for them to sue me.  If I had
11 assaulted this security guard, I could have
12 been sued for assault.  They brought nothing
13 against me for three years.  I waited three
14 years to see if they had anything against me.
15         They had nothing against me.
16 Nothing.  Not an assault, not a criminal
17 charge, not a grievance to the grievance
18 committee, nothing.  They had nothing to hold
19 their hat on, other than they removed me
20 improperly.  And I think they set me up that
21 morning.  I waited three years because I
22 wanted to see if they had anything against
23 me, and they didn't.
24    Q.   Is it possible they were just
25 satisfied that you were no longer at TVB?

Page 89

1          Mario H. Capogrosso
2     A.   I know they wanted me out.  They
3  wanted me out, and they got me out, and they
4  wanted -- and they wanted to ignore any
5  complaints or any follow-up.
6          They didn't want to talk to me.
7  I wrote letters, I made phone calls.  Nothing
8  was answered.  I wrote letters to your
9  office, it wasn't answered.  I wrote to
10 Traschen, Bushra Vahdat, Gelbstein.  They
11 were all ignored.
12         I was charged -- I was not
13 charged by the police.  There was nothing
14 they had against me.  I did nothing wrong.
15    Q.   And so you were expelled in May
16 of 2015.
17         Why didn't you bring an Article
18 78 proceeding?
19    A.   Because I couldn't get money.  I
20 had money that I had to return, that I was
21 due.  I couldn't get money in an Article 78
22 proceeding.
23         I wanted a Federal Court judge on
24 this case.  I was tired with this New York
25 State Court, everybody protecting one another

23 (Pages 86 - 89)

1            Mario H. Capogrosso
2  and brushing complaints under the rug. I was
3  tired of it. I wanted a Federal Court judge
4  to listen to this complaint, because they
5  stand above it. That was my opinion. I
6  wanted a Federal Court judge, number one.
7            And two, I was owed money, and I
8  can't get that in an Article 78 proceeding.
9       Q.    So you think -- so you think the
10 New York State Courts were corrupt?
11      A.    No. I didn't think I was going
12 to get a fair hearing.
13      Q.    Why not?
14      A.    I wanted a Federal Court judge.
15 I wanted a judge who stood above it.
16      Q.    Why didn't you think you would
17 get a fair hearing in Kings County Supreme
18 Court?
19      A.    I didn't think I would.
20      Q.    Why not?
21      A.    I saw how all the judges at the
22 TVB were treating me. I saw how the judges
23 at the TVB, Judge Gelbstein, laughing and
24 giggling when I made my complaint; a spade is
25 a spade. Bushra Vahdat lying, a judge lying.

1            Mario H. Capogrosso
2  I can go into her lies. Traschen not
3  returning phone calls.
4            I saw how I was being treated. I
5  didn't think I was going to get a fair
6  chance. That was my decision.
7            I told you why I made it. I
8  wanted to see, number one, if they had
9  anything against me, either criminally or by
10 way of a grievance, and they do not.
11           And two, I wanted a judge who
12 stood above it all.
13           And three, I was owed money.
14      Q.    So if you felt that the State
15 Supreme Court was going to be corrupt or
16 unfair, why would --
17      A.    I didn't say that. I said I
18 wasn't going to get a fair chance.
19      MR. THOMPSON: Withdrawn.
20      Q.    If you felt the State Supreme
21 Court was going to be unfair, why would the
22 Federal Court be any different?
23      A.    I told you my belief is a Federal
24 Court judge sits above this, sits above it.
25 That is just my opinion. I am entitled to my

1            Mario H. Capogrosso
2  opinion. And I wanted the money owed to me
3  on this case.
4       Q.    All right.
5       MR. THOMPSON: Hold on one
6  second. And this maybe a little dicey,
7  because we are doing this over Zoom, but
8  I am going to share a document with you
9  and with everyone. So please, everyone
10 let me know if there is a problem
11 viewing this.
12           Can everyone see this document?
13      THE WITNESS: Yes.
14      MR. THOMPSON: Mr. Videographer
15 and Madam Court Reporter, can you see
16 the document?
17      THE COURT REPORTER: Yes.
18      MR. VIDEOGRAPHER: I am sorry.
19 My mic was muted.
20           I see it, Counsel.
21      MR. THOMPSON: Okay. Very good.
22      Q.    Mr. Capogrosso, do you recognize
23 this document?
24      A.    My affirmation of service.
25      Q.    I will scroll down to page two,

1            Mario H. Capogrosso
2  because that may make it a little easier to
3  recognize.
4       A.    Yeah. My response to your
5  interrogatories, yeah. Yes, I do.
6       Q.    And this is your document that
7  you wrote, correct?
8       A.    Yes. Well, I have to see my
9  signature. But yeah, I would assume it is.
10      Q.    We can go down here to page --
11      A.    Yeah, that is my signature.
12      Q.    -- 17. That is your signature?
13      A.    Yes.
14      MR. THOMPSON: Madam, I ask you
15 to mark this as Defendant's 1, with the
16 understanding that we discussed before
17 that it will actually be formally marked
18 once it is entered into the Veritext
19 server after the deposition.
20           Is that something that you need
21 to explain on the record, Madam Court
22 Reporter?
23      THE COURT REPORTER: No.
24      (Whereupon, a document was deemed
25 marked as Defendant's Exhibit 1 for

24 (Pages 90 - 93)

Page 94

Mario H. Capogrosso

identification, as of this date.)

Q. Let's go down to page 17. And again, you said this was your signature?

A. Yes.

Q. And this declaration on page 18, you declared that, correct?

A. Yes.

Q. So do you still believe everything in your interrogatory responses is true and correct?

A. I signed it, so yes.

Q. Are you aware under the Federal Rules, you have the right and the obligation to amend your responses if anything is not correct or if there is an important omission?

A. Yes. I am trying to be truthful, yes.

Q. Okay. So let's go up there to interrogatory one. We are on page five. I would like to talk a little bit about the damages that you are claiming in this case.

A. All right.

Q. So interrogatory number one, we asked you for a calculation of damages and

Page 95

Mario H. Capogrosso

how they were calculated.

The first category you see, you said plaintiff seeks punitive damages in an amount to be determined, but not to exceed 20 million dollars, as stated in your complaint.

How much punitive damages are you actually seeking, because there is sort of not a specific figure.

A. Everything I stated in my complaint, 20 million dollars per count. I have to have look at my --

Q. 20 million dollars?

A. It is my count.

Q. So you are seeking 20 million dollars in punitive damages?

A. Yeah, sure. Absolutely.

Q. Where does that figure come from?

A. These are judges. Judges who acted wrongly. Judges who acted wrongly to have damaged my name and reputation, and they need to be honest. That is my opinion. That is for a jury to decide how much.

Q. When you say judges, do you mean -- who specifically do you mean?

Page 96

Mario H. Capogrosso

A. Judge Gelbstein. Bushra Vahdat, the worst of them, Bushra Vahdat. Ida Traschen, your clerical staff, Danielle Calvo, who never looked at the videotape and had me removed. Who else? Melanie Levine, another clerical supervisor who I didn't mention.

Q. Okay.

A. David Smart, who approached me and instigated this.

Q. And you want them all to be punished?

A. Yes, I do. Yeah, yes. The jury is going to make that determination.

But do I seek punishment? Yes.

Q. And are you aware that Ms. Vahdat is no longer a defendant in this case, and I don't believe Ms. Levine was ever a defendant in this case?

A. True. That is true.

Q. So this figure, this 20 million dollar figure, where does that come from?

A. Where does it come from?

Q. Yes?

Page 97

Mario H. Capogrosso

A. That is just a number.

It comes from my heart. That is where it comes from. It is how I felt when I wrote this complaint. What these judges, this tribunal did to me, it comes from my heart.

Q. So there is no formula that you used to get there?

A. I don't know how you arrive at a formula for punitive damages. I don't know if there is formula.

Q. So no?

A. It comes from my heart. It comes from the damage to my reputation and my name, which I value at 20 million dollars. All right. The damage to my name and reputation as a lawyer, as a lawyer that I want to continue practicing.

And I told you, I am going to work until I drop, and I want to continue to work my whole life.

Damage to my name and reputation as a lawyer, that is where it comes from.

Q. So were --

Mario H. Capogrosso

1
2     A.    And I have to explain this
3  number, explain my removal to any court that
4  I seek admittance to.  Any court, I have to
5  explain this somehow.
6     Q.    So why 20 million dollars and not
7  50 million dollars or five million dollars or
8  500,000?
9     A.    I don't -- let's see.  All right.
10  Let's see.  Normally -- I am 58 when I wrote
11  this.  I want to work at least -- I was
12  figuring a million dollars a year for the
13  next 20 years, the damage to my name and
14  reputation.
15     Q.    So you viewed this punitive
16  damage as covering the damage to your name
17  and reputation, correct?
18     A.    Name, reputation and for the
19  wrongful conduct, the wrongful, improper
20  conduct of judges, the clerical staff at the
21  Brooklyn TVB; wrongful, egregious conduct of
22  these judges and this clerical staff, yes.
23     Q.    So moving to item number two, you
24  say $122,715 in lost revenue, representing
25  approximately 15 months of projected

Mario H. Capogrosso

1
2  receipts.
3            Can you explain how you came to
4  that figure?
5     A.    I gave you my exhibit.  That was
6  the money that I had collected, the money
7  that I was owed to me.  It was the total
8  monies owed, I think.
9            And I gave you my breakdown that
10  was still on my calendar, that I either would
11  have earned or collected if I was given the
12  ability to represent to finish my caseload.
13  It was $122,000, and was still remaining on
14  my caseload going forward.
15     Q.    Okay.
16     A.    From May 11th, the day I left, my
17  caseload showed $122,000.
18     Q.    So these were cases that you had
19  already -- that you had already argued and
20  conducted, that you had outstanding bills
21  for, or these were cases that you were going
22  to argue in the future?
23     A.    Going to argue in the future,
24  that I was not able to earn.
25     Q.    Okay.  And you had already -- and

Mario H. Capogrosso

1
2  you had already collected this money; is that
3  correct?
4     A.    Part of it was collected.  Not
5  all of it.
6            It was due.  All of that was due.
7  Part it was, part of it wasn't.  It is all in
8  the exhibit to you.
9            MR. THOMPSON:  So let's go to
10  that exhibit.  I am going to figure out
11  how to stop sharing my screen.  Please
12  bear with me.  I am having some
13  technical difficulties.
14            Can you guys see Exhibit 2 now?
15            THE WITNESS:  No.
16            MR. THOMPSON:  You are seeing the
17  same thing?
18            THE WITNESS:  Yes, not seeing any
19  exhibits.
20            MR. THOMPSON:  You are not seeing
21  anything?
22            THE WITNESS:  No.
23            MR. THOMPSON:  All right.  Can
24  everyone see this?
25            THE WITNESS:  Yes.

Mario H. Capogrosso

1
2            MR. THOMPSON:  Okay.  So let's
3  rotate this, just so that it is facing
4  up.
5            So can everyone see this document
6  here?
7            THE VIDEOGRAPHER:  Yes, Counsel.
8            THE WITNESS:  Yes.
9     Q.    And, Mr. Capogrosso, do you
10  recognize this document?
11     A.    Yes.
12     Q.    What is it?
13     A.    That is my Excel worksheet that
14  shows my -- the date that I was initially
15  hired, the location.
16            I kept a very detailed calendar,
17  very detailed.  The subject matter would show
18  the client's name and the ticket, which I
19  redacted; the due date, which is the date I
20  had to be in court; the total amount that I
21  charged on the case, the amount that was paid
22  and the amount that was owed.
23            Now, on the ones that are on the
24  right there, it wasn't a Brooklyn TVB case or
25  a TVB case for Red Hook, it was down in

26 (Pages 98 - 101)

Page 102

```
1              Mario H. Capogrosso
2  criminal court. I moved that to the right.
3  I didn't feel that was appropriate.
4      Q.    So for instance, you are talking
5  about this line here, and I am
6  highlighting --
7      A.    Yes.
8      Q.    -- this line here, Monday,
9  April 27, 2015, due Monday, May 18, 2015?
10     A.    Which myself, I had to be --
11     Q.    Page one.
12     A.    I had to be on Red Hook, which is
13 criminal court, down in Brooklyn, on May --
14 and that was -- gave me 300 on that case.
15           Yes, so I didn't put that in
16 there, because it wasn't a TVB case.
17     Q.    Just for the record, this
18 document is number P191 through P206,
19 correct?
20     A.    That was my Bates Stamp when I
21 submitted the document to you.
22     Q.    Can you explain to me what the
23 start date means?
24     A.    The start date was when I
25 initially got hired on, the date.
```

Page 103

```
1              Mario H. Capogrosso
2      Q.    So I have noticed some of these
3  start dates are after your expulsion from the
4  TVB. For instance, I am looking at the
5  bottom of page P191, and there is two --
6  there is a number of items that are marked
7  Thursday, May 21, 2015. One is BS, one is
8  appeal, one is STLISL, and one Kent.
9            Can you explain to me what those
10 mean?
11     A.    Yeah, I don't know. Maybe that
12 is just a clerical error.
13           I know I took on no new cases
14 after I was removed. I don't know how that
15 happened. Maybe it was just a clerical --
16     Q.    What is --
17     A.    I don't know. I seriously I
18 don't know. I don't know.
19     Q.    What do those four -- my
20 apologies, Mr. Capogrosso. You can keep
21 answering, if you have more that you need to
22 say.
23     A.    I don't know why that is like
24 that. I don't understand that.
25           I know I didn't appear in any
```

Page 104

```
1              Mario H. Capogrosso
2  court after May 11th. I was ordered not to,
3  and I did not. I didn't take any new cases
4  on after May 11th and have the ability --
5      Q.    And so --
6      A.    Go ahead.
7      Q.    And so what is -- is BS, Brooklyn
8  South?
9      A.    Yes.
10     Q.    What is appeal?
11     A.    Appeal, they hired me on an
12 appeal.
13     Q.    Is that DMV appeals court?
14     A.    Yes. But I didn't take anything
15 after May 11th.
16     Q.    What is STLISL?
17     A.    Staten Island.
18     Q.    And what is Kent?
19     A.    That would have been Upstate,
20 which I moved to the right. That is an
21 Upstate court that I was hired on.
22     Q.    Is that Kent County?
23     A.    It was Kent -- Kent -- Kent.
24 Yeah, I don't know.
25           I would have written it out with
```

Page 105

```
1              Mario H. Capogrosso
2  the Kent County Village Court Upstate.
3      Q.    And so the due date starts on
4  May 11, 2015, because these are future cases
5  that you were going to handle in the future;
6  is that correct?
7      A.    Yes, that I was not able to.
8      Q.    Can you explain how you billed
9  your cases? Did you charge by the hour or
10 case?
11     A.    The motorists would come in.
12 They knew me. They would approach me.
13           I never approached a motorist,
14 never. There were signs all over the place
15 not to -- the other attorneys did, solicited
16 left and right. I didn't.
17           They approached me, asked me if I
18 am a lawyer. A lot of guys knew me already,
19 they walked up to me. You want to take the
20 case? Yes. Took out my legal pad. I wrote
21 down their name, their phone number, their
22 license ID, license number, their date of
23 birth, which is the information I needed.
24           The court in which it was in,
25 which is mostly Brooklyn South, I wrote them
```

27 (Pages 102 - 105)

Page 106

Mario H. Capogrosso

1       Mario H. Capogrosso
2 a receipt the way all the attorneys did it.
3 We wrote it on the back of a business card,
4 for the most part. Put the total, the amount
5 paid, the amount owed. I gave them the
6 receipt. I had my legal pad, showed
7 everything, all the information I took.
8       And I calendared it. I put it in
9 my calendar. Oftentimes these due dates got
10 changed, all the time. All the time, the due
11 dates got changed. Cases were being
12 rescheduled constantly.
13       Albany has the ability to
14 reschedule a case. The motorist can
15 reschedule a case. The police officer can
16 reschedule a case. I can reschedule a case.
17 The DMV can reschedule a case. The cases got
18 rescheduled all the time. Those due dates
19 changed all the time.
20       Q.   So, Mr. Capogrosso, that
21 wasn't -- I appreciate that.
22       I think the question was a little
23 bit narrower, which was how did you charge
24 for your services? Did you bill by the hour?
25       A.   No, each ticket. Each ticket.

Page 107

Mario H. Capogrosso

1       Mario H. Capogrosso
2       Q.   So you billed by the ticket?
3       A.   Yeah. 150, 250. The total was
4 the amount I billed. That column that says
5 total, that is the amount that I charged.
6       Q.   And how did you know how much to
7 charge?
8       A.   Which is what everybody -- just
9 the going rate that everybody was charging.
10 If the case was in Brooklyn
11 South, and it was that day, normally I
12 charged a hundred. If it was -- you know,
13 other than that, I normally charge 150,
14 because the case, like I say, got pushed out
15 several times over.
16       If it was that day, it was
17 charged a hundred. If it was like, I don't
18 know, tinted window, I charged less, because
19 it didn't carry no point violations.
20       If it was in another county, I
21 charged more, because I had to travel there.
22       If it was like in Manhattan
23 South, I would charge 200, because I had to
24 travel and be at a different courthouse.
25 That is pretty much how I did it.

Page 108

Mario H. Capogrosso

1       Mario H. Capogrosso
2 Predominately it was 150 or a hundred. If it
3 was done that day, and they walked in that
4 day, I charged a hundred. But that is how I
5 did it.
6       Q.   I think the most I saw for any of
7 the cases on here was 250.
8       What would be a $250 case?
9       A.   That was Queens South. So I
10 would have to travel down to Queens South. I
11 couldn't be in the Brooklyn South Traffic
12 Violations Bureau, so I had to reschedule to
13 make sure I was there. And that is the fee
14 we agreed on.
15       Q.   Okay. So why did you redact the
16 items in the middle?
17       A.   It was client information. I
18 didn't feel comfortable revealing it. Names,
19 phone numbers, ID numbers, driver's license
20 ID numbers, dates of births, phone numbers, I
21 am not going to give you that information.
22 It is not right.
23       Q.   Is there any legal authority for
24 you to redact that?
25       A.   It is just client information.

Page 109

Mario H. Capogrosso

1       Mario H. Capogrosso
2 It is privileged information. I am not going
3 to give you my client's phone numbers. I am
4 not going to do that. I don't think it's
5 appropriate, or their name. It is not
6 appropriate. Or their New York driver's
7 license ID, I don't think it's appropriate.
8 I don't think it is relevant and material.
9 To me, it is privileged information.
10       Q.   Did you seek -- did you seek a
11 protective order or confidentiality order?
12       A.   No, I did not.
13       Q.   All right. So I will show you,
14 Mr. Capagrosso, in what you produced to us,
15 the pages there is a gap between pages 201
16 and 206. Are you aware of that? It goes
17 straight from 201 down to 206. Why didn't
18 you produce the pages in between?
19       A.   No, I produced it. I have to
20 look.
21       How did I send this to you?
22 Maybe your -- maybe your -- I sent you this.
23 Maybe your -- I walked this down to your
24 office. I didn't scan it and send it to you,
25 I walked this down to your office.

28 (Pages 106 - 109)

Page 110

Mario H. Capogrosso

1       Mario H. Capogrosso
2       Maybe the person who scanned it
3   didn't scan it in properly. I didn't leave
4   out anything. None. Maybe somebody in your
5   office that scanned it improperly.
6       Q.   Okay. So you are confident --
7       A.   Yes, I am. Absolutely. I left
8   nothing out.
9       Q.   You are confident you produced
10  everything, correct?
11      A.   Yes. And I will get you those
12  missing pages, I will. I don't think I
13  misnumbered this.
14      Q.   So you indicated that the lost
15  revenue was $122,715 for 15 months; is that
16  correct?
17      A.   That was the money remaining on
18  my docket, yes, that I couldn't finish.
19      Q.   And did you divide that by adding
20  up this column paid?
21      A.   No, the total column, total.
22      Q.   So did that assume that everyone
23  was going to pay you what they owed?
24      A.   Yes, the money that was due.
25      Q.   Does everyone always pay you what

Page 111

Mario H. Capogrosso

1       Mario H. Capogrosso
2   they owe?
3       A.   Yeah, for the most part. My
4   clients are very -- for the most part, yes.
5   Yes.
6       Q.   But sometimes people don't?
7       A.   For the most part, my clients
8   paid me. They liked me, and they paid me,
9   and they respected what I did for them in a
10  courtroom, they did. I rarely had a
11  problem --
12      Q.   Wouldn't it be true that --
13  wouldn't it be true to say that sometimes
14  clients don't pay what they owe?
15      A.   For the most part, my client
16  always paid. They paid.
17      Q.   But not always, correct?
18      A.   I don't recall when they didn't.
19  I really don't.
20      My clients paid me. They liked
21  me, my clients. They respected what I did
22  for them in a courtroom, and they paid me.
23      Q.   So you indicated that $122,715
24  figure was lost revenue.
25      What were your expenses for your

Page 112

Mario H. Capogrosso

1       Mario H. Capogrosso
2   practice?
3       A.   I had a -- I had a virtual office
4   up in Hawthorne, Connecticut, where I
5   received mail, where I can receive clients.
6   You can use the conference room. I had my
7   home office I used. I had an apartment in
8   Brooklyn at the time. I had travel expenses.
9   I had my home -- we have the home up here in
10  New Rochelle. What else? Travel expenses.
11  What else do you have? You have the bridges
12  going back and forth, gas, the tolls. That
13  is it, normal operating expenses.
14      Laptop, desktop, copier, paper,
15  You know, my dues, my association dues to
16  practice law, my license dues, my CLE dues,
17  all that stuff.
18      Q.   So why didn't you include your
19  expenses in your calculation?
20      A.   I didn't think I needed to.
21      My expenses are my expenses.
22      That is the total money that I
23  was owed.
24      My expenses are my expenses.
25      Q.   But if you weren't practicing

Page 113

Mario H. Capogrosso

1       Mario H. Capogrosso
2   law, didn't you not need to pay for a great
3   deal of those expenses?
4       A.   What does that have to do with
5   the money I could have generated? I don't
6   understand. It is not relevant. Has nothing
7   do with my expenses, with the money I could
8   have been given. Nothing to do with it.
9       Q.   So it is your testimony that it
10  wouldn't have cost you any money to make this
11  money?
12      A.   It would have cost me money to
13  make this money.
14      Q.   So why didn't you include your
15  expenses in your calculations of your damage?
16      A.   Including my expenses, I didn't
17  think it was relevant. That is the money I
18  was owed. To me, it is not -- why expenses
19  should be taken off of the total revenue to
20  me, it was not relevant. That is the money I
21  was owed.
22      Q.   Okay. And in terms of --
23      A.   Wait. Wait. Wait. Let me think
24  about this question for a minute.
25      Q.   Sure.

29 (Pages 110 - 113)

Mario H. Capogrosso

1
2  A.   Because I have to understand what
3  you're saying here.
4        Total money owed, you are saying
5  that I should take off my expenses.
6        Let me try to understand it.
7  That is the money I was owed, that is it.
8  That is the money was I owed and the money I
9  lost.
10  Q.   Okay.  And your expenses included
11  the virtual office in Connecticut, home
12  office in --
13  A.   No, no.  Virtual office was
14  Hawthorne, New York.
15  Q.   Apologies.  The virtual office in
16  Hawthorne, New York, the mail in Connecticut,
17  home office, Brooklyn apartment, CLE, bar
18  fees, travel, wear and tear on the car.
19        Anything else?
20  A.   Yeah.  There was no mail in
21  Connecticut.
22  Q.   Didn't you say you had a place in
23  Connecticut where you received mail?
24  A.   No, no, no, no.  I received my
25  mail -- at that point I had an apartment in

Mario H. Capogrosso

1
2  Brooklyn.  We have a home up here in
3  New Rochelle.
4        No.  I was licensed in
5  Connecticut.  I did have a couple of cases in
6  Connecticut, only a couple which did not
7  involve the TVB; but I do have an office in
8  Connecticut.
9  Q.   So, Mr. Capogrosso, do you recall
10  that we asked you for your tax returns from
11  the relevant period?
12  A.   Yes.
13  Q.   And did you produce them?
14  A.   No.
15  Q.   Why not?
16  A.   Because I don't think they are
17  relevant material.  I do not.
18  Q.   Why don't you think so?
19  A.   Because I am showing you what I
20  could have made right there.  I showed you
21  what I could have made.  I have given you all
22  the money that I generated.
23        My tax returns are my tax
24  returns.  I don't think they are relevant
25  material.  I have shown you the money that I

Mario H. Capogrosso

1
2  collected.  I have shown you that.
3        Now, did I earn all that money?
4  No.  I showed you the money that I could have
5  collected.
6  Q.   Mr. Capogrosso, how much income
7  did you claim on your taxes in 2013?
8  A.   I don't recall.
9  Q.   Do you recall --
10  A.   Was it everything -- all the
11  revenue showed here?  No.  Not all the
12  revenue is shown here, because these tickets
13  were not necessarily completed on the due
14  date.  And I didn't earn this money until I
15  completed the ticket.
16        For example, a ticket that was
17  due date on May 11, 2015 might not get done,
18  completed for two years from that date.  Two
19  years.  Cases got rescheduled constantly.
20  Q.   So the actual income that you
21  would report on your taxes would be lower; is
22  that correct?
23  A.   Yes, lower.  Because that was the
24  money, the money when I completed the cases,
25  when I actually completed it.  That, to me,

Mario H. Capogrosso

1
2  then I finally earned that money.  Until I
3  completed the case, I didn't earn it.
4  Q.   Mr. Capogrosso, do you have an
5  estimate of how much money you claimed as
6  income on your taxes in 2013, ballpark
7  figure?
8  A.   What I am showing here is I would
9  bring in about 8,000 a month.  Bring in,
10  which is what this works out to.  But you
11  didn't complete $8,000 worth of work in a
12  month, you didn't complete it.  That is what
13  you brought in.  You might have finished, you
14  know, maybe 11, 1200 a week, maybe, where you
15  actually completed 11, 1200 dollars worth of
16  work a week.
17        You know, that is what I would
18  have completed.
19        Probably what you brought in was
20  more.
21  Q.   So I apologize if I don't quite
22  understand.
23        You would have completed about 11
24  or 1200 dollars worth of work per week, but
25  you would have brought in a little more.

30 (Pages 114 - 117)

Page 118

Mario H. Capogrosso

1        Mario H. Capogrosso
2        Can you explain that?
3        A.    Bring in clients, you bring in
4  revenue.
5            Like I said, a guy would hire me,
6  give me a ticket. You might collect $2,000
7  worth of tickets in a week or $8,000 in a
8  month.
9            But the cases that were actually
10 finished in that month or in that week would
11 be about 11 to 1200 dollars, around that
12 figure a week.
13    Q.    And it is not income for you
14 until the case is completed; is that correct?
15    A.    Absolutely. Absolutely. I have
16 not earned that money until I argue that
17 case. I have not earned that money until I
18 personally appeared and argue that case. I
19 have not earned that money.
20    Q.    Understood.
21            So do you have an estimate of how
22 much income you would claim on your taxes in
23 2013, 2014?
24    A.    I don't recall. Probably would
25 have been 11 to 1200 dollars a week. That

Page 119

Mario H. Capogrosso

1        Mario H. Capogrosso
2  was work that I actually completed, actually
3  completed for the week.
4    Q.    And do you recall approximately
5  how much income you claimed on your taxes in
6  2015?
7    A.    No.
8    Q.    What about in 2016, the year
9  after the first full year when you were no
10 longer work at the TVB? Do you recall how
11 much money you claimed on your taxes?
12    A.    No.
13    Q.    And 2017 and 2018, do you also
14 not recall?
15    A.    Well, in '18 I was working for
16 Jiang. Like I said, he was paying me 85,000
17 year, 85,000.
18            But I was a 1099, so that is what
19 it would have been. The Law Firm of Yuan
20 Jiang, I know he was paying me 85 a year.
21    Q.    And so the same for 2019?
22    A.    Yeah. But I started with Jiang
23 in March of 2018, and 2019 it would have been
24 a full. But this part of 2020, I stopped
25 working for him on March 17, 2020.

