**EXHIBIT A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X Docket#

CAPOGROSSO,                        : 18-cv-02710-EK-LB
              Plaintiff,           :
                                   :
                                   :
    - versus -                     : U.S. Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
GELBSTEIN, et al.,                 : March 16, 2021
              Defendants           : 11:01 AM
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
BEFORE THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE

A  P  P  E  A  R  A  N  C  E  S:


For the Plaintiff:        Mario H. Capogrosso, pro se
                          21 Sheldrake Place
                          New Rochelle, NY 10804


For the Defendants:       James M. Thompson, Esq.
                          Office of the New York State
                          Attorney General
                          28 Liberty Street
                          New York, NY 10005


For Defendant Smart:      David Smart, pro se
                          2355 Batchelder St.
                          Apartment 3E
                          Brooklyn, NY 11229


Transcription Service:    Transcriptions Plus II, Inc.
                          61 Beatrice Avenue
                          laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  Civil Cause for Telephone Status

2    Conference, docket number 18-cv-2710, Capogrosso v.

3    Gelbstein, et al.

4          Will the parties please state your names for

5    the record?

6          MR. CAPOGROSSO:  Mario Capogrosso, plaintiff,

7    21 Sheldrake Place, New Rochelle, NY 10804.

8          MR. THOMPSON:  Good morning.

9          James Thompson from the Office of the New York

10   State Attorney General for the state defendants and I'm

11   joined by Barbara Montina (ph.) who is in-house counsel

12   for DMV.

13         MR. SMART:  Yeah, my name is Mr. David Smart.

14   I'm here on my behalf.

15         THE CLERK:  The Honorable Lois Bloom presiding.

16         THE COURT:  Good morning, Mr. Capogrosso, Mr.

17   Thompson, Ms. Montina and Mr. Smart.

18         This is a telephone status conference in

19   plaintiff's civil rights action.  I last spoke with  the

20   parties on May 5th, 2020.

21         ___ _____ _____ _____ _____ _____ ___

22   this matter and Mr. Capogrosso, you wrote to the Court

23   and stated that you had served interrogatories on Mr.

24   Smart before the discovery deadline.  However, Mr. Smart

25   never responded.

3

Proceedings

1     And I directed you to provide the

2 interrogatories to the Court to review and I informed the

3 parties that this would be the one exception to the

4 discovery deadline.   That's in ECF entry number 148.

5     I reviewed your interrogatories and I directed

6 Mr. Smart to respond to the interrogatories and I

7 extended his deadline to do so. That's ECF entry number

8 154.

9     When Mr. Smart did not respond, Mr. Capogrosso

10 moved for a default junction and sanctions against Mr.

11 Smart.   That's ECF 157.

12     As Mr. Smart is like Mr. Capogrosso, proceeding

13 pro se, although Mr. Smart is not an attorney like Mr.

14 Capogrosso, I denied the request for default judgment and

15 sanctions and set today's telephone conference to get Mr.

16 Smart to answer the interrogatories orally on the record.

17 That's ECF entry number 159.

18     Mr. Smart has since informed the Court by

19 letter, that he is receiving assistance from the City Bar

20 Justice Center Pro Se project and that he is drafted

21 responses to the interrogatories and the letter was from

22 back in February and he said that they were going to be

23 served.

24     Mr. Capogrosso, have you gotten Mr. Smart's

25 responses to the interrogatories?

4

Proceedings

1          MR. CAPOGROSSO:  I did receive a document.  It

2   is not signed, Judge, and that was one of the comments I

3   wanted to make.  It's not signed by defendant Smart.  So

4   I don't know who wrote it and whether it's relevant or

5   material.  It is also dated after the date that you

6   required defendant Smart to respond by.  It's dated

7   February 24th.  You required him to respond by February

8   12th.

9          There's also -- it replies with the words

10  "information and belief" and according to -- Black's

11  Dictionary indicates information and belief is

12  information not made on firsthand knowledge but based on

13  secondhand knowledge.

14          THE COURT:  So again, as far as the timeliness,

15  Mr. Smart's letter which is ECF 59, requested an

16  extension of time nunc pro tunc to serve his responses

17  and I granted that request at ECF number 162.  And I kept

18  today's conference as scheduled to ensure that you have

19  responses and if you're saying that the responses sent

20  were not signed, I'm sure that's an oversight but in

21  order to correct it, I'm willing to go through this on

22  the record as I intended with Mr. Smart.

23          Mr. Smart?

24          MR. SMART:  Yeah.

25          THE COURT:  Are you willing today to answer

5

Proceedings

1  some of these questions on the record, so that we could

2  get this matter completed?

3          MR. SMART:  Yeah.

4          THE COURT:  Okay, sir.  So Mr. Smart, I am

5  going to ask you to raise your right hand, please.

6          MR. SMART:  Yeah.

7  D A V I D   S M A R T ,

8      having been first duly sworn, was examined and

9      testified as follows:

10         THE COURT:  And can you state your full name,

11 sir?

12         MR. SMART:  Yeah, my name is David Smart.

13         THE COURT:  And Mr.  Smart, were you employed

14 at the Brooklyn South Traffic Violations Bureau located

15 at 2875 West 8th Street in Brooklyn, New York, sir?

16         MR. SMART:  Yeah, I was once employed there but

17 I am no longer there.

18         THE COURT:  Okay.  So that answers question 1

19 and 2.  What was your job when you were working there,

20 sir?

21         MR. SMART:  I was a security guard.

22         THE COURT:  And who was your employer?  Who

23 paid your wages when you were employed there?

24         MR. SMART:  Yeah, the -- I started with a

25 company called PEC, started -- I started on 2/7 to '16,

Transcriptions Plus II, Inc.

6

Proceedings

1  2016.  I was there the 2015 when this (indiscernible)

2  occurred with PEC.  And then I resumed -- when PEC left,

3  I resumed working with Explorer (ph.) from 2/20 to --

4  2/2016 to October 8, 2020.

5          THE COURT:  So you're not currently working at

6  Brooklyn South Traffic Violations Bureau; is that

7  correct, sir?

8          MR. SMART:  No, yes, it's correct because I

9  left there since October 20, 2020 -- October 8th, sorry,

10  October 8th, 2020.

11          THE COURT:  So October 8th of 2020, you stopped

12  working at the Brooklyn South Traffic Violations?

13          MR. SMART:  Yeah, yeah, I was working for

14  Explorer at the -- at that time.

15          THE COURT:  Okay.  And from -- I think you said

16  2016 until 2020, you were working at the Brooklyn South

17  Traffic Violations Bureau; is that correct?

18          MR. SMART:  Yeah, with Explorer Company, a

19  different company, not PEC.  PEC left and we were -- they

20  were replaced by Explorer, a security company located on

21  the 151st Street -- 60 51st Street in Manhattan.

22          THE COURT:  So you're basically saying there

23  were different names of the employer because different

24  security firms got the contract but you were there from

25  2015 until 2020; is that --

7

Proceedings

1          MR. SMART:  Yeah, yes, yes.  It's how we did --

2    we had -- we had about five -- five different security

3    companies, replacing one another.

4          THE COURT:  Okay.  So now I am going to ask you

5    the question that Mr. Capogrosso wrote at number 5, this

6    is on document 149-1.  He asked, who told you to approach

7    Mario Capogrosso on the morning of May 11th, 2015?

8          MR. SMART:  Nobody -- nobody told me anything.

9    He was -- he was -- he -- he -- he came in.  I was really

10   by the door, he came in -- he came in aggressively,

11   raised his hand up and went to the line and then

12   continuously looking at me, you know?

13          So I am looking and looking, we were looking at

14   each other, and so -- and I say -- I say, wait a minute,

15   let me do -- what's going on here?  So I went -- I said

16   oh, why are you looking at me?  You see, I'm the one that

17   looking at him.  I said you are looking at me so like you

18   want to start something.  He say I was -- I was the one

19   that was looking at him.

20          You know, all of the sudden -- all of the

21   sudden, I was shocked though because I was knowing -- I

22   was knowing for a long time.  I was shocked.  He just

23   punched me in the chest and I had to hold onto the rail.

24   I had to hold onto the rail and then some police officer

25   came, everybody came around.  Then they say hey, you ave

8

Proceedings

1  to do something about this guy.  So I -- I say no, I'm

2  going to go and -- Danielle (ph.) came to me and said

3  what happened.  I said, my -- my response was say well go

4  61 on him, so I went to 6-0, I got 6-1 on him and two

5  police officers came with me, not too long, they came

6  with me.  Then they wanted to talk to him and he was

7  nowhere around.  They waited for quite a while and trying

8  to be -- they look around.  I checked -- they checked the

9  restroom.  They checked many other places.  He wasn't

10  anywhere on the ground.  He was gone.

11          THE COURT:  Okay.

12          MR. SMART:  And then they told me that the only

13  thing I can do, I can contact the One Police Plaza.  I

14  went back to the 6-0 and they gave me a form to fill out

15  and I sent out the -- the -- to One Police Plaza and One

16  Police Plaza sent me a response that -- they -- they

17  going to have a conversation with him or I was going to

18  say, or they're going to send me a letter and the rest

19  was history.

20          THE COURT:  Mr. Smart, I'm going to ask you

21  question number 6 which is similar to question number 5.

22  Did defendant Alan Gelbstein, defendant Ida Trachin,

23  defendant Danielle Calvo and/or Boshra Vahdat, tell you

24  to approach Mr. Capogrosso on the morning of May 11th,

25  2015?

Proceedings

9

1     MR. SMART: No way. No way.

2     THE COURT: Thank you, sir.

3     MR. SMART: They were not even -- they were not

4   even near.

5     THE COURT: Thank you. Thank you, sir. Thank

6   you. So I have gotten Mr. Smart to answer the

7   interrogatories under oath. I will get a copy of this

8   conference transcript made part of the record and that in

9   my mind, Mr. Capogrosso, has eliminated this issue which

10  has caused some consternation and I do know that Judge

11  Komitee has set a scheduled for the defendant's summary

12  judgment motion which means that they're going to serve

13  you with their motion on March 31st of 2021 and you have

14  until April 30th of 2021 to serve your opposition and

15  that they will reply and both sides should file their

16  portions of the motion on May 10th, 2021.

17      Let me just mention, Mr. Thompson, that there

18  is a special notice provision under 56.2 of the Local

19  Rules which although Mr. Capogrosso is an attorney and he

20  is not entitled to the special solicitude that pro se

21  litigants are entitled to, it may be smart for you to

22  just to include the notice, so that for any determination

23  to be made, you've gone above and beyond what your duty

24  is and provided him special notice of how to oppose a

25  motion for summary judgment.

10

Proceedings

1     And Mr. Capogrosso, because you are an

2 attorney, you are expected to look at Local Rule 56.1 and

3 to file a counter statement to whatever 56.1 statement is

4 filed by the defendants.

5     Mr. Smart, I know that you're still working

6 with the City Bar and that they were looking for limited

7 scope pro bono counsel for the purpose of moving on your

8 behalf for summary judgment.  Is that correct, sir?

9     MR. SMART:  Yeah, I was called yesterday by Kat

10 Ataka (ph.) and they say that she is looking for one to

11 represent me.

12     THE COURT:  Okay.

13     MR. SMART:  And she is going to let me know as

14 soon as possible.

15     THE COURT:  So you please stay in touch, so

16 that when the motion is made to Judge Komitee, he'll have

17 everybody's motion at the same time, okay?

18     MR. SMART:  Yeah.

19     THE COURT:  Mr. Capogrosso, do you have any

20 questions for the Court before we adjourn?

21     MR. CAPOGROSSO:  I do.  I do.

22     THE COURT:  Yes.

23     MR. CAPOGROSSO:  I do and I will keep it short

24 because I will waste the Court's time and I don't want to

25 do that but I do have several questions.  Number one,

Proceedings

1    will I be getting a copy of this deposition, your Honor?

2              THE COURT:  Are you going to get a copy of the

3    transcript of today's --

4              MR. CAPOGROSSO:  Of the transcript --

5              THE COURT:  -- conference?

6              MR. CAPOGROSSO:  -- yes.

7              THE COURT:  Yes, you are sir.

8              MR. CAPOGROSSO:  Yes, thank you.

9              May I ask Attorney Thompson concerning my

10   deposition which I have not received yet and I've sent

11   him a copy of mine.

