UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

MARIO H. CAPOGROSSO,                                18-CV-2710

                  Plaintiff

     -against-

ALAN GELBSTEIN, et al.

                  Defendants



_____

## MEMORANDUM OF LAW IN OPPOSITION TO STATE DEFENDNATS'

## MOTION FOR SUMMARY JUDGMENT

      The Plaintiff, Mario H. Capogrosso ("the Plaintiff"), submits this Memorandum of Law in opposition to the Motion for Summary Judgment of the Defendants, Vincent Palmieri ("Palmieri"), Alan Gelbstein ("Gelbstein"), Bosha Vahdatlamas ("Vahdat"), Ida Traschen ("Traschen"), Elizabeth Prickett-Morgan ("Pickett-Morgan"), Jean Flanagan ("Flanagan"), and Danielle Calvo ("Calvo") ("the Defendants"), for Summary Judgment dismissing the Plaintiff's Complaint. For the reasons that follow, the Defendants' Motion should be denied.

**Statement of Facts**

      For the sake of brevity, the Plaintiff respectfully refers the Court to the accompanying Statement of Material Facts in Opposition to the Defendants' Motion.

**Argument**

I.  **There is, Minimally, a Disputed Issue of Material Fact as to Absolute Judicial and Quasi-Judicial Immunity.**

   a.  **Judicial and Quasi-Judicial Immunity.**

   The Defendants first argue that the Plaintiff's claims against the individual defendants are barred by Absolute and Quasi-Judicial Immunity (State's Brief, p. 17). They contend that this is so "because the Individual Defendants were all officials in DMV's administrative courts, and because the action complained of – barring" the Plaintiff from practice there – "is attorney discipline, a core judicial function (*Id.*).

   However, as explained below, there is at least a disputed issue of material fact as to such application that warrants denial of the Motion.

   b.  **The Individual Defendants.**

   The State first argues that entitlement to absolute judicial immunity does not depend on the individual's title or office itself (State's Brief, p. 19).   Absolute judicial immunity, however, does not apply to purely administrative acts of a judge, such as employment decision. *See, generally, Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538 (U.S. 1988) (ruling that a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and first assistant district attorneys, or from any other Executive Branch official who is responsible for making such employment decisions).

   In *Butz v. Economou*, 438 U.S. 478, 511-13 (1978), the Court established a three-part test for determining whether judicial immunity applies to officials other than judges: (1) Whether the functions of the official in question are comparable to those of a judge; (2) whether the nature of the controversy is intense enough that future harassment or

intimidation by litigants is a realistic prospect; and (3) whether the system contains safeguards which are adequate to justify dispensing the private damages suits to control unconstitutional conduct. *Wagshal v. Foster*, 28 F.3d 1249 (D.C. 1994), *cert. denied*, 514 U.S. 1004 (1995).

In determining whether an act by a judge is "judicial," thereby warranting absolute immunity, the Second Circuit takes "a functional approach, for such immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). The factors determining whether an act by a judge is a judicial one relate to the nature of the act itself (whether an act by a judge is a judicial one relates to the nature of the act itself—whether normally performed by a judge—and the expectations of the parties—whether they dealt with the judge in his judicial capacity).

A judge's administrative decisions, even though potentially "essential to the very functioning of the courts, have not similarly been regarded as judicial acts." *Id.* at 511. "Such administrative actions include demoting or dismissing a court employee, . . . ." *Id.* "Similarly, judges are not entitled to judicial immunity for promulgating a code of conduct for attorneys, . . . ." *Id. And see, Parent v. New York*, 786 F.Supp.2d 516 (N.D.N.Y. 2011) (administrative actions such as terminating court employees do not fall within range of judicial actions protected by absolute immunity).

The actions taken here against the Plaintiff were not "judicial" in nature—but administrative—and hence do not fall under the "privilege" umbrella. The actions, in fact, were not technically "attorney discipline," as the Plaintiff's alleged actions were taken

outside of judicial proceedings, unrelated to the Plaintiff's duties as an attorney, and, in fact, related to general administration of the building.

