# EXHTBIT N

Page 1

1    UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF NEW YORK

2    -------------------------------------------X

3    MARIO H. CAPOGROSSO

4                        Plaintiff,

5                                      Case No:

         - against -             1:18-CV-02710

6                                  (EKLB)

7    ALAN GELBSTEIN, et al.,

8                        Defendants.

9    -------------------------------------------X

10

11                   December 18, 2020

                     9:45 a.m.

12

13

14

15

16

17       VIRTUAL VIDEOTAPED EXAMINATION BEFORE TRIAL OF

18

19   MARIO H. CAPOGROSSO, the Plaintiff, pursuant to

20

21   Notice, taken at the above date and time, before

22

23   MARIA ACOCELLA, a Notary Public within and for the

24

25       State of New York.

Page 2

1   APPEARANCES:
2
3
4   MARIO H. CAPOGROSSO, ESQ., Pro Se
5     21 Sheldrake Place
6     New Rochelle, New York 10804
7
8
9
10  STATE OF NEW YORK
11  OFFICE OF THE ATTORNEY GENERAL
12  LETITIA JAMES
13    Attorneys for Defendants
14    28 Liberty Street
15    New York, New York 10005
16  BY: JAMES THOMPSON, ESQ.,
17    Assistant Attorney General
18    Litigation Bureau
19
20
21
22
23  ALSO PRESENT:  Howard Brodsky, Videographer
24
25

Page 3

1     Mario H. Capogrosso
2   THE VIDEOGRAPHER:  Good morning. Here
3   begins the video recorded virtual
4   remote deposition of Mario H.
5   Capogrosso, appearing from his location
6   in New Rochelle, New York.
7     This deposition is taken by the
8   Defendants in the matter of Mario H.
9   Capogrosso, Plaintiff, against Alan
10  Gelbstein, et al. defendants, Case
11  Number 1:18-CV-02710 and KBLB in the
12  United States District Court for the
13  Eastern District of New York.
14    Today is Friday, December 18,
15  2020. The time is approximately 9:45
16  a.m. eastern standard time.
17    My name is Howard Brodsky, and I
18  am the legal video specialist in
19  association with Veritext Legal
20  Solutions with offices, located in
21  New York, New York. The court reporter
22  is Maria Acocella, in association with
23  Veritext.
24    Will counsel please state their
25  appearances for the record.

Page 4

1     Mario H. Capogrosso
2   MR. THOMPSON:  Yes. James M.
3  Thompson, from the Office of the
4  Attorney General, Letitia James,
5  Attorney General of the State of
6  New York, 28 Liberty Street, New York,
7  New York 10005 on behalf of the State
8  Defendants.
9    THE WITNESS:  I am Mario
10  Capogrosso, Pro Se Plaintiff who happens
11  to also be an attorney; 21 Sheldrake
12  Place, New Rochelle, New York 10804.
13    THE VIDEOGRAPHER:  Thank you.
14  Counsel.
15    I am sorry. Go ahead.
16    MR. THOMPSON:  One slight
17  correction, Mr. Brodsky, on the case
18  number. The suffix is now -- the case
19  number is correct, but the suffix is now
20  EKLB.  A couple of months ago we were
21  assigned a different judge.
22    THE VIDEOGRAPHER:  Thank you very
23  much for that correction, Counsel.
24    The parties have stipulated and
25  agreed that the court reporter may take

Page 5

1     Mario H. Capogrosso
2  the witness's oath remotely.
3    Will the court reporter please
4  swear in the witness.
5    THE COURT REPORTER:  Can you
6  raise your right hand for me.
7    Do you solemnly swear the
8  testimony you are about to give will be
9  the whole truth and nothing but the
10  truth, so help you God?
11    THE WITNESS:  Yes, I do.
12    THE COURT REPORTER:  Thank you.
13    MR. THOMPSON:  Thank you very
14  much, Mr. Capogrosso.
15 M A R I O   H.   C A P O G R O S S O, the
16 Plaintiff herein, having been first duly
17 sworn by a Notary Public within and for the
18 State of New York, was examined and
19 testified as follows:
20 EXAMINATION BY
21 MR. THOMPSON:
22   Q.   My name is James Thompson.  I am
23 Assistant Attorney General, and I represent
24 the defendants in this lawsuit.
25    So during the deposition there is

2 (Pages 2 - 5)

Page 6

Mario H. Capogrosso

1 a couple of preliminaries. I am going to be
2 asking you a number of questions, and there
3 is a handful of things that are helpful to
4 remember for the benefit of the transcript
5 and the court reporter, first of which is
6 when I ask a question, please wait until the
7 end of my question before beginning your
8 answer. That way, we don't have the two of
9 us talking at the same time.
10         If I ask a question that you
11 don't understand, please ask me clarify it.
12 If you give me an answer, I will assume that
13 you understood the question.
14         Similarly, please make all your
15 answers are verbal. In regular conversation
16 you have people respond by nodding their head
17 or shaking their head and saying uh-huh or
18 uh-uh, and that can make the transcript
19 difficult, even in a case like this one,
20 where we have a videographer.
21         And if at any point in the
22 deposition you feel like you need a break,
23 just ask me, and we will take one. I may ask
24 you to finish answering the question that I

Page 7

Mario H. Capogrosso

1 posed or a short line of questioning. But if
2 you need a break, just let me know, and we
3 will definitely take it.
4         Does all of that make sense?
5 A.     Yes.
6 Q.     Great. So Mr. Capogrosso, what
7 is your full name?
8 A.     Mario H -- Mario Henry
9 Capogrosso.
10 Q.     And what is your date of birth,
11 sir?
12 A.     July 4, 1961.
13 Q.     And have you ever been deposed
14 before?
15 A.     No.
16 Q.     And do you understand that you
17 are under oath today?
18 A.     Yes.
19 Q.     And what is your understanding of
20 what that means?
21 A.     That I will tell the truth, as I
22 always have.
23 Q.     Are you suffering from any
24 illness or other condition that could affect

Page 8

Mario H. Capogrosso

1 your ability to answer questions truthfully
2 today?
3 A.     No.
4 Q.     Did you take any medication that
5 could affect your ability to answer questions
6 today?
7 A.     No.
8 Q.     Is there any other reason why you
9 might not be able to give complete and
10 truthful answers to the questions that you
11 are asked today?
12 A.     Absolutely not.
13 Q.     Great. Sir, are you represented
14 by counsel?
15 A.     I am representing myself. I am
16 an attorney. I am representing myself.
17 Q.     And have you ever been
18 represented by counsel in this case?
19 A.     No.
20 Q.     So what did you do to prepare for
21 today's deposition?
22 A.     I read -- I read my complaint. I
23 read all the pleadings that were filed in my
24 complaint. I read all the exhibits that I

Page 9

Mario H. Capogrosso

1 filed, all the response to discovery that you
2 provided; and that was it.
3 Q.     Have you discussed this
4 deposition with anyone?
5 A.     No.
6 Q.     All right. So, Mr. Capogrosso,
7 where did you grow up?
8 A.     In the Bronx, New York.
9 Q.     And where did you go to high
10 school?
11 A.     Iona Prep in New Rochelle.
12 Q.     And college?
13 A.     I went to three colleges. I have
14 a bachelor's of art from Columbia University
15 in 1983. And in 1992 I got a bachelor's of
16 science in mechanical engineering from
17 Manhattan College School of Engineering. And
18 I graduated from Quinnipiac School of Law in
19 May of 2000.
20 Q.     So tell me about that.
21         You graduated from college in
22 1983m and what did you do after you
23 graduated?
24 A.     I worked -- let me look at my

3 (Pages 6 - 9)

Mario H. Capogrosso

2 resume.
3        I worked as a laborer in a
4 construction, which my father was a project
5 manager for -- i.e., executive in the
6 construction company. I worked for him for
7 several years because I enjoyed it, truly
8 liked being outside, after sitting in a
9 classroom. And I didn't know which direction
10 to take my career in. I worked as a laborer.
11        Then I worked for a construction
12 company as draftsman and as a project
13 engineer out in the field.
14        Then I went -- decided to get my
15 engineering degree, and I went to engineering
16 school and finished my engineering degree.
17    Q.   So why did you decide to get an
18 engineering degree?
19    A.   Because I was working in the
20 engineering field. I enjoyed it. I enjoyed
21 it very much. I enjoyed the guys I was
22 working with. I enjoyed the people I was
23 working with. And I enjoyed working with my
24 dad very much. And wanted to go back and get
25 my engineering degree, which I did.

Mario H. Capogrosso

2    Q.   And did you like engineering
3 school?
4    A.   I liked -- well, it was fun. I
5 mean, I enjoyed the mathematical part of it,
6 yes. I enjoyed the people, and I enjoyed
7 the -- I was good at it. I was a good
8 engineer. I still am a good engineer.
9    Q.   So how long -- well, actually, I
10 am getting ahead of myself.
11        What did you do after you
12 graduated engineering school?
13    A.   I worked for an engineering
14 company, several engineering companies.
15    Q.   What did your duties there
16 entail?
17    A.   Well, I was hired by Ebasco
18 Engineering. I worked at a nuclear power
19 plant as a project engineer. Nuclear power
20 planet design engineer.
21        I did both design work and
22 project work. I was responsible for the
23 design work at several nuclear power plants,
24 and I enjoyed it. I liked it. It was fun.
25 I enjoyed it. I traveled a lot. I had to go

Mario H. Capogrosso

2 to different job sites, nuclear sites.
3        So -- and the one thing that I
4 was taught at these job sites, nuclear sites,
5 is that you tell the truth. You be very
6 truthful and very direct, because if you
7 don't, there are severe consequences. So
8 that is my personality.
9    Q.   Okay.
10    A.   I worked at nuclear power plants
11 and in various parts of the country. It was
12 design work and engineering work.
13    Q.   And you said the name of that
14 company was Ebasco Company, I am sorry?
15    A.   Ebasco, E-B-A-S-C-O. Esbaso,
16 which later became Racions (phonetic)
17 Engineers and Constructors.
18        Actually, before then it was
19 Washington Group International.
20    Q.   And --
21    A.   Go ahead.
22    Q.   How long did you work for them?
23    A.   I worked at -- let me see -- I
24 worked between 1992 and 1996 at various
25 engineering companies.

Mario H. Capogrosso

2        No, I worked -- no, I am sorry.
3 1992 to 1994 I worked for Ebasco Engineers,
4 then I worked from '94 to '96 with a
5 construction company that was doing retrofit
6 work on power plants. Then I worked for --
7 as a mechanical engineer to 2001, Washington
8 Group International, at various other nuclear
9 power plants.
10        And then I worked for BGA
11 Consulting Engineers, which we did also work
12 at nuclear plants, because they liked my work
13 in 2003.
14    Q.   And, Mr. Capogrosso, you look
15 from the picture as if you are looking at a
16 document there; is that correct?
17    A.   My resume.
18    Q.   Can I ask for a copy of that to
19 be produced to us?
20    A.   Yeah, sure.
21    Q.   Do you have any other documents
22 that you are looking at, as you are giving
23 testimony today?
24    A.   Well, I have all the exhibits
25 that I provided to you yesterday and I

4 (Pages 10 - 13)

1          Mario H. Capogrosso
2   provided in this case, and I have all your
3   discovery. That is what I have to refresh my
4   recollection.
5      Q.   Okay. So can you list for me the
6   documents you have in front of you? Because
7   normally when you do a deposition, there is
8   no documents in front of the witness other
9   than what is put in front of them as an
10  exhibit.
11     A.   Well, I do have certain exhibits.
12  I have all the exhibits that were provided to
13  you yesterday. That is what I have. That is
14  what I have in front me.
15     Q.   Okay.
16     A.   There are 86 exhibits. I have
17  all 86 exhibits. You don't want me to refer
18  to them to refresh my recollection, well,
19  then you have to make an objection, but that
20  is what I have in front me.
21     Q.   The problem is that since we are
22  on Zoom, I can't see what is in front of you
23  in the way I could if we were all around the
24  table together. So can I ask you to please
25  clear the desk in front of you.

1          Mario H. Capogrosso
2      A.   It is cleared. It is cleared.
3      Q.   Thank you.
4          So, Mr. Capogrosso, why did you
5   decide to go to law school?
6      A.   I liked learning. I liked, you
7   know, pursuing academic endeavors.
8          And truthfully, I was married and
9   divorced, and I was sitting in my apartment
10  all alone. I said -- I had nothing to do at
11  night. Let me go to law school; it will give
12  me something to do.
13         I put in an application. I take
14  the exam. And I didn't study very long for
15  the exam; took the book, I read through it.
16         They accepted me into law school.
17  So rather than siting at home in the
18  apartment, I figured let me sit in a law
19  school. So I worked as an engineer during
20  the day, and at night I went to law school,
21  for four years. Helped me get through my
22  divorce, kept me busy.
23     Q.   And did you have a particular
24  career intention when you applied to law
25  school?

1          Mario H. Capogrosso
2      A.   Not really. Not really.
3          I worked as an engineer after I
4   graduated. I graduated in 2000. I still
5   enjoyed working as an engineer.
6          But the company I worked for
7   wanted me to travel, and I didn't want to
8   travel anymore. They wanted me to go to the
9   west coast, California, and be an engineer in
10  one of the power -- out in Washington State,
11  actually, not California.
12         I didn't want to go to Washington
13  State. I just didn't. I said, let me -- I
14  passed two bars, New York and Connecticut,
15  but I was still working as an engineer.
16         I said, all right. Let me send
17  out a resume, see if somebody gives me a job.
18  I got a job offer, and I went and took it.
19     Q.   And where -- where was that job
20  offer?
21     A.   That job offer was at the
22  Brooklyn TVB.
23     Q.   Okay. So you applied to work at
24  the Brooklyn TVB?
25     A.   No. I applied to an attorney,

1          Mario H. Capogrosso
2   Terry Kalker, who is a lawyer down there who
3   was looking for a lawyer. I sent him [sic]
4   my resume. She [sic] responded. I said, you
5   know, I don't know what type of work she did.
6          But I went down, started working
7   for her as one of her attorneys.
8      Q.   And how do you spell Ms. Kalker's
9   name?
10     A.   K-A -- I think K-A-L-K-E-R.
11     Q.   And so can you tell me a little
12  bit about working for Ms. Kalker?
13     A.   Well, when I worked for her, it
14  seemed fine when I first started. When I
15  first started, it seemed fine.
16         But she made certain
17  representations to me that she didn't
18  fulfill. Now I was getting -- now medical
19  insurance is very important to me, and making
20  a representation of following through with it
21  is very important to me.
22         She made a representation that I
23  would have medical insurance after three
24  months. I worked for her for three months,
25  and I said, where is my medical insurance?

5 (Pages 14 - 17)

Page 18

Mario H. Capogrosso

1    Mario H. Capogrosso
2  Because I had it in my previous job.
3    Working for an engineer, if they
4  say something, they do it.
5    Terry Kalker didn't do that. She
6  said, well, you will get medical insurance a
7  year and three months from now, which upset
8  me greatly, very greatly.
9    So at that point I said, all
10  right, you don't want to pay me medical
11  insurance, you are not upholding what you
12  said you were going to do.
13    I left her and went into practice
14  for myself. And that is what I started doing
15  in June, June of 2005. I started work for
16  Terry Kalker in April 2005, April or March of
17  2005. I only spent three or four months with
18  her.
19    Q.    And how did she respond when you
20  objected?
21    A.    She continued with that
22  affirmation, you will get your insurance from
23  a year. I said, that is unacceptable. I
24  said, you can't make a representation and
25  don't follow through with it.

Page 19

1    Mario H. Capogrosso
2    So at that point I really -- I
3  started not to trust this woman anymore. I
4  said, that is enough. She was sent in -- I
5  normally, with my engineering firm, if they
6  sent me someplace, they always paid my
7  expenses.
8    She said she was going to pay
9  expenses, and then she decided not to pay
10  expenses. And she sending me to all
11  different courts, all over Long Island and
12  Upstate New York. I said, I can't afford
13  this. I can't afford it. Gas, tolls.
14    So at that point I said, you
15  know, you are not going to truthful with me,
16  I don't feel comfortable working with you. I
17  decided to end it.
18    My clients who I was representing
19  liked me, liked my representation, so I said,
20  I will do this on my own, which is what I
21  did.
22    Q.    So what was your salary with
23  Ms. Kalker?
24    A.    That beginning salary, what I
25  recall was $40,000 a year, back in 2005.

Page 20

Mario H. Capogrosso

1    Mario H. Capogrosso
2    Q.    And that is without expenses?
3    A.    Without expenses. Without
4  medical insurance. No, maybe it was 50. I
5  am not sure. I think maybe it was 50. Maybe
6  it was 50. I think she offered 40, and I got
7  her up to 50, something like that, between 40
8  and 50. It was either 40 or 50. I am not
9  exactly sure. I don't remember. She paid
10  me, you know, a weekly check. It might have
11  been 50. Might have been.
12    Q.    And how did that compare to your
13  engineer -- your work at the engineering
14  firm? What were you paid there?
15    A.    I was paid more, and they were
16  paying expenses. I don't recall the exact
17  last salary I had as an engineer, but it was
18  more than that.
19    Q.    Do you have a ballpark figure,
20  approximately?
21    A.    Maybe 57 or 80, plus they gave me
22  per diem, which means when I went to a job
23  site, which I often did, they gave me a daily
24  per diem.
25    Or if I had to stay there for

Page 21

1    Mario H. Capogrosso
2  several months, they gave me per diem to pay
3  for my living expenses. They treated their
4  employees very well.
5    But I made the decision to try to
6  be a lawyer, because I went to law school at
7  night. I didn't want to do any more
8  traveling. I made that decision, and I
9  wanted to stay in one place for a while.
10    And my company wanted me to
11  travel, and I didn't want to travel anymore
12  and so I said, let me give it -- I went to
13  law school and I passed two exams, so let me
14  try it. And I did, and my clients liked me.
15    Q.    And so you started your practice
16  before TVB, your solo practice before the TVB
17  at -- in summer of 2005, correct?
18    A.    June, early July, late June,
19  early July 2005.
20    Q.    And can you sort of describe your
21  practice to me.
22    A.    I represented motorists at
23  hearings, traffic violation hearings. The
24  clients loved me. Police officers didn't
25  like me because I really grilled them, did

6 (Pages 18 - 21)

1             Mario H. Capogrosso
2 grill them. I went after them.
3          My clients loved me; they did.
4          I submitted several reviews to
5 you, many reviews. My clients really liked
6 me as an attorney, they did. Police officers
7 didn't. I really went after a police officer
8 in the court, I did. It was my obligation.
9 I felt an obligation to my clients to
10 zealously defend.
11          I remember taking that oath when
12 I got admitted into the bar, you have an
13 obligation to zealously defend, and that is
14 what I did.
15     Q.    Was your practice primarily in
16 the South Brooklyn TVB?
17     A.    Yes, pretty much. Occasionally I
18 would get -- what happens is you get a ticket
19 that sometimes go to other courts, another
20 tribunal, so if you took it -- you take it,
21 you went. Sometimes you get one Upstate,
22 Upstate New York or Long Island. And you
23 took the case, you had to go, and I went.
24 Predominately it was in Brooklyn South.
25     Q.    If you have to put a percentage

1             Mario H. Capogrosso
2 on that, what percent of your work would you
3 say was in the South Brooklyn TVB?
4     A.    Ninety percent. 90 percent.
5     Q.    Did you practice before any other
6 administrative tribunals other than the TVB?
7     A.    Let me think. Other
8 administrative.
9          I went to criminal court, 346
10 Broadway, which is down in New York City. I
11 went to criminal court often. Occasionally.
12          Sometimes they had a pink ticket,
13 which is not a yellow ticket, and I would
14 have to go down to criminal court. But that
15 wasn't a --
16     Q.    Can you explain that to me?
17     A.    Well, sometimes some of these
18 motorists would get, as opposed to a yellow
19 ticket, they would get a pink ticket, which
20 was covered by the penal code of New York
21 State, and it is a little more graver
22 implications.
23          Normally everything got pled out.
24 But I would go down to certain criminal
25 courts. That's where police officers gave

1             Mario H. Capogrosso
2 violations, summons that had criminal
3 implications. They were held at a different
4 court, and I went there. But for the most
5 part, that was it.
6     Q.    Did you do any other criminal
7 work outside of the pink tickets?
8     A.    I had one where a guy was accused
9 of stealing some groceries from a grocery
10 store, and another one where a man got
11 involved in an altercation with his --
12 another man concerning parking his truck in
13 front of his business.
14          And I went down to Red Hook
15 Criminal Court in Red Hook. I went out to
16 immigration court once, and I represented a
17 client there who never showed up for his
18 hearing, and the case got thrown out. That
19 is what I recall. That is what I recall.
20     Q.    And so no other administrative
21 tribunal other than TVB?
22     A.    No. That would be it.
23     Q.    Did you ever practice before the
24 OATH, the Office of Administrative Trials and
25 Hearings for New York City?

1             Mario H. Capogrosso
2     A.    No. I would have remembered
3 that.
4     Q.    So you said that you had
5 litigated a couple of criminal cases in
6 New York State Court and one immigration
7 case.
8          Have you litigated any other
9 cases in State court, criminal or civil?
10     A.    Well, after that point in time I
11 worked for an attorney down in Brooklyn, so
12 yes, there were other cases I have litigated.
13          I worked for an attorney in
14 Connecticut after I was removed from the
15 Brooklyn TVB system, the New York TVB system.
16 I worked for an attorney in Connecticut.
17          I worked for an attorney -- as an
18 independent -- well, and I worked for an
19 attorney in Brooklyn.
20     Q.    So let's step back to the TVB for
21 a second.
22          Did you like practicing at TVB?
23     A.    I loved it. I loved it. They
24 were short: Got there at 8:30 the day was
25 over by 4:00. I loved it. I loved my

1        Mario H. Capogrosso
2 clients. My clients loved me. I liked it.
3 It wasn't a whole bunch of preparation for
4 it.
5        It was the same defenses, for the
6 most part. I liked being the courtroom. I
7 liked to speak. My clients liked me.
8        I was right down by the water. I
9 loved going to the beach. Afterwards, I
10 would go to beach. I loved it. It was a
11 short day. It was nice. I loved it.
12   Q.   You said a short day.
13        What were your average hours?
14   A.   8:30. Court opened at 8:30. Got
15 there right at 8:30 or 8:15. The doors
16 opened right at 8:30, and the day ended
17 Monday, Tuesday, Wednesday, Friday by 4:00.
18 All cases are wrapped up by 3:30. On
19 Thursday it went later, until 6:00. That was
20 a late day.
21        All you had to make sure was that
22 your calendar was kept properly. Calendar
23 was very important. You had to make sure
24 your calendar was right, and you had to make
25 sure you stayed in contact with these

1        Mario H. Capogrosso
2 motorists.
3        They wanted to know what
4 happened. I would make phone calls all the
5 time, whether I won, I lost. I always told
6 them to show up. I always wanted my client
7 with me in a courtroom, always. I wanted
8 them to hear what I did and what I said. I
9 wanted them to know, if they gave me money, I
10 was defending them. I wanted them to know
11 that.
12        A lot of other motorists -- other
13 attorneys didn't like that. They didn't want
14 their motorists showing up. I wanted my
15 guys --
16   Q.   So did you ever --
17   A.   Go ahead.
18   Q.   Did you ever consider taking
19 another job while you were at the TVB?
20   A.   No. I liked it. No, I really
21 liked it. I enjoyed it. I enjoyed it.
22        I know there were other aspects
23 of law, but I know it would have taken a
24 commitment. I enjoyed it.
25   Q.   And if you had to estimate, how

1        Mario H. Capogrosso
2 long were you planning on continuing to
3 practice at the TVB? Were you thinking of
4 retiring at some point?
5   A.   I am a working man. I am going
6 to die -- I am going to work until I die. I
7 am a working man. I was brought up that way.
8        I told you after I left Columbia,
9 my father put me as a laborer, and I worked
10 as a laborer. I am a working man. I am
11 going to work until I can't work anymore. I
12 don't believe in retirement. I am going to
13 work until I can't work any longer. That is
14 my opinion. That is how I --
15   Q.   All right. So after you were
16 expelled from practicing before the TVB in
17 2015, what did do you for work?
18   A.   Afterwards, very difficult to
19 find work. I am not a youngster. Very
20 difficult finding work. I sent out resumes.
21        First of all, first of all, the
22 most important thing I did is I called every
23 one of my clients. I had 850 clients. I
24 called every one of them. I said, give me
25 your address, and I have to return money.

1        Mario H. Capogrosso
2 Because everybody who paid me a fee, and I
3 didn't complete that case, their money got
4 returned. Everyone got their money back.
5 Everyone. Give me an address, and for the
6 most part, for a long time, long time, I was
7 writing checks to return money.
8        I am not going to be called a
9 thief. I am no thief. I returned money. I
10 did that for a long time. And I don't think
11 you have one complaint from a motorist I
12 didn't return a fee to, not one. I returned
13 every fee that I did not earn because I
14 didn't complete the case.
15        Then when that got completed --
16 that took some time -- motorists were calling
17 me daily, daily: Where are you? Why aren't
18 you showing up? It was a real headache.
19 They were calling me daily, all hours of the
20 night, where is my money? How come you
21 didn't return my money? I did return your
22 money.
23        Well, how come I didn't get it
24 yet? Give it a couple of days in the mail.
25        I returned every dollar. It took

8 (Pages 26 - 29)

Mario H. Capogrosso

1  a long time to tell my clients, I am not
2  practicing this type of law right now. A lot
3  were asking, why not? Well, that was it.
4
5        So I did that for a while. That
6  took a long time, a good portion of time to
7  clear all the cases up.
8        And then I put out resumes, and I
9  got an offer in Connecticut. I worked from
10 Connecticut. And then I got the offer in
11 Brooklyn; I worked in Brooklyn.
12    Q.    So tell me about the position in
13 Connecticut. What organization was that
14 with?
15    A.    It was for a law firm in
16 Connecticut.
17    Q.    And what was the name of that law
18 firm?
19    A.    Law Firm of Frank Peluso,
20 P-E-L-U-S-O.
21    Q.    P-E-L-U-S-O.
22        And when did you start working
23 there?
24    A.    You don't want me referring to my
25 resume. Let me think. 2015, this happened.

Mario H. Capogrosso

1
2  I don't know. Two thousand --
3     Q.    You can look at your resume if
4  you want; that is fine. Just please provide
5  us with a copy of it after.
6     A.    2016, I think. I think it was
7  2016, I believe.
8     Q.    Do you know what month in 2016?
9     A.    No. I was working as an
10 independent contractor. He paid me on a
11 1099. So everything was always paid on 1099.
12     So was I officially with the
13 firm. I reported to the firm every day. I
14 reported to him every day.
15     Was I under -- was I salaried
16 employed? No, I was being paid on 1099.
17     Q.    Do you remember sort of what time
18 of the year it was that you started working
19 there?
20     A.    No.
21     Q.    Spring, summer, fall?
22     A.    Had to be in -- let me think. I
23 think it was May. May 2016, I think.
24     Q.    Okay. And what did your work for
25 the Peluso firm consist of?

Mario H. Capogrosso

1     A.    We had personal injury cases. I
2  had one in New York, one in Connecticut,
3  several in New York, several in Connecticut.
4  I am licensed in both states. He liked that.
5
6        I represented some criminal
7  defendants in criminal matters. I think we
8  had a couple of divorce cases. He was a
9  general practitioner.
10    Q.    And how much were you paid for
11 that work?
12    A.    I don't recall the exact salary.
13 I don't. I know he paid me on a weekly
14 basis. Might have been -- I don't know. Let
15 me think. 1100 to 1200. Thousand or 1100 a
16 week, something like that. 200 a day, 250 a
17 day, something like that. He paid me on a
18 weekly basis, you know, 200 to $250 a day,
19 from what I recall.
20    Q.    And so why did you stop working
21 for the Peluso firm?
22    A.    He lost his malpractice
23 insurance. It was an issue. I am not going
24 to go into the details of it, but he lost his
25 malpractice insurance.

Mario H. Capogrosso

1
2        I said Frank, I can't work for a
3  person that doesn't have malpractice, I
4  can't. I said, do you want to pay for my
5  malpractice insurance? I didn't feel
6  comfortable with that, because then it is not
7  under my license. I am really practicing
8  under my license.
9        I said, Frank, you gotta get
10 malpractice. You lost it. I said, I don't
11 feel comfort. I have to leave you. If you
12 don't have malpractice -- he had a problem or
13 issue; I don't want to get into it.
14        But he couldn't get malpractice
15 insurance. I said, I can't take a chance,
16 Frank.
17    Q.    Can you give me a quick summary
18 of what the issue was?
19    A.    I don't recall the -- you know,
20 you have to ask -- I don't know the issue. I
21 know one day he told me he had no
22 malpractice.
23        Frank, I can't work. I am sorry.
24        I don't know what his issue was.
25 I didn't get into it. I know he had

9 (Pages 30 - 33)

Mario H. Capogrosso

2 litigation going on, and the insurance
3 company decided to drop him, and he couldn't
4 get it anyplace else.
5    Q.    Did the issue have anything to do
6 with any of the cases you were working on?
7    A.    No, no. Before I got there, he
8 had an issue on a matter.
9        No, not me. Not me. No, I
10 wasn't involved in the malpractice suit.
11 Didn't mention my name at any point. Didn't
12 mention me. Mentioned him. And then he
13 showed up.
14    Q.    Um --
15    A.    -- go ahead.
16    Q.    I am sorry. I didn't mean to cut
17 you off.
18    A.    Well, before I took the job, I
19 didn't know he had this issue. I had no
20 idea. No idea. So I took the job.
21        Then I am into the job, and he
22 tells me, well, they dropped me. Well, what
23 do you want me to do, Frank? Had nothing to
24 do with what I did. I was never named in any
25 grievance or anything like that. Not.

Mario H. Capogrosso

2    Q.    And if you had to estimate, how
3 many personal injury cases did you do while
4 you were there?
5    A.    Oh, I don't know. Personal
6 injury, maybe -- oh, I don't know. The cases
7 were all -- he had a lot of them. The ones I
8 actually bring to complete -- I worked on a
9 lot of them. Do I recall?
10        You know, he had a lot -- he had
11 cases. But the ones I actually brought to
12 completion while I was there, maybe three or
13 four.
14    Q.    And cases you worked on, in
15 total? Just estimate.
16    A.    At least 50. At least 50 cases
17 that I had. But I only brought to completion
18 maybe three or four, in terms of --
19    Q.    How many criminal cases would you
20 say you worked on with the Peluso firm?
21    A.    Oh, he had cases, five or six
22 that I completed. I said they were ongoing.
23 They don't get completed overnight. They
24 were ongoing.
25    Q.    Yeah. Five or six that you

Mario H. Capogrosso

2 completed.
3        And what is an estimate of how
4 many that you worked on at one point or
5 another?
6    A.    He had a caseload. He had at
7 least 75 cases in the office that I touched,
8 that I had to get some type -- you know, that
9 I was working, that he was throwing at me on
10 different levels.
11    Q.    The Peluso Firm, did you do any
12 legal work other than personal injury and
13 criminal defense?
14    A.    We had a land dispute, a land
15 dispute that I helped resolve. We settled
16 that between parties, between two parties.
17 Somebody putting up a fence, that I remember.
18        What else? Divorce case that I
19 helped work on. And that was it.
20    Q.    Okay. And when did you stop
21 working for the Peluso Firm?
22    A.    When I found out that he lost the
23 malpractice.
24    Q.    And when was that?
25    A.    That would have been -- let me

Mario H. Capogrosso

2 see. Probably in '17. The beginning of
3 2017. Beginning of 2017. Yeah, 2017.
4    Q.    Okay. And what did you do after
5 you stopped working with the Peluso Firm?
6    A.    Well, then I was looking for
7 work. It is not easy, finding a job at my
8 age. I am 59 years old, not easy. I started
9 looking for work.
10        So I was taking whatever I could.
11 I was doing per diem work. I was sent out
12 to -- they have this thing called Attorneys
13 on Demand, AOD. I put my resume out there.
14 So I would go -- for a while I was doing
15 that, Attorneys on Demand. If they had a
16 case, I would go out to the case and do an
17 appearance and pay me for the appearance. I
18 did that for a while.
19    Q.    And about how much were you paid
20 by AOD?
21    A.    Oh, geez, it was substance level.
22 You had to bargain with them, too. You know,
23 there was a lot of attorneys. You know,
24 everybody -- if you were an attorney that
25 regularly went there, they gave it to them

10 (Pages 34 - 37)

Mario H. Capogrosso

1 first. It was nothing. 50. $75 maybe.
2
3    Q.    For an appearance?
4    A.    Yeah. hundred dollars an
5 appearance, maybe. Hundred dollars an
6 appearance was max.
7         But you took what you could get.
8 I gotta eat. You took what you could get.
9    Q.    And other than for AOD, did you
10 work at any other organizations at this time
11 before you joined the Brooklyn firm?
12    A.    I did some per diem work for a
13 couple of lawyers who needed some help on
14 certain things. I forgot their names. I
15 really did forget their names.
16         It wasn't a long time that I
17 worked for them. It was per diem. They --
18 work who needed some extra help. I forget
19 their names, I do.
20         And then I got the opportunity to
21 work with -- in Brooklyn in 2018. and I took
22 that position.
23    Q.    Did you -- you know, before we
24 get to the Brooklyn position, did you do any
25 cases yourself? Did you have any of your own

Mario H. Capogrosso

1
2 clients?
3    A.    No. no. All my clients got
4 returned to me.
5         My reputation in Brooklyn got
6 ruined. My reputation in Brooklyn got ruined
7 because of this.
8         And I didn't want to go out on my
9 own yet until this got resolved. I wanted
10 this put to an end. I wanted my reputation
11 reestablished. I want to tell my clients,
12 yeah, I won this case. and I am back to
13 practicing law, and I am a good lawyer. And
14 I wanted this case resolved before I went
15 back on my own on a full-time basis, because
16 my reputation got ruined, and I wanted this
17 resolved.
18    Q.    So you said you took a job in
19 2018 with a firm in Brooklyn; is that
20 correct?
21    A.    The law firm of Yuan Jiang.
22    Q.    And can you spell Yuan Jiang?
23    A.    Yuan, Y-U-A-N, Jiang, J-I-A-N-G.
24    Q.    And how did you get connected to
25 the job with the Yuan Jiang firm?

Mario II. Capogrosso

1
2    A.    I went on Craigslist he had
3 posted a job offering. I sent out my resume.
4         He was a nice guy, Yuan. I got
5 nothing bad to say about him. He is a really
6 nice guy. I sent out my resume. He was a
7 nice guy, Yuan, and he gave me a job. And I
8 am thankful for it, very thankful.
9    Q.    And when did you start working
10 with the Jiang firm?
11    A.    Once again, he paid me on a 1099.
12 But I was with the firm. I was. He paid me
13 on a 1099. It was his firm. I started in
14 March. I know the exact date, actually. I
15 think it was March 26, 2018.
16    Q.    And what did your duties consist
17 of at the Jiang firm?
18    A.    Well, one of his lead attorneys.
19 It was me, him, in the office. There was
20 another attorney who left right away.
21 Another attorney came in. And then there was
22 about three paralegals. And his wife was
23 there. She ran the front desk. But I was
24 one of the attorneys.
25    Q.    So what did you do for them?

Mario H. Capogrosso

1
2    A.    Drafted complaints, personal
3 injuries cases, drafted complaints, filed
4 complaints, answered complaints. Had
5 criminal cases we did that. What else?
6 Personal injury and criminal complaint work.
7         He had immigration work, which I
8 did a little bit of, but then he brought
9 somebody in who had a lot of experience in
10 immigration. I didn't have the experience.
11 I had one experience with immigration. But
12 he brought somebody in who was pretty good
13 with immigration. And that was it.
14    Q.    And if you had to estimate, you
15 know, how many personal injury cases and how
16 many criminal cases -- let ask one at a time.
17         How many personal injury cases
18 did you work on for the Jiang firm?
19    A.    Like I said, probably touched --
20 you know, he had a lot of cases coming in.
21 He had a lot; 45, 40 to 45. You know, I
22 would say about 40 cases. And criminal work,
23 another 15.
24    Q.    And anything other than criminal
25 and personal injury?

11 (Pages 38 - 41)

Mario H. Capogrosso

2    A.    We had a matrimonial case. I
3 enjoyed that one. And I thought the lady was
4 being treated very badly. It was a lady that
5 had been treated very, very badly. I wanted
6 a nice settlement for her, and I was very
7 happy with that case. We had a -- I had a
8 divorce case -- we actually had a couple of
9 cases. The one I actually settled,
10 and I got a nice settlement on, I was very
11 happy with.
12    Q.    And so what was your compensation
13 while you were at the Jiang firm?
14    A.    It was 85,000 a year. 85,000.
15 But I was paid on a weekly basis.
16    Q.    Did that include benefits?
17    A.    No benefits, no.
18    Q.    No insurance?
19    A.    No. He covered my malpractice
20 insurance. He covered the malpractice, and I
21 was -- it was great. But other than that,
22 nothing, no.
23    Q.    And so how long were you at the
24 Jiang firm for?
25    A.    Until COVID 19 hit. The last day

Mario H. Capogrosso

2 he closed the firm down, in March, what was
3 it 2020. March 17th, put a notice on the
4 front door said, we are closed right now. He
5 had me working from home like a week or two,
6 and said, this is not working, and put a
7 notice on the door and said we are closed.
8 It was exactly March 17, 2020.
9    Q.    So March 17th was your last day
10 working for the Jiang firm?
11    A.    Yes.
12    Q.    And it was an amicable
13 separation?
14    A.    Yeah. You know, he closed the
15 door down. Thank you. Thank you very much,
16 you know.
17    Q.    At the point when -- at the point
18 where the COVID crisis is over, do you expect
19 that you will go back to work for the Jiang
20 firm?
21    A.    I think he has moved on. I
22 haven't really spoken to him. I think he is
23 open now, and he hasn't reached out to me.
24 So I am sure he has moved on.
25        I don't want to go back into a

Mario H. Capogrosso

2 situation where I am meeting clients and
3 interacting with clients. I am fearful. I
4 am 59 years old, I am and I have had two
5 relatives who have died of this disease
6 already.
7    Q.    I am very sorry.
8    A.    Thank you. I am sorry. Thank
9 you.
10        I am fearful of interacting with
11 clients on a daily basis, I am. So until I
12 get vaccinated --
13        And I think Jiang has moved on.
14 I did drive by the office, and I saw it was
15 open. So at some level, he is open.
16        But I don't know what his
17 caseload is like, and I don't know if he is
18 generating any revenue.
19    Q.    And you haven't reached out to
20 him about that?
21    A.    No. I do wish him the best. He
22 is nice guy, Yuan. He is a nice guy and nice
23 wife. And I do wish him the best, yes.
24    Q.    So what you are doing for work
25 currently?

Mario H. Capogrosso

2    A.    Nothing. Nothing. Nothing.
3 Nothing.
4    Q.    You don't have any clients of
5 your own?
6    A.    No, nope. I told you, I need
7 this resolved. I need this resolved. One
8 way or the other, I need this resolved.
9 Either my name gets cleared as an attorney,
10 my name gets cleared and my reputation gets
11 reestablished as an attorney, or I move on in
12 another direction, because I am -- or I move
13 on. That is my feeling on this.
14    Q.    You said move on in another
15 direction. What would that be?
16    A.    I don't know. I don't know. I
17 will go out and do something to make a
18 living.
19        I do get made pandemic
20 assistance. I do. I am not going to lie
21 about that; I do get pandemic assistance. It
22 is going to run out very shortly; it will.
23 At that point, I don't know what I am going
24 to do. I will have to figure it out.
25    Q.    When you say pandemic assistance,

12 (Pages 42 - 45)

1        Mario H. Capogrosso
2 you mean unemployment?
3     A.    Yes.
4     Q.    And this is under the -- what is
5 it, the Cares Act that they passed?
6     A.    Yeah. I am not sure under what
7 act it was. But I do get PUA, pandemic
8 unemployment assistance. But it is going to
9 be running out. You get 39 weeks of it.
10    Q.    So you haven't done any legal or
11 other work since leaving the Jiang firm in
12 March; is that correct?
13    A.    Other than the work on my case,
14 and other than work on this case, no.
15        Wait, no. I had one client. He
16 is a friend, not really a client. He has a
17 friend that I talked to about a case.
18        Other than that, no.
19    Q.    All right. Was that -- did he
20 pay you for that legal advice?
21    A.    No. Nope. It was friend. A
22 friend. He was going -- he wanted to try to
23 establish visitation rights with his child.
24        First of all, I don't think it is
25 appropriate to represent friends or family.

1        Mario H. Capogrosso
2 You get too emotionally involved. Especially
3 me, I get too emotionally involved.
4        He has another attorney now, and
5 I wish him the best. I hope he gets
6 visitation, because he is a nice guy. And
7 that is it.
8     Q.    And do you have any other sources
9 of income at this time?
10    A.    No. I day trade a little bit,
11 making some money day trading. That is very
12 chancy. I have to resort to that, but I did
13 make some money day trading.
14    Q.    About how much money did you make
15 day trading?
16    A.    Oh, I don't know. How much money
17 do you lose day trading, is more like it.
18 There is no guaranteed money day trading.
19    Q.    Are you good at it? Do you win
20 more than you lose?
21    A.    There is no way to generate an
22 income. I am okay, but I don't generate any
23 significant -- first of all, you need money
24 to day trade.
25        I am okay. I am okay. I am not

1        Mario H. Capogrosso
2 great, but I to have resort to that right
3 now, but --
4     Q.    Would you say you make a couple
5 of thousand a year, more or less?
6     A.    I don't know. I don't know. I
7 really don't know.
8        It is not a thing I do often. It
9 is not something I can rely on, let me say
10 that. It is not something I can rely on.
11        I prefer being an engineer or
12 being a lawyer. You know, I enjoyed what I
13 was doing down in Brooklyn. I enjoyed being
14 an engineer.
15        I want this resolved. And once
16 this is resolved, I will make the decision
17 what direction to go in.
18    Q.    And you had mentioned that if you
19 don't prevail in the case, you would be
20 looking to do something else. Do you mean
21 something nonlegal, or do you have an idea in
22 mind?
23    A.    I don't know. I don't like the
24 way the legal professional acts. I don't --
25 I worked for an engineer a long time in my

1        Mario H. Capogrosso
2 life, nuclear -- at a nuclear -- if I lied
3 once, I was off the job. Once. Good-bye.
4        If I said inappropriate -- if I
5 didn't know anything, I kept my mouth shut.
6 But I would never say -- I would never lie.
7 I mean, it is not accepted.
8        I have dealt with more lawyers
9 and judges who have lied, who have not
10 investigated facts. Terry Kalker, who I
11 started out with, who told me, you will have
12 medical insurance in three months, which was
13 a lie, which is why I left her.
14        Yuan didn't do it. Yuan was a
15 straight guy.
16        Frank Peluso, who lost his
17 malpractice insurance.
18        I dealt with more lawyers who
19 have lied that I can -- it just disturbed the
20 heck out of me. It does. It does disturb
21 it. I am a very truthful guy.
22        In engineering, you cannot be
23 non-truthful. So I do want to stay in this
24 professional -- I don't know. I don't know
25 at this point.

13 (Pages 46 - 49)

Mario H. Capogrosso
2      I want to clear my name; that is
3 what I do know.
4      Q.   So that is what this case is
5 about for you, clearing your name?
6      A.   Clearing my name and getting the
7 money that I lost that I could have made.
8           I am a working man. Like I told
9 you, I am a working man.
10          I had to return a lot of fees, a
11 lot of fees, and I was put out of work
12 wrongly. Wrongly I was put out of work.
13     Q.   So can you summarize for me what
14 this case is about?
15     A.   Vindication of my name, my
16 reputation as an attorney. To getting the
17 money that I lost because I couldn't work as
18 an attorney. The money I had to return.
19          And for a Brooklyn jury to make a
20 decision, whether there are judges and
21 lawyers who have lied on my behalf to get rid
22 of me, because Judge Gelbstein needed a piece
23 of the action. Because he has lunch with
24 ticket brokers on a weekly basis. He has
25 other attorneys covering for him on cases

Mario H. Capogrosso
2 down there, and he wanted me out.
3           And judges like that shouldn't be
4 practicing, and he shouldn't be covered for
5 by his superiors. And complaints should not
6 be made against a hard working attorney like
7 myself, which is what I was.
8           There was not one grievance from
9 a motorist or a client against -- what he did
10 for them, not one grievance.
11          And my reputation has to be
12 besmirched, and they wanted me out of there
13 because I told the truth and reported what I
14 saw and heard, and they wanted me out of
15 there.
16          And they set me up. Not only the
17 incident with Yaakov Brody, which I think I
18 was set up on, but with these two who --
19 David Smart.
20          And then repeated it -- repeated
21 pleas for help, not only with your office,
22 where my complaint was lost and was never
23 responded to in my letter of March 20, 2015;
24 it was lost.
25          And I believe I was set up, and I

Mario H. Capogrosso
2 believe a Brooklyn jury has to hear it. And
3 people should be punished for their actions.
4 And how I was treated, they should be
5 punished. That is what this case is about.
6      Q.   So I mean, so some of this is
7 items that I intend to get to a little later
8 in the deposition.
9           You mentioned a couple of
10 incidents just now regarding Judge Gelbstein
11 and some allegations that you feel are valid.
12 You said something about a piece of the
13 action. Can you explain that to me?
14     A.   First meeting with Judge
15 Gelbstein, first meeting when I arrived, we
16 had a meeting. He arrived pretty much a
17 couple weeks or months after I arrived. He
18 has a meeting with all the lawyers.
19          And one of the first things I
20 remember -- I have a very good memory. I
21 have a very good memory -- how do I get a
22 piece of the action? How do I get a piece of
23 action? This is judge asking for a piece of
24 the action.
25     Q.   So can you explain to me sort of

Mario H. Capogrosso
2 the context in which that came up, like what
3 was said before that?
4      A.   I don't know if he is saying it
5 in what respect. But if you say to another
6 attorney, how do I get a piece of the action,
7 and you are a judge, and you think you are
8 saying this facetiously or being funny, I
9 don't accept it that way.
10          I don't -- I am a young attorney
11 down there. I am just kind of observing. It
12 hit me the wrong way, for a judge to say, how
13 do I get a piece of the action?
14          He had an attorney's meeting with
15 all the attorneys down there, all the regular
16 attorneys he calls it. He wanted a meeting
17 with everybody when I first arrived.
18     Q.   And when was this, what year?
19     A.   Well, I started working down in
20 June of -- like I said, June of 2005. So it
21 was right at that point, after that point, a
22 couple of months afterwards, he arrived;
23 July, August.
24     Q.   July, August 2005?
25     A.   Yes. He had the first meeting

14 (Pages 50 - 53)

Page 54

1      Mario H. Capogrosso
2 with all the regular attorneys down there,
3 and I was one of them at that point.
4      Q.    And can you tell me what happened
5 in the meeting?
6      A.    He was introducing himself as
7 Judge Gelbstein, and he makes this remark.
8            And I didn't know how this game
9 was played down there. And eventually I
10 found out what is going on.
11           And looking around, I said, this
12 judge might be getting a piece of the action.
13 Was I upset about it?
14 Absolutely.
15     Q.    So going back to the meeting, he
16 just said out of nowhere -- was anything said
17 before he said that? Did someone ask him a
18 question? Or was he talking about something
19 else?
20     A.    No, no. No, just makes the
21 remark, how do I get a piece of the action?
22     Q.    Just out of nowhere, how do I get
23 a piece of the action?
24     A.    Yeah.
25           Then I see a meeting with ticket

Page 55

1      Mario H. Capogrosso
2 brokers on a weekly basis.
3            Ticket brokers is a guy who comes
4 down there; that is what happens. They give
5 summons to lawyers, and these ticket brokers
6 are in his office every week.
7            And I asked -- walked in one day
8 said, what is going on?
9      Q.    Let's take a step back to the
10 initial meeting that we are talking about
11 here, if you would.
12           You had said you didn't think it
13 was funny, or that he was being facetious.
14           Was he joking when he said this?
15     A.    I don't know. I don't know.
16     Q.    Do you think he thought he was
17 joking?
18     A.    I don't know.
19           Listen, I came from a background,
20 if a man said something, you held him to his
21 word. That is the background I came from. I
22 came from an engineering background.
23           If a judge says something -- we
24 are all adults here, and he is a judge. He
25 is not a guy; you know, he is a judge. He is

Page 56

1      Mario H. Capogrosso
2 a lawyer.
3            You say that, and you expect me
4 to not accept it as truth? I don't know how
5 he meant or said it. I know he said it. I
6 am testifying to what I heard. I am not
7 getting paid --
8      Q.    Did he say --
9      A.    I am not getting paid to do the
10 Attorney General -- I shouldn't be looking
11 into this. This is not my responsibility to
12 be looking into, if a judge says how do I get
13 a piece of the action. I don't think it is
14 my responsibility. I reported what I heard.
15     Q.    Was there any other context
16 about, you know, that indicated what he might
17 have meant, that you recall?
18     A.    No. He said, I hope you guys all
19 make a lot of money. I know that, something
20 to that effect, that -- you know, I hope all
21 you attorneys make money.
22           He was introducing himself to the
23 attorneys. And he ended it with how do I get
24 a piece of the action?
25     Q.    All right. So the second item

Page 57

1      Mario H. Capogrosso
2 that you raised was something to do with
3 ticket brokers. Can you explain that to me?
4      A.    Ticket brokers are guys that
5 gather tickets from the community: Cab
6 drivers, motorists. And they would bring the
7 ticket down to lawyers. The lawyers would
8 take the ticket and argue the case on behalf
9 of the ticket broker and the client without
10 ever meeting the client himself.
11           And they would get a piece of the
12 action, the ticket brokers.
13     Q.    So the ticket broker would get a
14 cut of the legal fee?
15     A.    The ticket broker would collect
16 the legal fee, which I thought was terrible,
17 and they would pay the lawyer. The ticket
18 broker would take 200 for a ticket, call
19 himself a lawyer. I don't know that he was
20 calling himself. Then they would come down
21 to the courthouse, and every -- all the
22 attorneys had them. And the ticket broker
23 would give the lawyer money, and then the
24 lawyer would argue the case, take the case
25 on.

15 (Pages 54 - 57)

Veritext Legal Solutions

Page 58

Mario H. Capogrosso

2  Q.  You said he -- at one point in
3 that description, is there one specific
4 ticket broker you are thinking about?
5  A.  There were a lot of ticket
6 brokers, a lot of ticket brokers: Chinese
7 ticket brokers, Jewish ticket brokers.
8       I felt terrible about it. To me,
9 I called the bar association about it. I
10 said, is this wrong, for ticket brokers to
11 come down and pay lawyers to do tickets for
12 people who are not themselves?
13      The bar association couldn't give
14 me a straight answer. So, you know, for the
15 longest time -- first of all, they were
16 taking money out of the attorney's pocket,
17 which I didn't like.
18      And I did call the bar
19 association, and they didn't give me a
20 straight answer, or they didn't understand
21 it. So that was it.
22  Q.  And you indicated that you found
23 something objectionable about the way Judge
24 Gelbstein handled ticket brokers. Can you
25 explain that?

Page 59

Mario H. Capogrosso

2  A.  They were in his office. They
3 were in his office on a weekly basis.
4       And I walked into -- I knocked on
5 his door one day, and I said, do you know who
6 you are having lunch with here? He says, he
7 is a friend of my wife. I have dinner with
8 him, but I don't know what he does for
9 living.
10  Q.  Who is this, that we are talking
11 about?
12  A.  This is one of the Jewish ticket
13 brokers.
14  Q.  Do you know his name, sir?
15  A.  No. I didn't want to know his
16 name.
17      I didn't want to deal with these
18 guys; I really didn't. I really didn't want
19 to deal with them. I thought what they did
20 was wrong. They were taking money out of the
21 attorney's pocket, number one. Number two, I
22 don't know what kind of representations they
23 were making. They were making
24 representations in order to get these monies
25 from these clients and these motorists. They

Page 60

Mario H. Capogrosso

2 were saying something to them, and I don't
3 know what they were saying.
4       But to me, there was an
5 appearance of impropriety. I didn't want to
6 get involved with it. I felt it was
7 abhorrent that ticket brokers would be in his
8 office, abhorrent.
9  Q.  Is it correct to say there is one
10 particular ticket broker who was in his
11 office, the one who he said was a friend of
12 his wife's?
13  A.  I think there was a father and a
14 son. They were related on some basis. They
15 were related. I don't know any names.
16  Q.  Do you know anything else that
17 would identify them, of description or other,
18 you know, information?
19  A.  No, no. They had the Jewish --
20 one man has the traditional Jewish. I don't
21 know, garb that Jewish people wear. Another
22 person didn't.
23      But I know what they did. They
24 weren't lawyers. I knew the lawyers down
25 there. They were not lawyers. And I knew

Page 61

Mario H. Capogrosso

2 what they did.
3  Q.  And so Judge Gelbstein was having
4 lunch with them?
5  A.  They were in his office on a
6 weekly basis. In his office on a weekly
7 basis.
8       Now, I do --
9  Q.  Um -- I am sorry, continue.
10  A.  Well, there was another lady,
11 Tanya Rabinovich who I mentioned, who was
12 down there, actually in the courtroom,
13 calling herself a lawyer.
14      But clients, motorists, would
15 approach me and say, where is Tanya, the
16 lawyer? I said, she is not a lawyer. She is
17 not a lawyer. Where is Tanya the lawyer?
18 Where is Tanya the lawyer? She is not a
19 lawyer.
20      She had an office right near the
21 DMV at one point, right near the DMV
22 upstairs. Where is Tanya, the lawyer? I
23 said, she is not a lawyer.
24      I called the district attorney
25 one day. I said, you have a woman down here

16 (Pages 58 - 61)

1       Mario H. Capogrosso
2 calling herself a lawyer. Does anybody care?
3 She is making representations that she has a
4 legal degree, and she is not a lawyer.
5       You know, I went to law school at
6 night for four years while I worked during
7 the day, a full day as an engineer at a
8 nuclear power plant. I worked at night. I
9 went a hundred grand in debt to go to this
10 law school.
11      And I paid off every dollar.
12 Every dollar got paid off. I didn't renege
13 on any loans that I took. Every dollar got
14 paid off. I passed two bar exams.
15      And she gets to call herself a
16 lawyer in his courtroom, so I called the
17 district attorney concerning her. There is
18 an investigation made.
19      Next thing I know, she is not
20 there any more. And Gelbstein -- Judge
21 Gelbstein approaches me and says, who are
22 you, Don Quixote? I said, now I know this
23 guy is on the take. Now I know it. He wants
24 everybody to be quiet. He wants everything
25 to go on as is.

1       Mario H. Capogrosso
2       It is in my opinion, and I am
3 entitled to my opinion. Now I know this guy
4 is on the take.
5    Q.   And so let's take a step back.
6       This conversation where he said,
7 who are you, Don Quixote, when did that
8 happen?
9    A.   That is after I called the
10 district attorney on this woman, then I don't
11 see her anymore.
12   Q.   Do you know when that was?
13   A.   You know, when I first got there,
14 I didn't understand the game, who all the
15 players were. But after I started practicing
16 down there, it is when the clerks started not
17 to like me.
18      They liked Tanya. And I have an
19 understanding why they might have like her.
20 She was probably paying them off. She was
21 going to the counter and doing business with
22 them on a daily basis. She was going up to
23 the counter, and she would put in and ask for
24 tickets. She was given -- the clerks were
25 giving her tickets, summons for the clients

1       Mario H. Capogrosso
2 she had.
3       I said, how does this woman, who
4 is not a lawyer, and clerks are giving her
5 the summons that she is asking for, and she
6 is not a lawyer? How is she doing this?
7       And she would be rescheduling
8 these cases for these people. So obviously
9 she was giving these clerks something, for
10 them to do this.
11      I said, this is wrong. I said,
12 this is wrong. And the clerks were doing her
13 business.
14      I called the district attorney.
15 yeah, I did. I made that statement.
16      Next thing I know, the clerks
17 don't like me. The clerks don't like me at
18 this point.
19   Q.   When was this? Do you remember
20 what year?
21   A.   If I can refer to my document, I
22 can probably look at. It is in one of my
23 exhibits.
24      One of the clerks said I pushed
25 her. She actually came up to me -- it is in

1       Mario H. Capogrosso
2 one of the documents, one of the exhibits I
3 gave you. You can look it up. In my
4 affirmation in response, one of them said I
5 assaulted them.
6       There is no assault. I called
7 the district attorney. She comes over,
8 yelling and screaming, did you call the
9 district attorney? I could have denied it.
10 I could have denied that I didn't call.
11      I didn't deny it. I told her the
12 truth: Yeah, I called. You are calling
13 yourself a lawyer. You are doing business
14 down here as a lawyer.
15      She starts yelling and screaming
16 at me. I tried to get away from her, and I
17 walk away from her. We might have brushed
18 shoulders. I don't know. I didn't do
19 anything to her, but she is right on top of
20 me.
21      Now these clerks didn't like me
22 for that. I have a feeling for that, I
23 really do, that I called the district
24 attorney.
25      Judge Gelbstein didn't like it.

17 (Pages 62 - 65)

1          Mario H. Capogrosso
2 Clerks probably didn't like it. Go ahead.
3     Q.    So, Mr. Capogrosso, you said you
4 called the district attorney, and then there
5 was an investigation, and then she wasn't
6 there any more; is that correct?
7     A.    I don't know if there was an
8 investigation. Nobody ever reported anything
9 to me.
10          To me, I did my job. I saw --
11    Q.    So you called the district
12 attorney, and she was not there anymore?
13    A.    Yes.
14    Q.    Do you know -- do you know if she
15 was kicked out?
16    A.    All I know is Gelbstein
17 approaches me and says, who are you, Don
18 Quixote?
19          I have no idea. Nobody gave me a
20 report as to what happened. I told the
21 district attorney what I saw; I told them.
22 And after that, I don't see her anymore.
23          And that is -- if you look at the
24 exhibits, the date of that alleged incident
25 between me and her is the date I made the

1          Mario H. Capogrosso
2 call, I believe, right around that date.
3     Q.    And sitting here today, do you
4 remember what year that was?
5     A.    Well, I am not going to look at
6 my exhibits; so no, I don't recall.
7     Q.    Was it before that first lawsuit
8 that you had in 2012?
9     A.    Like I said, I don't remember.
10          And I am not going to look at the
11 exhibit. You told me not to.
12    Q.    All right. Was it before 2015?
13    A.    Absolutely, yes.
14    Q.    Okay. And similarly, the time
15 when Judge Gelbstein was having the two
16 Jewish ticket brokers, the father and son, in
17 his office, do you remember when that was,
18 what year?
19    A.    Oh, I sure do. That is the first
20 day I got there.
21          And I understood who the players
22 were, who were the brokers, who these ticket
23 brokers were and what they did. I saw them
24 right from day one.
25    Q.    And was there a time that it

1          Mario H. Capogrosso
2 stopped, him seeing those two Jewish ticket
3 brokers?
4     A.    No. Up until the date May
5 11th -- up until May 11th, I still saw them
6 down there. Up to May 11th, they were still
7 there.
8     Q.    Okay.
9     A.    Let me tell you the worst thing,
10 because I gotta get this one out. The worst
11 thing that really got me about this is when I
12 saw Gelbstein in the GE on a side bar, on a
13 side bar with Judge Bohmstein, ALJ Bohmstein,
14 pleading motorists guilty and rescheduling
15 cases. Then I just threw my hands up. I
16 said, this is terrible.
17    Q.    What is it that you saw? Can you
18 describe it to me in a little more detail?
19    A.    Judge Gelbstein, I had some
20 tickets GE, general -- waiting to be heard.
21 I am sitting there. He walks in with about
22 10 or 15, 20 tickets in the thing, before ALJ
23 Bohmstein sitting there.
24          I am entering a guilty plea on
25 this ticket, this ticket, this ticket, five

1          Mario H. Capogrosso
2 or six or seven. What the heck is going on
3 down here? This is a judge who has access to
4 every, every ticket in the system in his
5 office. On a computer system, he has access.
6 He has access to all of them.
7          If he needs to reschedule a case
8 because something -- he can do it in office.
9 He is doing GE before another judge, not on
10 the record. There was no appearance made.
11          I said -- I throw my hands up. I
12 can't work in this type -- I can't work here.
13 This is terrible.
14    Q.    I am sorry. I may not understand
15 this. But if Judge Gelbstein is talking with
16 this other judge, you said Judge Bohmstein?
17    A.    Yeah, on a side bar.
18    Q.    How do you spell Bohmstein?
19    A.    B-O-H-M-S-T-E-I-N,
20 B-O-H-M-S-T-E-I-N.
21          THE COURT REPORTER: Counselor?
22    Q.    So?
23          THE COURT REPORTER: Counselor?
24 Counselor?
25          THE WITNESS: Yes.

18 (Pages 66 - 69)

Mario H. Capogrosso

1
2     THE COURT REPORTER: I need to go
3 off the record.
4     MR. THOMPSON: Yes.
5     THE COURT REPORTER: You need to
6 go off the record for two minutes.
7     THE VIDEOGRAPHER: The time is
8 10:48 a.m. we are off the record.
9     (Discussion off the record).
10     THE VIDEOGRAPHER: The time is
11 10:50. We are on the record.
12     Q.   So, Mr. Capogrosso, we were
13 discussing an instance when you saw Judge
14 Gelbstein in the GE room rescheduling cases.
15 And I may not understand it.
16     But what is wrong with him
17 rescheduling cases, as a judge?
18     A.   If you are carrying a caseload --
19 this is what I am thinking. If you are
20 carrying a caseload, let me tell you how the
21 game is played. Attorneys take tickets in,
22 and they would push the tickets out,
23 reschedule three, four, five, six times,
24 stretch the money, they would call. They
25 would stretch the money. You get $200 a

Mario H. Capogrosso

1
2 ticket, you stretch it out for two years, and
3 plead the guy guilty, and you give the guy no
4 points. You give the motorist no points.
5     It is called stretching the
6 money, which is what the attorneys were
7 doing. A lot of attorneys would go to the
8 courtroom and enter a guilty plea, which is
9 one way of handling a ticket.
10     If you stretch it out 18 months,
11 the points don't show up on your license. If
12 you reschedule a whole bunch of cases, and
13 you push them out 18 months, and then you
14 enter a guilty plea for the guy, and he
15 doesn't get suspended, and they waive the
16 STV, and they give them a minimum fine, you
17 know, the motorist goes home happy.
18     My license is still good. I am
19 happy I got a minimum fine. I am not
20 suspended. That is one way you can play the
21 game.
22     Did I play it like that? No.
23 They hired me to fight a ticket, I fought a
24 ticket; so my clients liked me.
25     Q.   So, Mr. Capogrosso, I guess I

Mario H. Capogrosso

1
2 still don't understand what you contend is
3 wrong about what Judge Gelbstein did.
4     Because if he is a judge, and he is talking
5 to another judge to set up the docket, and
6 when cases will be heard, is there anything
7 wrong with that?
8     A.   I am told -- I don't know. I
9 don't know. I am told -- I reported what I saw
10 and what I heard. I don't know. I reported
11 what -- if you reschedule things on a sidebar
12 without putting in an appearance, and you are
13 entering guilty pleas without putting in an
14 authorization, to me, there is something
15 wrong.
16     I don't know. Maybe he had a
17 legitimate purpose. I reported what I saw
18 and what I heard.
19     I know I had a conflict with
20 another attorney over a ticket that we were
21 put in a room. We bought, put the same one
22 in I want to speak with him about.
23     He says, I am covering the case
24 for Gelbstein.
25     Q.   So let's put a pin on that one

Mario H. Capogrosso

1
2 and come to that in just a second.
3     This instance when you saw Judge
4 Gelbstein rescheduling tickets with judge
5 Bohmstein --
6     A.   And entering guilty pleas.
7     Q.   -- and entering guilty pleas.
8     First of all, you said you
9 reported that.
10     Who did you report that to?
11     A.   Who did I report it to? No, at
12 that point I said, I can't work here anymore.
13 At that point after I was removed, after I
14 was removed, there is nobody to report it to.
15 Nobody is listening.
16     I write to your office. Your
17 office doesn't respond to me in my letter of
18 complaint. I wrote a letter to Pricket
19 Morgan, March 20th. I got no response.
20     I have written to the grievance
21 committee. I explained this in the grievance
22 committee. They don't care. They said they
23 have no authority over this.
24     I have wrote to the Inspector
25 General's office. They told me it is an

19 (Pages 70 - 73)

Page 74

Mario H. Capogrosso

1 internal review. I wrote to the Commission
2 of Judicial Conduct. They have no control
3 over what goes on at the TVB, because it is
4 not a recognized tribunal.
5      I forgot who else I wrote to, but
6 I wrote and I explained everything that I
7 saw. And they all told me they have no
8 jurisdiction over this tribunal and what goes
9 on.
10  Q.   And so my next question is, this
11 time when you saw Judge Gelbstein speaking
12 with Judge Bohmstein and doing this with the
13 cases, when was that, approximately?
14  A.   That was right before this
15 happened that I got removed. It was maybe a
16 month or less before I got removed, May 11,
17 2015.
18  Q.   So April or May of 2015?
19  A.   Yeah. The first time I ever --
20  Q.   Do you have any reason to believe
21 that the adjournments and guilty pleas that
22 you saw were not valid, were not correct?
23  A.   As an attorney, if you to tell me
24 how do I get a piece of the action, if you

Page 75

Mario H. Capogrosso

1 have ticket brokers in your office, and you
2 tell me you don't know what they do for a
3 living, but they are friends of your wife,
4 and you don't know what they do for a living;
5 when you have a discrepancy with another
6 lawyer, and he tells me I am covering the
7 case for Gelbstein, and then you see this
8 happening in the GE, and then I make
9 complaints and complaints and complaints
10 against concerning the action of Defendant
11 Smart, right, and he laughs and giggles and
12 tells me a spade is a spade, and he doesn't
13 respond to any of the complaints, right.
14      The harassment continues. The
15 man wants me out. The man wants me out. He
16 doesn't me to see what he is doing. He wants
17 me out, and he got me there.
18  Q.   I appreciate that,
19 Mr. Capogrosso, but the question was a little
20 bit more narrow than that.
21      These specific adjournments and
22 these specific guilty pleas in this
23 conversation between Judge Gelbstein and
24 Judge Bohmstein, do you know whether or not

Page 76

Mario H. Capogrosso

1 those adjournments and guilty pleas were
2 correct?
3  A.   No, I said I have no idea. I
4 reported what I saw and heard. That is it.
5      I have no idea what he was doing.
6 I don't know. I never questioned him about
7 it. At that point, I just threw my hands up.
8 I don't know what he was doing. I reported
9 truthfully what I heard and what I saw. That
10 is not my job to make this investigation. It
11 is not my job.
12  Q.   So lastly you mentioned one other
13 incident, when you say someone said that he
14 was covering a case for Judge Gelbstein.
15      Can you explain to me what you
16 are discussing there?
17  A.   We both put a ticket in.
18 Sometimes clients they hired two lawyers
19 because they lose track of something. They
20 got two lawyers on the same summons. We both
21 put the ticket into GE, into the courtroom.
22      I go in the courtroom, the clerk
23 or the court -- and it has happened several
24 times. There is a lot of clients, a lot of

Page 77

Mario H. Capogrosso

1 motorists. Sometimes they hire the same
2 lawyer. There are lawyers on both -- there
3 is two lawyers on the same ticket, for
4 whatever reason.
5      So I will go up to this other
6 attorney. I said, what is going on? And he
7 tells me, I am covering the case for
8 Gelbstein. I said, do what you gotta do.
9      And I pulled off my ticket, and I
10 said, you want to cover it, go ahead.
11      And then I am thinking back to
12 myself, what is going on here? You are
13 covering the case for Gelbstein. Who am I
14 going to report it to? I am going to report
15 it to Judge Gelbstein. Who is listening to
16 these complaints?
17      I reported it to Bushra Vahdat.
18 Who wants to listen to these complaints, so I
19 let it go.
20  Q.   So, Mr. Capogrosso, first of all,
21 who is the attorney who said he was covering
22 the case for Judge Gelbstein?
23  A.   Eugene Gerbasi.
24  Q.   Eugene Gerbasi.

20 (Pages 74 - 77)

1    Mario H. Capogrosso
2    Can you spell Gerbasi for me?
3    A.    I believe G-E-R-B-A-S-I.
4    Q.    And so when he said was covering
5 the case, what did that mean?
6    A.    That means he was going to argue
7 the case. In my opinion, that is what it
8 meant.
9    Q.    Okay. So let me ask, what's --
10 what's wrong with him arguing a case?
11    A.    You are arguing a case for a
12 judge.
13    I don't know. I don't know.
14 Maybe there is nothing wrong with it. I
15 reported what I heard. I don't know. You do
16 your investigation. That is not my job. I
17 reported truthfully what I heard, what I saw.
18 I don't know.
19    Q.    So he said he was covering -- he
20 said he was covering a case.
21    You know, was Judge Gelbstein the
22 person with the ticket, or I guess what is
23 your concern about?
24    A.    I don't know. He said he is
25 covering a case for Gelbstein.

1    Mario H. Capogrosso
2    If you see ticket brokers -- if I
3 see ticket brokers in your office, and you
4 tell me you don't know what they are doing
5 for a living, I see you pleading guys in the
6 GF, and rescheduling cases, and if another
7 attorney tells me he is covering a case for
8 you, my opinion -- and only my opinion, which
9 I am entitled to -- you got a caseload. You
10 got a caseload, and you are trying to get a
11 piece of the action. That is my opinion.
12    Q.    When you say you have got a
13 caseload, you think he is practicing law as
14 an attorney at the TVB?
15    A.    As well as being a judge. Yeah,
16 that is my opinion. That is my opinion. I
17 don't know if it is true or not. That is not
18 my job. That is my opinion. I don't know if
19 it is true. I don't know if that is true. I
20 reported what I saw and what I heard.
21    Q.    But you never saw Judge Gelbstein
22 arguing a case at the TVB or representing a
23 client at THE TVB; is that correct?
24    A.    No, I never saw him do that. No.
25    Q.    Let's take a step back.

1    Mario H. Capogrosso
2 Mr. Capogrosso.
3    Why did you decide to sue in this
4 case?
5    A.    I want to go back to practicing
6 law at New York TVB. I want to clear my
7 name. I want to clear my name.
8    I was removed from the Brooklyn
9 TVB on May 11, 2015. Nobody looked at this
10 videotape, which we established that
11 yesterday. Nobody looked at it.
12    Did an Danielle Calvo, somebody
13 told her that there was an incident between
14 me and Smart. Danielle Calvo makes a call to
15 Judge Gelbstein. Gelbstein calls Traschen,
16 and Traschen tells Calvo to have me removed.
17    Nobody looks at the videotape.
18 The videotape was never kept. It is lost.
19 There is affidavit and affidavit and
20 accusations made against me and my name and
21 my reputation as a lawyer that I was never
22 served with so I could respond.
23    I asked yesterday, how come you
24 didn't file an affidavit? I never received a
25 complaint. I can't respond to a complaint if

1    Mario H. Capogrosso
2 I never received it.
3    I wrote to -- and nobody is --
4 and I wrote to Traschen. I wrote to Bushra
5 Vahdat. And I wrote to Judge Gelbstein, and
6 I wrote to your office.
7    And when I write to your office
8 concerning my concern -- detailing my
9 concerns what is going on, I get no response
10 from any of these offices.
11    And then I have some security
12 guard approach me on the morning of May 11th,
13 instigates an altercation, and I am removed
14 within five minutes.
15    I want to clear my name. I think
16 I was set up. I think Judge Gelbstein and
17 all these other parties wanted me out because
18 I wasn't playing the game.
19    And I want to clear my name. I
20 want to get back to work. I want the money
21 that I lost. And I think whoever did this,
22 especially if they are judges, should get
23 punished. They should not be a judges, and
24 they should not be represented --
25    Q.    When you say they wanted you out

21 (Pages 78 - 81)

212-267-6868                                                        516-608-2400

Mario H. Capogrosso

1
2 because you weren't playing the game, what do
3 you mean?
4     A.    I was not playing off the clerks.
5 I was not paying off the clerks. I was not
6 dealing with ticket brokers. I was not
7 giving the clerks part of this court money
8 and cash for the holidays.
9         The other attorneys were.
10 Several attorneys walked up to me, how much
11 you giving the clerks for Christmas? I said,
12 I am giving them nothing. I am giving them
13 nothing.
14         I gotta pay them. They have a
15 job to do. They get paid. I am not giving
16 them any more money.
17         Attorney said, why don't you buy
18 them breakfast? I am not going to buy them
19 breakfast in the morning. I am not doing
20 that. There is an appearance of impropriety.
21 I refuse to participate.
22         There was an appearance. I don't
23 know if you are allowed to do it or not. I
24 don't know if you are allowed to give the
25 clerks money. I don't know if you are

Mario H. Capogrosso

1
2 allowed to give them breakfast, give them
3 parties. There was appearance of
4 impropriety.
5         I chose not to participate. I
6 chose not to.
7     Q.    And you think that everyone
8 wanted to get rid of you because you weren't
9 paying money for the clerks?
10    A.    I don't know why they wanted to
11 get rid -- they didn't like me. They didn't
12 like my approach, my style, whatever. They
13 didn't like me. I knew that.
14         My clients loved me. My clients
15 loved me. You don't have one grievance from
16 or complaint from a client over ten years of
17 service in this tribunal. Ten years I was
18 down there, from motorist or a client. Other
19 than maybe a fee dispute or something, that
20 is it. Other than this one to Mr. Perez, I
21 never got -- I can't explain what happened
22 there. Not one complaint --
23    Q.    We will discuss Mr. Perez in a
24 bit later today.
25         Taking a step back, you mentioned

Mario H. Capogrosso

1
2 ticket brokers.
3         Let me ask you, the practice of
4 ticket brokers, people who bring cases in in
5 exchange for a cut of the attorney's fees, is
6 that legal or is that illegal?
7     A.    I have no idea. I don't know.
8         I think if you are calling
9 yourself a lawyer, and you are taking a the
10 fee and representing that you are an
11 attorney, and you take that fee, I think that
12 is terrible. I think that is wrong.
13         I think if you go into the ticket
14 counter, like Tanya Rabinovich was doing, and
15 the clerks were giving a whole of bunch
16 summons for the day and rescheduling cases
17 for her, and she is not a lawyer, I think
18 that is practicing law.
19         I think that is wrong. I think
20 that is wrong. Absolutely wrong. Because
21 now you are acting -- now you are taking an
22 authority over that summons.
23         I don't know. And you are --
24 and maybe you are even pleading guilty.
25 Maybe she was pleading them guilty, too. You

Mario H. Capogrosso

1
2 can do that at the counter.
3     Q.    But, Mr. Capogrosso, assuming
4 that the ticket broker isn't holding
5 themselves out to be anything but a ticket
6 broker, is there anything illegal or
7 unethical about the practice?
8     A.    I don't know. I don't know. If
9 you are calling yourself a ticket broker, I
10 don't know. I don't know.
11         I think if you make the
12 representation that you are lawyer, that is
13 wrong, or you are making --
14    Q.    And --
15    A.    I think that is wrong. I think
16 if you come down to the DMV with a ticket,
17 and the attorney takes the ticket and doesn't
18 talk to the client directly, directly, I
19 think that is wrong. Because then you don't
20 know what the client expectation is under.
21         The attorney is not talking to
22 the client himself, he is talking to an
23 intermediary, and I think that is wrong. You
24 should have some type of interaction with the
25 lawyer directly.

22 (Pages 82 - 85)

Mario H. Capogrosso
1  
2      I don't know if it is right or
3  wrong. You are the Attorney General; that is
4  your decision.
5      I am telling you what I saw and
6  what I heard. I am telling you that I didn't
7  feel comfortable dealing with these people.
8  I did not.
9     Q.   Mr. Capogrosso, sitting here
10 today, you are not aware of any statute or
11 regulation or source of authority that says
12 that ticket brokers are not legal or
13 permissible; is that correct?
14    A.   I think you can't make a
15 representation that you are a lawyer when you
16 are not a lawyer and collect a fee.
17    Q.   But --
18    A.   I think that is wrong.
19    Q.   Leaving aside if they don't
20 represent that they are a lawyer, you are not
21 aware of any statute prohibiting ticket
22 brokers, correct?
23    A.   I don't know.
24    Q.   Statute or --
25    A.   I didn't think its ever been

Mario H. Capogrosso
1  
2  broached, this question.
3     Q.   Okay.
4     A.   I don't think the question has
5  ever been looked at.
6     Q.   Mr. Capogrosso, did there come a
7  time when ticket brokers were banned from the
8  TVB?
9     A.   I saw ticket brokers there up
10 until the day I left, so obviously they were
11 not banned. I saw them up till the day -- I
12 know some paralegals were banned because they
13 were taking money, stealing money, but I
14 didn't see ticket brokers banned.
15    Q.   So your testimony is no. there
16 was never a ban on ticket brokers?
17    A.   Not that I was aware of. I
18 always saw them down there, even up to the
19 day I was asked to leave.
20    Q.   All right. So a couple more
21 questions about bringing the case.
22      You were expelled from practice
23 in 2015. You brought this case in 2018.
24      Why did you wait so long to bring
25 the case?

Mario H. Capogrosso
1  
2     A.   I wanted to see if they had
3  anything against me. Seriously. I gave them
4  three years to bring their case against me.
5  They wanted to sweep my complaints and
6  everything I had under the rug. If there was
7  a complaint against me or my office, you
8  could have aggrieved me.
9      I was waiting for a grievance. I
10 was waiting for them to sue me. If I had
11 assaulted this security guard, I could have
12 been sued for assault. They brought nothing
13 against me for three years. I waited three
14 years to see if they had anything against me.
15      They had nothing against me.
16 Nothing. Not an assault, not a criminal
17 charge, not a grievance to the grievance
18 committee, nothing. They had nothing to hold
19 their hat on, other than they removed me
20 improperly. And I think they set me up that
21 morning. I waited three years because I
22 wanted to see if they had anything against
23 me, and they didn't.
24    Q.   Is it possible they were just
25 satisfied that you were no longer at TVB?

Mario H. Capogrosso
1  
2     A.   I know they wanted me out. They
3  wanted me out, and they got me out, and they
4  wanted -- and they wanted to ignore any
5  complaints or any follow-up.
6      They didn't want to talk to me.
7  I wrote letters, I made phone calls. Nothing
8  was answered. I wrote letters to your
9  office, it wasn't answered. I wrote to
10 Traschen, Bushra Vahdat, Gelbstein. They
11 were all ignored.
12      I was charged -- I was not
13 charged by the police. There was nothing
14 they had against me. I did nothing wrong.
15    Q.   And so you were expelled in May
16 of 2015.
17      Why didn't you bring an Article
18 78 proceeding?
19    A.   Because I couldn't get money. I
20 had money that I had to return, that I was
21 due. I couldn't get money in an Article 78
22 proceeding.
23      I wanted a Federal Court judge on
24 this case. I was tired with this New York
25 State Court, everybody protecting one another

23 (Pages 86 - 89)

Mario H. Capogrosso
and brushing complaints under the rug. I was
tired of it. I wanted a Federal Court judge
to listen to this complaint, because they
stand above it. That was my opinion. I
wanted a Federal Court judge, number one.
        And two, I was owed money, and I
can't get that in an Article 78 proceeding.
    Q.    So you think -- so you think the
New York State Courts were corrupt?
    A.    No. I didn't think I was going
to get a fair hearing.
    Q.    Why not?
    A.    I wanted a Federal Court judge.
I wanted a judge who stood above it.
    Q.    Why didn't you think you would
get a fair hearing in Kings County Supreme
Court?
    A.    I didn't think I would.
    Q.    Why not?
    A.    I saw how all the judges at the
TVB were treating me. I saw how the judges
at the TVB, Judge Gelbstein, laughing and
giggling when I made my complaint; a spade is
a spade. Bushra Vahdat lying, a judge lying.

Mario H. Capogrosso
I can go into her lies. Traschen not
returning phone calls.
        I saw how I was being treated. I
didn't think I was going to get a fair
chance. That was my decision.
        I told you why I made it. I
wanted to see, number one, if they had
anything against me, either criminally or by
way of a grievance, and they do not.
        And two, I wanted a judge who
stood above it all.
        And three, I was owed money.
    Q.    So if you felt that the State
Supreme Court was going to be corrupt or
unfair, why would --
    A.    I didn't say that. I said I
wasn't going to get a fair chance.
    MR. THOMPSON: Withdrawn.
    Q.    If you felt the State Supreme
Court was going to be unfair, why would the
Federal Court be any different?
    A.    I told you my belief is a Federal
Court judge sits above this, sits above it.
That is just my opinion. I am entitled to my

Mario H. Capogrosso
opinion. And I wanted the money owed to me
on this case.
    Q.    All right.
    MR. THOMPSON: Hold on one
second. And this maybe a little dicey,
because we are doing this over Zoom, but
I am going to share a document with you
and with everyone. So please, everyone
let me know if there is a problem
viewing this.
        Can everyone see this document?
    THE WITNESS: Yes.
    MR. THOMPSON: Mr. Videographer
and Madam Court Reporter, can you see
the document?
    THE COURT REPORTER: Yes.
    MR. VIDEOGRAPHER: I am sorry.
My mic was muted.
        I see it, Counsel.
    MR. THOMPSON: Okay. Very good.
    Q.    Mr. Capogrosso, do you recognize
this document?
    A.    My affirmation of service.
    Q.    I will scroll down to page two.

Mario H. Capogrosso
because that may make it a little easier to
recognize.
    A.    Yeah. My response to your
interrogatories, yeah. Yes, I do.
    Q.    And this is your document that
you wrote, correct?
    A.    Yes. Well, I have to see my
signature. But yeah, I would assume it is.
    Q.    We can go down here to page --
    A.    Yeah, that is my signature.
    Q.    -- 17. That is your signature?
    A.    Yes.
    MR. THOMPSON: Madam, I ask you
to mark this as Defendant's 1, with the
understanding that we discussed before
that it will actually be formally marked
once it is entered into the Veritext
server after the deposition.
        Is that something that you need
to explain on the record, Madam Court
Reporter?
    THE COURT REPORTER: No.
        (Whereupon, a document was deemed
marked as Defendant's Exhibit 1 for

24 (Pages 90 - 93)

Mario H. Capogrosso

1
2     identification, as of this date.)
3     Q.    Let's go down to page 17. And
4  again, you said this was your signature?
5     A.    Yes.
6     Q.    And this declaration on page 18,
7  you declared that, correct?
8     A.    Yes.
9     Q.    So do you still believe
10 everything in your interrogatory responses is
11 true and correct?
12    A.    I signed it, so yes.
13    Q.    Are you aware under the Federal
14 Rules, you have the right and the obligation
15 to amend your responses if anything is not
16 correct or if there is an important omission?
17    A.    Yes. I am trying to be truthful,
18 yes.
19    Q.    Okay. So let's go up there to
20 interrogatory one. We are on page five. I
21 would like to talk a little bit about the
22 damages that you are claiming in this case.
23    A.    All right.
24    Q.    So interrogatory number one, we
25 asked you for a calculation of damages and

Mario H. Capogrosso

1
2  how they were calculated.
3     The first category you see, you
4  said plaintiff seeks punitive damages in an
5  amount to be determined, but not to exceed 20
6  million dollars, as stated in your complaint.
7     How much punitive damages are you
8  actually seeking, because there is sort of
9  not a specific figure.
10    A.    Everything I stated in my
11 complaint, 20 million dollars per count. I
12 have to have look at my --
13    Q.    20 million dollars?
14    A.    It is my count.
15    Q.    So you are seeking 20 million
16 dollars in punitive damages?
17    A.    Yeah, sure. Absolutely.
18    Q.    Where does that figure come from?
19    A.    These are judges. Judges who
20 acted wrongly. Judges who acted wrongly to
21 have damaged my name and reputation, and they
22 need to be honest. That is my opinion. That
23 is for a jury to decide how much.
24    Q.    When you say judges, do you
25 mean -- who specifically do you mean?

Mario H. Capogrosso

1
2     A.    Judge Gelbstein. Bushra Vahdat,
3  the worst of them, Bushra Vahdat. Ida
4  Traschen, your clerical staff, Danielle
5  Calvo, who never looked at the videotape and
6  had me removed. Who else? Melanie Levine,
7  another clerical supervisor who I didn't
8  mention.
9     Q.    Okay.
10    A.    David Smart, who approached me
11 and instigated this.
12    Q.    And you want them all to be
13 punished?
14    A.    Yes, I do. Yeah, yes. The jury
15 is going to make that determination.
16    But do I seek punishment? Yes.
17    Q.    And are you aware that Ms. Vahdat
18 is no longer a defendant in this case, and I
19 don't believe Ms. Levine was ever a defendant
20 in this case?
21    A.    True. That is true.
22    Q.    So this figure, this 20 million
23 dollar figure, where does that come from?
24    A.    Where does it come from?
25    Q.    Yes?

Mario H. Capogrosso

1
2     A.    That is just a number.
3     It comes from my heart. That is
4  where it comes from. It is how I felt when I
5  wrote this complaint. What these judges,
6  this tribunal did to me, it comes from my
7  heart.
8     Q.    So there is no formula that you
9  used to get there?
10    A.    I don't know how you arrive at a
11 formula for punitive damages. I don't know
12 if there is formula.
13    Q.    So no?
14    A.    It comes from my heart. It comes
15 from the damage to my reputation and my name,
16 which I value at 20 million dollars. All
17 right. The damage to my name and reputation
18 as a lawyer, as a lawyer that I want to
19 continue practicing.
20    And I told you, I am going to
21 work until I drop, and I want to continue to
22 work my whole life.
23    Damage to my name and reputation
24 as a lawyer, that is where it comes from.
25    Q.    So were --

25 (Pages 94 - 97)

1     Mario H. Capogrosso
2     A.   And I have to explain this
3 number, explain my removal to any court that
4 I seek admittance to. Any court, I have to
5 explain this somehow.
6     Q.   So why 20 million dollars and not
7 50 million dollars or five million dollars or
8 500,000?
9     A.   I don't -- let's see. All right.
10 Let's see. Normally -- I am 58 when I wrote
11 this. I want to work at least -- I was
12 figuring a million dollars a year for the
13 next 20 years, the damage to my name and
14 reputation.
15    Q.   So you viewed this punitive
16 damage as covering the damage to your name
17 and reputation, correct?
18    A.   Name, reputation and for the
19 wrongful conduct, the wrongful, improper
20 conduct of judges, the clerical staff at the
21 Brooklyn TVB; wrongful, egregious conduct of
22 these judges and this clerical staff, yes.
23    Q.   So moving to item number two, you
24 say $122,715 in lost revenue, representing
25 approximately 15 months of projected

1     Mario H. Capogrosso
2 receipts.
3     Can you explain how you came to
4 that figure?
5     A.   I gave you my exhibit. That was
6 the money that I had collected, the money
7 that I was owed to me. It was the total
8 monies owed, I think.
9     And I gave you my breakdown that
10 was still on my calendar, that I either would
11 have earned or collected if I was given the
12 ability to represent to finish my caseload.
13 It was $122,000, and was still remaining on
14 my caseload going forward.
15    Q.   Okay.
16    A.   From May 11th, the day I left, my
17 caseload showed $122,000.
18    Q.   So these were cases that you had
19 already -- that you had already argued and
20 conducted, that you had outstanding bills
21 for, or these were cases that you were going
22 to argue in the future?
23    A.   Going to argue in the future,
24 that I was not able to earn.
25    Q.   Okay. And you had already -- and

1     Mario H. Capogrosso
2 you had already collected this money; is that
3 correct?
4     A.   Part of it was collected. Not
5 all of it.
6     It was due. All of that was due.
7 Part it was, part of it wasn't. It is all in
8 the exhibit to you.
9     MR. THOMPSON: So let's go to
10 that exhibit. I am going to figure out
11 how to stop sharing my screen. Please
12 bear with me. I am having some
13 technical difficulties.
14    Can you guys see Exhibit 2 now?
15    THE WITNESS: No.
16    MR. THOMPSON: You are seeing the
17 same thing?
18    THE WITNESS: Yes, not seeing any
19 exhibits.
20    MR. THOMPSON: You are not seeing
21 anything?
22    THE WITNESS: No.
23    MR. THOMPSON: All right. Can
24 everyone see this?
25    THE WITNESS: Yes.

1     Mario H. Capogrosso
2     MR. THOMPSON: Okay. So let's
3 rotate this, just so that it is facing
4 up.
5     So can everyone see this document
6 here?
7     THE VIDEOGRAPHER: Yes, Counsel.
8     THE WITNESS: Yes.
9     Q.   And, Mr. Capogrosso, do you
10 recognize this document?
11    A.   Yes.
12    Q.   What is it?
13    A.   That is my Excel worksheet that
14 shows my -- the date that I was initially
15 hired, the location.
16    I kept a very detailed calendar,
17 very detailed. The subject matter would show
18 the client's name and the ticket, which I
19 redacted; the due date, which is the date I
20 had to be in court; the total amount that I
21 charged on the case, the amount that was paid
22 and the amount that was owed.
23    Now, on the ones that are on the
24 right there, it wasn't a Brooklyn TVB case or
25 a TVB case for Red Hook, it was down in

26 (Pages 98 - 101)

Mario H. Capogrosso

1
2    criminal court. I moved that to the right.
3    I didn't feel that was appropriate.
4       Q.    So for instance, you are talking
5    about this line here, and I am
6    highlighting --
7       A.    Yes.
8       Q.    -- this line here, Monday,
9    April 27, 2015, due Monday, May 18, 2015?
10      A.    Which myself, I had to be --
11      Q.    Page one.
12      A.    I had to be on Red Hook, which is
13   criminal court, down in Brooklyn, on May --
14   and that was -- gave me 300 on that case.
15           Yes, so I didn't put that in
16   there, because it wasn't a TVB case.
17      Q.    Just for the record, this
18   document is number P191 through P206,
19   correct?
20      A.    That was my Bates Stamp when I
21   submitted the document to you.
22      Q.    Can you explain to me what the
23   start date means?
24      A.    The start date was when I
25   initially got hired on, the date.

Mario H. Capogrosso

1
2       Q.    So I have noticed some of these
3    start dates are after your expulsion from the
4    TVB. For instance, I am looking at the
5    bottom of page P191, and there is two --
6    there is a number of items that are marked
7    Thursday, May 21, 2015. One is BS, one is
8    appeal, one is STLISL, and one Kent.
9            Can you explain to me what those
10   mean?
11      A.    Yeah, I don't know. Maybe that
12   is just a clerical error.
13           I know I took on no new cases
14   after I was removed. I don't know how that
15   happened. Maybe it was just a clerical --
16      Q.    What is --
17      A.    I don't know. I seriously I
18   don't know. I don't know.
19      Q.    What do those four -- my
20   apologies, Mr. Capogrosso. You can keep
21   answering, if you have more that you need to
22   say.
23      A.    I don't know why that is like
24   that. I don't understand that.
25           I know I didn't appear in any

Mario H. Capogrosso

1
2    court after May 11th. I was ordered not to,
3    and I did not. I didn't take any new cases
4    on after May 11th and have the ability --
5       Q.    And so --
6       A.    Go ahead.
7       Q.    And so what is -- is BS, Brooklyn
8    South?
9       A.    Yes.
10      Q.    What is appeal?
11      A.    Appeal, they hired me on an
12   appeal.
13      Q.    Is that DMV appeals court?
14      A.    Yes. But I didn't take anything
15   after May 11th.
16      Q.    What is STLISL?
17      A.    Staten Island.
18      Q.    And what is Kent?
19      A.    That would have been Upstate,
20   which I moved to the right. That is an
21   Upstate court that I was hired on.
22      Q.    Is that Kent County?
23      A.    It was Kent -- Kent -- Kent.
24   Yeah, I don't know.
25           I would have written it out with

Mario H. Capogrosso

1
2    the Kent County Village Court Upstate.
3       Q.    And so the due date starts on
4    May 11, 2015, because these are future cases
5    that you were going to handle in the future;
6    is that correct?
7       A.    Yes, that I was not able to.
8       Q.    Can you explain how you billed
9    your cases? Did you charge by the hour or
10   case?
11      A.    The motorists would come in.
12   They knew me. They would approach me.
13           I never approached a motorist,
14   never. There were signs all over the place
15   not to -- the other attorneys did, solicited
16   left and right. I didn't.
17           They approached me, asked me if I
18   am a lawyer. A lot of guys knew me already,
19   they walked up to me. You want to take the
20   case? Yes. Took out my legal pad. I wrote
21   down their name, their phone number, their
22   license ID, license number, their date of
23   birth, which is the information I needed.
24           The court in which it was in,
25   which is mostly Brooklyn South. I wrote them

27 (Pages 102 - 105)

Mario H. Capogrosso
1  Mario H. Capogrosso
2  a receipt the way all the attorneys did it.
3  We wrote it on the back of a business card.
4  for the most part. Put the total, the amount
5  paid, the amount owed. I gave them the
6  receipt. I had my legal pad, showed
7  everything, all the information I took.
8       And I calendared it. I put it in
9  my calendar. Oftentimes these due dates got
10  changed, all the time. All the time, the due
11  dates got changed. Cases were being
12  rescheduled constantly.
13       Albany has the ability to
14  reschedule a case. The motorist can
15  reschedule a case. The police officer can
16  reschedule a case. I can reschedule a case.
17  The DMV can reschedule a case. The cases got
18  rescheduled all the time. Those due dates
19  changed all the time.
20  Q.   So, Mr. Capogrosso, that
21  wasn't -- I appreciate that.
22       I think the question was a little
23  bit narrower, which was how did you charge
24  for your services? Did you bill by the hour?
25  A.   No, each ticket. Each ticket.

1  Mario H. Capogrosso
2  Q.   So you billed by the ticket?
3  A.   Yeah. 150, 250. The total was
4  the amount I billed. That column that says
5  total, that is the amount that I charged.
6  Q.   And how did you know how much to
7  charge?
8  A.   Which is what everybody -- just
9  the going rate that everybody was charging.
10       If the case was in Brooklyn
11  South, and it was that day, normally I
12  charged a hundred. If it was -- you know,
13  other than that, I normally charge 150,
14  because the case, like I say, got pushed out
15  several times over.
16       If it was that day, it was
17  charged a hundred. If it was like, I don't
18  know, tinted window, I charged less, because
19  it didn't carry no point violations.
20       If it was in another county, I
21  charged more, because I had to travel there.
22       If it was like in Manhattan
23  South, I would charge 200, because I had to
24  travel and be at a different courthouse.
25  That is pretty much how I did it.

1  Mario H. Capogrosso
2  Predominately it was 150 or a hundred. If it
3  was done that day, and they walked in that
4  day, I charged a hundred. But that is how I
5  did it.
6  Q.   I think the most I saw for any of
7  the cases on here was 250.
8       What would be a $250 case?
9  A.   That was Queens South. So I
10  would have to travel down to Queens South. I
11  couldn't be in the Brooklyn South Traffic
12  Violations Bureau, so I had to reschedule to
13  make sure I was there. And that is the fee
14  we agreed on.
15  Q.   Okay. So why did you redact the
16  items in the middle?
17  A.   It was client information. I
18  didn't feel comfortable revealing it. Names,
19  phone numbers, ID numbers, driver's license
20  ID numbers, dates of births, phone numbers, I
21  am not going to give you that information.
22  It is not right.
23  Q.   Is there any legal authority for
24  you to redact that?
25  A.   It is just client information.

1  Mario H. Capogrosso
2  It is privileged information. I am not going
3  to give you my client's phone numbers. I am
4  not going to do that. I don't think it's
5  appropriate, or their name. It is not
6  appropriate. Or their New York driver's
7  license ID, I don't think it's appropriate.
8  I don't think it is relevant and material.
9  To me, it is privileged information.
10  Q.   Did you seek -- did you seek a
11  protective order or confidentiality order?
12  A.   No, I did not.
13  Q.   All right. So I will show you,
14  Mr. Capagrosso, in what you produced to us,
15  the pages there is a gap between pages 201
16  and 206. Are you aware of that? It goes
17  straight from 201 down to 206. Why didn't
18  you produce the pages in between?
19  A.   No, I produced it. I have to
20  look.
21       How did I send this to you?
22  Maybe your -- maybe your -- I sent you this.
23  Maybe your -- I walked this down to your
24  office. I didn't scan it and send it to you.
25  I walked this down to your office.

28 (Pages 106 - 109)

1    Mario H. Capogrosso
2        Maybe the person who scanned it
3 didn't scan it in properly. I didn't leave
4 out anything. None. Maybe somebody in your
5 office that scanned it improperly.
6    Q.    Okay. So you are confident --
7    A.    Yes, I am. Absolutely. I left
8 nothing out.
9    Q.    You are confident you produced
10 everything, correct?
11    A.    Yes. And I will get you those
12 missing pages, I will. I don't think I
13 misnumbered this.
14    Q.    So you indicated that the lost
15 revenue was $122,715 for 15 months; is that
16 correct?
17    A.    That was the money remaining on
18 my docket, yes, that I couldn't finish.
19    Q.    And did you divide that by adding
20 up this column paid?
21    A.    No, the total column, total.
22    Q.    So did that assume that everyone
23 was going to pay you what they owed?
24    A.    Yes, the money that was due.
25    Q.    Does everyone always pay you what

1    Mario H. Capogrosso
2 they owe?
3    A.    Yeah, for the most part. My
4 clients are very -- for the most part, yes.
5 Yes.
6    Q.    But sometimes people don't?
7    A.    For the most part, my clients
8 paid me. They liked me, and they paid me,
9 and they respected what I did for them in a
10 courtroom, they did. I rarely had a
11 problem --
12    Q.    Wouldn't it be true that --
13 wouldn't it be true to say that sometimes
14 clients don't pay what they owe?
15    A.    For the most part, my client
16 always paid. They paid.
17    Q.    But not always, correct?
18    A.    I don't recall when they didn't.
19 I really don't.
20        My clients paid me. They liked
21 me, my clients. They respected what I did
22 for them in a courtroom, and they paid me.
23    Q.    So you indicated that $122,715
24 figure was lost revenue.
25        What were your expenses for your

1    Mario H. Capogrosso
2 practice?
3    A.    I had a -- I had a virtual office
4 up in Hawthorne, Connecticut, where I
5 received mail, where I can receive clients.
6 You can use the conference room. I had my
7 home office I used. I had an apartment in
8 Brooklyn at the time. I had travel expenses.
9 I had my home -- we have the home up here in
10 New Rochelle. What else? Travel expenses.
11 What else do you have? You have the bridges
12 going back and forth, gas, the tolls. That
13 is it, normal operating expenses.
14        Laptop, desktop, copier, paper.
15 You know, my dues, my association dues to
16 practice law, my license dues, my CLE dues,
17 all that stuff.
18    Q.    So why didn't you include your
19 expenses in your calculation?
20    A.    I didn't think I needed to.
21        My expenses are my expenses.
22        That is the total money that I
23 was owed.
24        My expenses are my expenses.
25    Q.    But if you weren't practicing

1    Mario H. Capogrosso
2 law, didn't you not need to pay for a great
3 deal of those expenses?
4    A.    What does that have to do with
5 the money I could have generated? I don't
6 understand. It is not relevant. Has nothing
7 do with my expenses, with the money I could
8 have been given. Nothing to do with it.
9    Q.    So it is your testimony that it
10 wouldn't have cost you any money to make this
11 money?
12    A.    It would have cost me money to
13 make this money.
14    Q.    So why didn't you include your
15 expenses in your calculations of your damage?
16    A.    Including my expenses, I didn't
17 think it was relevant. That is the money I
18 was owed. To me, it is not -- why expenses
19 should be taken off of the total revenue to
20 me, it was not relevant. That is the money I
21 was owed.
22    Q.    Okay. And in terms of --
23    A.    Wait. Wait. Wait. Let me think
24 about this question for a minute.
25    Q.    Sure.

                                    29 (Pages 110 - 113)

1          Mario H. Capogrosso
2     A.    Because I have to understand what
3 you're saying here.
4          Total money owed, you are saying
5 that I should take off my expenses.
6          Let me try to understand it.
7 That is the money I was owed, that is it.
8 That is the money was I owed and the money I
9 lost.
10    Q.    Okay. And your expenses included
11 the virtual office in Connecticut, home
12 office in --
13    A.    No, no. Virtual office was
14 Hawthorne, New York.
15    Q.    Apologies. The virtual office in
16 Hawthorne, New York, the mail in Connecticut,
17 home office, Brooklyn apartment, CLE, bar
18 fees, travel, wear and tear on the car.
19         Anything else?
20    A.    Yeah. There was no mail in
21 Connecticut.
22    Q.    Didn't you say you had a place in
23 Connecticut where you received mail?
24    A.    No, no, no, no. I received my
25 mail -- at that point I had an apartment in

1          Mario H. Capogrosso
2 Brooklyn. We have a home up here in
3 New Rochelle.
4          No. I was licensed in
5 Connecticut. I did have a couple of cases in
6 Connecticut, only a couple which did not
7 involve the TVB; but I do have an office in
8 Connecticut.
9     Q.    So, Mr. Capogrosso, do you recall
10 that we asked you for your tax returns from
11 the relevant period?
12    A.    Yes.
13    Q.    And did you produce them?
14    A.    No.
15    Q.    Why not?
16    A.    Because I don't think they are
17 relevant material. I do not.
18    Q.    Why don't you think so?
19    A.    Because I am showing you what I
20 could have made right there. I showed you
21 what I could have made. I have given you all
22 the money that I generated.
23         My tax returns are my tax
24 returns. I don't think they are relevant
25 material. I have shown you the money that I

1          Mario H. Capogrosso
2 collected. I have shown you that.
3          Now, did I earn all that money?
4 No. I showed you the money that I could have
5 collected.
6     Q.    Mr. Capogrosso, how much income
7 did you claim on your taxes in 2013?
8     A.    I don't recall.
9     Q.    Do you recall --
10    A.    Was it everything -- all the
11 revenue showed here? No. Not all the
12 revenue is shown here, because these tickets
13 were not necessarily completed on the due
14 date. And I didn't earn this money until I
15 completed the ticket.
16         For example, a ticket that was
17 due date on May 11, 2015 might not get done,
18 completed for two years from that date. Two
19 years. Cases got rescheduled constantly.
20    Q.    So the actual income that you
21 would report on your taxes would be lower; is
22 that correct?
23    A.    Yes, lower. Because that was the
24 money, the money when I completed the cases,
25 when I actually completed it. That, to me,

1          Mario H. Capogrosso
2 then I finally earned that money. Until I
3 completed the case, I didn't earn it.
4     Q.    Mr. Capogrosso, do you have an
5 estimate of how much money you claimed as
6 income on your taxes in 2013, ballpark
7 figure?
8     A.    What I am showing here is I would
9 bring in about 8,000 a month. Bring in,
10 which is what this works out to. But you
11 didn't complete $8,000 worth of work in a
12 month, you didn't complete it. That is what
13 you brought in. You might have finished, you
14 know, maybe 11, 1200 a week, maybe, where you
15 actually completed 11, 1200 dollars worth of
16 work a week.
17         You know, that is what I would
18 have completed.
19         Probably what you brought in was
20 more.
21    Q.    So I apologize if I don't quite
22 understand.
23         You would have completed about 11
24 or 1200 dollars worth of work per week, but
25 you would have brought in a little more.

30 (Pages 114 - 117)



Page 118

```
1        Mario H. Capogrosso
2        Can you explain that?
3    A.    Bring in clients, you bring in
4 revenue.
5        Like I said, a guy would hire me,
6 give me a ticket. You might collect $2,000
7 worth of tickets in a week or $8,000 in a
8 month.
9        But the cases that were actually
10 finished in that month or in that week would
11 be about 11 to 1200 dollars, around that
12 figure a week.
13   Q.    And it is not income for you
14 until the case is completed; is that correct?
15   A.    Absolutely. Absolutely. I have
16 not earned that money until I argue that
17 case. I have not earned that money until I
18 personally appeared and argue that case. I
19 have not earned that money.
20   Q.    Understood.
21        So do you have an estimate of how
22 much income you would claim on your taxes in
23 2013, 2014?
24   A.    I don't recall. Probably would
25 have been 11 to 1200 dollars a week. That
```

Page 119

```
1        Mario H. Capogrosso
2 was work that I actually completed, actually
3 completed for the week.
4    Q.    And do you recall approximately
5 how much income you claimed on your taxes in
6 2015?
7    A.    No.
8    Q.    What about in 2016, the year
9 after the first full year when you were no
10 longer work at the TVB? Do you recall how
11 much money you claimed on your taxes?
12   A.    No.
13   Q.    And 2017 and 2018, do you also
14 not recall?
15   A.    Well, in '18 I was working for
16 Jiang. Like I said, he was paying me 85,000
17 year, 85,000.
18        But I was a 1099, so that is what
19 it would have been. The Law Firm of Yuan
20 Jiang. I know he was paying me 85 a year.
21   Q.    And so the same for 2019?
22   A.    Yeah. But I started with Jiang
23 in March of 2018, and 2019 it would have been
24 a full. But this part of 2020, I stopped
25 working for him on March 17, 2020.
```

Page 120

```
1        Mario H. Capogrosso
2    Q.    Well, I am sure as heck not ready
3 to pay my 2020 taxes, so I won't ask you for
4 your estimates for this year, because I
5 certainly have no idea.
6        So let's go back to Exhibit 1.
7    A.    Yeah.
8    Q.    Switching my screen back to that.
9        MR. THOMPSON: Can everyone see
10 Exhibit 1?
11        THE WITNESS: Yes.
12        MR. THOMPSON: And, Madam Court
13 Reporter, before we are done with
14 Exhibit 2, had I asked you to mark that
15 yet?
16        THE COURT REPORTER: I can check
17 for you. Off the top of my head, I
18 don't remember, Counsel.
19        MR. THOMPSON: There is no need
20 to check. Let me just ask you now to
21 please have that marked as Exhibit 2.
22        (Whereupon, a document was deemed
23 marked as Exhibit 2 for identification,
24 as of this date.)
25        THE COURT REPORTER: Before we
```

Page 121

```
1        Mario H. Capogrosso
2 continue, can we take a break?
3        MR. THOMPSON: Sure. Actually
4 yeah, let's take a quick five-minute
5 break.
6        Is that fine with you,
7 Mr. Capogrosso?
8        THE WITNESS: Yes. 11:45?
9        MR. THOMPSON: 11:45.
10        THE VIDEOGRAPHER: The time is
11 11:40. We are off the record.
12        (Whereupon, a short recess was
13 taken at 11:40).
14        (Time noted: 11:40 a.m.)
15

16        MARIO H. CAPOGROSSO
17
   Subscribed and sworn to before me this
18
   _____ day of _____, 2020.
19
   _____, Notary
20 Public.
21
22
23
24
25
```

31 (Pages 118 - 121)

Page 122

```
 1
 2          INDEX TO TESTIMONY
 3                    Page   Line
 4   Examination by          5    20
     Mr. Thompson
 5
 6
         INDEX TO DEFENDANT'S EXHIBITS
 7
     Description            Page   Line
 8
     Exhibit 1  Interrogatories   193   24
 9
     Exhibit 2  Document          120   22
10
11
         INDEX TO REQUESTS
12
                    Page   Line
13
     Provide resume        13    18
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 124



ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME  Capogrosso v. Gellstein, Et Al
DATE OF DEPOSITION: 12/18/2020
WITNESSES' NAME  Mario Capogrosso, a m

PAGE  LINE (S)   CHANGE        REASON

Mario Capogrosso, a m
SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20 __

(NOTARY PUBLIC)          MY COMMISSION EXPIRES

Page 123

```
 1
 2              CERTIFICATE
 3
 4      I, MARIA ACOCELLA, a Notary Public within
 5   and for the State of New York, do hereby
 6   certify:
 7      That the witness whose deposition is
 8   hereinbefore set forth, was duly sworn by me
 9   and that the within transcript is a true
10   record of the testimony given by such
11   witness.
12      I further certify that I am not related to
13   any of the parties to this action by blood
14   or marriage and that I am in no way
15   interested in the outcome of this matter.
16      IN WITNESS WHEREOF, I have hereunto set my
17   hand this 5th day of January, 2021.
18
19
20
          MARIA ACOCELLA
21
22
23
24
25
```

32 (Pages 122 - 124)

1

2    UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF NEW YORK

3    CASE NO. CV-18-2710

4    ------------------------------------x

5    MARIO H. CAPOGROSSO,

6

                     Plaintiff,

7

8         -against-

9    ALAN GELBSTEIN, et al.,

10                   Defendants.

11   ------------------------------------x

12

                     December 18, 2020

13                   11:48 a.m.

14

15      VIDEO EXAMINATION BEFORE TRIAL of

16   MARIO H. CAPOGROSSO, the Plaintiff

17   herein, taken by the Defendants, pursuant

18   to Notice, before Lisa H. MacDonald, RPR,

19   and Notary Public of the State of New

20   York.

21

22              VOLUME II

23

24

25

Page 126

```
 1
 2  APPEARANCES.
 3
 4
    MARIO H. CAPOGROSSO, ESQ.
 5  21 Sheldrake Place
    New Rochelle, New York 10804
 6      Plaintiff Pro Se
 7
 8
    STATE OF NEW YORK, OFFICE OF THE ATTORNEY
 9  GENERAL, LETITIA JAMES
    28 Liberty Street
10  New York, New York 10005
        Attorneys for Defendants
11  BY:    JAMES THOMPSON, ASSISTANT
           ATTORNEY GENERAL.
12
13
    ALSO PRESENT:
14
    Howard Brodsky, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

Page 128

```
 1           M.H. Capogrosso
 2  on a case and you don't show up on that
 3  case, your reputation has been -- has
 4  been damaged. It's been taken away.
 5  Nobody is going to trust you anymore.
 6  Nobody is going to hire you on another
 7  case especially in Brooklyn if you take
 8  their money and you don't show up. The
 9  worst thing you can do to a Brooklyn
10  motorist or a Brooklyn client is take
11  their money and not show up.
12           I've dealt with the Brooklyn
13  community for 10 years. I've had threats
14  against my safety from the Brooklyn
15  community when I don't show up for a case
16  and I took their money. It's the worst
17  thing you can do is not show up on a case
18  and you take their money.
19           These are all cab drivers
20  that -- a lot of these cases. They're
21  all business -- they're all working men
22  for a living and you can't take their
23  money and not show up.
24           Now my reputation for
25  showing up in a courthouse in the
```

Page 127

```
 1           M.H. Capogrosso
 2           MR. VIDEOGRAPHER: The time
 3      is 11:48. We are on the record.
 4  EXAMINATION BY
 5  MR. THOMPSON:
 6      Q    So thank you,
 7  Mr. Capogrosso. You can see we are back
 8  looking at Exhibit 1; correct?
 9      A    Yes.
10      Q    And we are at page 4 of the
11  breakdown of your damages. You see item
12  number 4 which talks about compensatory
13  damages to the loss and resultant damages
14  to your legal reputation in the Brooklyn
15  community. You see that, correct,
16  Mr. Capogrosso?
17      A    I do, yeah.
18      Q    And you estimated damages as
19  5 times the value of 15 months of your
20  revenue; is that correct?
21      A    Yes.
22      Q    So how did you arrive at
23  that figure?
24      A    Well, your reputation as an
25  attorney is paramount. If you take money
```

Page 129

```
 1           M.H. Capogrosso
 2  Brooklyn community has been -- has been
 3  just -- has been ruined. I can't tell
 4  you how it's been ruined. Who's going to
 5  hire me on a case again? That's how I
 6  got that number.
 7      Q    So but when you -- I
 8  understand you feel that your reputation
 9  has been harmed, but why did you
10  determine that the value of it was 5
11  times $122,715?
12      A    The exact number -- well.
13  122 was the money I could have brought
14  in, 122 and five years is the amount of
15  money since I left to the time I brought
16  the Complaint. I was removed on May 11,
17  2015 and to currently right now it's been
18  five years.
19      Q    So --
20      A    Five and-a-half years. I
21  could have put it at 5.5, but I put it at
22  five.
23      Q    So you chose that number
24  because you feel that it reflects the
25  amount of money that you could have
```

2 (Pages 126 - 129)

Page 130

1    M.H. Capogrosso
2  brought in over those five years;
3  correct?

4    A    Over those five years, plus
5  the damage to my reputation over those
6  five years.
7    Q    Yeah.  The question I'm
8  trying to get at, Mr. Capogrosso, is why
9  do you put the value of the damage of
10  your reputation as the same of the value
11  of five years of your expense -- of your
12  income or your billings rather?
13    A    Well, that was the five
14  years I was not able to -- the damage to
15  my reputation for those five years I was
16  not present and being able to do this
17  type of work, not being able to talk to
18  my clients, not being able to represent
19  my clients for those five years.
20    Q    I guess my question is
21  what's the difference between your
22  reputational claims and the future
23  prospective revenue that you could be --
24  that you also claim?
25    A    Revenue is one thing.

Page 131

1    M.H. Capogrosso
2  Damage to -- I might not be able to get
3  that revenue ever again counsel.  I might
4  not ever be able to generate any type of
5  revenue in this community or in any TVB
6  in New York.  I might not be able to
7  generate that revenue again.
8        Now that is for a jury to
9  decide as to what the damage to my
10  reputation is, a jury to decide how these
11  defendants should be punished.  I have
12  given you figures.  I have told you the
13  total amount of revenue I brought in, the
14  amount of months, what it breaks down per
15  month.  I've given you my figures.  A
16  jury needs to make those determinations,
17  but that's how I made it, the five years
18  I've been out, the value to my reputation
19  that I don't think I'll be able to get
20  many more clients in the Brooklyn
21  community because of this and the money
22  which I lost because I was not able to
23  work for the Brooklyn community during
24  this period of time.
25    Q    So let me ask you -- let me

Page 132

1    M.H. Capogrosso
2  ask the question a different way.  If
3  your reputation had not been harmed at
4  all and you had continued practicing in
5  the TVB, would you have -- you would have
6  continued making money at that $8,181 per
7  month or you would have continued --
8  sorry.  Let me withdraw the question and
9  phrase it a different way.
10        If you had not had your
11  reputation damaged at all, isn't it the
12  case that you would have just continued
13  making the same amount of money you were
14  making before you were expelled?
15    A    Well, I don't know that.  I
16  can't assume that.  I can't assume it.  I
17  may have made more.  I may have made
18  less.  I don't know.  I probably would
19  have made more because people liked me.
20  My clients liked me.  My clients really
21  liked me.
22        I probably would have
23  brought even more money in, which is the
24  reason some of these attorneys down there
25  wanted me out.  It's a very competitive

Page 133

1    M.H. Capogrosso
2  business this ticket broker, this ticket
3  business.  We are all vying for the
4  same -- the same ticket.  There's only so
5  many tickets written.  It's a very
6  competitive business with the attorneys.
7        So my reputation was growing
8  and I probably would have made more.
9    Q    So let me ask you, do you
10  have any basis to believe or any evidence
11  for the proposition that you would have
12  made more money in the future?
13    A    My clients liked me.  My
14  reputation was good at that point.  I
15  reestablished my reputation.  I was
16  getting -- I was getting, you know,
17  clients, you know.  I don't know.  People
18  liked me.  My clients liked me.
19    Q    And how do you know that
20  your reputation was damaged?
21    A    Nobody is going to hire me
22  anymore when you -- I had to call 850
23  clients.  I gave you my calendar, 850
24  clients and tell them I can't show up.
25  You took my money.  Counsel, why aren't

3 (Pages 130 - 133)

Page 134

M.H. Capogrosso

1    M.H. Capogrosso
2 you here? I had to explain it to 850
3 clients.
4    I can't tell you why. I
5 have no idea. I was given nothing in
6 writing. I was told by Danielle Calvo to
7 leave and told by Ida Traschen I'm not
8 allowed. I was given nothing in writing.
9 I have nothing to tell them. I was given
10 nothing by your office. I have nothing
11 to tell my clients. I don't know why. I
12 have no reason. I was told to leave.
13   Q   All right.
14   A   So my reputation -- so my
15 reputation has been damaged.
16   Q   But you were still able to
17 get jobs in the legal community. You
18 said you represented clients on dozens of
19 cases, personal injury cases, criminal
20 cases and other cases; isn't that
21 correct?
22   A   It took me a while to get a
23 job. They're not easy to find,
24 especially as you get older. They're not
25 easy to find. It took me a year to find

Page 135

M.H. Capogrosso

1    M.H. Capogrosso
2 the first job and then Jiang was nice,
3 then Jiang's office, but it's not easy,
4 it is not and it's not --
5   Q   Did you --
6   A   I liked -- I liked doing
7 what I did.
8   Q   But your reputation --
9   A   People my age are retiring,
10 retiring at this age. I like to work and
11 it's not easy getting a job at this age.
12   Q   Your reputation didn't
13 prevent you from getting these jobs
14 though, the one in the Perla firm and
15 then the one at the Jiang firm; is that
16 correct?
17   A   I had to leave this type
18 of -- well, they didn't know about this,
19 my reputation. They didn't know about
20 this lawsuit or that I didn't show up on
21 cases, I wasn't allowed to show up.
22 Neither one of them asked me about this.
23 I would have told them if they did, but
24 they didn't ask me.
25    But in terms of the clients,

Page 136

M.H. Capogrosso

1    M.H. Capogrosso
2 yes, it was ruined. In terms of the
3 employers, no, it was not ruined because
4 I was never asked.
5   Q   So can you specifically
6 identify any economic harm that you've
7 caused -- that you've suffered based on
8 the damage to your reputation?
9   A   If I was to go back to
10 practice this type of law, I'm not going
11 to get as many cases as I did before. My
12 name and reputation as somebody who shows
13 up and argues a case and represents a
14 client zealously, which is an oath I
15 took, is not the same and it's not by my
16 fault. It's not by my fault. I took an
17 oath to zealously advocate and I could
18 not zealously advocate because I was
19 removed for no reason. No reasons were
20 given to me. I got a 10 second phone
21 call from Ida Traschen.
22   Q   Okay. But so the question
23 was can you specifically identify any
24 economic harm that has been caused by the
25 damage to your reputation?

Page 137

M.H. Capogrosso

1    M.H. Capogrosso
2   A   I'm not able to generate the
3 income that I was generating at the
4 Brooklyn TVB and I showed you the revenue
5 I was bringing in.
6   Q   But is that because you're
7 not practicing at the Brooklyn TVB or is
8 that because of the damage to your
9 reputation?
10   A   Because I'm not working at
11 the Brooklyn TVB and because of the
12 damage to my reputation. No one is ever
13 going to give me a case again down there,
14 nobody.
15   Q   Because you --
16   A   Nobody is going to give me a
17 case.
18   Q   Because you can't practice
19 there?
20   A   I can't practice there and
21 if I could they still wouldn't hire me.
22   Q   So it's more a contingent
23 thing in the event that you were to be
24 reinstated?
25   A   Listen, my -- my reputation

4 (Pages 134 - 137)

Page 138

M.H. Capogrosso

1 as an attorney has been damaged. I have
2 to explain this removal from the Brooklyn
3 TVB in 50 states in the United States if
4 I decide to go practice in any one of
5 these states, 50. In federal court, I
6 have to explain this. Immigration court,
7 I have to explain this. If I decide to
8 go down to the US PTO patent court, I
9 have to explain this.
10      That's the damage to my name
11 and reputation. I have to explain this
12 every place I go down the road and every
13 court I seek admittance to I have to
14 explain it. You put a number on it. I'm
15 low. This number should be much higher.
16 You have to explain this when you try to
17 seek admission to another state court
18 someplace or to your federal court, the
19 Eastern District court, try to.
20      I was removed without an
21 explanation as to what happened. A 10
22 second phone call from Ida Traschen, from
23 somebody, a clerk who didn't even look at
24 the videotape. That's the damage --

Page 139

M.H. Capogrosso

1 Q   So how would you --
2 A   -- to my reputation.
3 Q   How would you describe your
4 reputation while you were practicing at
5 the TVB?
6 A   My clients loved me. I sent
7 you my reviews. They loved me. Police
8 officers didn't like me. I argued a very
9 tough case. The other attorneys didn't
10 like me, I was competition, I know that.
11 But my clients -- the clerks didn't love
12 me, I know that, too, because I wasn't
13 giving them gifts and money and buying
14 them breakfast. I understand that.
15 But my clients loved me. I
16 argued every case.
17 Q   Did the ALJs like you?
18 A   I don't know. I didn't
19 associate with judges. You're not
20 allowed to. There's a rule about that.
21 There's a rule you're not supposed to
22 talk to judges outside a courtroom.
23 Whether they liked me or not, I really
24 didn't care. I know I argued a good

Page 140

M.H. Capogrosso

1 case. I didn't talk to the judges
2 outside the courtroom. You're not
3 allowed to.
4 Q   So you don't know if you
5 were liked and respected by the judges --
6 A   I didn't --
7 Q   -- is that correct?
8 A   I cared what my clients
9 thought. I cared what my clients
10 thought. I argued a tough case. I
11 wasn't trying to please a judge. I was
12 trying to win my client's case. I was
13 not trying to please the judge.
14 Q   I understand that,
15 Mr. Capogrosso, but the question was a
16 little narrower. Do you know if the
17 judges liked and respected you?
18 A   No, I don't. I don't know.
19 I really don't care.
20 Q   Okay.
21 A   I really don't care. I did
22 what I had to do for my clients. Whether
23 a judge liked me or not --
24 Q   Okay?

Page 141

M.H. Capogrosso

1 A   -- I wasn't trying to seek
2 their favor.
3 Q   And the clerks, did the
4 clerks like and respect you?
5 A   Clerks, I don't think they
6 liked me, no. I told you I wasn't giving
7 them any money. I wasn't giving them --
8 Q   Why not?
9 A   -- a piece of the action.
10      No, I don't think the clerks
11 liked me. No, I think maybe one clerk
12 liked me. I treated them all nicely and
13 respectfully. I might have been loud. I
14 have a loud voice when I talk. I never
15 verbally abused anyone. Never called --
16 never made a racial threat, verbally
17 abused anyone.
18      I would argue zealously for
19 my clients, I wanted the best for them,
20 but I never verbally abused anyone.
21 Q   And the other attorneys, did
22 they like you?
23 A   The other attorneys? We
24 were in a competitive business, no. No.

5 (Pages 138 - 141)

M.H. Capogrosso

2 they didn't like me. Yaakov Brody told
3 me to go fuck myself, I'm a Jew hater
4 anti-Semite because I was making too much
5 money in his presence. He had no other
6 reason for saying it.
7        When you go through all the
8 complaints written against me, there's
9 not one from a client or a motorist that
10 I made a racial epi -- a racial remark or
11 an anti-Semitic remark, not one from a
12 client. There's a couple complaints
13 about a fee, that I didn't show up or
14 something about a fee, but not one that I
15 made a racial remark or an inappropriate
16 remark to a client or I didn't show up on
17 a case.
18        Now Yaakov Brody didn't like
19 me and I'm sure --
20    Q     So is it your contention --
21    A     Yes.
22    Q     I apologize. I didn't mean
23 to cut you off, Mr. Capogrosso.
24    A     Go ahead. I'm listening.
25    Q     So is it your contention

M.H. Capogrosso

2 that the complaints about you are made
3 up?
4    A     There's no substance. No,
5 they're not made up. They're real. I
6 saw them. I was given no opportunity to
7 respond to them. The first time I saw
8 these complaints was -- well, I was given
9 no opportunity to respond. I might have
10 seen -- I know I saw them in response to
11 the --
12    Q     Let me rephrase the
13 question.
14    A     I saw the complaints in
15 response to the motion to dismiss, the
16 first time I saw them.
17    Q     Let me rephrase the
18 question. We are not -- Mr. Capogrosso,
19 if I may, obviously there's not a
20 question as to whether the complaints are
21 real or not, but is it your contention
22 that the allegations in the complaints
23 are untruthful?
24    A     Yes, absolutely. I was
25 given no --

M.H. Capogrosso

2    Q     How --
3    A     I'll go through them one by
4 one. Put them up, let's go through them.
5 I'll respond to every complaint written
6 against me. I will respond to every
7 complaint written against me. I will
8 respond to. I'm glad I have the
9 opportunity. I --
10    Q     So that is where we are
11 going to next. Hold on one quick second
12 while I bring up the first of them.
13        Mr. Capogrosso, can you see
14 the exhibit that I've just brought up?
15    A     Yeah. April 1. Yes, not
16 the whole part of it. I can only see the
17 top portion of it, so I'd like to read --
18        MR. THOMPSON: Madam Court
19    Reporter, can you see it?
20        MR. VIDEOGRAPHER: This is
21    the videographer. I see it, Counsel.
22    A     I can only see a portion of
23 it.
24    Q     Yeah. There's more down
25 here.

M.H. Capogrosso

2        MR. THOMPSON: I just wanted
3 to check with Ms. MacDonald because I
4 know you just swapped in. Are you
5 seeing the exhibits okay?
6        MS. REPORTER: Sorry. I was
7 on mute. Yes.
8        MR. THOMPSON: Okay. Good.
9    Q     So, Mr. Capogrosso, do you
10 recognize this document?
11    A     Well, I'd like to see the
12 bottom of it. I do recognize it,
13 absolutely.
14    Q     Sure.
15    A     All right. Go ahead. Yes.
16 I know exactly what this is.
17    Q     And this is, just for the
18 record, this is a document that you
19 produced at number P-80; is that correct?
20    A     I've produced it. I think
21 you produced it. You had this. I've
22 also given it back to you. Yes, it's
23 been produced.
24    Q     And you said you recognize
25 it. What is this document?

6 (Pages 142 - 145)

1      M.H. Capogrosso
2      A    Well, this is the date with
3   Tanya Rubinowitz. This is the lawyer,
4   the woman calling herself a lawyer in
5   Judge Gelbstein's courtroom and this is
6   written by a clerk, I'm not sure who that
7   is, Perez, one of the clerks there and it
8   happened on 2009.
9            This is after I called the
10  District Attorney and I said we have a
11  woman down here calling herself a lawyer
12  on a repeated basis and people asked me
13  where's Tanya, the lawyer. I said she's
14  not a lawyer.
15           And she approaches me that
16  day and says did you call -- did you call
17  the District Attorney? I said yes, I
18  did, I admitted it to her and then she
19  starts yelling and berating me and I
20  tried walking away from her.
21           Now, this clerk -- this
22  happened near the attorney's room. I
23  know exactly where it happened. Between
24  the attorney's room and the clerks, it's
25  at least 60 feet.

1      M.H. Capogrosso
2            But that's what happened.
3   She came at me yelling and screaming why
4   did you call the District Attorney. I
5   admitted that I did. I could not have
6   admitted to it. I could have said I
7   didn't call her, right. I could have
8   just walked away, but I didn't. I
9   admitted the truth and I tried walking
10  away. That's what happened.
11           I wasn't charged. I wasn't
12  arrested. I didn't do anything wrong but
13  tried to get away from the situation and
14  telling the truth. I told her what
15  happened and what I did.
16     Q    So in this statement from
17  Mr. Perez he writes that he saw -- "He
18  observed and heard Mr. Capogrosso
19  screaming and yelling profanities and
20  obscenities at Ms. Rabinovich, Tanya."
21           Is that true?
22     A    No, it's not. There's not
23  one --
24     Q    You did not?
25     A    No. I did not. I was

1      M.H. Capogrosso
2   telling her to get away from me. I
3   didn't yell any profanity because you
4   know what, they're not listed there. And
5   what obscenity was used? The clerk
6   doesn't put it down.
7            I was telling her to get
8   away from me, but I yelled no profanity
9   and no obscenity. You can't make an
10  allegation that I used a profanity or
11  obscenity if you don't tell me what it is
12  and I used none. I never talked to a
13  woman like that, never. I treat women
14  very respectful.
15           I was loud, that I agree I
16  was loud, but I did not use a profanity
17  or obscenity and none is listed. Tell me
18  which one I used.
19     Q    Mr. Perez also writes that
20  "Mr. Capogrosso was sitting down. I
21  observed him getting up" -- "get up from
22  his seat and approach Ms. Rabinovich
23  walking fast and hard toward her when he
24  bumped real hard into her as he tried to
25  pass by her, which was very unnecessary

1      M.H. Capogrosso
2   given he had plenty of room to walk
3   around her."
4            Is that true?
5      A    I did get up. She's right
6   in my face, right about three feet away
7   from me, right on top of me. I did get
8   up and walk away. I don't recall bumping
9   into her, no. I would never hit a woman,
10  never, never.
11     Q    Would you bump --
12     A    I don't -- she was like
13  right on top of me, maybe three feet
14  away, pointing her finger at me and
15  yelling at me in Russian and some other
16  nonsense, yelling and screaming at me.
17           Did I bump into her, no. I
18  would never hit a woman. But I did tell
19  her to get away from me and I did admit
20  to what I did and she was upset, but she
21  didn't --
22     Q    Did you --
23     A    She was upset.
24     Q    Did you make contact with
25  her in any way?

7 (Pages 146 - 149)

1          M.H. Capogrosso
2     A     No. not that I recall, no.
3 She would have filed a police report
4 against me that I hit her and none was
5 filed. I do not recall hitting her,
6 absolutely not.
7     Q     So I'll tell you,
8 Mr. Capogrosso, we are going to look at a
9 number of reports and this has some
10 similarities to some other ones in there
11 will be a number of reports that say that
12 you were yelling and shouting obscenities
13 and there will be a number of reports
14 saying that you bump into people and then
15 indicate that it's not on purpose.
16    A     Well --
17    Q     Is there any truth to that?
18    A     Well, you can write and say
19 whatever you want. You can write and say
20 whatever you want. You know, I was never
21 arrested on anything. I didn't yell any
22 obscenity. You have to give me the
23 obscenity I used. You can make any
24 allegation you want at me. You have to
25 prove it. You have to have some type of

1          M.H. Capogrosso
2 corroboration. Is anybody corroborating
3 this, Ms. Perez, that they saw me?
4     Q     Well --
5     A     Was there a police report
6 written against me?
7     Q     Well, this is not a, you
8 know, this is not a statement in a court
9 of law. This is just a complaint saying
10 what happened; isn't it?
11    A     Well, where's my affidavit
12 in response? Where's Judge Gelbstein
13 giving me a chance to respond to this so
14 we get right to the heart of the matter
15 in 2009?
16    Q     So this person L. Perez,
17 Jr., do you know who that is?
18    A     No.
19    Q     It says MVR 1. Do you know
20 what an MVR 1 is?
21    A     No.
22    Q     I would suspect that it
23 means Motor Vehicle Representative 1,
24 which is the pay grade for the people who
25 work as clerks behind the counter.

1          M.H. Capogrosso
2     So let's just ask here,
3 Mr. Perez who wrote this statement, is he
4 lying?
5     A     I did not bump into anybody.
6 I did not hit anybody. I did walk away
7 from this woman who approached me,
8 approached me and asked me if I called
9 the DA on her and I said yes, I did, but
10 that story doesn't get --
11    Q     So --
12    A     -- that story doesn't get
13 told.
14    Q     So Mr. Capogrosso that
15 wasn't quite the question. The question
16 is is Mr. Perez lying?
17    A     That I used an obscenity,
18 absolutely, absolutely.
19    Q     Why would he lie?
20    A     They like Tanya. I told you
21 this already. Tanya was doing business
22 with the clerks. I saw Tanya at the
23 clerk's counter rescheduling cases as if
24 she was a lawyer. Maybe she was entering
25 guilty pleas at the counter as if she was

1          M.H. Capogrosso
2 a lawyer. She had a case load.
3     She had an office right
4 outside the DMV and they were doing work
5 for her for some reason, which I don't
6 know, but, you know, it wasn't for free,
7 so they liked Tanya.
8     Q     And so you think Perez was
9 lying because Ms. Rabinovich bribed the
10 clerks --
11    A     That's not --
12    Q     -- is that correct?
13    A     I don't know. I don't know.
14 I know I didn't bump into anybody. I
15 know she was right on top of me. I know
16 I don't use obscenities with women,
17 absolutely not. There's not one --
18    Q     Okay.
19    A     -- from a motorist. If you
20 go through all the complaints against me,
21 they're all by clerks. Not one motorist
22 or client has made a complaint against me
23 that I used an obscenity. You go through
24 all my complaints.
25    Q     Well, we'll see some --

8 (Pages 150 - 153)

```
1            M.H. Capogrosso
2      A    You go through all my
3  complaints.
4      Q    Well, we'll see some of
5  those as we go forward. I'm going to
6  bring up another document here.
7         MR. THOMPSON: Oh, actually
8  before I do, Madam Court Reporter,
9  Ms. MacDonald, can I ask you to
10  please mark that as Exhibit 3?
11         Ms. MacDonald?
12         MS. REPORTER: Sure. I
13  usually don't like to speak while
14  you're videotaping so I've just been
15  nodding, but, yes, I'm noting in the
16  index that it will be marked.
17         MR. THOMPSON: Okay. Good.
18         MS. REPORTER: Are you
19  e-mailing -- did you e-mail all of
20  these exhibits to the other reporter?
21         MR. THOMPSON: Well, we
22  e-mailed all of them to Veritext
23  yesterday and we got a receipt, a
24  confirmation e-mail and I know that
25  the other reporter had them.
```

```
1            M.H. Capogrosso
2         MS. REPORTER: Okay.
3         (The above-referred-to
4  statement was marked as Exhibit 3 for
5  identification as of this date.)
6      Q    Mr. Capogrosso, I'm going to
7  bring up another exhibit --
8      A    Yes.
9      Q    -- and share my screen here.
10  Mr. Capogrosso, do you see
11  the exhibit?
12      A    Yes, yes. I remember that
13  one. April, yes.
14      Q    And you see this one was
15  produced by you and marked P-82; correct?
16      A    Yes.
17      Q    And so what is this
18  document?
19      A    Well, this is the same
20  incident and look what Roy says. Look
21  what Roy says. He was seated on the
22  bench. He stated get away from me, which
23  is what I'm telling Tanya. Then he rose
24  up and told Tanya to get away.
25         There's no indication I
```

```
1            M.H. Capogrosso
2  bumped into her because I didn't bump
3  into her. That's Roy's version of the
4  same story. I'm telling the woman to get
5  away from me.
6      Q    So this is a complaint
7  written by Roy Tucci; correct?
8      A    Yeah. Roy I know. He's one
9  of the clerks. There's no indication --
10      Q    Does --
11      A    Wait, you've got to let me
12  finish.
13      Q    Sure.
14      A    There's no indication I
15  verbally abused or I said any
16  obscenities. Now they both observed the
17  same incident. What Roy states is I told
18  Tanya to get away from me, which I did.
19         MR. THOMPSON: So -- well,
20  first of all, Madam, Ms. MacDonald,
21  can I ask you to please mark this as
22  Exhibit 4?
23         (The above-referred-to
24  statement was marked as Exhibit 4 for
25  identification as of this date.)
```

```
1            M.H. Capogrosso
2      Q    And, Mr. Capogrosso,
3  Mr. Tucci does say that he heard a loud
4  voice and that he saw you.
5      A    Well, I do speak loudly,
6  yes.
7      Q    He then writes "He then rose
8  and told Tanya the interpreter to get
9  away. Mr. Capogrosso moved towards Tanya
10  and they seemed to bump."
11      A    I didn't --
12      Q    "The noise continued" --
13      A    Go ahead, finish.
14      Q    So this is Mr. Tucci
15  corroborating that you bumped into
16  Ms. Rabinovich; isn't that correct?
17      A    She bumped into me. I'm
18  trying to get away from her. She
19  approaches me. She's right on top of me.
20  I'm telling her to get away. She's
21  yelling and screaming in Russian at me
22  pointing her finger at me and I'm trying
23  to get away from her.
24         He doesn't indicate I bumped
25  into her. He said they seemed to bump.
```

9 (Pages 154 - 157)

Page 158

M.H. Capogrosso

1
2   Q      Well, he said that you moved
3   toward Tanya. You'll see I'm
4   highlighting that language here. He says
5   that you moved toward her.
6   A      She's right in front of me.
7   I'm trying to get away from this woman
8   who's yelling and screaming at me at the
9   top of her lungs.
10          Now, did anybody report that
11  she's yelling at me, no. "They seem to
12  bump." She's three feet away from me.
13  I'm trying to get away from her. That's
14  what happened.
15  Q      Mr. Tucci says you're moving
16  towards her.
17  A      She was in front of me.
18  Where do you want me to go? How do I get
19  away from the woman?
20  Q      So is Mr. Tucci telling the
21  truth here?
22  A      I tried walking away from
23  this woman.
24  Q      I understand, but that's not
25  the question. The question is is

Page 159

M.H. Capogrosso

1
2   Mr. Tucci telling the truth here?
3   A      I don't recall touching this
4   woman at any point, at any point.
5   Q      I understand that,
6   Mr. Capogrosso, but the question is is
7   Mr. Tucci lying in this statement?
8   A      I don't know if he's lying
9   or not. Maybe that's what he thought he
10  saw. I don't remember hitting this or
11  touching this woman.
12  Q      Is it possible that you did?
13  A      I don't recall. I've never
14  hit or touched a woman like this in my
15  life, never. Bumping into somebody --
16  you're three feet away from me. Why are
17  you in my face? Why are you yelling and
18  screaming at me? How do I get away from
19  you at this point in time?
20  Q      Is it possible you bumped
21  into her on purpose?
22  A      Absolutely not. I would
23  never hit a woman in my life ever.
24  Q      Mr. Tucci writes that "The
25  noise continued until our supervisor

Page 160

M.H. Capogrosso

1
2   Danielle Calvo intervened." Do you
3   remember what happened?
4   A      She's yelling and screaming
5   at me in Russian, in Russian after I
6   admitted to her that I called the
7   District Attorney. She's yelling and
8   screaming in Russian at me. I don't know
9   what she was screaming.
10  Q      So --
11  A      And I like Russian women,
12  don't get me wrong, but I don't like a
13  Russian woman calling herself a lawyer
14  who's not. I didn't like that,
15  absolutely not.
16  Q      Do you remember if --
17  A      I did not bump into her.
18  Q      So do you remember if your
19  bodies made contact at all?
20  A      I've answered this. No, I
21  do not.
22  Q      Okay. No, you don't
23  remember or no, it didn't happen?
24  A      I would never -- I don't
25  recall bumping into this woman. No, I do

Page 161

M.H. Capogrosso

1
2   recall telling her to get away from me.
3   That's what I recall.
4   Q      How big is Ms. Rabinovich?
5   A      I don't recall. At that
6   point in time she was a nice 5'5" maybe.
7   Q      And how tall are you,
8   Mr. Capogrosso?
9   A      5'10".
10  Q      And are you a bigger guy,
11  are you a muscular guy?
12  A      Oh, absolutely, I'm not
13  going to deny that. I work out every
14  day.
15  Q      So you're, it's safe to say,
16  a lot more physically imposing than
17  Ms. Rabinovich was; is that correct?
18  A      That's why I was trying to
19  move away from her. I'm 210. I'm 5'10".
20  210. That's why I'm trying to get away
21  from her.
22  Q      All right.
23  A      That's why I'm telling her
24  to get away from me.
25  Q      Okay. Let's move on to the

10 (Pages 158 - 161)

Veritext Legal Solutions

212-267-6868                                    516-608-2400

1        M.H. Capogrosso
2   next document. I'll stop the Screen
3   Share.
4        MR. THOMPSON: And, Madam
5   Court Reporter, that was Exhibit 4.
6   Q      I'm going to share another
7   document here.
8        Mr. Capogrosso, can you see
9   this document?
10  A     Yeah.
11  Q     And what is this document?
12  Do you recognize it?
13  A     Well, it's from Marisol. I
14  know Marisol.
15  Q     And this document you
16  produced and Bates stamped P-84; correct?
17  A     Yes.
18  Q     And so what is this specific
19  document?
20  A     I guess it's her complaint
21  about me that I was acting aggressively
22  toward her.
23        MR. THOMPSON: Okay.
24  Ms. MacDonald, can I ask you to
25  please mark this as Exhibit 5?

1        M.H. Capogrosso
2        (The above-referred-to
3   statement was marked as Exhibit 5 for
4   identification as of this date.)
5   Q      So, Mr. Capogrosso, who is
6   Marisol Cervoni?
7   A     She's a clerk at the TVB,
8   Brooklyn TVB.
9   Q     Did you have a good
10  relationship with her?
11  A     She was a clerk. I just --
12  I went to the counter and she helped me
13  get the tickets for the day. She was a
14  clerk. I wasn't trying to have a
15  relationship with clerks. I wasn't
16  trying to have a relationship. I was
17  just trying to deal with her and to do my
18  job.
19  Q     I understand,
20  Mr. Capogrosso, but the question was did
21  you have a good relationship with
22  Ms. Cervoni?
23  A     I had a good relationship on
24  a business level with all the clerks. I
25  went up to the counter, I gave them my

1        M.H. Capogrosso
2   tickets that I needed for the day. Can I
3   please have my tickets, thank you very
4   much. That's all I said or did.
5   Q      Okay.
6   A     I did what was required to
7   do.
8   Q     So --
9   A     Did I talk to her after work
10  or during work or have conversations with
11  her, no. I did my business at the
12  counter or when I put the ticket in the
13  courtroom. That was the extent of it.
14  Hello, here's my ticket, thank you.
15  Q     So, Mr. Capogrosso,
16  Ms. Cervoni writes that on June 9, 2009
17  at approximately 9:45 a.m. she called a
18  customer to her counter. "The motorist
19  was accompany by Michael, who is the
20  assistant of Mr. Capogrosso who's one of
21  the lawyers who represents motorists at
22  their hearings at Brooklyn South."
23        Who is Michael?
24  A     Well, at that point in time
25  we were allowed to have paralegals. He

1        M.H. Capogrosso
2   would -- they were a lot of Russian
3   clients down there. He was a paralegal
4   that worked for me. He spoke Russian.
5   He translated -- he translated clients
6   who spoke Russian to English and helped
7   in the courtroom when we needed
8   translation.
9   Q      And you --
10  A     All the attorneys had a
11  paralegal at that point.
12  Q     And did you employ him?
13  A     He was paid as an
14  independent contractor.
15  Q     About how much did you pay
16  him?
17  A     I don't know. It varied.
18  It depends how many hours he put in.
19  Q     How much did you pay him per
20  hour?
21  A     I don't recall.
22  Q     Do you have a ballpark
23  estimate?
24  A     No. I don't recall. We
25  paid him -- we paid him on a daily basis.

11 (Pages 162 - 165)

1          M.H. Capogrosso
2 I made sure he got paid every day for the
3 work he did.
4     Q     And how long did you have an
5 assistant for --
6     A     I don't recall.
7     Q     -- or a paralegal?
8     A     I don't recall how long.
9 You know, it must have been -- all the
10 other attorneys had them, so at some
11 point in time I was doing well, I said
12 let me take on and they all were using
13 them, so I did.
14          I don't recall the exact
15 amount of time. I know they were all
16 thrown out at one point in time because
17 there were accusations against them, so
18 they were thrown out of all the TVBs.
19     Q     What --
20     A     We weren't allowed to have
21 them anymore.
22     Q     What were these accusations?
23     A     I don't know exactly. As I
24 understand it, they were stealing,
25 stealing from motorists, stealing from

1          M.H. Capogrosso
2 clients, stealing from lawyers, stealing
3 from each other.
4     Q     Were there accusations
5 against Michael?
6     A     No, no. Michael was a nice
7 guy, real nice guy.
8     Q     And what was Michael's last
9 name?
10     A     I don't remember, I really
11 don't, but he was a nice guy. He had a
12 brother --
13     Q     Did you --
14     A     His brother --
15     Q     Did you ever --
16     A     His brother worked for -- go
17 ahead.
18     Q     Did you ever employ an
19 assistant other than Michael?
20     A     His brother and I, when I
21 first came down, his brother was a
22 paralegal for Terry Horton. We became
23 friends. I forgot his name. Andy was
24 his brother.
25          But did I ever employ him,

1          M.H. Capogrosso
2 no. He worked for -- Andy worked for
3 Eugene Gabase(phonetic).
4     Q     So Michael is the only
5 assistant --
6     A     Yes.
7     Q     -- that you employed; is
8 that correct?
9     A     As I recall, yes, but Andy
10 and I were friends.
11     Q     All right. So in here, in
12 Exhibit 5 you see Ms. Cervoni writes that
13 the motorist handed her driver's license.
14 "And Michael called Mr. Capogrosso over
15 to my window. Mr. Capogrosso thinking
16 there was a problem approached my counter
17 and aggressively and belligerently began
18 yelling at me."
19          Do you recall this incident?
20     A     I don't think I was
21 aggressive or belligerent. I might have
22 been loud. I do speak loudly. I want
23 people to hear me when I speak. I think
24 maybe she's a little oversensitive.
25 Maybe I was trying to understand what was

1          M.H. Capogrosso
2 going on because I cared about my client
3 and what was going on and I actually give
4 a damn about my client and their
5 licenses.
6          So I was trying to get to
7 the heart of the matter, but I was not
8 belligerent or aggressive. Maybe I was
9 loud.
10     Q     So do you recall this
11 specific incident?
12     A     I recall Michael calling me
13 over, yeah. I never cursed or insulted
14 the woman, absolutely not, absolutely
15 not. She doesn't put down what curse or
16 insult I used. You make general
17 allegations --
18     Q     Does she have to?
19     A     Well, yeah. If you make an
20 accusation somebody is cursing or
21 insulting me, tell me what I said. Tell
22 me exactly. I might have been loud.
23 Listen, I am loud. I want people to hear
24 me when I speak. But tell me what word I
25 used to curse or what word I used to

12 (Pages 166 - 169)

M.H. Capogrosso
1
2   insult. I'd like to know.
3       I don't curse or insult
4   women. It's not something I do.
5       Q       Does it make her wrong if
6   she didn't list the curse word?
7       A       Absolutely, because I want
8   to know what I'm being accused of. Don't
9   accuse somebody of something if you can't
10  stand behind it. Tell me what curse word
11  I used and what word I used to insult
12  you. I want to know that.
13      Q       So you --
14      A       Tell her that.
15      Q       So you admit that you were
16  speaking with her, but you say you were
17  not belligerent --
18      A       I wasn't --
19      Q       -- is that correct?
20      A       I wasn't belligerent. I was
21  speaking loudly as I'm speaking to you.
22  I speak in a loud voice. If she took it
23  wrongly, I'm sorry.
24      Q       As you said, Mr. Capogrosso,
25  you're a big guy. You're an athletic

M.H. Capogrosso
1
2   guy. Is it possible -- and when you
3   speak loudly to someone, particularly a
4   woman, isn't it possible that they are
5   going to view that as aggressive and
6   belligerent?
7       A       I don't know how you view
8   it. I don't know how you view it. View
9   it anyway you like. I wasn't cursing. I
10  wasn't insulting. I might have been
11  loud. I might have been talking loudly
12  because I'm trying to get to the heart of
13  the matter and help my client out, but
14  how it's interpreted, I don't know.
15      Q       So she writes that she
16  assured you there was no problem and that
17  she had already printed out the ticket
18  for your client, quote, "but at that
19  point he was already out of control and
20  continued yelling, cursing and insulting
21  me."
22          Is that true?
23      A       No. I never cursed or
24  yelled or insulted, absolutely not.
25  Absolutely not.

M.H. Capogrosso
1
2       Q       So --
3       A       Absolutely not.
4       Q       So is Ms. Cervoni lying?
5       A       Yes. When she says I'm
6   cursing and insulting and yelling, yes,
7   I might have been loud, but not cursing
8   and insulting.
9           She doesn't put --
10      Q       Why would she --
11      A       -- down what I said.
12      Q       Why would she lie?
13      A       I don't know.
14      Q       What motivation would she
15  have to lie about you?
16      A       Like I said, maybe I wasn't
17  giving her gifts and presents and money
18  like the other clerks were getting. The
19  other attorneys were giving these clerks
20  money for Christmas, buying them
21  breakfast.
22      Q       Did --
23      A       You got to let me finish.
24          Buying them breakfast in the
25  morning, giving them parties. One of the

M.H. Capogrosso
1
2   attorneys says how much money are you
3   giving the clerks for Christmas? I was
4   not doing this. I was there to do a job,
5   that's it. I was not trying to --
6       Q       So is --
7       A       -- endear myself to the
8   clerks. I was not in any way. To me
9   there was an appearance of impropriety if
10  I tried to endear myself to these clerks
11  by giving them gifts or buying them
12  breakfast.
13      Q       Did --
14      A       You got to let me finish.
15  Buying them breakfast --
16      Q       Sure.
17      A       -- or giving them cash as
18  the other attorneys were doing. It was
19  an appearance. I didn't want to do it.
20  I just wanted to do my job.
21          Was I loud? I definitely
22  probably was loud. I'll admit to that.
23  Was I cursing and insulting, absolutely
24  not.
25      Q       Mr. Capogrosso, is it your

13 (Pages 170 - 173)

M.H. Capogrosso

1  M.H. Capogrosso
2  testimony that Ms. Cervoni made this up
3  because you weren't giving money to the
4  clerks?
5     A    She's not telling the truth
6  there. I did not curse and I didn't
7  insult. I don't know why. I'm a zealous
8  advocator in this court, that's what I
9  took an oath to do, zealously advocate.
10  I took an oath when I got sworn in.
11  That's what I do.
12        I didn't curse at --
13    Q    Do you think Ms. Cervoni
14  wanted to see you gone from the TVB?
15    A    I don't know. I don't know.
16  I think we became friends afterwards. I
17  think we became friends right before we
18  left. That's why I wanted to depose her.
19  I think she really liked me at one point
20  in time. She's a very beautiful woman,
21  Marisol and I think at one point -- she's
22  a nice woman and I think at one point we
23  became friends.
24        But was I trying to endear
25  myself to any of these clerks, no. I was

1  M.H. Capogrosso
2  trying to do my job. That's all I'm
3  required to do.
4    Q    She writes that -- she
5  writes that "The supervisors, Geri,
6  Danielle and John all came out to see
7  what the commotion was and to resolve the
8  situation, but he" and I assume that
9  means you "refused to listen to reason or
10  leave my counter."
11        Did you refuse to leave?
12    A    I don't recall, no, no.
13  Maybe I -- well, wait a second, wait.
14  Wait a second. Maybe I wanted the issue
15  resolved and I wanted some explanation of
16  the issue, which is my duty to do. I
17  have a duty to my client, not to a clerk,
18  but to my client to make sure the issue
19  is resolved, whatever this issue was.
20        Michael called me over,
21  there was an issue. I have a duty to
22  make sure that issue gets resolved as the
23  attorney for the motorist, that's my job,
24  make sure it's resolved, right? That's
25  the job of the attorney here, right? I

1  M.H. Capogrosso
2  had the obligation, so let me resolve it.
3  Let me speak to somebody else if there's
4  an issue and one person can't solve it,
5  you go to another person and maybe they
6  can solve it.
7        So. yeah, I had a duty to my
8  client to resolve that issue, so maybe --
9    Q    So she writes --
10  Mr. Capogrosso, she writes "Throughout
11  the day Mr. Capogrosso was taunting me.
12  He would walk past my station making
13  comments and smirking at me." Is that
14  true?
15    A    No. Taunt? Wait a second.
16  How exactly did I taunt? Now you give me
17  the exact words I used. That's a lie.
18        Smirk? You know, when an
19  issue is resolved with me, it's resolved.
20  I don't hold on -- you know, I don't keep
21  going back after it. I did not smirk. I
22  don't know what smirking is.
23        First of all, is there a
24  problem with smirking? I think we have a
25  Vice President now that smirks all the

1  M.H. Capogrosso
2  time. She enjoys smirking. That's my
3  opinion.
4        I don't see anything wrong
5  with smirking, though I don't recall
6  doing it. I don't even know what
7  smirking is. Laughing?
8    Q    Smirking is a little smile.
9    A    All right. We got a Vice
10  President that seems to do it all the
11  time. It's all right for the Vice
12  President.
13    Q    I'm not sure I understand
14  what this has to do with the Vice
15  President.
16    A    Well, I'm telling you we
17  have a Vice President now, Kamala, who
18  likes to smirk.
19        I don't -- I don't know what
20  smirking is. I have an issue, I resolve
21  the issue, I move on. I'm not trying to
22  have a beef with a clerk at a DMV. That
23  is not my issue to have a beef or an
24  argument with a clerk. I need these
25  clerks to help me out.

14 (Pages 174 - 177)

M.H. Capogrosso

2   Q     If you don't know what
3   smirking is --
4   A     I have -- I have no reason
5   to have an argument or an altercation
6   with a clerk, none, no reason.
7   Q     Mr. Capogrosso, if you don't
8   know what smirking is, how do you know
9   the Vice President does it?
10   A     Well, to me a smirk is when
11   you laugh sarcastically, right, that's a
12   smirk? That's what a smirk is, you laugh
13   sarcastically.
14        And once again I will
15   repeat, it does me no good to have any
16   type of issue with a clerk. I'm there to
17   do a job. I smirk? Now I smirk? I mean
18   I don't believe I'm being accused of
19   smirking.
20   Q     I will tell you,
21   Mr. Capogrosso, this is not the first
22   complaint that we'll see today where
23   someone indicates that you kept coming by
24   and smiling at them and sort of taunting
25   them throughout the day.

M.H. Capogrosso

2   A     Well, you can --
3   Q     Do you have any response to
4   that?
5   A     Well, you can make any
6   complaint you like, it doesn't mean it's
7   true and I have no reason, no reason to
8   have any beef, any complaints with a
9   clerk and clerks at this office that I
10   need. Now, I was given no opportunity to
11   respond to this, none at the time, none.
12   Q     Mr. Capogrosso she writes "I
13   can no longer interact with
14   Mr. Capogrosso at the service counter
15   because I fear for my safety. On many
16   occasions I've observed him display his
17   aggressive behavior toward my coworkers,
18   his clients, the other attorneys and
19   their assistants."
20        She feared for her safety,
21   what does that mean to you?
22   A     I don't know. I treated her
23   nicely and respectfully. Nicely and
24   respectfully I treated this woman. I
25   never threatened her or harmed her.

M.H. Capogrosso

2        I mean you can have any
3   perception you like of somebody. You can
4   have any perception you like. It doesn't
5   mean that that's what I am.
6   Q     Were you aware --
7   A     I was a zealous advocator,
8   but --
9   Q     Mr. Capogrosso, were you --
10   A     Let me finish.
11   Q     Sure.
12   A     Well, let me finish. What
13   reason did she fear? What exactly did I
14   do? See, I want to know the specifics.
15   I don't want to know the allegations.
16   Tell me exactly why you felt fearful.
17        And let me tell you
18   something, you tell me once, you never
19   have to tell me twice. Tell me exactly
20   what --
21   Q     Mr. Capogrosso --
22   A     -- I did. I'd like to know.
23   Q     Well, it seems here you
24   yelled at her and cursed at her and
25   wouldn't leave when she asked you to.

M.H. Capogrosso

2   A     Well, I didn't yell and I
3   didn't curse, I didn't insult. No words
4   are shown, no words. What words were
5   spoken?
6        Now what I did --
7   Q     Mr. Capogrosso --
8   A     -- do, maybe I was loud, but
9   I did not yell and I did not curse. I
10   did not curse and I did not insult and
11   for what reason she's fearful I do not
12   know. I didn't schmooze with her in the
13   morning and ask her how's she doing and
14   is she okay and how is your weekend and
15   how's all this. I didn't talk about all
16   that stuff. I was there to do a job.
17   Q     Mr. Capogrosso, were you
18   aware that there were people at the TVB
19   who were afraid of you?
20   A     No.
21   Q     No?
22   A     None of these complaints
23   were ever brought to me. You tell me
24   once, you don't have to tell me twice.
25   Q     That's not the question

15 (Pages 178 - 181)

1    M.H. Capogrosso
2  though. The question is were you aware
3  that there were people who were afraid of
4  you?
5    A    No. Tell me who. I was
6  never put on notice. You tell me once,
7  you never have to tell me twice.
8    Q    Did anyone around you seem
9  afraid of you?
10    A    Seem afraid? I don't know
11  how other people feel. I know I have a
12  very strong presence, I understand that.
13  I've been told that I have a certain
14  strong presence and maybe it's because a
15  lot of things I've done in my life, but I
16  do have a strong presence.
17    Q    If --
18    A    I've been told that.
19    Q    If someone was afraid of
20  you, would you care?
21    A    I would try to rectify it.
22  I would do everything I could in my
23  ability to rectify it. But was I trying
24  to endear myself to these clerks, no. I
25  was trying to do a job.

1    M.H. Capogrosso
2    Q    Were you aware that
3  Ms. Cervoni had filed a complaint?
4    A    No, no, absolutely not.
5  Like I said, if she had brought this to
6  my attention I would have rectified it
7  immediately. If anybody brought this to
8  my attention, I would have rectified it
9  immediately.
10    Q    She writes that you
11  assaulted a female assistant who works
12  for another lawyer. Is she referring to
13  Ms. Rabinovich?
14    A    Yeah. That was not an
15  assault. That's a lie. There was no
16  assault. There was no assault. I would
17  have been arrested if there's an assault.
18  That's an absolute lie. Your words are
19  very important here. You can't make
20  accusations against somebody that aren't
21  true.
22    Q    So why is Ms. Cervoni lying?
23    A    Why? I don't know. There
24  was no assault.
25    Q    Why would --

1    M.H. Capogrosso
2    A    Was I arrested for assault?
3    Q    Why would she lie?
4    A    Well, maybe she liked Tanya
5  and she didn't like me. Maybe she liked
6  Tanya and she didn't like me. I didn't
7  schmooze with these law -- with these
8  clerks. I wasn't there in the morning
9  saying how was your day. I wasn't there
10  saying how was your weekend. I wasn't
11  there saying what do you want to do for
12  lunch today.
13    Q    Well, she's --
14    A    I wasn't doing that.
15    Q    -- not saying that you're
16  not saying, you know, asking her how
17  she's doing, schmoozing her in the
18  mornings. She's saying that you're
19  physically scaring her.
20    A    How did I physically scare
21  her? Tell me the specifics.
22    Q    You --
23    A    Tell me what I did.
24    Q    -- yelled at her and cursed
25  at her and you wouldn't leave when she

1    M.H. Capogrosso
2  said to leave.
3    A    I didn't curse. I might
4  have been loud. I didn't curse.
5    Q    She says she had to go to
6  the back office to get away from you.
7    A    Well, that was her decision.
8  My duty is to my client. If a supervisor
9  comes out, I'm trying to resolve the
10  issue, I'm going to talk to the
11  supervisor.
12    Q    Do you remember her leaving
13  to get away from you?
14    A    No.
15    Q    She writes "His aggressive
16  behavior has steadily progressed within
17  the past few months. I no longer feel
18  comfortable at my place of employment
19  because of this individual's behavior and
20  I wish to go on record in the event of
21  any future conflicts."
22    A    Well --
23    Q    Had your aggressive behavior
24  been progressing?
25    A    I don't know what she means

16 (Pages 182 - 185)

Page 186

M.H. Capogrosso

```
1                M.H. Capogrosso
 2    by aggressive behavior. Tell me what I
 3    did.
 4        Q    Well, were you aware at this
 5    point that there have been multiple
 6    incidents where people claimed that you
 7    had been aggressive?
 8        A    No, no, no. I --
 9        Q    You had no idea that anyone
10    complained about the incident with
11    Ms. Rabinovich?
12        A    No, no. You tell me -- I've
13    never seen these complaints. If Judge
14    Gelbstein was doing his job or his
15    clerical supervisor was doing their job,
16    they would have brought this complaint to
17    my attention and I would have resolved
18    it. You tell me once, you don't have to
19    tell me twice.
20        Q    So --
21        A    You have to let me finish.
22    You tell me once, you never have to tell
23    me twice. You have to let me finish.
24        Q    So --
25        A    Let me finish.
```

Page 187

```
 1                M.H. Capogrosso
 2        Q    Sure.
 3        A    This was never brought to my
 4    attention so I could resolve it. I'm
 5    there working on a daily basis. I have
 6    no reason to have any altercations with
 7    anybody. I was there to zealously
 8    advocate on behalf of my clients.
 9             You tell me what the
10    aggressive behavior is and I will resolve
11    it, but don't accuse me of something --
12        Q    So --
13        A    You got to let me finish.
14        Q    Sure.
15        A    -- and leave out the details
16    of what the aggressive behavior was, then
17    don't show me this affidavit ever or
18    bring it to my attention so I can resolve
19    it. That's not being fair.
20        Q    So Mr. Capogrosso --
21        A    You've got to let me finish.
22        Q    I do need to ask another
23    question.
24        A    You have to let me finish.
25    I'm not finished.
```

Page 188

```
 1                M.H. Capogrosso
 2             That is not being fair to
 3    me. You have to let me finish. You're
 4    not being fair to me if you make an
 5    accusation and you don't let me address
 6    it and resolve it, you're not being fair
 7    to me.
 8        Q    All right.
 9        A    You have let me finish.
10        Q    Mr. Capogrosso, let's move
11    on to the next question.
12        A    I want to finish.
13        Q    Respectfully --
14        A    You're not --
15        Q    -- we are going to move on
16    to the next question.
17        A    You're not being fair to me
18    if you don't let me address that issue.
19        Q    Mr. Capogrosso, you've been
20    addressing the issue. We have other
21    questions that we need to get to, the
22    first of which is yesterday at his
23    deposition, Judge Gelbstein testified
24    that when he received a complaint about
25    you, he would take you into his office
```

Page 189

```
 1                M.H. Capogrosso
 2    and speak with you verbally about it.
 3             Did he do that in this
 4    case --
 5        A    No, he did not.
 6        Q    -- with the complaints?
 7        A    No.
 8        Q    Do you remember him ever
 9    taking you to his office to discuss
10    complaints about you and about aggressive
11    behavior?
12        A    Absolutely not. Now --
13        Q    Not once?
14        A    You have to let me finish.
15        Q    Sure.
16        A    All these complaints, Judge
17    Gelbstein never presented to me one of
18    these complaints, not one, because I
19    would have filed --
20        Q    Mr. Capogrosso --
21        A    You have to let me finish.
22    Mr. Thompson, you've got to let me
23    finish.
24        Q    Well, let me clarify the
25    question.
```

17 (Pages 186 - 189)

1        M.H. Capogrosso
2            MS. REPORTER: Wait, time
3   out. I'm going off the record right
4   now.
5        Q    Mr. Capogrosso --
6            MS. REPORTER: Time out.
7   I'm stopping. I'm not even writing
8   this.
9            MR. THOMPSON: Let's go off
10  the record.
11           MS. REPORTER: Off the
12  record, please, off the record. We
13  are having an issue.
14           MR. THOMPSON: Off the
15  record, please.
16           MR. VIDEOGRAPHER: The time
17  is 12:40. We are off the record.
18           (A short recess was taken.)
19           MR. VIDEOGRAPHER: The time
20  is 12:45. We are on the record.
21       Q    So, Mr. Capogrosso, as I
22  mentioned, yesterday at his deposition
23  Judge Gelbstein testified that when he
24  received a complaint about you, he would
25  take you into his office and tell you

1        M.H. Capogrosso
2   verbally the substance of that complaint.
3           Do you remember him
4   testifying to that?
5        A    He testified to it.
6        Q    Did that happen in this
7   case, in the case of Ms. Cervoni's
8   complaint?
9        A    Not to me, no, never.
10       Q    Do you remember him ever
11  having a verbal conversation with you
12  about complaints that had been made about
13  you?
14       A    No, nothing, no because he
15  never gave me any complaint to respond
16  to. I would have responded.
17       Q    And let me clarify the
18  question. I'm not asking whether he gave
19  you the physical hard copy complaint.
20  I'm asking whether he verbally told you
21  about complaints that had been made about
22  you?
23       A    No. You tell me once --
24       Q    He never did that?
25       A    No. You tell me once, you

1        M.H. Capogrosso
2   don't have to tell me twice.
3        Q    So was Mr. Gelbstein lying
4   when he said that he spoke with you
5   verbally about complaints?
6        A    Yes. I've never -- he never
7   gave me a specific of any complaint that
8   I could respond to, never the specific of
9   any complaint that I could respond to and
10  resolve.
11       Q    Did he ever tell you that
12  there had been complaints without giving
13  you the specifics?
14       A    No. Give me the specific
15  complaint. No. Tell me what it is and I
16  will respond and resolve it.
17       Q    So were you aware that there
18  had ever been any complaint made about
19  you by any person?
20       A    No, no. I saw no
21  complaints. People didn't like me. I
22  understand that, but I saw no complaints
23  from anyone that I could respond to and
24  resolve because --
25       Q    And --

1        M.H. Capogrosso
2        A    -- I'm the first one to
3   attempt to resolve it.
4        Q    And Mr. Capogrosso I want to
5   make this question very clear. I'm not
6   asking whether you saw a physical hard
7   copy paper complaint. I'm asking you
8   were you ever aware that anyone had ever
9   made a complaint about your conduct?
10       A    No.
11       Q    Let's move on to a new
12  document. I'll close out of that one.
13           MR. THOMPSON: I'm not sure
14  if we marked that one, Ms. MacDonald,
15  but let's mark that Exhibit 5 if we
16  haven't already, the previous one.
17       Q    Mr. Capogrosso, can you see
18  this document?
19       A    Yes.
20       Q    Do you recognize this
21  document?
22       A    Yeah. I recognize the top
23  portion of it, but I'm sure it's --
24       Q    And you see this document
25  was produced by you and marked P-86;

18 (Pages 190 - 193)

M.H. Capogrosso

1
2  correct?
3    A    Yes.
4    Q    What is this document?
5    A    I don't know. It's a
6  complaint from Diantha Fuller I guess.
7         MR. THOMPSON: Can I, Madam
8  Court Reporter, can I ask you to mark
9  this as Exhibit 6?
10        (The above-referred-to
11  statement was marked as Exhibit 6 for
12  identification as of this date.)
13   Q    Mr. Capogrosso, my first
14  question is these redactions up at the
15  top, did you add these?
16   A    No.
17   Q    Where are they from?
18   A    Where are they from? I
19  don't know where they're from. I know
20  you submitted it to my office and then I
21  returned it.
22   Q    Because to my knowledge,
23  these were not redacted --
24   A    Oh.
25   Q    -- when we submitted them.

M.H. Capogrosso

1
2    A    I'll tell you where I got
3  this. I got this redacted like this in
4  a motion -- in your motion to dismiss,
5  this was attached redacted. You filed
6  these affidavits. The first time I'm
7  seeing these affidavits is in your motion
8  to dismiss to me and they were redacted
9  in that manner. That's where I got it.
10   Q    Okay. So who is Diantha L.
11  Fuller?
12   A    She's a lawyer that worked
13  down there.
14   Q    And do you have a good
15  relationship with Ms. Fuller?
16   A    No. Diantha did not like
17  me. Diantha did not like me. She did
18  not like me at all.
19   Q    Why not?
20   A    I don't know. She just
21  didn't like me. I didn't talk to her. I
22  didn't socialize with her. I didn't like
23  the type of attorney she was.
24   Q    What type of attorney was
25  she?

M.H. Capogrosso

1
2    A    Well, she just pretty much
3  pleaded you guilty. She went into the
4  courtroom, took a case, postponed it and
5  she just entered a guilty plea. She
6  didn't really argue for her clients and I
7  felt that was terrible.
8         She's used to solicit
9  attorneys -- solicit clients all the
10  time, solicit clients all the time.
11  She'd walk up to a client in the morning,
12  hand them his bus -- her business card
13  and says here, I'm a lawyer. I thought
14  it was terrible. Judge Gelbstein allowed
15  it.
16        So I didn't like her as an
17  attorney whatsoever. It was terrible
18  what she was doing. There's signs all
19  around that say you shouldn't solicit and
20  she was soliciting everybody.
21   Q    So Ms. Fuller writes "As
22  requested by your staff, below is Agnes
23  Paez's report of the events that
24  transpired on 7/31/09 in the Coney Island
25  Traffic Bureaus, which I took directly

M.H. Capogrosso

1
2  from an e-mail she submitted to me."
3        Do you know who Agnes Paez
4  is?
5    A    Yes. She was a paralegal
6  down there.
7    Q    And who did she work for?
8    A    Well, actually I do remember
9  her now. Now actually this lady did work
10  for me for a while before Michael came on
11  and then went to work -- she did, she
12  worked as a translator. She spoke
13  Spanish. She did work for a couple of
14  months I think. I don't know exactly how
15  long, but for a couple of months with me
16  down there. She was a translator.
17        And I didn't like what she
18  was doing, so I let her go and I brought
19  Michael in instead.
20   Q    And was this time that she
21  worked with you before or after July 31,
22  2009?
23   A    It was before. Before then,
24  before then.
25   Q    And you said you fired

19 (Pages 194 - 197)

Page 198

1      M.H. Capogrosso
2  Ms. Paez; is that true?
3      A     I told her -- well, she
4  went -- I said we are not going to work
5  anymore together. I didn't like what she
6  was doing.
7      Q     What was she doing that you
8  didn't like?
9      A     She was soliciting,
10 soliciting motorists in the parking lot
11 and they was walking in. It was
12 embarrassing. She was hungry for money
13 this woman. She was walking -- she
14 was -- and the other attorneys were
15 complaining, too. She was in the parking
16 lot as motorists were walking in the
17 morning, she was handing out business
18 cards. I said you can't do that, you're
19 a translator.
20      She was soliciting motorists
21 as they were walking in the building. I
22 said it's terrible.
23      Q     Was she soliciting -- I
24 apologize. Keep going.
25      A     Yeah. It was terrible what

Page 199

1      M.H. Capogrosso
2  she was doing. I said I'm not having
3  this.
4      Q     Was she soliciting these
5  motorists on your behalf to work for you?
6      A     Well, it seemed like that
7  and as soon as I saw that happen, I said
8  that's it, no more, no more. You're not
9  supposed to solicit. You don't walk up
10 to clients. You're here as a translator.
11      Now she was doing it for
12 Diantha and Diantha didn't seem to have
13 any problem with it, which is the other
14 reason I didn't like Diantha because
15 Diantha was soliciting and Agnes was
16 soliciting. I said you girls do what you
17 want. I'm not going to engage in that.
18      Q     So Ms. Paez writes that she
19 was speaking with a client on behalf of
20 Ms. Fuller when she was approached by
21 you. You then "stood in front of me and
22 told Ms. Fuller's client that I was not a
23 lawyer and he should not be speaking to
24 me. He then handed my client his
25 business card."

Page 200

1      M.H. Capogrosso
2      Is that true?
3      A     No. That's not true. I
4  don't think I ever would have interrupted
5  another person in a conversation, that's
6  not what I do, absolutely not.
7      Q     And she says the client did,
8  in fact, know that Ms. Paez was not an
9  attorney and was shocked at your
10 behavior.
11      She writes "Mr. Capogrosso
12 then turned to me and called me a variety
13 of vulgar and profane names and
14 threatened me with violence to stay away
15 from the Department of Motor Vehicles."
16 Is that true?
17      A     No. It's absolutely a lie.
18 I would have been arrested for that,
19 Counselor. I would have been -- a police
20 report would have been filed and I would
21 have been arrested, arrested if that's
22 true.
23      Now you can say --
24      Q     Do you remember --
25      A     -- what you like. I would

Page 201

1      M.H. Capogrosso
2  have been arrested.
3      Q     Do you remember this
4  incident?
5      A     No, I absolutely do not. I
6  know I didn't like what she was doing
7  down there. Judge Gelbstein condoned it.
8  There's nothing I could do about it. But
9  did I ever approach her, absolutely not.
10 There was no reason for me to. I had
11 plenty.
12      Q     Why would -- why would
13 Ms. Paez lie?
14      A     I don't know. Diantha
15 didn't like me. I saw what she was doing
16 soliciting. I let her go. I didn't want
17 to work with her anymore.
18      Q     So you don't know why she
19 would lie?
20      A     I don't know. What she's
21 saying here is not the truth. I have no
22 reason to interfere between two people.
23 I had no reason to interfere. I had
24 plenty of clients down there. My clients
25 liked me.

20 (Pages 198 - 201)

1        M.H. Capogrosso
2    Q    So, Mr. Capogrosso, you're
3 telling us that a lot of people are
4 telling the same lie about you, that
5 they're all lying the same way, they're
6 all saying that you yelled and screamed
7 and cursed at them.  Why would they all
8 tell the same lie?
9    A    I have no idea.  I'm
10 responding to each affidavit in kind, all
11 right.  I'm responding to this affidavit
12 in kind.  Let's just stick to this one.
13 Let's be very specific, not general.  If
14 there's affidavits written against me, I
15 will address them.
16        Now, this affidavit --
17    Q    Well, I think it's --
18    A    Go ahead.
19    Q    I'm sorry, Mr. Capogrosso,
20 sometimes when you speak you pause and I
21 think you're done with your response and
22 then I speak up.
23    A    This affidavit states
24 generalizations, nothing specific.  It
25 states in a violent manner.  What exactly

1        M.H. Capogrosso
2 did I do?  Towering over me, what exactly
3 did I do?  Threatening, what exactly did
4 I do to threaten?  Frighten, what did I
5 do to frighten?  You tell me.  I used
6 vulgar and profane names.  Tell me the
7 names I used.  Tell me exactly what I did
8 to threaten.
9        Now you might feel that,
10 that might be your perception, but tell
11 me the specifics that I actually did and
12 there are none listed here.
13    Q    Well, she says that you
14 turned to her and you tried to get her to
15 stop speaking to somebody, you called her
16 a variety of vulgar and profane names and
17 you threatened her with violence.  I mean
18 that may not be specific enough for you,
19 but it's pretty specific.
20    A    Well, how exactly did I
21 threaten?  What did I say, I'm going to
22 hit you?  What did I say?
23    Q    Does it matter what you
24 said?
25    A    It does.

1        M.H. Capogrosso
2    Q    I mean if --
3    A    It's your allegations.
4 Well, tell me what I said.  Tell me
5 exactly what was said.  Give me an
6 opportunity to respond.
7    Q    She's characterizing your
8 speech.  She said you said vulgar and
9 profane names and threaten her with
10 violence.
11    A    Well, first of all I did.  I
12 would never talk to a woman like that,
13 but I want to know exactly what was said.
14 Tell me what was said.  You can make --
15 you know, I can write affidavits about
16 everybody down there.  I can say the same
17 thing about somebody.
18        You can't make these blatant
19 accusations about people and don't give
20 the specifics.  Exactly what was said?
21 If I threatened somebody with violence, I
22 would have been arrested.
23    Q    She writes "Finally
24 Mr. Capogrosso told me to stay away from
25 him in a very violent manner, towering

1        M.H. Capogrosso
2 over me and spoke so loudly and in a
3 threatening manner that a plain clothes
4 policeman standing next to me asked if he
5 needed to get involved."
6        Do you -- does that refresh
7 your recollection at all?
8    A    No.  I was never arrested
9 for anything.  I did nothing wrong.
10 Obviously the cop understood that.
11    Q    You know that you're a big
12 and intimidating guy.  Do you ever get in
13 someone's personal space because you know
14 that --
15    A    Absolutely not, no.
16    Q    What did --
17    A    I avoid situations.  I don't
18 want a situation.  I avoid if -- I
19 absolutely avoid.  Will I confront when
20 necessary, yes.  When it's on behalf of
21 my client, yes.
22        But if you're going to tell
23 me I threatened you, you better tell me
24 exactly what I said to threaten you.  I
25 would never threaten a woman number one.

M.H. Capogrosso

2  Q    Well, a number of people
3 have asserted that you did and we'll see
4 a couple more throughout the course of
5 the day.
6  A    Well, let's go through them
7 one at a time.
8  Q    All right. She writes
9 again, "I was especially nervous because
10 I am six months pregnant and I was in
11 fear his outbursts would turn violent."
12  A    Well, you --
13  Q    Do you have any response to
14 that?
15  A    You might have any
16 perception you want. I don't recall
17 having any altercation with this woman,
18 other than telling her I didn't want her
19 working for me anymore and as she was
20 soliciting motorists in the parking lot
21 and soliciting motorists on the DMV floor
22 and Diantha Fuller was condoning all
23 these actions.
24  Q    So is Ms. Fuller lying here?
25  A    About what?  What's

M.H. Capogrosso

2 Ms. Fuller's statements?
3  Q    Well, she's passing along
4 this statement from her paralegal.
5  A    Well, Ms. Fuller did not
6 observe it now, did she, so I don't know
7 what Ms. Fuller is observing.
8  Q    But Ms. Paez is lying, is
9 that your testimony?
10  A    I did not threaten a woman.
11 I would never threaten a woman in my
12 life.
13  Q    So yes, she's lying?
14  A    Yes, yes, absolutely lying.
15  Q    And you have no -- and you
16 have no sense of why she would lie; is
17 that correct?
18  A    I don't think you need a --
19 I don't know why. We are all
20 competitive. We are all going after the
21 same summonses down there. All going
22 over the same summonses. Did the woman
23 like me, no.
24  Q    So you think that's why
25 she's lying?

M.H. Capogrosso

2  A    I don't know why she's
3 lying, I have no idea, but what's -- if
4 you're going to accuse me of threatening
5 you, tell me the words I used or have me
6 arrested, but don't threaten -- don't say
7 something like that --
8  Q    All right.
9  A    -- ruin my reputation and my
10 name and don't give me the specifics of
11 exactly what I did.
12  Q    So let's move on to the next
13 exhibit.
14      MR. THOMPSON:  And,
15  Ms. MacDonald, I can't recall whether
16  we had that marked, but that previous
17  exhibit, let's have that marked as
18  Exhibit 6 if hasn't been already.
19  Q    Mr. Capogrosso, can you see
20 the exhibit?
21  A    Ah, yes, all the clerks
22 don't like me. They're signing their
23 names, yes, yes.
24  Q    So do you recognize this
25 document?

M.H. Capogrosso

2  A    Yes, absolutely.
3  Q    And what is this document?
4  A    This is a complaint. This
5 was something --
6  Q    What is this document?
7  A    I have no idea. Something
8 that all the clerks signed that Bushra
9 Vahdat had them sign.
10  Q    And this document was
11 produced by us and it's Bates stamped DMV
12 lots of zeros 244; correct?
13  A    Yeah. Yes. The clerks
14 didn't like me, I know that.
15  Q    You see that down in the
16 lower right?
17  A    Yeah. The clerks didn't
18 like me. I know that.
19  Q    And so, Mr. Capogrosso.
20 what's this document?
21  A    I don't know. This is an
22 affidavit by all the clerks.
23  Q    It's not an affidavit. I
24 don't think there's a notarization or
25 anything.

22 (Pages 206 - 209)

1    M.H. Capogrosso
2    A    I don't know what it is.
3 It's a bunch of signatures.
4    Q    Either way --
5    A    It's a bunch of signatures
6 by people at the DMV.
7        MR. THOMPSON: Ms.
8 MacDonald, can we have this marked as
9 Exhibit 7?
10        (The above-referred-to
11 statement along with signatures was
12 marked as Exhibit 7 for
13 identification as of this date.)
14    Q    And so the people who signed
15 this document, right, "We the undersigned
16 clerks, supervisors and judges of the
17 Brooklyn South Traffic Violations Bureau
18 state that we feel the presence of
19 attorney Mario Capogrosso on our premises
20 constitutes a threat to our physical
21 safety."
22        Why would they think that,
23 Mr. Capogrosso?
24    A    I have no idea. Tell me the
25 specifics. I have no idea. You can't

1    M.H. Capogrosso
2 make allegations against a man and his
3 reputation if you don't give me the
4 specifics that occurred and give me an
5 opportunity to respond and resolve it.
6 Let me know what I did.
7    Q    Did people --
8    A    I'd like to know.
9    Q    Did people view you as a
10 threat to their physical safety?
11    A    I don't know. I have no
12 idea, none. I can't answer that. They
13 might have. They --
14    Q    Did --
15    A    They might have.
16    Q    Were they right to view you?
17    A    I don't know. I am -- you
18 know, I was dealing with a lot of tough
19 guys down there, a lot of tough
20 motorists. There are tough guys down
21 there in Brooklyn, they are. I'm dealing
22 with a lot of tough guys.
23        And do I have a strong
24 presence, absolutely, I admit that. Do I
25 come across with a strong presence,

1    M.H. Capogrosso
2 absolutely. How you perceive me, that's
3 up to you. What did I actually do is a
4 different situation. You can perceive me
5 in any manner you like. What did I
6 actually do?
7    Q    What do you mean by strong
8 presence?
9    A    I do have a strong presence.
10 I've been told that. I'm not --
11    Q    What do you mean by the term
12 strong presence?
13    A    Well, I'm not afraid to
14 speak my mind. I'm not afraid to
15 confront. I'm not afraid to confront,
16 that's what lawyers do. I'm -- I -- I
17 state the truth, I get right to the issue
18 and I try to resolve it. That's who I am
19 as a person, as a man, as an attorney,
20 that's who I am.
21        If you perceive -- if you
22 have a perception of me that you feel,
23 tell me what I did. Give me an
24 opportunity to resolve it. Give me the
25 opportunity to resolve it. Don't just

1    M.H. Capogrosso
2 make blatant accusations against a man.
3    Q    When you say strong
4 presence, do you mean strong physical
5 presence?
6    A    I have a strong physical
7 presence, a strong persona. People say
8 that when I walk in the room, they feel
9 me or they sense me. I don't know why,
10 they do. They -- I've been told this. I
11 don't know why.
12        I'm trying to figure out why
13 they feel intimidated by me. I don't
14 know why. But if they do, give me an
15 opportunity to resolve it.
16    Q    But you knew that some
17 people felt intimidated by --
18    A    No, I did not.
19    Q    -- you; is that correct?
20    A    I did not. I did not. I
21 speak to everybody the same. I speak to
22 everybody the same. If you feel that
23 type -- if you feel that, give me an
24 opportunity to resolve it. Give me an
25 opportunity.

23 (Pages 210 - 213)

Page 214

M.H. Capogrosso

```
 1              M.H. Capogrosso
 2      Q     But were you aware that
 3 people were intimidated by your strong
 4 physical presence?
 5      A     No, no.  Absolutely not.
 6 I'm sorry if -- I'm sorry if I have a
 7 strong physical presence.  I'm sorry.
 8 You're allowed to have a strong physical
 9 presence.  You're allowed.  You're
10 allowed.
11      Q     So Mr. Capogrosso --
12      A     You have to let me finish.
13 I can't help that.  You're allowed to
14 have that.
15      Q     So Mr. Capogrosso, they
16 write "We believe that Mr. Capogrosso's
17 behavior is unstable and hereby state
18 that he has gotten into confrontations
19 with many of us in the past years" and
20 you'll see some of the names on this list
21 like Marisol Cervoni are the list of
22 people who have filed complaints or
23 otherwise indicated that they had
24 confrontations with you.
25      A     Well, they --
```

Page 215

M.H. Capogrosso

```
 1              M.H. Capogrosso
 2      Q     They write "These
 3 confrontations have been escalating to
 4 the point where a physical confrontation
 5 has nearly ensued between him and a
 6 Brooklyn South employee on January 5,
 7 2011 after the close of business."
 8          Do you know what they're
 9 referring to?
10      A     Absolutely.  I remember
11 that.  Absolutely.
12      Q     And what incident are they
13 referring to?
14      A     I'm going to the counter on
15 a ticket.  There's George and then
16 there's Cindy.  Cindy is George's
17 girlfriend, I didn't realize this, but
18 she's a nice lady.  I was talking to
19 Cindy.  I actually thought Cindy was a
20 very pretty woman.  I was taking to
21 Cindy.  George is getting upset I guess.
22 I didn't realize they were dating.  I had
23 no idea.
24          He starts yelling and
25 screaming at me.  I said that's enough,
```

Page 216

M.H. Capogrosso

```
 1              M.H. Capogrosso
 2 I'll talk to you about it later and
 3 that's it.  But now I'm not allowed to
 4 talk to a clerk.  I didn't know that
 5 Cindy and George were dating and now I'm
 6 not allowed to talk to Cindy.  So I was
 7 talking to Cindy.  George got upset.  He
 8 starts yelling and screaming at me.  I
 9 said I'll talk to you about it later if
10 you want to talk and I said the word
11 talk.  I didn't threaten anybody.  I said
12 the word talk.
13      Q     Who told you that you
14 weren't allowed to talk to someone?
15      A     George was getting upset.
16 George was getting upset.  I don't know.
17 I was talking --
18      Q     Were you flirting with --
19      A     I wasn't flirting.
20      Q     Were you flirting with
21 Cindy?
22      A     Cindy's a beautiful woman.
23 Cindy was a beautiful woman.  Was I
24 flirting?  I don't know if I was
25 flirting.  Did I like Cindy?  Cindy was
```

Page 217

M.H. Capogrosso

```
 1              M.H. Capogrosso
 2 very pretty.
 3          When I found out that they
 4 were dating, I said that's it.
 5      Q     What did you say to Cindy?
 6      A     I wasn't flirting.  I
 7 thought Cindy was a very attractive
 8 woman.  Marisol Cervoni is a very
 9 attractive woman.
10      Q     But what did you say to
11 Cindy on this day, January 5?
12      A     I don't remember.  I know it
13 was maybe how are you doing, what are you
14 doing for the weekend, are you going --
15 you know, maybe something to that.  I
16 don't know.  I don't remember the
17 specifics.
18          But I do remember I liked --
19 Cindy was a nice lady.  She was a nice
20 lady and she was a beautiful woman.
21      Q     Did you try to -- did you
22 try to fight Mr. Hon (phonetic)?
23      A     No.  Absolutely not.
24      Q     Did you block in his car?
25      A     Absolutely not.  If you look
```

24 (Pages 214 - 217)

M.H. Capogrosso

1    M.H. Capogrosso
2  at the --
3     Q    What happened?
4     A    If you look at the affidavit
5  that George Hon wrote, George Hon wrote,
6  not what Bushra Vahdat said happened,
7  what George Hon wrote was that I was
8  sitting in my car, which I do after work,
9  to make phone calls to my clients, which
10  I'm required to do and that George
11  approached me, got out of his car. At
12  that point I get out of my car.
13          If somebody approaches me in
14  their car, stops their car -- if they
15  stay in the car, I stay in the car. If
16  you get out of your car, I'm getting out
17  of my car. And he approached me. That's
18  what George Hon wrote. Read it.
19     Q    So did you have any sort of
20  confrontation with George Hon out in the
21  parking lot?
22     A    I said what's the problem.
23  He started yelling and screaming at me
24  about this and that. I said what's the
25  problem. Then I find out they're dating.

1    M.H. Capogrosso
2  I said fine, hands off, I don't need this
3  aggravation. She's a nice woman, but I
4  don't need the aggravation.
5     Q    So he yelled at you. You
6  didn't yell at him?
7     A    I'm sitting in my car like I
8  do every day. Either I go there, I sit
9  in a park, sometimes I go to the beach.
10  I'm sitting there, I'm making phone
11  calls. I'm sitting in my car.
12          Read what George wrote and
13  then read what Bushra Vahdat wrote, some
14  story. I'm blocking people. Read what
15  George wrote. He approaches me. He gets
16  out of his car. I'm sitting in my car.
17  That's the truth.
18     Q    And so did George and Bushra
19  lie?
20     A    George didn't lie. Bushra
21  lied. Bushra lied.
22     Q    Okay.
23     A    Bushra should not be a judge
24  if you make up a story like that.
25     Q    So, Mr. Capogrosso, you see

1    M.H. Capogrosso
2  this petition where 18 people sign a
3  letter saying that they believe that
4  you're a threat to their safety and that
5  your behavior is unstable.
6          What do you think that the
7  TVB should have done about this petition?
8     A    They should have shown it to
9  me, number one. They should have shown
10  it to me, number one.
11          Number two, they should have
12  told me exactly what I did, exactly what
13  I did and to give me an attempt to
14  resolve it. Give me an attempt to
15  resolve it. Give me the specifics, give
16  me a chance to apologize if I said
17  something wrong or I did something wrong.
18  Give me an opportunity to apologize.
19  Give me an opportunity to address it.
20  Tell me the specifics.
21          Now, the fact that you feel
22  intimidated by my presence, I can't help
23  that. I'm sorry. I can't. I am who I
24  am. I can't help it. I can't change it.
25  I am who I am. I've been very direct

1    M.H. Capogrosso
2  with you, very direct to the Court. I am
3  who I am.
4          But if you feel that well,
5  maybe that's your own personal
6  insecurity. You might have personal
7  insecurities. They're not my
8  insecurities. They're your insecurities.
9  But give me the exact threats that I used
10  or what exactly I did.
11          But if you have personal
12  insecurity, don't put that personal
13  insecurity on me.
14     Q    Mr. Capogrosso, so this is a
15  petition which 18 separate people say
16  that they think that you're unstable and
17  a threat to their safety. How do you
18  feel about that?
19     A    I want to know the
20  specifics. I feel insulted, number one
21  and I feel improperly accused. Tell me
22  what I did. Give me an opportunity to
23  defend myself and respond and respond to
24  it and resolve it. Give me that
25  opportunity. Don't make --

25 (Pages 218 - 221)

Page 222

1   M.H. Capogrosso
2   Q   Do you think you did --
3   A   Don't make accusations and
4   don't give me an opportunity to respond.
5   Q   Do you think you did
6   anything wrong to have 18 people feel
7   that you're a threat to their physical
8   safety?
9   A   I want to know the exact
10  specifics. Tell me what I did.
11  Q   I know, but that's not the
12  question. The question is --
13  A   No, I know.
14  Q   -- do you think you did
15  anything wrong?
16  A   I don't think I did anything
17  wrong, no. I do not. My clients loved
18  me. My clients --
19  Q   Do you think that -- do you
20  think that people get petitions written
21  about them with 18 signatures saying
22  they're a threat to their physical safety
23  if they haven't done anything wrong?
24  A   I don't know why they wrote
25  it. Tell me what I did to threaten their

Page 223

1   M.H. Capogrosso
2   physical safety. Tell me what I did.
3   Listen, I'm a black --
4   Q   Do you think --
5   A   I'm a black belted martial
6   artist, I am. Can I handle myself,
7   absolutely. Am I more fearful what I
8   would do to somebody as to what they
9   would do to me, absolutely. I walk away
10  from confrontations all the time. I
11  don't want to get into it with anybody, I
12  don't. I've been studying martial arts a
13  long time. I've been in a boxing ring a
14  long time. I don't want to have a
15  [illegible]
16  know how to handle myself.
17  That being said, if you feel
18  intimidated or threatened by me, I can't
19  help that. That's my persona. That's
20  who I am.
21  You tell me the specifics of
22  what I did and I will resolve it.
23  Q   Well, there were a number of
24  complaints that we've discussed and more
25  that we will.

Page 224

1   M.H. Capogrosso
2   A   Sure.
3   MR. THOMPSON: So.
4   Ms. MacDonald, can I ask you to
5   please mark this as Exhibit 7 if you
6   haven't already.
7   Q   One more quick note.
8   Mr. Capogrosso, you see how many of the
9   signatures on here, such as Marisol
10  Cervoni, supervisor as Roy Tucci, are
11  people who have already signed complaints
12  about your behavior; is that correct?
13  A   Well, they signed
14  complaints, yes. Yes, I've seen the --
15  you presented them. I've looked at the
16  complaints and I've addressed them.
17  Q   And you feel that they were
18  wrong?
19  A   I've already explained them
20  to you. The first time I saw them and
21  the first time I was given an
22  opportunity -- you want to talk about
23  Roy's? I didn't bump into him. Well, I
24  already explained my position on each
25  complaint --

Page 225

1   M.H. Capogrosso
2   Q   Okay.
3   A   -- that you've presented.
4   Q   And so you feel -- is it
5   fair to say that you feel that these
6   complaints that they were threatened were
7   unfounded?
8   A   They're unfounded because
9   there's no basis for them. Tell me what
10  I did. They're absolutely unfounded.
11  Tell me what I did. You don't have to
12  like me. You know, good attorneys are
13  not liked. I don't have to be liked to
14  do my job. I have to do my job.
15  People don't like me.
16  Either they like me or they hate me. I
17  know that, but I don't have to be liked.
18  I was not shown --
19  Q   I think we have been --
20  A   Well, I have not been trying
21  to endear myself to the clerks. I did
22  not. I was there to do a job. The one
23  time I tried doing it, talking to Cindy,
24  George got upset.
25  Q   So let's move on to a new

26 (Pages 222 - 225)

Page 226

1    M.H. Capogrosso
2    exhibit. I'm going to un-share my
3    screen.
4        MS. REPORTER: Did you guys
5    take a lunch break yet before I came
6    on or --
7        MR. THOMPSON: Would you
8    like one, Mr. Capogrosso?
9        THE WITNESS: I don't need
10   my brakes.
11       MR. THOMPSON: Ms. MacDonald
12   or Mr. Brodsky, you're also -- if you
13   would like one, we can certainly take
14   one. I'm perfectly happy to keep
15   going.
16       MR. VIDEOGRAPHER: You can
17   proceed Counsel, please.
18       MS. REPORTER: I mean I'd
19   like at least every hour and-a-half a
20   five minute break because you guys
21   are going -- and this is my fourth
22   deposition of the day, so --
23       MR. THOMPSON: We can take
24   a -- we can take a five minute break
25   if you'd like.

Page 227

1    M.H. Capogrosso
2        MS. REPORTER: Sure.
3        MR. THOMPSON: Why don't we
4    do that and reconvene at one 1:20.
5        MR. VIDEOGRAPHER: Okay.
6    The time is 1:15. We are off the
7    record.
8        (A short recess was taken.)
9        MR. VIDEOGRAPHER: The time
10   is 1:20. We are on the record.
11       MR. THOMPSON: Actually, I'm
12   having some problems here where it's
13   not letting me share my screen all of
14   a sudden.
15       ...............................
16   the record while I figure out what's
17   wrong here? My apologies.
18       MR. VIDEOGRAPHER: Sure.
19   The time is 1:21. We are off the
20   record.
21       (A short recess was taken.)
22       MR. VIDEOGRAPHER: The time
23   is 1:22. We are on the record.
24   Q    Mr. Capogrosso, I'm showing
25   you a document. Do you recognize this

Page 228

1        M.H. Capogrosso
2    document?
3    A    Yes. I recognize the top,
4    yes. Is this the one from Yaakov? Yes,
5    absolutely, yes.
6    Q    And what is this document?
7    A    This is an affidavit from
8    Yaakov Brody about the incident that
9    occurred on December 22, 2011.
10   Q    And this is the document
11   marked P-92 in your production; correct?
12   A    Absolutely.
13       MR. THOMPSON: And,
14   Ms. MacDonald, I'll ask that this
15   document be marked Exhibit 8.
16       (The above-referred-to
17   statement was marked as Exhibit 8 for
18   identification as of this date.)
19   Q    So who is Yaakov Brody?
20   A    He's an attorney that works
21   down there.
22   Q    Did you have a good
23   relationship with him?
24   A    I never talked to the man.
25   I mean I never talked to him really. I

Page 229

1        M.H. Capogrosso
2    knew he was down there, but I never
3    really had any conversation with him
4    until the morning of -- I thought it was
5    December 22nd of December. He says
6    December 21, 2011.
7    Q    And so you never talked to
8    him before this?
9    A    Not really, no. He --
10   Q    Okay.
11   A    He used to like to schmooze
12   with the clerks all the time. He was up
13   there for a half an hour at a time
14   talking to the clerks, not me.
15   Q    So Mr. Brody writes
16   "Mr. Capogrosso walked in and went to
17   reach for his briefcase which was lying
18   on the floor next to me. Mr. Capogrosso
19   then said excuse me so I could move over
20   so that he could get to his briefcase.
21   He already had plenty of time, but
22   regardless I shifted my body so he would
23   have even more room to reach for his
24   belongings."
25       Do you recall any of this?

27 (Pages 226 - 229)

M.H. Capogrosso
2    Λ    Yeah. It's not the truth.
3    I'll tell you what happened. I go in the
4    morning in the attorney's room, which is
5    about six feet long by about four feet
6    wide. It's a very small area. I get a
7    cup of coffee in the morning and the New
8    York Post. I get my coffee, I put it
9    under the bench -- under the bench with
10   my briefcase because I don't want my
11   coffee spilling on anybody's papers.
12          That day Brody is there.
13   He's right in front of my coffee. I say
14   excuse me, may I please get me coffee?
15   Excuse me, can I get my coffee? Brody
16   tells me excuse yourself, go fuck
17   yourself, you Jew hater anti-Semite. I
18   said that?
19          I get my coffee. I walk
20   away. I come back -- I go in the
21   courtroom, I argue a case. I come back,
22   put my coffee down where it was again and
23   Brody's right there, right -- right in
24   front of the coffee between -- the
25   coffee's under the bench. He's right

M.H. Capogrosso
2    where the bench is and he says to me
3    again -- I say excuse me, can I get my
4    coffee? He says excuse yourself, go fuck
5    yourself you Jew hater anti-Semite.
6          That's what I remember and
7    that's what happened.
8    Q    And what happened after
9    that?
10   A    Then after that he walked
11   out about 20 feet away, he's looking in
12   and Mr. Jeff Meyers came in to talk to me
13   as to what happened.
14   Q    And then?
15   [...] And then I threw a punch in
16   the vicinity of a wall, not in the
17   vicinity of anyone. I didn't hit the
18   wall, I wasn't charged and I was not
19   arrested. I was mad. The guy just told
20   me to go fuck myself twice. I didn't hit
21   the wall. I didn't hit Jeff Meyers.
22          I threw a punch in the
23   vicinity of a wall. I didn't hit the
24   wall and I was not charged and I was not
25   arrested and I was required to take an

M.H. Capogrosso
2    anger management course.
3    Q    And did anything happen
4    after that?
5    A    That's it. Nobody took my
6    affidavit. Nobody asked me my story.
7    There's affidavit after affidavit after
8    affidavit here from lawyers who said they
9    were there, but the lawyer that was
10   actually there, me, got no opportunity to
11   explain what happened, nothing.
12          But Yaakov Brody gets to --
13   who created this incident, told me to go
14   fuck myself twice, gets the opportunity
15   to write an affidavit. He states at one
16   point I'm going to hit you with my
17   briefcase. I'm not the type of guy who's
18   going to hit you with a briefcase. I'm
19   not. If there's an incident and I got to
20   defend myself I will, but I'm not going
21   to hit you with my briefcase.
22          A lying lawyer at the DMV
23   who wanted me out, for what reason I
24   don't know. I was making too much money
25   in his presence. That's what I stated

M.H. Capogrosso
2    and that's what I'll hold to.
3    Q    So your testimony is that
4    Mr. Brody just said fuck you, you Jew
5    hater anti-Semite out of nowhere?
6    A    Yeah. I walked in in the
7    morning as I always did. I get coffee at
8    the deli. I get a paper at the deli. I
9    like the Post. I take my coffee, before
10   I go in the courtroom I put it under the
11   bench. I do it the same way all the
12   time.
13          I was reaching for my
14   coffee, for whatever reason he decided to
15   [...] at me this morning. Do I think he
16   was put up to it? I think so. I think
17   Bushra Vahdat who had just come on maybe
18   wanted me out, I don't know and this was
19   her opportunity to get me out. So she
20   created this incident, that's my opinion.
21          I was blindsided. I can
22   have an opinion though. But this is the
23   first time I think I was blindsided.
24   That's my opinion. Vahdat, Gelbstein
25   wanted me out and maybe they put this

28 (Pages 230 - 233)

M.H. Capogrosso

1   M.H. Capogrosso
2   attorney up to it because out of the blue
3   he just happens to say this.
4        My mind was --
5   Q    Why would --
6   A    You got to let me finish.
7   My mind was someplace else. It was right
8   around Christmas time. It not really
9   thinking. I'm thinking about I got to
10  buy Christmas presents and what I'm
11  buying for who. That's where my mind was
12  on that morning. But that's what
13  happened.
14  Q    Why would Bushra Vahdat and
15  Alan Gelbstein want you out?
16  A    Bushra Vahdat -- well, they
17  had complaints against me from the
18  clerical staff, right and they had to
19  have a reason to have me removed and this
20  would have been an excellent reason,
21  right. They had all these complaints
22  that they were filing against me. There
23  was no sum and substance to any of them,
24  right.
25       But in order to get me

1   M.H. Capogrosso
2   removed they needed an incident like
3   this, so they created one. They
4   didn't -- they didn't have no -- they had
5   no basis to grieve me. There was no
6   grievance filed against me. They grieved
7   in Emig Tieg (phonetic) in Manhattan
8   North because they had a basis for that.
9   but they had no basis to grieve me
10  because there was no sum or substance to
11  any of these complaints, otherwise they
12  would have, so they created an incident.
13  That's my opinion.
14       And I was blindsided. My
15  mind was someplace else, it was Christmas
16  time and I took the bait. I did the
17  right thing. I did throw a punch at a
18  wall. I didn't hit the wall because I
19  was upset. What makes me a Jew hater
20  anti-Semite? What nerve does this
21  attorney have to call me a Jew hater
22  anti-Semite? I'm working down there 10
23  years. There's not one complaint from a
24  motorist or a client that I used an
25  anti-Semitic remark or a racist remark.

1   M.H. Capogrosso
2        What right does this man
3   have to call me an anti-Semite Jew hater?
4   Q    So why would he think that
5   you're a Jew hater anti-Semite? Why
6   would he say that out of nowhere?
7   A    Let me know. I'd like --
8   why don't you ask him? Why don't you ask
9   him? Ask this Mr. Yaakov Brody.
10  Q    Had you ever --
11  A    I'm making too much money in
12  his presence? I don't know. I'm an
13  Italian America down there. I'm
14  surrounded by Jewish lawyers. Most of
15  the lawyers down there are Jewish. Most
16  of the judges are Jewish.
17       Maybe I'm making too much
18  money. I don't know. Maybe I saw what
19  Judge Gelbstein was doing with the ticket
20  brokers. I don't know. But this guy had
21  it in for me --
22  Q    Had --
23  A    -- and I took the bait.
24  Q    Had you ever discussed Jews
25  or Judaism with Mr. Brody before this?

1   M.H. Capogrosso
2   A    Absolutely not. Listen. I
3   was there 10 years, 10 years I was there.
4   Look at the complaints against me. Not
5   one client or motorist made a statement
6   that I made an anti-Semitic or a racist
7   remark, not one.
8        Now I have to have this
9   lawyer call me a Jew hater anti-Semite.
10  For what reason?
11  Q    So had you had conversations
12  with Jews -- about Jews or Judaism at all
13  with anyone previous to this?
14  A    No. I don't -- no. no. I
15  don't care who you are, what religion you
16  are. I'm Catholic. I don't care what
17  you want to be. You're Jewish, fine. Do
18  whatever you like. God bless. I could
19  care less.
20       You look at the motorists
21  and the clients that I represented.
22  they're all nationalities, all races, all
23  of them. Not one indicated I made an
24  anti-Semitic or a racist remark and I'm
25  dealing with thousands, almost 850

29 (Pages 234 - 237)

M.H. Capogrosso

2 clients I had on the docket. I'm dealing
3 with hundreds of clients on a monthly
4 basis. Not one made a statement that I
5 made any type of statement, any type of
6 racist or anti-Semitic statement, not
7 one.
8         I took this very personally
9 and I had to go to an anger management
10 course because I did take it personally.
11    Q    So Mr. Brody writes that
12 "Mr. Capogrosso lashed out at me and said
13 he was being nice by saying excuse me and
14 next time he would simply hit me with his
15 briefcase" and you said you never said
16 that; correct?
17    A    I would never hit you with
18 my briefcase. If I'm going to hit you,
19 I'm going to hit you. If I'm going to --
20 if I have to -- if it comes to the point
21 where I've got to hit you, I'm going to
22 hit you. All right.
23         If I have to defend myself
24 against a physical attack, a knife, a
25 gun, I'm going to hit you or I'm going to

M.H. Capogrosso

2 get hit, but I'm not going to hit you
3 with my briefcase. That's not something
4 I would do.
5         This guy, Yaakov Brody, I
6 don't know what type of man he is, but
7 I'm not going to hit you with my
8 briefcase. That's an absolute lie. I am
9 not the type of guy who's going to hit
10 you with a briefcase.
11    Q    So he writes that you
12 proceeded to tell him that the next time
13 you see him you better get out of his
14 way.
15    A    That's not true.
16    Q    Did you say that?
17    A    No, absolutely not. Get out
18 of my way for what reason? We are both
19 working in the same building. How is he
20 going to get out of my way? We are both
21 attorneys at the same location. How is
22 he going to get out of my way?
23    Q    He writes that there were
24 three other attorneys in the room. Do
25 you remember there being anyone else in

M.H. Capogrosso

2 the room?
3    A    I remember -- let me think.
4 The first time, no, it was just me and
5 him.
6         The second time I went back
7 and I put my -- I went to the courtroom
8 and I came back and I said this guy
9 must -- I don't know. He was there in
10 the same location. My coffee, I put my
11 coffee back under the chair. He was
12 exactly in the same exact location as the
13 first time.
14         At that time -- who was in
15 there at that time? I think -- there was
16 another attorney. It wasn't Rick Maher.
17 that I know. He wasn't there. There was
18 another lawyer there, but I forgot the
19 guy's name. I forgot. There was one
20 other lawyer there, but I forgot the
21 guy's name. It wasn't Meyers, but there
22 was another lawyer there.
23    Q    So he writes that you took a
24 seat across from Mr. Brody and complained
25 that you didn't -- that he didn't give

M.H. Capogrosso

2 you enough room. He continued to ignore
3 you he says.
4         Then he writes, quote,
5 "Eager to show how angry he really was,
6 he took his coffee cup which still had
7 some coffee inside and threw it my
8 direction toward the garbage can that was
9 next to me."
10         Did you throw the garbage --
11 the coffee cup?
12    A    First of all, we are in a
13 lawyers' room that's six feet by about
14 four feet wide. There's bench on either
15 side. All right. I'm allowed to go in
16 the lawyers' room. Even after -- I'm
17 allowed to go in. My briefcase was in
18 there, number one. I wanted to make sure
19 nobody touched my briefcase. I had my
20 files in it.
21         Number two, my coffee's
22 still there in the lawyers' room because
23 I can't bring it into a courtroom. So I
24 get my coffee now. Now, I'm sitting
25 there and he comes in and sits there next

30 (Pages 238 - 241)

1      M.H. Capogrosso
2  to the garbage can, this Brody. I finish
3  my coffee cup. I said this guy is going
4  to start in on me again. Now he's going
5  to come at me for the third time. I
6  finish my coffee and as I'm leaving, he's
7  sitting right next to the coffee -- right
8  next to the garbage can. I threw my
9  empty cup, which I'm allowed to do, into
10  a garbage can. I didn't throw it at him.
11  I threw it into a garbage can and I
12  walked out.
13         And he came -- when I was in
14  there first and then he comes back in for
15  a third time and then he goes -- then
16  what do you call it, Meyers comes in,
17  into there and says what's going on, Jeff
18  Meyers who was a lawyer. That's what
19  happened that day.
20     Q    So Mr. Brody writes that "I
21  complained to Mr. Capogrosso that this
22  was not civilized behavior and I did
23  nothing to warrant such hostility.
24  Enraged, Mr. Capogrosso went on a rant on
25  how I was a, quote, Jew fucking cunt, a

1      M.H. Capogrosso
2  phrase which he repeated about six or
3  seven times."
4         What's your memory of what
5  happened here?
6     A    Well, I might have said
7  that.
8     MS. REPORTER: Wait, hold
9  on. My machine just stopped writing.
10  Let me read what I have and then pick
11  up from there.
12         (The requested portion was
13  read back by the Court Reporter.)
14     A    Well, the man just told me
15  to go fuck myself twice, I'm a Jew hater
16  anti-Semite. Now out of the blue I'm
17  making a statement like this, you Jew
18  fucking cunt? First of all, he is a Jew.
19  The word fucking, I might have used that
20  and the C word, I'm not sure.
21         But was he acting like a
22  real man on that date provoking a fight
23  when I say excuse me, can I get a cup of
24  coffee?
25         I mean I don't recall making

1      M.H. Capogrosso
2  the statement. I know I was mad. I was
3  mad and I did take an anger management
4  course and I was blindsided, but all I
5  did was say excuse me can I get my
6  coffee.
7         And if you look at the
8  affidavit from Tahir, it states that I
9  said excuse me twice. That's all I have
10  to say about that.
11     Q    Mr. Brody writes that after
12  that you went on to say that the place
13  was run by Jews. Did you say that?
14     A    I don't recall saying that,
15  but all the --
16     Q    Did you --
17     A    There are Jewish -- Judge
18  Gelbstein is Jewish. It's a true
19  statement. It is a true statement. Most
20  of the judges down there, it's a true
21  statement. Bushra Vahdat is a Jew. Ida
22  Traschen is a Jew. I am an Italian
23  American.
24         Is it a true statement,
25  yeah. Did I say that? I don't recall

1      M.H. Capogrosso
2  saying it. But is it a true statement,
3  yeah, most of the judges in the Brooklyn
4  TVB were Jewish, yes. Most of the
5  lawyers were Jewish.
6         I'm trying to understand in
7  my head why this guy is telling me to go
8  fuck myself, I'm a Jew hater anti-Semite
9  when I've been there since 2005 and you
10  don't have a complaint or an allegation
11  from a client that I ever acted in this
12  manner or said anything to a client or
13  motorist.
14         What is making this guy say
15  this to me I'm trying to think and I
16  still can't figure it out, other than he
17  was put up to it, other than he was put
18  up to it and I took an anger management
19  course because I did throw a punch at a
20  wall and I should not have thrown -- have
21  done that, but I -- what do you want me
22  to do? I'm a human being.
23     Q    So I'm not sure if I was
24  quite clear. Did you -- did you actually
25  say that the place was run by Jews?

31 (Pages 242 - 245)

Page 246

M.H. Capogrosso

2  A    I don't recall saying that,
3  but is that true that it is mostly Jewish
4  judges, yes, that's a true statement. Do
5  I remember saying it, no, I don't
6  remember saying it. But is it true, yes,
7  it is true.
8       All my accusers in this
9  case, Judge Gelbstein, Ida Traschen,
10  Bushra Vahdat, Yaakov Brody who started
11  this is Jewish, are Jewish. I'm an
12  Italian American. That's a true
13  statement.
14  Q    Do you think -- does it make
15  a difference that they're Jewish or that
16  you're Italian?
17  A    No. I don't care who you
18  are. I treat everybody the same. I
19  treat everyone respectfully. I treat
20  everyone respectfully. Look at the --
21  Q    And do you --
22  A    Look at my clients, there's
23  not one accusation from a client that I
24  used -- and there's all different
25  nationalities I'm dealing with down in

Page 247

M.H. Capogrosso

2  Brooklyn TVB, Russian, Jewish, Italian,
3  Arabic, Muslim, not one from a client or
4  a motorist, that I used an anti-Semitic
5  or racist remark.
6       The only racist here is
7  Judge Gelbstein who told me a spade is a
8  spade.
9  Q    Does it make a difference
10  that many of the people in leadership at
11  the DMV are, in fact, Jewish?
12  A    No. I could care less. God
13  bless, you got a job, God bless.
14  Actually, the best judges were the Jewish
15  judges. In a courtroom, Gelbstein gave
16  you the best chance. Bonstein
17  (phonetic). I mean not Gelbstein.
18  Bonstein gave you a great chance to win.
19  Chauney (phonetic) gave me a great
20  chance. Tilman gave me a great chance to
21  win. What do you call it?
22       The best judges were the
23  Jewish judges in the courtroom for me.
24  Walters gave me good -- Walters gave me a
25  terrible choice to win. Ross gave me a

Page 248

M.H. Capogrosso

2  bad choice. Who else was there?
3  Esposito, he gave me a -- he eventually
4  got better, but at the start he was very
5  tough.
6       But the best judges at the
7  start for me doing my job were Bonstein,
8  Tilman and Chauney. They were the best.
9  Abish (phonetic) was great in a courtroom
10  for a lawyer in dealing with these cases.
11  Q    So, Mr. Capogrosso,
12  yesterday at his deposition Judge
13  Gelbstein testified that you called him
14  to his face a beanie wearing Kike; is
15  that true?
16  A    That's an absolute lie.
17  That is an absolute lie. That judge
18  should be taken off the bench for making
19  a statement like that. That is an
20  absolute lie. That is a judge who wrote
21  that affirmation after I was removed from
22  the Brooklyn TVB because of this incident
23  in 2011 he wrote that affirmation. You
24  don't see that -- you don't see that
25  documented anyplace until after I was

Page 249

M.H. Capogrosso

2  removed.
3       That is an absolute lie by
4  that judge. He doesn't indicate the
5  circumstances for which I said it or does
6  anybody corroborate it, anybody witnessed
7  it. That is an absolute lie and that
8  judge should be removed because he made
9  that statement to get me kicked out and
10  that is why I'm looking for punitive
11  damages.
12       That is a lying lawyer
13  acting as a judge who should be taken off
14  the bench.
15  Q    And why at this point did he
16  want you kicked out?
17  A    I don't -- why did he
18  want -- you saw all the affidavits
19  written about me. He wanted me out. You
20  saw all the clerks' affidavits. He
21  wanted me out. I was -- maybe I was
22  making too much. I don't know why. He
23  wanted to keep things nice and quiet down
24  there so he could get a piece of the
25  action.

32 (Pages 246 - 249)

1    M.H. Capogrosso
2        I don't know why he wanted
3    me out, but I never made that statement.
4    Never made that statement to him.
5    Q    So Mr. Brody writes that
6    when he protested to you how he could use
7    the language about being Jewish that you
8    stated "What do you care, just call me a
9    fucking Italian ginny."
10   A    That should be Gini, but I
11   never said. I don't recall saying that.
12   Q    You never said that?
13   A    No. I know I was upset. I
14   walked in that morning and I was having a
15   personal problem with some woman I was
16   dating at the time and I'm thinking what
17   present I have to buy her and my head was
18   not there with buying this woman a
19   present and next thing you know I get
20   blindsided because I'm saying excuse me,
21   can I get my coffee and he blindsided me.
22   Q    And is it safe to say so
23   you -- let me withdraw that question.
24       So, Mr. Capogrosso, you
25   believe that Mr. Brody lied in this

1    M.H. Capogrosso
2    complaint; correct?
3    A    Absolutely, the whole thing,
4    the whole thing. I pointed them out.
5    I'm not hitting you with my briefcase. I
6    am not going to hit you with my
7    briefcase. I never heard of such
8    nonsense. I am not the type of guy who's
9    going to hit you with a briefcase. I
10   never heard of that nonsense.
11       There's no reason for me to
12   act like this in the morning when I say
13   excuse me to the man. I go from excuse
14   me to go fuck -- I go from that, I say
15   excuse me, I'm trying to be polite.
16       Come on, a lying lawyer at
17   the DMV wanted me out. I don't know why.
18   I think Bushra Vahdat and Alan Gelbstein
19   put him up to it. That's my opinion.
20   Q    Okay. So let's move on.
21       MR. THOMPSON: This I
22   believe was marked as Exhibit 8. If
23   we didn't do that, let's please mark
24   it that way.
25       Let me close out of this and

1    M.H. Capogrosso
2    out of the Screen Share.
3        (The above-referred-to
4    statement was marked as Exhibit 9 for
5    identification as of this date.)
6    Q    Mr. Capogrosso, can you see
7    this document?
8    A    Yes.
9    Q    And this document is from
10   your production marked P-250; correct?
11   A    Yeah. This is from Richard
12   Maher, yes.
13   Q    And what is this document?
14   A    Well, that was an affidavit
15   that another attorney got to write. I
16   never got to write my affidavit as to
17   what happened, who was not even in the
18   room that day. Maher was not even in the
19   room. I know Brody was in the room at
20   the first one, the time he said excuse
21   me, go fuck yourself.
22       And then the second time
23   there was another attorney, I forgot the
24   guy's name, but it wasn't Maher. Maher
25   was not even in the room. I don't think

1    M.H. Capogrosso
2    he was even there that day, but I'll go
3    through it, what I remember.
4    Q    So who is Richard Maher
5    before we get too far?
6    A    He's a lawyer down there
7    that worked at the TVB.
8    Q    Did you have a good
9    relationship with Mr. Maher?
10   A    I never talked to the guy
11   that much.
12   Q    And for the transcript Maher
13   is M-A-H-E-R; correct?
14   A    I don't know how he spells
15   his name. I don't know.
16   Q    It's spelled that way on
17   here.
18   A    Right. I don't know how he
19   spells it.
20   Q    So is it correct to say that
21   this statement corroborates Mr. Brody's
22   account?
23   A    I don't know. I don't know.
24   That's his version. I don't know if it
25   corroborates it or not. I don't know.

33 (Pages 250 - 253)

M.H. Capogrosso

2 He wasn't in the room. They could be
3 making up -- they could have corroborated
4 the story after the fact.
5          The man was not in the room.
6 I know who was in the room. I was there.
7 This man was not in the room.
8    Q     So it's your testimony that
9 Mr. Maher made up what's in this
10 statement?
11    A     Well, tell me exactly which
12 portions. He was not in the room that
13 day. I remember it very, very
14 distinctly.
15    Q     Sure.
16    A     He was not in the room.
17 When Brody came in and I said excuse me,
18 me and him were the only ones there.
19          When I came back again,
20 there was another attorney there. I
21 forgot the man's name. It wasn't this
22 attorney. Maher was never anyplace to be
23 seen.
24    Q     So first off I'll note he
25 says that the lawyers' room can

M.H. Capogrosso

2 accommodate up to a dozen attorneys; is
3 that right?
4    A     The lawyers' room is
5 precisely I would say six to eight feet
6 long, five feet wide. There are benches
7 that are at least, what, a foot in width,
8 so that leaves about three feet to walk,
9 three feet between the benches. Eight
10 feet, six to eight feet long, five feet
11 wide, the benches are a foot, that's the
12 dimensions.
13          I don't think it could fit
14 12, no. I don't believe so, no.
15    Q     Mr. Maher writes "When
16 Mr. Capogrosso entered, he asked
17 Mr. Brody to move so he could sit.
18 Mr. Brody did his best to reasonably
19 comply with this request. The bench
20 contained the belongings of other
21 attorneys and Brody in fact tried to make
22 more room so that Capogrosso could sit."
23 Then there's a parenthetical here.
24          "Far from acknowledging
25 Mr. Brody's attempt to show him courtesy,

M.H. Capogrosso

2 Capogrosso grumbled about Mr. Brody's
3 lack of decorum and began to berate
4 Brody."
5          So that's basically the same
6 version of events that Mr. Brody said;
7 correct?
8    A     No, it's not. It's not what
9 happened. I'm not looking to sit down.
10 I'm looking to get my coffee. I have to
11 go in the -- I'm looking to get my
12 coffee. I'm not looking to sit down. I
13 said excuse me, can I get my coffee.
14 Those are the words I actually stated.
15          I'm not looking to sit down.
16 My coffee is already under the bench. My
17 briefcase is already under the bench.
18 I'm looking to get my coffee so I can
19 have some coffee before I go into the
20 courtroom to argue my cases. I'm not
21 looking to sit down. It's not correct.
22    Q     And when he says that you
23 began to berate Brody; is that correct?
24    A     No. I said excuse me very
25 politely, can I get my coffee. He said

M.H. Capogrosso

2 excuse yourself, go fuck yourself you Jew
3 hater anti-Semite, at which point I took
4 my coffee and I walked away. I came
5 back, I put my coffee under it. He -- I
6 had some coffee. I put it back under the
7 bench so I could go argue my case.
8          I come back, he's standing
9 in the same place again and tells me
10 again excuse myself, go fuck myself.
11    Q     Mr. Maher writes "Capogrosso
12 then began to inveigh against Brody in
13 vituperative terms as his temper
14 continued to rise beyond all reason given
15 the fact that Brody was extending
16 courtesy to him by now under duress."
17    A     That -- this is an absolute
18 lying lawyer at the DV -- at the TVB
19 again.
20    Q     So why would Mr. --
21    A     I don't --
22    Q     Why would Mr. Maher lie?
23    A     Let me finish. Okay.
24 Finish your question. Go ahead.
25    Q     I'm sorry. Part of the

34 (Pages 254 - 257)

Page 258

M.H. Capogrosso

1 problem is you speak and then you pause
2 and then I think you're done and then I
3 start talking.
4     A     What's the question?
5     Q     So why would Mr. Maher lie?
6     A     Ask Mr. Maher. I have no
7 idea. This is not what happened. I'm
8 telling you what happened. I'm not
9 getting this angry over nothing. I'm not
10 getting this angry if Brody didn't
11 approach me and tell me to go fuck myself
12 twice. I'm not getting angry like this
13 and upset like this if the man didn't
14 approach me and tell me to go fuck myself
15 twice when all I said to the man was
16 excuse me, can I get my coffee.
17          Now write whatever you like,
18 but no man's going to get angry like this
19 unless he's told to go fuck himself
20 twice.
21     Q     So you have no idea why
22 Mr. Maher would write this?
23     A     I have no idea. Maybe
24 they're friends. I don't know. I don't

Page 259

M.H. Capogrosso

1 know.
2     Q     Do you have a suspicion?
3     A     No. I don't know. Maybe
4 they're two Jewish American attorneys and
5 I'm an Italian American attorney and
6 they're ganging up on me. I don't know.
7 You figure it out. You ask them. I
8 don't know.
9     Q     Did you --
10     A     That's a fact. He --
11     Q     Did you think that
12 Mr. Maher --
13     A     I don't know. Go ahead.
14     Q     Did you think Mr. Maher
15 wanted you out?
16     A     I don't know if he did or
17 not. I never talked to the man. I
18 didn't like him. I didn't like the way
19 he handled cases. Did I like the man,
20 no. Did I dislike him, no, I really
21 didn't care. He had a job to do, I had a
22 job to do.
23          I wasn't -- I wasn't
24 required to like other attorneys. I was

Page 260

M.H. Capogrosso

1 required to do a job. You know, I choose
2 my friends very carefully. I get -- you
3 know, I choose them very carefully. I
4 don't have to like everybody in this
5 world.
6          Did I like his approach, no,
7 but he had -- he had his right to do his
8 job. I had a right to do my job.
9     Q     Mr. Maher --
10     A     I don't have to like you.
11     Q     Mr. Maher writes again that
12 your remarks, quote, "became intensely
13 personal, directed at Brody, his person
14 and his culture, his ethnicity and his
15 very humanity." Is that true?
16     A     He told me to go fuck myself
17 twice. Did I call him a fucking Jew
18 cunt? I probably called him a fucking
19 something. I don't remember exactly the
20 words I did, but if you're going to tell
21 me to go fuck myself, I am going to
22 respond, all right.
23     Q     So this --
24     A     If you tell me to go fuck

Page 261

M.H. Capogrosso

1 myself twice, that I'm an anti-Semite Jew
2 hater, that I'm making too much money
3 it's my opinion in your presence, I'm
4 going to respond. I'm going to respond.
5 I think any normal man would respond,
6 whether an attorney or not. Outside of a
7 courtroom when it's not -- any normal man
8 is going to respond to an accusation like
9 that.
10          So is this man lying, yeah,
11 he's lying.
12     Q     So Mr. Maher writes, quote,
13 "Nothing Brody did or said during
14 Capogrosso's verbal attack was in any way
15 provocative or confrontational."
16     A     Well, first of all --
17     Q     Do you see that?
18     A     Yeah. Maher wasn't in the
19 room on the first instance. He wasn't
20 there on the second incident either, so
21 he doesn't know what Brody said to me.
22 Brody told me excuse yourself, go fuck
23 yourself, you're a Jew hater anti-Semite
24 twice, not once, twice. The first time I

35 (Pages 258 - 261)

Veritext Legal Solutions

212-267-6868                                   516-608-2400

M.H. Capogrosso

1      M.H. Capogrosso
2 walked away. The second time I said
3 what's going on with this guy. He said
4 it twice to me and I was never given an
5 opportunity to write my affidavit.
6     Q     So Mr. Maher writes that
7 Mr. Brody spoke up strongly, quote, "when
8 Capogrosso referred to him as a fucking
9 Jew cunt."
10      So there's the language
11 again. Does that refresh your memory at
12 all?
13     A     Did I say something to
14 Brody, yeah. Yeah, I did. I don't know
15 if I called him a Jew cunt. Is he a Jew,
16 yeah. Did I use the word fuck, I might
17 have. Was he acting like a man at this
18 point, no, not in my estimation.
19      If you provoke a fight like
20 that and you say this out of the blue,
21 was he acting like a real man, no, he
22 wasn't acting like a man.
23      Did I use those words? I
24 don't think I used the word -- I don't
25 know what I said, but I probably said

1      M.H. Capogrosso
2 something, but I don't know exactly what
3 I said, but I did say something. I was
4 mad. The man got me --
5     Q     He said --
6     A     The man blindsided me, got
7 me thrown out of the DMV, blindsided me.
8 I was thrown out of the DMV the next day
9 by Gelbstein telling me I'm not welcome
10 here anymore. I was never given an
11 opportunity to write an affidavit to say
12 what I had to say, my version of the
13 story, by anybody.
14      Judge Gelbstein, Bushra
15 Vahdat, Ida Traschen, never given an
16 opportunity to write my affidavit, where
17 every attorney got an opportunity to
18 write an affidavit. I was thrown out. I
19 had to take an anger management course
20 that cost me $10,000. So was I upset
21 that day, yeah. I was upset.
22     Q     Mr. Maher writes that
23 Michael Beer spoke up and said that you
24 crossed the line of decency. Do you
25 remember Michael Beer saying anything?

1      M.H. Capogrosso
2     A     Michael Beer was the other
3 attorney in the room the second time.
4 The second time Beer was there. Now you
5 refreshed it, yeah. Michael Beer was the
6 other attorney. He wasn't there the
7 first time. He was there the second
8 time, that I remember, Beer. Beer was
9 there.
10      When Brody was standing in
11 front of the coffee again and I said
12 excuse me, can I get my coffee, so Beer
13 was in the -- was in the room the second
14 time that Brody did this to me.
15     Q     And Mr. Maher writes that
16 you, quote, "expressed the belief that
17 the DMV was in fact run by fucking Jew
18 cunts;" is that correct?
19     A     I don't remember saying that
20 exactly. I don't remember saying that,
21 no. Is it run by Jewish judges and
22 lawyers, yeah. Am I an Italian American,
23 absolutely. Did Judge Gelbstein give me
24 an opportunity to write my affidavit and
25 response, no. Did Bushra Vahdat give me

1      M.H. Capogrosso
2 an opportunity, no. Did Ida Traschen,
3 no. They accepted this all as truth,
4 these affidavits, giving me no
5 opportunity to respond.
6      Now, most of the judges down
7 there are Jewish. The best -- the best
8 judges in the courtroom were Jewish. I'm
9 not going to deny that, they were, but
10 these Jewish judges gave me no
11 opportunity to respond.
12     Q     So let's move on to the next
13 exhibit.
14     A     Please.
15     Q     Mr. Capogrosso, can you see
16 this exhibit?
17     A     Yes.
18     Q     And you can see this is from
19 your production and marked P-96; correct?
20     A     Yes. This is a Sadiq Tahir,
21 yes.
22     Q     Do you recognize this
23 document?
24     A     Yes.
25     Q     And what is it?

36 (Pages 262 - 265)

M.H. Capogrosso

A    It's an affidavit from Tahir, another attorney, who had the opportunity to write an affidavit and I didn't as to what happened.

MR. THOMPSON:  And. Ms. MacDonald, can we mark this as Exhibit 10.

(The above-referred-to statement was marked as Exhibit 10 for identification as of this date.)

Q    So, Mr. Capogrosso, who is Sadiq Tahir?

A    He's a lawyer at the Brooklyn TVB. We were friends at one point in time, really good friends. We used to go out drinking together.

Q    When was that?

A    Before this incident. We used to go out all the time. We used to hang out at the same clubs. We used to hang out. We both drank. We used to go out drinking in Brooklyn.

Q    Mr. Capogrosso, do you know what Mr. Tahir's current status is?

M.H. Capogrosso

A    I think he's passed. I think he died.

Q    I heard that, too. You know, I don't --

A    I don't know.

Q    I heard people say that, but I don't know if it's actually true.

A    I don't know either, but we were friends at one point in time. Really -- I used to drive him -- I used to drive him home at night. He used to ask me for a ride home. We used to be really close. I went over to his apartment.

This hurts me more than anything, this affidavit. We were really, really close me and him.

Q    So then if you were so close, why do you think he wrote this statement?

A    I don't know what happened. I don't know. I know that he tells me Mr. Capogrosso walked, and he's being truthful here, and said excuse me. I

M.H. Capogrosso

did. He says that and I did say that. Maybe he was in the room. I don't know.

"He moved to the side to reach for his bag lying under the" -- "he then said again excuse me." I'm saying excuse me twice. Now Brody says why are you being rude, you have enough -- I said I didn't have enough room. If I didn't -- if I had room enough to get my coffee -- this -- why would I say excuse me?

That's when Brody says excuse yourself, go fuck yourself, I'm a Jew hater anti-Semite.

Q    So up until this point when he talks about saying excuse me, is Mr. Tahir's account correct?

A    I don't know. What point? Mr. Capogrosso walked into the room. I did do that. I said excuse me. I did do that. I was looking for my coffee. Now, Brody didn't move away. I had to say excuse me twice. I had to say it twice.

I have to be expelled from

M.H. Capogrosso

the Brooklyn TVB because I'm asking an attorney back in December of 2011 excuse me, can I get my coffee. I have to be expelled and take an anger management course because this lawyer couldn't just move to the side and let me get my coffee. He had to call me -- tell me I'm a Jew hater, fuck you I'm a Jew hater and I'm the cause of this now.

But go ahead, I'm listening.

Q    Mr. Tahir writes "Mr. Brody said you have enough room. Why are you so rude. Mr. Capogrosso got so upset that he started shouting against Jews. Mr. Beer who was also sitting in the room asked Mr. Capogrosso that it's enough, that you -- it's enough, you can't curse Jews." Is that correct?

A    Beer was in the room. Beer was in the room, that I remember. I remember -- said you had enough room -- I didn't have enough room. I said excuse me, can I get my coffee. He refused to move the first time and then he -- then

37 (Pages 266 - 269)

1    M.H. Capogrosso
2  he's telling me excuse yourself, go fuck
3  yourself.
4        Then I come back, Beer is
5  there. I remember Beer. I'm not sure if
6  Sadiq was there and -- Sadiq must have
7  obviously been there because he does say
8  the words excuse me.
9        And he refused to be --
10  he -- then he said it again to me, excuse
11  yourself, go fuck yourself. At that time
12  I got upset. At that point I got upset.
13  He walked -- at that point I got upset.
14  Yes, I did, I'm not going to deny it. I
15  took an anger management course.
16    Q    So he writes that
17  "Mr. Capogrosso said you can call me a
18  fucking Italian Gini. Mr. Brody said
19  that you're an anti-Semite and you don't
20  belong in this place. Mr. Brody shouted
21  stop it and in the meantime Ms. Daniel."
22  I guess that means Danielle, "Calvo came
23  into the room and tried to cool down the
24  situation." Is this correct?
25    A    I know Beer was in the room.

1    M.H. Capogrosso
2  I don't remember what he was saying. I
3  was upset at that point in time. Listen,
4  I was upset. You know, I don't recall
5  exactly what I said.
6    Q    Did Calvo come out? Calvo,
7  if she came out she took everybody's
8  affidavit, every lawyers' affidavit but
9  mine. She took every lawyers' affidavit
10  but mine as to what happened.
11        Beer I do remember in the
12  room and that's it. That's all I
13  remember. That's what I remember.
14    Q    So is there anyone -- you
15  know, of what we've looked at so far, is
16  there anything that Mr. Tahir has written
17  that is untrue?
18    A    Well, I don't know. I don't
19  know. I'm not going to say that because
20  I'll admit to the fact I said -- that I
21  said excuse me, that's what I'll admit
22  to. I don't know about the rest. I
23  don't recall the rest. I do remember
24  saying excuse me twice. I do -- I do
25  recall -- I do recall being upset. I

1    M.H. Capogrosso
2  was.
3        I do recall Beer being in
4  the room, that's what I remember. I
5  don't remember Calvo coming out, but
6  maybe she did. I know Maher was not in
7  the room, that I remember.
8    Q    So Mr. Tahir writes "A
9  little later Mr. Meyers came in the room
10  and" -- I can't actually quite read what
11  he says.
12    A    I have to apologize --
13  Meyers is asking me to apologize to
14  Brody. Meyers is asking me to apologize
15  to a guy that just told me to go fuck
16  myself twice. That's what I have to do.
17    Q    And what happened then?
18    A    I got -- I got upset. I got
19  to apologize to a guy that just told me
20  to go fuck myself twice? Are you kidding
21  me? I mean are you really kidding me?
22  That's when I threw the punch at the
23  wall. I didn't hit the wall. I wasn't
24  charged. I wasn't arrested. That's when
25  I really got -- he's asking me to

1    M.H. Capogrosso
2  apologize to a guy that just told me to
3  go fuck myself twice.
4        At that point Brody is
5  standing outside the -- outside the room.
6  He looks in and then he goes -- goes to
7  Judge Gelbstein. I think that's what
8  happened. I'm not sure.
9    Q    So Mr. Tahir writes that you
10  said to Mr. Meyers that I'll send you to
11  the hospital.
12    A    I never said that. I never
13  would say that. There's no reason for me
14  having -- being mad at Meyers. No reason
15  for me. Meyers didn't do anything.
16  Meyers just walked in the room. He's
17  asking me to apologize which is just
18  terrible because you know the truth
19  doesn't matter here. You know, the truth
20  doesn't matter as to what actually
21  happened. He's asking me to apologize to
22  a guy that just told me to go fuck myself
23  twice.
24        I never said I was going to
25  put Meyers in the hospital, never. I

38 (Pages 270 - 273)

M.H. Capogrosso

1  have no beef with Jeff Meyers. I mean we
2  weren't actually friends, but we did --
3  he was a funny guy, Jeff Meyers. He's a
4  funny guy to talk to, real funny guy. He
5  makes you laugh.
6
7  Q      So --
8  A      He's a nice --
9  Q      So is --
10 A      He's a funny guy.
11 Q      So is Mr. --
12 A      And I've been over to his
13 apartment. I mean we weren't friends.
14 We weren't close, but I was to his
15 apartment once. I did drive him home
16 several times after work because he
17 had -- his car was in the repair shop. I
18 did drive the man home.
19        But were we close, no, but
20 he was a funny guy to talk to.
21 Q      So is Mr. Tahir lying here?
22 A      What portion? Exactly what
23 portion?
24 Q      When he says that you
25 threatened to put Mr. Meyers in the

M.H. Capogrosso

1  hospital?
2  A      Absolutely. I wouldn't
3  threaten. I don't believe in
4  threatening. If you're going to do
5  something, just do it. I don't threaten.
6  I would never threaten anybody like that.
7  First of all, I could get arrested for
8  that and you don't threaten.
9         I mean if I have to defend
10 myself in this instance I would just do
11 it, but I'm not going to threaten you
12 with that. I don't threaten. I don't
13 believe in that. If you have to defend
14 yourself, you defend yourself, but you
15 don't threaten.
16 Q      So why would Mr. Tahir lie?
17 A      I don't know. I don't know
18 if that's a lie. I don't remember -- I
19 don't remember saying that, absolutely
20 not. I don't know why he lied. Ask the
21 man.
22 Q      Well, I can't. I think he
23 passed away.
24 A      Yeah. I think he did. I

M.H. Capogrosso

1  don't remember saying I would put
2  Meyers -- there's no reason to have a
3  beef with Meyers, none. Brody, yeah. I
4  have no reason to have an argument with
5  Meyers.
6
7         Over asking excuse me, at
8  Christmas time, can I please get my
9  coffee, this had to escalate to this.
10 Q      Did Mr. Tahir want you gone
11 from the TVB?
12 A      I don't know. I mean we
13 were friends at one point, but, you know,
14 I -- you know, I was making money down
15 there and, you know, this is a very
16 competitive business and you lose friends
17 over money. When everybody is, you know,
18 is chasing the same nickel, you lose
19 friends. There's only so many tickets
20 and only so much money to be made, you
21 know. And after a while if people aren't
22 making enough money and they see other
23 people making money, they get jealous and
24 attorneys, that it's, that's the game
25 down there.

M.H. Capogrosso

1         You know, people come down
2  with cash in their hands, paying you 200,
3  150, 100, $50 on a ticket. And they see
4  those transactions, people get jealous.
5  So do other attorneys want other
6  attorneys out, absolutely. It's a very
7  competitive business, it was all cash and
8  there's only so many tickets out there.
9         So maybe he wanted me out.
10 Maybe he wasn't making enough. I don't
11 know.
12 Q      And he --
13 A      I'm listening.
14 Q      Lastly Mr. Tahir writes
15 "Mr. Capogrosso went out of the room and
16 started hitting the wall and steel
17 guards." Is that true?
18 A      No. I don't recall doing
19 that. I do not recall doing that. I
20 remember I threw a punch at a wall in the
21 lawyers' room because the man just told
22 me to go fuck myself, but, no, I didn't.
23 I don't remember hitting a wall in the
24 DMV. I do not.

39 (Pages 274 - 277)

1       M.H. Capogrosso
2          First of all, if I hit a
3   steel guard I would have broke my hand.
4   Q     So is it your testimony that
5   you did not hit a wall that day, December
6   21, 2011?
7   A     I don't recall, no.
8   Q     Did you ever hit a wall or a
9   steel guard at the DMV?
10  A     No. Now, if I -- no, no. I
11  was never accused of it by Judge
12  Gelbstein. Judge Gelbstein never told
13  me. If you tell me once, it would never
14  happen twice. You only have to tell me
15  once. You don't have to tell me twice.
16  If I did something wrong, you tell me
17  once, you never have to tell me twice.
18  Q     So you never punched a wall
19  or any other object --
20  A     Not that I recall.
21  Q     -- at DMV?
22  A     No.
23  Q     Okay.
24  A     Not that I recall, no. Like
25  I said, if it happened, you tell me once,

1       M.H. Capogrosso
2   it never happens twice.
3   Q     So let's move on to a new
4   document.
5   A     I do not recall.
6   Q     I'm sorry, Mr. Capogrosso. I
7   didn't quite catch that.
8   A     I said no, I do not recall.
9   Q     Mr. Capogrosso, can you see
10  this document?
11  A     Yeah. Jeff Meyers. I used
12  to drive him home every afternoon.
13  Q     And this is a document from
14  your production Bates numbered P-248;
15  correct?
16  A     Yeah.
17  Q     And do you recognize this
18  document?
19  A     Yeah. It's Jeff. Jeff's a
20  funny guy.
21  Q     And what is this document?
22  A     It's his affidavit. Like I
23  said, everybody got a chance to write an
24  affidavit but me as to what happened,
25  everybody.

1       M.H. Capogrosso
2       MR. THOMPSON: So,
3   Ms. MacDonald, can I --
4   A     I never got a chance.
5   Q     I'm sorry. I missed what
6   you said there, Mr. Capogrosso.
7   A     I never got a chance to
8   write my affidavit as to what happened,
9   never got a chance and I was the one
10  there.
11      MR. THOMPSON: Ms.
12  MacDonald, let's mark this as Exhibit
13  11.
14      (The above-referred-to
15  statement was marked as Exhibit 11
16  for identification as of this date.)
17  Q     And so here again Mr. Meyers
18  writes that he overheard a loud commotion
19  which he was told resulted in a tirade of
20  anti-Semitic slurs and that he later
21  implored Mr. Capogrosso to apologize.
22      Did he, in fact, ask you to
23  apologize?
24  A     Yes, he did.
25  Q     He writes that your "conduct

1       M.H. Capogrosso
2   the rest of the day was one of abrasive
3   incoherent loud mutterings in which he
4   smashed his fist against concrete walls
5   and steel beams that are situated outside
6   the DMV hearing rooms, coupled with more
7   anti-Semitic comments. He kept saying
8   everyone here wants to fight me."
9       Does that refresh your
10  recollection at all?
11  A     Yeah. That didn't happen.
12  It didn't refresh me because I never said
13  that. I was upset and I was mad. I
14  didn't hit any concrete walls or steel
15  beams. I don't recall making that
16  statement, no, I do not.
17      Was I upset, absolutely I
18  was upset. I just got blindsided by this
19  guy Yaakov Brody telling me to go fuck
20  myself twice, that I'm a Jew hater. For
21  what reason? Anti-Semite, for what
22  reason?
23  Q     So Mr. Meyers is lying here;
24  correct?
25  A     I never smashed my hand

40 (Pages 278 - 281)

Page 282

1       M.H. Capogrosso
2 against the wall. no. I think I would
3 have broke -- broke my hand if I hit it
4 or hit anything. A steel column or a
5 brick wall, I would have broke my hand
6 so, yes.
7     Q    And why would Mr. Meyers
8 want to lie?
9     A    I don't know. I never said
10 it. Maybe he's a -- I don't know why.
11 You ask him. Ask him.
12     Q    Did --
13     A    I know what I said. I was
14 very upset. But did I hit a brick
15 concrete wall, no.
16     Q    Did Mr. Meyers want you
17 gone?
18     A    I don't know. Ask Meyers.
19 We were all very competitive, believe me.
20 This was a competitive environment. It's
21 an all cash environment. Money gets
22 transferred -- transferred on the floor
23 all day between lawyers and motorists.
24 There's only so many motorists coming in.
25        If I'm not there, Meyers

Page 283

1       M.H. Capogrosso
2 makes more money. If Meyers is not
3 there, I make more money. That's just
4 how the game is played.
5     Q    Later he writes that he was
6 sitting in the lawyers room across from
7 you, not engaging in any conversation
8 with him when he, Mr. Capogrosso, quote.
9 "suddenly became enraged and lunged at me
10 with his fists with great speed and
11 smacked his fists against his other hand
12 in a martial arts form coming within
13 12 inches of my face." Is that true?
14     A    No. I threw a punch at a
15 wall.
16     Q    What happened?
17     A    I told you several times, I
18 threw a punch at a wall in the vicinity
19 of no one. I didn't hit the wall, I
20 wasn't charged with it and I was not
21 arrested. I was mad, I'm sorry, I was.
22        Throwing a punch in the air,
23 not in the vicinity of anyone I don't
24 think is any -- I wasn't charged and I
25 wasn't arrested. I'm sorry, I did not.

Page 284

1       M.H. Capogrosso
2     Q    Mr. Meyers --
3     A    I did not come anywhere
4 close to Jeff Meyers. If I did, I would
5 have been charged or arrested.
6     Q    Mr. Meyers writes that you
7 said, quote. "I could put you in the
8 hospital with one just punch" -- "with
9 just one punch." Is that true, did you
10 say that?
11     A    Well, did I say it? No, no.
12 Now do I have that ability, absolutely.
13 Do I have the ability, yes. Did I say
14 it, no. I don't threaten people. Do I
15 have that ability, yes. I've been
16 training in martial arts my whole life.
17 I've been in and out of boxing rings my
18 whole life. Can I -- do I have the
19 ability, yes. Did I say it, no. I don't
20 threaten.
21        Now, did he feel intimidated
22 by me, did he feel that, yeah, maybe he
23 did, I don't know. But did I say that --
24     Q    Which martial arts -- I'm
25 sorry. I didn't mean to cut you off.

Page 285

1       M.H. Capogrosso
2       Did you have anything more
3 you wanted to say there?
4     A    No.
5     Q    Which martial art do you
6 train in?
7     A    Kempo, K-E-M-P-O.
8     Q    And you have a black belt in
9 it; is that true?
10     A    Yes. A very high level
11 black belt.
12     Q    What level?
13     A    I'm a high level black belt.
14     Q    But can you tell me what
15 level?
16     A    I don't recall. I'm a high
17 level black belt.
18     Q    You don't recall what level
19 of black belt you are?
20     A    At a certain point, you
21 forget.
22     Q    Do you have an estimate?
23     A    No. I'm a high level black
24 belt. I've been training a long time.
25     Q    Do you have any training in

41 (Pages 282 - 285)

1      M.H. Capogrosso
2 other martial arts?
3    A    Before Kempo I trained in
4 Mas Oyama and then in a boxing ring
5 and -- which I still was going to up to a
6 couple of years ago, which I had to stop,
7 but that's it.
8    Q    So Mr. Meyers writes "He
9 kept repeating the phrase you people, you
10 people. He later told me he envisioned
11 all of us Jews and didn't mean to single
12 me out during his assault on me." Is
13 this true?
14    A    You people? Now you're not
15 allowed to say you people. Isn't freedom
16 of expression? I don't recall saying
17 that. I mean he's offended because I say
18 you people? What's wrong with saying you
19 people? What is wrong with saying you
20 people? Maybe I was referring to lawyers
21 in general down there.
22      I've had lawyer after lawyer
23 make affidavit against me. Now I'm
24 making an anti-Semitic remark by saying
25 you people? Maybe he's a little

1      M.H. Capogrosso
2 oversensitive. I never used the word --
3 I said you people, so what. I don't
4 recall saying it, but maybe I was talking
5 about the lawyers down there.
6    Q    So Mr. Meyers writes "He
7 later told me that he envisioned all of
8 us Jews and didn't mean to single me out
9 during his assault on me." Did you say
10 that?
11    A    I envisioned all of us and
12 didn't mean to -- all of us, did I say
13 the word Jew? I said all of us. Maybe
14 all your lawyers who don't want me. All
15 you lawyers, maybe that's what I said.
16      Did I use the word Jew, no.
17 He has the Jew in parenthesis. Go to all
18 the --
19    Q    Okay.
20    A    Go to all the complaints
21 against me from a client or a motorist,
22 is there any Jewish person that states I
23 made an anti-Semitic remark, no. I mean
24 come on.
25    Q    So, Mr. Capogrosso, four of

1      M.H. Capogrosso
2 your colleagues, your fellow attorneys --
3    A    They're not my colleagues.
4 They're not my colleagues. Don't use
5 that word with me. They are not my
6 colleagues.
7    Q    Why are they not your
8 colleagues?
9    A    Because they don't -- they
10 don't write false defamatory statements
11 against somebody and give them no
12 opportunity to respond. They don't say
13 excuse me, go fuck yourself you Jew
14 hater. That's not a colleague. That's
15 not a colleague or -- I could go into
16 millions of things.
17      They're not colleagues.
18 They were attorneys I worked with down in
19 the Brooklyn TVB. I had to work
20 alongside. I didn't work with them.
21 They were there working. I was there
22 working. I was not their colleague. We
23 did not work together. We worked
24 separately and independently.
25    Q    All right. Four of your

1      M.H. Capogrosso
2 fellow attorneys at the Brooklyn TVB --
3    A    Yes.
4    Q    -- and they all remember the
5 incident the same way. Is that a
6 coincidence?
7    A    I don't know. You ask them.
8 I don't think they remembered it all the
9 same day. There are discrepancies here,
10 many discrepancies. I pointed them out
11 to you. One -- one affidavit says I'm
12 attempting to sit down. I wasn't
13 attempting to sit down.
14    Q    So if everything that is in
15 these affidavits were true and I know you
16 don't think it is, but if it were and you
17 had, in fact, said these things, thrown a
18 cup of coffee at Mr. Brody --
19    A    Well, that's not true. I
20 threw a cup of coffee in the garbage can.
21 Get the facts straight.
22    Q    I understand that you -- I
23 understand that you don't agree with the
24 facts, but I'm asking for the
25 hypothetical if these facts were true.

42 (Pages 286 - 289)

1          M.H. Capogrosso
2   would they justify excluding you from the
3   TVB?
4       A     They're not true. They're
5   not true, so there's no reason to exclude
6   me. They're not true. I told you what
7   happened that day. I was blindsided by
8   Brody. I have a right to get mad. Told
9   me to go excuse myself and go fuck myself
10  twice. I have a right to get mad. It's
11  a normal --
12      Q     I understand that you
13  disagree with the fact --
14      A     I was blindsided and that's
15  all that happened that day, that's it.
16          Now, this is a competitive
17  business, I told you that. These lawyers
18  wanted me out. I was making money and
19  every dollar I make is a dollar that they
20  don't make. So the more attorneys they
21  can get out of there, the better it is.
22      Q     Let me rephrase the
23  question. If someone, not you, had used
24  the phrase fucking Jew cunt, thrown a cup
25  of coffee at somebody and tried to punch,

1          M.H. Capogrosso
2   you know, the air in front of somebody
3   else's face and told them that they'd put
4   them in the hospital, would that person
5   be someone who could be excluded from the
6   TVB?
7       A     No. I don't know. It
8   didn't happen. I don't know. First of
9   all, it didn't happen. I didn't throw
10  a -- I told you the facts, so I'm not
11  going to -- I'm not going to discuss a
12  hypothetical, what could have or could
13  not happen. Nobody wants to take my
14  affidavit as to what happened here,
15  nobody.
16      Q     Okay. Let's --
17      A     Everybody, you know,
18  everybody here could have looked at the
19  videotape if I'm punching a wall or
20  punching a steel beam. Judge Gelbstein
21  had the ability to pull the videotape and
22  look at the videotape as to what happened
23  and what happened that day and he didn't
24  do it.
25          He had the ability to take

1          M.H. Capogrosso
2   my affidavit as to what happened and he
3   didn't do it, he didn't. If I'm punching
4   a wall or a steel beam, let Gelbstein
5   pull the videotape and he didn't do it.
6       Q     So let's move on to another
7   exhibit here.
8       A     And I don't like
9   hypotheticals that don't exist because
10  the facts that you're presenting aren't
11  true. I threw a cup, an empty cup in a
12  coffee -- in a garage can that Brody was
13  sitting next to. I didn't throw a punch
14  in the vicinity of any attorney. I
15  didn't hit any steel beams.
16          If you had the opportunity
17  to look at the videotape, the judge would
18  have saw that and he didn't do it and he
19  had an opportunity to do it.
20      Q     So, Mr. Capogrosso, can you
21  see the document that I just put up?
22      A     Yes.
23      Q     And this document is Bates
24  stamped DMV-0000224; correct?
25      A     Yes.

1          M.H. Capogrosso
2       Q     Do you recognize this
3   document?
4       A     Bushra Vahdat's affidavit.
5          MR. THOMPSON: Ms.
6   MacDonald, can I ask you to mark this
7   as Exhibit 12?
8          (The above-referred-to
9   statement was marked as Exhibit 12
10  for identification as of this date.)
11      Q     We'll just discuss this
12  document and then we'll take a bit of a
13  break because I know we are all a little
14  tired.
15      A     I'm not tired. I'm not
16  tired at all.
17      Q     So what is this document?
18      A     I think it's an affidavit
19  from Bushra Vahdat.
20      Q     And Ms. Vahdat writes that
21  when she was first appointed, the
22  clerical staff approached her and handed
23  her an affidavit signed by all of them
24  requesting help dealing with an attorney.
25          Do you think she's talking

43 (Pages 290 - 293)

1    M.H. Capogrosso
2  about the petition that we looked at
3  earlier?
4    A    Yeah. The petition that has
5  no facts attached to it, just a whole
6  bunch of signatures --
7    Q    And that --
8    A    -- which Bushra Vahdat never
9  presented to me so I could address the
10  issues and resolve them and tell me
11  exactly what I did so I could resolve it
12  and that's a judge.
13    Q    So she says that, in fact,
14  she did talk with you and in the next
15  paragraph she says and I'll highlight
16  this --
17    A    What paragraph? Go ahead.
18  Go ahead.
19    Q    "At that time I met with
20  Mr. Capogrosso in Senior ALJ Gelbstein's
21  office and we jointly had a conversation
22  with Mr. Capogrosso."
23      Do you remember that
24  conversation?
25    A    No, no. She was there.

1    M.H. Capogrosso
2  Gelbstein told me you're not welcome here
3  anymore after this incident on December
4  22, which I was given no opportunity to
5  respond to, none, none.
6      She was there the next day
7  with Gelbstein when I arrived. There was
8  a police officer in the room, that I
9  remember. Gelbstein is sitting down.
10  She's sitting next to him. Gelbstein
11  tells me you're not welcome here anymore.
12  I said don't have an opportunity to
13  explain, I've been here since 2005. I
14  don't have an opportunity -- I've been
15  here since 2005 serving the Brooklyn
16  community. I don't get an opportunity to
17  explain what happened yesterday by way of
18  affidavit, 2005.
19      Gelbstein tells me --
20    Q    So I believe --
21    A    You have to let me finish.
22      You're not welcome here
23  anymore. You have to leave.
24    Q    So I believe she's referring
25  to an earlier conversation that happened

1    M.H. Capogrosso
2  sometime before that. Do you remember
3  having a conversation with Ms. Vahdat and
4  Mr. Gelbstein prior to the time you were
5  expelled in 2011?
6    A    No, no.
7    Q    Okay.
8    A    The only time I remember
9  speaking to her was that time after this
10  event.
11    Q    So she writes "We explained
12  to him that his behavior was not
13  professional and that if he did not stop
14  his foul language and his threats we
15  would have to take action and bar him
16  from the TVB building. At that point he
17  promised us that he would conduct himself
18  according to the rules of conduct for
19  attorneys."
20      Did that conversation ever
21  happen --
22    A    Well, what foul language?
23    Q    -- do you recall?
24    A    Tell me exactly what foul
25  language I used and what threats? Was it

1    M.H. Capogrosso
2  the incident of December 22?
3    Q    Well, I --
4    A    I'd like to know.
5    Q    Well, Mr. Capogrosso --
6    A    What foul language did I
7  use?
8    Q    -- the question was do you
9  recall this conversation?
10    A    I recall -- the only
11  conversation I remember with her was
12  after this event.
13    Q    So this conversation that
14  I've -- that we've highlighted here, you
15  don't recall that ever happening; is that
16  correct?
17    A    The only conversation I
18  recall with this woman was the
19  conversation I had with Gelbstein and her
20  in the office after this.
21    Q    Okay.
22    A    Now, if you go back to the
23  following paragraph, "He abused the
24  clerks and followed a clerk in his car,"
25  which is a complete lie being made by a

44 (Pages 294 - 297)

M.H. Capogrosso

1   M.H. Capogrosso
2   judge, I followed a clerk in a car. Look
3   at what George Hon wrote. If she's
4   talking about George Hon, that's a
5   complete lie.
6   Q   So, Mr. Capogrosso, the
7   question is, it's just a narrow question,
8   yes or no, do you recall the highlighted
9   conversation in which you met with
10  Ms. Vahdat and --
11  A   No. I've answered --
12  Q   -- Mr. Capogrosso?
13  A   I've answered that question.
14  I recall one conversation --
15  Q   Okay.
16  A   -- with this woman.
17  Q   All right. So she says that
18  you were warned that if there were
19  further incidents that you would be
20  expelled; is that true?
21  A   I remember one conversation
22  with this woman with Gelbstein after the
23  event of December 22, that's it.
24  Q   Were you -- had you ever
25  previously been warned that if there were

M.H. Capogrosso

1   M.H. Capogrosso
2   any further incidents you would be
3   expelled?
4   A   Tell me what incidents
5   you're talking about. Give me an
6   opportunity to respond. So no, I do not.
7   I don't know what incident she's talking
8   about. The one with Brody where he told
9   me to go fuck myself twice?
10  Q   So Mr. Capogrosso --
11  A   What incident is she talking
12  about?
13  Q   Mr. Capogrosso, I'm not
14  asking about an incident. I'm just
15  asking for a narrow question. Were you
16  warned that prior to December 21 that you
17  might be expelled from the TVB if there
18  were an incident?
19  A   What -- I had one
20  conversation with this woman that I
21  recall on December 22 when Gelbstein told
22  me I had to leave because Brody
23  approached me in the lawyers' room.
24  Q   Let me --
25  A   That's it.

M.H. Capogrosso

1   M.H. Capogrosso
2   Q   Let me rephrase the question
3   and see if --
4   A   I'll say it again. I had one
5   conversation with this woman, that's it.
6   Q   So did --
7   A   There's nothing in writing.
8   Q   Mr. Capogrosso --
9   A   That's all I had.
10  Q   -- let me see if I can
11  clarify the question for you. Did anyone
12  warn you prior to December 21, 2011 that
13  you could be banned from the TVB for
14  misbehavior?
15  A   No. I received no
16  affidavits, no warnings, nothing to
17  respond to, nothing. I wish you had. I
18  wish you had given me these affidavits
19  and given me an opportunity to respond
20  and I would have responded, corrected it,
21  apologized for it if I did something
22  wrong. Tell me what I did and I would
23  have addressed it, but I was given no
24  opportunity.
25  Q   So Ms. Vahdat writes "On

M.H. Capogrosso

1   M.H. Capogrosso
2   Wednesday, December 21, I received an
3   e-mail from Danielle Calvo. She was very
4   concerned that she had to go into the
5   attorney room and stop Mr. Capogrosso
6   from shouting religious obscenities.
7   Mr. Capogrosso had thrown a coffee cup at
8   another attorney, Mr. Brody, in the
9   attorney room and after Mr. Brody had
10  objected, Mr. Capogrosso started to
11  scream and shout obscenities at everyone
12  around him. A crowd had gathered and the
13  entire courthouse was disturbed."
14          And then she writes "An hour
15  later I received another e-mail from
16  Ms. Calvo stating that Mr. Capogrosso had
17  tried punching one of the other
18  attorneys, Mr. Mayer, but had stopped
19  about an inch away from his face.
20  Mr. Mayer was very upset and left the
21  area in fear."
22          Is that referring to the
23  same incidents that we've been talking
24  about in the previous four statements?
25  A   Yes, but Danielle Calvo

45 (Pages 298 - 301)

```
 1        M.H. Capogrosso
 2  never gave the full story. She only
 3  gives half the story. She doesn't give
 4  my version of what happened that day.
 5    Q    So --
 6    A    She only gives half a story.
 7  Danielle Calvo, half a story. What
 8  precipitated that event? First of all, I
 9  didn't punch Jeff Meyers or throw a punch
10  in his vicinity. I did not, number one.
11        Number two -- you turned it
12  away. You turned away from it. She
13  doesn't say what Brody said to me that
14  day. Why is that left out? Why? Why is
15  Calvo not asking me what happened? Like
16  that all happened for no reason?
17        She doesn't understand that
18  Brody told me to go excuse myself, go
19  fuck myself twice. She doesn't put that
20  down.
21    Q    So you'll see here at the
22  bottom of page 1 -- that's not a good
23  highlight. I can do a better highlight
24  than that.
25    A    You know, this is not a --
```

```
 1        M.H. Capogrosso
 2    Q    Ms. Vahdat writes that
 3  "After taking everyone's statement
 4  Mr. Gelbstein and I met with
 5  Mr. Capogrosso. We asked him for his
 6  version of the prior day's events and he
 7  admitted to shouting the religious
 8  obscenities and trying to punch, as he
 9  put it, the air in front of Mr. Mayer's
10  face. He was not remorseful and claimed
11  that he needs to punch the walls in our
12  office to let out steam. I also observed
13  that his knuckles were severely bruised."
14        So what --
15    A    All right. What do you
16  want? What's the question? What's the
17  question?
18    Q    My question is what do you
19  recall from this meeting?
20    A    This meeting what I
21  recall -- first of all, Gelbstein told me
22  you're not welcome here. I was given no
23  opportunity to respond by way of written
24  affidavit as to what happened. I did not
25  shout religious obscenities. Again, I
```

```
 1        M.H. Capogrosso
 2  was mad and I was upset. I don't recall
 3  what I said.
 4        I did not go anywhere near
 5  Meyers, nowhere near Meyers. I was given
 6  no opportunity to respond. I threw an
 7  empty coffee cup --
 8    Q    Was she --
 9    A    Let me finish. I threw an
10  empty coffee cup --
11    Q    Sure.
12    A    -- not at Brody. I threw it
13  in a can, in a can that's in the lawyers'
14  room where I'm allowed to do that. I'm
15  allowed to throw an empty coffee cup in a
16  can in a lawyers' room. I'm allowed to.
17        She doesn't write down what
18  Brody said to me, that I'm a Jew hater
19  anti-Semite go fuck yourself twice.
20        My hands are bruised. I've
21  been going to martial arts all my entire
22  life. My hands are bruised. Sometimes I
23  get a black eye. It happens. I accept
24  the reality of that. It's not because I
25  hit a wall at the DMV. Because I go to a
```

```
 1        M.H. Capogrosso
 2  boxing gym and a martial arts gym that it
 3  happens. That's when I --
 4    Q    So, Mr. Capogrosso, she --
 5  you said you weren't able to put in your
 6  version of events, but she writes that
 7  she asked you for -- we asked him for his
 8  version of the prior day's events and he
 9  admitted shouting religious obscenities
10  and trying to punch at and that you were
11  not remorseful and claims that you needed
12  to punch the walls in the office.
13        So you were able to verbally
14  give your version of events; weren't you?
15    A    No, I wasn't. First of all,
16  it's a lie. First of all, it's a lie.
17  And what she's stating here is -- you
18  have to move this over -- up a little
19  bit, down or up.
20    Q    Sure.
21    A    That I -- this is an
22  absolute lie from a judge that I needed
23  to punch a wall in the office to let off
24  steam.
25        I have to look at it. It's
```

Veritext Legal Solutions

M.H. Capogrosso
1
2 still being blocked. I can't see it.
3     Q     You want to go further up?
4 What are you looking for?
5     A     It's blocking it. Further
6 up. Further up. Further up. Whatever
7 this -- just further up.
8     Q     There's nothing further up.
9     A     Well then further down.
10         This is the second lie this
11 woman is stating, that if I don't punch a
12 wall to let off steam I'm going to hit
13 somebody. That he needs to punch the
14 walls in our facility, that's the most
15 ridiculous statement that a lawyer would
16 ever make to a judge. That's a lying
17 lawyer acting as an administrative law
18 judge. I don't know the worst criminal
19 in the world that's going to make that
20 statement.
21         Did I use an obscenity when
22 Brody told me to go fuck myself, I
23 probably did. I don't recall. Did I
24 throw a punch, I admitted to throw a
25 punch, not at Meyers, at a wall. I

M.H. Capogrosso
1
2 didn't hit the wall, I wasn't charged and
3 I wasn't arrested.
4         All right. Are my hands
5 bruised, yes. I told you the reasons
6 why.
7     Q     So --
8     A     But was I given an
9 opportunity to write a written affidavit,
10 no, never, as to what happened.
11     Q     So, Mr. Capogrosso, I didn't
12 ask you about a written affidavit. I
13 asked you if you were able to verbally
14 say what your perspective was and it
15 sounds like you were; correct?
16     A     No, I was not. Gelbstein
17 called me in the room. I was not. I'm
18 telling you these facts are not true.
19 Gelbstein called me in the room in the
20 presence of a police officer and -- and
21 told me you're not welcome here anymore.
22 That's what I remember. They accepted no
23 affidavit on my behalf as to what
24 happened, none.
25         So Brody's allowed to walk

M.H. Capogrosso
1
2 into an attorneys' room in the morning,
3 tell a lawyer to go fuck himself, that
4 he's a Jew hater, anti-Semite and that's
5 allowed, that's acceptable.
6     Q     So, Mr. Capogrosso, let me
7 ask you, isn't this basically the same
8 thing that happened when you were
9 expelled from the TVB in 2015, there was
10 an incident with other -- with someone
11 else, you dispute the version of events,
12 there was an allegation of violence and
13 then you're escorted out after TVB
14 leadership is --
15     A     Well, tell me --
16     Q     -- called?
17     A     Well, tell me what I did.
18 Well, tell me what exactly I did on
19 May 11. Tell me exactly what I did
20 wrong. Now you can accuse me and -- tell
21 me. I turned around and look at a
22 security guard. I'll tell you what
23 happened on May 11. He's grumbling and
24 mumbling, shaking his head, crosses over
25 two security barriers, gets within three

M.H. Capogrosso
1
2 inches of my face, ducks his head and
3 obscures his hand and I put my hand up
4 and I say back up, back up. That's what
5 happened on May 11.
6         It has nothing to do with
7 this incident. This is a security guard
8 who stole money from a client looking for
9 me and I reported it and then started to
10 harass and was getting away with it
11 because Judge Gelbstein allowed his
12 harassment and I told you all the
13 harassment that was going on, giving me
14 the sign of the cross, a spear hand,
15 hitting me from behind.
16         I put my hand up, back up,
17 back up. It's absolutely not the same.
18     Q     All right.
19     A     I got blindsided again by
20 this -- that's it. Go ahead.
21         MR. THOMPSON: So why don't
22 we take a 15 minute break, come back
23 at around 2:45. Is that okay with
24 everybody?
25         THE WITNESS: I don't need a

47 (Pages 306 - 309)

M.H. Capogrosso

1 break, but if people need a break,
2 take a break.
3     MR. VIDEOGRAPHER: All
4 right. The time is 2:33. We are off
5 the record.
6     (A short recess was taken.)
7     MR. VIDEOGRAPHER: The time
8 is 2:48. We are on the record.
9     Q    So. Mr. Capogrosso, I've put
10 up an exhibit here. Do you recognize
11 this document?
12    A    Yes.
13    Q    What is this document?
14    A    Well, after the events with
15 Yaakov Brody in 2011, Gelbstein told me,
16 you know, you're not welcome here
17 anymore. I hired a lawyer, he
18 communicated with the DMV and the
19 Attorney General's office and he
20 represented me in an Article 78
21 proceeding.
22    Q    Okay. And you see this
23 document is Bates stamped DMV-0000226;
24 correct?

M.H. Capogrosso

1     A    Yes.
2     Q    And so this is a document
3 that was filed -- sent on your behalf by
4 your lawyer; correct?
5     A    Yes, at that time, Chris
6 McDonough.
7     MR. THOMPSON: All right.
8 Can you mark this as Exhibit 13?
9     (The above-referred-to
10 letter was marked as Exhibit 13 for
11 identification as of this date.)
12    Q    And is it safe to say that
13 this letter features your version of
14 events?
15    A    Well, as I told them to my
16 lawyer.
17    Q    And I want to go down to a
18 portion here at the bottom of the first
19 page, Mr. McDonough writes "One of the
20 managers of the center, Danielle, heard
21 the exchange, again Mr. Brody was yelling
22 at the cup" -- at the top of his lungs,
23 and came into the room. In front of
24 Mr. Capogrosso she stated now's our

M.H. Capogrosso

1 chance to get rid of him, referring to
2 Mr. Capogrosso."
3     Q    Can you tell me what's meant
4 by this?
5     A    I don't know what's meant.
6 That's what she said. That's what she
7 said. It's exactly what she said, now's
8 our opportunity to get rid of him.
9     Q    So --
10    A    Her clerks didn't like me.
11 You saw the affidavits written by her
12 clerks with no facts supporting anything
13 I said or did and she stated that, now's
14 our chance to get rid of him and I took
15 the bait. I took the bait.
16    Q    The Danielle mentioned here,
17 is that Danielle Calvo?
18    A    Yes.
19    Q    And so in your
20 interrogatories you mentioned an incident
21 when Ms. Calvo said now's our chance to
22 get rid of him. Is this the incident you
23 were referring to?
24    A    Yeah, yes.

M.H. Capogrosso

1     Q    So let me ask you, when
2 we -- before the break when we were
3 talking about the incident with
4 Mr. Brody, why didn't you mention
5 Ms. Calvo coming in and saying that?
6     A    When I said during the
7 incident with Mr. Brody? Because at --
8 at that -- you know, today is 2020. I
9 talked to this lawyer when, 2011, 2012,
10 eight years ago and eight years ago I
11 remember her saying it. Today, 2020, I
12 remember exactly what Brody said,
13 exactly.
14    So do I remember what she
15 said in 2012, no, but do I remember what
16 I stated to this lawyer, that's what I
17 said. If that's what I said, yes.
18    Q    So sitting here today, do
19 you contend that Ms. Calvo said these
20 words?
21    A    Yes, I do. I said them in
22 2012, what was it, January, a month after
23 this happened, yes, absolutely. I said
24 that a month, one month after this

48 (Pages 310 - 313)

```
 1        M.H. Capogrosso
 2 happened.  It is now 2020, eight years.
 3     Q     But sitting here today, you
 4 don't remember the circumstances in which
 5 she said that; is that correct?
 6     A     Listen, I remember what -- I
 7 told you what happened that day.  I said
 8 excuse me, can I get my coffee.  Was I
 9 upset, yes.  Was I -- was my voice loud,
10 yes.  Did she come --
11     Q     And why would she --
12     A     Did she come in, she
13 probably did.  Now that I'm looking at
14 this, yeah, she probably, she came in.  I
15 said this --
16     Q     Why would she want to --
17     A     -- in 2012.  I already told
18 you that.  Didn't you have all these
19 affidavits you're showing me that her
20 clerks didn't like me, didn't you show me
21 all these affidavits?
22        For what reason I don't
23 know, other than the other attorneys were
24 giving them money for Christmas, cash for
25 Christmas, buying them breakfast in the
```

```
 1        M.H. Capogrosso
 2 morning, talking, you know, schmoozing
 3 with them for 20 minutes at the DMV.
 4 Talking.
 5        I was there to do a job,
 6 that's it.  I don't know why they didn't
 7 like me, but the clerks didn't like me.
 8 I understood.  Maybe I wasn't giving her
 9 money.  Maybe the other attorneys were
10 paying her.  There's been allegations in
11 the Brooklyn, in the TVB and I showed you
12 those allegations, clerks getting paid
13 often.
14        I know the other attorneys
15 there were giving these clerks money in
16 cash for Christmas and the holidays, I
17 know it.  They were asking me how much
18 they should give them.  I know that
19 because the other attorneys were asking
20 me and I said I don't give them anything.
21        I know other attorneys were
22 buying them meals in the morning and
23 buying them lunch.  I didn't do it.  I
24 know that for a fact.  Maybe that's why.
25        I know I complained about
```

```
 1        M.H. Capogrosso
 2 Tanya Rabinovich to the District
 3 Attorney's office and she was removed
 4 after that complaint and I know maybe
 5 they liked Tanya because she was doing
 6 business at the Brooklyn TVB with the
 7 clerks and maybe they were getting paid
 8 by her, I don't know, but those are my
 9 reasons.
10     Q     So you'll see,
11 Mr. Capogrosso, I'm highlighting a
12 paragraph about halfway down page 2 where
13 your lawyer writes "Two weeks later
14 Mr. Capogrosso contacted Judge Vahdat."
15 Vahat it says, "and asked her to explain
16 her determination.  She advised that if
17 Mr. Capogrosso was good and stayed quiet,
18 she'd reconsider her determination three
19 months later and at that time determine
20 if he could go back into other Department
21 of Motor Vehicle adjudication centers,
22 but not Brooklyn South."
23        Do you recall that
24 conversation?
25     A     I might have called.  I
```

```
 1        M.H. Capogrosso
 2 don't know.  I was calling everybody
 3 after I got expelled.  Everybody I was
 4 making phone calls to.  After this
 5 incident where I was given --
 6     Q     Did --
 7     A     You have to let me finish.
 8     Q     Sure.
 9     A     After this incident I was
10 given no opportunity to file an affidavit
11 on my behalf and I was not allowed back
12 in the Brooklyn TVB and I had all these
13 clients whose money I was holding,
14 Brooklyn clients who I was not showing up
15 for cases on, that I was calling
16 everybody to try to get some explanation
17 of this.
18        And I probably got through
19 to her and if that's what she said,
20 that's what she said.  But that I had to
21 work my way back in, what does that mean
22 work my way back in?  I have to be good
23 and stay quiet?  I don't understand what
24 that means.  Are you suppressing my
25 freedom of expression?  I'm not allowed
```

49 (Pages 314 - 317)

M.H. Capogrosso

1  M.H. Capogrosso
2  to talk as a lawyer? What do I have to
3  do, stay quiet?
4  Q    So --
5  A    I don't know what that
6  means --
7  Q    So do you --
8  A    -- stay quiet.
9  Q    Mr. Capogrosso, sitting here
10 today, do you recall this conversation?
11 A    If I said that to my
12 attorney in 2012, then that's a true
13 statement. It's a true statement.
14 Q    Understood, Mr. Capogrosso,
15 but the question was sitting here today,
16 do you recall this conversation with
17 Ms. Vahdat?
18 A    Today do I remember it? Let
19 me think. I did try to make a lot of
20 phone calls. I did make phone calls
21 right after this happened. Do I recall
22 making this exact conversation, I don't
23 remember. I don't remember saying that
24 exact conversation, but I remember if I
25 said it to him at that time that that was

1  M.H. Capogrosso
2  the truth.
3  Q    Okay.
4  A    I had a big client case at
5  that point. I had clients calling me,
6  asking me where are you, what's going on.
7  So was I trying to reach out to people,
8  yes, I was, absolutely.
9  MR. THOMPSON: So let's mark
10 this as Exhibit 13 if we haven't
11 already and I suspect you already
12 did.
13 Q    And let's -- a couple of
14 other quick questions. So you filed an
15 Article 78 lawsuit; is that correct?
16 A    My attorney did on my
17 behalf, Chris McDonough at that point.
18 Q    And how did the lawsuit
19 proceed?
20 A    We went down to court, went
21 before a judge, Judge Gelbstein was there
22 and I was given the opportunity to go to
23 a hearing a year from now, a year from
24 the date -- a year, one year the judge
25 said. We'll hear the case in a year she

1  M.H. Capogrosso
2  told me or you agree to take an anger
3  management course.
4  Well, I had a lot of
5  clients. I had -- I forgot what that
6  letter said, but it was a lot of clients.
7  I had people calling me where are you,
8  where are you, where are you, why aren't
9  you showing up. I had clients calling me
10 left and right. I felt an obligation to
11 these clients because that's who I am.
12 If a guy gives me money to do a job, I
13 feel an obligation to do that job. I
14 feel a very strong obligation to do it
15 and to show up. I show up.
16 And I said all right, if I
17 have to wait a year in order for my case
18 to be heard and that was a bad decision.
19 I should have adjudicated this right at
20 the start because Chris McDonough told me
21 listen, if you go back down there, you
22 sneeze the wrong way, they're going to
23 throw you out. That's what he told me.
24 Chris told me that and he's a good
25 lawyer. He told me the truth. He said

1  M.H. Capogrosso
2  if you sneeze the wrong way, they're
3  going to throw you out again. I said
4  Chris, I got a ton of clients here and I
5  feel an obligation.
6  So I took the course rather
7  than wait a year to get a hearing on the
8  matter and I should have waited. I
9  should have waited it out and I should
10 have adjudicated this back then and I
11 didn't do it.
12 Q    So what were the terms of
13 the agreement that resolved the case?
14 A    I don't know. There were no
15 terms. I was told to take an anger
16 management course, that's it. I was told
17 to take an anger management course.
18 that's all I -- that's all Chris told me
19 to do.
20 Q    Were you told that any
21 violent or aggressive behavior would
22 result in your removal from the TVB?
23 A    I was given a letter, two
24 days before I was supposed to -- allowed
25 to go back in, a letter that was mailed

50 (Pages 318 - 321)

Page 322

M.H. Capogrosso
1
2  to my attorney two days before I was to
3  go. I agreed to take an anger management
4  course, that's all I agreed to, that's
5  it. I signed no other stipulation. I
6  agreed to nothing.
7        I know what the rules are
8  and how to act as a lawyer. I know that.
9  Q    Did --
10  A    But I didn't sign nothing.
11  I agreed to take an anger management
12  course and that's what I did. That's
13  what I told the judge.
14        Now, your office threw
15  something at me after the fact. After
16  this agreement that we reached your
17  office puts all these conditions, which I
18  adhered to anyway, but it was after the
19  fact, after I already agreed only to take
20  an anger management course.
21        So go ahead.
22  Q    And what was the Attorney
23  General's office's role in that lawsuit?
24  A    I assume they represented
25  the DMV.

Page 323

M.H. Capogrosso
1
2  Q    Just for the litigation or
3  for anything else?
4  A    I don't know. Chris would
5  know that better than me, my attorney on
6  the Article 78.
7  Q    I'm going to bring up an
8  exhibit and, Mr. Capogrosso, can you see
9  the exhibit here?
10  A    Yes.
11  Q    And this is marked in the
12  defendants' production DMV-0000205;
13  correct?
14  A    Yeah.
15  Q    And do you recognize this
16  document?
17  A    No, I don't. I have
18  probably seen it, but I got to see the
19  whole thing. Can you scroll down? I've
20  seen this.
21  Q    Sure.
22  A    Can you scroll down, please?
23  Go ahead. Now can you go up, please?
24        This is from who, Assistant
25  Attorney General?

Page 324

M.H. Capogrosso
1
2  Q    It's from Serwat Farooq.
3  A    Fine. I didn't sign this,
4  but fine. That was something that --
5  Q    So do you recognize --
6  A    Yeah. I do recognize it.
7  It's a letter from --
8  Q    Do you recognize it?
9  A    It's a letter from Chris
10  McDonough. Yeah, Chris is my lawyer.
11  Jackie was the lady that worked under
12  him.
13        I do remember -- I do
14  recognize this. This is a letter from --
15  I don't know if I remember seeing this
16  letter. I don't remember. I don't know.
17  I know I had to take an anger management
18  course. That's all I remember.
19        I don't think I was ever
20  shown this letter. Did I --
21  Q    Did you --
22  A    What's the marking on this?
23  Q    I'm not sure. This came
24  from our production.
25  A    Then I don't -- I don't

Page 325

M.H. Capogrosso
1
2  remember seeing this. I remember seeing
3  that one letter that was -- that had the
4  second half of this down. I only saw
5  this second half on the letter that was
6  sent to me, please be advised --
7  Q    Okay.
8  A    That's the portion I saw
9  where it says please be advised. That's
10  the letter I saw. I never saw this top
11  portion of it. I saw this second half
12  portion of it from please be advised down
13  and that portion of it was sent to me in
14  a letter with your letterhead on it
15  without these first four paragraphs --
16  without these first three paragraphs and
17  it was sent to me two days before I was
18  to go back in. That's what I remember.
19  Q    So you don't recognize this
20  letter here?
21  A    I recognize the last two
22  paragraphs where it says please be
23  advised. That's what was sent to me.
24  That's what I recognize.
25  Q    Okay.

51 (Pages 322 - 325)

M.H. Capogrosso

2  A    I don't remember the top
3  portion of it.
4       MR. THOMPSON: Ms.
5  MacDonald, we are skipping around a
6  little bit on the exhibits as we get
7  later in the day. So this is Exhibit
8  16 in what we sent to Veritext, but
9  please mark it down as the next
10  exhibit, which I think is Exhibit 14,
11  is that right?
12       MS. REPORTER: I have not
13  been keeping track because usually I
14  write the exhibits down. If you want
15  to just give me a minute.
16       MR. THOMPSON: We can mark
17  this as Exhibit 16 and we'll just
18  have a couple of exhibits with a gap.
19       (The above-referred-to
20  letter was marked as Exhibit 16 for
21  identification as of this date.)
22  A    Like I said, I only remember
23  seeing the bottom half of that letter,
24  please be advised, that's what was sent
25  to me. That was sent to me two -- it was

M.H. Capogrosso

2  sent to me by your office two days before
3  I was to go back to work, two days.
4  Q    So, Mr. Capogrosso, I'm
5  showing you another document. Do you
6  recognize this?
7  A    Yes, John McCann.
8  Q    And this is from your
9  production Bates stamped P-28; correct?
10  A    Yes.
11  Q    What document is this?
12  A    That's from the anger
13  management doctor I had to go to, anger
14  management course.
15       MR. THOMPSON: And so can we
16  mark this down, Ms. MacDonald, as
17  Exhibit 17.
18       (The above-referred-to
19  report was marked as Exhibit 17 for
20  identification as of this date.)
21  Q    So, Mr. Capogrosso, what did
22  the anger management course consist of?
23  A    I showed up at this man's
24  office. It was in the basement of his
25  house. There was couches, about 10 to 12

M.H. Capogrosso

2  guys all sitting there, all looking
3  angry. I talked to a few of them. They
4  all had problems at work or with their
5  girlfriends or with their wives.
6       I got called into his
7  office. I sat down with him. He gave me
8  a book to read about I over E,
9  intelligence over emotion. He kept
10  telling me intelligence over emotion. I
11  went back there week after week. He kept
12  telling me intelligence over emotion, to
13  read a chapter in the book every week. I
14  did that.
15       He told me, you know, I felt
16  bad -- he told me he felt bad for me. He
17  told me I was wrongfully accused, he felt
18  bad for me and he said I completed the
19  course.
20  Q    Do you feel like you got
21  anything out of the course?
22  A    I over E, I'll always
23  remember I over E, intelligence over
24  emotion. I mean it's a little easier
25  said than done. You know, I'm an

M.H. Capogrosso

2  emotional guy. It's a little easier said
3  than done, you know.
4       I over E is what he kept
5  telling me, I over E, so I try to think
6  before I act he told me. I said well,
7  it's easier said than done. When a guy
8  tells you go excuse yourself, go fuck
9  yourself twice, you know, you get upset
10  and that I'm a Jew hater. For what
11  reason I'm a Jew hater, I don't know,
12  so --
13  Q    Sir, do you think --
14  A    Go ahead.
15  Q    Do you think you benefited
16  from the course at all?
17  A    Absolutely. I went -- I
18  went to the Philippines. I had some -- I
19  took a break, I went to the Philippines
20  and I came back and I went back to work.
21  Q    And --
22  A    After I took the course I
23  went to the Philippines and I had some
24  fun and I came back.
25  Q    And did taking the course

52 (Pages 326 - 329)

1    M.H. Capogrosso
2 help you get along with co-workers at the
3 TVB?
4    A    Well, it made me more
5 suspicious of everybody. I hate to say
6 that, but it did. I was never a
7 suspicious person. You know, I pretty
8 much -- you know, but you have to be
9 suspicious of everything you say and
10 everything you do. You have to look at
11 every word.
12    I was never like that. I
13 was very, you know, outgoing and, you got
14 to be careful everything you say and
15 everything you do, who's taking it the
16 wrong way, who am I insulting, who's
17 fearful of my presence.
18    I mean, you know, so then I
19 got fearful of everything I said or do.
20 Every time I walk into a courthouse I got
21 to look around like I'm in church, but it
22 is what it is. A clerk, if I look at a
23 clerk, I'm smirking at clerk. What the
24 hell is smirking at a clerk?
25    So now I'm fearful of

1    M.H. Capogrosso
2 everything I do when I walk in a
3 courtroom, absolutely. You got to watch
4 every word you say. It's like you're
5 walking into church in the morning and
6 that's the way I act now when I go into a
7 courtroom. I don't talk to anybody. I
8 just do my business and that's it. I'm
9 very circumspect. I listen to every word
10 I say and I make sure it's not construed
11 in the wrong way, that's it.
12    Q    All right. Let's close out
13 of this and I'm going to bring up another
14 document here.
15    MR. THOMPSON: And,
16    Ms. MacDonald, in case I didn't say
17    it already, let's have that previous
18    document marked Exhibit 16 (sic).
19    Q    Mr. Capogrosso, do you
20 recognize this document?
21    A    This is the document I
22 reviewed, this document that was sent to
23 me. This document was sent to me.
24 That's the document.
25    Q    Okay. So what is this

1    M.H. Capogrosso
2 document?
3    A    That I took the anger
4 management course, which I did. I'll be
5 allowed to come back June 27. It's seven
6 days, I said two days, it's seven days
7 before I was -- that I got this document.
8 On June 20 I get this document, seven
9 days before I was supposed to go back in.
10    Q    And --
11    A    I already agreed just to
12 take an anger management course. You
13 want to throw all these other conditions,
14 that's fine because I adhered to all of
15 them, I did adhere to all of them, but I
16 said I'm going to -- I'm not going to
17 dispute it at this point because I'll --
18 you know, I'm not because I'm going back
19 to work in seven days, but I adhered to
20 all of it anyway.
21    But did I sign off on this
22 document, I never signed off to this
23 document.
24    Q    And just for the record,
25 Mr. Capogrosso, this document was marked

1    M.H. Capogrosso
2 P-143 in your production; correct?
3    A    Yes.
4    MR. THOMPSON: And,
5    Ms. MacDonald, let me ask you to
6    please mark this as Exhibit 19.
7    (The above-referred-to
8    letter was marked as Exhibit 19 for
9    identification as of this date.)
10    Q    So, Mr. Capogrosso. I'll --
11 you said that this is not something you
12 agreed to; correct?
13    A    I didn't sign it, the
14 written stipulation. It was thrown at
15 me, thrown at me, mailed to me on June
16 20, 2012. I think I received it -- maybe
17 it was dated -- I think I only received
18 it two days before I was to go back in,
19 two days and it's the first time I saw
20 it. I agreed to take an anger management
21 course, which is what I did.
22    I never saw this document,
23 no, until two days before I could go
24 back. Now, did I adhere to everything,
25 yes. Did I see it, no.

53 (Pages 330 - 333)

Page 334

M.H. Capogrosso

2  Q    So, Mr. Capogrosso, you see
3  where it says "Please be advised that if
4  and when Mr. Capogrosso appears at a TVB
5  office, he must strictly adhere to the
6  standards of conduct required of
7  attorneys appearing before State courts?
8  Threatening conduct by Mr. Capogrosso,
9  verbal threats of physical violence and
10  verbal abuse, including the use of ethic
11  slurs, will not be tolerated." Do you
12  see that?
13  A    Yes.
14  Q    And you read that prior to
15  going back; correct?
16  A    And I adhered to all of it,
17  all of it.
18  Q    And you see the passage that
19  says "DMV reserves all rights to respond
20  to future misconduct including, if
21  warranted, by immediately and permanently
22  barring Mr. Capogrosso from appearing on
23  behalf of DMV licensees at TVB offices;"
24  correct?
25  A    Well, you can say whatever

Page 335

M.H. Capogrosso

2  you like. You can say whatever you like.
3  Did I sign off on that statement, no.
4  No, I did not sign.
5  Q    Did you sign off on --
6  A    I signed off on going to --
7  Q    Did you sign off --
8  A    I signed off on going to
9  anger management, that it's. I agreed to
10  take an anger management course. that's
11  it, not all these conditions. I agreed
12  to take an anger management course,
13  that's all I agreed to do.
14       You threw this at me. Your
15  office threw this at me. I received this
16  two days before I was to go back.
17  After --
18  Q    Mr. Capogrosso --
19  A    Let me finish. After the
20  expense of $10,000 and an anger
21  management course. It cost me 10 grand.
22  After that expense, you throw this at me
23  two days before.
24       If you were going to put all
25  these conditions, you should have told me

Page 336

M.H. Capogrosso

2  up front and maybe I would have --
3  Q    Mr. Capogrosso, I'll
4  represent to you that these conditions
5  were included in the letter to your
6  lawyer that we previously discussed at
7  Exhibit 16.
8  A    The only time I saw that,
9  that was on -- that letter is dated June
10  20. That letter is dated June 20 and
11  that's the letter I received.
12  Q    And I'll represent to you
13  that the previous letter was dated May
14  15, 2012, which was sent to your lawyer.
15  A    The letter I received was
16  dated June 20. I was told to take an
17  anger management course. Now, I adhered
18  to all those conditions, but I agreed to
19  take an anger management course, that's
20  it.
21  Q    So hold on one second while
22  I bring up another document.
23       Mr. Capogrosso, can you see
24  this document?
25  A    Yeah. I think I remember

Page 337

M.H. Capogrosso

2  seeing that, yes.
3  Q    And what is this?
4  A    Stipulation of
5  Discontinuance.
6  Q    And is this the document
7  that ended the Article 78?
8  A    I believe so, yeah. I mean
9  I hate to say the word I believe. Let me
10  look at it.
11       Yeah, that's Jackie's
12  signature, yes.
13  Q    And so do you see anywhere
14  on here where there's an anger management
15  requirement?
16  A    No.
17  Q    I don't either.
18  A    No.
19  Q    So was anger management part
20  of the deal to have you come back to the
21  TVB?
22  A    The only deal I agreed to.
23  I was -- the judge told me the day I went
24  to court initially on this Article 78,
25  the judge told me two things and he said

54 (Pages 334 - 337)

Page 338

M.H. Capogrosso

1 either -- she told me. She told me I'll
2 give you a date a year from now to argue
3 this case or go take an anger management
4 course. I told the judge I'll take an
5 anger management course because I threw a
6 punch at a wall and to me -- well,
7 that's -- I said let me take the anger
8 because that's -- I said let me take the
9 anger management course. I had a lot of
10 clients calling me left and right, I had
11 to get back to court and deal with this.
12        I took an anger management
13 course. That's what I agreed.
14        MR. THOMPSON: And,
15 Ms. MacDonald, let's please mark this
16 Stipulation of Discontinuance as
17 Exhibit 18.
18        (The above-referred-to
19 stipulation of discontinuance was
20 marked as Exhibit 18 for
21 identification as of this date.)
22   Q    And now, Mr. Capogrosso, you
23 see how we are back at Exhibit 19?
24   A    Yes.

Page 339

M.H. Capogrosso

1   Q    So is it safe to say,
2 whether or not you feel that it's part of
3 the deal, that DMV warned you in this
4 letter that threatening conduct or
5 physical violence would result in your
6 expulsion?
7   A    Listen, I agreed to take an
8 anger management course. You can say
9 whatever you like. Obviously if there's
10 threatening conduct and all this other
11 stuff, you have a right to do what you
12 have to do, but I have a right to defend
13 myself as to those allegations.
14        Now, Chris told me Mario, if
15 you go back there and you sneeze the
16 wrong way they're throwing you out again.
17 He told me that. So he said he didn't
18 trust Gelbstein at all. He didn't trust
19 Gelbstein as to what he was saying.
20        I said Chris, I took the
21 anger management course. It cost me a
22 lot of money. I told you it cost me
23 what, $10,000, 7,500, plus I had to give
24 Chris his fee. I took it and that's what

Page 340

M.H. Capogrosso

1 I agreed to.
2        Now, did I -- did I not
3 reserve my right to question any removal?
4 I never, never disavowed my right to
5 question my removal, never, never. I
6 would never have signed off on that, that
7 I didn't have a right to respond or to
8 defend myself against these allegations.
9 I would never have -- I would never sign
10 off to anything like that, never.
11        I have a right to defend
12 myself in a courtroom against statements
13 and affidavits written against me. I
14 would never surrender that right on any
15 level.
16   Q    So, Mr. Capogrosso, one more
17 quick question on Exhibit 19. Is this
18 the document that established your right
19 to go back to the TVB?
20   A    No.
21   Q    And I'll point to this last
22 part of the first paragraph where
23 Ms. Farooq writes that she is going to,
24 quote, "advise you that Mr. Capogrosso

Page 341

M.H. Capogrosso

1 may appear on behalf of his clients at
2 Traffic Violation Bureau offices as of
3 June 27, 2012."
4   A    My attorney told me that I
5 could go back on June 27. My attorney
6 told me to go back. This letter was
7 thrown at me two days before I was to go
8 back from your office with all these
9 conditions.
10        I never, never surrendered
11 any right to go to trial or go to a
12 hearing and defend myself against any
13 accusations. That wouldn't make any
14 sense. Why would I do that? I'd
15 rather --
16   Q    I think you did.
17   A    I would rather go to the
18 Article 78 proceeding and give myself a
19 fair chance before a judge to hear the
20 case. I would never surrender that
21 right.
22        I was told by my lawyer
23 you're free to go back on June 27, which
24 is what I did. Your office sent me that

55 (Pages 338 - 341)

1     M.H. Capogrosso
2 letter two days beforehand. That's when
3 I received it.
4     Q     Do you think at this point
5 that the TVB wanted to get rid of you?
6     A     Yeah and I think your office
7 didn't treat me fairly. That letter
8 or anything should have been sent to me a
9 hell of a lot earlier. Two days before
10 I'm going back, are you treating me fair?
11     Q     Mr. Capogrosso, I'll
12 represent --
13     A     I don't think --
14     Q     -- to you that we did, in
15 fact, send exhibits.
16     A     They did not treat me
17 fairly, no. Absolutely they wanted to
18 get rid of me, absolutely.
19     Q     Okay. And so did you, in
20 fact, return to practice at the TVB on
21 June 27, 2012?
22     A     Yes, yes.
23     Q     So let's move on to a new
24 exhibit.
25           Mr. Capogrosso, do you

1     M.H. Capogrosso
2 recognize this document?
3     A     It's a Work Violence Report.
4     Q     And what is it?
5     A     It's a Work Violence Report
6 by one of your -- by one of your
7 representatives at the DMV, by -- Calvo's
8 name is on it. That's the name I
9 recognize.
10     Q     Do you recognize Geri
11 Piparo?
12     A     No.
13           MR. THOMPSON: All right.
14 Ms. MacDonald, can I ask you to mark
15 this as Exhibit 20?
16           (The above-referred-to
17 report was marked as Exhibit 20 for
18 identification as of this date.)
19     Q     So, Mr. Capogrosso, do you
20 know who Geri Piparo is?
21     A     No. I never heard --
22     Q     I'll represent to you --
23     A     -- of that name.
24     Q     I'll represent to you that
25 she's one of the clerks and that she

1     M.H. Capogrosso
2 signed the petition regarding you in
3 2011.
4     A     All right. Fine.
5     Q     On page 2 she writes "Mario
6 Capogrosso accused David Smart of looking
7 at him and there were heated words
8 exchanged. PO Nielsen intervened."
9           Can you tell me what
10 happened?
11     A     Well, there was a hell of a
12 lot more than looking at me. When I came
13 back from the -- my anger management
14 course, which I came back in June, I had
15 to leave in December of 2011, I was told
16 by one of the clerks, Cindy, the lady I
17 was talking to who liked me I guess a
18 little bit, that a motorist came down
19 looking for me, came down looking for me
20 to give me a fee because he owed me money
21 on a case and that she was told by the
22 motorist that David took the fee. It was
23 $80 and a $150 fee, right. So I report
24 that to Judge Gelbstein because he stole
25 it. You steal money, you should get

1     M.H. Capogrosso
2 reported.
3           After that there was a
4 series of harassments by David Smart
5 against my person. I've gone into them
6 with you. I've gone into them. He's
7 pushed me from behind. He gave me the
8 sign of the cross and the spear hand one
9 day. He would get in my face, a couple
10 of inches, but the same David Smart that
11 approached me on May 11 after he stole
12 the money and I reported him. Get in my
13 face. What's the problem? Fuck you,
14 you're the problem. Again, fuck you,
15 you're the problem, two, three, four
16 times.
17           So I tell -- I must have
18 told this woman, you know, this guy
19 doesn't want to leave me alone. Doesn't
20 want to leave me alone. Why do I have
21 to --
22     Q     And is this --
23     A     -- be harassed because I
24 report a theft which should have been
25 reported, which is the right thing to do.

56 (Pages 342 - 345)

M.H. Capogrosso

1  so that's what was going on.
2
3     Q     Is this incident, May 5th of
4  2014, is this the first incident or
5  confrontation you had with Mr. Smart?
6     A     No, no. Like I said, I
7  walked away a million times. I have no
8  reason to have a beef with a security
9  guard. I'm a lawyer. I got two licenses
10  I have to protect. I spent a lot of
11  money, a lot of time getting this
12  license. I don't need a beef with a
13  security guard. I don't need it. I
14  walked away.
15     Q     What was --
16     A     Let me finish. It's not the
17  first time, no, not the first time.
18     Q     When was the first time?
19     A     June of 2012. As soon as I
20  got back in, he comes up from behind me
21  and pushes me from behind. He's like --
22  pushes me.
23          I tell Gelbstein about it.
24  He looks at the security tape I think and
25  he says you don't need this down here. I

M.H. Capogrosso

1
2  said the man just assaulted me from
3  behind. Are you going to do anything
4  about it? And that was the end of it.
5  He pushes me from behind, June of 2012
6  when I -- first week I was back in there.
7          I reported it to Gelbstein.
8  He looked at the videotape. He did
9  nothing about it. Did I go to the cops,
10  no, I don't go to the cops. I'm not
11  going to complain about a cop and get a
12  guy arrested. I'm not doing it. That's
13  not who I am.
14          But should he have been
15  removed from the DMV at that point in
16  time, absolutely and he wasn't.
17     Q     Mr. Capogrosso, I'm bringing
18  up another document.
19          And can you see the
20  document? Can you see it okay,
21  Mr. Capogrosso?
22     A     Yeah. I can't see the whole
23  thing. You have to go down.
24     Q     Yeah, sure. Actually, let
25  me zoom out a little bit. Is that

M.H. Capogrosso

1
2  easier?
3     Q     Who wrote this? Wanda,
4  Wanda was a clerk.
5     Q     And this document is marked
6  or is Bates stamped DMV-0000061; correct?
7     A     Yeah, right. She's accusing
8  me -- okay. Go ahead.
9     Q     Do you recognize this
10  document?
11     A     Yeah. I see this document,
12  yeah.
13     Q     And what is it?
14     A     Wanda is accusing me of
15  telling a motorist to give a clerk an
16  attitude. I don't understand that. I
17  don't understand how I could tell a
18  motorist to give a clerk an attitude. I
19  mean that's just ridiculous.
20          MR. THOMPSON: Can we mark
21  this as Exhibit 21?
22          (The above-referred-to
23  statement was marked as Exhibit 21
24  for identification as of this date.)
25     A     I'm telling a motorist to

M.H. Capogrosso

1
2  give a clerk an attitude? How do you
3  tell a motorist to give a clerk an
4  attitude?
5          This is the clerks I had to
6  deal with. I told the guy that I'm not
7  here to give -- now go ahead.
8     Q     So what's your recollection
9  of what happened in this incident on
10  October 29, 2014?
11     A     I never saw -- I was never
12  addressed with this issue. I never saw
13  this until I received this affidavit from
14  your office.
15          But she's telling me that I
16  told a guy that I'm -- to encourage the
17  motorist beforehand to give me an
18  attitude is what she's accusing me of
19  doing. Me, a lawyer, is telling a
20  motorist to go to the clerk and give the
21  clerk an attitude.
22     Q     Now what --
23     A     That's what your clerks are
24  accusing me of.
25     Q     But, sir, do you have.

M.H. Capogrosso

1  sitting here today at the deposition, do
2  you have any independent recollection of
3  this?
4
5    A    No, absolutely not because I
6  wouldn't even know how to say that to a
7  motorist. Go to a clerk -- no, I have no
8  knowledge of this. I would not know how
9  to tell --
10   Q    So --
11   A    I would not know how to tell
12 a motorist to go give a clerk an
13 attitude. I mean this is a clerk whose
14 got some issues. I was --
15   Q    So did this happen?
16   A    I don't know. No, it didn't
17 happen, number one and it's ludicrous.
18 How do you tell a motorist to give a
19 clerk an attitude and these are the
20 clerks I got to deal with.
21   Q    So is it Ms. Alford lying
22 here?
23   A    I did not tell a motorist to
24 give a clerk an attitude. I did not.
25 That's a ridiculous friggon -- that's

M.H. Capogrosso

1
2  a -- excuse my language. That's a
3  ridiculous accusation against me,
4  ridiculous, but these are the type of
5  clerks I have to deal with.
6    Q    So the question was do you
7  believe that she's lying here?
8    A    I did not tell a motorist to
9  give a clerk an attitude. I did not.
10 Now --
11   Q    I understand that, but yes
12 or no?
13   A    Maybe she -- I don't know
14 what she's thinking, but I did not tell a
15 clerk -- a motorist to give a clerk an
16 attitude. First of all, I don't even
17 know how to do that or how a motorist
18 would know how to do that. How would a
19 motorist know how to give a clerk an
20 attitude?
21   Q    So why would she write this?
22   A    I don't know. I don't know.
23 They didn't want me there. I don't know.
24 Maybe you got a bunch of crazy clerks
25 down there.

M.H. Capogrosso

1
2    Q    Did Ms. Alford not want you
3  there?
4    A    Who's Ms. Alford? Wanda?
5    Q    Wanda Alford who --
6    A    I don't know.
7    Q    -- wrote the letter.
8    A    I don't know. This is the
9  first -- the first time I saw this
10 complaint that I have an opportunity to
11 respond to is when you sent it to me and
12 I don't even know how to respond to it.
13 I wouldn't know how to deal with this.
14 I'm accused of telling a motorist to give
15 a clerk an attitude.
16       MR. THOMPSON: And,
17   Ms. MacDonald, if we didn't do that
18   already, let's mark that as Exhibit
19   21.
20   A    Is that threatening conduct
21 or verbal abuse?
22   Q    Mr. Capogrosso, can you see
23 the document that I just put up?
24   A    Yeah. This is something
25 David Smart wrote.

M.H. Capogrosso

1
2    Q    Do you recognize this?
3    A    Yeah. I saw it when you
4  gave it to me, yes. He signed something.
5  It's an unsigned note of David Smart.
6    Q    And this is -- this document
7  is marked Gelb-0000059; correct?
8    A    Yeah.
9    Q    What is this document?
10   A    Some type of complaint by --
11 on February 3, I don't know what year,
12 9:15 a.m. Smarts telling me that I
13 deliberately walked into him. I am --
14 there's a board --
15   Q    Mr. Capogrosso, I'm sorry,
16 we lost your audio for a second there.
17 Can you restate that?
18   A    Yeah. This is -- I'm being
19 accused -- I'm being accused of walking
20 into a security guard. Now, at the DMV
21 there's a board that was hanging up when
22 I was there and every day there was a
23 calendar on the board as in most
24 courthouses that tell you where each case
25 is going to be heard.

58 (Pages 350 - 353)

M.H. Capogrosso

1     M.H. Capogrosso
2         I go in the morning, right.
3   David would put up or somebody would put
4   up the calendar. Most times it was David
5   Smart and in the afternoon he would take
6   it down. So I have to go to the calendar
7   to look at the calendar because in the
8   morning there's a lot of people and
9   everybody's rushing around here and
10  there. You have to know what courtroom
11  to go in.
12        So I'm walking to the
13  calendar and he tells -- and I'm trying
14  to go to the calendar and he tells me I
15  deliberately walked into him. I mean
16  that's just stupid. We are both working
17  in the same location. We both have to go
18  to the calendar. He has to hang it up
19  and I have to look at it.
20        I'm deliberately walking
21  into a security? I have to work in this
22  courthouse. I'm sorry. As a lawyer I
23  have to go to the board and look at the
24  docket to see where my case is being
25  held. This is what I'm being accused of,

M.H. Capogrosso

1     M.H. Capogrosso
2   deliberately walking into a guard.
3         We work in the same
4   building. We both have to go to the --
5   to the board in the morning, to the
6   docket. He has to hang it up. I got to
7   look at it to see where my case is.
8   That's all I have to say about this.
9   Q     So is Mr. Smart lying?
10  A     That I deliberately walked
11  into him, yes, absolutely. I don't
12  need --
13  Q     Why is he --
14  A     -- this beef with a security
15  guard. I don't need a beef with a
16  security guard at a courthouse that I'm
17  trying to make a living at.
18  Q     And why do you think he's
19  lying?
20  A     I don't know. Why would I
21  deliberately walk into a security -- I'm
22  going to the board to check the calendar.
23  Q     Did he have any animis
24  towards you?
25  A     I told you, I reported to

M.H. Capogrosso

1     M.H. Capogrosso
2   Gelbstein that he stole $80 and a $150
3   fee and I found that out when I got back
4   after taking my anger management course.
5   I told you that. Cindy told --
6   Q     And --
7   A     And then I wrote to the
8   motorist. The motorist confirmed it. I
9   didn't go to the police because that's
10  not what I do. I'm not going to get the
11  guy arrested. Like maybe I should have
12  looking back on this thing now.
13  Q     And would you have --
14  A     Gelbstein investigated it.
15  Gelbstein admits to me that Smart said he
16  took the money and he gave it to me,
17  which is an absolute lie. First of all,
18  I authorized nobody to take money on my
19  behalf, collect money on my behalf. He
20  had no authority to collect a fee on my
21  behalf, this security guard. Smart and
22  Gelbstein believes it, that he gave me
23  the money. Gelbstein believes this.
24        I told him the security
25  guard had no authority to take the money,

M.H. Capogrosso

1     M.H. Capogrosso
2   but he allows the security guard to stay
3   and then the harassment started and I
4   guess this is one of the ways he did it.
5   He's saying I deliberately walked into
6   him.
7   Q     And would it be correct to
8   say that you feel that Mr. Smart had a
9   grudge against you after this?
10  A     Absolutely, absolutely he
11  had a grudge. He wouldn't let it go. If
12  you steal, I'm going to report it. It's
13  a theft. It's a theft. I am a lawyer.
14  I am an officer of the court. You steal,
15  you're not stealing from me. You're
16  stealing from that cab driver that $80 is
17  a lot of money to.
18  Q     And do you believe that he
19  wanted -- not he. Do you believe that
20  Mr. Smart wanted to get rid of you --
21  A     Absolutely.
22  Q     -- because of this threat?
23  A     Absolutely. He wouldn't
24  start the harassment. I told you all the
25  incidents. He gets in my face. What's

59 (Pages 354 - 357)

Page 358

M.H. Capogrosso

1  the problem? Fuck you, you're the
2  problem. I told you that.
3
4    Q    One last question.
5  Mr. Capogrosso. this note is marked
6  February 3 at 9:15 a.m.  Do you recall
7  what year this was?
8    A    It was after. I don't know.
9  It's the first time -- the only time I
10 saw this note is when you produced it to
11 me in discovery.  I assume -- I assume it
12 was after the incident with Brody because
13 that's when I reported the theft.
14   Q    After the incident with?
15 I'm sorry. I didn't quite hear that.
16   A    With Brody. It was after I
17 came back in June of 2012 --
18   Q    Okay.
19   A    -- because that's when I
20 reported the theft.
21   Q    So, Mr. Capogrosso, I'm
22 going to bring up --
23      MR. THOMPSON: Oh, and
24   actually before we are done, I don't
25   know if I marked that, but

Page 359

M.H. Capogrosso

1
2  Ms. MacDonald if we didn't please
3  mark that as Exhibit 22, that note.
4      (The above-referred-to note
5   was marked as Exhibit 22 for
6   identification as of this date.)
7    Q    Mr. Capogrosso, do you see
8  the document that I just put up?
9    A    Yeah, Paul Perez.
10 Absolutely, I remember this one.
11   Q    And do you recognize this
12 document?
13   A    Well, I recognize it because
14 you produced it.  I never saw it before.
15 Just the fact that you produced it.
16   Q    And this document is marked
17 Gelb-0000058; correct?
18   A    Yes.
19   Q    And it's your testimony that
20 you never saw this document before the
21 case; correct?
22   A    I never saw any of these
23 affidavits before this case.
24      MR. THOMPSON: Ms.
25   MacDonald, can I ask you to mark this

Page 360

M.H. Capogrosso

1
2  as Exhibit 23?
3      (The above-referred-to
4   statement was marked as Exhibit 23
5   for identification as of this date.)
6    Q    And. Mr. Capogrosso. who is
7  Paul Perez?
8    A    What I remember, he was a
9  motorist that came down to the DMV.  I
10 did not represent him on any hearings
11 even though there's a work -- there's an
12 incident report that says I represented
13 him in court.  I never represented -- and
14 it could have been investigated and it
15 wasn't. I never represented him on his
16 hearing.
17      He had a hearing before
18 Judge Walters, that I know because I was
19 sitting outside the courtroom.  He came
20 outside the courtroom while I was sitting
21 on the bench and I think he was with his
22 girlfriend and they asked me if I'm a
23 lawyer because I'm sitting there with a
24 suit on and my calendar and can you help
25 him write an appeal.  I said I'll take

Page 361

M.H. Capogrosso

1
2  the appeal.  He was very nice when I
3  first met him. very nice.  Sat down, I
4  said I'll take it on appeal.  Collect a
5  fee on the appeal.
6      I never represented him in a
7  courtroom.  I did not get his license
8  suspended.  I was not the -- I was not in
9  the courtroom with him.  I did not argue
10 his case.  I was hired to write the
11 appeal.
12      The next day he comes down.
13 He finds out that his license got
14 suspended.  This guy had a terrible
15 license, terrible.  He comes in. comes at
16 me. starts yelling at me.  I said here.
17 take your appeal -- take your appeal and
18 I gave him his money back.
19      No.  First thing he says
20 was -- is that he curses me out.  He says
21 I'm going to cut you with a knife and
22 slash the tires of your car.  I said I
23 didn't get your license suspended.  I'm
24 hired to write the appeal.  I'm going to
25 cut you -- his exact words. I'll never

60 (Pages 358 - 361)

```
 1        M.H. Capogrosso
 2  forget it. I'm going to cut you with a
 3  knife and I'm going to slash tires of
 4  your car.
 5        At that point I gave him his
 6  money back on his appeal and he keeps
 7  saying to me, I'm going to cut you
 8  with a knife, I'm going to slash the
 9  tires of your car.
10        I look around for the
11  security guard. He's nowhere to be
12  found, Smart. Smart's not there. The
13  police officers are there, but they're
14  not doing anything about this.
15        At that point in time
16  Gelbstein told me if you got an unruly
17  client -- and I don't know if this guy's
18  got a knife on him or not, I really don't
19  know because there's no -- there's no
20  metal detectors coming into DMV. You
21  just walk in and out. You can carry
22  anything you want, guns, knives,
23  whatever.
24        Gelbstein told me if you got
25  a bad client, unruly client, you got to
```

```
 1        M.H. Capogrosso
 2  go outside the courthouse and speak to
 3  him outside, which I proceeded to do with
 4  this guy. He just threatened me twice,
 5  he's going to cut me with a knife and
 6  slash the tires of my car. I said let's
 7  go outside, we got to talk, which is what
 8  Gelbstein told me to do and I obeyed.
 9  That's what happened here.
10        And he didn't go out -- he
11  walked halfway and he turned around. I
12  obeyed what defendant Gelbstein told me
13  to do. I'm not going to be threatened
14  with a knife and tell me the tires of my
15  car were going to be slashed. The
16  security guard is nowhere to be found,
17  Smart. The police officers don't want to
18  get involved. It's not going to happen
19  to me.
20        And I obeyed what Gelbstein
21  did. I went out -- he said talk to him
22  outside. I said let's go talk outside,
23  which is what I did. That's what
24  happened here. And it could have been
25  investigated, that I was not in this
```

```
 1        M.H. Capogrosso
 2  courtroom. I did not argue his case. I
 3  did not get his license suspended. I did
 4  not.
 5        And the facts of this case
 6  were never investigated, nor was my --
 7  nor was I ever given an opportunity to
 8  state what happened in this case.
 9  Apparently --
10    Q    Mr. Capogrosso --
11    A    -- but Perez made a
12  statement.
13        Go ahead.
14    Q    Mr. Capogrosso, when Perez
15  writes that you were taking on a case for
16  him and, quote, "didn't live up to his
17  responsibility," what does he mean?
18    A    I have no idea. I don't
19  know. I don't know. The next day he
20  comes in, the day after he got suspended
21  in court, the day after Walters suspended
22  his license he comes in and tells me I'm
23  going to cut you with a knife and slash
24  the tires.
25        I didn't argue your case.
```

```
 1        M.H. Capogrosso
 2  Mr. Perez. I didn't argue your case.
 3  Here's your money back on the appeal. I
 4  don't want you as a -- take your money
 5  back. I'm not going to -- I'm not
 6  going -- I'm not going to be threatened
 7  by a client with a knife.
 8    Q    Do you think -- do you think
 9  he blamed you for the loss of his case at
10  the TVB?
11    A    I think he might have been
12  on drugs, seriously on drugs this guy
13  because when I met him for the first
14  time, he was a normal nice guy, normal.
15  had a normal conversation because I could
16  size up a guy pretty quickly. I've been
17  dealing with these clients for a long
18  time. I can size you up. He was normal
19  and nice. His girlfriend was nice.
20        The next day I'm cutting you
21  with a knife and I'm slashing the tires
22  of your car. That's the incident.
23  That's what happened.
24    Q    So his version of events
25  says that he told you he wanted another
```

61 (Pages 362 - 365)

```
 1       M.H. Capogrosso
 2  lawyer and his money back and that you
 3  told him to go fuck myself and that we
 4  can take it outside.
 5      A    I gave him the --
 6      Q    Is that true?
 7      A    No. First of all, I didn't
 8  argue the case. He hired me on the
 9  appeal. He hired me on the appeal. I
10  gave him his money back right away. I
11  gave him his money back. I took --
12      Q    Did you tell him --
13      A    Let me finish. If I didn't
14  give him money back, right, because every
15  time I give money back I take the receipt
16  back. He would have produced my receipt
17  and he doesn't produce it. I give him a
18  business card with my receipt on the
19  back. I sign my name to it. I tell him
20  the total amount, the amount paid.
21          But if I give you the money
22  back, which I did here, he gives me the
23  receipt back this way I'm not going to --
24  this way he has proof -- I have proof I
25  gave him the money back, he no longer has
```

```
 1       M.H. Capogrosso
 2  my receipt, right.
 3          He doesn't produce the
 4  receipt here. I gave him my money back
 5  and he, like he said --
 6      Q    So --
 7      A    -- he's going to cut me with
 8  a knife and slash the tires of my car.
 9      Q    Mr. Capogrosso, did you tell
10  him to go fuck himself?
11      A    I don't remember what I
12  said. After you tell me to go -- after
13  you tell me you're going to slash my
14  tires, he's going to cut me with a knife
15  and slash the tires of my car, I might
16  have said that. I might have told him
17  fuck, yes, I might have said something
18  like that.
19      Q    Did you tell him that you'd
20  take it outside?
21      A    I looked around for the
22  security -- no. What I said was this and
23  I'll tell it exactly again. I said here's
24  your money back. He came in the next
25  day. There was no way I could have
```

```
 1       M.H. Capogrosso
 2  written the appeal in a day anyway. Take
 3  your money back. Because I didn't mess
 4  up his case in any way. I didn't mess it
 5  up because I didn't argue it and I was
 6  given no opportunity to argue the appeal,
 7  so I messed up nothing. I messed up
 8  nothing.
 9          He came back the next day
10  and if you investigated the facts of this
11  you would have seen it, at that -- at
12  which point in time he tells me I'm going
13  to cut you with a knife and I'm going to
14  slash the tires of your car.
15          Take your money back and
16  then he repeatedly tells me he's going to
17  cut me with a knife and slash the tires
18  of my car. At that point, like I said, I
19  looked for the security guard, not there.
20  This is what happened. The police were
21  standing there. They did nothing. After
22  he repeatedly telling I'm going to cut
23  you with a knife and slash the tires on
24  your car, I said we have to talk outside.
25  That's what I said.
```

```
 1       M.H. Capogrosso
 2      Q    So you said we have to talk
 3  outside?
 4      A    I said we have to talk
 5  outside is what I said. The guy might be
 6  having -- the guy might have a knife on
 7  him. I don't know what he's got on him.
 8      Q    So --
 9      A    There's no camera. There is
10  no -- when you walk in the TVB, there is
11  no metal detectors there. There's nobody
12  checking. Anybody can walk in. I did
13  what I had to do in that --
14      Q    So this --
15      A    I did what I had to do in
16  that instance.
17      Q    So, Mr. Capogrosso, is Paul
18  Perez lying in this statement that he
19  made?
20      A    I didn't mess up. He's
21  lying there. I never messed up. I
22  didn't argue the case and I didn't have
23  any time to write the appeal, so I didn't
24  mess up.
25      Q    So why would --
```

62 (Pages 366 - 369)

M.H. Capogrosso

1 A    I gave him his money back.

2 Q    -- he lie about you?

3 A    I'm telling you what

happened. I don't know why he would lie.

Ask him. I'm telling you the facts. He

did lie because if you investigated the

facts and Danielle Calvo investigated it,

she would have seen that I didn't

represent him in a courthouse -- in the

hearing room. There's the lie. I never

was in the hearing room with him, ever

and the incident report that was written

indicates that I argued three cases for

him. That is a lie.

16          I never argued three cases

for him and got him suspended. I was

never in the hearing room.

19 Q    But why would he lie though?

20 A    I don't know why. Ask him

why. He was upset I would imagine. I

can't speculate to that. I never argued

three cases for him in the -- in the

hearing room, I never argued, but that's

what the report says --

M.H. Capogrosso

2 Q    And how --

3 A    -- I argued three cases. He

is lying. Why he's lying, I don't know,

but he is lying. He's upset his license

got suspended. I didn't suspend his

license. The judge suspended him.

8      MR. THOMPSON: Ms.

MacDonald, can you mark that document

for Mr. Perez if we haven't already

as Exhibit 23.

12 Q    Mr. Capogrosso, I'm about to

show you another document. Do you

recognize this document, sir?

15 A    Can you go down a little

bit?

17 Q    Sure.

18 A    Yeah. This is Perez, this

thing with Perez. Who wrote this one?

Melissa, who's Melissa? I don't know who

Melissa is, but go ahead. I've seen this

document, yeah.

23 Q    And what is this document?

24 A    It's another affidavit that

was submitted against me.

M.H. Capogrosso

2 Q    And this one is marked --

Bates stamped DMV-0000059; correct?

4 A    Yeah.

5      MR. THOMPSON: Ms.

MacDonald, if we could mark that as

Exhibit 24.

8      (The above-referred-to

statement was marked as Exhibit 24

for identification as of this date.).

11 Q    So who is Melissa Vergara?

12 A    I have no idea who Melissa

is.

14 Q    So she says she was sitting

at information station 7, so does that

refresh your recollection at all?

17 A    No.

18 Q    But if she was sitting at an

information station, she was probably a

clerk; right?

21 A    Well, yeah. She would be a

clerk, yeah.

23 Q    So as you said she's talking

about the situation with Mr. Perez. She

says she could hear arguing between Mario

M.H. Capogrosso

Capogrosso and a male motorist who was

later identified as Paul Perez.

4 A    Yup. I was arguing with the

man, yes.

6 Q    And then she writes and I'll

highlight this on the screen. "In a clear

and hostile tone, Mr. Capogrosso said to

the motorist to take this outside.

Originally the motorist began following.

He had even taken off his jacket and

swung it on to a stanchion, but only got

about halfway before he stopped himself,

turned around, picked up his jacket and

placed himself in the information line.

Mr. Capogrosso did not. He kept walking

to the door."

18      Does that refresh your

recollection of what happened?

20 A    Yeah, that's what happened.

After he said he was going to cut me with

a knife and slash the tires on my car, he

said it more than once to me, I looked

around for the security guard, nowhere to

be there. Police officer didn't get

63 (Pages 370 - 373)

M.H. Capogrosso

1   M.H. Capogrosso
2   involved. Gelbstein told me we have to
3   talk outside. I said we got to go
4   outside and talk.
5        I started walking to the
6   door to talk to this man and he stopped.
7   Q    Ms. Vergara --
8   A    That's what happened.
9   Q    Ms. Vergara also says that
10  you said to take it outside. Do you
11  recall that?
12  A    I said we have to talk
13  outside.
14  Q    Okay.
15  A    We have to talk outside is
16  what I said. We have to go outside and
17  talk, which is what Gelbstein told me to
18  do. You know, I don't go to the DMV to
19  get cut and slashed by a motorist. I
20  don't go there for that. I go there to
21  represent clients and make a living.
22       Now, there should have been
23  a security guard in there intervening or
24  the police should have intervened, I
25  should not have been put in this

M.H. Capogrosso

1   M.H. Capogrosso
2   situation, but neither one did. And I
3   should not have been told by Gelbstein in
4   a situation like this to go outside the
5   courtroom and talk to him about it.
6   Q    And do you think --
7   A    I don't go to a courtroom --
8   where most courthouses they have metal
9   detectors, this one has none. Where I'm
10  going to be told I'm going to get cut
11  with a knife and slash the tires on my
12  car and I got to sit there and be quiet.
13  Q    And do you think they didn't
14  do anything because they wanted you gone?
15  A    I don't know. Nobody got
16  involved. Smart didn't get involved.
17  Nobody took my affidavit as to what
18  happened. Nobody investigated the facts
19  as to what happened because they would
20  have seen I never represented him in a
21  courthouse. I never represented him in a
22  trial, I never did and they would have
23  seen that. But in the incident report
24  they wrote, they state that I represented
25  him in a hearing, which is a lie. I did

M.H. Capogrosso

1   M.H. Capogrosso
2   not get the man's license suspended.
3   Q    So, Mr. Capogrosso, I'm
4   bringing up another document. Do you
5   recognize this document?
6   A    Yes. I recognize Melanie
7   Levine.
8   Q    And what is this document?
9   A    That's the incident report
10  concerning Mr. Perez.
11       MR. THOMPSON:  And,
12  Ms. MacDonald, can I ask you to
13  please mark this as Exhibit 25?
14       (The above-referred-to
15  report was marked as Exhibit 25 for
16  identification as of this date.).
17  Q    So, Mr. Capogrosso, who is
18  Melanie Levine?
19  A    Well, I thought she was a
20  clerk, but she's actually a supervisor of
21  the clerks down at the DMV, Brooklyn TVB.
22  Q    And she writes that you did
23  represent Mr. Perez at trial for three
24  violations. If she's a clerk, is she in
25  a position to know whether or not you did

M.H. Capogrosso

1   M.H. Capogrosso
2   that?
3   A    If she's a supervisory
4   clerk, yes.
5   Q    So she writes that "Attorney
6   Capogrosso and Mr. Perez engaged in a
7   very loud verbal argument in the lobby
8   with threats of escalating to a physical
9   altercation outside in the parking lot."
10  A    I told you what happened.
11  She never took my affidavit. The man
12  threatened to cut me with a knife and
13  slash the tires on my car twice.
14  Q    Well, she writes later on
15  even afterwards that -- I highlighted
16  that wrong -- that "Attorney Capogrosso
17  continued to verbally provoke Mr. Perez
18  into going outside while he was on line
19  and throughout his experience at the
20  service counter being helped by MVR
21  Melissa."
22  A    That's an absolute lie.
23  That's an absolute lie. I'm not
24  provoking a guy with a knife who wants to
25  cut me for a further altercation. I'm

1  M.H. Capogrosso
2  not doing that. I don't know the worst
3  idiot in the world who's doing that. I
4  don't know the worst -- that's an
5  absolute lie.
6      Q      So why would Melanie lie?
7      A      I don't know why. That's an
8  absolute lie. I never continued to
9  provoke. I walked to the door. He
10 stopped. He went back on line. I guess
11 he thought he didn't want to get involved
12 with this any longer and he went back on
13 line. I turned away. I never provoked
14 that incident any further.
15         I've been in incidents like
16 this before, I didn't provoke it, but the
17 man was telling me twice he wants to cut
18 me with a knife. There was no security
19 guard. The police chose not to get
20 involved. I said we have to talk about
21 this outside at this point in time. I
22 start walking to the door and he stops.
23 That's what I remember and that's what
24 happened.
25         Why she's writing this, I

1  M.H. Capogrosso
2  don't know. If she investigated the
3  facts of this she would have seen I never
4  represented him in a courtroom and she
5  didn't investigate the facts and she
6  never asked my story on it.
7      Q      So Ms. Vergara and
8  Ms. Levine both said that even after he
9  went back in, you continued to provoke
10 him.
11     A      I didn't provoke him. I was
12 standing there watching him. I don't
13 know if this guy's coming at me with a
14 knife at this point. I didn't provoke.
15 I'm watching. That's not provoking. I'm
16 watching the man. I'm watching to see if
17 my car -- my tires on my car get slashed,
18 which I'm allowed to do.
19     Q      Then why would --
20     A      I was not provoking.
21     Q      So why would they say
22 something --
23     A      I don't know why.
24     Q      -- that's not true?
25     A      You keep asking me why they

1  M.H. Capogrosso
2  say things. I don't know why. But tell
3  me what words I used to provoke. Tell me
4  what words I actually stated. They're
5  not there. I provoked nothing. Tell me
6  what words I used to provoke.
7      Q      Well, this is sort of an
8  overview -- well, I think the word, one
9  of the words is take this outside.
10        But, Mr. Capogrosso, I think
11 this speaks to sort of a broader question
12 in this case, which is there are all of
13 these documents alleging that you --
14     A      Well, I'm going to respond
15 to each document separately, separately.
16     Q      And we've been addressing
17 them separately, but it's worth talking
18 about them together because --
19     A      Okay. What's your question?
20     Q      -- each of these documents
21 that you're saying --
22     A      Counselor --
23     Q      -- are broad --
24     A      Counselor, what is your
25 question?

1  M.H. Capogrosso
2      Q      I'm getting there. There
3  are all these documents we've been
4  talking about written by different
5  people, each of which you say are lies,
6  each of which say more or less the same
7  thing, that you verbally or physically
8  threatened or intimidated somebody.
9         Why are there so many people
10 saying this and why are they all lying
11 about you?
12     A      I've addressed each
13 affidavit individually and I've told you
14 my statement on each affidavit, each
15 affidavit. I was there 10 years. I told
16 you my statement on each affidavit and
17 I've given you those reasons already.
18 I'm not going to go into them again, but
19 I'm telling you on this affidavit what
20 happened that day.
21     Q      And you don't think there's
22 a pattern here?
23     A      I responded to each
24 affidavit individually. No, I do not
25 think there's a pattern, no.

65 (Pages 378 - 381)

M.H. Capogrosso

1
2    Q    Why not?
3    A    He told me he was going to
4    cut me a knife, slash the tires on my car
5    twice. I was told my Gelbstein if you
6    got an unruly client, talk to him outside
7    the courtroom, which is what I did. That
8    is not provoking. That is not
9    threatening. That is not verbal abusing.
10         He walked to the line. I
11   didn't -- I walked halfway and I stopped.
12   I kept my eyes on this guy and I made
13   sure he didn't cut the tires on my car.
14   I did nothing wrong there.
15         I do not think there's a
16   pattern. I think each affidavit has to
17   be taken individually and you tell me the
18   facts of each affidavit. There is no
19   pattern.
20   Q    Would someone who's not
21   familiar with your situation, like Bushra
22   Vahdat or Ida Traschen, see a pattern in
23   all of these complaints?
24   A    Well, maybe if they asked me
25   my opinion as to what happened and gave

M.H. Capogrosso

1
2    me an opportunity to state my opinion,
3    then they would have seen what actually
4    happened here, but they gave me no
5    opportunity, none. They write an
6    incident report that's a lie because they
7    could have investigated it and they
8    didn't.
9         I didn't represent this guy
10   Perez. They have -- so I don't know what
11   they're going to -- at least ask me my
12   opinion as to what happened on each case
13   and give me an opportunity to defend
14   myself.
15   Q    I mean how many
16   investigations are they supposed to run?
17   You know, at this point we are on Exhibit
18   25 we just went through. How many
19   investigations are they supposed to have
20   made?
21   A    Counsel, anybody can write
22   an allegation. Anybody can write an
23   affidavit. If you're going to write it,
24   then defend it and give me an opportunity
25   to respond to it.

M.H. Capogrosso

1
2    Q    Do they have an obligation
3    to investigate every single complaint?
4    A    Yeah, they do. If you're
5    going to put me out of work, yeah, they
6    do. Yes, they do. I don't care how long
7    it takes. If you're going to use it to
8    put me out of work, you better
9    investigate it --
10   Q    And what's --
11   A    -- otherwise you're not
12   giving me a fair chance.
13   Q    And what's the legal
14   authority for your contention that they
15   had an obligation to investigate all
16   these?
17   A    Because are they truthful or
18   not? Are they truthful, the truth? Is
19   there any substance to any of them?
20   Anybody can make an allegation.
21   Q    So, Mr. Capogrosso, I
22   understand that, but --
23   A    I can walk into the DMV and
24   make allegations.
25   Q    Mr. --

M.H. Capogrosso

1
2    A    I can walk -- wait a minute.
3    I can walk into the DMV and make
4    allegation, allegation and allegation and
5    you know what, they would throw me out
6    because I made allegations.
7    Q    Mr. Capogrosso, but the
8    question was are you aware of any statute
9    or regulation or other legal authority
10   requiring the investigations that you're
11   demanding?
12   A    I think if you're to make an
13   allegation against a guy, you got to give
14   a guy a chance to defend himself, hear
15   the facts, otherwise it's not a --
16   there's no allegation, just a one-sided
17   statement.
18   Q    Mr. Capogrosso, I would
19   appreciate it if you can answer this
20   question yes or no. Are you aware of any
21   statute, regulation or other legal
22   authority that requires the
23   investigations that you're demanding?
24   A    How about the 14th
25   Amendment, due process of law?

66 (Pages 382 - 385)

Page 386

```
 1        M.H. Capogrosso
 2    Q     What does that mean to you?
 3    A     To me it means I get a fair
 4 hearing. I get a chance to defend
 5 myself, present evidence, give an
 6 affidavit in response. The due process,
 7 the 14th Amendment to the Constitution.
 8 Due process, you're a lawyer. Let me
 9 tell you my side. Let an independent
10 somebody -- let them hear my side, give
11 evidence --
12    Q     And --
13    A     -- present witnesses, give
14 my statement --
15    Q     And Mr. Capogrosso --
16    A     -- do an investigation.
17    Q     Mr. Capogrosso, are you --
18    A     It can't be all one sided.
19    Q     Mr. Capogrosso --
20    A     You have to let me finish.
21    Q     No. Let me -- I have
22 another question, so let me state my
23 question. Are you aware that your due
24 process complaint was dismissed by Judge
25 Brody?
```

Page 387

```
 1        M.H. Capogrosso
 2    A     I had a right to be heard on
 3 these complaints. Anybody can write a
 4 complaint. This one by Perez is
 5 ridiculous. The man wants to cut me with
 6 a knife and you're telling me that that's
 7 acceptable in your -- in this courthouse.
 8    Q     Mr. Capogrosso, my question
 9 was are you aware that your due process
10 claim was dismissed?
11    A     No. I do not.
12    Q     No, you're not aware of
13 that?
14    A     No, I'm not. Maybe it was
15 dismissed, but when I was working at
16 this, they should have heard my side of
17 the story.
18    Q     But --
19    A     Mr. Perez comes down and
20 threatens me with a knife twice, twice --
21    Q     But Mr. Capogrosso --
22    A     -- and nobody takes my
23 affidavit concerning this. I mean is
24 this -- is this whole system just
25 ludicrous?
```

Page 388

```
 1        M.H. Capogrosso
 2    Q     Mr. Capogrosso, the federal
 3 court did dismiss your due process claim.
 4 That's no longer a part of this case.
 5    A     All right. Fine. So let
 6 me go down to the --
 7    Q     You know that; right?
 8    A     Let me go down to the
 9 Brooklyn TVB and take a knife. Is that
10 what you want me to do? Is that what the
11 DMV wants me to do, take a knife?
12    Q     Are you --
13    A     Get cut by a motorist, is
14 that acceptable?
15    Q     Are you threatening that?
16    A     No. I'm not threatening
17 that, but that's what you want. No, you
18 want me to take a knife. You want
19 Mr. Perez to come down and slice up an
20 attorney.
21    Q     No. No one wants that.
22    A     Well, then what would you
23 want me to do in this instance?
24    Q     Well --
25    A     It's ridiculous.
```

Page 389

```
 1        M.H. Capogrosso
 2    Q     Well, if the incident
 3 didn't --
 4    A     You have no metal detectors,
 5 no metal detectors, no security guard to
 6 be found, told by Gelbstein to talk to --
 7 to take the motorist outside.
 8          I did nothing wrong here.
 9 I'm sorry, I didn't. Let a Brooklyn jury
10 hear it.
11    Q     All right. Let's move on.
12 Mr. Capogrosso. I'm going to show you
13 another document. Do you recognize this
14 document, sir?
15    A     No. This one I don't know,
16 no.
17    Q     This document is --
18    A     It's talking about a paper
19 clip. I don't know what this is about a
20 paper clip. I have no idea.
21    Q     Marked Gelb-0000035;
22 correct?
23    A     Yeah.
24    Q     And I'll represent to you
25 it's an e-mail from Geri Piparo sent on
```

67 (Pages 386 - 389)

M.H. Capogrosso

1    M.H. Capogrosso
2    Monday, February 9, 2015.
3        A    You have a clerk leaving one
4    paper clip, one paper clip every morning.
5    I don't understand what this is about,
6    but that's what she's doing. For an
7    attorney to use, for what reason leaving
8    one paper clip.
9            This is the type of clerks
10   you have down there. She's leaving one
11   paper clip for an attorney to use, any
12   attorney.
13       Q    So --
14       A    I don't understand what your
15   clerks get paid to do, but this is what
16   she likes to do.
17       Q    Why is that --
18   Mr. Capogrosso, if I can ask, why is
19   it -- why is there a problem with leaving
20   a paper clip on a garbage pail?
21       A    There is none, do whatever
22   you want, but it doesn't make any sense.
23   What are you doing it for? What's the
24   purpose? What is this Geri, whatever her
25   name is, get paid to do?

1        M.H. Capogrosso
2            But there is no -- there is
3    no reason, but I never said -- it doesn't
4    make any sense to me this whole thing.
5    It doesn't make any sense.
6        Q    Did you make a complaint to
7    Judge Gelbstein about this paper clip?
8        A    No. Absolutely not. No.
9        Q    So why would she say that
10   you did?
11       A    I don't know. She admits to
12   doing it, it doesn't make a whole lot of
13   sense, but she does what she does. This
14   is what your clerks at the DMV get paid
15   to do.
16       Q    Is she lying?
17       A    About leaving the clip, no.
18   Did I make a complaint about it, no. I
19   could care less about a paper clip.
20       Q    So is she lying about your
21   conduct with the paper clip?
22       A    Absolutely. I could give a
23   damn about a paper clip. Was it stupid
24   that clerks have to waste time doing
25   nonsense stuff like this, yes, stupid.

1        M.H. Capogrosso
2    You have --
3        Q    So --
4        A    It's absolutely stupid. Did
5    I complain about it, no. Did I care
6    about it, no.
7        Q    She then writes "On November
8    18 as I was walking through the office,
9    Mr. Capogrosso was with a customer and as
10   I passed he said Geri, stick it where the
11   sun don't shine."
12       A    No. I never said that.
13       Q    You never said that?
14       A    No. I could care less --
15       Q    Did you say anything like
16   that?
17       A    No. I could care less about
18   a paper clip. I could care less about a
19   paper clip.
20       Q    I don't think that statement
21   was in connection with the paper clip. I
22   think she said that that was a different
23   incident.
24       A    Well, concerning what?
25   Concerning what?

1        M.H. Capogrosso
2        Q    It's not clear.
3        A    Well, tell me what exactly
4    I'm being accused of. I could care less
5    about a paper clip. Tell me exactly.
6        Q    She says that you told her
7    to stick it where the sun don't shine.
8        A    For what reason would I say
9    that? Tell me why I would say that.
10       Q    I don't know. You're the
11   deponent. You tell me.
12       A    I don't know why. I don't
13   know why. I did not say it and tell me
14   why she thinks I would have said it
15   because it wasn't said.
16       Q    She then says "I informed
17   Judge Gelbstein and Judge Vahdat again.
18   Judge Gelbstein went out to speak to
19   him."
20           Do you remember this
21   conversation?
22       A    No.
23       Q    She says that you verbally
24   attacked Judge Gelbstein and her cursing.
25       A    No.

68 (Pages 390 - 393)

1    M.H. Capogrosso
2    Q    Do you remember that?
3    A    No. I would never curse a
4 judge. I would never curse a woman,
5 never.
6    Q    So why is she lying?
7    A    I don't know. Ask her. I
8 do admit that there was -- she was -- she
9 admits to leaving this paper clip. It's
10 absolutely ridiculous. Absolutely
11 ridiculous that your clerks -- this is
12 what clerks do. But do I give a damn
13 about a paper clip, no.
14    Q    Can you explain to me why --
15 like why is it ridiculous that they leave
16 a paper clip someplace?
17    A    What's the purpose of
18 leaving a paper clip someplace? It
19 doesn't make -- for an attorney to use.
20 Why would I -- I don't know. I don't
21 understand the whole purpose of this
22 though. It's just nonsensical.
23    Q    I guess my question is who
24 cares if they leave a paper clip
25 somewhere?

1    M.H. Capogrosso
2    A    I don't care. That's the
3 whole deal. I don't care. I don't know
4 what this is about. I don't care. I
5 don't give a darn about a paper clip in a
6 courthouse. There's paper clips all over
7 the place. You got a bunch of idiot
8 clerks down there. I'm smirking at one
9 and now I'm complaining about a clip.
10 You got a bunch of idiot clerks.
11    Q    Do you think that Ms. Piparo
12 wanted to get rid of you?
13    A    I think -- I think all of
14 the clerks didn't like me. I told you, I
15 was there a long time. They were getting
16 gifts and money from all the other
17 attorneys and I was not getting involved
18 in this.
19        Now, nothing was said, but
20 the other attorneys told me that they
21 were giving the clerks money, cash,
22 buying them breakfast in the morning.
23 How many times do I have to say it to
24 you?
25    Q    And you think that's

1    M.H. Capogrosso
2 connected to this complaint?
3    A    I don't know.
4    Q    But you think --
5    A    I could care less about a
6 paper clip. I think you got a bunch of
7 idiot clerks there who need to -- you
8 know, who didn't like me because I
9 wasn't, you know, like I said, giving
10 them money, giving them cash, giving them
11 presents, buying them breakfast. I was
12 there to do a job. I told you that
13 repeatedly.
14        MR. THOMPSON: All right.
15 Ms. MacDonald, can we mark that
16 document as Exhibit 26?
17        (The above-referred-to
18 e-mail was marked as Exhibit 26 for
19 identification as of this date.)
20        THE WITNESS: Listen. I got
21 27 minutes left. I hope you
22 understand that, Attorney Thompson.
23        MR. THOMPSON: Let's take a
24 quick break and go off the record
25 then and talk.

1    M.H. Capogrosso
2        THE WITNESS: Because it's a
3 seven hour day.
4        MR. VIDEOGRAPHER: Okay. So
5 the time is 4:03. We are off the
6 record.
7        (A short recess was taken.)
8        MR. VIDEOGRAPHER: The time
9 is 4:05. We are on the record.
10    Q    And, Mr. Capogrosso, while
11 we were off the record we just had a
12 discussion about the timing of the
13 deposition and we agreed that we would go
14 until there's been a full seven hours on
15 the record; correct?
16    A    Yes, which should take us to
17 5:23 if we don't take any breaks.
18    Q    Good.
19        So, Mr. Capogrosso, I'm
20 going to show you a document. Do you
21 recognize this document?
22    A    Yes. Well, I recognize the
23 name, Diantha.
24    Q    Have you seen it before?
25    A    Yes.

69 (Pages 394 - 397)

```
1              M.H. Capogrosso
2      Q     And what is this document?
3      A     Some complaint that Diantha
4  wrote about me and I'm saying the word
5  shit. which I wasn't.
6      Q     And this document is Bates
7  stamped DMV-0000003; correct?
8      A     Yes.
9      Q     So Ms. Fuller says that
10 since she came back to practice at the
11 TVB in September 2014, you would say shit
12 whenever she passed by you --
13     A     No.
14     Q     -- is that correct?
15     A     No. I say eesha. I say
16 eesha.
17     Q     You said what?
18     A     Eesha, eesha. I was
19 practicing martial -- it's just something
20 I say to myself. I say it quietly, I say
21 it under my breath. It was never the
22 word shit. It was the word eesha.
23 E-E-S-H-A. I'm saying it for a long
24 time. It gets me motivated.
25     Q     What --
```

```
1              M.H. Capogrosso
2      A     It's just something I say.
3      Q     What does eesha mean?
4      A     It just means something to
5  me. It keeps me motivated. It's under
6  my breath. It's very low. It was never
7  the word shit. It was never directed to
8  any person. I say it to myself. It
9  keeps me motivated.
10           There's no -- no prohibition
11 against speaking to yourself. It's said
12 quietly. It keeps me motivated. It
13 means something to me. I'm allowed to
14 say it. If there was a problem with it,
15 all you had to do was tell me once, I
16 would never say it again, but it was not
17 the word shit and it was not directed to
18 her.
19     Q     So, in fact, she says that
20 she did say it was a problem. She says
21 that on March 13, 2015 you passed by her
22 and said shit to her and she responded --
23 and she responded saying that you were
24 crazy and that she was sick of you saying
25 shit to her.
```

```
1              M.H. Capogrosso
2      A     Well, I didn't say --
3      Q     Do you recall that
4  conversation?
5      A     I never said that word, no.
6  I never said the word. No, she's -- I
7  never said the word. I told you what I
8  said.
9      Q     Do you recall the
10 conversation where she --
11     A     No. I do not.
12     Q     -- objected to you saying
13 it?
14     A     No. She's verbally --
15 verbally swearing at me, that's not
16 appropriate. I say the word eesha and
17 I'm allowed to say it and I'll continue
18 saying it. There's nothing wrong with
19 it. It means something to me.
20           Now, if there was a problem
21 with that --
22     Q     Okay.
23     A     -- you don't barrage me with
24 swear words. You say Mr. Capogrosso.
25 what are you saying, can you please tell
```

```
1              M.H. Capogrosso
2  me and if I -- I would explain it to
3  her.
4      Q     And did you --
5      A     She didn't do that. She
6  didn't do that. What she did was a
7  barrage of swear words, telling me I'm
8  psycho and crazy.
9           Now, I'm allowed to say the
10 word because you are allowed. It's
11 called freedom of speech.
12     Q     And when you said eesha.
13 what does eesha mean to you?
14     A     It means something to me.
15     Q     What does it mean to you?
16     A     It just means something to
17 me. It keeps me motivated.
18     Q     Okay. But you're saying it
19 means something and I'm asking you what
20 it means.
21     A     It's just a little something
22 I say.
23     Q     And what is the meaning of
24 the little something that you say?
25     A     It's a motivational phrase
```

70 (Pages 398 - 401)

M.H. Capogrosso

1  that I say to myself. I've been saying
2  it forever.
3
4     Q      Where does it come from?
5     A      It just comes from where it
6  comes from. I don't know where it comes
7  from. It just comes.
8     Q      It's just a thing that you
9  say for no reason at all?
10    A      It's a thing I say that
11 keeps me motivated, yes.
12    Q      And you would say it
13 whenever you walked by Ms. Fuller?
14    A      No. I would say it when I
15 was feeling kind of tired or a little --
16 a little fatigued because it's a
17 fatiguing day down there. It wasn't --
18    Q      And you said --
19    A      It was before anybody. I
20 would just be -- you know, I had a hard
21 day, I'd just keep moving and it just
22 keeping me motivated.
23    Q      And you see more that this
24 is signed by Mr. Tahir as well; correct?
25    A      Yeah. I'll tell you where I

M.H. Capogrosso

1  got it from. I was training in a martial
2  arts gym a long time ago when I was a
3  younger guy and the instructor used to
4  say it all the time that I was training
5  with me at the time and it kept us
6  motivated throughout the course
7  seriously.
8        So I'm not going to give you
9  his name, a man I trained with at the
10 time, but it was in a gym and he would
11 say it to keep us -- and after that, you
12 know, we were -- I picked up on it.
13       Does it have anything to do
14 with shit or talking to this woman who's
15 calling me a psycho and swearing at me,
16 no. It's something I picked up in a
17 martial art gym a long time ago when I
18 was training and he would say it. I
19 never questioned him what it meant, but
20 it kept us going.
21       So that's where I picked it
22 up from, but it was not the word shit and
23 it wasn't directed to anybody.
24    Q      If this behavior were true,

M.H. Capogrosso

1  and I know you don't think it is, but if
2  you were saying shit to another attorney
3  every time you walked past her, would
4  that justify your exclusion from the TVB?
5     A      I'm not going to -- I'm not
6  going to get into hypotheticals. I don't
7  know. I didn't -- first of all, I didn't
8  say the word shit. Ask me what I said.
9  Don't swear at me with a barrage of swear
10 words and tell me I'm a psycho. Just
11 talk to me and --
12    Q      And you --
13    A      -- I'll tell her. Like I
14 told you, I would tell her.
15    Q      You had been warned by --
16    A      I told you. Like I told
17 you, I would tell her.
18    Q      Mr. Capogrosso, you had been
19 warned by the DMV that verbal abuse could
20 get you expelled; correct?
21    A      There was no verbal abuse
22 here, I'm sorry, there wasn't.
23    Q      I know you don't think so,
24 but the question is had you been warned

M.H. Capogrosso

1  before that verbal abuse could get you
2  expelled?
3     A      I saw the letter to that
4  effect. There was no verbal abuse.
5     Q      So were you worried after
6  this complaint from Ms. Fuller and
7  Mr. Tahir and this incident with
8  Ms. Fuller that you would be expelled
9  from the TVB?
10    A      No, because there was no
11 verbal abuse. It's called freedom of
12 expression. There was no verbal abuse --
13    Q      So were --
14    A      -- so stop making -- there
15 was no verbal abuse.
16    Q      Were you worried that this
17 incident would lead to your expulsion?
18    A      I'm allowed -- you know,
19 people pray all day. They say various
20 prayers. I'm down at the DMV, there's
21 guys praying. They're allowed to pray.
22 I'm allowed to say a word to myself
23 quietly under my breath. There was no
24 verbal abuse.

71 (Pages 402 - 405)

1        M.H. Capogrosso
2    Q    I understand.
3 Mr. Capogrosso, but that wasn't the
4 question. The question is were you
5 worried that this incident would lead
6 to --
7    A    No.
8    Q    -- the TVB to expel you?
9    A    No. I was not worried
10 because I did not verbally abuse anybody.
11 I was not worried. I did not verbally
12 abuse.
13        I'm not going to be told I
14 can't say a word under my breath that was
15 not the word shit and not directed to
16 anybody.
17    Q    So I'll just note that the
18 letter that you sent to AAG
19 Prickett-Morgan was sent the very next
20 day after this letter.
21        Did you send that letter
22 because you were worried the DMV was
23 going to take action against you?
24    A    No. I was worried because
25 the action with Smart. I didn't even

1        M.H. Capogrosso
2 realize that -- the action with Smart is
3 what I was more concerned about.
4        Now, listen, this, what do
5 you call it, Diantha, she's assaulted me
6 with a barrage and she admits to it, a
7 barrage of verbal abuse and obscenities.
8 She's yelling at me, cursing me out,
9 calling me a psycho. If that's not
10 verbal abuse, I don't know what it is.
11        So she's verbally abusing me
12 and she gets a pass. She's not -- she's
13 not thrown out. That's accepted, right.
14 She's verbally abusing me, calling me a
15 psycho and this and that.
16        I used the word eesha, not
17 the word shit. That's not verbal abuse.
18    MR. THOMPSON: So,
19 Ms. MacDonald, if we didn't already,
20 let's mark that letter from
21 Ms. Fuller and Mr. Tahir as Exhibit
22 27.
23        (The above-referred-to memo
24 was marked as Exhibit 27 for
25 identification as of this date.)

1        M.H. Capogrosso
2    Q    Mr. Capogrosso, I'm going to
3 bring up another letter here. Do you
4 recognize this letter?
5    A    Absolutely. That's the
6 letter that went to your office that got
7 lost in the mailroom for four weeks.
8    Q    Did you send this letter?
9    A    Yeah, I did.
10    Q    And this is marked P-41 in
11 your production; correct?
12    A    Yes.
13    MR. THOMPSON: And,
14 Ms. MacDonald, let me ask that this
15 letter be marked as Exhibit 28.
16        (The above-referred-to
17 letter was marked as Exhibit 28 for
18 identification as of this date.)
19    Q    Mr. Capogrosso, you said
20 this was lost in our mailroom. Can you
21 explain what you mean by that?
22    A    I sent it on March 20. I
23 called a couple of days later to see if
24 you received it. They didn't receive it.
25 I called again. A week later they told

1        M.H. Capogrosso
2 me it was lost in the mailroom. I called
3 again. They said they still couldn't
4 find it in the mailroom.
5        About three or four weeks
6 later after I called, eventually it was
7 found. I don't know how that happened.
8 I guess your office didn't want to
9 receive it, but that's what happened.
10    Q    So, Mr. Capogrosso, who is
11 Elizabeth Prickett-Morgan?
12    A    She's the Attorney General
13 of New York State.
14    Q    I'm pretty sure she's an
15 Assistant Attorney General.
16    A    I thought she was the
17 Attorney General. She's an Assistant,
18 right. Letitia James, right.
19    Q    So why would you send a
20 letter to her?
21    A    Because I complained to
22 Judge Gelbstein and when I complained to
23 Judge Gelbstein, he laughs and giggles
24 and tells me a spade is a spade. I'm not
25 getting relief about the harassment of

72 (Pages 406 - 409)

1      M.H. Capogrosso
2 Smart, the constant harassment by Smart
3 and I don't want an incident on this
4 floor and I'm seeing what's happening.
5 This guy, Smart, is provoking me into a
6 fight. He gets in my face. What's the
7 problem? Fuck you, you're the problem.
8 Because I complained about him stealing
9 $80 and a fee and he's allowed to remain
10 by Gelbstein. Vahdat's not --
11    Q     So --
12    A     Go ahead. Vahdat's not
13 listening to me.
14    Q     Mr. Capogrosso, was
15 Ms. Elizabeth Prickett-Morgan part of
16 DMV?
17    A     I said let me call -- let me
18 write a letter to the Attorney General's
19 office, that's all I said to myself. I
20 think that was the correspondence address
21 when I looked you up on the website.
22    Q     So -- and so did you file
23 this believing that Elizabeth
24 Prickett-Morgan was the Attorney General
25 of New York State?

1      M.H. Capogrosso
2    A     I filed it with the Attorney
3 General of New York State and when I
4 looked you up on the website, that was
5 the correspondence address that I found
6 to correspond with.
7    Q     So --
8    A     I looked you up to send it
9 in and they put her name there, so that's
10 the one I used.
11    Q     So what's, you know, what's
12 the connection between the Attorney
13 General's office and DMV?
14    A     The Attorney General's
15 office represented DMV in my Article 78
16 proceeding, right.
17    Q     But hadn't --
18    A     They're the lawyers.
19    Q     Hadn't the Article 78
20 proceeding been over for three years by
21 this point?
22    A     Yeah, but they're the ones
23 who put all these conditions on me, right
24 and I had to act in a certain way, right,
25 even though other attorneys were verbal

1      M.H. Capogrosso
2 abusing me is acceptable or using swear
3 words is acceptable or calling me a
4 psycho, Diantha Fuller, which is
5 acceptable.
6      So I don't want an incident.
7 The basis of this letter is this, I don't
8 want another incident at the TVB. I
9 don't want anything to happen to me,
10 right. I don't want an incident.
11      You gave me this letter. No
12 verbal abuse, threatening physical
13 conduct. I'm trying to be, you know, a
14 perfect gentleman, which is what I was,
15 right. I'm trying to do the right thing.
16 I'm trying to be a perfect gentleman,
17 handle my cases, do what I have to do.
18      I'm seeking relief here.
19 Gelbstein, when I complain about Smart,
20 he laughs and giggles and tells me a
21 spade is a spade. So let me call the
22 Attorney General's office who sent me
23 this letter, who represented me in the
24 Article 78, who gave me all these
25 conditions and tell her what's going on

1      M.H. Capogrosso
2 down here.
3    Q     But Elizabeth
4 Prickett-Morgan --
5    A     And your office does not
6 seem to care. They lose it in their
7 mailroom. They lose it they eventually
8 find it. They don't respond to it. They
9 don't give me any response to it and
10 Smart approaches me in the morning on
11 May 11.
12    Q     Elizabeth Prickett-Morgan
13 didn't represent DMV in your case; did
14 she?
15    A     I don't know. You would
16 have to talk to my attorney, Chris
17 McDonough, on this. I don't know who
18 did.
19      When I looked you up on
20 the -- on Google for a correspondence
21 address, Prickett-Morgan's name was
22 attached to it. That's why I wrote that.
23    Q     Did you speak with an
24 attorney about filing this letter?
25    A     No.

73 (Pages 410 - 413)

M.H. Capogrosso

1
2    Q     Did you speak with
3  Mr. McDonough?
4    A     No. Chris did tell me if
5  you sneeze the wrong way, they're going
6  to throw you out again.
7    Q     So I guess my question is
8  you wrote this letter to the office that
9  represented DMV in the case three years
10  ago to an attorney who wasn't even on the
11  case.
12       Why do you think anyone
13  would care about this letter?
14    A     I'll say it again, the
15  Article 78 guys gave me all these
16  conditions, right, in that letter, that
17  was from your office, no verbal abuse, no
18  threatening of physical contact or
19  conduct, right. That was from your
20  office, right, from your office, the
21  Attorney General's office. I did not
22  deal with the Attorney General's office.
23  Chris McDonough dealt with the Attorney
24  General's office.
25       I'm trying to adhere to all

M.H. Capogrosso

1
2  of these rules and regulations
3  specifically put on me, on me, that I had
4  to deal with now and I'm getting all this
5  harassment by Smart because I reported a
6  theft. I go to Gelbstein. Gelbstein
7  doesn't want to hear it. He laughs and
8  giggles, tells me a spade is a spade
9  concerning Smart.
10       Who else do you want me
11  writing to? If I'm supposed to adhere to
12  the conditions that you put on me, the
13  Attorney General's office, I got to go to
14  the Attorney General's office, say how do
15  I -- what do I do in this situation?
16       I can't adhere if I've got a
17  security guard who doesn't want to leave
18  me alone.
19    Q     So, Mr. Capogrosso, you
20  testify a moment ago that you wrote this
21  letter because you were worried that
22  there would be an incident?
23    A     Absolutely.
24    Q     Can you tell me what you
25  mean by that?

M.H. Capogrosso

1
2    A     I said this guy Smart
3  wouldn't stop. I went into detail with
4  it and Gelbstein's giving me no
5  protection. He's not telling this guy --
6  or he's incapable, incompetent or
7  complicit, I state that. Smart will get
8  in my face, what's the problem? Fuck
9  you, you're the problem. He gives me the
10  sign of the cross and a spear hand. He
11  bumps into me.
12    Q     And were you worried that
13  this incident --
14    A     Then the incident happens.
15  On May 11 this guys comes again. He
16  comes, he gets in my face again. I put
17  up my hand. I tell him to back up.
18    Q     Let me ask you,
19  Mr. Capogrosso, when you wrote this
20  letter were you worried that this
21  incident would be used to justify your
22  expulsion from the TVB?
23    A     Would I -- I saw something
24  coming. I saw something coming. This
25  guy Smart didn't want to stop. I don't

M.H. Capogrosso

1
2  know if Gelbstein -- I think Gelbstein
3  was putting him up to it. I really
4  believe Gelbstein was putting --
5  Gelbstein wanted me out. I really think
6  Gelbstein wanted me out of here and --
7    Q     And that's --
8    A     -- I think Gelbstein put
9  Smart up to it, I really do believe that,
10  because he didn't look at the videotape.
11  On the morning of May 11, he was
12  conveniently not in the DMV, just not
13  there. He was not in the TVB, in the
14  Brooklyn TVB conveniently.
15       I think he put this guy
16  Smart up to it. He wanted me out and I
17  saw it coming and I'm seeking --
18    Q     Is that part --
19    A     -- relief. I'm seeking
20  relief. I'm seeking for somebody to
21  allow me just to practice law like every
22  other lawyer.
23    Q     And is that part of why you
24  wrote the letter?
25    A     I'm seeking relief from your

74 (Pages 414 - 417)

Page 418

1        M.H. Capogrosso
2 office.
3   Q    Yes. So I understand, but
4 the question is you believe that Judge
5 Gelbstein was trying to get rid of you
6 through David Smart, was that why you
7 wrote this letter?
8   A    I want to practice law down
9 in Brooklyn TVB. I was a good lawyer
10 down there. I'm seeking relief.
11   Q    I understand that.
12   A    I don't know -- I don't know
13 if Gelbstein put this guy Smart up to it.
14 I don't know, but he --
15   Q    Did you suspect it at this
16 time?
17   A    What's that?
18   Q    Did you suspect at this time
19 that Judge Gelbstein was putting him up
20 to it?
21   A    I think Gelbstein is as
22 corrupt as they come, my personal opinion
23 and I told you the reasons why. When
24 you -- when you complain to a judge and
25 that judge laughs and giggles and tells

Page 419

1        M.H. Capogrosso
2 you a spade is a spade. I think he's
3 corrupt and doesn't deserve to hold the
4 office.
5      No matter who's protecting
6 him, I think he's corrupt and doesn't
7 deserve to hold that office. He should
8 have stopped the behavior.
9   Q    So the question is --
10   A    Gelbstein should have
11 stopped this behavior and he didn't do
12 it.
13   Q    So the question,
14 Mr. Capogrosso. is when you wrote this
15 letter, were you -- did you do it because
16 you were worried that Judge Gelbstein was
17 going to use David Smart to get you
18 expelled?
19   A    I used it to stop the
20 harassment. I didn't want an incident.
21 I spelled it out very clearly. I did
22 not --
23   Q    Mr. Capogrosso. I understand
24 that.
25   A    I answered it. I answered

Page 420

1        M.H. Capogrosso
2 your question. I used it because I did
3 not want an incident. I did not --
4   Q    So Mr. Capogrosso --
5   A    I did not want an incident.
6   Q    Can I ask you to answer the
7 question with a yes or a no. did you
8 write this letter, in whole or in part,
9 because you believed Judge Gelbstein was
10 trying to get you expelled?
11   A    I wrote it because I did not
12 want an incident. That's why I wrote it.
13   Q    Okay. But can I ask you to
14 answer the question yes or no?
15   A    That is the question. No
16 there's no -- that's the reason I wrote
17 it.
18   Q    So yes -- and, again, it's a
19 simple question, yes or no, was part of
20 the reason you wrote this because you
21 thought Judge Gelbstein was going to get
22 you expelled?
23   A    I wrote it because I didn't
24 want an incident on the floor. That's
25 why I wrote it.

Page 421

1        M.H. Capogrosso
2   Q    Mr. Capogrosso, is there
3 anything stopping you from giving a yes
4 or no answer to this question?
5   A    No. That's the reason I
6 wrote it. You're asking me why I wrote
7 it. That's the reason. That's the only
8 reason I wrote it. I did not want to get
9 expelled. I didn't want an incident. I
10 don't want to get thrown out. I wanted
11 to stay working. I wanted to make a
12 living. I wanted to pay bills.
13   Q    And so is the answer yes.
14 you believed that there was going to be
15 an incident Judge Gelbstein was going to
16 use to expel you?
17   A    I saw this guy Smart was not
18 backing off. He was still with the
19 harassment. I saw it. He didn't want to
20 stop.
21   Q    Mr. Capogrosso --
22   A    I answered your question. I
23 wrote it because I -- I wrote -- I gave
24 you the reasons why. I did not want an
25 incident on this floor.

75 (Pages 418 - 421)

```
1        M.H. Capogrosso
2        That's the last time I'm
3   going to answer this question.
4        Q    Well, Mr. Capogrosso, I'm
5   going to ask you again one more time to
6   please answer with a yes or a no. When
7   you wrote this letter, were you worried
8   that Judge Gelbstein was going to cause
9   an incident to get you expelled?
10       A    I was worried that there
11  would be an incident on the floor.
12  That's what I was worried about.
13       Q    But you didn't know if it
14  would be something Judge Gelbstein would
15  cause?
16       A    Listen, I just didn't want
17  an incident, that's it. I saw
18  Gelbstein --
19       Q    So why is it -- but why is
20  it so hard to get a yes or a no out of
21  you, Mr. Capogrosso?
22       A    I told you, I've given you
23  the reason I wrote this letter. I didn't
24  want an incident on the floor. I did not
25  want it. I wanted to work.
```

```
1        M.H. Capogrosso
2        Q    Okay, but that again is not
3   the question. Why can't you answer --
4        A    No.
5        Q    -- with a yes or a no?
6        A    I'm going to object right
7   now. You're badgering. I gave you the
8   reason I wrote this letter.
9        Q    All right.
10       A    You're badgering me. You've
11  asked it seven times, eight times. I
12  gave you my answer. I did not want an
13  incident. I'm begging for relief. I
14  want to work. I want to pay bills. I
15  want to make my clients happy.
16       Q    You can object, but I just
17  want to put on the record my question is
18  yes or no, did you believe that when you
19  wrote this letter that Judge Gelbstein
20  was trying to manufacture an incident to
21  get you expelled and you're not willing
22  to answer that yes or no question; is
23  that correct?
24       A    Well, I truly believe
25  that -- I'll tell you when I truly
```

```
1        M.H. Capogrosso
2   believed that, when he approached me on
3   the afternoon of May 8. On the afternoon
4   of May 8 --
5        Q    I'm not asking about that.
6        A    Well, on --
7        Q    I'm asking you about --
8        A    Well, on that date when he
9   told me can't you go practice somewhere
10  else, I saw what you wrote about me. I'm
11  implicit, incapable and incompetent. I
12  believe he wanted me out. At that point
13  in time, yes.
14       And when I wrote this
15  letter, all I wanted was for the
16  harassment to stop, but when he
17  approached me on May 8 and told me can't
18  you go practice someplace else and then
19  on May 11 Smart approaches me, yes, then
20  I knew he wanted me out.
21       Q    I'm not asking about that.
22  I'm asking about now when you wrote this
23  letter.
24       A    When I wrote this letter, I
25  just wanted the harassment to stop for
```

```
1        M.H. Capogrosso
2   the tenth time.
3        Q    So can you give me a yes or
4   a no answer to the question?
5        A    I don't recall what I
6   thought. I wanted the harassment just to
7   stop, that's what I wanted. I wanted to
8   work. I didn't want defendant Gelbstein
9   to laugh and giggle at me and tell me a
10  spade is a spade. I did not want that.
11       Q    All right.
12       A    I wanted to stop the
13  harassment.
14       Q    You've once again refused to
15  answer yes or no and I'm just going to
16  let you know and I'm going to put on the
17  record that we are going to go back and
18  we are going to have to consider whether
19  to file a motion to compel.
20       In the meantime, let's move
21  on.
22       MS. REPORTER: You know
23  what, if you still have an hour left,
24  I need a five minute break. I'm at
25  350 pages --
```

76 (Pages 422 - 425)

Page 426

```
 1        M.H. Capogrosso
 2        MR. THOMPSON: Ms.
 3   MacDonald --
 4        MS. REPORTER: Yes. Let's
 5   take a five minute break.
 6        MR. THOMPSON: Sure. That's
 7   fine. We'll be back at 4:33.
 8        MR. VIDEOGRAPHER: The time
 9   is 4:28. We are off the record.
10        (A short recess was taken.)
11        MR. VIDEOGRAPHER: The time
12   is 4:33. We are on the record.
13   Q    Mr. Capogrosso, you still
14   see that we have Exhibit 28 up?
15   A    Yes.
16        MR. THOMPSON: And,
17   Ms. MacDonald, in case we didn't mark
18   it as Exhibit 28, let's please do
19   that.
20   Q    You write in this letter
21   that upon completion of the anger
22   management course you were allowed to
23   practice law in all DMV courts on an
24   equal and unbiased standing with all
25   other attorneys in the DMV; is that
```

Page 427

```
 1        M.H. Capogrosso
 2   correct?
 3   A    That was my assumption, yes.
 4   Q    You say it was your
 5   assumption. What do you mean by that?
 6   A    I'm a lawyer. I'm licensed
 7   in the State of New York. I should be
 8   treated like every other lawyer. I see
 9   no reason why I shouldn't be. I should
10   be held to the same standard as every
11   other lawyer practicing, no different. I
12   took my course that I needed to take. I
13   should be held on the same standard as
14   every other lawyer.
15   Q    But, in fact, you weren't
16   quite on the same standing because you
17   had been warned that any further incident
18   would lead to your expulsion; isn't that
19   true?
20   A    Well, that was an improper
21   warning in my opinion. I should be
22   treated like any other lawyer, any other
23   lawyer.
24   Q    So why was it improper for
25   DMV to warn you that further incidents
```

Page 428

```
 1        M.H. Capogrosso
 2   would lead to an expulsion?
 3   A    Well, I don't know why they
 4   threw that letter to me. Like I said,
 5   they threw it at me two days before I was
 6   to go back to the DMV. I agreed to
 7   nothing but to take an anger management
 8   course, that's it.
 9   Q    Well, once again --
10   A    I took the course. I should
11   be treated like every other lawyer, not
12   on a special, you know, special -- I
13   should be treated like every other
14   lawyer. That's all I agreed to was take
15   a course.
16        I wouldn't have agreed to
17   anything else if I knew this letter was
18   going to be thrown at me.
19   Q    Mr. Capogrosso, you write
20   that "On numerous occasions your security
21   guard Dave Sparks told me to go F
22   myself."
23   A    I didn't know his name at
24   that point. It's Smart, not Sparks. I
25   didn't know his last name.
```

Page 429

```
 1        M.H. Capogrosso
 2   Q    How did you not know his
 3   last name at this point?
 4   A    I didn't know it.
 5   Q    You had been interacting
 6   with him for years you said.
 7   A    We all knew him by David. I
 8   never talked to him about his last name.
 9   I know people said S Smart something or
10   Smarks or something. I thought it was
11   Sparks.
12        I knew him -- I knew him as
13   the security guard, that's it. I know
14   his first name was David.
15   Q    When you --
16   A    That's what I knew.
17   Q    When you write,
18   Mr. Capogrosso, when you write "Will
19   provide proof upon request," what proof
20   would you have provided?
21   A    I sent you all my letters,
22   all my -- all the complaints I filed with
23   Gelbstein.
24   Q    So the proof would have been
25   your own letters to Judge Gelbstein?
```

77 (Pages 426 - 429)

M.H. Capogrosso

2  A  Yes and my testimony. The
3  fact that there was a video --
4  Q  Okay.
5  A  That I stated to Gelbstein
6  the man pushed me from behind in June of
7  2012. They stole money from me.
8  Q  And the same question for
9  item number 2 when you talk about
10  instances where Sparks redirected other
11  clients who had come looking for you to
12  other attorneys or interfered with his
13  conversations, the proof there would have
14  been your statements as well?
15  A  Yeah. I had an affidavit I
16  filed with -- I think I sent it to you
17  also, yes and I saw him doing it.
18  Q  So here on page 2 you see
19  and I'm going to highlight your
20  statement.
21  A  Yeah. Go ahead.
22  Q  "I've made numerous
23  complaints to Judge Gelbstein. His
24  response has been a spade is a spade.
25  His words not mine. He laughs and

M.H. Capogrosso

2  giggles."
3  A  That's true. That's
4  absolutely a true statement, absolutely
5  true.
6  Q  Well, he denied it
7  yesterday; didn't he?
8  A  It's an absolutely true
9  statement. He took no action in response
10  to these. He knew what I had to go
11  through back in 2011 with Yaakov Brody
12  and that incident.
13  Q  Mr. Capogrosso, that's not
14  the question.
15  A  He took no action --
16  Q  The question --
17  A  -- to respond to this.
18  Q  Sir, the question is he
19  denies it; correct?
20  A  I don't know if he denied
21  it. That an absolutely true statement.
22  That's what he said to me.
23  Q  Were you not at the
24  deposition yesterday when he denied it?
25  A  I'm sure he denied it at the

M.H. Capogrosso

2  deposition, but that's what he said to me
3  this man.
4  Q  So what can you tell me
5  about the conversation in which he made
6  that statement allegedly?
7  A  I said can you tell this guy
8  to leave me alone, Smart and now I know
9  his name is David. Now I know his name
10  is Smart. I don't want an incident on
11  this floor. I don't want anything to
12  happen. I want to practice law. I want
13  to make money. I want to make my clients
14  happy. I said can't you stop Smart from
15  doing this. And three inches from my
16  face what's the problem? Fuck you,
17  you're the problem. He laughs and
18  giggles at me and tells me a spade is a
19  spade.
20  Q  So when was this --
21  A  It happened outside of his
22  chamber door one day. He's walking, I
23  said judge, I got to talk to you for a
24  minute. This guy doesn't want to stop.
25  Can you tell him to leave me alone? What

M.H. Capogrosso

2  else do I need to do as a lawyer to tell
3  a judge to have a security guard leave a
4  hard working attorney alone and all he
5  does this judge is laugh and giggle at me
6  and tell me a spade is a spade.
7  Q  So, Mr. Capogrosso, when was
8  this conversation in which he said this?
9  A  Right before I wrote this
10  letter. After he said that to me, I said
11  I had enough. I said I had enough with
12  this guy. Not only is he having lunch
13  with ticket brokers, pleading people
14  guilty, telling me he doesn't know what
15  these ticket brokers do for a living, now
16  he's telling me a spade is a spade and he
17  laughs and giggles.
18  This guy should not be on
19  the bench.
20  Q  And so it's your testimony
21  that he said this shortly before you
22  filed the letter?
23  A  Absolutely. When he said
24  that to me, I said that's enough. I got
25  to get --

78 (Pages 430 - 433)

M.H. Capogrosso

1
2  Q    So you --
3  A    I have no protection down
4  here from this judge whatsoever, none.
5  Q    So in March of 2015?
6  A    Yeah. That's when he said
7  it to me. I wrote the letter. I'm
8  seeking relief. I don't want an incident
9  on this floor. Maybe your office could
10 help me.
11       What your office does is
12 they lose the -- they lose it in the
13 mailroom.
14 Q    And what is -- what do you
15 think a spade is a spade means?
16 A    Mr. Smart's a black man.
17 What I believe is that this Judge
18 Gelbstein is as prejudiced and biased as
19 they come because that's what he said to
20 me and Mr. --
21 Q    And what's your basis for
22 that belief?
23 A    Mr. Smart is a black man and
24 he was making fun of Mr. Smart's, um,
25 Mr. Smart. He's making fun of Mr. Smart.

M.H. Capogrosso

1
2       Now, I've dealt with all
3  types of clients down there, all types of
4  clients, all different nationalities,
5  races. Not one, not one client made a
6  complaint against me that I made an
7  offensive or anti-Semitic or racist
8  remark.
9       But this judge, if you want
10 to call him a judge. Gelbstein, laughs
11 and giggles and tells me a spade is a
12 spade.
13 Q    Do you think he could have
14 been talking about you when he said a
15 spade is a spade?
16 A    Absolutely not. I'm
17 complaining about Smart and he laughs and
18 giggles. Why would he call me a spade?
19 Why would he call me a spade?
20 Q    I don't know. You tell me.
21 A    I don't know why. I'm
22 talking about Smart at this point. I'm
23 complaining to him about Smart, that he
24 gave me the sign of a cross and a spear
25 hand and now he's getting -- and now he

M.H. Capogrosso

1
2  doesn't want to stop with the harassment.
3  Q    Can I ask, what is a spear
4  hand?
5  A    (Indicating). It's
6  something that can be very deadly. It's
7  a straight right hand like this
8  (indicating). Pointed right at somebody,
9  you can actually take a guy's eye out
10 with it if you do it right.
11 Q    Can you make a spear hand
12 and poke somebody's eye out?
13 A    Oh, absolutely. Would I,
14 no. Could I, yes, if I had to. If I
15 had, there's a guy with a knife or a gun
16 at me, absolutely. Coming at me with a
17 knife, absolutely I would do it in a
18 heartbeat.
19 Q    And --
20 A    I do whatever I can to avoid
21 that situation.
22 Q    And does Mr. Smart practice
23 any martial art that uses a spear hand to
24 your knowledge?
25 A    I have no idea. I'm telling

M.H. Capogrosso

1
2  you what he did. He directed his hand
3  directly at me like this (indicating).
4  stood up and gave me the sign of a cross.
5  Q    So let me ask you, if you
6  were raising -- if you had all these
7  concerns about Judge Gelbstein, you know.
8  Tanya Rabinovich having lunch with Jewish
9  ticket brokers, adjourning cases,
10 entering guilty pleas, why didn't you put
11 any of that stuff in this letter?
12 A    In this letter?
13 Q    Yes.
14 A    I only cared about me and
15 working, seriously. You know, how you
16 make your living, I don't care what you
17 do. I don't get involved in other
18 people's businesses, I really don't. You
19 want to be a corrupt judge, be a corrupt
20 judge. You want to be a taxicab driver,
21 be a taxicab driver, God bless. You want
22 to be a -- you want to work at a strip
23 club as a stripper, be a stripper. I
24 don't care. You want to be a lawyer, be
25 a lawyer, but be straight.

79 (Pages 434 - 437)

M.H. Capogrosso

1        M.H. Capogrosso
2        I care about me and making
3  my living. If you want to be a corrupt
4  judge, be a corrupt judge. I don't want
5  to get involved with it. I just want to
6  do --
7     Q    So I understand that --
8     A    I want to do my job.
9     Q    -- but the question is if
10  you were complaining about Judge
11  Gelbstein, why not include that in this
12  letter?
13     A    Because I cared about me, me
14  keeping my job. That's what I cared
15  about, for me to keep -- I don't care
16  what Judge Gelbstein does. If he wants
17  to make his living -- make a living on
18  the side working with ticket brokers, go
19  right ahead and do it. I could care
20  less. Do what you want to do. You want
21  to be a corrupt judge --
22     Q    Were you --
23     A    -- be a corrupt judge. What
24  I care about --
25     Q    Were you worried that you

1        M.H. Capogrosso
2  would lose your job?
3     A    I was worried about that I
4  wasn't -- that there was going to be an
5  incident on that floor with this guy
6  Smart and I wanted to keep working and
7  paying bills and representing my clients.
8     Q    Let me ask you, you write
9  "I" -- you write "I do not seek to
10  litigate, but I will if I have to." What
11  lawsuit would you have filed?
12     A    This one. I don't want to
13  get thrown out again. I don't want to
14  leave. I don't want to leave the
15  Brooklyn TVB. I don't want to. I want
16  to work. I want the harassment to stop.
17  I don't want Gelbstein to laugh and
18  giggle at me. I want him to put an end
19  to it.
20     I want your office to maybe
21  put an end to it so I can get up in the
22  morning and go make a living.
23     Q    And you write "Please take
24  any and all action to expedite and
25  resolve issues," but you don't say what

1        M.H. Capogrosso
2  that action would be. What did you
3  expect Ms. Prickett-Morgan to do?
4     A    I don't know. How about
5  respond to the letter? I was told to go
6  back to the DMV, I was allowed to, right.
7  I didn't expect to have all this
8  harassment thrown at me when I went back,
9  I did not.
10     We entered into a
11  stipulation agreement, right. I was
12  allowed to go back. Well, give me the
13  chance to practice law, practice it
14  properly without the harassment. Live up
15  to your side of the bargain. You allowed
16  me back. I took an anger management
17  course. I hired a lawyer. It cost me
18  $10,000 in total.
19     I did my part of the story.
20  Live up to your part. Put an end to this
21  harassment so I can make my living down
22  there and your office lost my complaint
23  in your mailroom for about three to four
24  weeks.
25     Q    Was it our job --

1        M.H. Capogrosso
2     A    Live up to your part.
3     Q    Was it our office's job to
4  take care of your complaint?
5     A    Listen, no -- I don't know.
6  You tell me. You're the Attorney
7  General.
8     Q    No is what I would tell you.
9     A    All right. Fine.
10     Q    This is --
11     A    Fine. So you sent the
12  complaint back to Gelbstein, nobody wants
13  to hear it, so I have no relief. There's
14  no relief being afforded to me. I got a
15  judge who laughs and giggles. The
16  Attorney General doesn't want to get
17  involved, doesn't even respond to it, to
18  my letter. She could have responded and
19  said this is not our job, it's not.
20     I make complaints. I called
21  the grievance. Nobody wants to listen.
22  That's what I did.
23     You don't want to respond to
24  the letter, don't respond. It's not your
25  job, it's not your job. You don't want

80 (Pages 438 - 441)

M.H. Capogrosso

1
2  to control the actions of the DMV, you
3  don't have any control over it, fine.
4      Q      Mr. Capogrosso, you
5  represented in your complaint and in your
6  interrogatory responses that later on
7  Judge Gelbstein mentioned this letter to
8  you; is that correct?
9      A      Absolutely, May 8. May 8.
10     Q      And can you tell me what
11 happened?
12     A      He approaches me in the
13 presence of Danielle Calvo. I think
14 Calvo was there. He said can't you go --
15 can't you go practice somewhere else? I
16 saw what you wrote about me, I'm
17 complicit, incapable and incompetent.
18 May 8. Friday afternoon.
19            May 11, he's conveniently
20 not in the Brooklyn TVB.
21     Q      And he just came up and said
22 that out of nowhere?
23     A      I -- yeah. He walks -- he
24 walks up to me. He says can't you go
25 practice someplace else? I saw what you

M.H. Capogrosso

1
2  wrote about me, I'm complicit, incapable
3  and incompetent.
4      Q      And what did you say?
5      A      I said no. I cannot. I have
6  too many clients. I cannot, my exact
7  words to him. I cannot. I have too many
8  clients who depend on me. I had 850
9  clients on my docket at that point, 850.
10 How do I just pick up and leave?
11     Q      And did anyone witness this
12 statement by Mr. Gelbstein?
13     A      I think Calvo was there. I
14 believe Calvo was there. That's what I
15 wrote in -- Calvo I believe was there,
16 yes.
17     Q      And is this statement by
18 Mr. Gelbstein documented in any way?
19     A      I think I wrote it in my
20 complaint, didn't I?
21     Q      Yes. You wrote it in your
22 complaint, but is there any contemporary
23 documentation of this statement?
24     A      Well, I wrote it in my
25 complaint. Contemporary documentation?

M.H. Capogrosso

1
2  That's what he said to me. That's what
3  the man said to me on May 8.
4            On May 11 he's not in the
5  DMV. Smart approaches me, creates this
6  incident. He loses the videotape. Calvo
7  doesn't keep it. Calvo doesn't even view
8  the videotape.
9      Q      So --
10     A      Traschen doesn't view the
11 videotape and I'm thrown out.
12     Q      Mr. Capogrosso, is it
13 correct to say that the only evidence of
14 this statement is your complaint which
15 you filed three years later?
16     A      That's what happened.
17 That's what he said to me. I remember
18 it.
19     Q      So yes?
20     A      I remember that statement as
21 if it was yesterday. That's exactly what
22 this man said to me, can't you go
23 practice somewhere else? I saw what you
24 wrote about me, I'm complicit, incapable
25 and incompetent. I'll remember it to the

M.H. Capogrosso

1
2  day I die. That's what he said to me.
3      Q      But Mr. Capogrosso that's
4  not the question. The question is is the
5  only evidence of this statement your
6  complaint three years later, yes or no?
7      A      I took notes of that. I
8  took -- I took notes of a lot of stuff
9  that happened.
10     Q      Well, I don't think you've
11 produced those notes; have you?
12     A      That note, no, but I wrote
13 down a lot of these things that happened.
14     Q      So why didn't you produce
15 them?
16     A      Well, because they're my
17 notes.
18     Q      Don't you think they would
19 be relevant and --
20     A      They're my notes. I
21 expressed my notes in my complaint.
22     Q      Do you still have these
23 notes?
24     A      I don't know. I'd have to
25 go look at them. I expressed my notes in

81 (Pages 442 - 445)

Page 446

M.H. Capogrosso

1  my complaint.
2      Q      Did you look through your
3  notes in responding to our document
4  requests?
5      A      I looked through everything.
6      Q      And so why did you decide
7  not to produce them?
8      A      I have notes that I made
9  with respect to my complaint. While
10  these things were happening, I was
11  taking -- I took down notes, yes.
12      Q      And don't you think those
13  notes would be relevant to the case?
14      A      I don't know. No, it was
15  expressed in my complaint. Everything
16  that was in my notes that I needed to say
17  I stated in my complaint.
18      Q      So were these notes that you
19  made in 2015 at the time or were these
20  notes that you made in 2018 when you were
21  writing your complaint?
22      A      2015. Right after all this
23  stuff happened, I started taking notes of
24  everything that happened, okay. I said

Page 447

M.H. Capogrosso

1  this is not right. What happened here is
2  not right.
3      Q      So Mr. Capogrosso, is it
4  your testimony that you had notes from
5  2015 that are contemporaneous to these
6  events and you didn't produce them?
7      A      I produced them in my
8  complaint. Whether I still have them, I
9  don't know. I don't think I do.
10      Q      Did you destroy them?
11      A      I put them in my complaint,
12  yes.
13      Q      So yes, you destroyed them?
14      A      I don't know if I still have
15  them or not. I don't think I have them,
16  no. I don't know.
17      Q      So then what happened to
18  them?
19      A      I expressed them in my
20  complaint.
21      Q      So you wrote your complaint
22  and then you destroyed the documents that
23  it was based on; is that correct?
24      A      I don't know. I don't

Page 448

M.H. Capogrosso

1  recall if I destroyed them or not. I
2  don't know if I still have them.
3      Q      Can I ask you to --
4      A      I know I expressed
5  everything in my complaint.
6      Q      Can I ask you to make a
7  search for those notes now and produce
8  them if you have them?
9      A      Right at this moment in
10  time, no.
11      Q      I mean no, now we are in the
12  deposition, but can I ask you before the
13  close of discovery on Monday to look
14  through what you have, see if you have
15  those notes and produce them? This is --
16  please treat this as a formal request.
17  We can make that request in writing if
18  you'd like, but we are requesting those
19  notes and others.
20      A      For the notes that I made,
21  I'll see if I have notes. I don't know
22  if they're dated. I know I wrote a lot
23  of stuff down while this was happening,
24  but everything that happened I expressed

Page 449

M.H. Capogrosso

1  in my complaint.
2      Q      And any other notes that are
3  relevant to this case.
4      A      If I have them -- if I have
5  it, I will produce it. But I know I did
6  take notes, I did use those notes to
7  write my complaint, I did do that.
8      Q      And if you don't have those
9  notes now, what happened to them?
10      A      I don't recall.
11      Q      You don't recall? They'd
12  just be gone?
13      A      I don't know. I don't --
14  there's a lot of paperwork involved. I
15  don't know.
16      Q      All right. Let's -- let me
17  put up a new document. Do you see this
18  document?
19      A      Well, let me see the bottom
20  of it, see who wrote it, then I'll
21  remember it more.
22      Q      Sure.
23      A      Tahir, yeah.
24      Q      Do you recognize this

82 (Pages 446 - 449)

```
 1            M.H. Capogrosso
 2   document?
 3      A      Yeah. It's about Tahir
 4   saying I used the word shit. I never
 5   used the word shit ever. I used the word
 6   eesha. I told you that.
 7      Q      And what is this document?
 8      A      This is a complaint by
 9   Tahir.
10      Q      And this is marked --
11      A      Which I never got an
12   opportunity to respond to or supply an
13   affidavit in relation.
14      Q      And Mr. Capogrosso this is
15   Bates stamped DMV-0000016; correct?
16      A      Yes.
17      Q      Mr. Tahir wrote that you got
18   into an argument about the placement of
19   his bag; is that correct?
20      A      When I came back -- no.
21   This is what happened here. When you --
22      Q      What happened?
23      A      Well, in this little
24   attorneys' room that we got in DMV, I
25   said it's about six to eight feet long,
```

```
 1            M.H. Capogrosso
 2   five feet wide. There's a chair in the
 3   back, a chair in the back, one chair,
 4   otherwise there's two benches.
 5            Now, all the attorneys, I
 6   don't know why they can't do this, but
 7   they put their bags on top of -- on top
 8   of the benches. There's no place to sit
 9   and then there's a chair in the back.
10   There's a chair in the back.
11            Now, Tahir thinks this is
12   his chair and only he can sit in it. If
13   you sit in it, he gets all upset. It's
14   only his chair. He's the only person
15   allowed to sit in it. I don't believe in
16   that. Anybody can sit in a chair in the
17   attorneys' room. But he believes because
18   he's the senior attorney there, the
19   oldest guy, it's his chair, don't touch
20   it, don't sit on it.
21            On that day, on May 5, I
22   walk in the attorney room. I got up and
23   I'm getting my coat or I'm getting
24   something and I get a phone call from a
25   client, so I always answer the phone call
```

```
 1            M.H. Capogrosso
 2   right away from the client because
 3   they're concerned about their license,
 4   right.
 5            I sit on the chair. He
 6   comes back. Now, there's nothing on the
 7   chair. The chair is empty. It's a blank
 8   chair. There's nothing on the chair. I
 9   sit on the chair to answer the phone
10   call. I'm a little tired at the end of
11   the day, right. I'm tired, I want to sit
12   down and all the benches have the bags
13   from the attorneys on it. You can't sit
14   on the bench.
15            Tahir comes in and goes
16   crazy. Why are you sitting on my chair?
17   This is my chair. I mean he had
18   conflicts with other attorneys on this,
19   too. Nobody's allowed to -- I sit where
20   I want to sit. You don't own the chair.
21   This is a chair in the attorneys' room.
22   You don't own it.
23            And that's what caused this
24   incident on May 5, I sat on a chair in an
25   attorneys' room that only Tahir could sit
```

```
 1            M.H. Capogrosso
 2   on. That's what happened.
 3      Q      And then what happened?
 4   What did he do? What did you say?
 5      A      He started screaming and
 6   yelling at me. He said I used the word
 7   shit. Actually moved his bag on the
 8   other bench. He was looking at me. He
 9   came in and yelled at me don't touch my
10   bag. Whose is this? I said I'm going to
11   move my bag.
12            He mentioned the chair. I
13   was sitting on his chair. He was upset
14   that I was sitting on his chair. That
15   was the whole deal with this thing. And
16   he tells me not to touch his stuff.
17   Well, I'm sorry, I'm allowed to sit in a
18   chair. You don't own the chair. That's
19   what happened here.
20      Q      Did you call him shit?
21      A      I said eesha. I don't use
22   the word shit. This man uses the word
23   mouther fucker like you don't believe.
24   Ever other time he speaks, it's mother
25   fucker this, mother fucker that. That's
```

83 (Pages 450 - 453)

M.H. Capogrosso

1  acceptable with this attorney to use
2  those words.
3
4          I said the word eesha. I
5  never said the word shit.
6     Q    Mr. Tahir writes that you
7  think -- he thinks that you thought that
8  he was, quote, "an easy and soft target."
9  Did you think that?
10    A    What do you mean, in a
11 boxing gym?  In a box -- I mean an easy
12 and soft target for what?
13    Q    Harassment.
14    A    And easy and soft target?
15 I'm there to do a job.  I'm not there to
16 harass a lawyer.  I sat in his chair.
17 Another paranoid lawyer, an insecure
18 lawyer.  It's his insecurities, not mine,
19 his insecurities.
20        I'm a -- he's a soft target
21 for what?  What am I going -- what am I
22 in a boxing ring with this guy?  We are
23 in a lawyers' -- we are in a lawyers'
24 room.  We are in a courthouse.  He's a
25 soft target?  I don't even know what that

M.H. Capogrosso

1  means.
2     Q    Is Mr. Tahir a big guy or
3  was he?
4     A    He's a frail guy.  He drank
5  a lot.  I was over his apartment.  He
6  drinks like a fish.  He drank a ton.
7     Q    Was he tall, short, fat,
8  skinny --
9     A    He was thin as a rail.
10    Q    -- muscular?
11    A    He was thin as a rail.
12    Q    How tall was he?
13    A    He was about my height, but
14 he was and he liked to drink.  He drank a
15 ton.
16        MR. THOMPSON:  All right.
17    Ms. MacDonald, let me ask you to --
18    A    Before I drove him home, he
19 used to go to the liquor store to pick up
20 liquor.
21    Q    Was Mr. Tahir a practicing
22 Muslim?
23    A    I don't know.  I think he
24 was Muslim, but I don't know if he was

M.H. Capogrosso

1  practicing.  I think he was a Muslim.
2        MR. THOMPSON:  Ms.
3    MacDonald, if I can ask you in case I
4    didn't already to -- (inaudible)
5        MS. REPORTER:  I don't know
6    if you were speaking.  You completely
7    cut out.
8        MR. THOMPSON:  In case you
9    didn't already mark it, I was asking
10   you to mark that document for
11   Mr. Tahir as Exhibit 29.
12       (The above-referred-to
13   statement was marked as Exhibit 29
14   for identification as of this date.)
15    Q    Mr. Capogrosso, can you see
16 the document on the screen now?
17    A    Yes.  That's from Beer,
18 right, on May 5?
19    Q    Do you recognize this
20 document?
21    A    You have to scroll down.
22 Let me read through it.  I've seen this
23 document.  You're going too fast.  Can
24 you go up, please?  You have to let me

M.H. Capogrosso

1  read it.  You're going too fast.
2        I have this.  You're not
3  allowing me to refer to the documents I
4  have, so I have to read it, but you have
5  to -- you have to direct me to what you
6  want me to read.
7        I do reco -- I do recognize
8  the document.
9     Q    Okay.  And what is the
10 document?
11    A    I think it was -- can you
12 see who's the signature on the bottom?
13 Is there a signature on it?
14        It's some type of affidavit
15 against me.  All right.  It's some type
16 of -- it's from Michael beer.  All right.
17 Fine.
18    Q    And this document's marked
19 DMV-0000017; correct?
20    A    Yeah.
21        MR. THOMPSON:  And,
22    Ms. McDonough, let me ask you to mark
23    this as Exhibit 31 and yes, I know we
24    just jumped one.  Sorry about that.

84 (Pages 454 - 457)

```
 1        M.H. Capogrosso
 2        (The above-referred-to
 3   statement was marked as Exhibit 31
 4   for identification as of this date.)
 5   Q    Who is Michael Beer?
 6   A    He's an attorney down there.
 7   Q    Did you have a good
 8   relationship?
 9   A    I mean I knew him. I didn't
10   really talk to him. I didn't talk to a
11   lot of the lawyers. I was there to do my
12   job, that's it.
13   Q    Mr. Beer writes on May 5,
14   2015. which is the same day as the
15   incident with Mr. Tahir, that he came
16   into the attorneys' room and that as soon
17   as he did, "I was verbally accosted with
18   the demand of don't touch my fucking
19   stuff, don't stuff my fucking stuff."
20   A    No. I never said that. I
21   have never said that.
22   Q    You never said that?
23   A    No.
24   Q    Is he lying?
25   A    On that statement, yes. I
```

```
 1        M.H. Capogrosso
 2   would never say that. I always carried
 3   my stuff with me for the most part.
 4   Q    He says that he didn't touch
 5   your stuff. You asked about a camera.
 6   Why did you ask about a camera?
 7   A    There was no camera. There
 8   was no camera, no. I did accuse Smart of
 9   moving -- of tampering with my files. I
10   did do that and he was doing it because I
11   saw them moved when I left them in the
12   attorneys' room and I saw him go in there
13   and do it. I did see that.
14        But I never said anything
15   about putting a camera in the attorneys'
16   room and I never accused Beer. Beer was
17   actually a very nice lawyer. He was a
18   nice guy.
19   Q    He says that you said piece
20   of shit, piece of shit at him, which he
21   heard you state to others many times in
22   the past. Did you say that --
23   A    No.
24   Q    -- on May 5?
25   A    No. I never --
```

```
 1        M.H. Capogrosso
 2   Q    No?
 3   A    I never used the word shit.
 4   If these attorneys would have just asked
 5   me, I would have told them like I'm
 6   telling you what I was saying. I said
 7   cesha. It was never the word shit.
 8        Now if these attorneys would
 9   have just asked me what I was saying
10   under my breath, which I'm allowed to do,
11   I would have explained it to them.
12   Q    So Mr. Beer writes that he
13   did ask you. He said "Excuse me, what
14   did you just say to me" and you responded
15   that "It didn't relate to you. I'm angry
16   at a judge."
17        Do you remember that?
18   A    I might have been angry at a
19   judge's decision. A lot of times we got
20   angry at judge's decisions. I really
21   felt -- you know, I really was very
22   passionate about arguing and winning
23   cases for my clients, I was.
24        Sometimes when I thought a
25   judge really just did a bad job, I was
```

```
 1        M.H. Capogrosso
 2   angry, yeah. I would get angry if a
 3   judge made a bad decision, I really
 4   would.
 5        But if a judge made a good
 6   decision and the cop, you know, did
 7   everything right on the case, it was
 8   fine, we all accepted it. But when I
 9   thought a guy --
10   Q    So did you --
11   A    -- didn't get a fair chance
12   in a courtroom and no matter what you
13   did, I would get angry, of course I
14   would. I really took a very liking to my
15   clients and I felt badly that they lost.
16   I thought they should have won it, so
17   yeah, I was angry.
18        But did I say anything to
19   him, no, I didn't say anything to the
20   man.
21   Q    And you didn't say piece of
22   shit, piece of shit?
23   A    No, not to him. Not to him,
24   not to him.
25   Q    Mr. Beer writes -- Mr. Beer
```

85 (Pages 458 - 461)

1       M.H. Capogrosso
2  writes later that he left the room and
3  that the issue of don't touch my fucking
4  stuff was an ongoing issue all day.
5       Quote, "And I witnessed Mario Capogrosso
6  yelling at Mr. Tahir to not touch his
7  fucking stuff."
8           Does that refresh your
9  recollection at all about --
10  A     No.
11  Q     -- what happened on May 5?
12  A     No. What I remember on
13  May 5 was one thing. I walked in that
14  attorneys' room to sit on a chair. It
15  was at the end of the day, to sit on a
16  chair or maybe I placed my bag on the
17  chair and Tahir said this is my chair and
18  get your stuff off it or don't sit on it,
19  but I know it involved Tahir's chair that
20  nobody was allowed to touch.
21           And maybe I put my bag on
22  the chair for a minute or I sat on the
23  chair for a minute or something to that
24  effect, but that was it and Tahir thought
25  that this chair, he owned the chair in

1       M.H. Capogrosso
2  the room.
3  Q     Mr. Beer writes --
4  A     That's what happened on May
5  5.
6  Q     So you never had an
7  altercation with Mr. Beer?
8  A     Not that I recall, no. Beer
9  was a nice guy. He was a really nice
10  guy.
11  Q     So why -- so you said that
12  he was lying about this. Why would
13  Mr. Beer lie?
14  A     I don't know why. I know
15  what happened that day. I know exactly
16  what happened. There was a chair there.
17  I wanted to sit down in the chair. I
18  wanted to make a phone call. I was
19  tired. Maybe I stood up and put my bag
20  on the chair because there was nowhere
21  else to put the bag. Maybe I was still
22  on the phone and Tahir comes in and gets
23  all upset and maybe Tahir was trying to
24  move my bag, I don't know, off his
25  personal chair because nobody was allowed

1       M.H. Capogrosso
2  to touch his chair.
3           And this is an attorneys'
4  room for all the attorneys, but nobody's
5  allowed to touch his chair or put
6  anything on his chair. So maybe I told
7  Tahir leave my bag alone.
8  Q     Did you --
9  A     But did I use those words,
10  no, I never said that, no.
11  Q     Mr. Beer writes that you
12  started ranting that guy, alluding to
13  Gelbstein, threw out Chuck Willinger and
14  now Chuck Willinger is dead. What does
15  that mean?
16  A     Well, Willinger was an
17  attorney when I first started. I have to
18  read it. Can you go back up?
19  Q     Sure.
20  A     Go back up.
21           Willinger was an attorney.
22  I never said for the judge to put a gun
23  to his head. Willinger was a guy that
24  was a lawyer down at the Brooklyn TVB
25  when I first got there and he had some

1       M.H. Capogrosso
2  issues, Mr. Willinger. To say the least,
3  he had some issues and he wasn't -- he
4  was -- as I understand it, eventually we
5  became friends me and him, as I
6  understand he had issues with drugs, a
7  lot of drugs.
8           And he was making money at
9  the start, but then he got involved with
10  cocaine and he winds up committing
11  suicide. They found him dead on his bed
12  one day.
13  Q     Sorry.
14  A     He wasn't showing up for
15  cases because he was on so much drugs.
16  He wasn't showing up and Gelbstein threw
17  him out because he wasn't showing up for
18  some reason. I don't know why he threw
19  the guy out of the DMV.
20           And he never gave the guy a
21  hearing. Never gave him an opportunity
22  to at least, you know, give him a chance.
23  Q     Is there an entitlement to a
24  hearing if you're thrown out of the DMV?
25  A     Oh, no. It's my personal

```
 1              M.H. Capogrosso
 2   opinion. If you're telling a guy he
 3   can't show up, at least hear his story.
 4   Give him a reason. I don't know if
 5   you're entitled or not, but give the guy
 6   a chance. Give him a fair chance, you
 7   know.
 8       Q      So --
 9       A      I personally covered --
10       Q      -- Mr. Beer -- I'm sorry.
11       A      I covered cases for the guy
12   when he wasn't there. I covered his
13   cases, some of his cases. I tried the
14   best to help the guy out when he wasn't
15   there. You know, he was on drugs, what
16   are you going to do.
17              But at least give the man a
18   chance to, you know, clean up his act,
19   but he threw him out, that's it and
20   then --
21       Q      Mr. Beer --
22       A      But I never said the judge
23   put a gun to his head. That's
24   ridiculous.
25       Q      Well, Mr. Beer writes -- he
```

```
 1              M.H. Capogrosso
 2   doesn't say that you told the judge to
 3   put a gun to his head. He says that you
 4   said that if Judge Gelbstein was a man,
 5   he would put a gun to his head.
 6       A      No. I never said that.
 7   That's absolutely ridiculous. That's a
 8   total lie. That's a lie. First of all,
 9   I don't really give a darn about
10   Willinger. I felt bad for the man, you
11   know, but did I hang out with the guy,
12   no.
13              I mean, you know, he was a
14   lawyer, I was a lawyer. I felt bad for
15   the guy, he was on drugs and he died of
16   suicide, but that was -- you know, he
17   made the decision what to do with his
18   life.
19              Why would I -- why would I
20   tell Gelbstein put a gun to his head?
21   That's ridiculous.
22       Q      Why would Mr. Beer be lying
23   about something like this?
24       A      I don't know. I didn't say
25   that remark. I know Willinger should
```

```
 1              M.H. Capogrosso
 2   have been given a hearing, that's what I
 3   felt, an opportunity to at least give his
 4   position before they threw him out,
 5   especially what happened to me in
 6   December of 2011, right, that's how I
 7   felt.
 8              He should have gave
 9   Willinger at least an opportunity to at
10   least hear his side of the story, but
11   they didn't give him that opportunity so,
12   yeah. I felt bad for the man because I
13   was in the same predicament as he was.
14       Q      Why --
15       A      Did I tell the judge to put
16   a gun to his head, absolutely not.
17       Q      Why were you in the same
18   predicament as Mr. Willinger?
19       A      Because I got thrown out
20   with that guy Brody over there, right, in
21   December 2011 after Brody told me to go
22   fuck myself twice, without a hearing,
23   without anything, without an affidavit,
24   nothing.
25              I felt bad for the guy. I
```

```
 1              M.H. Capogrosso
 2   did feel bad. I covered his cases as
 3   best as I could. I didn't want to see
 4   the guy, but I felt bad for him. He had
 5   a real drug problem this guy. He wound
 6   up dissolute, lost all his money. They
 7   found him dead in his apartment one day.
 8   I felt bad for the man. I truly did. We
 9   are all attorneys. I felt bad for the
10   guy.
11              I didn't tell Gelbstein to
12   put a gun to his head. It's ridiculous.
13   I was in the same predicament as
14   Willinger. They threw me out, too. They
15   gave me no opportunity to respond to
16   anything.
17       Q      Mr. Capogrosso, so we've
18   looked at reports from Tahir and
19   Mr. Beer. I'll represent to you that
20   there are two other reports that
21   corroborate you yelling at people about
22   touching your things and being verbally
23   abusive on this day, May 5, the other two
24   being from Kimberly Rivers and Danielle
25   Calvo.
```

87 (Pages 466 - 469)

Page 470

```
1        M.H. Capogrosso
2          Are they all lying about
3   you?
4    A    Now, Kimberly Rivers would
5   have been -- I don't know. Let's address
6   them one at a time. I told you what
7   happened that day. I told you what
8   happened that day. I was in the
9   attorneys' room, there was a chair in the
10  attorneys' room. I'm telling you what
11  I -- what I recall. Either I sat on the
12  chair or I put my bag on the chair.
13  Tahir thought this is only his chair,
14  that nobody could touch it. He walks in
15  the room, starts moving my -- tells me
16  to -- and I'm sitting in the chair.
17       At some point I might have
18  gotten up and put my briefcase on it and
19  he starts moving my briefcase. I said
20  don't touch my briefcase and he shouldn't
21  have touched it. He shouldn't have
22  touched it. He doesn't own the chair in
23  the lawyers' room. He doesn't own it.
24   Q    So Mr. Capogrosso --
25   A    Now, what would you -- the
```

Page 471

```
1        M.H. Capogrosso
2   man should not have put his hands on my
3   briefcase if that's what he did on that
4   day, but I was in the -- I was either
5   sitting on his chair or my briefcase was
6   on his chair and I'm making a phone call
7   to a client and I'm telling the other
8   lawyer leave my briefcase alone, that I
9   probably said or I was sitting on his
10  chair, which I had a right to do.
11   Q    Mr. Capogrosso, if -- and I
12  know you don't believe that it's true and
13  I know you don't agree, but if everything
14  that these four people said about you was
15  true and you had been yelling and cursing
16  at people about moving your stuff and
17  saying that the judge should put a gun to
18  his head, would those be grounds to expel
19  you from the TVB?
20   A    No. First of all, I'm not
21  going to talk about hypotheticals because
22  none of that that they're saying
23  happened. I told you exactly what
24  happened that day. I'm not going to deal
25  in hypotheticals. I know what happened
```

Page 472

```
1        M.H. Capogrosso
2   that day. I was there. I was there.
3    Q    Let me --
4    A    I know what happened.
5    Q    Let me you ask a question.
6    A    Well, let me ask you a
7   question. Tahir said the word mother
8   fucker throughout the day. He doesn't
9   get removed. He said the word mother
10  fucker to everybody and everyone, every
11  client sometimes. He says mother fucker
12  judge this, he got a bad hearing. He
13  says it all the time.
14       Diantha Fuller cursed me
15  out. She curses. Are they being removed
16  from the Brooklyn TVB, no. No, they're
17  not. So what is their basis? Attorneys
18  curse all the time if it's not on -- they
19  do it at -- they curse all the time down
20  there. I'm sorry --
21   Q    So let me ask you --
22   A    -- but I don't see any other
23  attorney getting thrown out.
24   Q    Mr. Capogrosso, let me ask
25  you the question if I may. I have a
```

Page 473

```
1        M.H. Capogrosso
2   question for you. What conduct or
3   behavior would justify someone being
4   expelled from the TVB?
5    A    I have no idea. I don't
6   know. I didn't verbally abuse anybody.
7   I used the word eesha, eesha.
8    Q    So --
9    A    That's not verbal abuse.
10  Imagine I said stay away from my stuff, I
11  don't think that's verbal abuse. Maybe I
12  sat in somebody's chair. That's not
13  verbal abuse. I didn't threaten anybody
14  with any physical conduct -- with any
15  physical -- with anything.
16   Q    So --
17   A    I didn't threaten anybody.
18   Q    -- Mr. Capogrosso --
19   A    I don't know.
20   Q    You don't know what standard
21  of behavior -- you don't know what
22  infractions would justify someone being
23  expelled from the TVB?
24   A    Well, have the same standard
25  for everybody. Have the same standard
```

88 (Pages 470 - 473)

```
1            M.H. Capogrosso
2   for everybody.
3       Q     I'm not asking about your
4   standard. I'm asking about the TVB's
5   standard.
6       A     I don't know. Ask the TVB.
7   I know I didn't verbally abuse anyone. I
8   abused no one.
9       Q     Let me ask you this, is
10  there --
11      A     I didn't abuse anyone.
12      Q     Is there anything that you
13  could do that would justify your being
14  expelled from the TVB?
15      A     I don't know. You tell me.
16  I don't know. Take -- I'll tell you
17  what, what I would do, if you took a case
18  as a lawyer and you didn't argue that
19  case before the judge and you just took
20  the money and didn't show up, yeah, I
21  would think that would get you removed.
22          That's why I took it very
23  seriously about showing up on every case.
24  When they threw it at -- you know, you
25  didn't show up for a case that you got
```

```
1            M.H. Capogrosso
2   paid on, I think that would be egregious.
3          I think if you bribed a
4   clerk, which the attorneys -- or give
5   money to a clerk, I think that would be
6   egregious and you should be thrown out,
7   absolutely and I saw that or you gave
8   money to a clerk and cash gifts to a
9   clerk because you were seeking favor from
10  that clerk, I think that's a reason.
11          Paying off and bribing
12  clerks, I think that's a reason,
13  absolutely.
14      Q     Do you think that there's
15  anyone else who practiced before TVB who
16  should have been expelled?
17      A     Absolutely.
18      Q     Who?
19      A     Any lawyer who's bribing a
20  clerk, giving a clerk money. I think --
21      Q     Can you name anyone specific
22  who you think should have been expelled?
23      A     Any clerk -- any attorney
24  that's covering cases for Judge Gelbstein
25  I think should be thrown out. I think
```

```
1            M.H. Capogrosso
2   that's totally inappropriate if
3   Gelbstein's got a caseload and there's an
4   attorney covering cases for him.
5       Q     I understand that, but the
6   question was can you name --
7       A     Name anyone?
8       Q     -- anyone by name who should
9   have been expelled?
10      A     Anybody who was paying
11  clerks and giving clerks cash in gifts
12  and buying breakfast to get favor from
13  those clerks, yes.
14      Q     The question is by name --
15      A     By name?
16      Q     -- can you name anyone?
17      A     You have to do your job.
18  I've done my job here. I told you what I
19  saw and I see. That's the Attorney
20  General's job. That's the DMV Inspector
21  General's job. That's not my job.
22          I told you what I saw and
23  what I -- you asked me a very specific
24  question. That would be the reason for
25  expelling somebody, bribing clerks.
```

```
1            M.H. Capogrosso
2   Getting --
3       Q     So just for the record, you
4   have not named anyone.
5       A     How about Judge Gelbstein
6   asking for a piece of the action?
7   Absolutely he should be out. Absolutely
8   he should be out.
9          Ida -- Ida Traschen should
10  be thrown out for not viewing evidence,
11  not viewing evidence.
12          Danielle Calvo should be out
13  for not viewing evidence and saying I
14  pushed Smart when she didn't view the
15  push. Danielle Calvo should be out
16  because she didn't view any evidence.
17          Melanie Levine should be out
18  because she filed a false report. She
19  should be out for filing a false report
20  about me and that could have been very
21  easily investigated.
22          Who else? Smart.
23          Vahdat should be thrown out
24  by giving a false statement that I
25  followed a clerk and stopped him, which
```

89 (Pages 474 - 477)

Page 478

1          M.H. Capogrosso
2  is not what happened because if you asked
3  George Hon, that's a false statement.
4  She should be thrown out because George
5  Hon approached me that afternoon because
6  I was talking to his girlfriend and I
7  told you that.
8         Those are the people who
9  should be thrown out.
10    Q    Anyone else?
11    A    Traschen. Who else did I
12  miss? Vahdat, Gelbstein. Gelbstein for
13  getting a piece of the action, having
14  lunch with ticket brokers and meeting
15  with ticket brokers when he doesn't know
16  what they're doing.
17         The judges -- the lawyers
18  paying off the clerks, giving them money.
19  The clerks accepting the money. The
20  clerks accepting the money. The clerks
21  advising motorists, and I heard this at
22  the DMV, these clerks advising go plead
23  yourself guilty. You're not going to get
24  any points. What are you telling a
25  motorist? A clerk was doing that.

Page 479

1          M.H. Capogrosso
2  Telling a motorist to go plead yourself
3  guilty or you don't need an attorney on
4  this, just go plead yourself guilty.
5         Why is a clerk giving advice
6  to a motorist? That was happening all
7  the time. I would get upset with that.
8         Those are the people who
9  should be thrown out, but -- those are
10  the people, not a hard working attorney
11  who has no complaints by any clients or
12  motorists, no, absolutely not.
13         Tanya Rabinovich should be
14  thrown out. She's calling herself a
15  lawyer and collecting a fee and going to
16  the counter and the clerks are doing
17  business with her. She's rescheduling
18  cases and pleading people guilty at the
19  counter and she's not a lawyer. She
20  should be thrown out.
21         That's who should be thrown
22  out.
23    Q    Well, I have no further
24  questions.
25    A    There you go.

Page 480

1          M.H. Capogrosso
2         MR. THOMPSON: Ms.
3  MacDonald, Mr. Brodsky, is there
4  anything that we should discuss here
5  before we go off the record?
6         MR. VIDEOGRAPHER: If
7  there's any stipulations you want to
8  put on the transcript, you can tell
9  the court reporter.
10         MR. THOMPSON: I think only
11  that we agreed at yesterday's
12  deposition that Mr. Capogrosso would
13  share a copy of those transcripts
14  with me and that I would share a copy
15  of today's with him, correct?
16         Is that right,
17  Mr. Capogrosso?
18         THE WITNESS: Yeah. You're
19  going to send me a copy, I'll send
20  you a copy of what I ordered,
21  absolutely.
22         MR. VIDEOGRAPHER: Then I'll
23  wrap it. Here ends media unit number
24  six --
25         THE WITNESS: I'm sorry.

Page 481

1          M.H. Capogrosso
2  One question to Attorney Thompson.
3  How are you going to send me a copy?
4  Are you going to e-mail it to me or
5  are you going to send me a hard copy?
6         MR. THOMPSON: That's a good
7  question. I actually don't know what
8  format I'm going to get this in.
9         So, Ms. MacDonald, are we
10  going to get digital, hard copy or
11  both?
12         MS. REPORTER: However you
13  want to order it.
14         MR. THOMPSON: That's a good
15  question. I generally much prefer
16  digital. Can I e-mail it to you?
17         MS. REPORTER: I think
18  that's to you, Mario.
19         MR. THOMPSON: Yes.
20  Mr. Capogrosso?
21         THE WITNESS: All right. If
22  you get it digitally, I'll take it
23  digitally, that's it. I'm not going
24  to ask you print it out. If you get
25  it digitally, I'll take it digitally.

90 (Pages 478 - 481)

Page 482

```
 1        M.H. Capogrosso
 2        If I get it by hard copy,
 3   then I'm going to get you a hard copy
 4   back, all right?
 5        MR. THOMPSON: Okay.
 6        THE WITNESS: However I
 7   receive it, I'll give it to you.
 8   However you receive it, you give it
 9   to me. That's all I can do.
10        MR. THOMPSON: Digital is
11   fine by us, so thank you.
12        THE WITNESS: All right.
13        The other question is you
14   said you missed five pages out of one
15   of my exhibits I gave you showing
16   my -- my docket and my monies earned.
17   I have to get you those five pages or
18   if you ask your clerk in your office,
19   I don't think they scanned it in
20   because I didn't omit any pages, but
21   I will check that, all right.
22        MR. THOMPSON: And, you
23   know, again as we did ask if you have
24   any of the contemporary notes from
25   2015 that you referenced, we'd like
```

Page 483

```
 1        M.H. Capogrosso
 2   copies of those as well.
 3        THE WITNESS: All right.
 4   Fine.
 5        MR. VIDEOGRAPHER: Okay.
 6   Then here ends media unit number six.
 7   This concludes the video recorded
 8   virtual remote deposition of Mario H.
 9   Capogrosso taken by the defendants on
10   Friday, December 18, 2020.
11        The time is 5:21 p.m.
12   Eastern Standard Time and we are
13   going off the record.
14
15
16   ---------------------------
17        MARIO H. CAPOGROSSO
18
     Subscribed and sworn to
19
     before me on this _____ day
20
     of _____, 2021.
21
22
23
24        NOTARY PUBLIC
25
```



Page 484

```
 1
 2             INDEX
 3        INDEX TO TESTIMONY
 4                 Page   Line
 5   Examination by Mr    127    6
     Thompson
 6
 7        INDEX TO REQUESTS
 8
                         Page   Line
 9
     The notes          448     7
10
11        INDEX TO EXHIBITS
12
     Description        Page    Line
13
     Exhibit 3          155     3
14   Statement from L. Perez,
     Jr., Bates stamped
15   P-80
16   Exhibit 4          156     23
     Statement of Roy Tucci,
17   Bates stamped P-82
18   Exhibit 5          163     2
     Statement of Marisol
19   Cervoni, Bates stamped
     P-84
20
     Exhibit 6          194     10
21   Statement of Diantha
     Fuller, Bates stamped
22   P-86
23   Exhibit 7          210     10
     Statement with a list of
24   signatures, Bates
     stamped DMV-000024
25
```

Page 485

```
 1             Index
 2   Exhibit 8          228     16
     Statement of Yaakov
 3   Brody, Bates stamped
     P-92
 4
     Exhibit 9          252     3
 5   Statement of Richard F
     Maher, Bates stamped
 6   P-250
 7   Exhibit 10         266     9
     Statement of M. Sadiq
 8   Tahir, Bates stamped
     P-96
 9
     Exhibit 11         280     14
10   Statement of Jeffrey A
     Meyers, Bates stamped
11   P-248
12   Exhibit 12         291     8
     Statement of Bushra
13   Vahdat, Bates stamped
     DMV-0000224
14
     Exhibit 13         311     10
15   Letter dated January 25,
     2012 to Ms. Esala from
16   Chris McDonough, Bates
     stamped DMV-0000226
17
     Exhibit 16         326     19
18   Letter dated May 15,
     2012 to Chris
19   McDonough and
     Jacqueline A. Rappel
20   from Serwat Farooq,
     Bates stamped
21   DMV-0000205
22   Exhibit 17         127     18
     Report from John J
23   McCann, PhD dated June
     11, 2012, Bates
24   stamped P-28 and P-29
25   Exhibit 19         333     7
     Letter dated June 20
```

91 (Pages 482 - 485)

Page 486

```
        Index
 1
 2  2012 to Jacqueline A
    Rappel from Serwat
 3  Farooq, Bates stamped
    P-143
 4
    Exhibit 18      338    19
 5  Stipulation of
    Discontinuance
 6
    Exhibit 20      343    16
 7  Report of Workplace
    Violence Incident
 8
    Exhibit 21      348    22
 9  Statement of Wanda
    Alford, Bates stamped
10  DMV-0000061
11  Exhibit 22      359     4
    Note of David Smart,
12  Bates stamped
    GELB-0000059
13
    Exhibit 23      360     3
14  Statement of Paul Perez,
    Bates stamped
15  GELB-0000058
16  Exhibit 24      372     8
    Statement of Melissa
17  Vergara, Bates stamped
    DMV-0000059
18
    Exhibit 25      376    14
19  Report of Workplace
    Violence Incident
20
    Exhibit 26      396    17
21  E-mail from Gen Paparo
    to Alan Gelbstein,
22  Bates stamped
    GELB-0000035
23
    Exhibit 27      407    23
24  Memo to File from
    Diantha Fuller, Bates
25  stamped DMV-0000001
```

Page 487

```
        Index
 1
 2  Exhibit 28      408    16
    Letter dated March 20,
 3  2015 to Elizabeth
    Prickett-Morgan from
 4  Mario Capogrosso,
    Bates stamped P-41 and
 5  P-42
 6  Exhibit 29      456    13
    Statement of M. Sadiq
 7  Tahir, Bates stamped
    DMV-0000016
 8
    Exhibit 31      458     2
 9  Statement of Michael E.
    Beer, Bates stamped
10  DMV-0000017
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 488

```
 1
 2      C E R T I F I C A T I O N
 3
 4      I, LISA H. MACDONALD, a Registered
 5  Professional Reporter and a Notary
 6  Public, do hereby certify that the
 7  foregoing witness, MARIO H. CAPOGROSSO,
 8  was duly sworn on the date indicated, and
 9  that the foregoing is a true and accurate
10  transcription of my stenographic notes.
11      I further certify that I am not
12  employed by nor related to any party to
13  this action.
14
15
16
17
18          LISA H. MACDONALD, RPR
19
20
21
22
23
24
25
```

Page 489

```
 1
 2      ERRATA SHEET
        VERITEXT/NEW YORK REPORTING, LLC
 3         1-800-727-6396
 4  330 Old Country Road   1250 Broadway
    Mineola, NY 11501    New York, NY 10001
 5
    NAME OF CASE:  Capogrosso v Gelbstein
 6  DATE OF DEPOSITION: December 18, 2020
    NAME OF DEPONENT:  Mario H. Capogrosso
 7
 8  PAGE LINE (S) CHANGE     REASON
 9  ___ ___|___|___ ____ _____
10  ___ ___|___|___ ____ _____
11  ___ ___|___|___ ____ _____
12  ___ ___|___|___ ____ _____
13  ___ ___|___|___ ____ _____
14  ___ ___|___|___ ____ _____
15  ___ ___|___|___ ____ _____
16  ___ ___|___|___ ____ _____
17  ___ ___|___|___ ____ _____
18  ___ ___|___|___ ____ _____
19  ___ ___|___|___ ____ _____
20
21      MARIO H. CAPOGROSSO
22
    SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS    DAY OF _____ , 20__
24  _____
25  (NOTARY PUBLIC)  MY COMMISSION EXPIRES
```