Page 120

Mario H. Capogrosso

1        Mario H. Capogrosso
2    Q.    Well, I am sure as heck not ready
3  to pay my 2020 taxes, so I won't ask you for
4  your estimates for this year, because I
5  certainly have no idea.
6            So let's go back to Exhibit 1.
7    A.    Yeah.
8    Q.    Switching my screen back to that.
9            MR. THOMPSON:  Can everyone see
10 Exhibit 1?
11            THE WITNESS:  Yes.
12            MR. THOMPSON:  And, Madam Court
13 Reporter, before we are done with
14 Exhibit 2, had I asked you to mark that
15 yet?
16            THE COURT REPORTER:  I can check
17 for you. Off the top of my head, I
18 don't remember, Counsel.
19            MR. THOMPSON:  There is no need
20 to check. Let me just ask you now to
21 please have that marked as Exhibit 2.
22            (Whereupon, a document was deemed
23 marked as Exhibit 2 for identification,
24 as of this date.)
25            THE COURT REPORTER:  Before we

Page 121

Mario H. Capogrosso

1        Mario H. Capogrosso
2  continue, can we take a break?
3            MR. THOMPSON:  Sure. Actually
4  yeah, let's take a quick five-minute
5  break.
6            Is that fine with you,
7  Mr. Capogrosso?
8            THE WITNESS:  Yes. 11:45?
9            MR. THOMPSON:  11:45.
10           THE VIDEOGRAPHER:  The time is
11 11:40. We are off the record.
12           (Whereupon, a short recess was
13 taken at 11:40).
14           (Time noted:  11:40 a.m.)
15
16           MARIO H. CAPOGROSSO
17
   Subscribed and sworn to before me this
18
       ____ day of _____, 2020.
19     _____
                              , Notary
20 Public.
21
22
23
24
25

31 (Pages 118 - 121)

Page 122

```
 1
 2              INDEX TO TESTIMONY
 3                      Page   Line
 4  Examination by        5    20
    Mr. Thompson
 5
 6
           INDEX TO DEFENDANT'S EXHIBITS
 7
    Description          Page   Line
 8
    Exhibit 1 Interrogatories   193   24
 9
    Exhibit 2  Document    120   22
10
11
              INDEX TO REQUESTS
12
                      Page   Line
13
    Provide resume        13    18
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 124

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

```
 1
 2  CASE NAME: Capogrosso v. Gelbstein, Et Al.
 3  DATE OF DEPOSITION: 12/18/2020
    WITNESSES' NAME: Mario Capogrosso , a.m.
 4
 5  PAGE  LINE (S)   CHANGE        REASON
 6   |_____|_____|_____|
 7   |_____|_____|_____|
 8   |_____|_____|_____|
 9   |_____|_____|_____|
10   |_____|_____|_____|
11   |_____|_____|_____|
12   |_____|_____|_____|
13   |_____|_____|_____|
14   |_____|_____|_____|
15   |_____|_____|_____|
16   |_____|_____|_____|
17   |_____|_____|_____|
18   |_____|_____|_____|
19   |_____|_____|_____|
20   |_____|_____|_____|
21           Mario Capogrosso , a.m.
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24
25  (NOTARY PUBLIC)        MY COMMISSION EXPIRES:
```

Page 123