12             THE COURT:  Mr. Thompson?

13             MR. CAPOGROSSO:  And when am I going to get it?

14             THE COURT:  Mr. Thompson, can you get Mr.

15   Capogrosso a copy of his deposition transcript please?

16             MR. THOMPSON:  Certainly, we can do that.

17             MR. CAPOGROSSO:  When am I going to get it and

18   is it going to be a hard copy or an electronic file?  I

19   sent you a hard copy.

20             MR. THOMPSON:  If you would like, I can email

21   you a digital copy this afternoon.

22             MR. CAPOGROSSO:  I don't want a digital copy, I

23   want a hard copy.  I sent you a hard copy.  I would like

24   a hard copy (indiscernible).

25             THE COURT:  Sir, sir, sir?

Transcriptions Plus II, Inc.

Case 1:18-cv-02710-EK-LB Document 165 Filed 03/18/21 Page 12 of 22 PageID #: 1934

12

Proceedings

1      MR. CAPOGROSSO:  Yes.

2      THE COURT:  Nobody is in their office, so if

3  what you're asking for him to print it in a printer and

4  put it in the mail to you, it's going to take longer.

5  Don't you have a printer at your home where he could

6  email it to you and you could print it out for yourself?

7      MR. CAPOGROSSO:  Judge, I would like it the way

8  I sent it to Attorney Thompson.  That's how I would like

9  it, hard copy.

10      THE COURT:  Mr. Thompson, is there a way that

11  you could get it printed in your office and sent to Mr.

12  Capogrosso?

13      MR. THOMPSON:  We could but what I would ask in

14  return, it's much more useful for us to have copies of

15  transcripts in digital formats because when he sends

16  things to us in hard copy, we have to have someone go

17  through page-by-page and scan it.

18      So what I would say is if we're going to print

19  out a hard copy for him, I would request a digital copy

20  of the transcripts he's taken.

21      MR. CAPOGROSSO:  That's fine.  That's fine.

22  That's fine.

23      THE COURT:  So Mr. Capogrosso --

24      MR. CAPOGROSSO:  That's fine.

25      THE COURT:  -- they will print out a copy for

Case 1:18-cv-02710-EK-LB Document 163 Filed 03/18/21 Page 13 of 22 PageID #: 1935

13

                    Proceedings

1  you because that's your preference and he said could you

2  please email him --

3           MR. CAPOGROSSO:  Absolutely.

4           THE COURT:  -- a digital copy of the

5  depositions that you took, okay?

6           MR. CAPOGROSSO:  Well, normally the court

7  reporter prints out a hard copy.  I've done this for a

8  while.  A hard copy, they do, they send you a hard copy

9  of (indiscernible).  So that's fine.  We'll make a hard

10 copy and as soon as I get a hard copy, I'll send you a

11 digital copy.

12          In terms of the deposition, Judge, this is the

13 Court's deposition, am I allowed to (indiscernible) any

14 question?

15          THE COURT:  No.

16          MR. CAPOGROSSO:  I am not.

17          THE COURT:  You're done.  You're done.

18          MR. CAPOGROSSO:  All right.  Okay.

19 (Indiscernible).

20          THE COURT:  Was there anything else today, Mr.

21 Capogrosso before we adjourn?

22          MR. CAPOGROSSO:  When will I get the hard copy,

23 Attorney Thompson?

24          MR. THOMPSON:  I -- let me check and see.  I

25 will try to get it in the mail for you by the end of the

14

Proceedings

 1  wee, does that work?

 2          MR. CAPOGROSSO:  That's fine.  That will be

 3  great.

 4          THE COURT:  And likewise, I'll get the court

 5  reporter's to transcribe today's conference and I will

 6  endeavor to get it to you by the end of next week, Mr.

 7  Capogrosso.

 8          MR. CAPOGROSSO:  All right.  I'm not wanting to

 9  waste the Court's time but I have one more comment that I

10  would like to ask Attorney Thompson and as well as the

11  attorney for the DMV.  This was brought up at the

12  deposition of defendant Gelbstein.  May I ask Attorney

13  Thompson?

14          THE COURT:  Go ahead, Mr. Capogrosso.

15          MR. CAPOGROSSO:  Fine.  At the attorney of

16  Attorney Gelbstein, you testified that there were no

17  ticket brokers in his office.  Defendant Calvo indicated

18  he saw ticket brokers in his office.

19          THE COURT:  I'm having a difficult time, Mr.

20  Capogrosso, understanding --

21          MR. CAPOGROSSO:  Fine.

22          THE COURT:  -- what you're saying.  I don't

23  know if it's the line or you're speaking not into the

24  phone but please, you are asking Mr. Thompson a question

25  about Gelbstein's deposition, so what is the question?

Proceedings

15

1    MR. CAPOGROSSO:  Yes.  The question is at his
2    deposition, I'm speaking into the phone now, he indicated
3    that there were no ticket brokers in his office, Jewish
4    ticket brokers in his office.  Defendant Calvo indicated
5    that there were.  She saw them.  I saw them. I was there
6    ten years.  He indicated that he was not pleading
7    motorists guilty on a sidebar with Judge Bloomstein.  I
8    indicated I saw that.  He indicated that he might have --
9    might have --

10    THE COURT:  What is the question that you have,
11    Mr. Capogrosso?

12    MR. CAPOGROSSO:  The question is is this, your
13    Honor.  Your Honor, the question is this.  These are
14    allegations of wrongdoing on behalf of -- by Defendant
15    Gelbstein by myself on behalf -- by defendant Gelbstein
16    by myself.  Has the Attorney General's office opened up
17    an investigation concerning these allegations of
18    wrongdoing with respect to defendant Gelbstein?

19    THE COURT:  Mr. Capogrosso, sir, with all due
20    respect --

21    MR. CAPOGROSSO:  Yes.

22    THE COURT:  -- you are an attorney.  If you
23    want to ask a FOIA request of the State regarding any
24    investigation, you could do that but Mr. Thompson is not
25    going to have to answer your questions today and again,

16

Proceedings

1   as far as the summary judgment goes, if there are
2   inconsistencies in the testimony of the witnesses, you
3   could use that for whatever purpose is, you could use for
4   whatever purpose you believe will help you sustain your
5   burden as the plaintiff in this civil rights action but
6   that's not the purpose of today's call.
7           So I am not going to have Mr. Thompson have to
8   answer whether there's an investigation into these
9   allegations.  You say there was testimony that
10  contradicted Gelbstein's testimony.  You can point that
11  out in your papers to the Court and make your best
12  argument but that is not for Mr. Thompson today and if
13  you want to file a FOIL request with the State to find
14  out if there has been an investigation, you're an
15  attorney, sir, you're free to do that.
16          MR. CAPOGROSSO:  I understand that.
17          THE COURT:  Okay?
18          MR. CAPOGROSSO:  One more -- I don't want to
19  waste the Court's time, I'll take one more minute.
20          THE COURT:  Yes, sir.
21          MR. CAPOGROSSO:  With respect to your
22  questioning of defendant Smart, now I would ask that a
23  more precise question because part of the question was
24  who told defendant Smart -- who told you to approach me,
25  approach, the word was approach.

17

Proceedings

1      THE COURT:  He said no one did.

2      MR. CAPOGROSSO:  Now defendant Smart --

3      THE COURT:  He said no one did.  And he clearly

4  talked about that you walked in, were staring at him, he

5  was staring at you, because you were staring at him and

6  that's why he approached you.  That's what his sworn

7  testimony was.

8      MR. CAPOGROSSO:  He didn't say that he

9  approached me.

10     THE COURT:  Yes, he did.

11     MR. CAPOGROSSO:  That's the question I want

12  more precise answer.  He never said he approached me.

13     THE COURT:  He said he approached you.  He said

14  he approached you --

15     MR. CAPOGROSSO:  All right.  I'll look at the

16  deposition.

17     THE COURT:  .-- for staring at him.

18     MR. CAPOGROSSO:  I'll look at the transcript.

19     THE COURT:  Okay.

20     MR. CAPOGROSSO:  All right.  Fine.  Thank you,

21  Judge.

22     THE COURT:  Okay. Anything else, Mr. Thompson

23  before we adjourn today?

24     MR. THOMPSON:  Yes, your Honor, one quick

25  matter and it may be for Judge Komitee.  I noticed in Mr.

Transcriptions Plus II, Inc.

18

Proceedings

1  Smart's submission that he's contemplating filing his own

2  motion for summary judgment which would presumably go on

3  a different and alter timetable than ours.

4          THE COURT:  Hopefully not, hopefully not.

5  Hopefully, whoever is filing for him will be able to file

6  something short and sweet within the time frame set by

7  the Court and if not, they'll make the application to

8  Judge Komitee.

9          MR. THOMPSON:  Okay.  Our request was just that

10 we, you know -- our time table be harmonized with that

11 one but we can see what happens then.

12         THE COURT:  Stay with your time table unless

13 you need an extension of time and then you should

14 approach Mr. Capogrosso before approaching Judge Komitee.

15         MR. THOMPSON:  Thank you, your Honor.

16         THE COURT:  Anything further, Mr. Smart, before

17 we adjourn here today?

18         MR. SMART:  No, what I -- what I would like to

19 say to Mr. Capogrosso is that I have known him -- your

20 Honor, I have known Mario, I used to work for Alexanders

21 and that was how the whole thing started and I was

22 talking him and I say oh, he used to work for Alexanders

23 also.  At what part --

24         MR. CAPOGROSSO:  No, this is off the record.

25         MR. SMART:  No, no, no, no this is very --

19

Proceedings

1          THE COURT:  No, we're still on the record.

2          MR. SMART:  This is very -- this is very

3    important.  This is very important because that is where

4    you and me became we're talking about this and then we're

5    talking about Alexanders and all those kind of stuff and

6    then -- then he also told me that he's so lonely where he

7    lives and he would like to find a place, a club or some

8    sort.  So I told him about Log Cabin, that was a club on

9    23rd Street and Avenue Z and -- Town Coffee (ph.) on 20 -

10   - on 18th Street and Avenue Z.  And we went on -- that

11   went on, he carry on and you impressed me for introduce

12   you to those clubs.  So you know, I am just shocked that

13   this nonsense will come to this kind of a area which I

14   wasn't expecting and that's all I have to say because I'm

15   very shocked.

16         MR. CAPOGROSSO:  Well, this is nonsense.  I'm

17   out of work.  My career has been ruined, David, ruined.

18   I don't have to explain --

19         THE COURT:  Again --

20         MR. CAPOGROSSO:  -- (indiscernible) the things

21   that you created, (indiscernible) stopped.

22         THE COURT:  Mr. Capogrosso --

23         MR. CAPOGROSSO:  There was all kinds of

24   nonsense.

25         THE COURT:  Mr. Capogrosso, again --

Proceedings

20

1              MR. CAPOGROSSO:  Yes, Judge.

2              THE COURT:  -- you're litigating the case --

3              MR. CAPOGROSSO:  I understand.

4              THE COURT:  -- Mr. Smart just stated on the

5     record that he's shocked.  It has nothing to do with the

6     merits of the case.  He's shocked.

7              MR. CAPOGROSSO:  Fine, Judge.

8              THE COURT:  He's entitled to his feelings.

9              Is there anything else that anybody needs to

10    address today, otherwise I am adjourning the conference.

11    All discovery is closed.

12             MR. CAPOGROSSO:  Okay, David.

13             THE COURT:  The defendants have gotten

14    permission from Judge Komitee to move for summary

15    judgment and the schedule has been set by Judge Komitee

16    and any alteration of that schedule should only be made

17    on application to Judge Komitee after the parties have

18    spoken about it if they need any extension of time.  That

19    works on both sides, Mr. Capogrosso.  If you need more

20    time, you need to contact Mr. Thompson.  If Mr. Thompson

21    needs more time, he needs to contact you and the Court

22    could always grant it even if one side or the other says

23    no.

24             So again, I am saying that the summary judgment

25    schedule remains in effect.  I have said to look at the

21

Proceedings

1  Local Rules, Mr. Thompson, to make sure that you're

2  complying with them, that goes for you as well, Mr.