The Defendants' citation to authority is not to the contrary. For example, *Jackson v. Pfau*, 523 F. Appx. 736 (2d Cir. 2013) (State's Brief, pp. 19-20), fails to give any detail into what "judicial action" was engaged in). And *McKeown v. N.Y. State Commn. On Judicial Conduct*, 377 Fed. Appx. 121 (2d Cir. 2010) (State's Brief, p. 20), specifically references attorney disciplinary proceedings—not administrative termination of an individual's right to present in a building. *Id.* at 124.

Significantly, *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106 (2d Cir. 2020) (State's Brief, p. 20), underscores the Plaintiff's argument. In that case, the court specifically stated that "the act of disbarring an attorney as a sanction for the attorney's contumacious conduct *in connection with a particular case* is a judicial act, . . . ." *Id.* at 124 [*emphasis added*]. Indeed, the actions taken herein are unlike "attorney disciplinary proceedings" (*c.f.,* State's Brief, p. 20) (referring to attorney disciplinary proceedings in case law).

Because the actions taken here were administrative and not judicial, the State's argument that the "individual defendants" are all immune from liability (State's Brief, p. 20) must fail. If, in fact, this had been a judicial determination, then affording immunity to those involved in administering a judicial determination makes sense. That is not the case here.

## II.      There is, Minimally, a Disputed Issue of Material Fact as to Retaliation.

The State argues that "it *appears* unlikely that the AG

Letter could qualify as protected speech to support a claim of First Amendment retaliation"

(State's Brief, p. 22) [*emphasis added*].  It claims that the "problem is that" the Plaintiff,

"as an attorney practicing before a State administrative tribunal," is neither "a public

employee" nor "a private citizen" (*Id.*).

In support of this contention, however, the State fails to cite any authority that

actually supports it.   *Connick v. Myers*, 461 U.S. 138 (1983), by the State's own

description, doesn't speak to the Plaintiff's role as attorney (State's Brief, p. 22).  And the

United States Supreme Court, in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct.

2720, 115 L.Ed.2d 888 (1991) (State's Brief, p. 22), rejected the idea that an attorney's

speech was different:

> Respondent argues that speech by an attorney is subject to greater regulation than
> speech by others, and restrictions on an attorney's speech should be assessed under
> a balancing test that weighs the State's interest in the regulation of a specialized
> profession against the lawyer's First Amendment interest in the kind of speech that
> was at issue.  The cases cited by our colleagues to support this balancing , . . . ,
> involved either commercial speech by attorneys or restrictions upon release of
> information that the attorney could gain only by use of the court's discovery
> process.  Neither of those categories, nor the underlying interests which justified
> their creation, were implicated here.  Petitioner was disciplined because he
> proclaimed to the community what he thought to be a misuse of the prosecutorial
> and police powers.  Wide-opening balancing of interests is not appropriate in this
> context.

*Id.* at 1052, 1233.

The Court there further spoke, to wit:

> At the very least, our cases recognize that disciplinary rules governing the legal
> profession cannot punish activity protected by the First Amendment, and that First
> Amendment protection survives even when the attorney violates a disciplinary rule
> he swore to obey when admitted to the practice of law . . . .

*Id.* at 1054, 2734.

The State's citation to the *Gentile* case is misleading in its omission.  While it quotes the case as referring to indication "that the speech of lawyers . . . may be regulated under a less demanding standard" (State's Brief, p. 22), their " . . ." omits the words "in pending cases." *Gentile*, 501 U.S. at 2744, 111 S.Ct. at 1073.  Indeed, the Supreme Court goes on in the same paragraph to reference lawyers "representing clients in pending cases" who are, in that capacity, "key participants in the criminal justice system, . . ." *Id.*

But, in fact, this Court's previous decision – as quoted by the State – seems to indicate that it viewed the Plaintiff as a "private citizen" (State's Brief, p. 23).  The State's argument, hence, that "the AG Letter is subject to the test applicable to public employees, or even to some less demanding formulation of it" (*Id.*) is bankrupt.