```
 1
 2              CERTIFICATE
 3
 4     I, MARIA ACOCELLA, a Notary Public within
 5  and for the State of New York, do hereby
 6  certify:
 7     That the witness whose deposition is
 8  hereinbefore set forth, was duly sworn by me
 9  and that the within transcript is a true
10  record of the testimony given by such
11  witness.
12     I further certify that I am not related to
13  any of the parties to this action by blood
14  or marriage and that I am in no way
15  interested in the outcome of this matter.
16     IN WITNESS WHEREOF, I have hereunto set my
17  hand this 5th day of January, 2021.
18
19
20
21           MARIA ACOCELLA
22
23
24
25
```

**[02710 – absolutely]**

| **0** |
|---|
| **02710**   1:5 3:11 |

| **1** |
|---|
| **1**   93:15,25 120:6 |
| 120:10 122:8 |
| **10**   68:22 |
| **10005**   2:15 4:7 |
| **10804**   2:6 4:12 |
| **1099**   31:11,11,16 |
| 40:11,13 119:18 |
| **10:48**   70:8 |
| **10:50**   70:11 |
| **11**   74:17 80:9 |
| 105:4 116:17 |
| 117:14,15,23 |
| 118:11,25 |
| **1100**   32:15,15 |
| **11:40**   121:11,13 |
| 121:14 |
| **11:45**   121:8,9 |
| **11th**   68:5,5,6 |
| 81:12 99:16 104:2 |
| 104:4,15 |
| **12/18/2020**   124:3 |
| **120**   122:9 |
| **1200**   32:15 117:14 |
| 117:15,24 118:11 |
| 118:25 |
| **122,000**   99:13,17 |
| **122,715**   98:24 |
| 110:15 111:23 |
| **13**   122:13 |
| **15**   41:23 68:22 |
| 98:25 110:15 |
| **150**   107:3,13 108:2 |
| **17**   37:2 43:8 93:12 |
| 94:3 119:25 |
| **17th**   43:3,9 |
| **18**   1:11 3:14 71:10 |
| 71:13 94:6 102:9 |

119:15 122:13
**19**   42:25
**193**   122:8
**1961**   7:13
**1983**   9:16
**1983m**   9:23
**1992**   9:16 12:24
13:3
**1994**   13:3
**1996**   12:24
**1:18**   1:5 3:11

| **2** |
|---|
| **2**   100:14 120:14,21 |
| 120:23 122:9 |
| **2,000**   118:6 |
| **20**   51:23 68:22 |
| 95:5,11,13,15 |
| 96:22 97:16 98:6 |
| 98:13 122:4 |
| 124:22 |
| **200**   32:16,18 57:18 |
| 70:25 107:23 |
| **2000**   9:20 16:4 |
| **2001**   13:7 |
| **2003**   13:13 |
| **2005**   18:15,16,17 |
| 19:25 21:17,19 |
| 53:20,24 |
| **201**   109:15,17 |
| **2012**   67:8 |
| **2013**   116:7 117:6 |
| 118:23 |
| **2014**   118:23 |
| **2015**   28:17 30:25 |
| 51:23 67:12 74:18 |
| 74:19 80:9 87:23 |
| 89:16 102:9,9 |
| 103:7 105:4 |
| 116:17 119:6 |
| **2016**   31:6,7,8,23 |
| 119:8 |

**2017**   37:3,3,3
119:13
**2018**   38:21 39:19
40:15 87:23
119:13,23
**2019**   119:21,23
**2020**   1:11 3:15
43:3,8 119:24,25
120:3 121:18
**2021**   123:17
**206**   109:16,17
**20th**   73:19
**21**   2:5 4:11 103:7
**22**   122:9
**24**   122:8
**250**   32:16,18 107:3
108:7,8
**26**   40:15
**27**   102:9
**28**   2:14 4:6

| **3** |
|---|
| **300**   102:14 |
| **346**   23:9 |
| **3865**   123:20 |
| **39**   46:9 |
| **3:30**   26:18 |

| **4** |
|---|
| **4**   7:13 |
| **40**   20:6,7,8 41:21 |
| 41:22 |
| **40,000**   19:25 |
| **45**   41:21,21 |
| **4:00**   25:25 26:17 |

| **5** |
|---|
| **5**   122:4 |
| **50**   20:4,5,6,7,8,8 |
| 20:11 35:16,16 |
| 38:2 98:7 |
| **500,000**   98:8 |

**57**   20:21
**58**   98:10
**59**   37:8 44:4
**5th**   123:17

| **6** |
|---|
| **6:00**   26:19 |

| **7** |
|---|
| **75**   36:7 38:2 |
| **78**   89:18,21 90:8 |

| **8** |
|---|
| **8,000**   117:9,11 |
| 118:7 |
| **80**   20:21 |
| **85**   119:20 |
| **85,000**   42:14,14 |
| 119:16,17 |
| **850**   28:23 |
| **86**   14:16,17 |
| **8:15**   26:15 |
| **8:30**   25:24 26:14 |
| 26:14,15,16 |

| **9** |
|---|
| **90**   23:4 |
| **94**   13:4 |
| **96**   13:4 |

| **a** |
|---|
| **a.m.**   1:11 3:16 |
| 70:8 121:14 124:3 |
| 124:21 |
| **abhorrent**   60:7,8 |
| **ability**   8:2,6 99:12 |
| 104:4 106:13 |
| **able**   8:10 99:24 |
| 105:7 |
| **absolutely**   8:13 |
| 54:14 67:13 84:20 |
| 95:17 110:7 |
| 118:15,15 |

[academic - attorney's]                                                Page 2

| | | | |
|---|---|---|---|
| **academic** 15:7 | **ago** 4:20 | **appeal** 103:8 | **article** 89:17,21 |
| **accept** 53:9 56:4 | **agreed** 4:25 |   104:10,11,12 |   90:8 |
| **accepted** 15:16 |   108:14 | **appeals** 104:13 | **aside** 86:19 |
|   49:7 | **ahead** 4:15 11:10 | **appear** 103:25 | **asked** 8:12 55:7 |
| **access** 69:3,5,6 |   12:21 27:17 34:15 | **appearance** 37:17 |   80:23 87:19 94:25 |
| **accusations** 80:20 |   66:2 77:11 104:6 |   37:17 38:3,5,6 |   105:17 115:10 |
| **accused** 24:8 | **al** 1:7 3:10 124:2 |   60:5 69:10 72:12 |   120:14 |
| **acocella** 1:23 3:22 | **alan** 1:7 3:9 |   82:20,22 83:3 | **asking** 6:3 30:4 |
|   123:4,21 | **albany** 106:13 | **appearances** 3:25 |   52:23 64:5 |
| **act** 46:5,7 | **alj** 68:13,22 | **appeared** 118:18 | **aspects** 27:22 |
| **acted** 95:20,20 | **allegations** 52:11 | **appearing** 3:5 | **assault** 65:6 88:12 |
| **acting** 84:21 | **alleged** 66:24 | **application** 15:13 |   88:16 |
| **action** 50:23 52:13 | **allowed** 82:23,24 | **applied** 15:24 | **assaulted** 65:5 |
|   52:22,23,24 53:6 |   83:2 |   16:23,25 |   88:11 |
|   53:13 54:12,21,23 | **altercation** 24:11 | **appreciate** 75:19 | **assigned** 4:21 |
|   56:13,24 57:12 |   81:13 |   106:21 | **assistance** 45:20 |
|   74:25 75:11 79:11 | **amend** 94:15 | **approach** 61:15 |   45:21,25 46:8 |
|   123:13 | **amicable** 43:12 |   81:12 83:12 | **assistant** 2:17 5:23 |
| **actions** 52:3 | **amount** 95:5 |   105:12 | **association** 3:19 |
| **acts** 48:24 |   101:20,21,22 | **approached** 96:10 |   3:22 58:9,13,19 |
| **actual** 116:20 |   106:4,5 107:4,5 |   105:13,17 |   112:15 |
| **adding** 110:19 | **answer** 6:9,13 8:2 | **approaches** 62:21 | **assume** 6:13 93:9 |
| **address** 28:25 |   8:6 58:14,20 |   66:17 |   110:22 |
|   29:5 | **answered** 41:4 | **appropriate** 46:25 | **assuming** 85:3 |
| **adjournments** |   89:8,9 |   102:3 109:5,6,7 | **attorney** 2:11,17 |
|   74:22 75:22 76:2 | **answering** 6:25 | **approximately** |   4:4,5,11 5:23 8:17 |
| **administrative** |   103:21 |   3:15 20:20 74:14 |   16:25 22:6 25:11 |
|   23:6,8 24:20,24 | **answers** 6:16 8:11 |   98:25 119:4 |   25:13,16,17,19 |
| **admittance** 98:4 | **anybody** 62:2 | **april** 18:16,16 |   37:24 40:20,21 |
| **admitted** 22:12 | **anymore** 16:8 |   74:19 102:9 |   45:9,11 47:4 |
| **adults** 55:24 |   19:3 21:11 28:11 | **argue** 57:8,24 78:6 |   50:16,18 51:6 |
| **advice** 46:20 |   63:11 66:12,22 |   99:22,23 118:16 |   53:6,10 56:10 |
| **affect** 7:25 8:6 |   73:12 |   118:18 |   61:24 62:17 63:10 |
| **affidavit** 80:19,19 | **anyplace** 34:4 | **argued** 99:19 |   64:14 65:7,9,24 |
|   80:24 | **aod** 37:13,20 38:9 | **arguing** 78:10,11 |   66:4,12,21 72:20 |
| **affirmation** 18:22 | **apartment** 15:9,18 |   79:22 |   74:24 77:7,22 |
|   65:4 92:24 |   112:7 114:17,25 | **arrive** 97:10 |   79:7,14 82:17 |
| **afford** 19:12,13 | **apologies** 103:20 | **arrived** 52:15,16 |   84:11 85:17,21 |
| **age** 37:8 |   114:15 |   52:17 53:17,22 |   86:3 |
| **aggrieved** 88:8 | **apologize** 117:21 | **art** 9:15 | **attorney's** 53:14 |
| | | |   58:16 59:21 84:5 |

[attorneys - called]

| | | | |
|---|---|---|---|
| **attorneys** 2:13 | 114:17 | **bottom** 103:5 | **brought** 28:7 |
| 17:7 27:13 37:12 | **bargain** 37:22 | **bought** 72:21 | 35:11,17 41:8,12 |
| 37:15,23 40:18,24 | **bars** 16:14 | **break** 6:23 7:3 | 87:23 88:12 |
| 50:25 53:15,16 | **basis** 32:14,18 | 121:2,5 | 117:13,19,25 |
| 54:2 56:21,23 | 39:15 42:15 44:11 | **breakdown** 99:9 | **brushed** 65:17 |
| 57:22 70:21 71:6 | 50:24 55:2 59:3 | **breakfast** 82:18 | **brushing** 90:2 |
| 71:7 82:9,10 | 60:14 61:6,7 | 82:19 83:2 | **bs** 103:7 104:7 |
| 105:15 106:2 | 63:22 | **bridges** 112:11 | **bunch** 26:3 71:12 |
| **august** 53:23,24 | **bates** 102:20 | **bring** 35:8 57:6 | 84:15 |
| **authority** 73:23 | **beach** 26:9,10 | 84:4 87:24 88:4 | **bureau** 2:18 |
| 84:22 86:11 | **bear** 100:12 | 89:17 117:9,9 | 108:12 |
| 108:23 | **beginning** 6:8 | 118:3,3 | **bushra** 77:18 81:4 |
| **authorization** | 19:24 37:2,3 | **bringing** 87:21 | 89:10 90:25 96:2 |
| 72:14 | **begins** 3:3 | **broached** 87:2 | 96:3 |
| **average** 26:13 | **behalf** 4:7 50:21 | **broadway** 23:10 | **business** 24:13 |
| **aware** 86:10,21 | 57:8 | **brodsky** 2:23 3:17 | 63:21 64:13 65:13 |
| 87:17 94:13 96:17 | **belief** 91:23 | 4:17 | 106:3 |
| 109:16 | **believe** 28:12 31:7 | **brody** 51:17 | **busy** 15:22 |
| **b** | 51:25 52:2 67:2 | **broker** 57:9,13,15 | **buy** 82:17,18 |
| | 74:21 78:3 94:9 | 57:18,22 58:4 | **bye** 49:3 |
| **b** 12:15 69:19,20 | 96:19 | 60:10 85:4,6,9 | **c** |
| 78:3 | **benefit** 6:5 | **brokers** 50:24 | |
| **bachelor's** 9:15,16 | **benefits** 42:16,17 | 55:2,3,5 57:3,4,12 | **c** 2:1 5:15 12:15 |
| **back** 10:24 19:25 | **besmirched** 51:12 | 58:6,6,7,7,10,24 | **cab** 57:5 |
| 25:20 29:4 39:12 | **best** 44:21,23 47:5 | 59:13 60:7 67:16 | **calculated** 95:2 |
| 39:15 43:19,25 | **bga** 13:10 | 67:22,23 68:3 | **calculation** 94:25 |
| 54:15 55:9 63:5 | **bill** 106:24 | 75:2 79:2,3 82:6 | 112:19 |
| 77:12 79:25 80:5 | **billed** 105:8 107:2 | 84:2,4 86:12,22 | **calculations** |
| 81:20 83:25 106:3 | 107:4 | 87:7,9,14,16 | 113:15 |
| 112:12 120:6,8 | **bills** 99:20 | **bronx** 9:9 | **calendar** 26:22,22 |
| **background** 55:19 | **birth** 7:11 105:23 | **brooklyn** 16:22,24 | 26:24 99:10 |
| 55:21,22 | **births** 108:20 | 22:16,24 23:3 | 101:16 106:9 |
| **bad** 40:5 | **bit** 17:12 41:8 | 25:11,15,19 30:11 | **calendared** 106:8 |
| **badly** 42:4,5 | 47:10 75:21 83:24 | 30:11 38:11,21,24 | **california** 16:9,11 |
| **ballpark** 20:19 | 94:21 106:23 | 39:5,6,19 48:13 | **call** 57:18 58:18 |
| 117:6 | **blood** 123:13 | 50:19 52:2 80:8 | 62:15 65:8,10 |
| **ban** 87:16 | **bohmstein** 68:13 | 98:21 101:24 | 67:2 70:24 80:14 |
| **banned** 87:7,11,12 | 68:13,23 69:16,18 | 102:13 104:7 | **called** 28:22,24 |
| 87:14 | 73:5 74:13 75:25 | 105:25 107:10 | 29:8 37:12 58:9 |
| **bar** 22:12 58:9,13 | **book** 15:15 | 108:11 112:8 | 61:24 62:16 63:9 |
| 58:18 62:14 68:12 | | 114:17 115:2 | 64:14 65:6,12,23 |
| 68:13 69:17 | | | 66:4,11 71:5 |

**calling** 29:16,19 57:20 61:13 62:2 65:12 84:8 85:9
**calls** 27:4 53:16 80:15 89:7 91:3
**calvo** 80:12,14,16 96:5
**capagrosso** 109:14
**capogrosso** 1:3,19 2:4 3:1,5,9 4:1,10 5:1,14 6:1 7:1,7 7:10 8:1 9:1,7 10:1 11:1 12:1 13:1,14 14:1 15:1 15:4 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1,3 67:1 68:1 69:1 70:1,12 71:1 71:25 72:1 73:1 74:1 75:1,20 76:1 77:1,21 78:1 79:1 80:1,2 81:1 82:1 83:1 84:1 85:1,3 86:1,9 87:1,6 88:1 89:1 90:1 91:1 92:1,22 93:1 94:1

95:1 96:1 97:1 98:1 99:1 100:1 101:1,9 102:1 103:1,20 104:1 105:1 106:1,20 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 115:9 116:1,6 117:1,4 118:1 119:1 120:1 121:1 121:7,16 124:2,3 124:21
**car** 114:18
**card** 106:3
**care** 62:2 73:22
**career** 10:10 15:24
**cares** 46:5
**carry** 107:19
**carrying** 70:18,20
**case** 1:5 3:10 4:17 4:18 6:20 8:19 14:2 22:23 24:18 25:7 29:3,14 36:18 37:16,16 39:12,14 42:2,7,8 46:13,14,17 48:19 50:4,14 52:5 57:8 57:24,24 69:7 72:23 75:8 76:15 77:8,14,23 78:5,7 78:10,11,20,25 79:7,22 80:4 87:21,23,25 88:4 89:24 92:3 94:22 96:18,20 101:21 101:24,25 102:14 102:16 105:10,20 106:14,15,16,16 106:17 107:10,14 108:8 117:3

118:14,17,18 124:2
**caseload** 36:6 44:17 70:18,20 79:9,10,13 99:12 99:14,17
**cases** 25:5,9,12 26:18 30:7 32:2,8 34:6 35:3,6,11,14 35:16,19,21 36:7 38:25 41:3,5,15,16 41:17,20,22 42:9 50:25 64:8 68:15 70:14,17 71:12 72:6 74:14 79:6 84:4,16 99:18,21 103:13 104:3 105:4,9 106:11,17 108:7 115:5 116:19,24 118:9
**cash** 82:8
**category** 95:3
**certain** 14:11 17:16 23:24 38:14
**certainly** 120:5
**certificate** 123:2
**certify** 123:6,12
**chance** 33:15 91:6 91:18
**chancy** 47:12
**change** 124:5
**changed** 106:10 106:11,19
**charge** 88:17 105:9 106:23 107:7,13,23
**charged** 89:12,13 101:21 107:5,12 107:17,18,21 108:4

**charging** 107:9
**check** 20:10 120:16,20
**checks** 29:7
**child** 46:23
**chinese** 58:6
**chose** 83:5,6
**christmas** 82:11
**city** 23:10 24:25
**civil** 25:9
**claim** 116:7 118:22
**claimed** 117:5 119:5,11
**claiming** 94:22
**clarify** 6:12
**classroom** 10:9
**cle** 112:16 114:17
**clear** 14:25 30:7 50:2 80:6,7 81:15 81:19
**cleared** 15:2,2 45:9,10
**clearing** 50:5,6
**clerical** 96:4,7 98:20,22 103:12 103:15
**clerk** 76:23
**clerks** 63:16,24 64:4,9,12,16,17,24 65:21 66:2 82:4,5 82:7,11,25 83:9 84:15
**client** 24:17 27:6 46:15,16 51:9 57:9,10 79:23 83:16,18 85:18,20 85:22 108:17,25 111:15
**client's** 101:18 109:3

[clients - court]

**clients** 19:18 21:14
21:24 22:3,5,9
26:2,2,7 28:23,23
30:2 39:2,3,11
44:2,3,11 45:4
59:25 61:14 63:25
71:24 76:19,25
83:14,14 111:4,7
111:14,20,21
112:5 118:3
**closed** 43:2,4,7,14
**coast** 16:9
**code** 23:20
**collect** 57:15 86:16
118:6
**collected** 99:6,11
100:2,4 116:2,5
**college** 9:13,18,22
**colleges** 9:14
**columbia** 9:15
28:8
**column** 107:4
110:20,21
**come** 29:20,23
57:20 58:11 73:2
80:23 85:16 87:6
95:18 96:23,24
105:11
**comes** 55:3 65:7
97:3,4,6,14,14,24
**comfort** 33:11
**comfortable** 19:16
33:6 86:7 108:18
**coming** 41:20
**commission** 74:2
124:25
**commitment**
27:24
**committee** 73:21
73:22 88:18

**community** 57:5
**companies** 11:14
12:25
**company** 10:6,12
11:14 12:14,14
13:5 16:6 21:10
34:3
**compare** 20:12
**compensation**
42:12
**complaint** 8:23,25
29:11 41:6 51:22
73:18 80:25,25
83:16,22 88:7
90:4,24 95:6,11
97:5
**complaints** 41:2,3
41:4,4 51:5 75:10
75:10,10,14 77:17
77:19 88:5 89:5
90:2
**complete** 8:10
29:3,14 35:8
117:11,12
**completed** 29:15
35:22,23 36:2
116:13,15,18,24
116:25 117:3,15
117:18,23 118:14
119:2,3
**completion** 35:12
35:17
**computer** 69:5
**concern** 78:23
81:8
**concerning** 24:12
62:17 75:11 81:8
**concerns** 81:9
**condition** 7:25
**conduct** 74:3
98:19,20,21

**conducted** 99:20
**conference** 112:6
**confident** 110:6,9
**confidentiality**
109:11
**conflict** 72:19
**connected** 39:24
**connecticut** 16:14
25:14,16 30:9,10
30:13,16 32:3,4
112:4 114:11,16
114:21,23 115:5,6
115:8
**consequences** 12:7
**consider** 27:18
**consist** 31:25
40:16
**constantly** 106:12
116:19
**construction** 10:4
10:6,11 13:5
**constructors**
12:17
**consulting** 13:11
**contact** 26:25
**contend** 72:2
**context** 53:2 56:15
**continue** 61:9
97:19,21 121:2
**continued** 18:21
**continues** 75:15
**continuing** 28:2
**contractor** 31:10
**control** 74:3
**conversation** 6:16
63:6 75:24
**copier** 112:14
**copy** 13:18 31:5
**correct** 4:19 13:16
21:17 39:20 46:12
60:9 66:6 74:23

76:3 79:23 86:13
86:22 93:7 94:7
94:11,16 98:17
100:3 102:19
105:6 110:10,16
111:17 116:22
118:14
**correction** 4:17,23
**corrupt** 90:10
91:15
**cost** 113:10,12
**counsel** 3:24 4:14
4:23 8:15,19
92:20 101:7
120:18
**counselor** 69:21
69:23,24
**count** 95:11,14
**counter** 63:21,23
84:14 85:2
**country** 12:11
**county** 90:17
104:22 105:2
107:20
**couple** 4:20 6:2
25:5 29:24 32:8
38:13 42:8 48:4
52:9,17 53:22
87:20 115:5,6
**court** 1:1 3:12,21
4:25 5:3,5,12 6:6
22:8 23:9,11,14
24:4,15,16 25:6,9
26:14 69:21,23
70:2,5 76:24 82:7
89:23,25 90:3,6,14
90:18 91:15,21,22
91:24 92:15,17
93:21,23 98:3,4
101:20 102:2,13
104:2,13,21 105:2

[court - divide]

105:24 120:12,16
120:25
**courthouse** 57:21
107:24
**courtroom** 26:6
27:7 61:12 62:16
71:8 76:22,23
111:10,22
**courts** 19:11 22:19
23:25 90:10
**cover** 77:11
**covered** 23:20
42:19,20 51:4
**covering** 50:25
72:23 75:7 76:15
77:8,14,22 78:4,19
78:20,25 79:7
98:16
**covid** 42:25 43:18
**craigslist** 40:2
**criminal** 23:9,11
23:14,24 24:2,6,15
25:5,9 32:6,7
35:19 36:13 41:5
41:6,16,22,24
88:16 102:2,13
**criminally** 91:9
**crisis** 43:18
**currently** 44:25
**cut** 34:16 57:14
84:5
**cv** 1:5 3:11

**d**

**dad** 10:24
**daily** 20:23 29:17
29:17,19 44:11
63:22
**damage** 97:15,17
97:23 98:13,16,16
113:15

**damaged** 95:21
**damages** 94:22,25
95:4,7,16 97:11
**danielle** 80:12,14
96:4
**date** 1:21 7:11
40:14 66:24,25
67:2 68:4 94:2
101:14,19,19
102:23,24,25
105:3,22 116:14
116:17,18 120:24
124:3
**dates** 103:3 106:9
106:11,18 108:20
**david** 51:19 96:10
**day** 15:20 25:24
26:11,12,16,20
31:13,14 32:16,17
32:18 33:21 42:25
43:9 47:10,11,13
47:15,17,18,24
55:7 59:5 61:25
62:7,7 67:20,24
84:16 87:10,11,19
99:16 107:11,16
108:3,4 121:18
123:17 124:22
**days** 29:24
**deal** 59:17,19
113:3
**dealing** 82:6 86:7
**dealt** 49:8,18
**debt** 62:9
**december** 1:11
3:14
**decide** 10:17 15:5
80:3 95:23
**decided** 10:14
19:9,17 34:3

**decision** 21:5,8
48:16 50:20 86:4
91:6
**declaration** 94:6
**declared** 94:7
**deemed** 93:24
120:22
**defend** 22:10,13
**defendant** 75:11
96:18,19
**defendant's** 93:15
93:25 122:6
**defendants** 1:8
2:13 3:8,10 4:8
5:24 32:7
**defending** 27:10
**defense** 36:13
**defenses** 26:5
**definitely** 7:4
**degree** 10:15,16
10:18,25 62:4
**demand** 37:13,15
**denied** 65:9,10
**deny** 65:11
**deposed** 7:14
**deposition** 3:4,7
5:25 6:23 8:22 9:5
14:7 52:8 93:19
123:7 124:3
**describe** 21:20
68:18
**description** 58:3
60:17 122:7
**design** 11:20,21,23
12:12
**desk** 14:25 40:23
**desktop** 112:14
**detail** 68:18
**detailed** 101:16,17
**detailing** 81:8

**details** 32:24
**determination**
96:15
**determined** 95:5
**dicey** 92:6
**die** 28:6,6
**died** 44:5
**diem** 20:22,24
21:2 37:11 38:12
38:17
**different** 4:21 12:2
19:11 24:3 36:10
91:22 107:24
**difficult** 6:20
28:18,20
**difficulties** 100:13
**dinner** 59:7
**direct** 12:6
**direction** 10:9
45:12,15 48:17
**directly** 85:18,18
85:25
**discovery** 9:2 14:3
**discrepancy** 75:6
**discuss** 83:23
**discussed** 9:4
93:16
**discussing** 70:13
76:17
**discussion** 70:9
**disease** 44:5
**dispute** 36:14,15
83:19
**district** 1:1,1 3:12
3:13 61:24 62:17
63:10 64:14 65:7
65:9,23 66:4,11,21
**disturb** 49:20
**disturbed** 49:19
**divide** 110:19

**[divorce - explain]**                                           Page 7

**divorce** 15:22 32:8
  36:18 42:8,9
**divorced** 15:9
**dmv** 61:21,21
  85:16 104:13
  106:17
**docket** 72:5
  110:18
**document** 13:16
  64:21 92:8,12,16
  92:23 93:6,24
  101:5,10 102:18
  102:21 120:22
  122:9
**documents** 13:21
  14:6,8 65:2
**doing** 13:5 18:14
  37:11,14 44:24
  48:13 63:21 64:6
  64:12 65:13 69:9
  71:7 74:13 75:17
  76:6,9 79:4 82:19
  84:14 92:7
**dollar** 29:25 62:11
  62:12,13 96:23
**dollars** 38:4,5 95:6
  95:11,13,16 97:16
  98:6,7,7,12 117:15
  117:24 118:11,25
**don** 62:22 63:7
  66:17
**door** 43:4,7,15
  59:5
**doors** 26:15
**drafted** 41:2,3
**draftsman** 10:12
**drive** 44:14
**driver's** 108:19
  109:6
**drivers** 57:6

**drop** 34:3 97:21
**dropped** 34:22
**due** 89:21 100:6,6
  101:19 102:9
  105:3 106:9,10,18
  110:24 116:13,17
**dues** 112:15,15,16
  112:16
**duly** 5:16 123:8
**duties** 11:15 40:16

**e**

**e** 2:1,1 12:15 17:10
  30:20,21 69:19,20
  78:3
**early** 21:18,19
**earn** 29:13 99:24
  116:3,14 117:3
**earned** 99:11
  117:2 118:16,17
  118:19
**easier** 93:2
**eastern** 1:1 3:13
  3:16
**easy** 37:7,8
**eat** 38:8
**ebasco** 11:17
  12:14,15 13:3
**effect** 56:20
**egregious** 98:21
**either** 20:8 45:9
  91:9 99:10
**eklb** 1:6 4:20
**emotionally** 47:2,3
**employed** 31:16
**employees** 21:4
**endeavors** 15:7
**ended** 26:16 56:23
**engineer** 10:13
  11:8,8,19,20 13:7
  15:19 16:3,5,9,15
  18:3 20:13,17

48:11,14,25 62:7
**engineering** 9:17
  9:18 10:15,15,16
  10:18,20,25 11:2
  11:12,13,14,18
  12:12,25 19:5
  20:13 49:22 55:22
**engineers** 12:17
  13:3,11
**enjoyed** 10:7,20
  10:20,21,22,23
  11:5,6,6,24,25
  16:5 27:21,21,24
  42:3 48:12,13
**entail** 11:16
**enter** 71:8,14
**entered** 93:18
**entering** 68:24
  72:13 73:6,7
**entitled** 63:3 79:9
  91:25
**errata** 124:1
**error** 103:12
**esbaso** 12:15
**especially** 47:2
  81:22
**esq** 2:4,16
**establish** 46:23
**established** 80:10
**estimate** 27:25
  35:2,15 36:3
  41:14 117:5
  118:21
**estimates** 120:4
**et** 1:7 3:10 124:2
**eugene** 77:24,25
**eventually** 54:9
**everybody** 29:2
  37:24 53:17 62:24
  89:25 107:8,9

**exact** 20:16 32:12
  40:14
**exactly** 20:9 43:8
**exam** 15:14,15
**examination** 1:17
  5:20 122:4
**examined** 5:18
**example** 116:16
**exams** 21:13 62:14
**exceed** 95:5
**excel** 101:13
**exchange** 84:5
**executive** 10:5
**exhibit** 14:10
  67:11 93:25 99:5
  100:8,10,14 120:6
  120:10,14,21,23
  122:8,9
**exhibits** 8:25
  13:24 14:11,12,16
  14:17 64:23 65:2
  66:24 67:6 100:19
  122:6
**expect** 43:18 56:3
**expectation** 85:20
**expelled** 28:16
  87:22 89:15
**expenses** 19:7,9,10
  20:2,3,16 21:3
  111:25 112:8,10
  112:13,19,21,21
  112:24,24 113:3,7
  113:15,16,18
  114:5,10
**experience** 41:9
  41:10,11
**expires** 124:25
**explain** 23:16
  52:13,25 57:3
  58:25 76:16 83:21
  93:21 98:2,3,5

[explain - given]

99:3 102:22 103:9
105:8 118:2
**explained** 73:21
74:7
**expulsion** 103:3
**extra** 38:18

**f**

**facetious** 55:13
**facetiously** 53:8
**facing** 101:3
**facts** 49:10
**fair** 90:12,17 91:5
91:18
**fall** 31:21
**family** 46:25
**father** 10:4 28:9
60:13 67:16
**fearful** 44:3,10
**federal** 89:23 90:3
90:6,14 91:22,23
94:13
**fee** 29:2,12,13
57:14,16 83:19
84:10,11 86:16
108:13
**feel** 6:23 19:16
33:5,11 52:11
86:7 102:3 108:18
**feeling** 45:13
65:22
**fees** 50:10,11 84:5
114:18
**felt** 22:9 58:8 60:6
91:14,20 97:4
**fence** 36:17
**field** 10:13,20
**fight** 71:23
**figure** 20:19 45:24
95:9,18 96:22,23
99:4 100:10
111:24 117:7

118:12
**figured** 15:18
**figuring** 98:12
**file** 80:24
**filed** 8:24 9:2 41:3
**finally** 117:2
**find** 28:19
**finding** 28:20 37:7
**fine** 17:14,15 31:4
71:16,19 121:6
**finish** 6:25 99:12
110:18
**finished** 10:16
117:13 118:10
**firm** 19:5 20:14
30:15,18,19 31:13
31:13,25 32:21
35:20 36:11,21
37:5 38:11 39:19
39:21,25 40:10,12
40:13,17 41:18
42:13,24 43:2,10
43:20 46:11
119:19
**first** 5:16 6:6
17:14,15 28:21,21
38:2 46:24 47:23
52:14,15,19 53:17
53:25 58:15 63:13
67:7,19 73:8
74:20 77:21 95:3
119:9
**five** 35:21,25
68:25 70:23 81:14
94:20 98:7 121:4
**follow** 18:25 89:5
**following** 17:20
**follows** 5:19
**forget** 38:15,18
**forgot** 38:14 74:6

**formally** 93:17
**formula** 97:8,11
97:12
**forth** 112:12 123:8
**forward** 99:14
**fought** 71:23
**found** 36:22 54:10
58:22
**four** 15:21 18:17
35:13,18 62:6
70:23 103:19
**frank** 30:19 33:2,9
33:16,23 34:23
49:16
**friday** 3:14 26:17
**friend** 46:16,17,21
46:22 59:7 60:11
**friends** 46:25 75:4
**front** 14:6,8,9,14
14:20,22,25 24:13
40:23 43:4
**fulfill** 17:18
**full** 7:8 39:15 62:7
119:9,24
**fun** 11:4,24
**funny** 53:8 55:13
**further** 123:12
**future** 99:22,23
105:4,5

**g**

**g** 5:15 39:23 78:3
**game** 54:8 63:14
70:21 71:21 81:18
82:2
**gap** 109:15
**garb** 60:21
**gas** 19:13 112:12
**gather** 57:5
**ge** 68:12,20 69:9
70:14 75:9 76:22
79:6

**geez** 37:21
**gelbstein** 1:7 3:10
50:22 52:10,15
54:7 58:24 61:3
62:20,21 65:25
66:16 67:15 68:12
68:19 69:15 70:14
72:3,24 73:4
74:12 75:8,24
76:15 77:9,14,16
77:23 78:21,25
79:21 80:15,15
81:5,16 89:10
90:23 96:2 124:2
**general** 2:11,17
4:4,5 5:23 32:9
56:10 68:20 86:3
**general's** 73:25
**generate** 47:21,22
**generated** 113:5
115:22
**generating** 44:18
**gerbasi** 77:24,25
78:2
**getting** 11:10
17:18 50:6,16
54:12 56:7,9
**giggles** 75:12
**giggling** 90:24
**give** 5:8 6:13 8:10
15:11 21:12 28:24
29:5,24 33:17
55:4 57:23 58:13
58:19 71:3,4,16
82:24 83:2,2
108:21 109:3
118:6
**given** 63:24 99:11
113:8 115:21
123:10

[gives - helped]

| | | | |
|---|---|---|---|
| **gives** 16:17 | **gotta** 33:9 38:8 | 14:1 15:1 16:1 | **handled** 58:24 |
| **giving** 13:22 63:25 | 68:10 77:9 82:14 | 17:1 18:1 19:1 | **handling** 71:9 |
| 64:4,9 82:7,11,12 | **graduated** 9:19,22 | 20:1 21:1 22:1 | **hands** 68:15 69:11 |
| 82:12,15 84:15 | 9:24 11:12 16:4,4 | 23:1 24:1 25:1 | 76:8 |
| **go** 4:15 9:10 10:24 | **grand** 62:9 | 26:1 27:1 28:1 | **happen** 63:8 |
| 11:25 12:21 15:5 | **graver** 23:21 | 29:1 30:1 31:1 | **happened** 27:4 |
| 15:11 16:8,12 | **great** 7:7 8:14 | 32:1 33:1 34:1 | 30:25 54:4 66:20 |
| 22:19,23 23:14,24 | 42:21 48:2 113:2 | 35:1 36:1 37:1 | 74:16 76:24 83:21 |
| 26:10 27:17 32:24 | **greatly** 18:8,8 | 38:1 39:1 40:1 | 103:15 |
| 34:15 37:14,16 | **grievance** 34:25 | 41:1 42:1 43:1 | **happening** 75:9 |
| 39:8 43:19,25 | 51:8,10 73:20,21 | 44:1 45:1 46:1 | **happens** 4:10 |
| 45:17 48:17 62:9 | 83:15 88:9,17,17 | 47:1 48:1 49:1 | 22:18 55:4 |
| 62:25 66:2 70:2,6 | 91:10 | 50:1 51:1 52:1 | **happy** 42:7,11 |
| 71:7 76:23 77:6 | **grill** 22:2 | 53:1 54:1 55:1 | 71:17,19 |
| 77:11,20 80:5 | **grilled** 21:25 | 56:1 57:1 58:1 | **harassment** 75:15 |
| 84:13 91:2 93:10 | **groceries** 24:9 | 59:1 60:1 61:1 | **hard** 51:6 |
| 94:3,19 100:9 | **grocery** 24:9 | 62:1 63:1 64:1 | **hat** 88:19 |
| 104:6 120:6 | **group** 12:19 13:8 | 65:1 66:1 67:1 | **hawthorne** 112:4 |
| **god** 5:10 | **grow** 9:8 | 68:1 69:1,19,20 | 114:14,16 |
| **goes** 71:17 74:4,9 | **guaranteed** 47:18 | 70:1 71:1 72:1 | **head** 6:17,18 |
| 109:16 | **guard** 81:12 88:11 | 73:1 74:1 75:1 | 120:17 |
| **going** 6:2 18:12 | **guess** 71:25 78:22 | 76:1 77:1 78:1 | **headache** 29:18 |
| 19:8,15 26:9 28:5 | **guilty** 68:14,24 | 79:1 80:1 81:1 | **hear** 27:8 52:2 |
| 28:6,11,12 29:8 | 71:3,8,14 72:13 | 82:1 83:1 84:1 | **heard** 51:14 56:6 |
| 32:23 34:2 45:20 | 73:6,7 74:22 | 85:1 86:1 87:1 | 56:14 68:20 72:6 |
| 45:22,23 46:8,22 | 75:23 76:2 84:24 | 88:1 89:1 90:1 | 72:10,18 76:5,10 |
| 54:10,15 55:8 | 84:25 | 91:1 92:1 93:1 | 78:15,17 79:20 |
| 63:21,22 67:5,10 | **guy** 24:8 40:4,6,7 | 94:1 95:1 96:1 | 86:6 |
| 69:2 77:7,13,15,15 | 44:22,22 47:6 | 97:1 98:1 99:1 | **hearing** 24:18 |
| 78:6 81:9 82:18 | 49:15,21 55:3,25 | 100:1 101:1 102:1 | 90:12,17 |
| 90:11 91:5,15,18 | 62:23 63:3 71:3,3 | 103:1 104:1 105:1 | **hearings** 21:23,23 |
| 91:21 92:8 96:15 | 71:14 118:5 | 106:1 107:1 108:1 | 24:25 |
| 97:20 99:14,21,23 | **guys** 10:21 27:15 | 109:1 110:1 111:1 | **heart** 97:3,7,14 |
| 100:10 105:5 | 56:18 57:4 59:18 | 112:1 113:1 114:1 | **heck** 49:20 69:2 |
| 107:9 108:21 | 79:5 100:14 | 115:1 116:1 117:1 | 120:2 |
| 109:2,4 110:23 | 105:18 | 118:1 119:1 120:1 | **held** 24:3 55:20 |
| 112:12 | | 121:1,16 | **help** 5:10 38:13,18 |
| **good** 3:2 11:7,7,8 | **h** | **hand** 5:6 123:17 | 51:21 |
| 30:6 39:13 41:12 | | **handful** 6:4 | **helped** 15:21 |
| 47:19 49:3 52:20 | **h** 1:3,19 2:4 3:1,4 | **handle** 105:5 | 36:15,19 |
| 52:21 71:18 92:21 | 3:8 4:1 5:1,15 6:1 | | |
| | 7:1,9 8:1 9:1 10:1 | | |
| | 11:1 12:1 13:1 | | |

[helpful - judge]                                                                 Page 10

**helpful** 6:4
**henry** 7:9
**hereinbefore** 123:8
**hereunto** 123:16
**high** 9:10
**highlighting** 102:6
**hire** 77:2 118:5
**hired** 11:17 71:23 76:19 101:15 102:25 104:11,21
**hit** 42:25 53:12
**hold** 88:18 92:5
**holding** 85:4
**holidays** 82:8
**home** 15:17 43:5 71:17 112:7,9,9 114:11,17 115:2
**honest** 95:22
**hook** 24:14,15 101:25 102:12
**hope** 47:5 56:18 56:20
**hour** 105:9 106:24
**hours** 26:13 29:19
**howard** 2:23 3:17
**huh** 6:18
**hundred** 38:4,5 62:9 107:12,17 108:2,4

**i**

**i.e.** 10:5
**ida** 96:3
**idea** 34:20,20 48:21 66:19 76:4 76:6 84:7 120:5
**identification** 94:2 120:23
**identify** 60:17
**ignore** 89:4

**ignored** 89:11
**illegal** 84:6 85:6
**illness** 7:25
**immigration** 24:16 25:6 41:7 41:10,11,13
**implications** 23:22 24:3
**important** 17:19 17:21 26:23 28:22 94:16
**improper** 98:19
**improperly** 88:20 110:5
**impropriety** 60:5 82:20 83:4
**inappropriate** 49:4
**incident** 51:17 66:24 76:14 80:13
**incidents** 52:10
**include** 42:16 112:18 113:14
**included** 114:10
**including** 113:16
**income** 47:9,22 116:6,20 117:6 118:13,22 119:5
**independent** 25:18 31:10
**index** 122:2,6,11
**indicated** 56:16 58:22 110:14 111:23
**information** 60:18 105:23 106:7 108:17,21,25 109:2,9
**initial** 55:10
**initially** 101:14 102:25

**injuries** 41:3
**injury** 32:2 35:3,6 36:12 41:6,15,17 41:25
**inspector** 73:24
**instance** 70:13 73:3 102:4 103:4
**instigated** 96:11
**instigates** 81:13
**insurance** 17:19 17:23,25 18:6,11 18:22 20:4 32:23 32:25 33:5,15 34:2 42:18,20 49:12,17
**intend** 52:7
**intention** 15:24
**interacting** 44:3 44:10
**interaction** 85:24
**interested** 123:15
**intermediary** 85:23
**internal** 74:2
**international** 12:19 13:8
**interrogatories** 93:5 122:8
**interrogatory** 94:10,20,24
**introducing** 54:6 56:22
**investigated** 49:10
**investigation** 62:18 66:5,8 76:11 78:16
**involve** 115:7
**involved** 24:11 34:10 47:2,3 60:6
**iona** 9:12

**island** 19:11 22:22 104:17
**issue** 32:23 33:13 33:18,20,24 34:5,8 34:19
**item** 56:25 98:23
**items** 52:7 103:6 108:16

**j**

**j** 39:23
**james** 2:12,16 4:2 4:4 5:22
**january** 123:17
**jewish** 58:7 59:12 60:19,20,21 67:16 68:2
**jiang** 39:21,22,23 39:25 40:10,17 41:18 42:13,24 43:10,19 44:13 46:11 119:16,20 119:22
**job** 12:2,4 16:17 16:18,19,21 18:2 20:22 27:19 34:18 34:20,21 37:7 39:18,25 40:3,7 49:3 66:10 76:11 76:12 78:16 79:18 82:15
**joined** 38:11
**joking** 55:14,17
**judge** 4:21 50:22 52:10,14,23 53:7 53:12 54:7,12 55:23,24,25 56:12 58:23 61:3 62:20 65:25 67:15 68:13 68:19 69:3,9,15,16 69:16 70:13,17 72:3,4,5 73:3,4

[judge - listening]                                          Page 11

| | | | |
|---|---|---|---|
| 74:12,13 75:24,25 | 20:10 27:3,9,10,22 | **lady** 42:3,4 61:10 | 110:7 |
| 76:15 77:16,23 | 27:23 31:2,8 | **land** 36:14,14 | **legal** 3:18,19 36:12 |
| 78:12,21 79:15,21 | 32:13,14,18 33:19 | **laptop** 112:14 | 46:10,20 48:24 |
| 80:15 81:5,16 | 33:20,21,24,25 | **lastly** 76:13 | 57:14,16 62:4 |
| 89:23 90:3,6,14,15 | 34:19 35:5,6,10 | **late** 21:18 26:20 | 84:6 86:12 105:20 |
| 90:23,25 91:11,24 | 36:8 37:22,23 | **laughing** 90:23 | 106:6 108:23 |
| 96:2 | 38:23 40:14 41:15 | **laughs** 75:12 | **legitimate** 72:17 |
| **judges** 49:9 50:20 | 41:20,21 43:14,16 | **law** 9:19 15:5,11 | **letitia** 2:12 4:4 |
| 51:3 81:22,23 | 44:16,17 45:16,16 | 15:16,18,20,24 | **letter** 51:23 73:17 |
| 90:21,22 95:19,19 | 45:23 47:16 48:6 | 21:6,13 27:23 | 73:18 |
| 95:20,24 97:5 | 48:6,7,12,23 49:5 | 30:3,15,17,19 | **letters** 89:7,8 |
| 98:20,22 | 49:24,24 50:3 | 39:13,21 62:5,10 | **level** 37:21 44:15 |
| **judicial** 74:3 | 53:4 54:8 55:15 | 79:13 80:6 84:18 | **levels** 36:10 |
| **july** 7:13 21:18,19 | 55:15,18,25 56:4,5 | 112:16 113:2 | **levine** 96:6,19 |
| 53:23,24 | 56:16,19,20 58:14 | 119:19 | **liberty** 2:14 4:6 |
| **june** 18:15,15 | 59:5,8,14,15,22 | **lawsuit** 5:24 67:7 | **license** 33:7,8 |
| 21:18,18 53:20,20 | 60:3,15,16,18,21 | **lawyer** 17:2,3 21:6 | 71:11,18 105:22 |
| **jurisdiction** 74:9 | 60:23 62:5,19,22 | 39:13 48:12 56:2 | 105:22 108:19 |
| **jury** 50:19 52:2 | 62:23 63:3,12,13 | 57:17,19,23,24 | 109:7 112:16 |
| 95:23 96:14 | 64:16 65:18 66:7 | 61:13,16,16,17,17 | **licensed** 32:5 |
| | 66:14,14,16 71:17 | 61:18,19,22,23 | 115:4 |
| **k** | 72:8,9,10,16,19 | 62:2,4,16 64:4,6 | **lie** 45:20 49:6,13 |
| | 75:3,5,25 76:7,9 | 65:13,14 75:7 | **lied** 49:2,9,19 |
| **k** 17:10,10,10 | 78:13,13,15,18,21 | 77:3 80:21 84:9 | 50:21 |
| **kalker** 17:2,12 | 78:24 79:4,17,18 | 84:17 85:12,25 | **lies** 91:2 |
| 18:5,16 19:23 | 79:19 82:23,24,25 | 86:15,16,20 97:18 | **life** 49:2 97:22 |
| 49:10 | 83:10 84:7,23 | 97:18,24 105:18 | **liked** 10:8 11:4,24 |
| **kalker's** 17:8 | 85:8,8,10,10,20 | **lawyers** 38:13 | 13:12 15:6,6 |
| **kblb** 3:11 | 86:2,23 87:12 | 49:8,18 50:21 | 19:19,19 21:14 |
| **keep** 103:20 | 89:2 92:10 97:10 | 52:18 55:5 57:7,7 | 22:5 26:2,6,7,7 |
| **kent** 103:8 104:18 | 97:11 103:11,13 | 58:11 60:24,24,25 | 27:20,21 32:5 |
| 104:22,23,23,23 | 103:14,17,18,18 | 76:19,21 77:3,4 | 63:18 71:24 111:8 |
| 105:2 | 103:23,25 104:24 | **lead** 40:18 | 111:20 |
| **kept** 15:22 26:22 | 107:6,12,18 | **learning** 15:6 | **line** 7:2 102:5,8 |
| 49:5 80:18 101:16 | 112:15 117:14,17 | **leave** 33:11 87:19 | 122:3,7,12 124:5 |
| **kicked** 66:15 | 119:20 | 110:3 | **list** 14:5 |
| **kind** 53:11 59:22 | | **leaving** 46:11 | **listen** 55:19 77:19 |
| **kings** 90:17 | **l** | 86:19 | 90:4 |
| **knew** 60:24,25 | | **left** 18:13 28:8 | **listening** 73:15 |
| 83:13 105:12,18 | **l** 17:10 30:20,21 | 40:20 49:13 87:10 | 77:16 |
| **knocked** 59:4 | **laborer** 10:3,10 | 99:16 105:16 | |
| **know** 7:3 10:9 | 28:9,10 | | |
| 15:7 17:5,5 19:15 | | | |

[litigated - mention]

| | | | |
|---|---|---|---|
| **litigated** 25:5,8,12 | 114:9 | **maria** 1:23 3:22 | 118:1 119:1 120:1 |
| **litigation** 2:18 | **lot** 11:25 27:12 | 123:4,21 | 121:1,16 124:3,21 |
| 34:2 | 30:3 35:7,9,10 | **mario** 1:3,19 2:4 | **mark** 93:15 |
| **little** 17:11 23:21 | 37:23 41:9,20,21 | 3:1,4,8 4:1,9 5:1 | 120:14 |
| 41:8 47:10 52:7 | 50:10,11 56:19 | 6:1 7:1,9,9 8:1 9:1 | **marked** 93:17,25 |
| 68:18 75:20 92:6 | 58:5,6 71:7 76:25 | 10:1 11:1 12:1 | 103:6 120:21,23 |
| 93:2 94:21 106:22 | 76:25 105:18 | 13:1 14:1 15:1 | **marriage** 123:14 |
| 117:25 | **loved** 21:24 22:3 | 16:1 17:1 18:1 | **married** 15:8 |
| **living** 21:3 45:18 | 25:23,23,25,25 | 19:1 20:1 21:1 | **material** 109:8 |
| 59:9 75:4,5 79:5 | 26:2,9,10,11 83:14 | 22:1 23:1 24:1 | 115:17,25 |
| **llc** 124:1 | 83:15 | 25:1 26:1 27:1 | **mathematical** |
| **loans** 62:13 | **lower** 116:21,23 | 28:1 29:1 30:1 | 11:5 |
| **located** 3:20 | **lunch** 50:23 59:6 | 31:1 32:1 33:1 | **matrimonial** 42:2 |
| **location** 3:5 | 61:4 | 34:1 35:1 36:1 | **matter** 3:8 34:8 |
| 101:15 | **lying** 90:25,25 | 37:1 38:1 39:1 | 101:17 123:15 |
| **long** 11:9 12:22 | **m** | 40:1 41:1 42:1 | **matters** 32:7 |
| 15:14 19:11 22:22 | | 43:1 44:1 45:1 | **max** 38:6 |
| 28:2 29:6,6,10 | **m** 4:2 5:15 69:19 | 46:1 47:1 48:1 | **mean** 11:5 34:16 |
| 30:2,6 38:16 | 69:20 | 49:1 50:1 51:1 | 46:2 48:20 49:7 |
| 42:23 48:25 87:24 | **madam** 92:15 | 52:1 53:1 54:1 | 52:6 78:5 82:3 |
| **longer** 28:13 88:25 | 93:14,21 120:12 | 55:1 56:1 57:1 | 95:25,25 103:10 |
| 96:18 119:10 | **mail** 29:24 112:5 | 58:1 59:1 60:1 | **means** 7:21 20:22 |
| **longest** 58:15 | 114:16,20,23,25 | 61:1 62:1 63:1 | 78:6 102:23 |
| **look** 9:25 13:14 | **making** 17:19 | 64:1 65:1 66:1 | **meant** 56:5,17 |
| 31:3 64:22 65:3 | 47:11 59:23,23 | 67:1 68:1 69:1 | 78:8 |
| 66:23 67:5,10 | 62:3 85:13 | 70:1 71:1 72:1 | **mechanical** 9:17 |
| 95:12 109:20 | **malpractice** 32:22 | 73:1 74:1 75:1 | 13:7 |
| **looked** 80:9,11 | 32:25 33:3,5,10,12 | 76:1 77:1 78:1 | **medical** 17:18,23 |
| 87:5 96:5 | 33:14,22 34:10 | 79:1 80:1 81:1 | 17:25 18:6,10 |
| **looking** 13:15,22 | 36:23 42:19,20 | 82:1 83:1 84:1 | 20:4 49:12 |
| 17:3 37:6,9 48:20 | 49:17 | 85:1 86:1 87:1 | **medication** 8:5 |
| 54:11 56:10,12 | **man** 24:10,12 28:5 | 88:1 89:1 90:1 | **meeting** 44:2 |
| 103:4 | 28:7,10 50:8,9 | 91:1 92:1 93:1 | 52:14,15,16,18 |
| **looks** 80:17 | 55:20 60:20 75:16 | 94:1 95:1 96:1 | 53:14,16,25 54:5 |
| **lose** 47:17,20 | 75:16 | 97:1 98:1 99:1 | 54:15,25 55:10 |
| 76:20 | **manager** 10:5 | 100:1 101:1 102:1 | 57:10 |
| **lost** 27:5 32:22,24 | **manhattan** 9:18 | 103:1 104:1 105:1 | **melanie** 96:6 |
| 33:10 36:22 49:16 | 107:22 | 106:1 107:1 108:1 | **memory** 52:20,21 |
| 50:7,17 51:22,24 | **march** 18:16 | 109:1 110:1 111:1 | **mention** 34:11,12 |
| 80:18 81:21 98:24 | 40:14,15 43:2,3,8 | 112:1 113:1 114:1 | 96:8 |
| 110:14 111:24 | 43:9 46:12 51:23 | 115:1 116:1 117:1 | |
| | 73:19 119:23,25 | | |

[mentioned - obviously]

mentioned 34:12
48:18 52:9 61:11
76:13 83:25
mic 92:19
middle 108:16
million 95:6,11,13
95:15 96:22 97:16
98:6,7,7,12
mind 48:22
minimum 71:16
71:19
minute 113:24
121:4
minutes 70:6
81:14
misnumbered
110:13
missing 110:12
monday 26:17
102:8,9
money 27:9 28:25
29:3,4,7,9,20,21
29:22 47:11,13,14
47:16,18,23 50:7
50:17,18 56:19,21
57:23 58:16 59:20
70:24,25 71:6
81:20 82:7,16,25
83:9 87:13,13
89:19,20,21 90:7
91:13 92:2 99:6,6
100:2 110:17,24
112:22 113:5,7,10
113:11,12,13,17
113:20 114:4,7,8,8
115:22,25 116:3,4
116:14,24,24
117:2,5 118:16,17
118:19 119:11
monies 59:24 99:8

month 31:8 74:17
117:9,12 118:8,10
months 4:20 17:24
17:24 18:7,17
21:2 49:12 52:17
53:22 71:10,13
98:25 110:15
morgan 73:19
morning 3:2 81:12
82:19 88:21
motorist 29:11
51:9 71:4,17
83:18 105:13
106:14
motorists 21:22
23:18 27:2,12,14
29:16 57:6 59:25
61:14 68:14 77:2
105:11
mouth 49:5
move 45:11,12,14
moved 43:21,24
44:13 102:2
104:20
moving 98:23
muted 92:19

| n |
| --- |

n 2:1 39:23,23
69:19,20
name 3:17 5:22
7:8 12:13 17:9
30:17 34:11 45:9
45:10 50:2,5,6,15
59:14,16 80:7,7,20
81:15,19 95:21
97:15,17,23 98:13
98:16,18 101:18
105:21 109:5
124:2,3
named 34:24

names 38:14,15,19
60:15 108:18
narrow 75:21
narrower 106:23
near 61:20,21
necessarily 116:13
need 6:23 7:3 45:6
45:7,8 47:23 70:2
70:5 93:20 95:22
103:21 113:2
120:19
needed 38:13,18
50:22 105:23
112:20
needs 69:7
never 24:17 34:24
49:6,6 51:22 76:7
79:21,24 80:18,21
80:24 81:2 83:21
87:16 96:5 105:13
105:14
new 1:1,25 2:6,6
2:10,15,15 3:6,6
3:13,21,21 4:6,6,7
4:12,12 5:18 9:9
9:12 16:14 19:12
22:22 23:10,20
24:25 25:6,15
32:3,4 80:6 89:24
90:10 103:13
104:3 109:6
112:10 114:14,16
115:3 123:5 124:1
nice 26:11 40:4,6,7
42:6,10 44:22,22
44:22 47:6
night 15:11,20
21:7 29:20 62:6,8
ninety 23:4
nodding 6:17

non 49:23
nonlegal 48:21
nope 45:6 46:21
normal 112:13
normally 14:7
19:5 23:23 98:10
107:11,13
notary 1:23 5:17
121:19 123:4
124:25
noted 121:14
notice 1:21 43:3,7
noticed 103:2
nuclear 11:18,19
11:23 12:2,4,10
13:8,12 49:2,2
62:8
number 3:11 4:18
4:19 6:3 59:21,21
90:6 91:8 94:24
97:2 98:3,23
102:18 103:6
105:21,22
numbers 108:19
108:19,20,20
109:3

| o |
| --- |

o 5:15,15,15,15
12:15 30:20,21
69:19,20
oath 5:2 7:18
22:11 24:24
objected 18:20
objection 14:19
objectionable
58:23
obligation 22:8,9
22:13 94:14
observing 53:11
obviously 64:8
87:10

[occasionally - planet]                                              Page 14

**occasionally** 22:17
  23:11
**offer** 16:18,20,21
  30:9,10
**offered** 20:6
**offering** 40:3
**office** 2:11 4:3
  24:24 36:7 40:19
  44:14 51:21 55:6
  59:2,3 60:8,11
  61:5,6,20 67:17
  69:5,8 73:16,17,25
  75:2 79:3 81:6,7
  88:7 89:9 109:24
  109:25 110:5
  112:3,7 114:11,12
  114:13,15,17
  115:7
**officer** 22:7
  106:15
**officers** 21:24 22:6
  23:25
**offices** 3:20 81:10
**officially** 31:12
**oftentimes** 106:9
**oh** 35:5,6,21 37:21
  47:16 67:19
**okay** 12:9 14:5,15
  16:23 31:24 36:20
  37:4 47:22,25,25
  67:14 68:8 78:9
  87:3 92:21 94:19
  96:9 99:15,25
  101:2 108:15
  110:6 113:22
  114:10
**old** 37:8 44:4
**omission** 94:16
**once** 24:16 40:11
  48:15 49:3,3
  93:18

**ones** 35:7,11
  101:23
**ongoing** 35:22,24
**open** 43:23 44:15
  44:15
**opened** 26:14,16
**operating** 112:13
**opinion** 28:14 63:2
  63:3 78:7 79:8,8
  79:11,16,16,18
  90:5 91:25 92:2
  95:22
**opportunity** 38:20
**opposed** 23:18
**order** 59:24
  109:11,11
**ordered** 104:2
**organization**
  30:13
**organizations**
  38:10
**outcome** 123:15
**outside** 10:8 24:7
**outstanding** 99:20
**overnight** 35:23
**owe** 111:2,14
**owed** 90:7 91:13
  92:2 99:7,8
  101:22 106:5
  110:23 112:23
  113:18,21 114:4,7
  114:8

**p**

**p** 2:1,1 5:15 30:20
  30:21
**p191** 102:18 103:5
**p206** 102:18
**pad** 105:20 106:6
**page** 92:25 93:10
  94:3,6,20 102:11
  103:5 122:3,7,12

124:5
**pages** 109:15,15
  109:18 110:12
**paid** 19:6 20:9,14
  20:15 29:2 31:10
  31:11,16 32:10,13
  32:17 37:19 40:11
  40:12 42:15 56:7
  56:9 62:11,12,14
  82:15 101:21
  106:5 110:20
  111:8,8,16,20,20
  111:22
**pandemic** 45:19
  45:21,25 46:7
**paper** 112:14
**paralegals** 40:22
  87:12
**parking** 24:12
**part** 11:5 24:5
  26:6 29:6 82:7
  100:4,7,7 106:4
  111:3,4,7,15
  119:24
**participate** 82:21
  83:5
**particular** 15:23
  60:10
**parties** 4:24 36:16
  36:16 81:17 83:3
  123:13
**parts** 12:11
**passed** 16:14
  21:13 46:5 62:14
**pay** 18:10 19:8,9
  21:2 33:4 37:17
  46:20 57:17 58:11
  82:14 110:23,25
  111:14 113:2
  120:3

**paying** 20:16
  63:20 82:5 83:9
  119:16,20
**peluso** 30:19 31:25
  32:21 35:20 36:11
  36:21 37:5 49:16
**penal** 23:20
**people** 6:17 10:22
  11:6 52:3 58:12
  60:21 64:8 84:4
  86:7 111:6
**percent** 23:2,4,4
**percentage** 22:25
**perez** 83:20,23
**period** 115:11
**permissible** 86:13
**person** 33:3 60:22
  78:22 110:2
**personal** 32:2 35:3
  35:5 36:12 41:2,6
  41:15,17,25
**personality** 12:8
**personally** 118:18
**phone** 27:4 89:7
  91:3 105:21
  108:19,20 109:3
**phonetic** 12:16
**picture** 13:15
**piece** 50:22 52:12
  52:22,22,23 53:6
  53:13 54:12,21,23
  56:13,24 57:11
  74:25 79:11
**pin** 72:25
**pink** 23:12,19 24:7
**place** 2:5 4:12 21:9
  105:14 114:22
**plaintiff** 1:4,19 3:9
  4:10 5:16 95:4
**planet** 11:20

[planning - real]

| | | | |
|---|---|---|---|
| **planning** 28:2 | **posed** 7:2 | 111:11 | 63:23 72:21,21,25 |
| **plant** 11:19 62:8 | **position** 30:12 | **proceeding** 89:18 | 76:18,22 102:15 |
| **plants** 11:23 12:10 | 38:22,24 | 89:22 90:8 | 106:4,8 |
| 13:6,9,12 | **possible** 88:24 | **produce** 109:18 | **putting** 36:17 |
| **play** 71:20,22 | **posted** 40:3 | 115:13 | 72:12,13 |
| **played** 54:9 70:21 | **power** 11:18,19,23 | **produced** 13:19 | |
| **players** 63:15 | 12:10 13:6,9 | 109:14,19 110:9 | **q** |
| 67:21 | 16:10 62:8 | **professional** 48:24 | **queens** 108:9,10 |
| **playing** 81:18 82:2 | **practice** 18:13 | 49:24 | **question** 6:7,8,11 |
| 82:4 | 21:15,16,21 22:15 | **prohibiting** 86:21 | 6:14,25 54:18 |
| **plea** 68:24 71:8,14 | 23:5 24:23 28:3 | **project** 10:4,21 | 74:11 75:20 87:2 |
| **plead** 71:3 | 84:3 85:7 87:22 | 11:19,22 | 87:4 106:22 |
| **pleading** 68:14 | 112:2,16 | **projected** 98:25 | 113:24 |
| 79:5 84:24,25 | **practicing** 25:22 | **properly** 26:22 | **questioned** 76:7 |
| **pleadings** 8:24 | 28:16 30:3 33:7 | 110:3 | **questioning** 7:2 |
| **pleas** 51:21 72:13 | 39:13 51:4 63:15 | **protecting** 89:25 | **questions** 6:3 8:2,6 |
| 73:6,7 74:22 | 79:13 80:5 84:18 | **protective** 109:11 | 8:11 87:21 |
| 75:23 76:2 | 97:19 112:25 | **provide** 31:4 | **quick** 33:17 121:4 |
| **please** 3:24 5:3 6:7 | **practitioner** 32:9 | 122:13 | **quiet** 62:24 |
| 6:12,15 14:24 | **predominately** | **provided** 9:3 | **quinnipiac** 9:19 |
| 31:4 92:9 100:11 | 22:24 108:2 | 13:25 14:2,12 | **quite** 117:21 |
| 120:21 | **prefer** 48:11 | **pua** 46:7 | **quixote** 62:22 63:7 |
| **pled** 23:23 | **preliminaries** 6:2 | **public** 1:23 5:17 | 66:18 |
| **plus** 20:21 | **prep** 9:12 | 121:20 123:4 | |
| **pocket** 58:16 | **preparation** 26:3 | 124:25 | **r** |
| 59:21 | **prepare** 8:21 | **pulled** 77:10 | **r** 2:1 5:15,15 17:10 |
| **point** 6:22 18:9 | **present** 2:23 | **punished** 52:3,5 | 78:3 |
| 19:2,14 25:10 | **pretty** 22:17 41:12 | 81:23 96:13 | **rabinovich** 61:11 |
| 28:4 34:11 36:4 | 52:16 107:25 | **punishment** 96:16 | 84:14 |
| 43:17,17 45:23 | **prevail** 48:19 | **punitive** 95:4,7,16 | **racions** 12:16 |
| 49:25 53:21,21 | **previous** 18:2 | 97:11 98:15 | **raise** 5:6 |
| 54:3 58:2 61:21 | **pricket** 73:18 | **purpose** 72:17 | **raised** 57:2 |
| 64:18 73:12,13 | **primarily** 22:15 | **pursuant** 1:19 | **ran** 40:23 |
| 76:8 107:19 | **privileged** 109:2,9 | **pursuing** 15:7 | **rarely** 111:10 |
| 114:25 | **pro** 2:4 4:10 | **push** 70:22 71:13 | **rate** 107:9 |
| **points** 71:4,4,11 | **probably** 37:2 | **pushed** 64:24 | **reached** 43:23 |
| **police** 21:24 22:6,7 | 41:19 63:20 64:22 | 107:14 | 44:19 |
| 23:25 89:13 | 66:2 117:19 | **put** 14:9 15:13 | **read** 8:23,23,24,25 |
| 106:15 | 118:24 | 22:25 28:9 30:8 | 15:15 |
| **portion** 30:6 | **problem** 14:21 | 37:13 39:10 43:3 | **ready** 120:2 |
| | 33:12 92:10 | 43:6 50:11,12 | **real** 29:18 |

| | | | |
|---|---|---|---|
| **really** 16:2,2 19:2 21:25 22:5,7 27:20 33:7 38:15 40:5 43:22 46:16 48:7 59:18,18 65:23 68:11 111:19 | **refresh** 14:3,18 **refuse** 82:21 **regarding** 52:10 **regular** 6:16 53:15 54:2 **regularly** 37:25 **regulation** 86:11 **related** 60:14,15 123:12 | 69:23 70:2,5 92:15,17 93:22,23 120:13,16,25 **reporting** 124:1 **represent** 5:23 46:25 86:20 99:12 **representation** 17:20,22 18:24 19:19 85:12 86:15 | **respond** 6:17 18:19 73:17 75:14 80:22,25 **responded** 17:4 51:23 **response** 9:2 65:4 73:19 81:9 93:4 **responses** 94:10 94:15 |
| **reason** 8:9 74:21 77:5 124:5 **recall** 19:25 20:16 24:19,19 32:12,19 33:19 35:9 56:17 67:6 111:18 115:9 116:8,9 118:24 119:4,10,14 **receipt** 106:2,6 **receipts** 99:2 **receive** 112:5 | **relatives** 44:5 **relevant** 109:8 113:6,17,20 115:11,17,24 **rely** 48:9,10 **remaining** 99:13 110:17 **remark** 54:7,21 **remember** 6:5 20:9 22:11 31:17 | **representations** 17:17 59:22,24 62:3 **represented** 8:14 8:19 21:22 24:16 32:6 81:24 **representing** 8:16 8:17 19:18 79:22 84:10 98:24 | **responsibility** 56:11,14 **responsible** 11:22 **resume** 10:2 13:17 16:17 17:4 30:25 31:3 37:13 40:3,6 122:13 **resumes** 28:20 30:8 |
| **received** 80:24 81:2 112:5 114:23 114:24 **recess** 121:12 **recognize** 92:22 93:3 101:10 **recognized** 74:5 **recollection** 14:4 14:18 | 36:17 52:20 64:19 67:4,9,17 120:18 **remembered** 25:2 **remote** 3:4 **remotely** 5:2 **removal** 98:3 **removed** 25:14 | **reputation** 39:5,6 39:10,16 45:10 50:16 51:11 80:21 95:21 97:15,17,23 98:14,17,18 **requests** 122:11 **reschedule** 69:7 | **retirement** 28:12 **retiring** 28:4 **retrofit** 13:5 **return** 28:25 29:7 29:12,21,21 50:10 50:18 89:20 **returned** 29:4,9,12 29:25 39:4 |
| **record** 3:25 69:10 70:3,6,8,9,11 93:21 102:17 121:11 123:10 **recorded** 3:3 **red** 24:14,15 101:25 102:12 | 73:13,14 74:16,17 80:8,16 81:13 88:19 96:6 103:14 **renege** 62:12 **repeated** 51:20,20 **report** 66:20 73:10 73:11,14 77:15,15 116:21 | 70:23 71:12 72:11 106:14,15,16,16 106:17 108:12 **rescheduled** 106:12,18 116:19 **rescheduling** 64:7 68:14 70:14,17 73:4 79:6 84:16 | **returning** 91:3 **returns** 115:10,23 115:24 **revealing** 108:18 **revenue** 44:18 98:24 110:15 111:24 113:19 116:11,12 118:4 |
| **redact** 108:15,24 **redacted** 101:19 **reestablished** 39:11 45:11 **refer** 14:17 64:21 **referring** 30:24 | **reported** 31:13,14 51:13 56:14 66:8 72:9,10,17 73:9 76:5,9 77:18 78:15,17 79:20 **reporter** 3:21 4:25 5:3,5,12 6:6 69:21 | **resolve** 36:15 **resolved** 39:9,14 39:17 45:7,7,8 48:15,16 **resort** 47:12 48:2 **respect** 53:5 **respected** 111:9 111:21 | **review** 74:2 **reviews** 22:4,5 **rid** 50:21 83:8,11 **right** 5:6 9:7 16:16 18:10 26:8,15,16 26:24 28:15 30:3 40:20 43:4 46:19 |

[right - sources]

| | | | |
|---|---|---|---|
| 48:2 53:21 56:25 61:20,21 65:19 67:2,12,24 74:15 75:12,14 86:2 87:20 92:4 94:14 94:23 97:17 98:9 100:23 101:24 102:2 104:20 105:16 108:22 109:13 115:20 | **says** 55:23 56:12 59:6 62:21 66:17 72:23 86:11 107:4 **scan** 109:24 110:3 **scanned** 110:2,5 **school** 9:11,18,19 10:16 11:3,12 15:5,11,16,19,20 15:25 21:6,13 62:5,10 | 40:6 109:22 **separation** 43:13 **seriously** 88:3 103:17 **served** 80:22 **server** 93:19 **service** 83:17 92:24 **services** 106:24 **set** 51:16,18,25 72:5 81:16 88:20 123:8,16 | **sidebar** 72:11 **signature** 93:9,11 93:12 94:4 123:20 **signed** 94:12 **significant** 47:23 **signs** 105:14 **similarly** 6:15 67:14 **sir** 7:12 8:14 59:14 **sit** 15:18 **site** 20:23 |
| **rights** 46:23 **rochelle** 2:6 3:6 4:12 9:12 112:10 115:3 **room** 70:14 72:21 112:6 **rotate** 101:3 **rug** 88:6 90:2 **ruined** 39:6,6,16 **rules** 94:14 **run** 45:22 **running** 46:9 | **science** 9:17 **screaming** 65:8,15 **screen** 100:11 120:8 **scroll** 92:25 **se** 2:4 4:10 **second** 25:21 56:25 73:2 92:6 **security** 81:11 88:11 | **settled** 36:15 42:9 **settlement** 42:6,10 **seven** 69:2 **severe** 12:7 **shaking** 6:18 **share** 92:8 **sharing** 100:11 **sheet** 124:1 **sheldrake** 2:5 4:11 | **sites** 12:2,2,4,4 **siting** 15:17 **sits** 91:24,24 **sitting** 10:8 15:9 67:3 68:21,23 86:9 **situation** 44:2 **six** 35:21,25 69:2 70:23 **slight** 4:16 **smart** 51:19 75:12 |
| **s** | **see** 12:23 14:22 16:17 37:2 54:25 63:11 66:22 75:8 75:17 79:2,3,5 87:14 88:2,14,22 91:8 92:12,15,20 93:8 95:3 98:9,10 100:14,24 101:5 120:9 | **short** 7:2 25:24 26:11,12 121:12 **shortly** 45:22 **shoulders** 65:18 **show** 27:6 71:11 101:17 109:13 **showed** 24:17 34:13 99:17 106:6 115:20 116:4,11 | 80:14 96:10 **solemnly** 5:7 **solicited** 105:15 **solo** 21:16 **solutions** 3:20 **somebody** 16:17 36:17 41:9,12 80:12 110:4 |
| **s** 2:1 5:15,15 12:15 30:20,21 69:19,20 78:3 124:5 **salaried** 31:15 **salary** 19:22,24 20:17 32:12 **satisfied** 88:25 **saw** 44:14 51:14 66:10,21 67:23 68:5,12,17 70:13 72:9,17 73:3 74:8 74:12,23 76:5,10 78:17 79:20,21,24 86:5 87:9,11,18 90:21,22 91:4 108:6 **saying** 6:18 53:4,8 60:2,3 114:3,4 | **seeing** 68:2 100:16 100:18,20 **seek** 96:16 98:4 109:10,10 **seeking** 95:8,15 **seeks** 95:4 **send** 16:16 109:21 109:24 **sending** 19:10 **sense** 7:5 **sent** 17:3 19:4,6 28:20 37:11 40:3 | **showing** 27:14 29:18 115:19 117:8 **shown** 115:25 116:2,12 **shows** 101:14 **shut** 49:5 **sic** 17:3,4 **side** 68:12,13 69:17 | **someplace** 19:6 **son** 60:14 67:16 **sorry** 4:15 12:14 13:2 33:23 34:16 44:7,8 61:9 69:14 92:18 **sort** 21:20 31:17 52:25 95:8 **source** 86:11 **sources** 47:8 |

[south - thief]

| | | | |
|---|---|---|---|
| **south**  22:16,24 | **statute**  86:10,21 | **summer**  21:17 | **talked**  46:17 |
| 23:3 104:8 105:25 | 86:24 | 31:21 | **talking**  6:10 54:18 |
| 107:11,23 108:9 | **stay**  20:25 21:9 | **summons**  24:2 | 55:10 59:10 69:15 |
| 108:10,11 | 49:23 | 55:5 63:25 64:5 | 72:4 85:21,22 |
| **spade**  75:13,13 | **stayed**  26:25 | 76:21 84:16,22 | 102:4 |
| 90:24,25 | **stealing**  24:9 | **superiors**  51:5 | **tanya**  61:11,15,17 |
| **speak**  26:7 72:22 | 87:13 | **supervisor**  96:7 | 61:18,22 63:18 |
| **speaking**  74:12 | **step**  25:20 55:9 | **supreme**  90:17 | 84:14 |
| **specialist**  3:18 | 63:5 79:25 83:25 | 91:15,20 | **taught**  12:4 |
| **specific**  58:3 75:22 | **stipulated**  4:24 | **sure**  13:20 20:5,9 | **tax**  115:10,23,23 |
| 75:23 95:9 | **stlisl**  103:8 104:16 | 26:21,23,25 43:24 | **taxes**  116:7,21 |
| **specifically**  95:25 | **stood**  90:15 91:12 | 46:6 67:19 95:17 | 117:6 118:22 |
| **spell**  17:8 39:22 | **stop**  32:20 36:20 | 108:13 113:25 | 119:5,11 120:3 |
| 69:18 78:2 | 100:11 | 120:2 121:3 | **tear**  114:18 |
| **spent**  18:17 | **stopped**  37:5 68:2 | **suspended**  71:15 | **technical**  100:13 |
| **spoken**  43:22 | 119:24 | 71:20 | **tell**  7:22 9:21 12:5 |
| **spring**  31:21 | **store**  24:10 | **swear**  5:4,7 | 17:11 30:2,12 |
| **staff**  96:4 98:20,22 | **straight**  49:15 | **sweep**  88:5 | 39:11 54:4 68:9 |
| **stamp**  102:20 | 58:14,20 109:17 | **switching**  120:8 | 70:20 74:24 75:3 |
| **stand**  90:5 | **street**  2:14 4:6 | **sworn**  5:17 121:17 | 79:4 |
| **standard**  3:16 | **stretch**  70:24,25 | 123:8 124:22 | **telling**  86:5,6 |
| **start**  30:22 40:9 | 71:2,10 | **system**  25:15,15 | **tells**  34:22 75:7,13 |
| 102:23,24 103:3 | **stretching**  71:5 | 69:4,5 | 77:8 79:7 80:16 |
| **started**  17:6,14,15 | **study**  15:14 | | **ten**  83:16,17 |
| 18:14,15 19:3 | **stuff**  112:17 | **t** | **terms**  35:18 |
| 21:15 31:18 37:8 | **stv**  71:16 | | 113:22 |
| 40:13 49:11 53:19 | **style**  83:12 | **t**  69:19,20 | **terrible**  57:16 58:8 |
| 63:15,16 119:22 | **subject**  101:17 | **table**  14:24 | 68:16 69:13 84:12 |
| **starts**  65:15 105:3 | **submitted**  22:4 | **take**  4:25 6:24 7:4 | **terry**  17:2 18:5,16 |
| **state**  1:25 2:10 | 102:21 | 8:5 10:10 15:13 | 49:10 |
| 3:24 4:5,7 5:18 | **subscribed**  121:17 | 22:20 33:15 55:9 | **testified**  5:19 |
| 16:10,13 23:21 | 124:22 | 57:8,18,24 62:23 | **testifying**  56:6 |
| 25:6,9 89:25 | **substance**  37:21 | 63:4,5 70:21 | **testimony**  5:8 |
| 90:10 91:14,20 | **sue**  80:3 88:10 | 79:25 84:11 104:3 | 13:23 87:15 113:9 |
| 123:5 | **sued**  88:12 | 104:14 105:19 | 122:2 123:10 |
| **stated**  95:6,10 | **suffering**  7:24 | 114:5 121:2,4 | **thank**  4:13,22 5:12 |
| **statement**  64:15 | **suffix**  4:18,19 | **taken**  1:21 3:7 | 5:13 15:3 43:15 |
| **staten**  104:17 | **suit**  34:10 | 27:23 113:19 | 43:15 44:8,8 |
| **states**  1:1 3:12 | **summarize**  50:13 | 121:13 | **thankful**  40:8,8 |
| 32:5 | **summary**  33:17 | **takes**  85:17 | **thief**  29:9,9 |
| | | **talk**  85:18 89:6 | |
| | | 94:21 | |

thing  12:3 28:22
  37:12 48:8 62:19
  64:16 68:9,11,22
  100:17
things  6:4 38:14
  52:19 72:11
think  17:10 20:5,6
  23:7 29:10 30:25
  31:6,6,22,23,23
  32:7,15 40:15
  43:21,22 44:13
  46:24 51:17 53:7
  55:12,16 56:13
  60:13 79:13 81:15
  81:16,21 83:7
  84:8,11,12,13,17
  84:19,19 85:11,15
  85:15,19,23 86:14
  86:18,25 87:4
  88:20 90:9,9,11,16
  90:19 91:5 99:8
  106:22 108:6
  109:4,7,8 110:12
  112:20 113:17,23
  115:16,18,24
thinking  28:3 58:4
  70:19 77:12
thompson  2:16 4:2
  4:3,16 5:13,21,22
  70:4 91:19 92:5
  92:14,21 93:14
  100:9,16,20,23
  101:2 120:9,12,19
  121:3,9 122:4
thought  42:3
  55:16 57:16 59:19
thousand  31:2
  32:15 48:5
three  9:14 17:23
  17:24 18:7,17
  35:12,18 40:22

49:12 70:23 88:4
  88:13,13,21 91:13
threw  68:15 76:8
throw  69:11
throwing  36:9
thrown  24:18
thursday  26:19
  103:7
ticket  22:18 23:12
  23:13,19,19 50:24
  54:25 55:3,5 57:3
  57:4,7,8,9,12,13
  57:15,17,18,22
  58:4,5,6,7,7,10,24
  59:12 60:7,10
  67:16,22 68:2,25
  68:25,25 69:4
  71:2,9,23,24 72:20
  75:2 76:18,22
  77:4,10 78:22
  79:2,3 82:6 84:2,4
  84:13 85:4,5,9,16
  85:17 86:12,21
  87:7,9,14,16
  101:18 106:25,25
  107:2 116:15,16
  118:6
tickets  24:7 57:5
  58:11 63:24,25
  68:20,22 70:21,22
  73:4 116:12 118:7
till  87:11
time  1:21 3:15,16
  6:10 25:10 27:5
  29:6,6,10,16 30:2
  30:6,6 31:17
  38:10,16 39:15
  41:16 47:9 48:25
  58:15 67:14,25
  70:7,10 74:12,20
  87:7 106:10,10,18

106:19 112:8
  121:10,14
times  70:23 76:25
  107:15
tinted  107:18
tired  89:24 90:3
today  3:14 7:18
  8:3,7,12 13:23
  67:3 83:24 86:10
today's  8:22
told  27:5 28:8
  33:21 45:6 49:11
  50:8 51:13 65:11
  66:20,21 67:11
  72:8 73:25 74:8
  80:13 91:7,23
  97:20
tolls  19:13 112:12
top  65:19 120:17
total  35:15 99:7
  101:20 106:4
  107:3,5 110:21,21
  112:22 113:19
  114:4
touched  36:7
  41:19
track  76:20
trade  47:10,24
trading  47:11,13
  47:15,17,18
traditional  60:20
traffic  21:23
  108:11
transcript  6:5,19
  123:9
traschen  80:15,16
  81:4 89:10 91:2
  96:4
travel  16:7,8 21:11
  21:11 107:21,24
  108:10 112:8,10

114:18
traveled  11:25
traveling  21:8
treated  21:3 42:4
  42:5 52:4 91:4
treating  90:22
trial  1:17
trials  24:24
tribunal  22:20
  24:21 74:5,9
  83:17 97:6
tribunals  23:6
tried  65:16
truck  24:12
true  79:17,19,19
  94:11 96:21,21
  111:12,13 123:9
truly  10:7
trust  19:3
truth  5:9,10 7:22
  12:5 51:13 56:4
  65:12
truthful  8:11 12:6
  19:15 49:21,23
  94:17
truthfully  8:2 15:8
  76:10 78:17
try  21:5,14 46:22
  114:6
trying  79:10 94:17
tuesday  26:17
tvb  16:22,24 21:16
  21:16 22:16 23:3
  23:6 24:21 25:15
  25:15,20,22 27:19
  28:3,16 74:4
  79:14,22,23 80:6,9
  87:8 88:25 90:22
  90:23 98:21
  101:24,25 102:16
  103:4 115:7

[tvb - work]

119:10

**two**  6:9 16:14
21:13 31:2 36:16
43:5 44:4 51:18
59:21 62:14 67:15
68:2 70:6 71:2
76:19,21 77:4
90:7 91:11 92:25
98:23 103:5
116:18,18

**type**  17:5 30:3
36:8 69:12 85:24

**u**

**u**  30:20,21 39:23

**uh**  6:18,19,19

**um**  34:14 61:9

**unacceptable**
18:23

**understand**  6:12
7:17 58:20 63:14
69:14 70:15 72:2
103:24 113:6
114:2,6 117:22

**understanding**
7:20 63:19 93:16

**understood**  6:14
67:21 118:20

**unemployment**
46:2,8

**unethical**  85:7

**unfair**  91:16,21

**united**  1:1 3:12

**university**  9:15

**upholding**  18:11

**upset**  18:7 54:13

**upstairs**  61:22

**upstate**  19:12
22:21,22 104:19
104:21 105:2

**use**  112:6

**v**

**v**  124:2

**vaccinated**  44:12

**vahdat**  77:18 81:5
89:10 90:25 96:2
96:3,17

**valid**  52:11 74:23

**value**  97:16

**various**  12:11,24
13:8

**verbal**  6:16

**veritext**  3:19,23
93:18 124:1

**video**  3:3,18

**videographer**  2:23
3:2 4:13,22 6:21
70:7,10 92:14,18
101:7 121:10

**videotape**  80:10
80:17,18 96:5

**videotaped**  1:17

**viewed**  98:15

**viewing**  92:11

**village**  105:2

**vindication**  50:15

**violation**  21:23

**violations**  24:2
107:19 108:12

**virtual**  1:17 3:3
112:3 114:11,13
114:15

**visitation**  46:23
47:6

**w**

**wait**  6:7 46:15
87:24 113:23,23
113:23

**waited**  88:13,21

**waiting**  68:20 88:9
88:10

**waive**  71:15

**walk**  65:17

**walked**  55:7 59:4
82:10 105:19
108:3 109:23,25

**walks**  68:21

**want**  14:17 16:7
16:12 18:10 21:7
21:11 27:13 30:24
31:4 33:4,13
34:23 39:8,11
43:25 48:15 49:23
50:2 59:15,17,18
60:5 72:22 77:11
80:5,6,7 81:15,19
81:20,20 89:6
96:12 97:18,21
98:11 105:19

**wanted**  10:24 16:7
16:8 21:9,10 27:3
27:6,7,9,10,14
39:9,10,14,16 42:5
46:22 51:2,12,14
53:16 81:17,25
83:8,10 88:2,5,22
89:2,3,4,4,23 90:3
90:6,14,15 91:8,11
92:2

**wants**  62:23,24
75:16,16,17 77:19

**washington**  12:19
13:7 16:10,12

**water**  26:8

**way**  6:9 14:23
28:7 45:8 47:21
48:24 53:9,12
58:23 71:9,20
91:10 106:2
123:14

**wear**  60:21 114:18

**wednesday**  26:17

**week**  32:16 43:5
55:6 117:14,16,24
118:7,10,12,25
119:3

**weekly**  20:10
32:13,18 42:15
50:24 55:2 59:3
61:6,6

**weeks**  46:9 52:17

**went**  9:14 10:14
10:15 15:20 16:18
17:6 18:13 20:22
21:6,12 22:2,7,21
22:23 23:9,11
24:4,14,15 26:19
37:25 39:14 40:2
62:5,9

**west**  16:9

**whereof**  123:16

**wife**  40:22 44:23
59:7 75:4

**wife's**  60:12

**win**  47:19

**window**  107:18

**wish**  44:21,23 47:5

**withdrawn**  91:19

**witness**  4:9 5:4,11
14:8 69:25 92:13
100:15,18,22,25
101:8 120:11
121:8 123:7,11,16

**witness's**  5:2

**witnesses'**  124:3

**woman**  19:3 61:25
63:10 64:3

**won**  27:5 39:12

**word**  55:21

**work**  11:21,22,23
12:12,12,22 13:6
13:11,12 16:23

[work - zoom]

| | | |
|---|---|---|
| 17:5 18:15 20:13 | **write** 73:16 81:7 | 119:9,17,20 120:4 |
| 23:2 24:7 28:6,11 | **writing** 29:7 | **years** 10:7 15:21 |
| 28:11,13,13,17,19 | **written** 73:20 | 37:8 44:4 62:6 |
| 28:20 31:24 32:11 | 104:25 | 71:2 83:16,17 |
| 33:2,23 36:12,19 | **wrong** 53:12 58:10 | 88:4,13,14,21 |
| 37:7,9,11 38:10,12 | 59:20 64:11,12 | 98:13 116:18,19 |
| 38:18,21 41:6,7,18 | 70:16 72:3,7,15 | **yelling** 65:8,15 |
| 41:22 43:19 44:24 | 78:10,14 84:12,19 | **yellow** 23:13,18 |
| 46:11,13,14 50:11 | 84:20,20 85:13,15 | **yesterday** 13:25 |
| 50:12,17 69:12,12 | 85:19,23 86:3,18 | 14:13 80:11,23 |
| 73:12 81:20 97:21 | 89:14 | **york** 1:1,25 2:6,10 |
| 97:22 98:11 | **wrongful** 98:19,19 | 2:15,15 3:6,13,21 |
| 117:11,16,24 | 98:21 | 3:21 4:6,6,7,12 |
| 119:2,10 | **wrongly** 50:12,12 | 5:18 9:9 16:14 |
| **worked** 9:25 10:3 | 95:20,20 | 19:12 22:22 23:10 |
| 10:6,10,11 11:13 | **wrote** 73:18,24 | 23:20 24:25 25:6 |
| 11:18 12:10,23,24 | 74:2,6,7 81:3,4,4,5 | 25:15 32:3,4 80:6 |
| 13:2,3,4,6,10 | 81:6 89:7,8,9 93:7 | 89:24 90:10 109:6 |
| 15:19 16:3,6 | 97:5 98:10 105:20 | 114:14,16 123:5 |
| 17:13,24 25:11,13 | 105:25 106:3 | 124:1 |
| 25:16,17,18 28:9 | | |
| 30:9,11 35:8,14,20 | **x** | **young** 53:10 |
| 36:4 38:17 48:25 | | **youngster** 28:19 |
| 62:6,8 | **x** 1:2,9 | **yuan** 39:21,22,23 |
| **working** 10:19,22 | | 39:25 40:4,7 |
| 10:23,23 16:5,15 | **y** | 44:22 49:14,14 |
| 17:6,12 18:3 | | 119:19 |
| 19:16 28:5,7,10 | **y** 39:23 | |
| 30:22 31:9,18 | **yaakov** 51:17 | **z** |
| 32:20 34:6 36:9 | **yeah** 13:20 35:25 | |
| 36:21 37:5 40:9 | 37:3 38:4 39:12 | **zealously** 22:10,13 |
| 43:5,6,10 50:8,9 | 43:14 46:6 54:24 | **zoom** 14:22 92:7 |
| 51:6 53:19 119:15 | 64:15 65:12 69:17 | |
| 119:25 | 74:20 79:15 93:4 | |
| **works** 117:10 | 93:5,9,11 95:17 | |
| **worksheet** 101:13 | 96:14 103:11 | |
| **worst** 68:9,10 96:3 | 104:24 107:3 | |
| **worth** 117:11,15 | 111:3 114:20 | |
| 117:24 118:7 | 119:22 120:7 | |
| **wrapped** 26:18 | 121:4 | |
| | **year** 18:7,23 19:25 | |
| | 31:18 42:14 48:5 | |
| | 53:18 64:20 67:4 | |
| | 67:18 98:12 119:8 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Case 1:18-cv-02710-EK-LB  Document 222  Filed 05/17/21  Page 1 of 148 PageID #: 2406

Page 125

1

2    UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF NEW YORK

3    CASE NO. CV-18-2710

4    -------------------------------------x

5    MARIO H. CAPOGROSSO,

6

                         Plaintiff,

7

8         -against-

9    ALAN GELBSTEIN, et al.,

10                       Defendants.

11   -------------------------------------x

12

                         December 18, 2020

13                       11:48 a.m.

14

15      VIDEO EXAMINATION BEFORE TRIAL of

16   MARIO H. CAPOGROSSO, the Plaintiff

17   herein, taken by the Defendants, pursuant

18   to Notice, before Lisa H. MacDonald, RPR,

19   and Notary Public of the State of New

20   York.

21

22                  VOLUME II

23

24

25

Page 126