3  Capogrosso.  They'll get you the transcript of the

4  deposition.  You'll get them the transcripts.  I will get

5  the record made from today's conference and make that

6  transcript available to you, Mr. Capogrosso and with

7  that, we are adjourned.

8          MR. CAPOGROSSO:  Thank you.

9          THE COURT:  Thank you everybody very much.

10         MR. SMART:  Thank you, your Honor.

11                 (Matter Concluded)

12                     -o0o-

13

14

15

16

17

18

19

20

21

22

23

24

25

22

## C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **17th** day of **March** 2021.

*Linda Ferrara*
Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.

**EXHIBIT B**

My NAME IS Ingrid Gordon

ON 5/14/14 @ Approx 2:00 PM.

Patterson, I was waiting for Jo

speak to Mr. Marc H. Cgopimin,

Mr. Patterson Asked your

Your Security buord Does Appointing

a question,

Mr. Patterson I told Doise please

she is waiting to speak to me.

At that point the security buord

told me Fuck you. I indicated

to him she is waiting to speak

she is waiting to speak to

to me please my conversation me

He told me Fuck you again.

I told him to keep working.

While I was waiting for Mr. C the security came

back and walked over to Mr. C and was hostile    P-32

**EXHIBIT C**

10/23/14

ON WEDNESDAY OCTOBER 22, 2014

WHILE SPEAKING TO A MOTORIST

I MOVED AN UMBRELLA LYING ON

TOP OF YOUR TRASH FROM THE REAR

FRONT OF THE TRASH TO THE REAR OF

THE TRASH IN ORDER TO LAY DOWN

MY PAD SO I COULD BETTER

SPEAK TO A CLIENT

ON THURSDAY OCTOBER 23, 2014

YOUR SECURITY GUARD DAVE APPROACHED

ME INDICATING NOT TO MOVE ANY

UMBRELLA ON THE TRASH CANS OR ELSE

MARIO H. CHOGOLUOD, Eg.
914-806-8692

P-33

**EXHIBIT D**

I came down to the
DMV 10/31/13 Lady for
Ms Carpenter, the secretary
filed Dave inducted to
pre them Ms Carpenter was
not here. He deceived
me to another attorney
and r/d me to fake
another attorney.
As a result
I lost time
from any job.

A mc Lemont
Racauel L mc Lemon
Racauel mc Lemon
8382

P-34

**EXHIBIT E**

**Law Office of Mario H. Capogrosso, Esq.**

245 Saw Mill River Road, Suite 106
Hawthorne, New York 10532

March 20, 2015

Ms. Elizabeth Prickett-Morgan
NYS Office of the Attorney General
120 Broadway, 24th floor
New York City, NY 10027

Dear Madam:

I am an attorney in the state of New York.

My Registration number is 424431.

Please reference index number 7738/2012.Capogrosso vs. State Dept of Motor Vehicles for which I was in litigation. A settlement agreement was reached on June 20, 2012. As part of this settlement agreement I was required to take an anger management course and upon completion of this course I was to be allowed to practice law in all DMV courts on an equal and unbiased standing with all other attorneys in the DMV.

To this date, I have been in complete compliance with all conditions as set forth as part of this settlement agreement.

However, the DMV has not upheld its side of this agreement.

on numerous occasions, I have been harassed, threatened and now currently my files are being tampered with while they are left unprotected in the attorneys room at the DMV at 2875 West 8th Street, Brooklyn, the principal DMV location at which I practice.

The threatening and harassment I have let go because I do not easily get intimidated nor harassed. But at this point my client's files are being tampered with and I must, as a attorney, object.

I provide the following in evidence:

1) On numerous occasions your security guard Dave Sparks has told me to go F___ myself (will provide proof upon request);

2) on several occasions your security guard Sparks has redirected other clients who come   have looking for me specifically to other attorneys or has interfered with my conversations while speaking to a clients (will provide proof upon request);

3) your security guard Sparks has approached me,  gotten in my face, stared and glared, I asked him what was the problem was and he told me I was the problem, F ___  you.;

P-41

4) your security guard Sparks, has stood  looked at me directly while I was standing on the DMV traffic line gave me the sign of the cross twice and directed a spear hand in my direction.

After several complaints to Administrative Judge Gelbstein, the Senior judge at the Brooklyn TVB, I called Sparks employer. Subsequently, your security guard Sparks was relieved from his duties at the Brooklyn DMV for two weeks (proof to be provided).

I have made numerous complaints to Judge Gelbstein. His response has been " a spade is a spade (his words not mine), he laughs and giggles.

Judge Gelbstein is either complicit, incapable or incompetent to handle this issue.

As I have stated, I have ignored these incidents and have attempted at all levels not to aggravate the situation.

I have been in countless courts in my ten years of practice as an attorney and have never seen such behavior in any court system.

As I have stated, I can defend myself and absolutely will, so to this point I have ignored these incidents.

However, at this point your security guard Sparks is entering the attorney's room and tampering with my files. I have asked Judge Gelbstein to look at security tapes and have gotten no response.

As an attorney, I must now object. I cannot have my files tampered with.

I do not want an incident on your floor, I do not want an incident in your courtroom, I have no reason to have any trouble with any of your employees at the Brooklyn DMV.

To date, I have been a perfect gentleman and in complete with all conditions as set upon me by the settlement reached on June 12, 2012.

The DMV has not upheld their side of this agreement.

All I ask is that they do so.

I do not seek to litigate but I will if I have to.

Please take any and all action to expedite and resolve these issues

Mario H.Capogrosso, Esq.

914-806-3692

NY Registration No: 4244331

2

P-42

**EXHIBIT f**



# MEMORANDUM

DATE:      May 27, 2015

TO:        Jean Flanagan and Vincent Palmieri

FROM:      Danielle Calvo

RE:        May 2015 Monthly Report

OFFICE:    Brooklyn South TVB



~~Workplace Violence~~

On 5/5 two of the attorneys (Mr.Capagrosso and Mr.Tahir) had an altercation and a workplace violence report was submitted.  On 5/11 Mr.Capogrosso pushed our security guard David Smart and another workplace violence report was submitted.  Mr. Capogrosso was asked to leave the building that day and since then has not been permitted to enter any of the TVB offices.

**www.dmv.ny.gov**

P-255



### I. Workplace Violence

On 5/5 two of the attorneys (Mr.Capagrosso and Mr.Tahir) had an altercation and a workplace violence report was submitted.   On 5/11 Mr.Capogrosso pushed our security guard David Smart and another workplace violence report was submitted.  Mr. Capogrosso was asked to leave the building that day and since then has not been permitted to enter any of the TVB offices.



P-256

Brooklyn South TVB
Monthly Report for period ending May 31, 2015
Legal Affairs Key Priorities for Program Area Performance and Results



p-257

**EXHIBIT G**

MV-884 (12/11)



New York State Department of Motor Vehicles
DIVISION OF LABOR RELATIONS
## REPORT OF WORKPLACE VIOLENCE INCIDENT

Please fill out the form as accurately as possible and fax it to the Division of Field Investigation at (518) 474-7543 **AND** Labor Relations at (518) 474-8423. If the incident is a written threat, please include a copy of the letter with this report. Originals should be maintained in a workplace violence report folder at the primary office that the reporter works in.

FILE NUMBER: _____

Received: _____

X RE: _____

X RE: _____

PRIVACY CONCERN:  ☐ YES   ☐ NO

### NAME OF INDIVIDUAL FILING REPORT

| Name | Title | Office Location | Phone Number |
|---|---|---|---|
| David Smart | Guard-Summit | Brooklyn South TVB | REDACTED |

### INCIDENT REPORTED TO

| Date Reported | Person Reported To | Title |
|---|---|---|
| 5/11/15 | Danielle Calvo | Supervisor Grade 17 |

### INCIDENT

| Date | Time | | Location of Occurrence |
|---|---|---|---|
| 5/11/15 | 8:50  ☑AM ☐PM | | Brooklyn South TVB near line 1 |

DFI Contacted? ☐ Yes ☑ No    DFI Contact Name

### EMPLOYEES INVOLVED

| Name | Title |
|---|---|
| David Smart | Security Guard-Summit Security |
| Name | Title |
| Name | Title |

### OUTSIDE INDIVIDUALS INVOLVED

| Name | Sex | Phone | Client ID # |
|---|---|---|---|
| Mario H.Capogrosso | ☑ Male ☐ Female | REDACTED | |
| Address | City REDACTED | State | Zip Code |
| Name | ☐ Male ☐ Female | Phone | Client ID # |
| Address | City | State | Zip Code |
| Name | ☐ Male ☐ Female | Phone | Client ID # |
| Address | City | State | Zip Code |

### WITNESSES

| Name | Sex | Phone | |
|---|---|---|---|
| REDACTED | ☑ Male ☐ Female | REDACTED | |
| Address | City REDACTED | State | Zip Code |
| REDACTED | ☑ Male ☐ Female | REDACTED | |
| Address | City REDACTED | State | Zip Code |
| Name | ☐ Male ☐ Female | Phone | |
| Address | City | State | Zip Code |

Continue on other side

Page 1 of 2

Ex. 6 p. 016

D-261

**Description of Events Leading to the Incident and What Occured:**

Near line 1 Mr. Capogrosso said to security guard David Smart "Are you looking at me?". David replied "You are looking at me". Mr.Capogrosso said "back up, back up", he then pushed David in his chest.

**Nature and Extent of Injuries:**

**Additional Comments:**

911 was called and two officers responded. David went up to the 60pct with them to make a report. They said that they could not arrest Mr.Capogrosso because he pushed David with an open hand not a closed fist. I was told by Judge Gelbstein to go with officers from the police room, to tell Mr.Capogrosso that he must leave the building, and to give him legal's phone number for any further details. I did that and he left the building.

Danielle Calvo
_____
Name of Individual Filing Report

_____
Name of Supervisor

_____
Signature of Individual Filing Report

_____
Signature of Supervisor

5/11/15
_____
Date

_____
Date

MV-984 (12/11)

Page 2 of 2

Ex. 6 p. 017

D-262

**EXHIBIT H**





# New York State Department of Motor Vehicles
## Coney Island
### Traffic Violations Bureau
### 2875 West 8th Street
### Brooklyn, New York 11224

Date: 5/11/15

To: Labor Relations

From: Danielle Calvo

Number of pages including coversheet: 5

Our Telephone: 718-266-6867
Our Fax:             718-266-7478

The last page is Mr. Tahir's
statement from last week's
incident He just gave it in today



P-258

MV-984 (12/11)



**New York State Department of Motor Vehicles**
**DIVISION OF LABOR RELATIONS**
# REPORT OF WORKPLACE VIOLENCE INCIDENT

Please fill out the form as accurately as possible and fax it to the Division of Field Investigation at (518) 474-7543 **AND** Labor Relations at (518) 474-8423. If the incident is a written threat, please include a copy of the letter with this report. Originals should be maintained in a workplace violence report folder at the primary office that the reporter works in.

| FOR OFFICE USE ONLY |
|---|
| FILE NUMBER: |
| Received: |
| X RE: |
| X RE: |
| PRIVACY CONCERN: ☐ YES ☐ NO |

### NAME OF INDIVIDUAL FILING REPORT

| Name | Title | Office Location | Phone Number |
|---|---|---|---|
| David Smart | Guard-Summit | Brooklyn South TVB | 718-266-5512 |

### INCIDENT REPORTED TO

| Date Reported | Person Reported To | Title |
|---|---|---|
| 5/11/15 | Danielle Calvo | Supervisor Grade 17 |

### INCIDENT

| Date | Time | | Location of Occurrence |
|---|---|---|---|
| 5/11/15 | 8:50 | ☑ AM ☐ PM | Brooklyn South TVB near line 1 |

DFI Contacted? ☐ Yes ☑ No   DFI Contact Name

### EMPLOYEES INVOLVED

| Name | Title |
|---|---|
| David Smart | Security Guard-Summit Security |
| Name | Title |
| Name | Title |

### OUTSIDE INDIVIDUALS INVOLVED

| Name | Sex | Phone | Client ID # |
|---|---|---|---|
| Mario H. Capogrosso | ☑ Male ☐ Female | 914-806-3692 | |
| Address | City | State | Zip Code |
| 245 Saw Mill River Road Suite 106 | Hawthorne | NY | 10532 |
| Name | Sex ☐ Male ☐ Female | Phone | Client ID # |
| Address | City | State | Zip Code |
| Name | Sex ☐ Male ☐ Female | Phone | Client ID # |
| Address | City | State | Zip Code |

### WITNESSES

| Name | Sex | Phone |
|---|---|---|
| George Han-MVR | ☑ Male ☐ Female | 718-266-5512 |
| Address | City | State | Zip Code |
| 2875 West 8th Street | Brooklyn | NY | 11224 |
| Name | Sex | Phone |
| Anthony Adinolfi, ESQ | ☑ Male ☐ Female | 718-265-2211 |
| Address | City | State | Zip Code |
| 2875 West 8th Street | Brooklyn | NY | 11224 |
| Name | Sex ☐ Male ☐ Female | Phone |
| Address | City | State | Zip Code |

Continue on other side

P-259

**Description of Events Leading to the Incident and What Occured:**

Near line 1 Mr. Capogrosso said to security guard David Smart "Are you looking at me?". David replied "You are looking at me". Mr.Capogrosso said "back up, back up", he then pushed David in his chest.