While the State acknowledges that there is, minimally, an "unclear standard for First Amendment retaliation in the context of attorney speech," and "lack of controlling case law on the subject" (State's Brief, p. 24), it contends that the Individual Defendants are thus entitled to Qualified Immunity. However, for the reasons set forth above, the immunity for these administrative actions fails.

The State also argues that no rational jury could find the AG Letter to be a but-for cause of the Plaintiff's expulsion from the TVB (State's Brief, p. 24).

The State argues that the "purported factual bases for" the "First Amendment retaliation claim make little sense, and virtually all of them occurred before he even sent the AG Letter that serves as the purported protected activity" (State's Brief, p. 25).  The operative phrase is "virtually all."  The State falsely assumes the validity, veracity, and or merit  of all the allegations made. There was no attempt by defendants' Gelbstein, Calvo or Traschen to make any sort of meaningful search for the truth of these allegations (Exhibit

A, Gelbstein deposition pages 4-9, 27--45 , Exhibit B, Traschen deposition pages 10-19, Exhibit C, Calvo deposition pages 5-7, 21-33) nor was I ever made aware of such allegations so that I could properly respond (Exhibit E  Capogrosso deposition, page 189, 16-19, page 300 lines 15-24).

However, there is evidence that the AG Letter was a motivating factor in the decision. I have affirmed that defendant Gelbstein approached me on May 8, 2015 and states "Can't you go practice somewhere else, I saw what you wrote about me that I am complicit and incapable" (Complaint page 3). Defendant Gelbstein was conveniently, if not purposefully, not present in the Brooklyn TVB on the morning of May 11, 2015 (Exhibit A, Gelbstein deposition pages 4-5).

While the State cites *Skates v. Inc. Vil. Of Freeport*, 265 F.Supp.3d 222 (E.D.N.Y. 2017) (State's Brief, p. 26), in that case "There [wa]s no evidence that anyone who took adverse employment actions against Plaintiff, . . . , was aware of Plaintiff's" actions.  265 F.Supp.2d at 237-38.  Here, in contrast, even the State concedes that it is only "virtually all" of the complained of conduct that occurred before the AG Letter.

The State almost parenthetically writes that Calvo "must also be dismissed for lack of personal involvement" (State's Brief, p. 26), the facts demonstrate that she was in fact personally involved. Defendant Calvo was most assuredly personally involved. Defendant Gelbstein was not present in the Brooklyn TVB on the morning of May 11, 2015. (Exhibit A, Gelbstein deposition pages 4-5).  Defendant Traschen was not in the Brooklyn TVB on the morning of May 11, 2015, I was told to call legal counsel by defendant Calvo (Exhibit T)..

Defendant Calvo without observing the alleged incident between myself and defendant Smart (Exhibit C, Calvo deposition page 5), without being able to identify the witness who reported to her there was an incident, (Exhibit C, Calvo deposition page 5) who did not view the videotape of the incident, (Exhibit C, Calvo deposition page 6), who did not question myself, (Exhibit C, Calvo deposition page 9) or defendant Smart (Exhibit C, Calvo deposition page 8) made a determination to call defendant Gelbstein and "let him know what happened." Defendant Calvo had no basis to form a determination as to what happened yet I was removed and subsequently banned from the Brooklyn TVB on that representation.