```
 1
 2  A P P E A R A N C E S :
 3
 4
    MARIO H. CAPOGROSSO, ESQ.
 5  21 Sheldrake Place
    New Rochelle, New York 10804
 6        Plaintiff Pro Se
 7
 8
    STATE OF NEW YORK, OFFICE OF THE ATTORNEY
 9  GENERAL, LETITIA JAMES
    28 Liberty Street
10  New York, New York 10005
       Attorneys for Defendants
11  BY:    JAMES THOMPSON, ASSISTANT
           ATTORNEY GENERAL
12
13
    ALSO PRESENT:
14
    Howard Brodsky, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 127

```
 1              M.H. Capogrosso
 2          MR. VIDEOGRAPHER:  The time
 3     is 11:48.  We are on the record.
 4  EXAMINATION BY
 5  MR. THOMPSON:
 6     Q      So thank you,
 7  Mr. Capogrosso.  You can see we are back
 8  looking at Exhibit 1; correct?
 9     A      Yes.
10     Q      And we are at page 4 of the
11  breakdown of your damages.  You see item
12  number 4 which talks about compensatory
13  damages to the loss and resultant damages
14  to your legal reputation in the Brooklyn
15  community.  You see that, correct,
16  Mr. Capogrosso?
17     A      I do, yeah.
18     Q      And you estimated damages as
19  5 times the value of 15 months of your
20  revenue; is that correct?
21     A      Yes.
22     Q      So how did you arrive at
23  that figure?
24     A      Well, your reputation as an
25  attorney is paramount.  If you take money
```

Page 128

```
 1              M.H. Capogrosso
 2  on a case and you don't show up on that
 3  case, your reputation has been -- has
 4  been damaged.  It's been taken away.
 5  Nobody is going to trust you anymore.
 6  Nobody is going to hire you on another
 7  case especially in Brooklyn if you take
 8  their money and you don't show up.  The
 9  worst thing you can do to a Brooklyn
10  motorist or a Brooklyn client is take
11  their money and not show up.
12          I've dealt with the Brooklyn
13  community for 10 years.  I've had threats
14  against my safety from the Brooklyn
15  community when I don't show up for a case
16  and I took their money.  It's the worst
17  thing you can do is not show up on a case
18  and you take their money.
19          These are all cab drivers
20  that -- a lot of these cases.  They're
21  all business -- they're all working men
22  for a living and you can't take their
23  money and not show up.
24          Now my reputation for
25  showing up in a courthouse in the
```

Page 129

```
 1              M.H. Capogrosso
 2  Brooklyn community has been -- has been
 3  just -- has been ruined.  I can't tell
 4  you how it's been ruined.  Who's going to
 5  hire me on a case again?  That's how I
 6  got that number.
 7     Q      So but when you -- I
 8  understand you feel that your reputation
 9  has been harmed, but why did you
10  determine that the value of it was 5
11  times $122,715?
12     A      The exact number -- well,
13  122 was the money I could have brought
14  in, 122 and five years is the amount of
15  money since I left to the time I brought
16  the Complaint.  I was removed on May 11,
17  2015 to currently right now it's been
18  five years.
19     Q      So --
20     A      Five and-a-half years.  I
21  could have put it at 5.5, but I put it at
22  five.
23     Q      So you chose that number
24  because you feel that it reflects the
25  amount of money that you could have
```

2 (Pages 126 - 129)

Page 130

```
1           M.H. Capogrosso
2   brought in over those five years;
3   correct?
4       A      Over those five years, plus
5   the damage to my reputation over those
6   five years.
7       Q      Yeah.  The question I'm
8   trying to get at, Mr. Capogrosso, is why
9   do you put the value of the damage of
10  your reputation as the same of the value
11  of five years of your expense -- of your
12  income or your billings rather?
13      A      Well, that was the five
14  years I was not able to -- the damage to
15  my reputation for those five years I was
16  not present and being able to do this
17  type of work, not being able to talk to
18  my clients, not being able to represent
19  my clients for those five years.
20      Q      I guess my question is
21  what's the difference between your
22  reputational claims and the future
23  prospective revenue that you could be --
24  that you also claim?
25      A      Revenue is one thing.
```