**Nature and Extent of Injuries:**

**Additional Comments:**

911 was called and two officers responded. David went up to the 60pct with them to make a report. They said that they could not arrest Mr.Capogrosso because he pushed David with an open hand not a closed fist. I was told by Judge Gelbstein to go with officers from the police room, to tell Mr.Capogrosso that he must leave the building, and to give him legal's phone number for any further details. I did that and he left the building.

| | |
|---|---|
| Lielle Calvo | VINCENT Palmier |
| Name of Individual Filing Report | Name of Supervisor |
| *(signature)* | *(signature)* |
| Signature of Individual Filing Report | Signature of Supervisor |
| 5/11/15 | 5/11/15 |
| Date | Date |

M (12/11)

This fax was received by GFI FaxMaker fax server. For more information, visit: http://www.gfi.com

P - 260

**EXHIBIT I**

December 17, 2020

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
MARIO H. CAPOGROSSO,

        PLAINTIFF,

-against-    Case No.:
        18 CV 2710 (EK) (LB)

ALAN GELBSTEIN, in his individual capacity,
IDA TRASCHEN, in her individual capacity,
DANIELLE CALVO, in her capacity, SADIQ
TAHIR, in his individual capacity, PEC
GROUP OF NY, INC., DAVID SMART, and DMV
COMMISSIONER MARK SCHROEDER, in his
official capacity,
        DEFENDANTS.
------------------------------------X
DATE:  December 17, 2020
TIME:  1:24 P.M.

DEPOSITION of the Defendant,
DANIELLE CALVO, taken by the Plaintiff,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held VIA ZOOM
VIDEOCONFERENCE, before Jamie Newman, a
Notary Public of the State of New York.

**Page 2**

APPEARANCES:

THE LAW FIRM OF MARIO H. CAPOGROSSO
PLAINTIFF PRO SE
21 Sheldrake Place
New Rochelle, New York 10804
Capogrosso@aol.com

OFFICE OF THE NEW YORK STATE ATTORNEY
GENERAL
Attorneys for the Defendants
ALAN GELBSTEIN, in his individual
capacity, IDA TRASCHEN, in her individual
capacity, DANIELLE CALVO, in her
capacity, SADIQ TAHIR, in his individual
capacity, PEC GROUP OF NY, INC., DAVID
SMART, and DMV COMMISSIONER MARK
SCHROEDER, in his official capacity
28 Liberty Street, 17th Floor
New York, New York 10005
BY: JAMES THOMPSON, ESQ.
james.thompson@ag.ny.gov

DMV LEGAL BUREAU
Attorneys for the Defendant
DMV COMMISSIONER MARK SCHROEDER, in his
official capacity
6 Empire State Plaza, Room 522A
Albany, New York 11228
BY: BARBARA MONTENA, ESQ.
File #: 18CV2710
barbara.montena@dmv.nyc.gov

    * * * *

**Page 3**

1
2        (Whereupon, all 86 exhibits
3    were previously marked by Counsel,
4    Mark Capogrosso.
5    D A N I E L L E  C A L V O, called as a
6    witness, having been first duly sworn by a
7    Notary Public of the State of New York, was
8    examined and testified as follows:
9    EXAMINATION BY
10    MR. CAPOGROSSO:
11    Q.  Please state your name for the
12  record.
13    A.  Danielle Calvo.
14    Q.  What is your address?
15    A.  9952 Fort Hamilton Parkway,
16  Brooklyn, New York 11209.
17    Q.  All right.
18    Mario Capogrosso, I'm just
19  going to ask you a couple of questions. I
20  just want the truth, I want to get to the
21  truth.
22    Now, you had me removed, you
23  came to me on the morning of May 11, 2015
24  at the Brooklyn TVB and you asked me to
25  leave in the presence of police officers.

**Page 4**

1    Danielle Calvo
2  Am I right in saying that?
3    A.  That's correct.
4    Q.  Who told you to do that?
5    A.  I was told by my supervisors.
6    Q.  Which supervisor?
7    A.  I was told by Ida Traschen.
8    Q.  On the morning of May 11, 2015?
9    A.  What is --
10    MR. THOMPSON:  Is that a
11  question?
12    Q.  On the morning of May 11, 2015
13  you had a telephone conversation with Ida
14  Traschen?
15    A.  If that is the day you were
16  asked to leave? Yes.
17    Q.  Now, for what reason did you
18  have me removed?
19    A.  It wasn't my decision, it was
20  my supervisor's decision.
21    Q.  It was Ida Traschen's decision?
22    A.  Yes.
23    Q.  Now, what made you have -- who
24  called whom, did Ida Traschen call you or
25  you called Ida Traschen?

December 17, 2020

| | Page 5 |
|---|---|
| | Danielle Calvo |

1         Danielle Calvo
2         A.   I was directed to call her.
3         Q.   By whom?
4         A.   Judge Gelbstein.
5         Q.   Was Judge Gelbstein in the
6    building that morning?
7         A.   No, he was not.
8         Q.   Did you view any of the
9    videotape of the alleged incident between
10   myself and Defendant Smart?
11        MR. THOMPSON:  Objection to the
12        form of the question.  You can
13        answer.
14        A.   Not that I recall, no.
15        Q.   How did you get notice of the
16   fact that there was an incident between
17   myself and Defendant Smart?
18        A.   Someone came into the office
19   and told me.
20        Q.   Who?
21        A.   I don't recall who.
22        Q.   Was it Defendant Smart?
23        A.   I don't recall.
24        Q.   And based on their testimony to
25   you, you decided that there was an incident

Page 7

1         Danielle Calvo
2    form of the question, you can answer.
3         A.   I didn't make any decision
4    whether it was the truth or not, I just
5    reported what I was told.
6         Q.   By some person you don't know
7    their name?
8         A.   I don't remember, no.
9         Q.   Can you tell me exactly what
10   that person said to you, exact nature of
11   that conversation, the exact words used?
12        A.   I can't tell you the exact
13   words, no.
14        Q.   But, based on that testimony,
15   you made a decision to call Judge
16   Gelbstein; is that right?
17        A.   Yes.
18        MR. THOMPSON:  Objection to the
19        form of the question.  You can
20        answer.
21        Q.   And Judge Gelbstein made a
22   decision to call who, to call Ida Traschen?
23        A.   Judge Gelbstein told me to call
24   Ida Traschen.
25        Q.   And based on that observation

Page 6

1         Danielle Calvo
2    and an altercation between myself and
3    Defendant Smart?
4         MR. THOMPSON:  Objection to the
5         form of the question.  You can
6         answer.
7         A.   I didn't decide anything.  I
8    just called Judge Gelbstein and let him
9    know what happened and then that was it.
10        Q.   But, you didn't observe what
11   happened; right?
12        A.   No, I did not.
13        Q.   And you didn't look at any
14   videotape; right?
15        A.   Not that I recall, no.
16        Q.   And you had the ability to look
17   at the videotape, but you didn't?
18        A.   I don't know if that incident
19   was videotaped.  I don't know what position
20   on the floor it happened, so I couldn't
21   say.
22        Q.   You're taking somebody's
23   witness -- some witness observation as to
24   what happened as to the truth; right?
25        MR. THOMPSON:  Objection to the

Page 8

1         Danielle Calvo
2    -- based on that testimony from a
3    third-party, I was removed from the
4    practice of law in all New York TVBs?
5         Is that fair?
6         MR. THOMPSON:  Objection to the
7         form of the question.  You can
8         answer.
9         A.   At that time I had no idea what
10   was going to happen, I was just reporting
11   to my supervisor what I was told.
12        Q.   And you don't recall what you
13   were told exactly?
14        A.   No.
15        MR. THOMPSON:  Objection, asked
16        and answered.
17        Q.   You don't recall the alleged
18   incident or what was said concerning the
19   incident?
20        MR. THOMPSON:  Same objection.
21        Q.   Did you ever talk to Defendant
22   Smart concerning the incident?
23        A.   I don't recall if I had any
24   particular conversation with him afterwards
25   or during, but I'm sure we did at some

2  (Pages 5 to 8)

December 17, 2020

Page 9

Danielle Calvo

1
2  point.
3      Q.   So, you never asked him what
4  was the nature of the incident between
5  myself and him, as to what factually
6  occurred?
7          MR. THOMPSON:  Objection to the
8      form of the question.  You can
9      answer.
10     A.   I may have asked him at the
11  time, but I don't recall what he said to me
12  or...
13     Q.   Did you ask him before I was
14  removed, or after I was removed?
15     A.   I don't know.
16     Q.   You don't know.
17         Did you ever ask me as to what
18  happened concerning that alleged incident?
19     A.   I don't remember having any
20  conversation with you, no.
21     Q.   You don't recall the
22  particulars of the incident, you don't
23  recall talking to Defendant Smart
24  concerning the incident, and you didn't
25  talk to me concerning the accident.

Page 10

Danielle Calvo

1
2          Yet you make a phone call to
3  Defendant Gelbstein concerning the incident
4  who tells you to call Ida Traschen
5  concerning the incident; is that fair to
6  say?
7          MR. THOMPSON:  Object to the
8      form, you can answer.
9      A.   Yes.
10     Q.   And as a result of that phone
11  call, I'm not allowed to practice at the
12  New York TVB, you know that; right?
13         MR. THOMPSON:  Object to the
14     form, you can answer.
15     A.   I was not aware at that moment
16  that that was what was going to happen, but
17  I am aware of that afterwards, yes.
18     Q.   Did you approach me on the
19  afternoon of May 8th in the attorneys' room
20  in the presence of the Defendant Gelbstein,
21  did you and him approach me in the
22  afternoon of May 8, 2015?
23     A.   I don't know if we did or not.
24     Q.   Do you recall Defendant
25  Gelbstein saying to me, "I read what you

Page 11

Danielle Calvo

1
2  wrote about me, that I'm complicit,
3  incapable and incompetent, can't you go
4  practice somewhere else."
5          Do recall that statement by
6  Defendant Gelbstein?
7      A.   No, I do not.
8      Q.   Do you have any knowledge as to
9  whether Defendant Gelbstein or Ida Traschen
10  had Defendant Smart approach me on the
11  morning of May 11, 2015?
12     A.   No, I do not.
13     Q.   Are you privy or knowledgeable
14  of the letter that I wrote to the attorney
15  general's office on March 20, 2015, were
16  you knowledgeable about that?
17         MR. THOMPSON:  Objection to the
18     form, you can answer.
19     A.   I did know about it.  I don't
20  know if I ever saw it or who told me about
21  it, but I was aware that something was
22  written.
23     Q.   Did you ever read it?
24     A.   To my knowledge, I don't
25  remember.