I was told by defendant Calvo to call defendant Traschen., (Exhibit T). After the incident with Smart on May 11, 2015 I was banned permanently from all New York TVB with a two (2) minute phone call to defendant Traschen. on the morning of May 11, 2015. (Exhibit W). See phone log attached as Exhibit W, reference May 11, 9:57. This is the only time I spoke to defendant Traschen.  Defendant Traschen recalls having only one phone conversation with me and does not recall responding to anything in writing (Exhibit B, Traschen deposition, page 26 line 24-25, page 27, lines 1-4). I wrote multiple letters to the TVB none of which were responded to (See Exhibit X).

In fact defendant Calvo was likely to take sides with defendant Smart and take a personal interest on his behalf. In a similar incident of misconduct, (see Exhibit Y), a verbal confrontation between a security officer for the district office and defendant Smart at the Brooklyn TVB, and after a full and proper investigation the conclusion rendered was that that the confrontation was provoked by Smart. "Mr. Flores spoke with Mrs. Burke and the Bronx District Office manager Raquel Padilla, who was on site for a meeting, and both

8

state that the confrontation was provoked by Officer Smart." However, it goes on to state that defendant Calvo took sides opposing this determination, "Mrs. Calvo also stated the at she did not want Officer Smart fired, as she felt the incident was not his fault and that he was a very good guard."

The State also argues that "the only evidentiary basis [the Plaintiff] provides" for the "statement" that Gelbstein approached the Plaintiff and asked him to "go practice somewhere else," as he "saw what [he] wrote about" him and that he was implicit and incapable "is a citation to his own complaint, . . . ." (State's Brief, p. 27). This is a puzzling argument, as the State cites to the Plaintiff's Interrogatory Responses, not Complaint (*Id.*). Interrogatory Responses are under oath and constitute evidence.

The State effectively argues for the disputed issues of material fact to be construed in their favor and against the Plaintiff when it contends that judgment is appropriate where "the AG Letter was sent well before two unrelated intervening events: the May 5 incident . . . , and the May 11, 2015 altercation . . . ." (State's Brief, p. 27). This, by its own language, precludes a finding of undisputed material fact given that events occurring before the letter occurred.

Third, the State argues that Summary Judgment is appropriate because there is "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony," and "no reasonable person could believe" it (State's Brief, p. 28). However, the case to which it cites, *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) (*Id.*), does not support this position. There, Jeffreys signed a written confession to twelve burglaries, but the confession contained no reference to any police mistreatment. At his arraignment, plea, and sentencing, Jeffreys also made no

9

reference of any beating or defenestration. He first stated that he had been thrown out of a window by police nine months later in a conversation with a doctor in a correctional facility.

It was against "the weight of these confessions and failures to make his accusations known publicly," that Jeffreys offered one statement from his aunt as evidence that he called her from jail shortly after arrest and told her he had been thrown out of a window by police, and another from the mother of his child, to establish that at some time he told her the same.

Notably, Jeffreys could not "identify any of the individuals who he alleges participated in the attack, nor can he provide any description of their ethnicities, physical features, facial hair, weight, or clothing on the night in question." *Jeffreys*, 426 F.3d at 552. Nor could he recall how many police officers were there at any given time. *Id.*

Examination and testing at hospital revealed that Jeffreys suffered no external injury to his scalp or facial skin consistent with suffering a blow to the head with a hard round object (as claimed).

In light of the foregoing, the court ruled that Jeffreys' contentions – which relied solely on his own testimony as well as those of friends and family – raised no genuine issues of material fact. Jeffreys' "own testimony" was "so replete with inconsistencies and improbabilities that" no reasonable jury could find that excessive force was used against him. In fact, "permitting Jeffreys to present such incredulous testimony at trial would be a terrible waste of judicial resources and a fraud on the court." *Id.* at 553.

In sharp contrast to the *Jeffreys* case, here the State's complaints are effectively that the Plaintiff's allegations are, subjectively, "disconnected rants, half-baked grievances, and

10

dubious conspiracy theories; . . . ." (State's Brief, p. 28). Notably, each one of these adjectives is borne of the opposing writer's descriptions, rather than concrete contradiction. The State in part relies on the explanations that the Plaintiff gave not of what occurred (contrary to Jeffreys), but his pontification as to *why* the Defendants acted the way they did (State's Brief, p. 28).