Page 131

```
1           M.H. Capogrosso
2   Damage to -- I might not be able to get
3   that revenue ever again counsel.  I might
4   not ever be able to generate any type of
5   revenue in this community or in any TVB
6   in New York.  I might not be able to
7   generate that revenue again.
8           Now that is for a jury to
9   decide as to what the damage to my
10  reputation is, a jury to decide how these
11  defendants should be punished.  I have
12  given you figures.  I have told you the
13  total amount of revenue I brought in, the
14  amount of months, what it breaks down per
15  month.  I've given you my figures.  A
16  jury needs to make those determinations,
17  but that's how I made it, the five years
18  I've been out, the value to my reputation
19  that I don't think I'll be able to get
20  many more clients in the Brooklyn
21  community because of this and the money
22  which I lost because I was not able to
23  work for the Brooklyn community during
24  this period of time.
25      Q      So let me ask you -- let me
```

Page 132

```
1           M.H. Capogrosso
2   ask the question a different way.  If
3   your reputation had not been harmed at
4   all and you had continued practicing in
5   the TVB, would you have -- you would have
6   continued making money at that $8,181 per
7   month or you would have continued --
8   sorry.  Let me withdraw the question and
9   phrase it a different way.
10          If you had not had your
11  reputation damaged at all, isn't it the
12  case that you would have just continued
13  making the same amount of money you were
14  making before you were expelled?
15      A      Well, I don't know that.  I
16  can't assume that.  I can't assume it.  I
17  may have made more.  I may have made
18  less.  I don't know.  I probably would
19  have made more because people liked me.
20  My clients liked me.  My clients really
21  liked me.
22          I probably would have
23  brought even more money in, which is the
24  reason some of these attorneys down there
25  wanted me out.  It's a very competitive
```

Page 133

```
1           M.H. Capogrosso
2   business this ticket broker, this ticket
3   business.  We are all vying for the
4   same -- the same ticket.  There's only so
5   many tickets written.  It's a very
6   competitive business with the attorneys.
7           So my reputation was growing
8   and I probably would have made more.
9       Q      So let me ask you, do you
10  have any basis to believe or any evidence
11  for the proposition that you would have
12  made more money in the future?
13      A      My clients liked me.  My
14  reputation was good at that point.  I
15  reestablished my reputation.  I was
16  getting -- I was getting, you know,
17  clients, you know.  I don't know.  People
18  liked me.  My clients liked me.
19      Q      And how do you know that
20  your reputation was damaged?
21      A      Nobody is going to hire me
22  anymore when you -- I had to call 850
23  clients, I gave you my calendar, 850
24  clients and tell them I can't show up.
25  You took my money, Counsel, why aren't
```

3 (Pages 130 - 133)

Page 134

M.H. Capogrosso

1
2  you here? I had to explain it to 850
3  clients.
4        I can't tell you why. I
5  have no idea. I was given nothing in
6  writing. I was told by Danielle Calvo to
7  leave and told by Ida Traschen I'm not
8  allowed. I was given nothing in writing.
9  I have nothing to tell them. I was given
10 nothing by your office. I have nothing
11 to tell my clients. I don't know why. I
12 have no reason. I was told to leave.
13     Q      All right.
14     A      So my reputation -- so my
15 reputation has been damaged.
16     Q      But you were still able to
17 get jobs in the legal community. You
18 said you represented clients on dozens of
19 cases, personal injury cases, criminal
20 cases and other cases; isn't that
21 correct?
22     A      It took me a while to get a
23 job. They're not easy to find,
24 especially as you get older. They're not
25 easy to find. It took me a year to find

Page 135

M.H. Capogrosso

1
2  the first job and then Jiang was nice,
3  then Jiang's office, but it's not easy,
4  it is not and it's not --
5     Q      Did you --
6     A      I liked -- I liked doing
7  what I did.
8     Q      But your reputation --
9     A      People my age are retiring,
10 retiring at this age. I like to work and
11 it's not easy getting a job at this age.
12     Q      Your reputation didn't
13 prevent you from getting these jobs
14 though, the one in the Perla firm and
15 then the one at the Jiang firm; is that
16 correct?
17     A      I had to leave this type
18 of -- well, they didn't know about this,
19 my reputation. They didn't know about
20 this lawsuit or that I didn't show up on
21 cases, I wasn't allowed to show up.
22 Neither one of them asked me about this.
23 I would have told them if they did, but
24 they didn't ask me.
25        But in terms of the clients,

Page 136

M.H. Capogrosso

1
2  yes, it was ruined. In terms of the
3  employers, no, it was not ruined because
4  I was never asked.
5     Q      So can you specifically
6  identify any economic harm that you've
7  caused -- that you've suffered based on
8  the damage to your reputation?
9     A      If I was to go back to
10 practice this type of law, I'm not going
11 to get as many cases as I did before. My
12 name and reputation as somebody who shows
13 up and argues a case and represents a
14 client zealously, which is an oath I
15 took, is not the same and it's not by my
16 fault. It's not by my fault. I took an
17 oath to zealously advocate and I could
18 not zealously advocate because I was
19 removed for no reason. No reasons were
20 given to me. I got a 10 second phone
21 call from Ida Traschen.
22     Q      Okay. But so the question
23 was can you specifically identify any
24 economic harm that has been caused by the
25 damage to your reputation?

Page 137

M.H. Capogrosso

1
2     A      I'm not able to generate the
3  income that I was generating at the
4  Brooklyn TVB and I showed you the revenue
5  I was bringing in.
6     Q      But is that because you're
7  not practicing at the Brooklyn TVB or is
8  that because of the damage to your
9  reputation?
10     A      Because I'm not working at
11 the Brooklyn TVB and because of the
12 damage to my reputation. No one is ever
13 going to give me a case again down there,
14 nobody.
15     Q      Because you --
16     A      Nobody is going to give me a
17 case.
18     Q      Because you can't practice
19 there?
20     A      I can't practice there and
21 if I could they still wouldn't hire me.
22     Q      So it's more a contingent
23 thing in the event that you were to be
24 reinstated?
25     A      Listen, my -- my reputation

4 (Pages 134 - 137)

M.H. Capogrosso

1  
2  as an attorney has been damaged. I have
3  to explain this removal from the Brooklyn
4  TVB in 50 states in the United States if
5  I decide to go practice in any one of
6  these states, 50. In federal court, I
7  have to explain this. Immigration court,
8  I have to explain this. If I decide to
9  go down to the US PTO patent court, I
10  have to explain this.
11      That's the damage to my name
12  and reputation. I have to explain this
13  every place I go down the road and every
14  court I seek admittance to I have to
15  explain it. You put a number on it. I'm
16  low. This number should be much higher.
17  You have to explain this when you try to
18  seek admission to another state court
19  someplace or to your federal court, the
20  Eastern District court, try to.
21      I was removed without an
22  explanation as to what happened. A 10
23  second phone call from Ida Traschen, from
24  somebody, a clerk who didn't even look at
25  the videotape. That's the damage --

M.H. Capogrosso

1  
2      Q   So how would you --
3      A   -- to my reputation.
4      Q   How would you describe your
5  reputation while you were practicing at
6  the TVB?
7      A   My clients loved me. I sent
8  you my reviews. They loved me. Police
9  officers didn't like me. I argued a very
10  tough case. The other attorneys didn't
11  like me, I was competition, I know that.
12  But my clients -- the clerks didn't love
13  me, I know that, too, because I wasn't
14  giving them gifts and money and buying
15  them breakfast, I understand that.
16      But my clients loved me. I
17  argued every case.
18      Q   Did the ALJs like you?
19      A   I don't know. I didn't
20  associate with judges. You're not
21  allowed to. There's a rule about that.
22  There's a rule you're not supposed to
23  talk to judges outside a courtroom.
24  Whether they liked me or not, I really
25  didn't care. I know I argued a good

M.H. Capogrosso

1  
2  case. I didn't talk to the judges
3  outside the courtroom. You're not
4  allowed to.
5      Q   So you don't know if you
6  were liked and respected by the judges --
7      A   I didn't --
8      Q   -- is that correct?
9      A   I cared what my clients
10  thought. I cared what my clients
11  thought. I argued a tough case. I
12  wasn't trying to please a judge. I was
13  trying to win my client's case. I was
14  not trying to please the judge.
15      Q   I understand that,
16  Mr. Capogrosso, but the question was a
17  little narrower. Do you know if the
18  judges liked and respected you?
19      A   No, I don't. I don't know.
20  I really don't care.
21      Q   Okay.
22      A   I really don't care. I did
23  what I had to do for my clients. Whether
24  a judge liked me or not --
25      Q   Okay?

M.H. Capogrosso

1  
2      A   -- I wasn't trying to seek
3  their favor.
4      Q   And the clerks, did the
5  clerks like and respect you?
6      A   Clerks, I don't think they
7  liked me, no. I told you I wasn't giving
8  them any money. I wasn't giving them --
9      Q   Why not?
10      A   -- a piece of the action.
11      No, I don't think the clerks
12  liked me. No, I think maybe one clerk
13  liked me. I treated them all nicely and
14  respectfully. I might have been loud. I
15  have a loud voice when I talk. I never
16  verbally abused anyone. Never called --
17  never made a racial threat, verbally
18  abused anyone.
19      I would argue zealously for
20  my clients, I wanted the best for them,
21  but I never verbally abused anyone.
22      Q   And the other attorneys, did
23  they like you?
24      A   The other attorneys? We
25  were in a competitive business, no. No,

5 (Pages 138 - 141)

Page 142

M.H. Capogrosso

1
2 they didn't like me. Yaakov Brody told
3 me to go fuck myself, I'm a Jew hater
4 anti-Semite because I was making too much
5 money in his presence. He had no other
6 reason for saying it.
7         When you go through all the
8 complaints written against me, there's
9 not one from a client or a motorist that
10 I made a racial epi -- a racial remark or
11 an anti-Semitic remark, not one from a
12 client. There's a couple complaints
13 about a fee, that I didn't show up or
14 something about a fee, but not one that I
15 made a racial remark or an inappropriate
16 remark to a client or I didn't show up on
17 a case.
18         Now Yaakov Brody didn't like
19 me and I'm sure --
20    Q    So is it your contention --
21    A    Yes.
22    Q    I apologize. I didn't mean
23 to cut you off, Mr. Capogrosso.
24    A    Go ahead. I'm listening.
25    Q    So is it your contention

Page 143

M.H. Capogrosso

1
2 that the complaints about you are made
3 up?
4    A    There's no substance. No,
5 they're not made up. They're real. I
6 saw them. I was given no opportunity to
7 respond to them. The first time I saw
8 these complaints was -- well, I was given
9 no opportunity to respond. I might have
10 seen -- I know I saw them in response to
11 the --
12    Q    Let me rephrase the
13 question.
14    A    I saw the complaints in
15 response to the motion to dismiss, the
16 first time I saw them.
17    Q    Let me rephrase the
18 question. We are not -- Mr. Capogrosso,
19 if I may, obviously there's not a
20 question as to whether the complaints are
21 real or not, but is it your contention
22 that the allegations in the complaints
23 are untruthful?
24    A    Yes, absolutely. I was
25 given no --

Page 144

M.H. Capogrosso

1
2    Q    How --
3    A    I'll go through them one by
4 one. Put them up, let's go through them.
5 I'll respond to every complaint written
6 against me. I will respond to every
7 complaint written against me, I will
8 respond to. I'm glad I have the
9 opportunity. I --
10    Q    So that is where we are
11 going to next. Hold on one quick second
12 while I bring up the first of them.
13         Mr. Capogrosso, can you see
14 the exhibit that I've just brought up?
15    A    Yeah. April 1. Yes, not
16 the whole part of it. I can only see the
17 top portion of it, so I'd like to read --
18         MR. THOMPSON: Madam Court
19    Reporter, can you see it?
20         MR. VIDEOGRAPHER: This is
21    the videographer. I see it, Counsel.
22    A    I can only see a portion of
23 it.
24    Q    Yeah. There's more down
25 here.

Page 145

M.H. Capogrosso

1
2         MR. THOMPSON: I just wanted
3    to check with Ms. MacDonald because I
4    know you just swapped in. Are you
5    seeing the exhibits okay?
6         MS. REPORTER: Sorry. I was
7    on mute. Yes.
8         MR. THOMPSON: Okay. Good.
9    Q    So, Mr. Capogrosso, do you
10 recognize this document?
11    A    Well, I'd like to see the
12 bottom of it. I do recognize it,
13 absolutely.
14    Q    Sure.
15    A    All right. Go ahead. Yes.
16 I know exactly what this is.
17    Q    And this is, just for the
18 record, this is a document that you
19 produced at number P-80; is that correct?
20    A    I've produced it. I think
21 you produced it. You had this. I've
22 also given it back to you. Yes, it's
23 been produced.
24    Q    And you said you recognize
25 it. What is this document?

6 (Pages 142 - 145)

Page 146

```
 1              M.H. Capogrosso
 2      A    Well, this is the date with
 3  Tanya Rubinowitz.  This is the lawyer,
 4  the woman calling herself a lawyer in
 5  Judge Gelbstein's courtroom and this is
 6  written by a clerk, I'm not sure who that
 7  is, Perez, one of the clerks there and it
 8  happened on 2009.
 9           This is after I called the
10  District Attorney and I said we have a
11  woman down here calling herself a lawyer
12  on a repeated basis and people asked me
13  where's Tanya, the lawyer.  I said she's
14  not a lawyer.
15           And she approaches me that
16  day and says did you call -- did you call
17  the District Attorney?  I said yes, I
18  did, I admitted it to her and then she
19  starts yelling and berating me and I
20  tried walking away from her.
21           Now, this clerk -- this
22  happened near the attorney's room.  I
23  know exactly where it happened.  Between
24  the attorney's room and the clerks, it's
25  at least 60 feet.
```

Page 147

```
 1              M.H. Capogrosso
 2           But that's what happened.
 3  She came at me yelling and screaming why
 4  did you call the District Attorney.  I
 5  admitted that I did.  I could not have
 6  admitted to it.  I could have said I
 7  didn't call her, right.  I could have
 8  just walked away, but I didn't.  I
 9  admitted the truth and I tried walking
10  away.  That's what happened.
11           I wasn't charged.  I wasn't
12  arrested.  I didn't do anything wrong but
13  tried to get away from the situation and
14  telling the truth.  I told her what
15  happened and what I did.
16      Q    So in this statement from
17  Mr. Perez he writes that he saw -- "He
18  observed and heard Mr. Capogrosso
19  screaming and yelling profanities and
20  obscenities at Ms. Rabinovich, Tanya."
21           Is that true?
22      A    No, it's not.  There's not
23  one --
24      Q    You did not?
25      A    No.  I did not.  I was
```

Page 148

```
 1              M.H. Capogrosso
 2  telling her to get away from me.  I
 3  didn't yell any profanity because you
 4  know what, they're not listed there.  And
 5  what obscenity was used?  The clerk
 6  doesn't put it down.
 7           I was telling her to get
 8  away from me, but I yelled no profanity
 9  and no obscenity.  You can't make an
10  allegation that I used a profanity or
11  obscenity if you don't tell me what it is
12  and I used none.  I never talked to a
13  woman like that, never.  I treat women
14  very respectful.
15           I was loud, that I agree I
16  was loud, but I did not use a profanity
17  or obscenity and none is listed.  Tell me
18  which one I used.
19      Q    Mr. Perez also writes that
20  "Mr. Capogrosso was sitting down.  I
21  observed him getting up" -- "get up from
22  his seat and approach Ms. Rabinovich
23  walking fast and hard toward her when he
24  bumped real hard into her as he tried to
25  pass by her, which was very unnecessary
```

Page 149

```
 1              M.H. Capogrosso
 2  given he had plenty of room to walk
 3  around her."
 4           Is that true?
 5      A    I did get up.  She's right
 6  in my face, right about three feet away
 7  from me, right on top of me.  I did get
 8  up and walk away.  I don't recall bumping
 9  into her, no.  I would never hit a woman,
10  never, never.
11      Q    Would you bump --
12      A    I don't -- she was like
13  right on top of me, maybe three feet
14  away, pointing her finger at me and
15  yelling at me in Russian and some other
16  nonsense, yelling and screaming at me.
17           Did I bump into her, no.  I
18  would never hit a woman.  But I did tell
19  her to get away from me and I did admit
20  to what I did and she was upset, but she
21  didn't --
22      Q    Did you --
23      A    She was upset.
24      Q    Did you make contact with
25  her in any way?
```

7 (Pages 146 - 149)

Page 150

```
 1         M.H. Capogrosso
 2     A    No, not that I recall, no.
 3  She would have filed a police report
 4  against me that I hit her and none was
 5  filed.  I do not recall hitting her,
 6  absolutely not.
 7     Q    So I'll tell you,
 8  Mr. Capogrosso, we are going to look at a
 9  number of reports and this has some
10  similarities to some other ones in there
11  will be a number of reports that say that
12  you were yelling and shouting obscenities
13  and there will be a number of reports
14  saying that you bump into people and then
15  indicate that it's not on purpose.
16     A    Well --
17     Q    Is there any truth to that?
18     A    Well, you can write and say
19  whatever you want.  You can write and say
20  whatever you want.  You know, I was never
21  arrested on anything.  I didn't yell any
22  obscenity.  You have to give me the
23  obscenity I used.  You can make any
24  allegation you want at me.  You have to
25  prove it.  You have to have some type of
```

Page 151

```
 1         M.H. Capogrosso
 2  corroboration.  Is anybody corroborating
 3  this, Ms. Perez, that they saw me?
 4     Q    Well --
 5     A    Was there a police report
 6  written against me?
 7     Q    Well, this is not a, you
 8  know, this is not a statement in a court
 9  of law.  This is just a complaint saying
10  what happened; isn't it?
11     A    Well, where's my affidavit
12  in response?  Where's Judge Gelbstein
13  giving me a chance to respond to this so
14  we get right to the heart of the matter
15  in 2009?
16     Q    So this person L. Perez,
17  Jr., do you know who that is?
18     A    No.
19     Q    It says MVR 1.  Do you know
20  what an MVR 1 is?
21     A    No.
22     Q    I would suspect that it
23  means Motor Vehicle Representative 1,
24  which is the pay grade for the people who
25  work as clerks behind the counter.
```

Page 152

```
 1         M.H. Capogrosso
 2         So let's just ask here,
 3  Mr. Perez who wrote this statement, is he
 4  lying?
 5     A    I did not bump into anybody.
 6  I did not hit anybody.  I did walk away
 7  from this woman who approached me,
 8  approached me and asked me if I called
 9  the DA on her and I said yes, I did, but
10  that story doesn't get --
11     Q    So --
12     A    -- that story doesn't get
13  told.
14     Q    So Mr. Capogrosso that
15  wasn't quite the question.  The question
16  is is Mr. Perez lying?
17     A    That I used an obscenity,
18  absolutely, absolutely.
19     Q    Why would he lie?
20     A    They like Tanya.  I told you
21  this already.  Tanya was doing business
22  with the clerks.  I saw Tanya at the
23  clerk's counter rescheduling cases as if
24  she was a lawyer.  Maybe she was entering
25  guilty pleas at the counter as if she was
```

Page 153

```
 1         M.H. Capogrosso
 2  a lawyer.  She had a case load.
 3         She had an office right
 4  outside the DMV and they were doing work
 5  for her for some reason, which I don't
 6  know, but, you know, it wasn't for free,
 7  so they liked Tanya.
 8     Q    And so you think Perez was
 9  lying because Ms. Rabinovich bribed the
10  clerks --
11     A    That's not --
12     Q    -- is that correct?
13     A    I don't know.  I don't know.
14  I know I didn't bump into anybody.  I
15  know she was right on top of me.  I know
16  I don't use obscenities with women,
17  absolutely not.  There's not one --
18     Q    Okay.
19     A    -- from a motorist.  If you
20  go through all the complaints against me,
21  they're all by clerks.  Not one motorist
22  or client has made a complaint against me
23  that I used an obscenity.  You go through
24  all my complaints.
25     Q    Well, we'll see some --
```

8 (Pages 150 - 153)

Page 154

M.H. Capogrosso

1
2       A       You go through all my
3   complaints.
4       Q       Well, we'll see some of
5   those as we go forward. I'm going to
6   bring up another document here.
7           MR. THOMPSON: Oh, actually
8   before I do, Madam Court Reporter,
9   Ms. MacDonald, can I ask you to
10  please mark that as Exhibit 3?
11  Ms. MacDonald?
12          MS. REPORTER: Sure. I
13  usually don't like to speak while
14  you're videotaping so I've just been
15  nodding, but, yes, I'm noting in the
16  index that it will be marked.
17          MR. THOMPSON: Okay. Good.
18          MS. REPORTER: Are you
19  e-mailing -- did you e-mail all of
20  these exhibits to the other reporter?
21          MR. THOMPSON: Well, we
22  e-mailed all of them to Veritext
23  yesterday and we got a receipt, a
24  confirmation e-mail and I know that
25  the other reporter had them.

Page 155

M.H. Capogrosso

1
2           MS. REPORTER: Okay.
3           (The above-referred-to
4   statement was marked as Exhibit 3 for
5   identification as of this date.)
6       Q       Mr. Capogrosso, I'm going to
7   bring up another exhibit --
8       A       Yes.
9       Q       -- and share my screen here.
10  Mr. Capogrosso, do you see
11  the exhibit?
12      A       Yes, yes. I remember that
13  one. April, yes.
14      Q       And you see this one was
15  produced by you and marked P-82; correct?
16      A       Yes.
17      Q       And so what is this
18  document?
19      A       Well, this is the same
20  incident about what Roy says. Look
21  what Roy says. He was seated on the
22  bench. He stated get away from me, which
23  is what I'm telling Tanya. Then he rose
24  up and told Tanya to get away.
25          There's no indication I

Page 156

M.H. Capogrosso

1
2   bumped into her because I didn't bump
3   into her. That's Roy's version of the
4   same story. I'm telling the woman to get
5   away from me.
6       Q       So this is a complaint
7   written by Roy Tucci; correct?
8       A       Yeah, Roy I know. He's one
9   of the clerks. There's no indication --
10      Q       Does --
11      A       Wait, you've got to let me
12  finish.
13      Q       Sure.
14      A       There's no indication I
15  verbally abused or I said any
16  obscenities. Now they both observed the
17  same incident. What Roy states is I told
18  Tanya to get away from me, which I did.
19          MR. THOMPSON: So -- well,
20  first of all, Madam, Ms. MacDonald,
21  can I ask you to please mark this as
22  Exhibit 4?
23          (The above-referred-to
24  statement was marked as Exhibit 4 for
25  identification as of this date.)

Page 157

M.H. Capogrosso

1
2       Q       And, Mr. Capogrosso,
3   Mr. Tucci does say that he heard a loud
4   voice and that he saw you.
5       A       Well, I do speak loudly,
6   yes.
7       Q       He then writes "He then rose
8   and told Tanya the interpreter to get
9   away. Mr. Capogrosso moved towards Tanya
10  and they seemed to bump."
11      A       I didn't --
12      Q       "The noise continued" --
13      A       Go ahead, finish.
14      Q       So this is Mr. Tucci
15  corroborating that you bumped into
16  Ms. Rabinovich; isn't that correct?
17      A       She bumped into me. I'm
18  trying to get away from her. She
19  approaches me. She's right on top of me.
20  I'm telling her to get away. She's
21  yelling and screaming in Russian at me
22  pointing her finger at me and I'm trying
23  to get away from her.
24          He doesn't indicate I bumped
25  into her. He said they seemed to bump.

9 (Pages 154 - 157)

Page 158

M.H. Capogrosso

1        M.H. Capogrosso
2   Q   Well, he said that you moved
3  toward Tanya. You'll see I'm
4  highlighting that language here. He says
5  that you moved toward her.
6   A   She's right in front of me.
7  I'm trying to get away from this woman
8  who's yelling and screaming at me at the
9  top of her lungs.
10   Now, did anybody report that
11  she's yelling at me, no. "They seem to
12  bump." She's three feet away from me.
13  I'm trying to get away from her. That's
14  what happened.
15   Q   Mr. Tucci says you're moving
16  towards her.
17   A   She was in front of me.
18  Where do you want me to go? How do I get
19  away from the woman?
20   Q   So is Mr. Tucci telling the
21  truth here?
22   A   I tried walking away from
23  this woman.
24   Q   I understand, but that's not
25  the question. The question is is

Page 159

1        M.H. Capogrosso
2  Mr. Tucci telling the truth here?
3   A   I don't recall touching this
4  woman at any point, at any point.
5   Q   I understand that,
6  Mr. Capogrosso, but the question is is
7  Mr. Tucci lying in this statement?
8   A   I don't know if he's lying
9  or not. Maybe that's what he thought he
10  saw. I don't remember hitting this or
11  touching this woman.
12   Q   Is it possible that you did?
13   A   I don't recall. I've never
14  hit or touched a woman like this in my
15  life, never. Bumping into somebody --
16  you're three feet away from me. Why are
17  you in my face? Why are you yelling and
18  screaming at me? How do I get away from
19  you at this point in time?
20   Q   Is it possible you bumped
21  into her on purpose?
22   A   Absolutely not. I would
23  never hit a woman in my life ever.
24   Q   Mr. Tucci writes that "The
25  noise continued until our supervisor

Page 160

1        M.H. Capogrosso
2  Danielle Calvo intervened." Do you
3  remember what happened?
4   A   She's yelling and screaming
5  at me in Russian, in Russian after I
6  admitted to her that I called the
7  District Attorney. She's yelling and
8  screaming in Russian at me. I don't know
9  what she was screaming.
10   Q   So --
11   A   And I like Russian women,
12  don't get me wrong, but I don't like a
13  Russian woman calling herself a lawyer
14  who's not. I didn't like that,
15  absolutely not.
16   Q   Do you remember if --
17   A   I did not bump into her.
18   Q   So do you remember if your
19  bodies made contact at all?
20   A   I've answered this. No, I
21  do not.
22   Q   Okay. No, you don't
23  remember or no, it didn't happen?
24   A   I would never -- I don't
25  recall bumping into this woman. No, I do

Page 161

1        M.H. Capogrosso
2  recall telling her to get away from me.
3  That's what I recall.
4   Q   How big is Ms. Rabinovich?
5   A   I don't recall. At that
6  point in time she was a nice 5'5" maybe.
7   Q   And how tall are you,
8  Mr. Capogrosso?
9   A   5'10".
10   Q   And are you a bigger guy,
11  are you a muscular guy?
12   A   Oh, absolutely, I'm not
13  going to deny that. I work out every
14  day.
15   Q   So you're, it's safe to say,
16  a lot more physically imposing than
17  Ms. Rabinovich was; is that correct?
18   A   That's why I was trying to
19  move away from her. I'm 210. I'm 5'10",
20  210. That's why I'm trying to get away
21  from her.
22   Q   All right.
23   A   That's why I'm telling her
24  to get away from me.
25   Q   Okay. Let's move on to the

10 (Pages 158 - 161)

Page 162

M.H. Capogrosso

1        next document. I'll stop the Screen
2   Share.
3        MR. THOMPSON: And, Madam
4   Court Reporter, that was Exhibit 4.
5        Q      I'm going to share another
6   document here.
7             Mr. Capogrosso, can you see
8   this document?
9        A      Yeah.
10       Q      And what is this document?
11  Do you recognize it?
12       A      Well, it's from Marisol. I
13  know Marisol.
14       Q      And this document you
15  produced and Bates stamped P-84; correct?
16       A      Yes.
17       Q      And so what is this specific
18  document?
19       A      I guess it's her complaint
20  about me that I was acting aggressively
21  toward her.
22            MR. THOMPSON: Okay.
23  Ms. MacDonald, can I ask you to
24  please mark this as Exhibit 5?

Page 163

M.H. Capogrosso

1        (The above-referred-to
2   statement was marked as Exhibit 5 for
3   identification as of this date.)
4        Q      So, Mr. Capogrosso, who is
5   Marisol Cervoni?
6        A      She's a clerk at the TVB,
7   Brooklyn TVB.
8        Q      Did you have a good
9   relationship with her?
10       A      She was a clerk. I just --
11  I went to the counter and she helped me
12  get the tickets for the day. She was a
13  clerk. I wasn't trying to have a
14  relationship with clerks. I wasn't
15  trying to have a relationship. I was
16  just trying to deal with her and to do my
17  job.
18       Q      I understand,
19  Mr. Capogrosso, but the question was did
20  you have a good relationship with
21  Ms. Cervoni?
22       A      I had a good relationship on
23  a business level with all the clerks. I
24  went up to the counter, I gave them my

Page 164

M.H. Capogrosso

1   tickets that I needed for the day. Can I
2   please have my tickets, thank you very
3   much. That's all I said or did.
4        Q      Okay.
5        A      I did what was required to
6   do.
7        Q      So --
8        A      Did I talk to her after work
9   or during work or have conversations with
10  her, no. I did my business at the
11  counter or when I put the ticket in the
12  courtroom. That was the extent of it.
13  Hello, here's my ticket, thank you.
14       Q      So, Mr. Capogrosso,
15  Ms. Cervoni writes that on June 9, 2009
16  at approximately 9:45 a.m. she called a
17  customer to her counter. "The motorist
18  was accompany by Michael, who is the
19  assistant of Mr. Capogrosso who's one of
20  the lawyers who represents motorists at
21  their hearings at Brooklyn South."
22            Who is Michael?
23       A      Well, at that point in time
24  we were allowed to have paralegals. He

Page 165

M.H. Capogrosso

1   would -- they were a lot of Russian
2   clients down there. He was a paralegal
3   that worked for me. He spoke Russian.
4   He translated -- he translated clients
5   who spoke Russian to English and helped
6   in the courtroom when we needed
7   translation.
8        Q      And you --
9        A      All the attorneys had a
10  paralegal at that point.
11       Q      And did you employ him?
12       A      He was paid as an
13  independent contractor.
14       Q      About how much did you pay
15  him?
16       A      I don't know. It varied.
17  It depends how many hours he put in.
18       Q      How much did you pay him per
19  hour?
20       A      I don't recall.
21       Q      Do you have a ballpark
22  estimate?
23       A      No. I don't recall. We
24  paid him -- we paid him on a daily basis.