Page 12

Danielle Calvo

1
2      Q.   Were you knowledgeable of any
3  of the complaints I had against Defendant
4  Smart at the Brooklyn TVB that I followed
5  with Defendant Gelbstein, were you
6  knowledgeable of any of those complaints?
7      A.   I know you made a lot of
8  complaints about a lot of different people,
9  particularly and specifically, no.
10     Q.   I only make complaints about
11  Defendant Smart.
12         The only thing that was in
13  writing was to Defendant Smart and I'm
14  asking very specifically, did you have any
15  knowledge of any of those complaints?
16         MR. THOMPSON:  Objection, asked
17     and answered.  You can answer.
18     A.   I don't recall specifically,
19  but I may have known at the time.
20     Q.   Did you have supervisory
21  authority over the actions of Defendant
22  Smart at the Brooklyn TVB?
23         MR. THOMPSON:  Objection to the
24     form.  You can answer.
25     A.   To some extent we could ask him

3  (Pages 9 to 12)

December 17, 2020

Page 13

Danielle Calvo

1
2  to do certain things, but he worked for an
3  outside company.
4      Q.   So, who did he report to on a
5  daily basis?
6      A.   He had to call into his office
7  every morning and he submitted his time
8  cards to them, but we had to know he was
9  there.
10     Q.   Who governed his day-to-day
11 activities at the Brooklyn TVB?
12         MR. THOMPSON:  Objection to the
13     form.  You can answer.
14     A.   We would tell him what we
15 wanted done as far as opening, closing.
16 Things like that.
17     Q.   You governed his day-to-day
18 activities?
19         MR. THOMPSON:  Same objection.
20     Q.   Clerical staff, the clerical
21 supervisors governed his day-to-day
22 activities; is that correct?
23         MR. THOMPSON:  Same objection.
24     A.   To some extent, yes.
25     Q.   And did you receive complaints

Page 14

Danielle Calvo

1
2  with respect to Defendant Smart, did they
3  go to your office as a clerical supervisor?
4         MR. THOMPSON:  Object as to
5     form.  You can answer.
6      A.   It depends on who the complaint
7  was made to specifically.
8      Q.   If I submitted a complaint to
9  Defendant Gelbstein, would become
10 knowledgeable of it and have authority to
11 act upon it?
12     A.   If you made the complaint to
13 him, he may have told me about them, yes,
14 but if you made it to him, then it would be
15 up to him to make any decisions.
16     Q.   Now, in June of 2012 Defendant
17 Smart pushed me from behind, assaulted me
18 from behind reaching for my cell phone.
19         Are aware of that complaint
20 that I filed with Defendant Gelbstein, were
21 you aware of that?
22         MR. THOMPSON:  Objection to the
23     form.
24     A.   Not that I recall, but it's
25 possible at the time I did.

Page 15

Danielle Calvo

1
2      Q.   Did you take any action and
3  response to it?
4      A.   Not that I remember.
5      Q.   So, you didn't try to curtail
6  that threat or respond to it in any way?
7         MR. THOMPSON:  Object to the
8     form, you can answer.
9      A.   I don't know if I knew about it
10 and I don't know if I did, if I spoke to
11 him or not.
12     Q.   In December of 2014 Defendant
13 Smart stood up from where he was sitting,
14 pointed directly at me with a spear hand
15 and gave me the sign of the cross.
16         Were you aware of that
17 complaint that I filed with Defendant
18 Gelbstein?
19         MR. THOMPSON:  Objection to the
20     form.  You can answer.
21     A.   I don't recall.
22     Q.   Do you recall reviewing any
23 videotape with respect to that complaint?
24     A.   No, I don't recall.
25     Q.   Did you take any action in

Page 16

Danielle Calvo

1
2  response to that complaint?
3      A.   That I don't recall.
4      Q.   In June of 2012, Defendant
5  Smart -- between December 11, 2011 and
6  December 12, 2012, Defendant Smart stole
7  $80 on a $150 fee.
8         Were you aware of that, that he
9  stole $80 on a fee that was owed to me?
10         MR. THOMPSON:  Object to the
11     form, you can answer.
12     A.   No, I was not.
13     Q.   Did you take any action in
14 response to that complaint that I made to
15 Defendant Gelbstein concerning that theft?
16     A.   I don't recall.
17     Q.   Was there an investigation made
18 by your office, the clerical -- you, as a
19 supervisor, with respect to that theft?
20     A.   I don't recall.
21     Q.   I made complaints to Defendant
22 Gelbstein concerning that Defendant Smart,
23 after I reported this theft, would get in
24 my face, within several inches of my face
25 and I would ask him what was the problem

4  (Pages 13 to 16)

December 17, 2020

## Page 17

Danielle Calvo

1
2  and he would respond "fuck you, you are the
3  problem."
4      Q.   Did you investigate any of
5  those complaints?
6      A.   I don't recall.
7      Q.   So, pretty much Defendant Smart
8  was given carte blanche to act as he wanted
9  to in the Brooklyn TVB with respect to your
10  office?
11      MR. THOMPSON:  Objection to the
12  form of the question.  You can
13  answer.
14      Q.   You took no action and response
15  to any of the threats of violence or
16  harassment by Defendant Smart with respect
17  to my person; is that fair to say?
18      MR. THOMPSON:  Same objection,
19  you can answer.
20      A.   I don't recall what was done
21  about any of those incidents.
22      Q.   I'm asking if you took any
23  response, you made --
24      A.   I don't remember.
25      Q.   So, you gave Defendant Smart

## Page 18

Danielle Calvo

1
2  carte blanche, freedom, to act the way he
3  wanted to act; is that fair?
4      MR. THOMPSON:  Objection, asked
5  and answered.  Argumentative.  You
6  can answer.
7      A.   No, I did not.
8      Q.   Who is in control of the
9  videotape at the Brooklyn TVB?
10      MR. THOMPSON:  Object to the
11  form, you can answer.
12      A.   The cameras themselves -- um --
13  the monitor was in the back office.  There
14  was no tape, it was directly to some type
15  of hard drive.
16      Q.   Did you request that any of the
17  videotape of May 11th be preserved or kept?
18      A.   Not that I recall.
19      Q.   So, you kept none of the
20  evidence that would have shown the alleged
21  altercation between myself and Defendant
22  Smart on May 11, 2015?
23      MR. THOMPSON:  Objection to the
24  form of the question.  You can
25  answer.

## Page 19

Danielle Calvo

1
2      A.   Can you repeat that, I didn't
3  understand?
4      Q.   You made no attempt to keep or
5  preserve that evidence, that videotape of
6  the alleged altercation between myself and
7  Defendant Smart?
8      MR. THOMPSON:  Same objection.
9      A.   I don't know if it was
10  videotaped and I don't recall what was --
11  there is no way for me to keep or erase
12  anything on there, unless someone would
13  have told us how to do it.
14      Q.   So, you made no attempt to
15  preserve it, you didn't make any phone
16  calls to the security people who monitor
17  these cameras to preserve that evidence,
18  did you?
19      MR. THOMPSON:  Objection to the
20  form.
21      A.   Not that I know of.
22      Q.   Did you ever view that
23  videotape of the alleged incident between
24  myself and Defendant Smart?
25      A.   Not that I recall.

## Page 20

Danielle Calvo

1
2      Q.   Did you observe Defendant
3  Gelbstein viewing that videotape in your
4  presence?
5      MR. THOMPSON:  Objection to the
6  form.  You can answer.
7      A.   Not that I recall.
8      Q.   Did you ever observe Ida
9  Traschen observe that videotape in your
10  presence?
11      A.   No.
12      Q.   Now, there were many complaints
13  written against me and my office while I
14  was there at Brooklyn TVB by the clerical
15  staff at the Brooklyn TVB.
16      Is that fair to say -- is that
17  a fair statement?
18      A.   Yes.
19      Q.   Is that a fair statement, they
20  didn't like me?
21      A.   I can't say what they felt
22  about it, I can only speak for myself.
23      Q.   Well, they made many complaints
24  about me, that's fair, I mean, I have them.
25  They were all kept by Defendant Gelbstein,

DEITZ Court Reporting... A Lexitas Company
800-678-0166

December 17, 2020

### Page 21

Danielle Calvo

1
2 they were all made by clerks, some by
3 attorneys, one by a judge at the Brooklyn
4 TVB and the clerks were under your
5 supervision; right?
6     MR. THOMPSON:  Object to the
7     form of the question, it's compound.
8     You can answer.
9     A.    The clerks were under my
10 supervision, but I did not ever tell them
11 what to write.
12     Q.    But, you were privy to the
13 complaints they made against me; am I
14 right?
15     A.    I'm sure I was at that time,
16 yes.
17     MR. THOMPSON:  Objection.
18     Q.    Did you investigate at any
19 point the voracity or truthfulness of any
20 of these complaints?
21     A.    I may have, I don't know.
22     Q.    You don't know.
23     So, you don't know whether
24 they're truthful or not; is that a fair
25 statement?

### Page 22

Danielle Calvo

1
2     MR. THOMPSON:  Objection to the
3     form. You can answer.
4     A.    It depends on what exactly
5 we're talking about, I don't know.
6 Specific incidents?  I don't remember
7 specific incidents, but in general, I know
8 that there was many times that there was
9 problems.
10     Q.    Well, tell me one of the
11 problems, please, tell me one; I want you
12 to tell me one?
13     MR. THOMPSON:  Is that a
14     question?
15     Q.    Yeah, tell me one of the
16 problems that you experienced with me and
17 your clerical staff, tell me one?
18     A.    That you would get aggressive
19 with them, yelling at them.
20     Q.    Who, who, tell me who?
21     A.    I can't name specific names,
22 you had a problem with everyone.
23     Q.    Well, tell me who, can you name
24 one; can you name one and tell me a
25 specific date and a specific instance, tell

### Page 23

Danielle Calvo

1
2 me --
3     A.    I can't. I can't give you --
4     MR. THOMPSON:  Objection to the
5     form of answer. You can answer.
6     A.    I can't give you a specific
7 time or incident, but I remember speaking
8 to you personally myself, asking you that
9 if you had a problem with any of the
10 clerks, to come speak to me directly as a
11 supervisor and I told you that many times.
12     Q.    I never had a problem with any
13 of your clerks, never.
14     A.    Excuse me?
15     Q.    Your clerks had a problem with
16 me, they didn't like me. I'll get into
17 that, but you can't give me one specific
18 instance and one specific occurrence?
19     MR. THOMPSON:  Object to the
20     form, asked and answered.
21     Q.    Can you give me one specific
22 instance of where I verbally abused one of
23 your clerks, the date, the time and exactly
24 what I said, I'd like to know?
25     A.    No, I can't.

### Page 24

Danielle Calvo

1
2     Q.    Are you familiar with
3 corruption at the New York TVB, are you
4 familiar corruption and allegations of
5 corruption at the New York TVBs?
6     MR. THOMPSON:  Objection to the
7     form of the question, you can answer.
8     A.    No.
9     Q.    You're not.
10     Let me direct you to Exhibit 4.
11 Let me show you Exhibit 4.
12     (Whereupon, Plaintiff's Exhibit
13     4, previously marked, was
14     introduced.)
15     Q.    Are you familiar with this
16 article, DMV clerk accused of taking bribes
17 for years in ticket fixing schemes.
18     Do you have any knowledge of
19 this article?
20     A.    It does not look familiar, no.
21     Q.    Are you familiar with ticket
22 fixing schemes at the TVB in New York?
23     A.    Am I? No, I'm not.
24     Q.    As a clerical supervisor,
25 you're not familiar with the clerks taking

6 (Pages 21 to 24)

**EXHIBIT J**

December 17, 2020

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x
MARIO H. CAPOGROSSO,

                    PLAINTIFF,

-against-      Case No.:
               18 CV 2710 (EK) (LB)

ALAN GELBSTEIN, in his individual capacity,
IDA TRASCHEN, in her individual capacity,
DANIELLE CALVO, in her capacity, SADIQ
TAHIR, in his individual capacity, PEC
GROUP OF NY, INC., DAVID SMART, and DMV
COMMISSIONER MARK SCHROEDER, in his
official capacity,
                    DEFENDANTS.
-------------------------------------x
         DATE: December 17, 2020
         TIME: 10:16 A.M.

        DEPOSITION of the Defendant,
ALAN GELBSTEIN, taken by the Plaintiff,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held VIA ZOOM
VIDEOCONFERENCE, before Jamie Newman, a
Notary Public of the State of New York.