The State's citation to *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98 (2d Cir. 2011) (State's Brief, p. 28), is likewise distinguishable. There, the plaintiff's opposition to the defendant's motion for summary judgment made contentions that impeached her own claims in an original and amended pleading. Here, in contrast, the State points to the Plaintiff's pontifications as to the *motivations* behind the Defendants' actions—not contradictions or impeachment of his own claims.

The State next argues that "the evidence adduced in discovery shows that" the Plaintiff's "TVB Practice Bar was manifestly caused by his own aggressive and erratic behavior, and that" it would have occurred "even if he never sent the AG Letter" (State's Brief, p. 29). It errs, however, in concluding – as it does – that the fact that no actions were taken against the Plaintiff "for months after the letter was sent" undermines "any claim of a causal nexus" (State's Brief, p. 29). Though a material fact exists as to whether the AG Letter was a motivating factor in the adverse action, the State argues that it was the "incidents of hostile and violent behavior that led ALJ Gelbstein and Ms. Traschen to institute the TBV Practice Ban - . . . ." (*Id.* at p. 30).

The State's almost parenthetical reference to 15 N.Y.C.R.R. 124.2(a)(*Id.*) is not on point, as it requires TVB attorneys to conform to standards of conduct required of attorneys appearing before State courts, and not be permitted to represent *clients* if they fail to do so.

The State non-sequentially tries to demonstrate the "lack of any connection between" the Plaintiff's expulsion and AG Letter "by" referencing "the fact that ALJ Gelbstein . . . took essentially the same action, in the same manner," back in 2011 (State's Brief, p. 30). The State hence asks the Court to find, as a matter of law, that the AG Letter could have played no role in the Practice Bar due to a decision made years beforehand. In effect, the State is suggesting that actions in the past equal explanations for actions in the future. This, at best, asks the Court to disregard very significant disputed issues of material fact in favor of borrowing its line of reasoning.

The fallacy in the State's argument is that the "but-for" causation "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of" the retaliatory motive. *Pena-Barrero v. City of New York*, 2017 WL 119447, 17 (S.D.N.Y. 2017).

### III.    Injunctive Relief is Available.

The State argues that the Plaintiff's demand for a federal injunction is barred by the express terms of 42 U.S.C. 1983 (State's Brief, p. 31). The problem with the argument is that "declaratory relief was unavailable" (State's Brief, pp. 31-32). In this way, the State recycles and relies upon its (disputed) conclusion that the Individual Defendants were engaged in "judicial acts" when expelling the Plaintiff from the building (State's Brief, p. 32). Because of this, the State's extended argument is built and based upon a faulty premise.

### IV.    There is, Minimally, a Disputed Issue of Material Fact as to Qualified Immunity.

Finally, the State argues that the Individual Defendants are protected by Qualified Immunity. It argues that the Plaintiff has not shown facts making out a Constitutional

violation; but, even so, "the nature of the First Amendment right in this context is" not "clearly established" (State's Brief, p. 33).

But here, too, the State relies on an argument that has already been addressed and that wavers on infirm ground, claiming that the Plaintiff is neither a private citizen nor a public official (*Id.* at p. 34). As briefed above, however, this conclusion is incorrect.

Lastly, whether it was in fact "objectively reasonable" for the Individual Defendants to conclude that the AG Letter "had no legal significance," which "alone is enough for qualified immunity" (*Id.* at p. 35). This was not a situation in which government officials made "reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S.Ct. 2074, 2085 (U.S. 2011). Instead, this was a situation in which persons in the TBV took administrative action that was not protected by any privilege.

**Conclusion**

For the reasons set forth above, the State's Motion for Summary Judgment should be denied.


July 29, 2021

Respectfully submitted,

Mario H. Capogrosso