11 (Pages 162 - 165)

Page 166

```
 1              M.H. Capogrosso
 2    I made sure he got paid every day for the
 3    work he did.
 4       Q    And how long did you have an
 5    assistant for --
 6       A    I don't recall.
 7       Q    -- or a paralegal?
 8       A    I don't recall how long.
 9    You know, it must have been -- all the
10    other attorneys had them, so at some
11    point in time I was doing well, I said
12    let me take on and they all were using
13    them, so I did.
14             I don't recall the exact
15    amount of time. I know they were all
16    thrown out at one point in time because
17    there were accusations against them, so
18    they were thrown out of all the TVBs.
19       Q    What --
20       A    We weren't allowed to have
21    them anymore.
22       Q    What were these accusations?
23       A    I don't know exactly. As I
24    understand it, they were stealing,
25    stealing from motorists, stealing from
```

Page 167

```
 1              M.H. Capogrosso
 2    clients, stealing from lawyers, stealing
 3    from each other.
 4       Q    Were there accusations
 5    against Michael?
 6       A    No, no. Michael was a nice
 7    guy, real nice guy.
 8       Q    And what was Michael's last
 9    name?
10       A    I don't remember, I really
11    don't, but he was a nice guy. He had a
12    brother --
13       Q    Did you --
14       A    His brother --
15       Q    Did you ever --
16       A    His brother worked for -- go
17    ahead.
18       Q    Did you ever employ an
19    assistant other than Michael?
20       A    His brother and I, when I
21    first came down, his brother was a
22    paralegal for Terry Horton. We became
23    friends. I forgot his name. Andy was
24    his brother.
25             But did I ever employ him,
```

Page 168

```
 1              M.H. Capogrosso
 2    no. He worked for -- Andy worked for
 3    Eugene Gabase(phonetic).
 4       Q    So Michael is the only
 5    assistant --
 6       A    Yes.
 7       Q    -- that you employed; is
 8    that correct?
 9       A    As I recall, yes, but Andy
10    and I were friends.
11       Q    All right. So in here, in
12    Exhibit 5 you see Ms. Cervoni writes that
13    the motorist handed her driver's license.
14    "And Michael called Mr. Capogrosso over
15    to my window. Mr. Capogrosso thinking
16    there was a problem approached my counter
17    and aggressively and belligerently began
18    yelling at me."
19             Do you recall this incident?
20       A    I don't think I was
21    aggressive or belligerent. I might have
22    been loud. I do speak loudly. I want
23    people to hear me when I speak. I think
24    maybe she's a little oversensitive.
25    Maybe I was trying to understand what was
```

Page 169

```
 1              M.H. Capogrosso
 2    going on because I cared about my client
 3    and what was going on and I actually give
 4    a damn about my client and their
 5    licenses.
 6             So I was trying to get to
 7    the heart of the matter, but I was not
 8    belligerent or aggressive. Maybe I was
 9    loud.
10       Q    So do you recall this
11    specific incident?
12       A    I recall Michael calling me
13    over, yeah. I never cursed or insulted
14    the woman, absolutely not, absolutely
15    not. She doesn't put down what curse or
16    insult I used. You make general
17    allegations --
18       Q    Does she have to?
19       A    Well, yeah. If you make an
20    accusation somebody is cursing and
21    insulting me, tell me what I said. Tell
22    me exactly. I might have been loud.
23    Listen, I am loud. I want people to hear
24    me when I speak. But tell me what word I
25    used to curse or what word I used to
```

12 (Pages 166 - 169)

Page 170

```
 1            M.H. Capogrosso
 2  insult. I'd like to know.
 3       I don't curse or insult
 4  women. It's not something I do.
 5       Q     Does it make her wrong if
 6  she didn't list the curse word?
 7       A     Absolutely, because I want
 8  to know what I'm being accused of. Don't
 9  accuse somebody of something if you can't
10  stand behind it. Tell me what curse word
11  I used and what word I used to insult
12  you. I want to know that.
13       Q     So you --
14       A     Tell her that.
15       Q     So you admit that you were
16  speaking with her, but you say you were
17  not belligerent --
18       A     I wasn't --
19       Q     -- is that correct?
20       A     I wasn't belligerent. I was
21  speaking loudly as I'm speaking to you.
22  I speak in a loud voice. If she took it
23  wrongly, I'm sorry.
24       Q     As you said, Mr. Capogrosso,
25  you're a big guy. You're an athletic
```

Page 171

```
 1            M.H. Capogrosso
 2  guy. Is it possible -- and when you
 3  speak loudly to someone, particularly a
 4  woman, isn't it possible that they are
 5  going to view that as aggressive and
 6  belligerent?
 7       A     I don't know how you view
 8  it. I don't know how you view it. View
 9  it anyway you like. I wasn't cursing. I
10  wasn't insulting. I might have been
11  loud. I might have been talking loudly
12  because I'm trying to get to the heart of
13  the matter and help my client out, but
14  how it's interpreted, I don't know.
15       Q     So she writes that she
16  assured you there was no problem and that
17  she had already printed out the ticket
18  for your client, quote, "but at that
19  point he was already out of control and
20  continued yelling, cursing and insulting
21  me."
22       Is that true?
23       A     No. I never cursed or
24  yelled or insulted, absolutely not.
25  Absolutely not.
```

Page 172

```
 1            M.H. Capogrosso
 2       Q     So --
 3       A     Absolutely not.
 4       Q     So is Ms. Cervoni lying?
 5       A     Yes. When she says I'm
 6  cursing and insulting and yelling, yes.
 7  I might have been loud, but not cursing
 8  and insulting.
 9       She doesn't put --
10       Q     Why would she --
11       A     -- down what I said.
12       Q     Why would she lie?
13       A     I don't know.
14       Q     What motivation would she
15  have to lie about you?
16       A     Like I said, maybe I wasn't
17  giving her gifts and presents and money
18  like the other clerks were getting. The
19  other attorneys were giving these clerks
20  money for Christmas, buying them
21  breakfast.
22       Q     Did --
23       A     You got to let me finish.
24       Buying them breakfast in the
25  morning, giving them parties. One of the
```

Page 173

```
 1            M.H. Capogrosso
 2  attorneys says how much money are you
 3  giving the clerks for Christmas? I was
 4  not doing this. I was there to do a job,
 5  that's it. I was not trying to --
 6       Q     So is --
 7       A     -- endear myself to the
 8  clerks, I was not in any way. To me
 9  there was an appearance of impropriety if
10  I tried to endear myself to these clerks
11  by giving them gifts or buying them
12  breakfast.
13       Q     Did --
14       A     You got to let me finish.
15  Buying them breakfast --
16       Q     Sure.
17       A     -- or giving them cash as
18  the other attorneys were doing. It was
19  an appearance. I didn't want to do it.
20  I just wanted to do my job.
21       Was I loud? I definitely
22  probably was loud, I'll admit to that.
23  Was I cursing and insulting, absolutely
24  not.
25       Q     Mr. Capogrosso, is it your
```

13 (Pages 170 - 173)

**Page 174**

M.H. Capogrosso

```
 2   testimony that Ms. Cervoni made this up
 3   because you weren't giving money to the
 4   clerks?
 5       A    She's not telling the truth
 6   there. I did not curse and I didn't
 7   insult. I don't know why. I'm a zealous
 8   advocator in this court, that's what I
 9   took an oath to do, zealously advocate.
10   I took an oath when I got sworn in.
11   That's what I do.
12           I didn't curse at --
13       Q    Do you think Ms. Cervoni
14   wanted to see you gone from the TVB?
15       A    I don't know. I don't know.
16   I think we became friends afterwards. I
17   think we became friends right before we
18   left. That's why I wanted to depose her.
19   I think she really liked me at one point
20   in time. She's a very beautiful woman,
21   Marisol and I think at one point -- she's
22   a nice woman and I think at one point we
23   became friends.
24           But was I trying to endear
25   myself to any of these clerks, no. I was
```

**Page 175**

M.H. Capogrosso

```
 2   trying to do my job. That's all I'm
 3   required to do.
 4       Q    She writes that -- she
 5   writes that "The supervisors, Geri,
 6   Danielle and John all came out to see
 7   what the commotion was and to resolve the
 8   situation, but he" and I assume that
 9   means you "refused to listen to reason or
10   leave my counter."
11           Did you refuse to leave?
12       A    I don't recall, no, no.
13   Maybe I -- well, wait a second, wait.
14   Wait a second. Maybe I wanted the issue
15   resolved and I wanted some explanation of
16   the issue, which is my duty to do. I
17   have a duty to my client, not to a clerk,
18   but to my client to make sure the issue
19   is resolved, whatever this issue was.
20           Michael called me over,
21   there was an issue. I have a duty to
22   make sure that issue gets resolved as the
23   attorney for the motorist, that's my job,
24   make sure it's resolved, right? That's
25   the job of the attorney here, right? I
```

**Page 176**

M.H. Capogrosso

```
 2   had the obligation, so let me resolve it.
 3   Let me speak to somebody else if there's
 4   an issue and one person can't solve it,
 5   you go to another person and maybe they
 6   can solve it.
 7           So, yeah, I had a duty to my
 8   client to resolve that issue, so maybe --
 9       Q    So she writes --
10   Mr. Capogrosso, she writes "Throughout
11   the day Mr. Capogrosso was taunting me.
12   He would walk past my station making
13   comments and smirking at me." Is that
14   true?
15       A    No. Taunt? Wait a second.
16   How exactly did I taunt? Now you give me
17   the exact words I used. That's a lie.
18           Smirk? You know, when an
19   issue is resolved with me, it's resolved.
20   I don't hold on -- you know, I don't keep
21   going back after it. I did not smirk. I
22   don't know what smirking is.
23           First of all, is there a
24   problem with smirking? I think we have a
25   Vice President now that smirks all the
```

**Page 177**

M.H. Capogrosso

```
 2   time. She enjoys smirking. That's my
 3   opinion.
 4           I don't see anything wrong
 5   with smirking, though I don't recall
 6   doing it. I don't even know what
 7   smirking is. Laughing?
 8       Q    Smirking is a little smile.
 9       A    All right. We got a Vice
10   President that seems to do it all the
11   time. It's all right for the Vice
12   President.
13       Q    I'm not sure I understand
14   what this has to do with the Vice
15   President.
16       A    Well, I'm telling you we
17   have a Vice President now, Kamala, who
18   likes to smirk.
19           I don't -- I don't know what
20   smirking is. I have an issue, I resolve
21   the issue, I move on. I'm not trying to
22   have a beef with a clerk at a DMV. That
23   is not my issue to have a beef or an
24   argument with a clerk. I need these
25   clerks to help me out.
```

14 (Pages 174 - 177)

**Page 178**

M.H. Capogrosso

1
2      Q      If you don't know what
3   smirking is --
4      A      I have -- I have no reason
5   to have an argument or an altercation
6   with a clerk, none, no reason.
7      Q      Mr. Capogrosso, if you don't
8   know what smirking is, how do you know
9   the Vice President does it?
10     A      Well, to me a smirk is when
11  you laugh sarcastically, right, that's a
12  smirk?  That's what a smirk is, you laugh
13  sarcastically.
14            And once again I will
15  repeat, it does me no good to have any
16  type of issue with a clerk.  I'm there to
17  do a job.  I smirk?  Now I smirk?  I mean
18  I don't believe I'm being accused of
19  smirking.
20     Q      I will tell you,
21  Mr. Capogrosso, this is not the first
22  complaint that we'll see today where
23  someone indicates that you kept coming by
24  and smiling at them and sort of taunting
25  them throughout the day.

**Page 179**

M.H. Capogrosso

1
2      A      Well, you can --
3      Q      Do you have any response to
4   that?
5      A      Well, you can make any
6   complaint you like, it doesn't mean it's
7   true and I have no reason, no reason to
8   have any beef, any complaints with a
9   clerk and clerks at this office that I
10  need.  Now, I was given no opportunity to
11  respond to this, none at the time, none.
12     Q      Mr. Capogrosso she writes "I
13  can no longer interact with
14  Mr. Capogrosso at the service counter
15  because I fear for my safety.  On many
16  occasions I've observed him display his
17  aggressive behavior toward my coworkers,
18  his clients, the other attorneys and
19  their assistants."
20            She feared for her safety,
21  what does that mean to you?
22     A      I don't know.  I treated her
23  nicely and respectfully.  Nicely and
24  respectfully I treated this woman.  I
25  never threatened her or harmed her.

**Page 180**

M.H. Capogrosso

1
2            I mean you can have any
3   perception you like of somebody.  You can
4   have any perception you like.  It doesn't
5   mean that that's what I am.
6      Q      Were you aware --
7      A      I was a zealous advocator,
8   but --
9      Q      Mr. Capogrosso, were you --
10     A      Let me finish.
11     Q      Sure.
12     A      Well, let me finish.  What
13  reason did she fear?  What exactly did I
14  do?  See, I want to know the specifics.
15  I don't want to know the allegations.
16  Tell me exactly why you felt fearful.
17            And let me tell you
18  something, you tell me once, you never
19  have to tell me twice.  Tell me exactly
20  what --
21     Q      Mr. Capogrosso --
22     A      -- I did.  I'd like to know.
23     Q      Well, it seems here you
24  yelled at her and cursed at her and
25  wouldn't leave when she asked you to.

**Page 181**

M.H. Capogrosso

1
2      A      Well, I didn't yell and I
3   didn't curse, I didn't insult.  No words
4   are shown, no words.  What words were
5   spoken?
6            Now what I did --
7      Q      Mr. Capogrosso --
8      A      -- do, maybe I was loud, but
9   I did not yell and I did not curse.  I
10  did not curse and I did not insult and
11  for what reason she's fearful I do not
12  know.  I didn't schmooze with her in the
13  morning and ask her how's she doing and
14  is she okay and how is your weekend and
15  how's all this.  I didn't talk about all
16  that stuff.  I was there to do a job.
17     Q      Mr. Capogrosso, were you
18  aware that there were people at the TVB
19  who were afraid of you?
20     A      No.
21     Q      No?
22     A      None of these complaints
23  were ever brought to me.  You tell me
24  once, you don't have to tell me twice.
25     Q      That's not the question

15 (Pages 178 - 181)

| Page 182 | Page 184 |
|---|---|
| M.H. Capogrosso | M.H. Capogrosso |

**Page 182**

1         M.H. Capogrosso
2  though. The question is were you aware
3  that there were people who were afraid of
4  you?
5     A    No. Tell me who. I was
6  never put on notice. You tell me once,
7  you never have to tell me twice.
8     Q    Did anyone around you seem
9  afraid of you?
10    A   Seem afraid? I don't know
11  how other people feel. I know I have a
12  very strong presence, I understand that.
13  I've been told that I have a certain
14  strong presence and maybe it's because a
15  lot of things I've done in my life, but I
16  do have a strong presence.
17    Q    If --
18    A   I've been told that.
19    Q    If someone was afraid of
20  you, would you care?
21    A   I would try to rectify it.
22  I would do everything I could in my
23  ability to rectify it. But was I trying
24  to endear myself to these clerks, no. I
25  was trying to do a job.

**Page 183**

1         M.H. Capogrosso
2     Q    Were you aware that
3  Ms. Cervoni had filed a complaint?
4    A   No, no, absolutely not.
5  Like I said, if she had brought this to
6  my attention I would have rectified it
7  immediately. If anybody brought this to
8  my attention, I would have rectified it
9  immediately.
10    Q    She writes that you
11  assaulted a female assistant who works
12  for another lawyer. Is she referring to
13  Ms. Rabinovich?
14    A   Yeah. That was not an
15  assault. That's a lie. There was no
16  assault. There was no assault. I would
17  have been arrested if there's an assault.
18  That's an absolute lie. Your words are
19  very important here. You can't make
20  accusations against somebody that aren't
21  true.
22    Q    So why is Ms. Cervoni lying?
23    A   Why? I don't know. There
24  was no assault.
25    Q    Why would --

**Page 184**

1         M.H. Capogrosso
2    A   Was I arrested for assault?
3    Q    Why would she lie?
4    A   Well, maybe she liked Tanya
5  and she didn't like me. Maybe she liked
6  Tanya and she didn't like me. I didn't
7  schmooze with these law -- with these
8  clerks. I wasn't there in the morning
9  saying how was your day. I wasn't there
10  saying how was your weekend. I wasn't
11  there saying what do you want to do for
12  lunch today.
13    Q    Well, she's --
14    A   I wasn't doing that.
15    Q    -- not saying that you're
16  not saying, you know, asking her how
17  she's doing, schmoozing her in the
18  mornings. She's saying that you're
19  physically scaring her.
20    A   How did I physically scare
21  her? Tell me the specifics.
22    Q    You --
23    A   Tell me what I did.
24    Q    -- yelled at her and cursed
25  at her and you wouldn't leave when she

**Page 185**

1         M.H. Capogrosso
2  said to leave.
3    A   I didn't curse. I might
4  have been loud. I didn't curse.
5    Q    She says she had to go to
6  the back office to get away from you.
7    A   Well, that was her decision.
8  My duty is to my client. If a supervisor
9  comes out, I'm trying to resolve the
10  issue, I'm going to talk to the
11  supervisor.
12    Q    Do you remember her leaving
13  to get away from you?
14    A   No.
15    Q    She writes "His aggressive
16  behavior has steadily progressed within
17  the past few months. I no longer feel
18  comfortable at my place of employment
19  because of this individual's behavior and
20  I wish to go on record in the event of
21  any future conflicts."
22    A   Well --
23    Q    Had your aggressive behavior
24  been progressing?
25    A   I don't know what she means

16 (Pages 182 - 185)

Page 186

```
 1            M.H. Capogrosso
 2   by aggressive behavior.  Tell me what I
 3   did.
 4       Q    Well, were you aware at this
 5   point that there have been multiple
 6   incidents where people claimed that you
 7   had been aggressive?
 8       A    No, no, no.  I --
 9       Q    You had no idea that anyone
10   complained about the incident with
11   Ms. Rabinovich?
12       A    No, no.  You tell me -- I've
13   never seen these complaints.  If Judge
14   Gelbstein was doing his job or his
15   clerical supervisor was doing their job,
16   they would have brought this complaint to
17   my attention and I would have resolved
18   it.  You tell me once, you don't have to
19   tell me twice.
20       Q    So --
21       A    You have to let me finish.
22   You tell me once, you never have to tell
23   me twice.  You have to let me finish.
24       Q    So --
25       A    Let me finish.
```

Page 187

```
 1            M.H. Capogrosso
 2       Q    Sure.
 3       A    This was never brought to my
 4   attention so I could resolve it.  I'm
 5   there working on a daily basis.  I have
 6   no reason to have any altercations with
 7   anybody.  I was there to zealously
 8   advocate on behalf of my clients.
 9            You tell me what the
10   aggressive behavior is and I will resolve
11   it, but don't accuse me of something --
12       Q    So --
13       A    You got to let me finish.
14       Q    Sure.
15       A    -- and leave out the details
16   of what the aggressive behavior was, then
17   don't show me this affidavit ever or
18   bring it to my attention so I can resolve
19   it.  That's not being fair.
20       Q    So Mr. Capogrosso --
21       A    You've got to let me finish.
22       Q    I do need to ask another
23   question.
24       A    You have to let me finish.
25   I'm not finished.
```

Page 188

```
 1            M.H. Capogrosso
 2            That is not being fair to
 3   me.  You have to let me finish.  You're
 4   not being fair to me if you make an
 5   accusation and you don't let me address
 6   it and resolve it, you're not being fair
 7   to me.
 8       Q    All right.
 9       A    You have let me finish.
10       Q    Mr. Capogrosso, let's move
11   on to the next question.
12       A    I want to finish.
13       Q    Respectfully --
14       A    You're not --
15       Q    -- we are going to move on
16   to the next question.
17       A    You're not being fair to me
18   if you don't let me address that issue.
19       Q    Mr. Capogrosso, you've been
20   addressing the issue.  We have other
21   questions that we need to get to, the
22   first of which is yesterday at his
23   deposition, Judge Gelbstein testified
24   that when he received a complaint about
25   you, he would take you into his office
```

Page 189

```
 1            M.H. Capogrosso
 2   and speak with you verbally about it.
 3            Did he do that in this
 4   case --
 5       A    No, he did not.
 6       Q    -- with the complaints?
 7       A    No.
 8       Q    Do you remember him ever
 9   taking you to his office to discuss
10   complaints about you and about aggressive
11   behavior?
12       A    Absolutely not.  Now --
13       Q    Not once?
14       A    You have to let me finish.
15       Q    Sure.
16       A    All these complaints, Judge
17   Gelbstein never presented to me one of
18   these complaints, not one, because I
19   would have filed --
20       Q    Mr. Capogrosso --
21       A    You have to let me finish.
22   Mr. Thompson, you've got to let me
23   finish.
24       Q    Well, let me clarify the
25   question.
```

17 (Pages 186 - 189)

1  M.H. Capogrosso
2  MS. REPORTER: Wait, time
3  out. I'm going off the record right
4  now.
5  Q  Mr. Capogrosso --
6  MS. REPORTER: Time out.
7  I'm stopping. I'm not even writing
8  this.
9  MR. THOMPSON: Let's go off
10  the record.
11  MS. REPORTER: Off the
12  record, please, off the record. We
13  are having an issue.
14  MR. THOMPSON: Off the
15  record, please.
16  MR. VIDEOGRAPHER: The time
17  is 12:40. We are off the record.
18  (A short recess was taken.)
19  MR. VIDEOGRAPHER: The time
20  is 12:45. We are on the record.
21  Q  So, Mr. Capogrosso, as I
22  mentioned, yesterday at his deposition
23  Judge Gelbstein testified that when he
24  received a complaint about you, he would
25  take you into his office and tell you

1  M.H. Capogrosso
2  verbally the substance of that complaint.
3  Do you remember him
4  testifying to that?
5  A  He testified to it.
6  Q  Did that happen in this
7  case, in the case of Ms. Cervoni's
8  complaint?
9  A  Not to me, no, never.
10  Q  Do you remember him ever
11  having a verbal conversation with you
12  about complaints that had been made about
13  you?
14  A  No, nothing, no because he
15  never gave me any complaint to respond
16  to. I would have responded.
17  Q  And let me clarify the
18  question. I'm not asking whether he gave
19  you the physical hard copy complaint.
20  I'm asking whether he verbally told you
21  about complaints that had been made about
22  you?
23  A  No. You tell me once --
24  Q  He never did that?
25  A  No. You tell me once, you

1  M.H. Capogrosso
2  don't have to tell me twice.
3  Q  So was Mr. Gelbstein lying
4  when he said that he spoke with you
5  verbally about complaints?
6  A  Yes. I've never -- he never
7  gave me a specific of any complaint that
8  I could respond to, never the specific of
9  any complaint that I could respond to and
10  resolve.
11  Q  Did he ever tell you that
12  there had been complaints without giving
13  you the specifics?
14  A  No. Give me the specific
15  complaint. No. Tell me what it is and I
16  will respond and resolve it.
17  Q  So were you aware that there
18  had ever been any complaint made about
19  you by any person?
20  A  No, no. I saw no
21  complaints. People didn't like me, I
22  understand that, but I saw no complaints
23  from anyone that I could respond to and
24  resolve because --
25  Q  And --

1  M.H. Capogrosso
2  A  -- I'm the first one to
3  attempt to resolve it.
4  Q  And Mr. Capogrosso I want to
5  make this question very clear, I'm not
6  asking whether you saw a physical hard
7  copy paper complaint. I'm asking you
8  were you ever aware that anyone had ever
9  made a complaint about your conduct?
10  A  No.
11  Q  Let's move on to a new
12  document. I'll close out of that one.
13  MR. THOMPSON: I'm not sure
14  if we marked that one, Ms. MacDonald,
15  but let's mark that Exhibit 5 if we
16  haven't already, the previous one.
17  Q  Mr. Capogrosso, can you see
18  this document?
19  A  Yes.
20  Q  Do you recognize this
21  document?
22  A  Yeah. I recognize the top
23  portion of it, but I'm sure it's --
24  Q  And you see this document
25  was produced by you and marked P-86;

Page 194

1     M.H. Capogrosso
2  correct?
3     A     Yes.
4     Q     What is this document?
5     A     I don't know.  It's a
6  complaint from Diantha Fuller I guess.
7        MR. THOMPSON: Can I, Madam
8     Court Reporter, can I ask you to mark
9     this as Exhibit 6?
10       (The above-referred-to
11    statement was marked as Exhibit 6 for
12    identification as of this date.)
13    Q     Mr. Capogrosso, my first
14 question is these redactions up at the
15 top, did you add these?
16    A     No.
17    Q     Where are they from?
18    A     Where are they from?  I
19 don't know where they're from.  I know
20 you submitted it to my office and then I
21 returned it.
22    Q     Because to my knowledge,
23 these were not redacted --
24    A     Oh.
25    Q     -- when we submitted them.

Page 195

1     M.H. Capogrosso
2     A     I'll tell you where I got
3  this.  I got this redacted like this in
4  a motion -- in your motion to dismiss,
5  this was attached redacted.  You filed
6  these affidavits.  The first time I'm
7  seeing these affidavits is in your motion
8  to dismiss to me and they were redacted
9  in that manner.  That's where I got it.
10    Q     Okay.  So who is Diantha L.
11 Fuller?
12    A     She's a lawyer that worked
13 down there.
14    Q     And do you have a good
15 relationship with Ms. Fuller?
16    A     No.  Diantha did not like
17 me.  Diantha did not like me.  She did
18 not like me at all.
19    Q     Why not?
20    A     I don't know.  She just
21 didn't like me.  I didn't talk to her.  I
22 didn't socialize with her.  I didn't like
23 the type of attorney she was.
24    Q     What type of attorney was
25 she?

Page 196

1     M.H. Capogrosso
2     A     Well, she just pretty much
3  pleaded you guilty.  She went into the
4  courtroom, took a case, postponed it and
5  she just entered a guilty plea.  She
6  didn't really argue for her clients and I
7  felt that was terrible.
8        She's used to solicit
9  attorneys -- solicit clients all the
10 time, solicit clients all the time.
11 She'd walk up to a client in the morning,
12 hand them his bus -- her business card
13 and says here, I'm a lawyer.  I thought
14 it was terrible.  Judge Gelbstein allowed
15 it.
16        So I didn't like her as an
17 attorney whatsoever.  It was terrible
18 what she was doing.  There's signs all
19 around that say you shouldn't solicit and
20 she was soliciting everybody.
21    Q     So Ms. Fuller writes "As
22 requested by your staff, below is Agnes
23 Paez's report of the events that
24 transpired on 7/31/09 in the Coney Island
25 Traffic Bureaus, which I took directly

Page 197

1     M.H. Capogrosso
2  from an e-mail she submitted to me."
3        Do you know who Agnes Paez
4  is?
5     A     Yes.  She was a paralegal
6  down there.
7     Q     And who did she work for?
8     A     Well, actually I do remember
9  her now.  Now actually this lady did work
10 for me for a while before Michael came on
11 and then went to work -- she did, she
12 worked as a translator.  She spoke
13 Spanish.  She did work for a couple of
14 months I think.  I don't know exactly how
15 long, but for a couple of months with me
16 down there.  She was a translator.
17        And I didn't like what she
18 was doing, so I let her go and I brought
19 Michael in instead.
20    Q     And was this time that she
21 worked with you before or after July 31,
22 2009?
23    A     It was before.  Before then,
24 before then.
25    Q     And you said you fired

19 (Pages 194 - 197)

| Page 198 |
| --- |

M.H. Capogrosso

1　　　　M.H. Capogrosso
2　Ms. Paez; is that true?
3　　A　　I told her -- well, she
4　went -- I said we are not going to work
5　anymore together. I didn't like what she
6　was doing.
7　　Q　　What was she doing that you
8　didn't like?
9　　A　　She was soliciting,
10　soliciting motorists in the parking lot
11　and they was walking in. It was
12　embarrassing. She was hungry for money
13　this woman. She was walking -- she
14　was -- and the other attorneys were
15　complaining, too. She was in the parking
16　lot as motorists were walking in in the
17　morning, she was handing out business
18　cards. I said you can't do that, you're
19　a translator.
20　　　　She was soliciting motorists
21　as they were walking in the building. I
22　said it's terrible.
23　　Q　　Was she soliciting -- I
24　apologize. Keep going.
25　　A　　Yeah. It was terrible what

| Page 199 |
| --- |

M.H. Capogrosso

1　　　　M.H. Capogrosso
2　she was doing. I said I'm not having
3　this.
4　　Q　　Was she soliciting these
5　motorists on your behalf to work for you?
6　　A　　Well, it seemed like that
7　and as soon as I saw that happen, I said
8　that's it, no more, no more. You're not
9　supposed to solicit. You don't walk up
10　to clients. You're here as a
11　translator.
12　　　　Now she was doing it for
13　Diantha and Diantha didn't seem to have
14　any problem with it, which is the other
15　reason I didn't like Diantha because
16　Diantha was soliciting and Agnes was
17　soliciting. I said you girls do what you
18　want. I'm not going to engage in that.
19　　Q　　So Ms. Paez writes that she
20　was speaking with a client on behalf of
21　Ms. Fuller when she was approached by
22　you. You then "stood in front of me and
23　told Ms. Fuller's client that I was not a
24　lawyer and he should not be speaking to
25　me. He then handed my client his
26　business card."

| Page 200 |
| --- |

M.H. Capogrosso

1　　　　M.H. Capogrosso
2　　　Is that true?
3　　A　　No. That's not true. I
4　don't think I ever would have interrupted
5　another person in a conversation, that's
6　not what I do, absolutely not.
7　　Q　　And she says the client did,
8　in fact, know that Ms. Paez was not an
9　attorney and was shocked at your
10　behavior.
11　　　　She writes "Mr. Capogrosso
12　then turned to me and called me a variety
13　of vulgar and profane names and
14　threatened me with violence to stay away
15　from the Department of Motor Vehicles."
16　Is that true?
17　　A　　No. It's absolutely a lie.
18　I would have been arrested for that,
19　Counselor. I would have been -- a police
20　report would have been filed and I would
21　have been arrested, arrested if that's
22　true.
23　　　　Now you can say --
24　　Q　　Do you remember --
25　　A　　-- what you like. I would

| Page 201 |
| --- |

M.H. Capogrosso

1　　　　M.H. Capogrosso
2　have been arrested.
3　　Q　　Do you remember this
4　incident?
5　　A　　No, I absolutely do not. I
6　know I didn't like what she was doing
7　down there. Judge Gelbstein condoned it.
8　There's nothing I could do about it. But
9　did I ever approach her, absolutely not.
10　There was no reason for me to. I had
11　plenty.
12　　Q　　Why would -- why would
13　Ms. Paez lie?
14　　A　　I don't know. Diantha
15　didn't like me. I saw what she was doing
16　soliciting. I let her go. I didn't want
17　to work with her anymore.
18　　Q　　So you don't know why she
19　would lie?
20　　A　　I don't know. What she's
21　saying here is not the truth. I have no
22　reason to interfere between two people.
23　I had no reason to interfere. I had
24　plenty of clients down there. My clients
25　liked me.

20 (Pages 198 - 201)

Page 202

1    M.H. Capogrosso
2    Q    So, Mr. Capogrosso, you're
3  telling us that a lot of people are
4  telling the same lie about you, that
5  they're all lying the same way, they're
6  all saying that you yelled and screamed
7  and cursed at them. Why would they all
8  tell the same lie?
9    A    I have no idea. I'm
10  responding to each affidavit in kind, all
11  right. I'm responding to this affidavit
12  in kind. Let's just stick to this one.
13  Let's be very specific, not general. If
14  there's affidavits written against me, I
15  will address them.
16      Now, this affidavit --
17    Q    Well, I think it's --
18    A    Go ahead.
19    Q    I'm sorry, Mr. Capogrosso,
20  sometimes when you speak you pause and I
21  think you're done with your response and
22  then I speak up.
23    A    This affidavit states
24  generalizations, nothing specific. It
25  states in a violent manner. What exactly

Page 203

1    M.H. Capogrosso
2  did I do? Towering over me, what exactly
3  did I do? Threatening, what exactly did
4  I do to threaten? Frighten, what did I
5  do to frighten? You tell me. I used
6  vulgar and profane names. Tell me the
7  names I used. Tell me exactly what I did
8  to threaten.
9      Now you might feel that,
10  that might be your perception, but tell
11  me the specifics that I actually did and
12  there are none listed here.
13    Q    Well, she says that you
14  turned to her and you tried to get her to
15  stop speaking to somebody, you called her
16  a variety of vulgar and profane names and
17  you threatened her with violence. I mean
18  that may not be specific enough for you,
19  but it's pretty specific.
20    A    Well, how exactly did I
21  threaten? What did I say, I'm going to
22  hit you? What did I say?
23    Q    Does it matter what you
24  said?
25    A    It does.