## Page 2

1
2   APPEARANCES:
3
    THE LAW FIRM OF MARIO H. CAPOGROSSO
4      PLAINTIFF PRO SE
       21 Sheldrake Place
5      New Rochelle, New York 10804
       capogrossom@aol.com
6
7
    OFFICE OF THE NEW YORK STATE
8   ATTORNEY GENERAL
       Attorneys for the Defendants
9      ALAN GELBSTEIN, in his individual
       capacity, IDA TRASCHEN, in her individual
10     capacity, DANIELLE CALVO, in her
       capacity, SADIQ TAHIR, in his individual
11     capacity, PEC GROUP OF NY, INC., DAVID
       SMART, and DMV COMMISSIONER MARK
12     SCHROEDER, in his official capacity
       28 Liberty Street, 17th Floor
13     New York, New York 10005
       BY: JAMES THOMPSON, ESQ.
14     james.thompson@ag.ny.gov
15
    DMV LEGAL BUREAU
16     Attorneys for the Defendant
       DMV COMMISSIONER MARK SCHROEDER, in his
17     official capacity
       6 Empire State Plaza, Room 522A
18     Albany, New York 11228
       BY: BARBARA MONTENA, ESQ.
19     File #: 18CV2710
       barbara.montena@dmv.nyc.gov
20
21
            *   *   *   *
22
23
24
25

## Page 3

1           ALAN GELBSTEIN
2        (Whereupon, all 86 exhibits
3      were previously marked by Counsel,
4      Mr. Capogrosso.)
5       A L A N   G E L B S T E I N, called as a
6    witness, having been first duly affirmed by
7    a Notary Public of the State of New York,
8    was examined and testified as follows:
9    EXAMINATION BY
10   MR. CAPOGROSSO:
11      Q.   Please state your name for the
12   record.
13      A.   Alan Gelbstein.
14      Q.   What is your address?
15      A.   1570 East 7th Street, Brooklyn,
16   New York 11230.
17      Q.   Defendant Gelbstein we're here
18   today because I need to take your
19   deposition concerning the action filed
20   against you, myself and several other
21   defendants.
22          THE COURT REPORTER:  Wait,
23   wait, you're breaking up Counsel.
24   Counsel, you're breaking up so I
25   can't hear you.

## Page 4

1           ALAN GELBSTEIN
2       MR. CAPOGROSSO:  Can you hear
3    me now?
4       THE COURT REPORTER:  You are
5    still breaking up, it's not the best
6    connection.  I could hear you, but it
7    goes in and out.
8       MR. CAPOGROSSO:  Can you hear
9    me now?
10      THE COURT REPORTER:  It goes in
11   and out.
12      MR. CAPOGROSSO:  Let me ask a
13   few more questions and see how we do.
14   Is that all right?
15      THE COURT REPORTER:  That's
16   fine.
17      Q.   These questions are all going
18   to be directed to Defendant, Gelbstein.
19          Were you in the Brooklyn
20   Traffic Violation Bureau on the morning of
21   May 11, 2015?
22      A.   At some point, yes.
23      Q.   At what point did you arrive at
24   the Brooklyn Traffic Violation Bureau on
25   that day?

1  (Pages 1 to 4)

December 17, 2020

Page 5

ALAN GELBSTEIN
1  
2  A.  I arrived late, I don't recall
3  the time.
4  Q.  Did you arrive after my removal
5  on that day?
6  A.  Yes.
7  Q.  What are your normal business
8  hours at the Brooklyn TVB?
9  A.  Business hours I believe are
10 8:30 to 4:30.
11 Q.  So, why were you late that day?
12 A.  I had some personal things to
13 attend to.
14 Q.  Did you not want to be in the
15 building that day for any reason?
16 A.  No, sir.
17 Q.  Now, I was removed that day on
18 May 11, 2015 under your direction?
19 A.  I beg your pardon.
20 MR. THOMPSON:  Objection to the
21 form of the question.
22 Q.  I was removed that day from the
23 Brooklyn TVB by your direction, do you
24 recall doing that?
25 MR. THOMPSON:  Objection to the

Page 6

ALAN GELBSTEIN
1  
2  form of the question.  You can
3  answer.
4  Q.  Do you recall having me removed
5  from the Brooklyn TVB on May 11, 2015?
6  A.  I don't believe that is
7  correct.
8  Q.  You don't recall having me
9  removed?
10 A.  I did not have you removed.
11 Q.  You did not?
12 A.  No.
13 Q.  Let me take you back -- lets
14 goes to Exhibit 70.  Exhibit 70 that I have
15 marked, Plaintiff's Exhibit 70.
16 Are you in possession of
17 Plaintiff's Exhibit 70?
18 A.  I am not.
19 Q.  Is your attorney, Thompson, in
20 possession of it?
21 MR. THOMPSON:  My understanding
22 and Madame Court Reporter correct me
23 if I'm wrong, you're going to be
24 putting the exhibits up on the
25 screen; is that correct?

Page 7

ALAN GELBSTEIN
1  
2  THE COURT REPORTER:  That's my
3  impression, but if I put it on the
4  screen you have to wait because I
5  can't have my hands off the machine,
6  but yeah, if that's what you want me
7  to do.
8  MR. CAPOGROSSO:  Well, I
9  already forwarded all the exhibits to
10 counsel, attorney Thompson.  So,
11 attorney Thompson, do you not have
12 this exhibit?
13 MR. THOMPSON:  I do have the
14 exhibit, but I think it would be best
15 if it were put on the screen so
16 everyone can see it.
17 MR. CAPOGROSSO:  Well, it's
18 actually Exhibit 69.  Exhibit 69.
19 THE COURT REPORTER:  Is that
20 what you would like me to put up?
21 MR. CAPOGROSSO:  No, actually,
22 it's Exhibit 68.  Exhibit 68, let's
23 start with that one.
24 THE COURT REPORTER:  Are these
25 already marked, Counsel?

Page 8

ALAN GELBSTEIN
1  
2  MR. CAPOGROSSO:  It's marked as
3  Plaintiff's Exhibit 68.  Scroll down
4  to the first page.
5  (Whereupon, Plaintiff's Exhibit
6  68, previously marked, was
7  introduced.)
8  Q.  This is a work violence police
9  report, are you familiar with this document
10 Exhibit 68?
11 A.  Yes, I am.
12 Q.  Are you familiar with the
13 person at the top David Smart?
14 A.  Yes.
15 Q.  Now, I ask you take a look at
16 the second page.
17 Right there under additional
18 comments and I would like you to take note
19 of the third line of that page which reads
20 "I was told by Judge Gelbstein to go with
21 officers from the police room to tell Mr.
22 Capogrosso that he must leave the building
23 and give him a legal phone number for any
24 further details.  I did that and he left
25 the building."

Page 9

ALAN GELBSTEIN

1
2      Now, that is a statement made
3   by Danielle Calvo, would you agree to that?
4      A.   Yes.
5      Q.   And you're saying that you did
6   not order Danielle Calvo to have me
7   removed?
8      A.   I may have, I -- I may have,
9   yes.
10     Q.   So, which one is it, you had me
11  removed on that day?
12     A.   I didn't physically remove you,
13  I was, as I recall vaguely, I can't say
14  with absolute certainty, that they called
15  me telephonically and relayed what occurred
16  and at some point I imagine because it says
17  so here, I must have told her to have you
18  removed and to give you legal counsel's
19  phone number.
20     Q.   Well, who called you on that
21  morning?
22     A.   I believe it was Danielle.
23     Q.   Danielle.
24         And what time did she call you?
25     A.   I beg your pardon.

Page 10

ALAN GELBSTEIN

1
2      Q.   And what time did she call you?
3      A.   I don't recall the time.
4      Q.   Now, there was a videotape of
5   this alleged altercation between myself and
6   Defendant Smart, did you observe that
7   videotape?
8         MR. THOMPSON:  I'm going to
9      object to the form of the question.
10     Q.   Did you observe the video --
11  you still have to -- did you observe the
12  videotape of the alleged push?
13        MR. THOMPSON:  Note my
14     objection, you can answer.
15     A.   I don't recall whether I did or
16  not.
17     Q.   So, you don't recall ever
18  observing the videotape?
19     A.   I don't recall, no.
20     Q.   Did you keep possession of that
21  videotape?
22     A.   I personally did not.
23     Q.   At any point in time did you
24  view that videotape?
25     A.   I don't recall.

Page 11

ALAN GELBSTEIN

1
2         MR. THOMPSON:  Objection, asked
3      and answered.
4      Q.   Did you have me removed from
5   the Brooklyn TVB based on that videotape,
6   did you?
7      A.   I would have -- assuming that I
8   saw it, which I don't recall I did, it
9   would have been probably well after the
10  fact.
11     Q.   So, you're having me thrown out
12  based on an allegation made by Danielle
13  Calvo, is that it?
14        MR. THOMPSON:  Objection to the
15     form of the question.
16     Q.   Is that correct?
17     A.   I believe based on what she
18  told me, we took action.
19     Q.   And did you ask Danielle Calvo
20  if she viewed the videotape?
21     A.   Did I ask her if she viewed it?
22     Q.   Yes.
23     A.   I did not ask her.
24     Q.   Did you approach me on the
25  afternoon May 8th and said, "I saw what you

Page 12

ALAN GELBSTEIN

1
2   wrote about me," concerning a letter I
3   wrote to Attorney General Pricket-Morgan
4   that I called you complacent, incompetent
5   and incapable.
6         Do you recall approaching me on
7   the afternoon of May 8th?
8      A.   I do not.
9      Q.   And did you say to me on the
10  afternoon of May 8th, "can't you go
11  practice somewhere else"?
12     A.   I don't remember saying that to
13  you at all.
14     Q.   Were you predisposed to having
15  me removed from the Brooklyn TVB?
16     A.   I was not.
17     Q.   Were you conveniently not
18  present at the Brooklyn TVB on the morning
19  of May 11th; sir, did you not happen to
20  view the videotape or the incident between
21  myself and Defendant Smart?
22        MR. THOMPSON:  Objection.
23     A.   I'm not sure I understand the
24  question.
25     Q.   Were you purposefully not

3  (Pages 9 to 12)

Page 13

ALAN GELBSTEIN

1    ALAN GELBSTEIN
2  available at the Brooklyn TVB on the
3  morning of May 11, 2015?
4         MR. THOMPSON: Objection.
5      (Whereupon, there was
6      cross-talk, so Counsel re-asked the
7      question.)
8      Q.  Were you purposefully not
9  available on the morning of May 11, 2015?
10     A.  No.
11     Q.  Did you tell Defendant Smart to
12  approach me on the morning of May 11, 2015
13  and create an incident between myself and
14  him?
15        MR. THOMPSON: Objection,
16  compound. You can answer.
17        THE WITNESS: I didn't hear
18  you, Counsel?
19     Q.  Did you tell?
20        THE WITNESS: I heard you, I
21  didn't hear Mr. Thompson said
22  something.
23        MR. THOMPSON: Objection,
24  compound, but you can answer the
25  question.