Page 204

1    M.H. Capogrosso
2    Q    I mean if --
3    A    It's your allegations.
4  Well, tell me what I said. Tell me
5  exactly what was said. Give me an
6  opportunity to respond.
7    Q    She's characterizing your
8  speech. She said you said vulgar and
9  profane names and threated her with
10  violence.
11    A    Well, first of all I did. I
12  would never talk to a woman like that,
13  but I want to know exactly what was said.
14  Tell me what was said. You can make --
15  you know, I can write affidavits about
16  everybody down there. I can say the same
17  thing about somebody.
18      You can't make these blatant
19  accusations about people and don't give
20  the specifics. Exactly what was said?
21  If I threatened somebody with violence, I
22  would have been arrested.
23    Q    She writes "Finally
24  Mr. Capogrosso told me to stay away from
25  him in a very violent manner, towering

Page 205

1    M.H. Capogrosso
2  over me and spoke so loudly and in a
3  threatening manner that a plain clothes
4  policeman standing next to me asked if he
5  needed to get involved."
6      Do you -- does that refresh
7  your recollection at all?
8    A    No. I was never arrested
9  for anything. I did nothing wrong.
10  Obviously the cop understood that.
11    Q    You know that you're a big
12  and intimidating guy. Do you ever get in
13  someone's personal space because you know
14  that --
15    A    Absolutely not, no.
16    Q    What did --
17    A    I avoid situations. I don't
18  want a situation. I avoid if -- I
19  absolutely avoid. Will I confront when
20  necessary, yes. When it's on behalf of
21  my client, yes.
22      But if you're going to tell
23  me I threatened you, you better tell me
24  exactly what I said to threaten you. I
25  would never threaten a woman number one.

21 (Pages 202 - 205)

**Page 206**

1         M.H. Capogrosso
2    Q    Well, a number of people
3  have asserted that you did and we'll see
4  a couple more throughout the course of
5  the day.
6    A    Well, let's go through them
7  one at a time.
8    Q    All right.  She writes
9  again, "I was especially nervous because
10  I am six months pregnant and I was in
11  fear his outbursts would turn violent."
12    A    Well, you --
13    Q    Do you have any response to
14  that?
15    A    You might have any
16  perception you want.  I don't recall
17  having any altercation with this woman,
18  other than telling her I didn't want her
19  working for me anymore and as she was
20  soliciting motorists in the parking lot
21  and soliciting motorists on the DMV floor
22  and Diantha Fuller was condoning all
23  these actions.
24    Q    So is Ms. Fuller lying here?
25    A    About what?  What's

**Page 207**

1         M.H. Capogrosso
2  Ms. Fuller's statements?
3    Q    Well, she's passing along
4  this statement from her paralegal.
5    A    Well, Ms. Fuller did not
6  observe it now, did she, so I don't know
7  what Ms. Fuller is observing.
8    Q    But Ms. Paez is lying, is
9  that your testimony?
10    A    I did not threaten a woman.
11  I would never threaten a woman in my
12  life.
13    Q    So yes, she's lying?
14    A    Yes, yes, absolutely lying.
15    Q    And you have no -- and you
16  have no sense of why she would lie; is
17  that correct?
18    A    I don't think you need a --
19  I don't know why.  We are all
20  competitive.  We are all going after the
21  same summonses down there.  All going
22  over the same summonses.  Did the woman
23  like me, no.
24    Q    So you think that's why
25  she's lying?

**Page 208**

1         M.H. Capogrosso
2    A    I don't know why she's
3  lying, I have no idea, but what's -- if
4  you're going to accuse me of threatening
5  you, tell me the words I used or have me
6  arrested, but don't threaten -- don't say
7  something like that --
8    Q    All right.
9    A    -- ruin my reputation and my
10  name and don't give me the specifics of
11  exactly what I did.
12    Q    So let's move on to the next
13  exhibit.
14        MR. THOMPSON:  And,
15    Ms. MacDonald, I can't recall whether
16    we had that marked, but that previous
17    exhibit, let's have that marked as
18    Exhibit 6 if hasn't been already.
19    Q    Mr. Capogrosso, can you see
20  the exhibit?
21    A    Ah, yes, all the clerks
22  don't like me.  They're signing their
23  names, yes, yes.
24    Q    So do you recognize this
25  document?

**Page 209**

1         M.H. Capogrosso
2    A    Yes, absolutely.
3    Q    And what is this document?
4    A    This is a complaint.  This
5  was something --
6    Q    What is this document?
7    A    I have no idea.  Something
8  that all the clerks signed that Bushra
9  Vahdat had them sign.
10    Q    And  this document was
11  produced by us and it's Bates stamped DMV
12  lots of zeros 244; correct?
13    A    Yeah.  Yes.  The clerks
14  didn't like me, I know that.
15    Q    You see that down in the
16  lower right?
17    A    Yeah.  The clerks didn't
18  like me.  I know that.
19    Q    And so, Mr. Capogrosso,
20  what's this document?
21    A    I don't know.  This is an
22  affidavit by all the clerks.
23    Q    It's not an affidavit.  I
24  don't think there's a notarization or
25  anything.

Page 210

M.H. Capogrosso

1
2     A     I don't know what it is.
3 It's a bunch of signatures.
4     Q     Either way --
5     A     It's a bunch of signatures
6 by people at the DMV.
7           MR. THOMPSON: Ms.
8 MacDonald, can we have this marked as
9 Exhibit 7?
10          (The above-referred-to
11    statement along with signatures was
12    marked as Exhibit 7 for
13    identification as of this date.)
14    Q     And so the people who signed
15 this document, right, "We the undersigned
16 clerks, supervisors and judges of the
17 Brooklyn South Traffic Violations Bureau
18 state that we feel the presence of
19 attorney Mario Capogrosso on our premises
20 constitutes a threat to our physical
21 safety."
22          Why would they think that,
23 Mr. Capogrosso?
24    A     I have no idea. Tell me the
25 specifics. I have no idea. You can't

Page 211

M.H. Capogrosso

1
2 make allegations against a man and his
3 reputation if you don't give me the
4 specifics that occurred and give me an
5 opportunity to respond and resolve it.
6 Let me know what I did.
7     Q     Did people --
8     A     I'd like to know.
9     Q     Did people view you as a
10 threat to their physical safety?
11    A     I don't know. I have no
12 idea, none. I can't answer that. They
13 might have. They --
14    Q     Did --
15    A     They might have.
16    Q     Were they right to view you?
17    A     I don't know. I am -- you
18 know, I was dealing with a lot of tough
19 guys down there, a lot of tough
20 motorists. There are tough guys down
21 there in Brooklyn, they are. I'm dealing
22 with a lot of tough guys.
23          And do I have a strong
24 presence, absolutely, I admit that. Do I
25 come across with a strong presence,

Page 212

M.H. Capogrosso

1
2 absolutely. How you perceive me, that's
3 up to you. What did I actually do is a
4 different situation. You can perceive me
5 in any manner you like. What did I
6 actually do?
7     Q     What do you mean by strong
8 presence?
9     A     I do have a strong presence.
10 I've been told that. I'm not --
11    Q     What do you mean by the term
12 strong presence?
13    A     Well, I'm not afraid to
14 speak my mind. I'm not afraid to
15 confront. I'm not afraid to confront,
16 that's what lawyers do. I'm -- I -- I
17 state the truth, I get right to the issue
18 and I try to resolve it. That's who I am
19 as a person, as a man, as an attorney,
20 that's who I am.
21          If you perceive -- if you
22 have a perception of me that you feel,
23 tell me what I did. Give me an
24 opportunity to resolve it. Give me the
25 opportunity to resolve it. Don't just

Page 213

M.H. Capogrosso

1
2 make blatant accusations against a man.
3     Q     When you say strong
4 presence, do you mean strong physical
5 presence?
6     A     I have a strong physical
7 presence, a strong persona. People say
8 that when I walk in the room, they feel
9 me or they sense me. I don't know why,
10 they do. They -- I've been told this. I
11 don't know why.
12          I'm trying to figure out why
13 they feel intimidated by me. I don't
14 know why. But if they do, give me an
15 opportunity to resolve it.
16    Q     But you knew that some
17 people felt intimidated by --
18    A     No, I did not.
19    Q     -- you; is that correct?
20    A     I did not. I did not. I
21 speak to everybody the same. I speak to
22 everybody the same. If you feel that
23 type -- if you feel that, give me an
24 opportunity to resolve it. Give me an
25 opportunity.

23 (Pages 210 - 213)

| Page 214 |
|---|

M.H. Capogrosso

1
2    Q     But were you aware that
3  people were intimidated by your strong
4  physical presence?
5    A     No, no.  Absolutely not.
6  I'm sorry if -- I'm sorry if I have a
7  strong physical presence.  I'm sorry.
8  You're allowed to have a strong physical
9  presence.  You're allowed.  You're
10  allowed.
11    Q     So Mr. Capogrosso --
12    A     You have to let me finish.
13  I can't help that.  You're allowed to
14  have that.
15    Q     So Mr. Capogrosso, they
16  write "We believe that Mr. Capogrosso's
17  behavior is unstable and hereby state
18  that he has gotten into confrontations
19  with many of us in the past years" and
20  you'll see some of the names on this list
21  like Marisol Cervoni are the list of
22  people who have filed complaints or
23  otherwise indicated that they had
24  confrontations with you.
25    A     Well, they --

| Page 215 |
|---|

M.H. Capogrosso

1
2    Q     They write "These
3  confrontations have been escalating to
4  the point where a physical confrontation
5  has nearly ensued between him and a
6  Brooklyn South employee on January 5,
7  2011 after the close of business."
8         Do you know what they're
9  referring to?
10    A     Absolutely.  I remember
11  that.  Absolutely.
12    Q     And what incident are they
13  referring to?
14    A     I'm going to the counter on
15  a ticket.  There's George and then
16  there's Cindy.  Cindy is George's
17  girlfriend, I didn't realize this, but
18  she's a nice lady.  I was talking to
19  Cindy.  I actually thought Cindy was a
20  very pretty woman.  I was taking to
21  Cindy.  George is getting upset I guess.
22  I didn't realize they were dating.  I had
23  no idea.
24         He starts yelling and
25  screaming at me.  I said that's enough,

| Page 216 |
|---|

M.H. Capogrosso

1
2  I'll talk to you about it later and
3  that's it.  But now I'm not allowed to
4  talk to a clerk.  I didn't know that
5  Cindy and George were dating and now I'm
6  not allowed to talk to Cindy.  So I was
7  talking to Cindy.  George got upset.  He
8  starts yelling and screaming at me.  I
9  said I'll talk to you about it later if
10  you want to talk and I said the word
11  talk.  I didn't threaten anybody.  I said
12  the word talk.
13    Q     Who told you that you
14  weren't allowed to talk to someone?
15    A     George was getting upset.
16  George was getting upset.  I don't know.
17  I was talking --
18    Q     Were you flirting with --
19    A     I wasn't flirting.
20    Q     Were you flirting with
21  Cindy?
22    A     Cindy's a beautiful woman.
23  Cindy was a beautiful woman.  Was I
24  flirting?  I don't know if I was
25  flirting.  Did I like Cindy?  Cindy was

| Page 217 |
|---|

M.H. Capogrosso

1
2  very pretty.
3         When I found out that they
4  were dating, I said that's it.
5    Q     What did you say to Cindy?
6    A     I wasn't flirting.  I
7  thought Cindy was a very attractive
8  woman.  Marisol Cervoni is a very
9  attractive woman.
10    Q     But what did you say to
11  Cindy on this day, January 5?
12    A     I don't remember.  I know it
13  was maybe how are you doing, what are you
14  doing for the weekend, are you going --
15  you know, maybe something to that.  I
16  don't know.  I don't remember the
17  specifics.
18         But I do remember I liked --
19  Cindy was a nice lady.  She was a nice
20  lady and she was a beautiful woman.
21    Q     Did you try to -- did you
22  try to fight Mr. Hon (phonetic)?
23    A     No.  Absolutely not.
24    Q     Did you block in his car?
25    A     Absolutely not.  If you look

24 (Pages 214 - 217)

Page 218

M.H. Capogrosso

1  at the --
2  Q    What happened?
3  A    If you look at the affidavit
4  that George Hon wrote, George Hon wrote,
5  not what Bushra Vahdat said happened,
6  what George Hon wrote was that I was
7  sitting in my car, which I do after work,
8  to make phone calls to my clients, which
9  I'm required to do and that George
10 approached me, got out of his car. At
11 that point I get out of my car.
12       If somebody approaches me in
13 their car, stops their car -- if they
14 stay in the car, I stay in the car. If
15 you get out of your car, I'm getting out
16 of my car. And he approached me. That's
17 what George Hon wrote. Read it.
18 Q    So did you have any sort of
19 confrontation with George Hon out in the
20 parking lot?
21 A    I said what's the problem.
22 He started yelling and screaming at me
23 about this and that. I said what's the
24 problem. Then I find out they're dating.

Page 219

M.H. Capogrosso

1  I said fine, hands off, I don't need this
2  aggravation. She's a nice woman, but I
3  don't need the aggravation.
4  Q    So he yelled at you. You
5  didn't yell at him?
6  A    I'm sitting in my car like I
7  do every day. Either I go there, I sit
8  in a park, sometimes I go to the beach.
9  I'm sitting there, I'm making phone
10 calls. I'm sitting in my car.
11       Read what George wrote and
12 then read what Bushra Vahdat wrote, some
13 story, I'm blocking people. Read what
14 George wrote. He approaches me. He gets
15 out of his car. I'm sitting in my car.
16 That's the truth.
17 Q    And so did George and Bushra
18 lie?
19 A    George didn't lie. Bushra
20 lied. Bushra lied.
21 Q    Okay.
22 A    Bushra should not be a judge
23 if you make up a story like that.
24 Q    So, Mr. Capogrosso, you see

Page 220

M.H. Capogrosso

1  this petition where 18 people sign a
2  letter saying that they believe that
3  you're a threat to their safety and that
4  your behavior is unstable.
5       What do you think that the
6  TVB should have done about this petition?
7  A    They should have shown it to
8  me, number one. They should have shown
9  it to me, number one.
10      Number two, they should have
11 told me exactly what I did, exactly what
12 I did and to give me an attempt to
13 resolve it. Give me an attempt to
14 resolve it. Give me the specifics, give
15 me a chance to apologize if I said
16 something wrong or I did something wrong.
17 Give me an opportunity to apologize.
18 Give me an opportunity to address it.
19 Tell me the specifics.
20      Now, the fact that you feel
21 intimidated by my presence, I can't help
22 that. I'm sorry, I can't. I am who I
23 am. I can't help it. I can't change it.
24 I am who I am. I've been very direct

Page 221

M.H. Capogrosso

1  with you, very direct to the Court. I am
2  who I am.
3       But if you feel that well,
4  maybe that's your own personal
5  insecurity. You might have personal
6  insecurities. They're not my
7  insecurities. They're your insecurities.
8  But give me the exact threats that I used
9  or what exactly I did.
10      But if you have personal
11 insecurity, don't put that personal
12 insecurity on me.
13 Q    Mr. Capogrosso, so this is a
14 petition which 18 separate people say
15 that they think that you're unstable and
16 a threat to their safety. How do you
17 feel about that?
18 A    I want to know the
19 specifics. I feel insulted, number one
20 and I feel improperly accused. Tell me
21 what I did. Give me an opportunity to
22 defend myself and respond and respond to
23 it and resolve it. Give me that
24 opportunity. Don't make --

25 (Pages 218 - 221)

Veritext Legal Solutions

212-267-6868                                          516-608-2400

Page 222

M.H. Capogrosso

2  Q    Do you think you did --
3  A    Don't make accusations and
4  don't give me an opportunity to respond.
5  Q    Do you think you did
6  anything wrong to have 18 people feel
7  that you're a threat to their physical
8  safety?
9  A    I want to know the exact
10 specifics. Tell me what I did.
11 Q    I know, but that's not the
12 question. The question is --
13 A    No, I know.
14 Q    -- do you think you did
15 anything wrong?
16 A    I don't think I did anything
17 wrong, no, I do not. My clients loved
18 me. My clients --
19 Q    Do you think that -- do you
20 think that people get petitions written
21 about them with 18 signatures saying
22 they're a threat to their physical safety
23 if they haven't done anything wrong?
24 A    I don't know why they wrote
25 it. Tell me what I did to threaten their

Page 223

M.H. Capogrosso

2  physical safety. Tell me what I did.
3  Listen, I'm a black --
4  Q    Do you think --
5  A    I'm a black belted martial
6  artist, I am. Can I handle myself,
7  absolutely. Am I more fearful what I
8  would do to somebody as to what they
9  would do to me, absolutely. I walk away
10 from confrontations all the time. I
11 don't want to get into it with anybody, I
12 don't. I've been studying martial arts a
13 long time. I've been in a boxing ring a
14 long time. I don't want to have a
15 confrontation with anybody, I do not. I
16 know how to handle myself.
17        That being said, if you feel
18 intimidated or threatened by me, I can't
19 help that. That's my persona. That's
20 who I am.
21        You tell me the specifics of
22 what I did and I will resolve it.
23 Q    Well, there were a number of
24 complaints that we've discussed and more
25 that we will.

Page 224

M.H. Capogrosso

2  A    Sure.
3        MR. THOMPSON: So,
4  Ms. MacDonald, can I ask you to
5  please mark this as Exhibit 7 if you
6  haven't already.
7  Q    One more quick note,
8  Mr. Capogrosso, you see how many of the
9  signatures on here, such as Marisol
10 Cervoni, supervisor as Roy Tucci, are
11 people who have already signed complaints
12 about your behavior; is that correct?
13 A    Well, they signed
14 complaints, yes. Yes, I've seen the --
15 you presented them, I've looked at the
16 complaints and I've addressed them.
17 Q    And you feel that they were
18 wrong?
19 A    I've already explained them
20 to you. The first time I saw them and
21 the first time I was given an
22 opportunity -- you want to talk about
23 Roy's? I didn't bump into him. Well, I
24 already explained my position on each
25 complaint --

Page 225

M.H. Capogrosso

2  Q    Okay.
3  A    -- that you've presented.
4  Q    And so you feel -- is it
5  fair to say that you feel that these
6  complaints that they were threatened were
7  unfounded?
8  A    They're unfounded because
9  there's no basis for them. Tell me what
10 I did. They're absolutely unfounded.
11 Tell me what I did. You don't have to
12 like me. You know, good attorneys are
13 not liked. I don't have to be liked to
14 do my job. I have to do my job.
15        People don't like me.
16 Either they like me or they hate me, I
17 know that, but I don't have to be liked.
18 I was not shown --
19 Q    I think we have been --
20 A    Well, I have not been trying
21 to endear myself to the clerks. I did
22 not. I was there to do a job. The one
23 time I tried doing it, talking to Cindy,
24 George got upset.
25 Q    So let's move on to a new

26 (Pages 222 - 225)

| Page 226 | Page 228 |
|---|---|
| M.H. Capogrosso | M.H. Capogrosso |

**Page 226**

1  M.H. Capogrosso
2 exhibit. I'm going to un-share my
3 screen.
4      MS. REPORTER: Did you guys
5 take a lunch break yet before I came
6 on or --
7      MR. THOMPSON: Would you
8 like one, Mr. Capogrosso?
9      THE WITNESS: I don't need
10 my brakes.
11      MR. THOMPSON: Ms. MacDonald
12 or Mr. Brodsky, you're also -- if you
13 would like one, we can certainly take
14 one. I'm perfectly happy to keep
15 going.
16      MR. VIDEOGRAPHER: You can
17 proceed Counsel, please.
18      MS. REPORTER: I mean I'd
19 like at least every hour and-a-half a
20 five minute break because you guys
21 are going -- and this is my fourth
22 deposition of the day, so --
23      MR. THOMPSON: We can take
24 a -- we can take a five minute break
25 if you'd like.

**Page 228**

1  M.H. Capogrosso
2 document?
3      A    Yes. I recognize the top,
4 yes. Is this the one from Yaakov? Yes,
5 absolutely, yes.
6      Q    And what is this document?
7      A    This is an affidavit from
8 Yaakov Brody about the incident that
9 occurred on December 22, 2011.
10      Q    And this is the document
11 marked P-92 in your production; correct?
12      A    Absolutely.
13      MR. THOMPSON: And,
14 Ms. MacDonald, I'll ask that this
15 document be marked Exhibit 8.
16      (The above-referred-to
17 statement was marked as Exhibit 8 for
18 identification as of this date.)
19      Q    So who is Yaakov Brody?
20      A    He's an attorney that works
21 down there.
22      Q    Did you have a good
23 relationship with him?
24      A    I never talked to the man.
25 I mean I never talked to him really. I

**Page 227**

1  M.H. Capogrosso
2      MS. REPORTER: Sure.
3      MR. THOMPSON: Why don't we
4 do that and reconvene at one 1:20.
5      MR. VIDEOGRAPHER: Okay.
6 The time is 1:15. We are off the
7 record.
8      (A short recess was taken.)
9      MR. VIDEOGRAPHER: The time
10 is 1:20. We are on the record.
11      MR. THOMPSON: Actually, I'm
12 having some problems here where it's
13 not letting me share my screen all of
14 a sudden.
15      Actually, can we go back off
16 the record while I figure out what's
17 wrong here? My apologies.
18      MR. VIDEOGRAPHER: Sure.
19 The time is 1:21. We are off the
20 record.
21      (A short recess was taken.)
22      MR. VIDEOGRAPHER: The time
23 is 1:22. We are on the record.
24      Q    Mr. Capogrosso, I'm showing
25 you a document. Do you recognize this

**Page 229**

1  M.H. Capogrosso
2 knew he was down there, but I never
3 really had any conversation with him
4 until the morning of -- I thought it was
5 December 22nd of December. He says
6 December 21, 2011.
7      Q    And so you never talked to
8 him before this?
9      A    Not really, no. He --
10      Q    Okay.
11      A    He used to like to schmooze
12 with the clerks all the time. He was up
13 there for a half an hour at a time
14 talking to the clerks, not me.
15      Q    So Mr. Brody writes
16 "Mr. Capogrosso walked in and went to
17 reach for his briefcase which was lying
18 on the floor next to me. Mr. Capogrosso
19 then said excuse me so I could move over
20 so that he could get to his briefcase.
21 He already had plenty of time, but
22 regardless I shifted my body so he would
23 have even more room to reach for his
24 belongings."
25      Do you recall any of this?

27 (Pages 226 - 229)

| Page 230 | Page 232 |
|---|---|
| M.H. Capogrosso | M.H. Capogrosso |

**Page 230**

1      M.H. Capogrosso
2    A    Yeah. It's not the truth.
3  I'll tell you what happened. I go in the
4  morning in the attorney's room, which is
5  about six feet long by about four feet
6  wide. It's a very small area. I get a
7  cup of coffee in the morning and the New
8  York Post. I get my coffee, I put it
9  under the bench -- under the bench with
10  my briefcase because I don't want my
11  coffee spilling on anybody's papers.
12      That day Brody is there.
13  He's right in front of my coffee. I say
14  excuse me, may I please get me coffee?
15  Excuse me, can I get my coffee? Brody
16  tells me excuse yourself, go fuck
17  yourself, you Jew hater anti-Semite. I
18  said what?
19      I get my coffee. I walk
20  away. I come back -- I go in the
21  courtroom, I argue a case. I come back,
22  put my coffee down where it was again and
23  Brody's right there, right -- right in
24  front of the coffee between -- the
25  coffee's under the bench. He's right

**Page 231**

1      M.H. Capogrosso
2  where the bench is and he says to me
3  again -- I say excuse me, can I get my
4  coffee? He says excuse yourself, go fuck
5  yourself you Jew hater anti-Semite.
6      That's what I remember and
7  that's what happened.
8    Q    And what happened after
9  that?
10    A    Then after that he walked
11  out about 20 feet away, he's looking in
12  and Mr. Jeff Meyers came in to talk to me
13  as to what happened.
14    Q    And then?
15    A    And then I threw a punch in
16  the vicinity of a wall, not in the
17  vicinity of anyone. I didn't hit the
18  wall, I wasn't charged and I was not
19  arrested. I was mad. The guy just told
20  me to go fuck myself twice. I didn't hit
21  the wall. I didn't hit Jeff Meyers.
22      I threw a punch in the
23  vicinity of a wall. I didn't hit the
24  wall and I was not charged and I was not
25  arrested and I was required to take an

**Page 232**

1      M.H. Capogrosso
2  anger management course.
3    Q    And did anything happen
4  after that?
5    A    That's it. Nobody took my
6  affidavit. Nobody asked me my story.
7  There's affidavit after affidavit after
8  affidavit here from lawyers who said they
9  were there, but the lawyer that was
10  actually there, me, got no opportunity to
11  explain what happened, nothing.
12      But Yaakov Brody gets to --
13  who created this incident, told me to go
14  fuck myself twice, gets the opportunity
15  to write an affidavit. He states at one
16  point I'm going to hit you with my
17  briefcase. I'm not the type of guy who's
18  going to hit you with a briefcase. I'm
19  not. If there's an incident and I got to
20  defend myself I will, but I'm not going
21  to hit you with my briefcase.
22      A lying lawyer at the DMV
23  who wanted me out, for what reason I
24  don't know. I was making too much money
25  in his presence. That's what I stated

**Page 233**

1      M.H. Capogrosso
2  and that's what I'll hold to.
3    Q    So your testimony is that
4  Mr. Brody just said fuck you, you Jew
5  hater anti-Semite out of nowhere?
6    A    Yeah. I walked in the
7  morning as I always did. I get coffee at
8  the deli. I get a paper at the deli. I
9  like the Post. I take my coffee, before
10  I go in the courtroom I put it under the
11  bench. I do it the same way all the
12  time.
13      I was reaching for my
14  coffee, for whatever reason he decided to
15  come at me this morning. Do I think he
16  was put up to it? I think so. I think
17  Bushra Vahdat who had just come on maybe
18  wanted me out, I don't know and this was
19  her opportunity to get me out. So she
20  created this incident, that's my opinion.
21      I was blindsided. I can
22  have an opinion though. But this is the
23  first time I think I was blindsided.
24  That's my opinion. Vahdat, Gelbstein
25  wanted me out and maybe they put this

28 (Pages 230 - 233)

Page 234

```
 1        M.H. Capogrosso
 2   attorney up to it because out of the blue
 3   he just happens to say this.
 4        My mind was --
 5   Q      Why would --
 6   A      You got to let me finish.
 7   My mind was someplace else. It was right
 8   around Christmas time. I'm not really
 9   thinking. I'm thinking about I got to
10   buy Christmas presents and what I'm
11   buying for who. That's where my mind was
12   on that morning. But that's what
13   happened.
14   Q      Why would Bushra Vahdat and
15   Alan Gelbstein want you out?
16   A      Bushra Vahdat -- well, they
17   had complaints against me from the
18   clerical staff, right and they had to
19   have a reason to have me removed and this
20   would have been an excellent reason,
21   right. They had all these complaints
22   that they were filing against me. There
23   was no sum and substance to any of them,
24   right.
25        But in order to get me
```

Page 235

```
 1        M.H. Capogrosso
 2   removed they needed an incident like
 3   this, so they created one. They
 4   didn't -- they didn't have no -- they had
 5   no basis to grieve me. There was no
 6   grievance filed against me. They grieved
 7   in Emig Tieg (phonetic) in Manhattan
 8   North because they had a basis for that,
 9   but they had no basis to grieve me
10   because there was no sum or substance to
11   any of these complaints, otherwise they
12   would have, so they created an incident.
13   That's my opinion.
14        And I was blindsided. My
15   mind was someplace else, it was Christmas
16   time and I took the bait. I did the
17   right thing. I did throw a punch at a
18   wall. I didn't hit the wall because I
19   was upset. What makes me a Jew hater
20   anti-Semite? What nerve does this
21   attorney have to call me a Jew hater
22   anti-Semite? I'm working down there 10
23   years. There's not one complaint from a
24   motorist or a client that I used an
25   anti-Semitic remark or a racist remark.
```

Page 236

```
 1        M.H. Capogrosso
 2        What right does this man
 3   have to call me an anti-Semite Jew hater?
 4   Q      So why would he think that
 5   you're a Jew hater anti-Semite? Why
 6   would he say that out of nowhere?
 7   A      Let me know. I'd like --
 8   why don't you ask him? Why don't you ask
 9   him? Ask this Mr. Yaakov Brody.
10   Q      Had you ever --
11   A      I'm making too much money in
12   his presence? I don't know. I'm an
13   Italian America down there. I'm
14   surrounded by Jewish lawyers. Most of
15   the lawyers down there are Jewish. Most
16   of the judges are Jewish.
17        Maybe I'm making too much
18   money. I don't know. Maybe I saw what
19   Judge Gelbstein was doing with the ticket
20   brokers. I don't know. But this guy had
21   it in for me --
22   Q      Had --
23   A      -- and I took the bait.
24   Q      Had you ever discussed Jews
25   or Judaism with Mr. Brody before this?
```

Page 237

```
 1        M.H. Capogrosso
 2   A      Absolutely not. Listen, I
 3   was there 10 years, 10 years I was there.
 4   Look at the complaints against me. Not
 5   one client or motorist made a statement
 6   that I made an anti-Semitic or a racist
 7   remark, not one.
 8        Now I have to have this
 9   lawyer call me a Jew hater anti-Semite.
10   For what reason?
11   Q      So had you had conversations
12   with Jews -- about Jews or Judaism at all
13   with anyone previous to this?
14   A      No. I don't -- no, no. I
15   don't care who you are, what religion you
16   are. I'm Catholic. I don't care what
17   you want to be. You're Jewish, fine. Do
18   whatever you like. God bless. I could
19   care less.
20        You look at the motorists
21   and the clients that I represented,
22   they're all nationalities, all races, all
23   of them. Not one indicated I made an
24   anti-Semitic or a racist remark and I'm
25   dealing with thousands, almost 850
```

29 (Pages 234 - 237)

M.H. Capogrosso

1         M.H. Capogrosso
2  clients I had on the docket. I'm dealing
3  with hundreds of clients on a monthly
4  basis. Not one made a statement that I
5  made any type of statement, any type of
6  racist or anti-Semitic statement, not
7  one.
8        I took this very personally
9  and I had to go to an anger management
10  course because I did take it personally.
11    Q   So Mr. Brody writes that
12  "Mr. Capogrosso lashed out at me and said
13  he was being nice by saying excuse me and
14  next time he would simply hit me with his
15  briefcase" and you said you never said
16  that; correct?
17    A   I would never hit you with
18  my briefcase. If I'm going to hit you,
19  I'm going to hit you. If I'm going to --
20  if I have to -- if it comes to the point
21  where I've got to hit you, I'm going to
22  hit you. All right.
23        If I have to defend myself
24  against a physical attack, a knife, a
25  gun, I'm going to hit you or I'm going to

M.H. Capogrosso

1         M.H. Capogrosso
2  get hit, but I'm not going to hit you
3  with my briefcase. That's not something
4  I would do.
5        This guy, Yaakov Brody, I
6  don't know what type of man he is, but
7  I'm not going to hit you with my
8  briefcase. That's an absolute lie. I am
9  not the type of guy who's going to hit
10  you with a briefcase.
11    Q   So he writes that you
12  proceeded to tell him that the next time
13  you see him you better get out of his
14  way.
15    A   That's not true.
16    Q   Did you say that?
17    A   No, absolutely not. Get out
18  of my way for what reason? We are both
19  working in the same building. How is he
20  going to get out of my way? We are both
21  attorneys at the same location. How is
22  he going to get out of my way?
23    Q   He writes that there were
24  three other attorneys in the room. Do
25  you remember there being anyone else in