Page 14

1    ALAN GELBSTEIN
2      A.  Repeat the question, please.
3      Q.  Did you tell Defendant Smart to
4  approach me on the morning of May 11, 2015?
5      A.  No.
6      Q.  Do you have authority over the
7  actions of Defendant Smart at the Brooklyn
8  TVB?
9         MR. THOMPSON: Objection to the
10  form of question, you can answer.
11     A.  I do.
12     Q.  You do?
13     A.  Yes.
14     Q.  Who viewed the evidence on the
15  morning of May 11, 2015 of this alleged
16  push, other than Danielle Calvo?
17        MR. THOMPSON: I'm having a
18  hard time hearing what you're saying,
19  Mr. Capogrosso.
20     Q.  Who viewed the evidence of this
21  alleged push, who viewed the videotape on
22  the morning of May 11, 2015, other than
23  Danielle Calvo?
24        MR. THOMPSON: Objection,
25  assumes facts not in evidence. You

Page 15

1    ALAN GELBSTEIN
2  can answer.
3      A.  I don't know who viewed it.
4      Q.  Did Ida Traschen view the
5  videotape before she had me removed --
6  before she told me that I was not allowed
7  to practice law in the Brooklyn TVB or any
8  New York TVB?
9         MR. THOMPSON: Objection to the
10  form.
11     A.  I don't know if Ida Traschen
12  observed it.
13     Q.  Did you have a conversation
14  with Ida Traschen on the morning of May 11,
15  2015?
16     A.  I do not recall with certainty
17  whether I did or not.
18     Q.  Ida Traschen did not call you
19  and question you concerning my removal on
20  the morning of May 11, 2015?
21        MR. THOMPSON: I'm going to
22  object on the basis of
23  attorney/client privilege and work
24  product, the contents of any
25  conversation between Judge Gelbstein

Page 16

1    ALAN GELBSTEIN
2  and Ida Traschen who is counsel of
3  DMV that is a legal conversation.
4  And so, Judge Gelbstein I'll
5  instruct you not to answer any
6  question what you said to Ida and
7  what Ida said to you.
8      Q.  You still have to answer the
9  question, did you have a conversation with
10  Ida Traschen?
11     A.  I don't recall.
12     Q.  Were you in possession of a
13  letter that I wrote on March 20, 2015, to
14  Attorney General Pricket-Morgan?
15     A.  I believe I was furnished a
16  copy of that letter.
17     Q.  When were you furnished a copy
18  of that letter?
19     A.  I don't know the date, it was
20  part of an e-mail.
21     Q.  Was it prior to the event, the
22  alleged push on May 11, 2015?
23     A.  I couldn't tell you, I don't
24  know.
25        THE COURT REPORTER: What is

4  (Pages 13 to 16)

December 17, 2020

Page 17

```
1              ALAN GELBSTEIN
2   Cricket's last name?
3       MR. CAPOGROSSO:
4    Pricket-Morgan, M-O-R-G-A-N.  Pricket
5    is also her last name.
6       MR. THOMPSON:  It's hyphenated,
7    Pricket-Morgan.
8    Q.   You don't recall when you came
9   in possession of a letter of May 11, 2015?
10   A.   Not at this time.  It's been
11  five years and I did not review it, I
12  couldn't tell you.
13   Q.   Was that letter forwarded to
14  you directly by Attorney General
15  Pricket-Morgan?
16   A.   No.
17   Q.   Did you address any of the
18  complaints that I made in that letter of
19  March 20, 2015?
20   A.   I don't remember with
21  specificity what the complaints were.
22   Q.   Well, I will get that letter
23  for you now, but did you take any action
24  with respect to that letter?
25   A.   Again, if I don't know -- if I
```

Page 18

```
1              ALAN GELBSTEIN
2   don't recall the contents, I couldn't tell
3   you what my reaction would be.
4    Q.   Fine, let me get you the
5   letter.  Let's go to Exhibit 15.
6       (Whereupon, Plaintiff's Exhibit
7    15, previously marked, was
8    introduced.)
9    Q.   Defendant Gelbstein, do you
10  recall receiving this letter?
11   A.   Yes, I saw this letter.
12   Q.   When did you see it?
13   A.   I don't recall the first time I
14  saw it.  As I said, it was attached to an
15  e-mail I received.
16   Q.   And it's dated March 20th; is
17  that correct?
18   A.   Yes.
19   Q.   2015?
20   A.   Yes.
21   Q.   The incident between myself and
22  Defendant Smart, this alleged push occurred
23  on May 11th, am I right?
24   A.   I don't know what you're
25  looking at.  I beg your pardon.
```

Page 19

```
1              ALAN GELBSTEIN
2       MR. CAPOGROSSO:  I'll withdraw
3    that question.
4    Q.   Now, I made certain complaints
5   against Defendant Smart which I brought to
6   your attention in this letter.  I ask you
7   to look down that page.
8       MR. CAPOGROSSO:  If you can
9    scroll down the page, please.
10       THE COURT REPORTER:  Sure.
11   Q.   Now, Item Number 1, I'll draw
12  your attention to Item Number 1, I state
13  that your security guard David Sparks to me
14  repeated times "to go fuck myself."
15       Do you see that statement?
16   A.   I do.
17   Q.   You did.
18       Did you take any action in
19  response to that statement, did you rectify
20  it?
21   A.   Your statement does not seem to
22  be addressed to me for me to take action
23  upon David Sparks.
24   Q.   Did I ever make a complaint to
25  your office concerning that type of
```

Page 20

```
1              ALAN GELBSTEIN
2   behavior?
3    A.   You have come in to my office
4   to complain about security guard David
5   Sparks, yes.
6    Q.   And what did you do in response
7   to those complaints?
8    A.   On each -- well, I don't know
9   how many times you came in.  I remember you
10  coming in, I called David Sparks in and I
11  told him that if he said anything
12  derogatory or had an altercation with you,
13  he has to keep far away from you.  Whenever
14  he sees you, he should go in the opposite
15  direction.
16   Q.   But, he didn't obey that order,
17  did he?
18   A.   I don't know that to be
19  correct, sir.
20   Q.   Well, he did approach me on the
21  morning of May 11, 2015; right?
22   A.   I don't know that to be the
23  case, sir.
24   Q.   The police reports -- you
25  didn't -- I mean, after Defendant Smart
```

5 (Pages 17 to 20)

December 17, 2020

## Page 21

ALAN GELBSTEIN

1
2  approached me on May 11, 2015, you didn't
3  view that videotape at any point
4  thereafter?
5        MR. THOMPSON: Objection to the
6  form of the question.
7        THE WITNESS: Answer?
8        MR. THOMPSON: You may answer.
9    Q.   After he approached me on
10  May 11th --
11        THE COURT REPORTER: Wait, the
12  connection is not good. This is not
13  a good connection.
14        MR. CAPOGROSSO: Give me one
15  minute, maybe if I move my laptop to
16  a different location maybe I can get
17  a better connection. Can you give me
18  one minute to do that?
19        THE COURT REPORTER: Sure.
20        MR. CAPOGROSSO: Can you hear
21  me better, Ma'am?
22        THE COURT REPORTER: Yes, I
23  can. The witness was trying to
24  answer, but the connection got all
25  messed up.

## Page 22

ALAN GELBSTEIN

1
2    A.   The answer is, I don't recall
3  ever seeing the tape.
4    Q.   All right.
5        Directing your attention to the
6  that third question that I made complaints
7  to the office that your security guard
8  stared and glared at me and would get in my
9  face and say FU.
10        Do you recall that?
11    A.   I missed the question, say it
12  again, please.
13    Q.   I made a complaint that your
14  security guard Defendant Smart would get in
15  my face and stare and glare at me.
16        Do you recall me making a
17  complaint to your office concerning that?
18    A.   I just read Number 3 and what
19  is your question with regard to Number 3?
20    Q.   Do you recall me making that
21  complaint to your office?
22    A.   No, I do not.
23    Q.   At one point in time did you
24  laugh and giggle at me when I was telling
25  you about these complaints concerning

## Page 23

ALAN GELBSTEIN

1
2  Defendant Smart and telling me "a spade is
3  a spade"?
4    A.   Are you reading something else
5  in the letter now?
6    Q.   Yes, the second page down.
7    A.   I see the paragraph.
8    Q.   Do you recall laughing and
9  giggling at me and telling me "a spade is a
10  spade" when I complained about Defendant
11  Smart's action?
12    A.   I didn't hear you. Can you
13  repeat the question?
14    Q.   Do you recall laughing and
15  giggling at me and telling me "a spade is a
16  spade" when I complained of Defendant's
17  Smart's actions?
18    A.   No.
19    Q.   Many Affidavits were written by
20  your clerks, by attorneys, by a judge
21  against me and they were all presented to
22  me for the first time in Defendant's Motion
23  to Dismiss.
24        Are you familiar with those
25  complaints and Affidavits of misconduct?

## Page 24

ALAN GELBSTEIN

1
2        MR. THOMPSON: Objection to
3  form, you can answer.
4    A.   I don't know which ones
5  specifically you are referring to, but yes,
6  I did receive complaints.
7    Q.   All right, fine.
8        Did you ever give me an
9  opportunity to response to any of those
10  complaints?
11    A.   I'm not sure if -- I need
12  clarification on your question. If the
13  question is if there were specificity in
14  the particular complaint, is it your
15  question did I ask you --
16    Q.   I'll rephrase the question.
17        Did you ever approach me with a
18  complaint and ask me to respond to it?
19    A.   Yes.
20    Q.   You presented me with a written
21  complaint and asked me to respond?
22    A.   No. I never gave you a written
23  complaint to respond to.
24    Q.   You did not?
25    A.   No.

6  (Pages 21 to 24)

December 17, 2020

## Page 25

ALAN GELBSTEIN

1
2     Q.   So, I had no opportunity to
3   respond to any of these complaints that
4   either your clerks were making or attorneys
5   were making or even a judge made, you gave
6   me no opportunity to respond before having
7   me removed; is that fair?
8         MR. THOMPSON:  Objection to
9   form.
10    A.   No, it's not fair.
11    Q.   At what point in time did you
12  give me an opportunity to respond?
13    A.   As complaints came in over a
14  period of time, whenever there was a
15  complaint lodged and it was more serious,
16  there were complaints I thought pay, but it
17  was a more serious, I would call you in and
18  I would tell you other complaints and I
19  would tell you to cease and desist and you
20  would promise that you would.
21        And that was the end of the
22  discussion with any particular complaint.
23    Q.   Well, tell me which complaint
24  you did that because I don't recall it,
25  tell me, tell me the exact complaint?

## Page 26

ALAN GELBSTEIN

1
2     A.   At this time I don't recall
3   specificity, but as I said before, whenever
4   I felt a complaint and not a minor
5   complaint, a serious complaint required my
6   intervention, I called you in and we had a
7   discussion in my office.
8     Q.   But, you don't recall the date
9   that you called me in or the complaint that
10  you asked me to address?
11    A.   Right.
12    Q.   And you never asked me for a
13  written reply to any complaint; is that
14  fair?
15    A.   That's fair.
16    Q.   Did you ever investigate the
17  voracity or truthfulness of any of these
18  complaints?
19    A.   I did.
20    Q.   Or did you just accept them as
21  truthful?
22    A.   I investigated to the best of
23  my recollection every serious complaint.
24    Q.   And you used these complaints
25  of misconduct to have me removed from the

## Page 27

ALAN GELBSTEIN

1
2   Brooklyn TVB?
3     A.   Could you repeat the question?
4     Q.   Did you use these complaints to
5   have me removed from the Brooklyn TVB?
6         MR. THOMPSON:  I object to the
7   form, you can answer.
8     A.   From the cumulative complaints,
9   no one complaint in and of itself was the
10  deciding factor.  It was a cumulation of
11  complaints over a period of time.
12    Q.   And you just accepted all those
13  complaints as true without asking for my
14  affidavit in response; is that a fair
15  statement?
16    A.   I did not ask for an affidavit
17  in response.
18    Q.   Well, let me draw your
19  attention to a couple of those complaints
20  that you said you investigated the
21  truthfulness and voracity of if I may for
22  which you had me removed from the Brooklyn
23  TVB.
24        I'll ask you to take a look at
25  specifically one that was made by your

## Page 28

ALAN GELBSTEIN

1
2   chief clerk, your chief clerk which is
3   Exhibit -- let's see -- 84?  84.  Can we go
4   to Exhibit 85, I'm sorry, 85.
5         (Whereupon, Plaintiff's Exhibit
6         85, previously marked, was
7         introduced.)
8     Q.   Are you familiar with Melanie
9   Levine?
10    A.   Yes.
11    Q.   Who is Melanie, M-E-L-A-N-I-E,
12  Levine?
13    A.   She, at the time, was a
14  supervisor in the clerical office.
15    Q.   So, she was a supervisor of
16  your clerks, am I right in saying that?
17    A.   She was a supervisor of some of
18  the clerks.  She was not the head clerk,
19  she was a principal clerk.
20        MR. CAPOGROSSO:  Can you please
21  scroll down, Ma'am, to the next page.
22        (Whereupon, the Court Reporter
23  complied.)
24    Q.   I'll direct you to the first
25  paragraph on the next page, right there,

7  (Pages 25 to 28)

December 17, 2020

Page 29

ALAN GELBSTEIN

1  ALAN GELBSTEIN
2  thank you. Now, I'll direct you to first
3  paragraph where your clerk of supervisors
4  states, "attorney Capogrosso represented
5  Mr. Perez at trial for three violations on
6  January 21, 2015."
7        MR. THOMPSON: I think he's
8  referring to the previous page,
9  Page 3.
10       THE COURT REPORTER: That's
11  what I thought, but his connection is
12  slower. This, this is Page 3, so
13  give it a second to catch up. You
14  want Page 4, the handwritten portion.
15       MR. CAPOGROSSO: The one before
16  that, Ma'am. Further up Ma'am --
17  right there.
18    Q.  Did you investigate that
19  complaint, Defendant Gelbstein?
20    A.  I don't recall if I
21  specifically investigated this complaint.
22    Q.  So. You don't know the
23  voracity or truthfulness of that complaint;
24  is that a fair statement?
25    A.  I don't recall at this time.