M.H. Capogrosso

1         M.H. Capogrosso
2  the room?
3    A   I remember -- let me think.
4  The first time, no, it was just me and
5  him.
6        The second time I went back
7  and I put my -- I went to the courtroom
8  and I came back and I said this guy
9  must -- I don't know. He was there in
10  the same location. My coffee, I put my
11  coffee back under the chair. He was
12  exactly in the same exact location as the
13  first time.
14        At that time -- who was in
15  there at that time? I think -- there was
16  another attorney. It wasn't Rick Maher,
17  that I know. He wasn't there. There was
18  another lawyer there, but I forgot the
19  guy's name. I forgot. There was one
20  other lawyer there, but I forgot the
21  guy's name. It wasn't Meyers, but there
22  was another lawyer there.
23    Q   So he writes that you took a
24  seat across from Mr. Brody and complained
25  that you didn't -- that he didn't give

M.H. Capogrosso

1         M.H. Capogrosso
2  you enough room. He continued to ignore
3  you he says.
4        Then he writes, quote,
5  "Eager to show how angry he really was,
6  he took his coffee cup which still had
7  some coffee inside and threw it my
8  direction toward the garbage can that was
9  next to me."
10        Did you throw the garbage --
11  the coffee cup?
12    A   First of all, we are in a
13  lawyers' room that's six feet by about
14  four feet wide. There's bench on either
15  side. All right. I'm allowed to go in
16  the lawyers' room. Even after -- I'm
17  allowed to go in. My briefcase was in
18  there, number one. I wanted to make sure
19  nobody touched my briefcase. I had my
20  files in it.
21        Number two, my coffee's
22  still there in the lawyers' room because
23  I can't bring it into a courtroom. So I
24  get my coffee now. Now, I'm sitting
25  there and he comes in and sits there next

Page 242

M.H. Capogrosso

1
2  to the garbage can, this Brody. I finish
3  my coffee cup. I said this guy is going
4  to start in on me again. Now he's going
5  to come at me for the third time. I
6  finish my coffee and as I'm leaving, he's
7  sitting right next to the coffee -- right
8  next to the garbage can. I threw my
9  empty cup, which I'm allowed to do, into
10 a garbage can. I didn't throw it at him.
11 I threw it into a garbage can and I
12 walked out.
13      And he came -- when I was in
14 there first and then he comes back in for
15 a third time and then he goes -- then
16 what do you call it, Meyers comes in,
17 into there and says what's going on, Jeff
18 Meyers who was a lawyer. That's what
19 happened that day.
20     Q    So Mr. Brody writes that "I
21 complained to Mr. Capogrosso that this
22 was not civilized behavior and I did
23 nothing to warrant such hostility.
24 Enraged, Mr. Capogrosso went on a rant on
25 how I was a, quote, Jew fucking cunt, a

Page 243

M.H. Capogrosso

1
2  phrase which he repeated about six or
3  seven times."
4      What's your memory of what
5  happened here?
6     A    Well, I might have said
7  that.
8      MS. REPORTER: Wait, hold
9  on. My machine just stopped writing.
10 Let me read what I have and then pick
11 up from there.
12      (The requested portion was
13 read back by the Court Reporter.)
14     A    Well, the man just told me
15 to go fuck myself twice, I'm a Jew hater
16 anti-Semite. Now out of the blue I'm
17 making a statement like this, you Jew
18 fucking cunt? First of all, he is a Jew.
19 The word fucking, I might have used that
20 and the C word, I'm not sure.
21      But was he acting like a
22 real man on that date provoking a fight
23 when I say excuse me, can I get a cup of
24 coffee?
25      I mean I don't recall making

Page 244

M.H. Capogrosso

1
2  the statement. I know I was mad. I was
3  mad and I did take an anger management
4  course and I was blindsided, but all I
5  did was say excuse me can I get my
6  coffee.
7      And if you look at the
8  affidavit from Tahir, it states that I
9  said excuse me twice. That's all I have
10 to say about that.
11     Q    Mr. Brody writes that after
12 that you went on to say that the place
13 was run by Jews. Did you say that?
14     A    I don't recall saying that,
15 but all the --
16     Q    Did you --
17     A    There are Jewish -- Judge
18 Gelbstein is Jewish. It's a true
19 statement. It is a true statement. Most
20 of the judges down there, it's a true
21 statement. Bushra Vahdat is a Jew. Ida
22 Traschen is a Jew. I am an Italian
23 American.
24      Is it a true statement,
25 yeah. Did I say that? I don't recall

Page 245

M.H. Capogrosso

1
2  saying it. But is it a true statement,
3  yeah, most of the judges in the Brooklyn
4  TVB were Jewish, yes. Most of the
5  lawyers were Jewish.
6      I'm trying to understand in
7  my head why this guy is telling me to go
8  fuck myself, I'm a Jew hater anti-Semite
9  when I've been there since 2005 and you
10 don't have a complaint or an allegation
11 from a client that I ever acted in this
12 manner or said anything to a client or
13 motorist.
14      What is making this guy say
15 this to me I'm trying to think and I
16 still can't figure it out, other than he
17 was put up to it, other than he was put
18 up to it and I took an anger management
19 course because I did throw a punch at a
20 wall and I should not have thrown -- have
21 done that, but I -- what do you want me
22 to do? I'm a human being.
23     Q    So I'm not sure if I was
24 quite clear. Did you -- did you actually
25 say that the place was run by Jews?

31 (Pages 242 - 245)

Page 246

```
 1           M.H. Capogrosso
 2      A    I don't recall saying that,
 3  but is that true that it is mostly Jewish
 4  judges, yes, that's a true statement.  Do
 5  I remember saying it, no, I don't
 6  remember saying it.  But is it true, yes,
 7  it is true.
 8           All my accusers in this
 9  case, Judge Gelbstein, Ida Traschen,
10  Bushra Vahdat, Yaakov Brody who started
11  this is Jewish, are Jewish.  I'm an
12  Italian American.  That's a true
13  statement.
14      Q    Do you think -- does it make
15  a difference that they're Jewish or that
16  you're Italian?
17      A    No.  I don't care who you
18  are.  I treat everybody the same.  I
19  treat everyone respectfully.  I treat
20  everyone respectfully.  Look at the --
21      Q    And do you --
22      A    Look at my clients, there's
23  not one accusation from a client that I
24  used -- and there's all different
25  nationalities I'm dealing with down in
```

Page 247

```
 1           M.H. Capogrosso
 2  Brooklyn TVB, Russian, Jewish, Italian,
 3  Arabic, Muslim, not one from a client or
 4  a motorist, that I used an anti-Semitic
 5  or racist remark.
 6           The only racist here is
 7  Judge Gelbstein who told me a spade is a
 8  spade.
 9      Q    Does it make a difference
10  that many of the people in leadership at
11  the DMV are, in fact, Jewish?
12      A    No.  I could care less.  God
13  bless, you got a job, God bless.
14  Actually, the best judges were the Jewish
15  judges.  In a courtroom, Gelbstein gave
16  you the best chance.  Bonstein
17  (phonetic), I mean not Gelbstein,
18  Bonstein gave you a great chance to win.
19  Chauney (phonetic) gave me a great
20  chance.  Tilman gave me a great chance to
21  win.  What do you call it?
22           The best judges were the
23  Jewish judges in the courtroom for me.
24  Walters gave me good -- Walters gave me a
25  terrible choice to win.  Ross gave me a
```

Page 248

```
 1           M.H. Capogrosso
 2  bad choice.  Who else was there?
 3  Esposito, he gave me a -- he eventually
 4  got better, but at the start he was very
 5  tough.
 6           But the best judges at the
 7  start for me doing my job were Bonstein,
 8  Tilman and Chauney.  They were the best.
 9  Abish (phonetic) was great in a courtroom
10  for a lawyer in dealing with these cases.
11      Q    So, Mr. Capogrosso,
12  yesterday at his deposition Judge
13  Gelbstein testified that you called him
14  to his face a beanie wearing Kike; is
15  that true?
16      A    That's an absolute lie.
17  That is an absolute lie.  That judge
18  should be taken off the bench for making
19  a statement like that.  That is an
20  absolute lie.  That is a judge who wrote
21  that affirmation after I was removed from
22  the Brooklyn TVB because of this incident
23  in 2011 he wrote that affirmation.  You
24  don't see that -- you don't see that
25  documented anyplace until after I was
```

Page 249

```
 1           M.H. Capogrosso
 2  removed.
 3           That is an absolute lie by
 4  that judge.  He doesn't indicate the
 5  circumstances for which I said it or does
 6  anybody corroborate it, anybody witnessed
 7  it.  That is an absolute lie and that
 8  judge should be removed because he made
 9  that statement to get me kicked out and
10  that is why I'm looking for punitive
11  damages.
12           That is a lying lawyer
13  acting as a judge who should be taken off
14  the bench.
15      Q    And why at this point did he
16  want you kicked out?
17      A    I don't -- why did he
18  want -- you saw all the affidavits
19  written about me.  He wanted me out.  You
20  saw all the clerks' affidavits.  He
21  wanted me out.  I was -- maybe I was
22  making too much.  I don't know why.  He
23  wanted to keep things nice and quiet down
24  there so he could get a piece of the
25  action.
```

32 (Pages 246 - 249)

Page 250

```
 1        M.H. Capogrosso
 2        I don't know why he wanted
 3  me out, but I never made that statement.
 4  Never made that statement to him.
 5      Q    So Mr. Brody writes that
 6  when he protested to you how he could use
 7  the language about being Jewish that you
 8  stated "What do you care, just call me a
 9  fucking Italian ginny."
10      A    That should be Gini, but I
11  never said. I don't recall saying that.
12      Q    You never said that?
13      A    No. I know I was upset. I
14  walked in that morning and I was having a
15  personal problem with some woman I was
16  dating at the time and I'm thinking what
17  present I have to buy her and my head was
18  not there with buying this woman a
19  present and next thing you know I get
20  blindsided because I'm saying excuse me,
21  can I get my coffee and he blindsided me.
22      Q    And is it safe to say so
23  you -- let me withdraw that question.
24        So, Mr. Capogrosso, you
25  believe that Mr. Brody lied in this
```

Page 251

```
 1        M.H. Capogrosso
 2  complaint; correct?
 3      A    Absolutely, the whole thing,
 4  the whole thing. I pointed them out.
 5  I'm not hitting you with my briefcase. I
 6  am not going to hit you with my
 7  briefcase. I never heard of such
 8  nonsense. I am not the type of guy who's
 9  going to hit you with a briefcase. I
10  never heard of that nonsense.
11        There's no reason for me to
12  act like this in the morning when I say
13  excuse me to the man. I go from excuse
14  me to go fuck -- I go from that, I say
15  excuse me, I'm trying to be polite.
16        Come on, a lying lawyer at ·
17  the DMV wanted me out. I don't know why.
18  I think Bushra Vahdat and Alan Gelbstein
19  put him up to it. That's my opinion.
20      Q    Okay. So let's move on.
21      MR. THOMPSON: This I
22  believe was marked as Exhibit 8. If
23  we didn't do that, let's please mark
24  it that way.
25        Let me close out of this and
```

Page 252

```
 1        M.H. Capogrosso
 2  out of the Screen Share.
 3        (The above-referred-to
 4  statement was marked as Exhibit 9 for
 5  identification as of this date.)
 6      Q    Mr. Capogrosso, can you see
 7  this document?
 8      A    Yes.
 9      Q    And this document is from
10  your production marked P-250; correct?
11      A    Yeah. This is from Richard
12  Maher, yes.
13      Q    And what is this document?
14      A    Well, that was an affidavit
15  that another attorney got to write, I
16  never got to write my affidavit as to
17  what happened, who was not even in the
18  room that day. Maher was not even in the
19  room. I know Brody was in the room at
20  the first one, the time he said excuse
21  me, go fuck yourself.
22        And then the second time
23  there was another attorney, I forgot the
24  guy's name, but it wasn't Maher. Maher
25  was not even in the room. I don't think
```

Page 253

```
 1        M.H. Capogrosso
 2  he was even there that day, but I'll go
 3  through it, what I remember.
 4      Q    So who is Richard Maher
 5  before we get too far?
 6      A    He's a lawyer down there
 7  that worked at the TVB.
 8      Q    Did you have a good
 9  relationship with Mr. Maher?
10      A    I never talked to the guy
11  that much.
12      Q    And for the transcript Maher
13  is M-A-H-E-R; correct?
14      A    I don't know how he spells
15  his name. I don't know.
16      Q    It's spelled that way on
17  here.
18      A    Right. I don't know how he
19  spells it.
20      Q    So is it correct to say that
21  this statement corroborates Mr. Brody's
22  account?
23      A    I don't know. I don't know.
24  That's his version. I don't know if it
25  corroborates it or not. I don't know.
```

33 (Pages 250 - 253)

Page 254

M.H. Capogrosso

1
2 He wasn't in the room.  They could be
3 making up -- they could have corroborated
4 the story after the fact.
5          The man was not in the room.
6 I know who was in the room.  I was there.
7 This man was not in the room.
8     Q     So it's your testimony that
9 Mr. Maher made up what's in this
10 statement?
11     A     Well, tell me exactly which
12 portions.  He was not in the room that
13 day.  I remember it very, very
14 distinctly.
15     Q     Sure.
16     A     He was not in the room.
17 When Brody came in and I said excuse me,
18 me and him were the only ones there.
19          When I came back again,
20 there was another attorney there.  I
21 forgot the man's name.  It wasn't this
22 attorney.  Maher was never anyplace to be
23 seen.
24     Q     So first off I'll note he
25 says that the lawyers' room can

Page 255

M.H. Capogrosso

1
2 accommodate up to a dozen attorneys; is
3 that right?
4     A     The lawyers' room is
5 precisely I would say six to eight feet
6 long, five feet wide.  There are benches
7 that are at least, what, a foot in width,
8 so that leaves about three feet to walk,
9 three feet between the benches.  Eight
10 feet, six to eight feet long, five feet
11 wide, the benches are a foot, that's the
12 dimensions.
13          I don't think it could fit
14 12, no.  I don't believe so, no.
15     Q     Mr. Maher writes "When
16 Mr. Capogrosso entered, he asked
17 Mr. Brody to move so he could sit.
18 Mr. Brody did his best to reasonably
19 comply with this request.  The bench
20 contained the belongings of other
21 attorneys and Brody in fact tried to make
22 more room so that Capogrosso could sit."
23 Then there's a parenthetical here.
24          "Far from acknowledging
25 Mr. Brody's attempt to show him courtesy,

Page 256

M.H. Capogrosso

1
2 Capogrosso grumbled about Mr. Brody's
3 lack of decorum and began to berate
4 Brody."
5          So that's basically the same
6 version of events that Mr. Brody said;
7 correct?
8     A     No, it's not.  It's not what
9 happened.  I'm not looking to sit down.
10 I'm looking to get my coffee.  I have to
11 go in the -- I'm looking to get my
12 coffee.  I'm not looking to sit down.  I
13 said excuse me, can I get my coffee.
14 Those are the words I actually stated.
15          I'm not looking to sit down.
16 My coffee is already under the bench.  My
17 briefcase is already under the bench.
18 I'm looking to get my coffee so I can
19 have some coffee before I go into the
20 courtroom to argue my cases.  I'm not
21 looking to sit down.  It's not correct.
22     Q     And when he says that you
23 began to berate Brody; is that correct?
24     A     No.  I said excuse me very
25 politely, can I get my coffee.  He said

Page 257

M.H. Capogrosso

1
2 excuse yourself, go fuck yourself you Jew
3 hater anti-Semite, at which point I took
4 my coffee and I walked away.  I came
5 back, I put my coffee under it.  He -- I
6 had some coffee, I put it back under the
7 bench so I could go argue my case.
8          I come back, he's standing
9 in the same place again and tells me
10 again excuse myself, go fuck myself.
11     Q     Mr. Maher writes "Capogrosso
12 then began to inveigh against Brody in
13 vituperative terms as his temper
14 continued to rise beyond all reason given
15 the fact that Brody was extending
16 courtesy to him by now under duress."
17     A     That -- this is an absolute
18 lying lawyer at the DV -- at the TVB
19 again.
20     Q     So why would Mr. --
21     A     I don't --
22     Q     Why would Mr. Maher lie?
23     A     Let me finish.  Okay.
24 Finish your question.  Go ahead.
25     Q     I'm sorry.  Part of the

34 (Pages 254 - 257)

Page 258

M.H. Capogrosso

1
2  problem is you speak and then you pause
3  and then I think you're done and then I
4  start talking.
5      A    What's the question?
6      Q    So why would Mr. Maher lie?
7      A    Ask Mr. Maher. I have no
8  idea. This is not what happened. I'm
9  telling you what happened. I'm not
10 getting this angry over nothing. I'm not
11 getting this angry if Brody didn't
12 approach me and tell me to go fuck myself
13 twice. I'm not getting angry like this
14 and upset like this if the man didn't
15 approach me and tell me to go fuck myself
16 twice when all I said to the man was
17 excuse me, can I get my coffee.
18         Now write whatever you like,
19 but no man's going to get angry like this
20 unless he's told to go fuck himself
21 twice.
22     Q    So you have no idea why
23 Mr. Maher would write this?
24     A    I have no idea. Maybe
25 they're friends. I don't know. I don't

Page 259

M.H. Capogrosso

1
2  know.
3      Q    Do you have a suspicion?
4      A    No. I don't know. Maybe
5  they're two Jewish American attorneys and
6  I'm an Italian American attorney and
7  they're ganging up on me. I don't know.
8  You figure it out. You ask them. I
9  don't know.
10     Q    Did you --
11     A    That's a fact. He --
12     Q    Did you think that
13 Mr. Maher --
14     A    I don't know. Go ahead.
15     Q    Did you think Mr. Maher
16 wanted you out?
17     A    I don't know if he did or
18 not. I never talked to the man. I
19 didn't like him. I didn't like the way
20 he handled cases. Did I like the man,
21 no. Did I dislike him, no, I really
22 didn't care. He had a job to do, I had a
23 job to do.
24         I wasn't -- I wasn't
25 required to like other attorneys. I was

Page 260

M.H. Capogrosso

1
2  required to do a job. You know, I choose
3  my friends very carefully. I get -- you
4  know, I choose them very carefully. I
5  don't have to like everybody in this
6  world.
7          Did I like his approach, no,
8  but he had -- he had his right to do his
9  job. I had a right to do my job.
10     Q    Mr. Maher --
11     A    I don't have to like you.
12     Q    Mr. Maher writes again that
13 your remarks, quote, "became intensely
14 personal, directed at Brody, his person
15 and his culture, his ethnicity and his
16 very humanity." Is that true?
17     A    He told me to go fuck myself
18 twice. Did I call him a fucking Jew
19 cunt? I probably called him a fucking
20 something. I don't remember exactly the
21 words I did, but if you're going to tell
22 me to go fuck myself, I am going to
23 respond, all right.
24     Q    So this --
25     A    If you tell me to go fuck

Page 261

M.H. Capogrosso

1
2  myself twice, that I'm an anti-Semite Jew
3  hater, that I'm making too much money
4  it's my opinion in your presence, I'm
5  going to respond. I'm going to respond.
6  I think any normal man would respond,
7  whether an attorney or not. Outside of a
8  courtroom when it's not -- any normal man
9  is going to respond to an accusation like
10 that.
11         So is this man lying, yeah,
12 he's lying.
13     Q    So Mr. Maher writes, quote,
14 "Nothing Brody did or said during
15 Capogrosso's verbal attack was in any way
16 provocative or confrontational."
17     A    Well, first of all --
18     Q    Do you see that?
19     A    Yeah. Maher wasn't in the
20 room on the first instance. He wasn't
21 there on the second incident either, so
22 he doesn't know what Brody said to me.
23 Brody told me excuse yourself, go fuck
24 yourself, you're a Jew hater anti-Semite
25 twice, not once, twice. The first time I

35 (Pages 258 - 261)

Page 262

M.H. Capogrosso

1
2  walked away.  The second time I said
3  what's going on with this guy.  He said
4  it twice to me and I was never given an
5  opportunity to write my affidavit.
6      Q     So Mr. Maher writes that
7  Mr. Brody spoke up strongly, quote, "when
8  Capogrosso referred to him as a fucking
9  Jew cunt."
10          So there's the language
11  again.  Does that refresh your memory at
12  all?
13      A     Did I say something to
14  Brody, yeah.  Yeah, I did.  I don't know
15  if I called him a Jew cunt.  Is he a Jew,
16  yeah.  Did I use the word fuck, I might
17  have.  Was he acting like a man at this
18  point, no, not in my estimation.
19          If you provoke a fight like
20  that and you say this out of the blue,
21  was he acting like a real man, no, he
22  wasn't acting like a man.
23          Did I use those words?  I
24  don't think I used the word -- I don't
25  know what I said, but I probably said

Page 263

M.H. Capogrosso

1
2  something, but I don't know exactly what
3  I said, but I did say something.  I was
4  mad.  The man got me --
5      Q     He said --
6      A     The man blindsided me, got
7  me thrown out of the DMV, blindsided me.
8  I was thrown out of the DMV the next day
9  by Gelbstein telling me I'm not welcome
10  here anymore.  I was never given an
11  opportunity to write an affidavit to say
12  what I had to say, my version of the
13  story, by anybody.
14          Judge Gelbstein, Bushra
15  Vahdat, Ida Traschen, never given an
16  opportunity to write my affidavit, where
17  every attorney got an opportunity to
18  write an affidavit.  I was thrown out.  I
19  had to take an anger management course
20  that cost me $10,000.  So was I upset
21  that day, yeah, I was upset.
22      Q     Mr. Maher writes that
23  Michael Beer spoke up and said that you
24  crossed the line of decency.  Do you
25  remember Michael Beer saying anything?

Page 264

M.H. Capogrosso

1
2      A     Michael Beer was the other
3  attorney in the room the second time.
4  The second time Beer was there.  Now you
5  refreshed it, yeah.  Michael Beer was the
6  other attorney.  He wasn't there the
7  first time.  He was there the second
8  time, that I remember, Beer.  Beer was
9  there.
10          When Brody was standing in
11  front of the coffee again and I said
12  excuse me, can I get my coffee, so Beer
13  was in the -- was in the room the second
14  time that Brody did this to me.
15      Q     And Mr. Maher writes that
16  you, quote, "expressed the belief that
17  the DMV was in fact run by fucking Jew
18  cunts;" is that correct?
19      A     I don't remember saying that
20  exactly.  I don't remember saying that,
21  no.  Is it run by Jewish judges and
22  lawyers, yeah.  Am I an Italian American,
23  absolutely.  Did Judge Gelbstein give me
24  an opportunity to write my affidavit and
25  response, no.  Did Bushra Vahdat give me

Page 265

M.H. Capogrosso

1
2  an opportunity, no.  Did Ida Traschen,
3  no.  They accepted this all as truth,
4  these affidavits, giving me no
5  opportunity to respond.
6          Now, most of the judges down
7  there are Jewish.  The best -- the best
8  judges in the courtroom were Jewish, I'm
9  not going to deny that, they were, but
10  these Jewish judges gave me no
11  opportunity to respond.
12      Q     So let's move on to the next
13  exhibit.
14      A     Please.
15      Q     Mr. Capogrosso, can you see
16  this exhibit?
17      A     Yes.
18      Q     And you can see this is from
19  your production and marked P-96; correct?
20      A     Yes.  This is a Sadiq Tahir,
21  yes.
22      Q     Do you recognize this
23  document?
24      A     Yes.
25      Q     And what is it?

36 (Pages 262 - 265)

Page 266

```
 1            M.H. Capogrosso
 2      A      It's an affidavit from
 3   Tahir, another attorney, who had the
 4   opportunity to write an affidavit and I
 5   didn't as to what happened.
 6            MR. THOMPSON: And,
 7      Ms. MacDonald, can we mark this as
 8   Exhibit 10.
 9            (The above-referred-to
10      statement was marked as Exhibit 10
11      for identification as of this date.)
12      Q      So, Mr. Capogrosso, who is
13   Sadiq Tahir?
14      A      He's a lawyer at the
15   Brooklyn TVB.  We were friends at one
16   point in time, really good friends.  We
17   used to go out drinking together.
18      Q      When was that?
19      A      Before this incident.  We
20   used to go out all the time.  We used to
21   hang out at the same clubs.  We used to
22   hang out.  We both drank.  We used to go
23   out drinking in Brooklyn.
24      Q      Mr. Capogrosso, do you know
25   what Mr. Tahir's current status is?
```

Page 267

```
 1            M.H. Capogrosso
 2      A      I think he's passed.  I
 3   think he died.
 4      Q      I heard that, too.  You
 5   know, I don't --
 6      A      I don't know.
 7      Q      I heard people say that, but
 8   I don't know if it's actually true.
 9      A      I don't know either, but we
10   were friends at one point in time.
11   Really -- I used to drive him -- I used
12   to drive him home at night.  He used to
13   ask me for a ride home.  We used to be
14   really close.  I went over to his
15   apartment.
16            This hurts me more than
17   anything, this affidavit.  We were
18   really, really close me and him.
19      Q      So then if you were so
20   close, why do you think he wrote this
21   statement?
22      A      I don't know what happened.
23   I don't know.  I know that he tells me
24   Mr. Capogrosso walked, and he's being
25   truthful here, and said excuse me.  I
```

Page 268

```
 1            M.H. Capogrosso
 2   did.  He says that and I did say that.
 3   Maybe he was in the room.  I don't know.
 4            "He moved to the side to
 5      reach for his bag lying under the" -- "he
 6   then said again excuse me."  I'm saying
 7   excuse me twice.  Now Brody says why are
 8   you being rude, you have enough -- I said
 9   I didn't have enough room.  If I
10   didn't -- if I had room enough to get my
11   coffee -- this -- why would I say excuse
12   me?
13            That's when Brody says
14   excuse yourself, go fuck yourself, I'm a
15   Jew hater anti-Semite.
16      Q      So up until this point when
17   he talks about saying excuse me, is
18   Mr. Tahir's account correct?
19      A      I don't know.  What point?
20   Mr. Capogrosso walked into the room.  I
21   did do that.  I said excuse me.  I did do
22   that.  I was looking for my coffee.  Now,
23   Brody didn't move away.  I had to say
24   excuse me twice.  I had to say it twice.
25            I have to be expelled from
```

Page 269

```
 1            M.H. Capogrosso
 2   the Brooklyn TVB because I'm asking an
 3   attorney back in December of 2011 excuse
 4   me, can I get my coffee.  I have to be
 5   expelled and take an anger management
 6   course because this lawyer couldn't just
 7   move to the side and let me get my
 8   coffee.  He had to call me -- tell me I'm
 9   a Jew hater, fuck you I'm a Jew hater and
10   I'm the cause of this now.
11            But go ahead, I'm listening.
12      Q      Mr. Tahir writes "Mr. Brody
13   said you have enough room.  Why are you
14   so rude.  Mr. Capogrosso got so upset
15   that he started shouting against Jews.
16   Mr. Beer who was also sitting in the room
17   asked Mr. Capogrosso that it's enough,
18   that you -- it's enough, you can't curse
19   Jews."  Is that correct?
20      A      Beer was in the room.  Beer
21   was in the room, that I remember.  I
22   remember -- said you had enough room -- I
23   didn't have enough room.  I said excuse
24   me, can I get my coffee.  He refused to
25   move the first time and then he -- then
```

37 (Pages 266 - 269)

M.H. Capogrosso

1   M.H. Capogrosso
2   he's telling me excuse yourself, go fuck
3   yourself.
4         Then I come back, Beer is
5   there. I remember Beer. I'm not sure if
6   Sadiq was there and -- Sadiq must have
7   obviously been there because he does say
8   the words excuse me.
9         And he refused to be --
10  he -- then he said it again to me, excuse
11  yourself, go fuck yourself. At that time
12  I got upset. At that point I got upset.
13  He walked -- at that point I got upset.
14  Yes, I did, I'm not going to deny it. I
15  took an anger management course.
16  Q    So he writes that
17  "Mr. Capogrosso said you can call me a
18  fucking Italian Gini. Mr. Brody said
19  that you're an anti-Semite and you don't
20  belong in this place. Mr. Brody shouted
21  stop it and in the meantime Ms. Daniel,"
22  I guess that means Danielle, "Calvo came
23  into the room and tried to cool down the
24  situation." Is this correct?
25  A    I know Beer was in the room.

M.H. Capogrosso

1   M.H. Capogrosso
2   I don't remember what he was saying. I
3   was upset at that point in time. Listen,
4   I was upset. You know, I don't recall
5   exactly what I said.
6         Did Calvo come out? Calvo,
7   if she came out she took everybody's
8   affidavit, every lawyers' affidavit but
9   mine. She took every lawyers' affidavit
10  but mine as to what happened.
11        Beer I do remember in the
12  room and that's it. That's all I
13  remember. That's what I remember.
14  Q    So is there anyone -- you
15  know, of what we've looked at so far, is
16  there anything that Mr. Tahir has written
17  that is untrue?
18  A    Well, I don't know. I don't
19  know. I'm not going to say that because
20  I'll admit to the fact I said -- that I
21  said excuse me, that's what I'll admit
22  to. I don't know about the rest. I
23  don't recall the rest. I do remember
24  saying excuse me twice. I do -- I do
25  recall -- I do recall being upset. I

M.H. Capogrosso

1   M.H. Capogrosso
2   was.
3         I do recall Beer being in
4   the room, that's what I remember. I
5   don't remember Calvo coming out, but
6   maybe she did. I know Maher was not in
7   the room, that I remember.
8   Q    So Mr. Tahir writes "A
9   little later Mr. Meyers came in the room
10  and" -- I can't actually quite read what
11  he says.
12  A    I have to apologize --
13  Meyers is asking me to apologize to
14  Brody. Meyers is asking me to apologize
15  to a guy that just told me to go fuck
16  myself twice. That's what I have to do.
17  Q    And what happened then?
18  A    I got -- I got upset. I got
19  to apologize to a guy that just told me
20  to go fuck myself twice? Are you kidding
21  me? I mean are you really kidding me?
22  That's when I threw the punch at the
23  wall. I didn't hit the wall. I wasn't
24  charged. I wasn't arrested. That's when
25  I really got -- he's asking me to

M.H. Capogrosso

1   M.H. Capogrosso
2   apologize to a guy that just told me to
3   go fuck myself twice.
4         At that point Brody is
5   standing outside the -- outside the room.
6   He looks in and then he goes -- goes to
7   Judge Gelbstein. I think that's what
8   happened. I'm not sure.
9   Q    So Mr. Tahir writes that you
10  said to Mr. Meyers that I'll send you to
11  the hospital.
12  A    I never said that. I never
13  would say that. There's no reason for me
14  having -- being mad at Meyers. No reason
15  for me. Meyers didn't do anything.
16  Meyers just walked in the room. He's
17  asking me to apologize which is just
18  terrible because you know the truth
19  doesn't matter here. You know, the truth
20  doesn't matter as to what actually
21  happened. He's asking me to apologize to
22  a guy that just told me to go fuck myself
23  twice.
24        I never said I was going to
25  put Meyers in the hospital, never. I

38 (Pages 270 - 273)