Page 30

1  ALAN GELBSTEIN
2    Q.  But, you used this as one of
3  the complaints of misconduct to have me
4  removed; is that right?
5    A.  This is one of many, yes.
6    Q.  And you know I never
7  represented Mr. Perez on January 11, 2015,
8  you know that; right?
9    A.  I do not.
10   Q.  Well, she's making a false
11  statement. You could have investigated it,
12  but you didn't investigate it now, did you?
13       MR. THOMPSON: Objection to the
14  form of the question. You can
15  answer.
16   A.  I don't recall the particular
17  complaint now with specificity and what
18  actions I took with regard to this. I
19  don't recall whether I spoke to Paul Perez
20  or not. I may have, I don't recall.
21   Q.  Did you ever talk to me about
22  this complaint?
23   A.  Again, I don't remember with
24  specificity with this particular complaint
25  whether I spoke to you on it or not.

Page 31

1  ALAN GELBSTEIN
2    Q.  Well, let me tell you what
3  happened with this complaint, Mr. Perez did
4  not hire me to represent him on three
5  violations, he did not. He hired me on
6  appeal the day after he lost and was
7  suspended in a courthouse by one of your
8  judges on these violations, that's what
9  happened.
10       And he hired me on the appeal
11  and I took the appeal and then he came back
12  the next day and what he told me was that
13  his license got suspended and revoked. And
14  he said to me I want my --
15       MR. THOMPSON: Note my
16  objection.
17   Q.  -- Mr. Perez did not hire me on
18  those violations and you never investigated
19  that now, did you Mr. Gelbstein?
20       MR. THOMPSON: Note my
21  objection, you can answer.
22   A.  I don't recall with specificity
23  what I did at the time. I'm aware of the
24  complaint, I don't remember if I spoke to
25  him or not. I don't recall.

Page 32

1  ALAN GELBSTEIN
2    Q.  But, you never took my
3  affidavit in response; right?
4        MR. THOMPSON: Objection, asked
5  and answered, you can respond.
6    Q.  Now, you know what happened
7  that day Mr. Perez approached me, after I
8  gave him his money back and he told me he
9  was going to cut me with a knife and the
10  slash the tires of my car, you understand
11  that, that's what he said to me?
12       MR. THOMPSON: Objection,
13  assumes fact not in evidence.
14   A.  I wasn't there when you had the
15  conversation, I don't know what he said to
16  nor do I know what you said to him.
17   Q.  But, you never took my
18  statement in reference to that complaint
19  now did you?
20   A.  Again, I don't recall the
21  specific conversation we had with regard to
22  it, if we didn't have a conversation.
23   Q.  You never had a conversation
24  with me concerning this complaint because
25  there's no affidavit attached to this

8  (Pages 29 to 32)

**EXHIBIT K**

**Response to Exhibit 23**

My hand went up in defensive posture. Defendant Smart was in my personal space, and this was not for the first time. Reference my letter to Defendant Prickett Morgan Exhibit D where I sought relief from such behavior form Defendant Smart. As shown in my Complaint, dated May 8, 2018, Defendant Smart has pushed me from behind of for no apparent reason, gave me the sign of the cross and spear hand while standing on the clerk entry summons line (an I believe was removed from his duties at the Brooklyn South SMV TVB for approximately two weeks after such incident by Defendant Gelbstein), to get the summons for a day's hearings, got in my face several times in a threatening aggressive manner between June 20, 2012 and May 111, 2015 and when I asked what was the problem his response was "F--k you, you are the problem, and has admitted to taking money from one of my clients while at some point in time between December 11, 2011 to June 20, 2012 when I was required to take an anger management. He has admitted to taking $80 owed from a client on a $150 fee. He admits he took this money because he indicates that I authorized him to do so. An outright lie. He indicated that he gave this money to me. A lie. Simple and plain. During the time when Defendant Smart took this money between December 11, 2011 and June 20, 2012 I had no communication with the DMV and specifically with a security guard who worked at the DMV. I reported this abuse and theft to Defendant Gelbstein, he performed an investigation and let Defendant Smart remain at the Brooklyn TVB. After which time a series of threats and assaults began by Defendant Smart against my person at the Brooklyn DMV TVB which culminated in the incident of May 11, 2015. I have no motive for having any type of altercation with a security guard. I was there to represent clients and make my living. . **Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs" conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof**

**Response to Exhibit 24**

Same as above

**Response to Exhibit 25**

Police report filed no action taken against me.

**Response to Exhibit 26**

Defendant Calvo's admits to having me removed and banned from the TVB for two incidents 1) the incident with Tahir on May 8,2015, and 2) the incident with Smart on May 11, 2015. Please, look at the record. . **Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs" conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof.**

10

P-72

**EXHIBIT M**

Page 354

M.H. Capogrosso

1  I go in the morning, right.
2  David would put up or somebody would put
3  up the calendar. Most times it was David
4  Smart and in the afternoon he would take
5  it down. So I have to go to the calendar
6  to look at the calendar because in the
7  morning there's a lot of people and
8  everybody's rushing around here and
9  there. You have to know what courtroom
10  to go in.
11      So I'm walking to the
12  calendar and he tells -- and I'm trying
13  to go to the calendar and he tells me I
14  deliberately walked into him. I mean
15  that's just stupid. We are both working
16  in the same location. We both have to go
17  to the calendar. He has to hang it up
18  and I have to look at it.
19      I'm deliberately walking
20  into a security? I have to work in this
21  courthouse. I'm sorry. As a lawyer I
22  have to go to the board and look at the
23  docket to see where my case is being
24  held. This is what I'm being accused of,

Page 355

M.H. Capogrosso

1  deliberately walking into a guard.
2      We work in the same
3  building. We both have to go to the --
4  to the board in the morning, to the
5  docket. He has to hang it up. I got to
6  look at it to see where my case is.
7  That's all I have to say about this.
8      Q  So is Mr. Smart lying?
9      A  That I deliberately walked
10  into him, yes, absolutely. I don't
11  need --
12      Q  Why is he --
13      A  -- this beef with a security
14  guard. I don't need a beef with a
15  security guard at a courthouse that I'm
16  trying to make a living at.
17      Q  And why do you think he's
18  lying?
19      A  I don't know. Why would I
20  deliberately walk into a security -- I'm
21  going to the board to check the calendar.
22      Q  Did he have any animis
23  towards you?
24      A  I told you, I reported to

Page 356

M.H. Capogrosso

1  Gelbstein that he stole $80 and a $150
2  fee and I found that out when I got back
3  after taking my anger management course.
4  I told you that. Cindy told --
5      Q  And --
6      A  And then I wrote to the
7  motorist. The motorist confirmed it. I
8  didn't go to the police because that's
9  not what I do. I'm not going to get the
10  guy arrested. Like maybe I should have
11  looking back on this thing now.
12      Q  And would you have --
13      A  Gelbstein investigated it.
14  Gelbstein admits to me that Smart said he
15  took the money and he gave it to me,
16  which is an absolute lie. First of all,
17  I authorized nobody to take money on my
18  behalf, collect money on my behalf. He
19  had no authority to collect a fee on my
20  behalf, this security guard, Smart and
21  Gelbstein believes it, that he gave me
22  the money. Gelbstein believes this.
23      I told him the security
24  guard had no authority to take the money,

Page 357

M.H. Capogrosso

1  but he allows the security guard to stay
2  and then the harassment started and I
3  guess this is one of the ways he did it.
4  He's saying I deliberately walked into
5  him.
6      Q  And would it be correct to
7  say that you feel that Mr. Smart had a
8  grudge against you after this?
9      A  Absolutely, absolutely he
10  had a grudge. He wouldn't let it go. If
11  you steal, I'm going to report it. It's
12  a theft. It's a theft. I am a lawyer.
13  I am an officer of the court. You steal,
14  you're not stealing from me. You're
15  stealing from that cab driver who $80 is
16  a lot of money to.
17      Q  And do you believe that he
18  wanted -- not he. Do you believe that
19  Mr. Smart wanted to get rid of you --
20      A  Absolutely.
21      Q  -- because of this threat?
22      A  Absolutely. He wouldn't
23  start the harassment. I told you all the
24  incidents. He gets in my face. What's

59 (Pages 354 - 357)

Page 426

1    M.H. Capogrosso
2    MR. THOMPSON: Ms.
3 MacDonald --
4    MS. REPORTER: Yes. Let's
5 take a five minute break.
6    MR. THOMPSON: Sure. That's
7 fine. We'll be back at 4:33.
8    MR. VIDEOGRAPHER: The time
9 is 4:28. We are off the record.
10    (A short recess was taken.)
11    MR. VIDEOGRAPHER: The time
12 is 4:33. We are on the record.
13    Q    Mr. Capogrosso, you still
14 see that we have Exhibit 28 up?
15    A    Yes.
16    MR. THOMPSON: And,
17 Ms. MacDonald, in case we didn't mark
18 it as Exhibit 28, let's please do
19 that.
20    Q    You write in this letter
21 that upon completion of the anger
22 management course you were allowed to
23 practice law in all DMV courts on an
24 equal and unbiased standing with all
25 other attorneys in the DMV; is that

Page 427

1    M.H. Capogrosso
2 correct?
3    A    That was my assumption, yes.
4    Q    You say it was your
5 assumption. What do you mean by that?
6    A    I'm a lawyer. I'm licensed
7 in the State of New York. I should be
8 treated like every other lawyer. I see
9 no reason why I shouldn't be. I should
10 be held to the same standard as every
11 other lawyer practicing, no different. I
12 took my course that I needed to take. I
13 should be held on the same standard as
14 every other lawyer.
15    Q    But, in fact, you weren't
16 quite on the same standing because you
17 had been warned that any further incident
18 would lead to your expulsion; isn't that
19 true?
20    A    Well, that was an improper
21 warning in my opinion. I should be
22 treated like any other lawyer, any other
23 lawyer.
24    Q    So why was it improper for
25 DMV to warn you that further incidents

Page 428

1    M.H. Capogrosso
2 would lead to an expulsion?
3    A    Well, I don't know why they
4 threw that letter to me. Like I said,
5 they threw it at me two days before I was
6 to go back to the DMV. I agreed to
7 nothing but to take an anger management
8 course, that's it.
9    Q    Well, once again --
10    A    I took the course. I should
11 be treated like every other lawyer, not
12 on a special, you know, special -- I
13 should be treated like every other
14 lawyer. That's all I agreed to was take
15 a course.
16    I wouldn't have agreed to
17 anything else if I knew this letter was
18 going to be thrown at me.
19    Q    Mr. Capogrosso, you write
20 that "On numerous occasions your security
21 guard Dave Sparks told me to go F
22 myself."
23    A    I didn't know his name at
24 that point. It's Smart, not Sparks. I
25 didn't know his last name.

Page 429

1    M.H. Capogrosso
2    Q    How did you not know his
3 last name at this point?
4    A    I didn't know it.
5    Q    You had been interacting
6 with him for years you said.
7    A    We all knew him by David. I
8 never talked to him about his last name.
9 I know people said S Smart something or
10 Smarks or something. I thought it was
11 Sparks.
12    I knew him -- I knew him as
13 the security guard, that's it. I know
14 his first name was David.
15    Q    When you --
16    A    That's what I knew.
17    Q    When you write,
18 Mr. Capogrosso, when you write "Will
19 provide proof upon request," what proof
20 would you have provided?
21    A    I sent you all my letters,
22 all my -- all the complaints I filed with
23 Gelbstein.
24    Q    So the proof would have been
25 your own letters to Judge Gelbstein?

77 (Pages 426 - 429)