# EXHTBIT Q

December 17, 2020

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
MARIO H. CAPOGROSSO,

PLAINTIFF,

-against-    Case No.:
18 CV 2710 (EK) (LB)

ALAN GELBSTEIN, in his individual capacity,
IDA TRASCHEN, in her individual capacity,
DANIELLE CALVO, in her capacity, SADIQ
TAHIR, in his individual capacity. PEC
GROUP OF NY, INC., DAVID SMART, and DMV
COMMISSIONER MARK SCHROEDER, in his
official capacity,
DEFENDANTS.
-------------------------------------X
DATE:  December 17, 2020
TIME:  1:24 P.M.

DEPOSITION of the Defendant,
DANIELLE CALVO, taken by the Plaintiff,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held VIA ZOOM
VIDEOCONFERENCE, before Jamie Newman, a
Notary Public of the State of New York.

## Page 2

APPEARANCES:

THE LAW FIRM OF MARIO H. CAPOGROSSO
PLAINTIFF PRO SE
21 Sheldrake Place
New Rochelle, New York 10804
Capogrossom@aol.com

OFFICE OF THE NEW YORK STATE ATTORNEY
GENERAL
Attorneys for the Defendants
ALAN GELBSTEIN, in his individual
capacity, IDA TRASCHEN, in her individual
capacity, DANIELLE CALVO, in her
capacity, SADIQ TAHIR, in his individual
capacity, PEC GROUP OF NY, INC., DAVID
SMART, and DMV COMMISSIONER MARK
SCHROEDER, in his official capacity
28 Liberty Street, 17th Floor
New York, New York 10005
BY: JAMES THOMPSON, ESQ.
james.thompson@ag.ny.gov

DMV LEGAL BUREAU
Attorneys for the Defendant
DMV COMMISSIONER MARK SCHROEDER, in his
official capacity
6 Empire State Plaza, Room 522A
Albany, New York 11228
BY: BARBARA MONTENA, ESQ.
File #: 18CV2710
barbara.montena@shnv.nyc.gov

* * * *

## Page 3

2    (Whereupon, all 86 exhibits
3    were previously marked by Counsel,
4    Mark Capogrosso.
5    D A N I E L L E   C A L V O, called as a
6    witness, having been first duly sworn by a
7    Notary Public of the State of New York, was
8    examined and testified as follows:
9    EXAMINATION BY
10   MR. CAPOGROSSO:
11   Q.   Please state your name for the
12   record.
13   A.   Danielle Calvo.
14   Q.   What is your address?
15   A.   9952 Fort Hamilton Parkway,
16   Brooklyn, New York 11209.
17   Q.   All right.
18        Mario Capogrosso, I'm just
19   going to ask you a couple of questions. I
20   just want the truth, I want to get to the
21   truth.
22        Now, you had me removed, you
23   came to me on the morning of May 11, 2015
24   at the Brooklyn TVB and you asked me to
25   leave in the presence of police officers.

## Page 4

1         Danielle Calvo
2         Am I right in saying that?
3    A.   That's correct.
4    Q.   Who told you to do that?
5    A.   I was told by my supervisors.
6    Q.   Which supervisor?
7    A.   I was told by Ida Traschen.
8    Q.   On the morning of May 11, 2015?
9    A.   What is --
10        MR. THOMPSON:  Is that a
11   question?
12   Q.   On the morning of May 11, 2015
13   you had a telephone conversation with Ida
14   Traschen?
15   A.   If that is the day you were
16   asked to leave?  Yes.
17   Q.   Now, for what reason did you
18   have me removed?
19   A.   It wasn't my decision, it was
20   my supervisor's decision.
21   Q.   It was Ida Traschen's decision?
22   A.   Yes.
23   Q.   Now, what made you have -- who
24   called whom, did Ida Traschen call you or
25   you called Ida Traschen?

1  (Pages 1 to 4)

December 17, 2020

Page 5

Danielle Calvo

1
2       A.   I was directed to call her.
3       Q.   By whom?
4       A.   Judge Gelbstein.
5       Q.   Was Judge Gelbstein in the
6   building that morning?
7       A.   No, he was not.
8       Q.   Did you view any of the
9   videotape of the alleged incident between
10  myself and Defendant Smart?
11          MR. THOMPSON: Objection to the
12      form of the question. You can
13      answer.
14      A.   Not that I recall, no.
15      Q.   How did you get notice of the
16  fact that there was an incident between
17  myself and Defendant Smart?
18      A.   Someone came into the office
19  and told me.
20      Q.   Who?
21      A.   I don't recall who.
22      Q.   Was it Defendant Smart?
23      A.   I don't recall.
24      Q.   And based on their testimony to
25  you, you decided that there was an incident

Page 6

Danielle Calvo

1
2   and an altercation between myself and
3   Defendant Smart?
4          MR. THOMPSON: Objection to the
5      form of the question. You can
6      answer.
7       A.   I didn't decide anything. I
8   just called Judge Gelbstein and let him
9   know what happened and then that was it.
10      Q.   But, you didn't observe what
11  happened; right?
12      A.   No, I did not.
13      Q.   And you didn't look at any
14  videotape; right?
15      A.   Not that I recall, no.
16      Q.   And you had the ability to look
17  at the videotape, but you didn't?
18      A.   I don't know if that incident
19  was videotaped. I don't know what position
20  on the floor it happened, so I couldn't
21  say.
22      Q.   You're taking somebody's
23  witness -- some witness observation as to
24  what happened as to the truth; right?
25          MR. THOMPSON: Objection to the

Page 7

Danielle Calvo

1
2   form of the question, you can answer.
3       A.   I didn't make any decision
4   whether it was the truth or not, I just
5   reported what I was told.
6       Q.   By some person you don't know
7   their name?
8       A.   I don't remember, no.
9       Q.   Can you tell me exactly what
10  that person said to you, exact nature of
11  that conversation, the exact words used?
12      A.   I can't tell you the exact
13  words, no.
14      Q.   But, based on that testimony,
15  you made a decision to call Judge
16  Gelbstein; is that right?
17      A.   Yes.
18          MR. THOMPSON: Objection to the
19      form of the question. You can
20      answer.
21      Q.   And Judge Gelbstein made a
22  decision to call who, to call Ida Traschen?
23      A.   Judge Gelbstein told me to call
24  Ida Traschen.
25      Q.   And based on that observation

Page 8

Danielle Calvo

1
2   -- based on that testimony from a
3   third-party, I was removed from the
4   practice of law in all New York TVBs?
5      Is that fair?
6          MR. THOMPSON: Objection to the
7      form of the question. You can
8      answer.
9       A.   At that time I had no idea what
10  was going to happen, I was just reporting
11  to my supervisor what I was told.
12      Q.   And you don't recall what you
13  were told exactly?
14      A.   No.
15          MR. THOMPSON: Objection, asked
16      and answered.
17      Q.   You don't recall the alleged
18  incident or what was said concerning the
19  incident?
20          MR. THOMPSON: Same objection.
21      Q.   Did you ever talk to Defendant
22  Smart concerning the incident?
23      A.   I don't recall if I had any
24  particular conversation with him afterwards
25  or during, but I'm sure we did at some

2  (Pages 5 to 8)

December 17, 2020

| Page 9 | Page 11 |
|---|---|

**Page 9**

Danielle Calvo

1
2 point.
3      Q.   So, you never asked him what
4 was the nature of the incident between
5 myself and him, as to what factually
6 occurred?
7           MR. THOMPSON:  Objection to the
8 form of the question.  You can
9 answer.
10     A.   I may have asked him at the
11 time, but I don't recall what he said to me
12 or...
13     Q.   Did you ask him before I was
14 removed, or after I was removed?
15     A.   I don't know.
16     Q.   You don't know.
17          Did you ever ask me as to what
18 happened concerning that alleged incident?
19     A.   I don't remember having any
20 conversation with you, no.
21     Q.   You don't recall the
22 particulars of the incident, you don't
23 recall talking to Defendant Smart
24 concerning the incident, and you didn't
25 talk to me concerning the accident.

**Page 10**

Danielle Calvo

1
2      Yet you make a phone call to
3 Defendant Gelbstein concerning the incident
4 who tells you to call Ida Traschen
5 concerning the incident; is that fair to
6 say?
7           MR. THOMPSON:  Object to the
8 form, you can answer.
9     A.   Yes.
10     Q.   And as a result of that phone
11 call, I'm not allowed to practice at the
12 New York TVB, you know that; right?
13          MR. THOMPSON:  Objection to the
14 form, you can answer.
15     A.   I was not aware at that moment
16 that that was what was going to happen, but
17 I am aware of that afterwards, yes.
18     Q.   Did you approach me on the
19 afternoon of May 8th in the attorneys' room
20 in the presence of the Defendant Gelbstein,
21 did you and him approach me in the
22 afternoon of May 8, 2015?
23     A.   I don't know if we did or not.
24     Q.   Do you recall Defendant
25 Gelbstein saying to me, "I read what you

**Page 11**

Danielle Calvo

1
2 wrote about me, that I'm complicit,
3 incapable and incompetent, can't you go
4 practice somewhere else."
5      Do recall that statement by
6 Defendant Gelbstein?
7     A.   No, I do not.
8     Q.   Do you have any knowledge as to
9 whether Defendant Gelbstein or Ida Traschen
10 had Defendant Smart approach me on the
11 morning of May 11, 2015?
12     A.   No, I do not.
13     Q.   Are you privy or knowledgeable
14 of the letter that I wrote to the attorney
15 general's office on March 20, 2015, were
16 you knowledgeable about that?
17          MR. THOMPSON:  Objection to the
18 form, you can answer.
19     A.   I did know about it.  I don't
20 know if I ever saw it or who told me about
21 it, but I was aware that something was
22 written.
23     Q.   Did you ever read it?
24     A.   To my knowledge, I don't
25 remember.

**Page 12**

Danielle Calvo

1
2      Q.   Were you knowledgeable of any
3 of the complaints I had against Defendant
4 Smart at the Brooklyn TVB that I followed
5 with Defendant Gelbstein, were you
6 knowledgeable of any of those complaints?
7     A.   I know you made a lot of
8 complaints about a lot of different people,
9 particularly and specifically, no.
10     Q.   I only make complaints about
11 Defendant Smart.
12          The only thing that was in
13 writing was to Defendant Smart and I'm
14 asking very specifically, did you have any
15 knowledge of any of those complaints?
16          MR. THOMPSON:  Objection, asked
17 and answered.  You can answer.
18     A.   I don't recall specifically,
19 but I may have known at the time.
20     Q.   Did you have supervisory
21 authority over the actions of Defendant
22 Smart at the Brooklyn TVB?
23          MR. THOMPSON:  Objection to the
24 form.  You can answer.
25     A.   To some extent we could ask him

3  (Pages 9 to 12)

December 17, 2020

Page 13

Danielle Calvo

1   Danielle Calvo
2   to do certain things, but he worked for an
3   outside company.
4       Q.   So, who did he report to on a
5   daily basis?
6       A.   He had to call into his office
7   every morning and he submitted his time
8   cards to them, but we had to know he was
9   there.
10      Q.   Who governed his day-to-day
11  activities at the Brooklyn TVB?
12          MR. THOMPSON:  Objection to the
13      form.  You can answer.
14      A.   We would tell him what we
15  wanted done as far as opening, closing.
16  Things like that.
17      Q.   You governed his day-to-day
18  activities?
19          MR. THOMPSON:  Same objection.
20      Q.   Clerical staff, the clerical
21  supervisors governed his day-to-day
22  activities; is that correct?
23          MR. THOMPSON:  Same objection.
24      A.   To some extent, yes.
25      Q.   And did you receive complaints

Page 14

Danielle Calvo

1   Danielle Calvo
2   with respect to Defendant Smart, did they
3   go to your office as a clerical supervisor?
4           MR. THOMPSON:  Object as to
5       form.  You can answer.
6       A.   It depends on who the complaint
7   was made to specifically.
8       Q.   If I submitted a complaint to
9   Defendant Gelbstein, would become
10  knowledgeable of it and have authority to
11  act upon it?
12      A.   If you made the complaint to
13  him, he may have told me about them, yes,
14  but if you made it to him, then it would be
15  up to him to make any decisions.
16      Q.   Now, in June of 2012 Defendant
17  Smart pushed me from behind, assaulted me
18  from behind reaching for my cell phone.
19          Were you aware of that complaint
20  that I filed with Defendant Gelbstein, were
21  you aware of that?
22          MR. THOMPSON:  Objection to the
23      form.
24      A.   Not that I recall, but it's
25  possible at the time I did.

Page 15

Danielle Calvo

1   Danielle Calvo
2       Q.   Did you take any action and
3   response to it?
4       A.   Not that I remember.
5       Q.   So, you didn't try to curtail
6   that threat or respond to it in any way?
7           MR. THOMPSON:  Object to the
8       form, you can answer.
9       A.   I don't know if I knew about it
10  and I don't know if I did, if I spoke to
11  him or not.
12      Q.   In December of 2014 Defendant
13  Smart stood up from where he was sitting,
14  pointed directly at me with a spear hand
15  and gave me the sign of the cross.
16          Were you aware of that
17  complaint that I filed with Defendant
18  Gelbstein?
19          MR. THOMPSON:  Objection to the
20      form.  You can answer.
21      A.   I don't recall.
22      Q.   Do you recall reviewing any
23  videotape with respect to that complaint?
24      A.   No, I don't recall.
25      Q.   Did you take any action in

Page 16

Danielle Calvo

1   Danielle Calvo
2   response to that complaint?
3       A.   That I don't recall.
4       Q.   In June of 2012, Defendant
5   Smart -- between December 11, 2011 and
6   December 12, 2012, Defendant Smart stole
7   $80 on a $150 fee.
8           Were you aware of that, that he
9   stole $80 on a fee that was owed to me?
10          MR. THOMPSON:  Object to the
11      form, you can answer.
12      A.   No, I was not.
13      Q.   Did you take any action in
14  response to that complaint that I made to
15  Defendant Gelbstein concerning that theft?
16      A.   I don't recall.
17      Q.   Was there an investigation made
18  by your office, the clerical -- you, as a
19  supervisor, with respect to that theft?
20      A.   I don't recall.
21      Q.   I made complaints to Defendant
22  Gelbstein concerning that Defendant Smart,
23  after I reported this theft, would get in
24  my face, within several inches of my face
25  and I would ask him what was the problem

4  (Pages 13 to 16)

December 17, 2020

## Page 17

```
 1              Danielle Calvo
 2    and he would respond "fuck you, you are the
 3    problem."
 4              Did you investigate any of
 5    those complaints?
 6        A.   I don't recall.
 7        Q.   So, pretty much Defendant Smart
 8    was given carte blanche to act as he wanted
 9    to in the Brooklyn TVB with respect to your
10    office?
11              MR. THOMPSON:  Objection to the
12        form of the question.  You can
13        answer.
14        Q.   You took no action and response
15    to any of the threats of violence or
16    harassment by Defendant Smart with respect
17    to my person; is that fair to say?
18              MR. THOMPSON:  Same objection,
19        you can answer.
20        A.   I don't recall what was done
21    about any of those incidents.
22        Q.   I'm asking if you took any
23    response, you made --
24        A.   I don't remember.
25        Q.   So, you gave Defendant Smart
```

## Page 18

```
 1              Danielle Calvo
 2    carte blanche, freedom, to act the way he
 3    wanted to act; is that fair?
 4              MR. THOMPSON:  Objection, asked
 5        and answered.  Argumentative.  You
 6        can answer.
 7        A.   No, I did not.
 8        Q.   Who is in control of the
 9    videotape at the Brooklyn TVB?
10              MR. THOMPSON:  Object to the
11        form, you can answer.
12        A.   The cameras themselves -- um --
13    the monitor was in the back office.  There
14    was no tape, it was directly to some type
15    of hard drive.
16        Q.   Did you request that any of the
17    videotape of May 11th be preserved or kept?
18        A.   Not that I recall.
19        Q.   So, you kept none of the
20    evidence that would have shown the alleged
21    alteration between myself and Defendant
22    Smart on May 11, 2015?
23              MR. THOMPSON:  Objection to the
24        form of the question.  You can
25        answer.
```

## Page 19

```
 1              Danielle Calvo
 2        A.   Can you repeat that, I didn't
 3    understand?
 4        Q.   You made no attempt to keep or
 5    preserve that evidence, that videotape of
 6    the alleged altercation between myself and
 7    Defendant Smart?
 8              MR. THOMPSON:  Same objection.
 9        A.   I don't know if it was
10    videotaped and I don't recall what was --
11    there is no way for me to keep or erase
12    anything on there, unless someone would
13    have told us how to do it.
14        Q.   So, you made no attempt to
15    preserve it, you didn't make any phone
16    calls to the security people who monitor
17    these cameras to preserve that evidence,
18    did you?
19              MR. THOMPSON:  Objection to the
20        form.
21        A.   Not that I know of.
22        Q.   Did you ever view that
23    videotape of the alleged incident between
24    myself and Defendant Smart?
25        A.   Not that I recall.
```

## Page 20

```
 1              Danielle Calvo
 2        Q.   Did you observe Defendant
 3    Gelbstein viewing that videotape in your
 4    presence?
 5              MR. THOMPSON:  Objection to the
 6        form.  You can answer.
 7        A.   Not that I recall.
 8        Q.   Did you ever observe Ida
 9    Traschen observe that videotape in your
10    presence?
11        A.   No.
12        Q.   Now, there were many complaints
13    written against me and my office while I
14    was there at Brooklyn TVB by the clerical
15    staff at the Brooklyn TVB.
16              Is that fair to say -- is that
17    a fair statement?
18        A.   Yes.
19        Q.   Is that a fair statement, they
20    didn't like me?
21        A.   I can't say what they felt
22    about it, I can only speak for myself.
23        Q.   Well, they made many complaints
24    about me, that's fair, I mean, I have them.
25    They were all kept by Defendant Gelbstein,
```

5  (Pages 17 to 20)

December 17, 2020

Page 21

1    Danielle Calvo
2    they were all made by clerks, some by
3    attorneys, one by a judge at the Brooklyn
4    TVB and the clerks were under your
5    supervision; right?
6         MR. THOMPSON: Object to the
7    form of the question, it's compound.
8    You can answer.
9    A.   The clerks were under my
10   supervision, but I did not ever tell them
11   what to write.
12   Q.   But, you were privy to the
13   complaints they made against me; am I
14   right?
15   A.   I'm sure I was at that time,
16   yes.
17        MR. THOMPSON: Objection.
18   Q.   Did you investigate at any
19   point the voracity or truthfulness of any
20   of these complaints?
21   A.   I may have, I don't know.
22   Q.   You don't know.
23        So, you don't know whether
24   they're truthful or not; is that a fair
25   statement?

Page 22

1    Danielle Calvo
2         MR. THOMPSON: Objection to the
3    form. You can answer.
4    A.   It depends on what exactly
5    we're talking about, I don't know.
6    Specific incidents? I don't remember
7    specific incidents, but in general, I know
8    that there was many times that there was
9    problems.
10   Q.   Well, tell me one of the
11   problems, please, tell me one; I want you
12   to tell me one?
13        MR. THOMPSON: Is that a
14   question?
15   Q.   Yeah, tell me one of the
16   problems that you experienced with me and
17   your clerical staff, tell me one?
18   A.   That you would get aggressive
19   with them, yelling at them.
20   Q.   Who, who, tell me who?
21   A.   I can't name specific names,
22   you had a problem with everyone.
23   Q.   Well, tell me who, can you name
24   one; can you name one and tell me a
25   specific date and a specific instance, tell

Page 23

1    Danielle Calvo
2    me --
3    A.   I can't. I can't give you --
4         MR. THOMPSON: Objection to the
5    form of answer. You can answer.
6    A.   I can't give you a specific
7    time or incident, but I remember speaking
8    to you personally myself, asking you that
9    if you had a problem with any of the
10   clerks, to come speak to me directly as a
11   supervisor and I told you that many times.
12   Q.   I never had a problem with any
13   of your clerks, never.
14   A.   Excuse me?
15   Q.   Your clerks had a problem with
16   me, they didn't like me. I'll get into
17   that, but you can't give me one specific
18   instance and one specific occurrence?
19        MR. THOMPSON: Object to the
20   form, asked and answered.
21   Q.   Can you give me one specific
22   instance of where I verbally abused one of
23   your clerks, the date, the time and exactly
24   what I said, I'd like to know?
25   A.   No, I can't.

Page 24

1    Danielle Calvo
2    Q.   Are you familiar with
3    corruption at the New York TVB, are you
4    familiar corruption and allegations of
5    corruption at the New York TVBs?
6         MR. THOMPSON: Objection to the
7    form of the question, you can answer.
8    A.   No.
9    Q.   You're not.
10        Let me direct you to Exhibit 4.
11   Let me show you Exhibit 4.
12        (Whereupon, Plaintiff's Exhibit
13   4, previously marked, was
14   introduced.)
15   Q.   Are you familiar with this
16   article, DMV clerk accused of taking bribes
17   for years in ticket fixing schemes.
18        Do you have any knowledge of
19   this article?
20   A.   It does not look familiar, no.
21   Q.   Are you familiar with ticket
22   fixing schemes at the TVB in New York?
23   A.   Am I? No, I'm not.
24   Q.   As a clerical supervisor,
25   you're not familiar with the clerks taking

6 (Pages 21 to 24)

December 17, 2020

---

## Page 25

Danielle Calvo

1  Danielle Calvo
2  bribes to fix tickets?
3      A.   No.  If I was aware of that, I
4  would have turned them in.
5      Q.   Let me read a couple of
6  statements out of this article that I
7  found, this investigation that I made.
8          Directing your attention to the
9  first paragraph which reads, "my
10 investigation found a Traffic Violation
11 Bureau mired in corrupt practices, from
12 public employees taking cash in fixing
13 tickets from attorneys offering clerks
14 improper payments in gifts to garner new
15 clients all under woefully deficient direct
16 oversight Inspector General, IG, Leahy
17 Scott."
18         Are aware of such allegations
19 at the TVB?
20         MR. THOMPSON:  Objection to the
21 form of the question.
22     Q.   Are you aware of such ticket
23 fixing complaints at the TVB?
24     A.   No.
25     Q.   Are you aware that clerks

## Page 26

1  Danielle Calvo
2  received money in gifts from --
3      A.   No, if I was aware of that I
4  would --
5          MR. THOMPSON:  Same objection.
6      A.   -- have reported them.
7      Q.   That same report, if you go up
8  to Page 2.  And I'll direct your attention
9  to the fourth paragraph down, "Alexis,
10 Eddie and one former clerk were also
11 accused of steering motorists to certain
12 defense lawyers in exchange for cash or
13 meals.  Officials said they often texted or
14 called attorneys throughout the day --
15 workday to make the referrals."
16         Are you aware of such
17 allegations?
18     A.   This does not stay Brooklyn
19 South TVB, this says Northern Manhattan
20 Traffic Violation.
21     Q.   I understand, but at the TVB in
22 general, are you aware of such things going
23 on; are you aware of it?
24     A.   No.
25     Q.   You're a supervisor of clerks,

## Page 27

1  Danielle Calvo
2  you're not aware of clerks receiving gifts
3  in cash?
4      A.   If I --
5          MR. THOMPSON:  Objection.
6          Object to the form.  Objection, asked
7          and answered.  You can answer.
8      A.   If I was aware, I would have
9  reported them.  I don't do illegal things,
10 so...
11     Q.   Were there attorneys giving
12 gifts in money and meals to your clerks at
13 the TVB?
14     A.   Not that I know of, no.
15     Q.   Jeffrey Zift (phonetic) wasn't
16 buying your clerks lunch and breakfast in
17 the morning?
18     A.   If they were, then I was not
19 told of it.
20     Q.   And attorneys weren't giving
21 them money in cash for Christmas, was that
22 happening?
23     A.   Not that I was aware of, no.
24     Q.   Was there a clerk doing work
25 for another attorney and would do work for

## Page 28

1  Danielle Calvo
2  him?
3      A.   That should not have not
4  occurred and if it did, and I did not know
5  about it.
6      Q.   Well, I was privy to all of
7  this.  The attorneys were asking me how
8  much money was I giving the clerks this
9  Christmas, I said none.
10         But you weren't aware of any of
11 that, money going back and forth?
12         MR. THOMPSON:  Objection to the
13 form of the question.
14     A.   No.
15     Q.   Were there parties given for
16 the clerks by certain attorneys?
17     A.   I wouldn't -- sometimes at
18 Christmas Judge Gelbstein allowed them to
19 not give a party, but like contribute to
20 the Christmas party they were also allowed
21 to attend.
22     Q.   Did Terry Kalker give parties
23 for the clerks during the holidays?
24     A.   I believe she was one of the
25 people who supplied Kosher food items to

7 (Pages 25 to 28)

Page 29

Danielle Calvo

1
2  holiday parties.
3       Q.   So, she was supplying meals to
4  your clerks?
5       A.   I wouldn't say it was --
6            MR. THOMPSON:  Objection.
7       A.   -- a day-to-day occurrence, it
8  was allowed.
9       Q.   And were those attorneys given
10  preferential treatment?
11      A.   No, they were not.
12      Q.   They were not.
13           Did you think that there was an
14  appearance -- that it was improper for your
15  clerks to receive money, cash, meals --
16           MR. THOMPSON:  Object to the
17      form of the question.
18      Q.   -- by attorneys, was it
19  improper; was it an improper act for your
20  clerks to receive such gratuities?
21           MR. THOMPSON:  Same objection.
22      A.   If I would have known about
23  them receiving any gratuities or anything
24  improper, I would have reported it.
25      Q.   All right.

Page 30

Danielle Calvo

1
2       Let me direct your attention to
3  Exhibit 35, lets go through some of these
4  complaints by your clerks.  Actually, Can
5  we go to Exhibit 6 -- it's not Exhibit 6.
6  Give me one minute.  Exhibit 11.
7           (Whereupon, Plaintiff's Exhibit
8      11, previously marked, was
9      introduced.)
10      Q.   Directing your attention to
11  this exhibit, Exhibit 11.
12           Is Danielle there?
13      A.   Yes.
14      Q.   All right, fine.
15           Are you familiar with this
16  exhibit?
17      A.   I don't know if I've seen this
18  before or not.
19      Q.   Well, it's telling you that I
20  have to restrain from threatening conduct.
21           Can you tell me what
22  threatening conduct I exhibited towards
23  your clerks, can you tell me exactly what I
24  did?
25           MR. THOMPSON:  Objection to the

Page 31

Danielle Calvo

1
2  form.
3       Q.   I was given this letter in June
4  of 2012, can you tell me what the
5  threatening conduct I ever exhibited with
6  one of your clerks?
7            MR. THOMPSON:  Same objection,
8       you can answer.
9       A.   It's not up to me to decide
10  what is threatening conduct.  If they feel
11  like they were threatened, then they
12  reported it.  If not...
13      Q.   Well, what threatening conduct
14  was ever reported to you by one of your
15  clerks, tell me?
16      A.   I don't recall specific
17  incidents.
18      Q.   Tell me what verbal threat of
19  physical violence I ever made to one of
20  your clerks, can you tell me the date and
21  time I made it?
22           MR. THOMPSON:  Objection, asked
23      and answered.
24      Q.   Tell me one time I verbally
25  abused one of your clerks, the date, the

Page 32

Danielle Calvo

1
2  time, the occurrence, exactly what I said?
3            MR. THOMPSON:  Objection.
4       A.   No, I cannot tell you that.
5       Q.   Can you tell me what ethnic
6  slur I ever made with respect to one of
7  your clerks?
8            MR. THOMPSON:  Same objection,
9       you can answer.
10      A.   I can't tell you specifically
11  any incident, date, time.  I don't have
12  that information.
13      Q.   They didn't like me because I
14  wasn't buying them presents or buying them
15  meals or giving them cash for the holidays.
16           Would that be a fair statement?
17      A.   No, I would say not.
18           MR. THOMPSON:  Objection to the
19      form of the question.
20      Q.   So, tell me the reasons they
21  didn't like me?
22      A.   I can't tell you, I can only
23  speak for myself.
24      Q.   Did you ever make an
25  investigation to any of these complaints

8  (Pages 29 to 32)

December 17, 2020

**Page 33**

Danielle Calvo

1
2 against me by your clerks?
3      A.   If I did, I don't recall, but I
4 may have.
5      Q.   Can you tell me the results of
6 that investigation?
7      A.   I can't tell you because I
8 don't recall.
9      Q.   But, those complaints of
10 misconduct were used to get me removed from
11 the Brooklyn TVB and from all TVBs; is that
12 fair to say?
13      MR. THOMPSON:  Objection to the
14 form of the question.  You can
15 answer.
16      A.   I can't say that what -- they
17 were incidents that they reported.  They
18 were -- there was not a specific reason why
19 that they reported them.  They felt that it
20 was an incident, so I can't say why they
21 reported it or not.
22      Q.   But, they were all used against
23 me and they were all used against me to
24 have me removed and you made no
25 investigation as to whether they were true

**Page 34**

Danielle Calvo

1
2 or not; is that fair?
3      MR. THOMPSON:  Objection.
4      A.   I didn't say that, I said I
5 don't recall.
6      Q.   You gave me no opportunity to
7 respond to any of these complaints; right?
8      A.   I don't recall.
9      MR. THOMPSON:  Objection to the
10 form.
11      Q.   Now, you didn't like me either
12 at the Brooklyn TVB; is that fair, you
13 wanted me out of there?
14      A.   You were a problem and I felt
15 that you threatened the staff, yes.
16      Q.   You wanted me removed; right?
17      A.   But it was not my decision in
18 any form because you would have been out
19 way sooner.
20      Q.   But you wanted me out of there,
21 didn't you?
22      A.   I wanted you to stop what you
23 were doing and if you could have stopped,
24 then you wouldn't have had to be...
25      Q.   Stop what, tell me exactly what

**Page 35**

Danielle Calvo

1
2 I did?
3      A.   Aggressive behavior.
4      Q.   Tell me the aggressive
5 behavior, tell me what I did?
6      A.   I can't give you specific
7 instances.  You were argumentative,
8 yelling, always aggressive, always
9 complaining.  We didn't have this many
10 problems with anyone else.  So I can't tell
11 you specific incidents.  You have the
12 reports, so you must know what they are.
13      Q.   All I know is Mr. Capogrosso is
14 the problem and that's all I know and there
15 is no investigation made.  This is the
16 voracity of the complaints to the
17 allegations and Mr. Capogrosso is given no
18 opportunity to respond.
19      That's all I know that he's the
20 problem and that's it.  Is that your
21 position?
22      MR. THOMPSON to the form of the
23 question.
24      A.   I did not say that I never did
25 anything about any of the complaints.  I

**Page 36**

Danielle Calvo

1
2 don't remember.
3      Q.   Did you ever give me an
4 opportunity to respond to one of these
5 complaints so I could resolve the issue?
6      MR. THOMPSON:  Objection, asked
7 and answered.  You can answer.
8      Q.   What opportunity did you give
9 me to respond to any one of the complaints
10 by your clerks?
11      A.   I don't know specifically about
12 those complaints, but I know I spoke to you
13 on many occasions asking you not to direct
14 any issues with the clerks whatsoever.
15      Q.   Concerning what?
16      A.   Concerning anything.  If you
17 had a problem --
18      MR. THOMPSON:  Objection, you
19 asked this question over and over
20 again.
21      THE COURT REPORTER:  Hold on,
22 my hands are off the record.  It's
23 physically impossible on a Zoom to
24 get all three of you at the same
25 time.

December 17, 2020

Page 37

Danielle Calvo

1
2     Q.   You can't identify one specific
3     instance of misconduct with respect to your
4     clerks; is that fair today?
5        A.   From memory?  No.
6        Q.   Can I direct you to Exhibit 7.
7           (Whereupon, Plaintiff's Exhibit
8           7, previously marked, was
9           introduced.)
10       Q.   And I'll direct you to
11    Paragraph 13.
12           Are you there?
13       A.   I'm here, but I don't see
14    Paragraph 13.
15       Q.   Now, this was a petition that
16    was submitted -- that was written by my
17    attorney in an Article 78 proceeding.
18    Capogrosso versus the Department of Motor
19    Vehicles.  And in that petition in
20    Paragraph 13 I indicate that I had an
21    incident with Yakov Brody.
22           Do you recall that incident?
23       A.   I recall there was an incident,
24    but I don't remember specifics.
25       Q.   And it happened in

Page 38

Danielle Calvo

1
2     December 2011.
3           Did you ever give me an
4     opportunity to file my affidavit as to what
5     happened with respect to that incident?
6        A.   I didn't ask you for anything,
7     but if you want to write something, you
8     could have.
9        Q.   But, you took Yakov Brody's
10    statement; right?
11       A.   Anyone who wants to make a
12    statement, makes a statement.  If they
13    don't want -- if someone doesn't give me
14    one, I don't ask for something unless I'm
15    told that we need it.
16       Q.   And you illicited the
17    statements of all the other attorneys
18    concerning this one incident; right?
19           MR. THOMPSON:  Objection to the
20    form of the question, you can answer.
21       A.   I don't remember.
22       Q.   You don't remember.
23           But, you never illicited my
24    affidavit, right, as to what happened?
25           MR. THOMPSON:  Same objection,

Page 39

Danielle Calvo

1
2     you can answer.
3        A.   I also don't remember.
4        Q.   But, you wanted me out because
5     that's what that Paragraph 13 says, "now's
6     our chance to get rid of him."
7           Did you make that statement
8     concerning --
9        A.   I'm sure I did not.
10       Q.   -- concerning the incident with
11    Yakov Brody on December 22, 2011, did you
12    make that statement?
13       A.   Not that I recall, no.
14       Q.   You don't remember making it?
15       A.   No.
16       Q.   But, you wanted me out, right,
17    from the DMV?
18           MR. THOMPSON:  Objection, asked
19    and answered.  You can answer.
20       Q.   Did you want me out because I
21    wasn't giving cash and meals and presents
22    to your clerks?
23           MR. THOMPSON:  Objection, asked
24    and answered.  Don't badger the
25    witness.

Page 40

Danielle Calvo

1
2     Q.   Did you want me out because I
3     wasn't giving cash and meals and gratuities
4     to you as a clerical supervisor?
5        A.   No, I did not.
6           MR. THOMPSON:  Objection, asked
7     and answered.
8        Q.   You did not want me out for
9     that reason?
10       A.   No.
11       Q.   Were you receiving gifts and
12    gratuities and meals from the other
13    attorneys?
14       A.   No, I did not.
15       Q.   Did you have any specific
16    complaints from motorists or clients of
17    mine to your office that I behaved
18    improperly, rudely or threatened them in
19    any way, by motorists or clients, other
20    than your clerks?
21           MR. THOMPSON:  Objection, asked
22    and answered.
23       Q.   I haven't heard that one.
24           Did you receive any complaints
25    from motorists or clients that I threatened

10  (Pages 37 to 40)

December 17, 2020

## Page 41

Danielle Calvo

1          Danielle Calvo
2 them or I abused them -- verbally abused
3 them, did you receive any such complaints
4 from motorist or clients?
5     A.   Not that I recall.
6     Q.   So the only complaints that you
7 are getting are from your clerks?
8     MR. THOMPSON:  Objection to the
9 form of the question.  You can
10 answer.
11     A.   Whatever complaints are on
12 file, I don't remember.
13     Q.   Right.
14     And it's because I didn't give
15 those clerks money for Christmas and I
16 wasn't buying them breakfast?
17     MR. THOMPSON:  Objection, asked
18 and answered.  I think four times
19 now.
20     Q.   Now, there was an incident with
21 Yakov Brody on December 11, 2011 and Brody
22 states that I threw a coffee cup, an empty
23 coffee cup in a garbage can that he was
24 sitting next to.
25     Were you familiar with that

## Page 42

1          Danielle Calvo
2 complaint?
3     A.   Specifically I don't remember
4 that date or an incident about a coffee
5 cup.
6     Q.   But, you never took my
7 affidavit with respect to that alleged
8 incident with Yakov Brody; right?
9     MR. THOMPSON:  Objection, asked
10 and answered.  You can answer.
11     Q.   All I said to Yakov Brody that
12 day was "excuse me, can I get my coffee."
13 And he told me, "excuse yourself, go fuck
14 yourself, you Jew hater anti-Semite."  You
15 know that's what Yakov Brody told me that
16 day twice.  "Excuse yourself, go fuck
17 yourself, you Jew hater anti-Semite.  And
18 then I leave to get away from the
19 situation, I come back and he is still
20 blocking the coffee and he says that again
21 to me.
22     Did you ever take my affidavit
23 with respect to what happened that day?
24     MR. THOMPSON:  Objection to the
25 form of the question.  Asked and

## Page 43

1          Danielle Calvo
2 answered, you can answer.
3     A.   Not that I recall.  I don't
4 remember.
5     Q.   But, it was okay for attorney
6 Brody to give you his affidavit as to what
7 happened?
8     MR. THOMPSON:  Objection to the
9 form, you can answer.
10     A.   Anyone who wanted to make a
11 report, could have made a report.  If you
12 wanted to make a report, Mr. Capogrosso,
13 you could have made a report.
14     Q.   I was removed from the Brooklyn
15 TVB based on that incident, so I didn't
16 have the opportunity to make a report;
17 right?
18     MR. THOMPSON:  Objection to the
19 form, you can answer.
20     A.   I don't know.  If you say you
21 didn't have an opportunity, than you
22 didn't, I have no idea.
23     Q.   Did you ever question me
24 concerning that incident?
25     A.   I don't remember.

## Page 44

1          Danielle Calvo
2     Q.   Was any of it grieved or sent
3 to the grievance committee of the State of
4 New York by one of your clerks; did they
5 ever bring a grievance against me
6 personally to the grievance committee to
7 the State of New York?
8     A.   Not that I'm aware of, no.
9     Q.   But, you're aware that another
10 attorney was grieved who worked at the
11 Department of Motor Vehicles, an attorney
12 named Eamon Teague?
13     MR. THOMPSON:  Objection to the
14 form of the question.
15     A.   An attorney who?
16     Q.   Eamon Teague that he was
17 grieved for an inappropriate conduct?
18     A.   No, I don't even know who that
19 person is.
20     Q.   Why didn't you grieve me for
21 any of these acts that I committed with
22 your clerks, why didn't you ever grieve me;
23 why didn't you bring a complaint to the
24 grievance committee?
25     A.   You're asking me that.  I have

11 (Pages 41 to 44)

December 17, 2020

Page 45

Danielle Calvo

1
2 no idea because I don't even know what that
3 process is. We went through our own DMV
4 reporting, not to any outside other things.
5 I don't know what that is that you're
6 talking about.
7     Q.  And you never questioned the
8 truth or voracity of any of those reports;
9 right?
10     MR. THOMPSON:  Objection to the
11     form.  Objection, asked and answered.
12     You can answer.
13     Q.  Are you familiar with, let's
14 see, Melanie Levine; are you familiar with
15 Melanie Levine, does that name ring a bell?
16     A.  Yes, she was a supervisor in
17 our office at one point.
18     Q.  And she filed a complaint
19 against me too, are you aware of that; she
20 filed a work violence incident report, are
21 you familiar with that?
22     A.  I may have been, but I don't
23 recall right now.
24     Q.  Can pull up Exhibit 85.
25     (Whereupon, Plaintiff's Exhibit

Page 46

Danielle Calvo

1
2     85 previously marked, was
3     introduced.)
4     Q.  Are you familiar with this
5 workplace violence incident?
6     A.  I don't -- I may have seen it
7 before, I don't remember.
8     Q.  Were you a supervisor at the
9 DMV, Brooklyn DMV on February 5, 2015?
10     A.  Yes.
11     Q.  Did you ever investigate the
12 facts and allegations of this incident
13 report as a supervisor?
14     A.  I don't know what the incident
15 was because I only see the top part of it.
16     Q.  Let's go to the second page.
17 This is a clerical supervisor, like
18 yourself, writing about me.
19     "Attorney Capogrosso had
20 represented Mr. Perez at trial for three
21 violations on January 22, 2015." Did you
22 investigate the validity of that statement,
23 the truthfulness of that statement as to
24 whether I actually represented them at
25 trial?

Page 47

Danielle Calvo

1
2     A.  I don't know if I did at the
3 time.
4     Q.  Could you have investigated the
5 truth, the validity of this report?
6     A.  I could have, but it depends on
7 what my supervisor told me to do.
8     Q.  So, you don't know whether I
9 represented this Mr. Perez on January 21,
10 2015, because I never did.  I was never in
11 court with him, you know that; right?
12     A.  I don't know that.
13     MR. THOMPSON:  Objection to the
14     form.  You can answer.
15     A.  I don't know that. I don't
16 recall that.
17     Q.  So, you don't know whether it's
18 true or not because -- you don't know the
19 -- you never took my statement with respect
20 to this work incident report, did you, as
21 to what happened?
22     A.  I don't remember if I did or
23 not.
24     Q.  Well, let me tell you what
25 happened that day because I never

Page 48

Danielle Calvo

1
2 represented Mr. Perez in court on these
3 three violations that you could have
4 checked out. Mr. Perez got his own license
5 suspended before Judge Waltrus (phonetic)
6 and he came out and hired me on an appeal
7 and then he went home and found out his
8 license was suspended and then he came back
9 to court.
10     And you know what he did when
11 he came back to court, he demanded his
12 money back and you know what I did, I gave
13 his money back. And you know what he did
14 after that, he threatened me with a knife.
15 He was going to cut me and stab me with a
16 knife and then slash the tires of my car.
17     MR. THOMPSON:  Objection.
18     Who's testifying here?
19     Q.  I'm prefacing my question.
20     Did you ever investigate the
21 actual complaint as to what actually
22 happened with me concerning this event?
23     A.  I do not recall.
24     Q.  But you never took my statement
25 with this report as to what happened, this

12  (Pages 45 to 48)

Page 49

Danielle Calvo

1  Danielle Calvo
2  is a clerical supervisor making this
3  report?
4      A.   Anyone could make any report
5  they want to.
6      Q.   So, a false report that is
7  submitted to your office and you accept it
8  as truth; is that a fair statement?
9      MR. THOMPSON:  Objection to the
10     form of the question.  You can
11     answer.
12     Q.   You accept this report as true?
13     A.   Is that report sent to me?
14     Q.   It's written in big Melanie
15 Levine.
16     A.   All right, but who is it sent
17 to?
18     Q.   It's written by a clerical
19 supervisor, did you not have access to this
20 report?
21     A.   All right, but I can't stop
22 anyone from making whatever report they
23 want.
24     Q.   You don't investigate the
25 truthfulness of any of these reports?

Page 50

Danielle Calvo

1  Danielle Calvo
2      A.   I don't recall what I did at
3  that time in regards to that report, but
4  anyone could make whatever report they
5  want.
6      Q.   Anybody could say whatever they
7  want, say it whether it has any truth or
8  not with respect to your office and you
9  don't care, you let them write whatever
10 they want?
11     MR. THOMPSON:  Objection,
12     argumentative?
13     Q.   I'm not being argumentative, is
14 that your position?
15     A.   I never said I don't care, but
16 I can't block someone from making a work
17 place violence report.
18     Q.   Fine.
19         You don't investigate the truth
20 of that report now, do you?
21     A.   I'm not an investigator, I was
22 a supervisor.
23     Q.   But, you're using those reports
24 to get me removed from the Brooklyn TVB,
25 are you not?

Page 51

Danielle Calvo

1  Danielle Calvo
2      MR. THOMPSON:  Objection to
3     form, you can answer.
4      A.   I was not doing anything.  If
5  they made the reports they made the
6  reports.  I was not amassing any kind of
7  thing against you.
8      Q.   You didn't investigate the
9  truth and you didn't give me any
10 opportunity to respond, so pretty much any
11 report that is written is accepted as truth
12 in your office; right?
13     MR. THOMPSON:  Objection.
14     Object to the form.  Objection, asked
15     and answered.  Objection, badgering
16     the witness.
17     Q.   At what point in time did you
18 give me an opportunity to respond to that
19 report --
20     MR. THOMPSON:  Objection to the
21     form.
22     Q.   -- at what point in time did
23 you give me an opportunity to respond to
24 that report?
25     MR. THOMPSON:  You can answer.

Page 52

Danielle Calvo

1  Danielle Calvo
2      A.   It's a report, it's not a
3  question and answer --
4      Q.   That was used --
5      A.   -- it's a report made by a DMV
6  employee.
7      Q.   To get me removed from
8  practicing law in all New TVBs.  You don't
9  investigate the truth of it, you give me no
10 opportunity to respond to it --
11     MR. THOMPSON:  Objection, asked
12     and answered.
13     Q.   -- is that a fair statement?
14     MR. THOMPSON:  Same objection.
15     Object as to form, you can answer.
16     A.   No, it's not a fair statement.
17     Q.   At what point in time did I get
18 to see this work incident report prior to
19 my removal of May 11, 2015, when?
20     A.   That would have been up to
21 Albany, not to me.
22     Q.   Where is this report sent to?
23     A.   Look at the top of the page, I
24 don't know.
25     Q.   And you also sent work violence

13  (Pages 49 to 52)

December 17, 2020

Page 53

Danielle Calvo

1
2      reports up to the chain, right; you sent
3      them to Albany work violence reports, did
4      you not?
5          A.   I'm sure I have, yes.
6          Q.   Concerning me?
7          A.   I don't recall.
8          Q.   Did you ever give me an
9      opportunity to supply my version of the
10     story as to what happened to any of these
11     work violence reports?
12         A.   A workplace violence report is
13     a report by someone who has an issue.  It
14     is not up for me to decide whether or not
15     it's true or whether or not I want to send
16     it.
17         Q.   Anybody in your office can
18     write whatever they want whether it's true
19     or not --
20             MR. THOMPSON:  Objection, you
21         keep --
22         Q.   -- and it gets accepted --
23             MR. THOMPSON:  You keep making
24         these laud statement.
25         Q.   Anybody gets to write whatever

Page 54

Danielle Calvo

1
2      they want on a work incident report, is
3      that true and make whatever statements they
4      want without any review by your office?
5             MR. THOMPSON:  Object to the
6         form, you can answer.
7          A.   Anyone could make any kind of
8      statement, yes.  If they feel that it was
9      workplace violence they are allowed to make
10     a report.
11         Q.   And your office does no review
12     of it?
13         A.   What we did or did not do at
14     that time, I don't remember.  But, this
15     report was not to me.  If you go back to
16     the top of the page, I believe it's to
17     someone in Albany, whatever department.
18         Q.   Were you personally involved in
19     my removal on May 11, 2015?
20             MR. THOMPSON:  Object to the
21         form, you can answer.
22         Q.   Were personally involved in my
23     removal on the morning of May 11, 2015?
24         A.   My only involvement was to give
25     you the information that Ida Traschen told

Page 55

Danielle Calvo

1
2      me to give you, and to have the police
3      escort me to let you know to call Albany.
4      What they were going to do with you after
5      that or what they were going to allow, was
6      not ever my decision.
7          Q.   But, you personally approached
8      me on the morning of May 11th; right?
9          A.   Yes, as told by my supervisor
10     to do.
11         Q.   And that was whom?
12         A.   Ida Traschen is the one who
13     told me to do that.
14         Q.   After consulting with Judge
15     Gelbstein that morning.
16             Now, you didn't like me, right,
17     you didn't like me as an attorney working
18     down there; is that true?
19             MR. THOMPSON:  Objection, asked
20         and answered.
21         Q.   You didn't like me as an
22     attorney?
23         A.   I didn't like the things you
24     did.
25         Q.   And you wanted me out of there;

Page 56

Danielle Calvo

1
2      right?
3             MR. THOMPSON:  Objection, asked
4         and answered.
5          A.   I wanted you to stop what you
6      were doing.  I didn't care one way if you
7      were out of there or not.  I just needed to
8      have certain order in the place and --
9          Q.   You never explained exactly
10     what I was doing?
11             MR. THOMPSON:  You cannot keep
12         asking the same question over and
13         over in a louder and louder tone of
14         voice and hoping to get a different
15         answer.  That's badgering the
16         witness, it's not acceptable as the
17         Federal rules and I'd ask you to cut
18         it out, please.
19             MR. CAPOGROSSO:  It's a
20         different context that I asked that
21         question.  Different context.
22             This is in respect to the
23         morning of May 11th.  That question
24         was asked with respect to another
25         incident.  That question was asked

December 17, 2020

Page 57

Danielle Calvo

1
2   with respect to the incident on the
3   morning -- the incident of May 11,
4   2015.
5       MR. THOMPSON:  Go ahead and ask
6       your question.
7       Q.   Did you an opportunity to read
8   the police report that was written by
9   Defendant Smart on the morning of May 11,
10  2015, did you not?
11      A.   I don't recall.
12      Q.   Let me find that police report,
13  it's Exhibit 67.
14      (Whereupon, Plaintiff's Exhibit
15      67, previously marked, was
16      introduced.)
17      Q.   Now, this is a police officer
18  writing the first paragraph.  "Mr.
19  Capogrosso" --
20      MR. THOMPSON:  Object to the
21      form of the question.
22      Q.   Well, this is a workplace
23  violence incident report.  The top portion
24  indicates, "Mr. Capogrosso said "back up,
25  back up," that would be to Defendant Smart.

Page 59

Danielle Calvo

1
2       Q.   But, then on the following
3   paragraph down below you state, "I was
4   told" -- you went to Judge Gelbstein at
5   some point that I couldn't get arrested
6   because I used an open hand which is what I
7   did, I put my hand up, not a closed fist.
8   I was told by Judge Gelbstein your writing
9   this Danielle Calvo, to go with officers
10  from the police room to tell Mr. Capogrosso
11  to leave the building, but you don't recall
12  telling Gelbstein that I told him to back
13  up?
14      A.   I don't recall.
15      Q.   Yet this report gets me removed
16  from the practice of law at all New York
17  TVBs; is that fair?
18      MR. THOMPSON:  Objection to the
19      form of question.  You can answer.
20      Q.   So, you refused to give
21  Defendant Gelbstein and Defendant Traschen
22  my version of what happened; is that a fair
23  statement?
24      A.   I have no idea if they asked me
25  or what -- if I didn't see exactly what

Page 58

Danielle Calvo

1
2       Did you ever tell Defendant
3   Gelbstein and Defendant Traschen that I
4   told Smart to back up, back up?
5       A.   I don't even see where you're
6   looking at because --
7       Q.   The top paragraph description
8   of events leading to the incident.  Second
9   line, "Mr. Capogrosso said back up, back up
10  to David Smart."
11      Did you ever tell Defendant
12  Gelbstein or Defendant Traschen that I said
13  to Smart "back up, back up"?
14      MR. THOMPSON:  Let me just say
15      before you answer the question, I'm
16      going to instruct you not to say
17      anything about any conversation you
18      had with Ida Traschen on the basis of
19      attorney/client privilege.  You can
20      answer the question.
21      A.   I don't recall.
22      Q.   So, you never told either
23  Gelbstein or Traschen that I'm telling
24  Smart to get away from them?
25      A.   I have no idea.

Page 60

Danielle Calvo

1
2   happened, how am I going to tell them
3   anything.  Whatever report they were given,
4   I don't...
5       Q.   Why didn't you ask me what
6   happened that day and take my statement
7   before you --
8       A.   I recorded what happened to my
9   supervisor and this is what they told me to
10  do.
11      Q.   Somebody who came and told you
12  and you never questioned Smart and you
13  never questioned me; right?
14      MR. THOMPSON:  Object to the
15      form.
16      Q.   Is that what happened?
17      A.   I don't remember.
18      Q.   Do you believe you acted
19  lawfully that day?
20      A.   Do I believe that I acted
21  lawfully, me?
22      Q.   Yes.
23      A.   Yes.
24      Q.   And what authority or right did
25  you act that day?

15  (Pages 57 to 60)

Page 61

```
 1            Danielle Calvo
 2         MR. THOMPSON: Objection, calls
 3     for a legal conclusion.
 4         A.   I was a supervisor and I was
 5     told by my supervisors what to do and
 6     that's what I did.  I asked you to leave
 7     the building.
 8         Q.   And you never followed up as to
 9     look to the videotape as to what happened
10     that day?
11         MR. THOMPSON:  Objection, asked
12     and answered.
13         Q.   Did you look at the videotape
14     after I was removed?
15         MR. THOMPSON:  Objection as to
16     form.  Objection, asked and answered,
17     you can answer.
18         A.   I don't remember if I did, but
19     at that point that you were gone, it's out
20     of my hands what they decided to do as far
21     as that goes, had nothing to do with me.
22     No one asked me my opinion.
23         Q.   But it was your report to
24     Gelbstein and then to Traschen based on
25     what you said somebody told you, that got
```

Page 62

```
 1            Danielle Calvo
 2     me removed; but you didn't verify that
 3     story by looking at the videotape, now did
 4     you?
 5         MR. THOMPSON:  Objection as to
 6     form.  Objection, asked and answered,
 7     you can answer.
 8         A.   I reported what I was told and
 9     what happened as far as I know it.
10         Q.   But you didn't verify --
11         A.   Any investigation is not to be
12     done by me.  I'm not the legal division of
13     the Department of Motor Vehicles.  I'm not
14     an investigator.
15         Q.   But you're the one telling
16     Gelbstein and you're the one telling
17     Traschen of this alleged incident of what
18     happened?
19         MR. THOMPSON:  Objection,
20     argumentative.
21         Q.   But you never verified that
22     what you told them was actually true, now
23     did you?
24         MR. THOMPSON:  Objection, asked
25     and answered.  You've asked this
```

Page 63

```
 1            Danielle Calvo
 2     question at this point eight or nine
 3     times.
 4         Q.   You never verified what you saw
 5     or what you were told, did you, at any
 6     point in time?
 7         MR. THOMPSON:  Object to the
 8     form of the question.  You can answer
 9     and Mr. Capogrosso I would ask you to
10     not ask the same question again for
11     time Number 10.
12         Q.   I'm waiting, did you ever
13     verify what you were told was truthful?
14         A.   Nobody asked me to verify it.
15     So, if someone asked me to that's not part
16     of my job, I'm not an investigator.  We
17     have a whole DMV investigation unit if they
18     wanted to investigate an incident or a
19     police report or anything else.
20         Q.   So, you didn't feel any
21     compulsion just to verify the truthfulness
22     of what somebody told you?
23         MR. THOMPSON:  Objection.
24         Q.   The first party that you know
25     who it is and you felt no compulsion to
```

Page 64

```
 1            Danielle Calvo
 2     verify that?
 3         MR. THOMPSON:  You've already
 4     asked this question, she's already
 5     answered it.
 6         Q.   That's the way business is
 7     handled at the Brooklyn TVB.  What
 8     everybody says that's acceptable as truth,
 9     right; is that how business is handled down
10     there?
11         MR. THOMPSON:  Objection,
12     compound.  Why don't you pick one
13     question and ask it.
14         Q.   Is that how business is handled
15     at the Brooklyn TVB?
16         MR. THOMPSON:  Objection to the
17     form.
18         Q.   Miss, you have to answer it.
19     That's how business is handled,
20     people make complaints --
21         MR. THOMPSON:  Mr. Capogrosso
22     that is not even a question.  Are we
23     done here?  What are we doing?
24         MR. CAPOGROSSO:  Give me
25     another three minutes, let me make
```

16 (Pages 61 to 64)

December 17, 2020

Page 65

Danielle Calvo
1
2       sure I got everything. Give me a few
3       more minutes.
4           Q.   Did you tell Defendant Smart to
5       approach me on the morning of May 11, 2015?
6           A.   I never told him to approach
7       you for anything.
8           Q.   Did you attempt to curtail my
9       exercise of freedom of speech by having me
10      removed from the Brooklyn TVB?
11              MR. THOMPSON:  Objection to the
12          form of the question.  You can
13          answer.
14          A.   No.
15          Q.   Did you ever observe ticket
16      brokers going to Defendant Gelbstein's
17      office, ticket brokers, you know what a
18      ticket broker is, right?
19              Did you ever observe ticket
20      brokers in Defendant Gelbstein's office?
21              MR. THOMPSON:  Objection to the
22          form, you can answer.
23          A.   Rumor to be, yes.  Do I have
24      proof what they were?  No.
25          Q.   But, you saw them in his

Page 66

Danielle Calvo
1
2       office; right?
3           A.   Yes.
4           Q.   Did you question him why they
5       were in his office?
6           A.   Question him?
7           Q.   Yes.
8           A.   He's my supervisor, I wasn't in
9       a position to question him.
10          Q.   Did you ever see defendant
11      Gelbstein in the GE room pleading motorists
12      guilty or have any knowledge to that
13      effect?
14          A.   No.
15          Q.   Did you ever see Defendant
16      Gelbstein in the GE room rescheduling
17      motorists cases, did you ever see him doing
18      that?
19          A.   No.
20          Q.   Did you have any knowledge of
21      any attorneys covering cases for Defendant
22      Gelbstein while they were working at the
23      Brooklyn TVB?
24          A.   No.
25          Q.   Arguing cases on his behalf?

Page 67

Danielle Calvo
1
2           A.   No.
3           Q.   Do you have any knowledge that
4       Defendant Gelbstein had his own caseload
5       down there at the Brooklyn TVB?
6           A.   No.
7           Q.   Did you think it was suspicious
8       that ticket brokers were in his office on a
9       routine basis?
10              MR. THOMPSON:  Objection to the
11          form, you can answer.
12          Q.   Was it suspicious to you?
13          A.   Yes.
14          Q.   It was suspicious.
15              Were you concerned about it;
16      were you concerned about it that he was
17      doing something wrong?
18          A.   I was concerned about it, but I
19      had no proof, so...
20          Q.   But you didn't do anything
21      about it, right, you didn't file any
22      complaint with anybody; you see, I did and
23      I got removed.
24              MR. THOMPSON:  Objection to the
25          form of the question.

Page 68

Danielle Calvo
1
2           Q.   I did complain, I saw what was
3       going on and I complained.
4               MR. THOMPSON:  Same objection.
5           Q.   And I got removed, but you
6       didn't do anything; right?
7               MR. THOMPSON:  Objection to the
8           form of the question.
9           Q.   But you saw the activities of
10      Defendant Gelbstein and what he was doing?
11              MR. THOMPSON:  Mr. Capogrosso
12          can you ask one question and if
13          you're just going to pontificate
14          instead of asking questions then
15          maybe we should be done.  If you have
16          a question to ask, ask it.
17          Q.   You saw the action of Defendant
18      Gelbstein, right, after what he was doing?
19          A.   If I can't say what he was
20      actually doing.  Did I see people go into
21      his office that I didn't think should be
22      there, yeah, but I can't say what they were
23      doing.
24              MR. CAPOGROSSO:  All right.
25          Okay.  That's it.  Okay, thank you

17  (Pages 65 to 68)

December 17, 2020

Page 69

1    Danielle Calvo
2  very much.  I'm done.
3       (Whereupon, at 2:37 P.M., the
4  Examination of this witness was
5  concluded.)
6
7       o    o    o    o
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 71

1       Danielle Calvo
2       E X H I B I T S
3
4  PLAINTIFF'S EXHIBITS (Previously marked)
5
6  EXHIBIT  EXHIBIT              PAGE
7  NUMBER   DESCRIPTION
8    4    Three-page DMV article   24
9   11    One-page letter dated
10           June 20, 2012          30
11    7    11-page Verified Petition 37
12   85    Four-page workplace
13           violence incident      45
14   67    Three-page workplace
15           violence incident      67
16
17  (Exhibits retained by Court Reporter.)
18
19
20
21
22
23
24
25

Page 70

1
2       D E C L A R A T I O N
3
4       I hereby certify that having been
5  first duly sworn to testify to the truth, I
6  gave the above testimony.
7
8       I FURTHER CERTIFY that the foregoing
9  transcript is a true and correct transcript
10  of the testimony given by me at the time
11  and place specified hereinbefore.
12
13
14
15  _____
16       DANIELLE CALVO
17
18  Subscribed and sworn to before me
19  this _____ day of _____ 20___.
20
21
22  _____
     NOTARY PUBLIC
23
24
25

Page 72

1       Danielle Calvo
2       I N D E X
3
4  EXAMINATION BY            PAGE
5  MR. CAPOGROSSO            3
6
7
8  INFORMATION AND/OR DOCUMENTS REQUESTED
9  INFORMATION AND/OR DOCUMENTS    PAGE
10  (None)
11
12
13
14
15
16  QUESTIONS MARKED FOR RULINGS
17  PAGE LINE QUESTION
18  (None)
19
20
21
22
23
24
25

18  (Pages 69 to 72)

December 17, 2020

Page 73

1       Danielle Calvo
2       C E R T I F I C A T E
3
4    STATE OF NEW YORK    )
                          : SS.:
5    COUNTY OF KINGS      )
6
7        I, JAMIE NEWMAN, a Notary Public for
8    and within the State of New York, do hereby
9    certify:
10       That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14       I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19       IN WITNESS WHEREOF, I have hereunto
20   set my hand this 31st day of December 2020.
21
22
23       
            JAMIE NEWMAN
24
25

19 (Page 73)

| A | | | | |
|---|---|---|---|---|
| **ability (1)** | **aggressive (4)** | 42:10 43:2,9 | 37:17 71:8 | 10:19 |
| 6:16 | 22:18 35:3,4,8 | 43:19 45:12 | **asked (38)** | **authority (3)** |
| **abused (4)** | **ahead (1)** | 47:14 49:11 | 3:24 4:16 8:15 | 12:21 14:10 |
| 23:22 31:25 | 57:5 | 51:3,25 52:3 | 9:3,10 12:16 | 60:24 |
| 41:2,2 | **ALAN (2)** | 52:15 54:6,21 | 18:4 23:20 | **aware (22)** |
| **accept (2)** | 1:8 2:9 | 56:15 58:15 | 27:6 31:22 | 10:15,17 11:21 |
| 49:7,12 | **Albany (5)** | 58:20 59:19 | 36:6,19 39:18 | 14:19,21 |
| **acceptable (2)** | 2:19 52:21 | 61:17 62:7 | 39:23 40:6,21 | 15:16 16:8 |
| 56:16 64:8 | 53:3 54:17 | 63:8 64:18 | 41:17 42:9,25 | 25:3,18,22,25 |
| **accepted (2)** | 55:3 | 65:13,22 | 45:11 51:14 | 26:3,16,22,23 |
| 51:11 53:22 | **Alexis (1)** | 67:11 | 52:11 55:19 | 27:2,8,23 |
| **access (1)** | 26:9 | **answered (24)** | 56:3,20,24,25 | 28:10 44:8,9 |
| 49:19 | **allegations (5)** | 8:16 12:17 | 59:24 61:6,11 | 45:19 |
| **accident (1)** | 24:4 25:18 | 18:5 23:20 | 61:16,22 62:6 | |
| 9:25 | 26:17 35:17 | 27:7 31:23 | 62:24,25 | |
| **accused (2)** | 46:12 | 36:7 39:19,24 | 63:14,15 64:4 | **B** |
| 24:16 26:11 | **alleged (8)** | 40:7,22 41:18 | **asking (3)** | **B (1)** |
| **act (6)** | 5:9 8:17 9:18 | 42:10 43:2 | 12:14 17:22 | 71:2 |
| 14:11 17:8 | 18:20 19:6,23 | 45:11 51:15 | 23:8 28:7 | **back (17)** |
| 18:2,3 29:19 | 42:7 62:17 | 52:12 55:20 | 36:13 44:25 | 18:13 28:11 |
| 60:25 | **allow (1)** | 56:4 61:12,16 | 56:12 68:14 | 42:19 48:8,11 |
| **acted (2)** | 55:5 | 62:6,25 64:5 | **assaulted (1)** | 48:12,13 |
| 60:18,20 | **allowed (5)** | **anti-Semite (2)** | 14:17 | 54:15 57:24 |
| **action (6)** | 10:11 28:18,20 | 42:14,17 | **attempt (3)** | 57:25 58:4,4 |
| 15:2,25 16:13 | 29:8 54:9 | **anybody (4)** | 19:4,14 65:8 | 58:9,9,13,13 |
| 17:14 68:17 | **altercation (3)** | 50:6 53:17,25 | **attend (1)** | 59:12 |
| 73:16 | 6:2 18:21 19:6 | 67:22 | 28:21 | **badger (1)** |
| **actions (1)** | **amassing (1)** | **appeal (1)** | **attention (4)** | 39:24 |
| 12:21 | 51:6 | 48:6 | 25:8 26:8 30:2 | **badgering (2)** |
| **activities (4)** | **AND/OR (2)** | **appearance (1)** | 30:10 | 51:15 56:15 |
| 13:11,18,22 | 72:8,9 | 29:14 | **attorney (11)** | **BARBARA (1)** |
| 68:9 | **answer (60)** | **approach (5)** | 2:8 11:14 | 2:19 |
| **acts (1)** | 5:13 6:6 7:2,20 | 10:18,21 11:10 | 27:25 37:17 | **barbara.mon...** |
| 44:21 | 8:8 9:9 10:8 | 65:5,6 | 43:5 44:10,11 | 2:20 |
| **actual (1)** | 10:14 11:18 | **approached (...** | 44:15 46:19 | **based (6)** |
| 48:21 | 12:17,24 | 55:7 | 55:17,22 | 5:24 7:14,25 |
| **address (1)** | 13:13 14:5 | **Arguing (1)** | **attorney/clie...** | 8:2 43:15 |
| 3:14 | 15:8,20 16:11 | 66:25 | 58:19 | 61:24 |
| **affidavit (5)** | 17:13,19 18:6 | **argumentati...** | **attorneys (14)** | **basis (3)** |
| 38:4,24 42:7 | 18:11,25 20:6 | 18:5 35:7 | 2:9,17 21:3 | 13:5 58:18 |
| 42:22 43:6 | 21:8 22:3 | 50:12,13 | 25:13 26:14 | 67:9 |
| **afternoon (2)** | 23:5,5 24:7 | 62:20 | 27:11,20 28:7 | **behalf (1)** |
| 10:19,22 | 27:7 31:8 | **arrested (1)** | 28:16 29:9,18 | 66:25 |
| **against- (1)** | 32:9 33:15 | 59:5 | 38:17 40:13 | **behaved (1)** |
| 1:6 | 36:7 38:20 | **article (5)** | 66:21 | 40:17 |
| | 39:2,19 41:10 | 24:16,19 25:6 | **attorneys' (1)** | **behavior (2)** |
| | | | | 35:3,5 |

December 17, 2020

Page 75

| | | | | |
|---|---|---|---|---|
| **believe (4)** | **business (4)** | 54:1 55:1 | 14:18 | **closing (1)** |
| 28:24 54:16 | 64:6,9,14,19 | 56:1 57:1 | **certain (4)** | 13:15 |
| 60:18,20 | **buying (4)** | 58:1 59:1,9 | 13:2 26:11 | **coffee (5)** |
| **bell (1)** | 27:16 32:14,14 | 60:1 61:1 | 28:16 56:8 | 41:22,23 42:4 |
| 45:15 | 41:16 | 62:1 63:1 | **certify (4)** | 42:12,20 |
| **big (1)** | ———————— | 64:1 65:1 | 70:4,8 73:9,14 | **come (2)** |
| 49:14 | **C** | 66:1 67:1 | **chain (1)** | 23:10 42:19 |
| **blanche (2)** | **C (5)** | 68:1 69:1 | 53:2 | **COMMISSI...** |
| 17:8 18:2 | 2:2 3:5 70:2 | 70:15 71:1 | **chance (1)** | 1:10 2:12,17 |
| **block (1)** | 73:2,2 | 72:1 73:1 | 39:6 | **committed (1)** |
| 50:16 | **call (11)** | **cameras (2)** | **checked (1)** | 44:21 |
| **blocking (1)** | 4:24 5:2 7:15 | 18:12 19:17 | 48:4 | **committee (3)** |
| 42:20 | 7:22,22,23 | **capacity (11)** | **Christmas (5)** | 44:3,6,24 |
| **blood (1)** | 10:2,4,11 | 1:8,8,9,9,11 | 27:21 28:9,18 | **company (1)** |
| 73:16 | 13:6 55:3 | 2:10,10,11,11 | 28:20 41:15 | 13:3 |
| **breakfast (2)** | **called (5)** | 2:12,18 | **Civil (1)** | **complain (1)** |
| 27:16 41:16 | 3:5 4:24,25 6:8 | **Capogrosso (...** | 1:19 | 68:2 |
| **bribes (2)** | 26:14 | 1:3 2:4 3:4,10 | **clerical (11)** | **complained (1)** |
| 24:16 25:2 | **calls (2)** | 3:18 35:13,17 | 13:20,20 14:3 | 68:3 |
| **bring (2)** | 19:16 61:2 | 37:18 43:12 | 16:18 20:14 | **complaining ...** |
| 44:5,23 | **Calvo (75)** | 46:19 56:19 | 22:17 24:24 | 35:9 |
| **Brody (8)** | 1:9,17 2:10 | 57:19,24 58:9 | 40:4 46:17 | **complaint (13)** |
| 37:21 39:11 | 3:13 4:1 5:1 | 59:10 63:9 | 49:2,18 | 14:6,8,12,19 |
| 41:21,21 42:8 | 6:1 7:1 8:1 | 64:21,24 | **clerk (3)** | 15:17,23 16:2 |
| 42:11,15 43:6 | 9:1 10:1 11:1 | 68:11,24 72:5 | 24:16 26:10 | 16:14 42:2 |
| **Brody's (1)** | 12:1 13:1 | **Capogrosso...** | 27:24 | 44:23 45:18 |
| 38:9 | 14:1 15:1 | 2:6 | **clerks (37)** | 48:21 67:22 |
| **broker (1)** | 16:1 17:1 | **cards (1)** | 21:2,4,9 23:10 | **complaints (...** |
| 65:18 | 18:1 19:1 | 13:8 | 23:13,15,23 | 12:3,6,8,10,15 |
| **brokers (4)** | 20:1 21:1 | **care (4)** | 24:25 25:13 | 13:25 16:21 |
| 65:16,17,20 | 22:1 23:1 | 48:16 50:9,15 | 25:25 26:25 | 17:5 20:12,23 |
| 67:8 | 24:1 25:1 | 56:6 | 27:2,12,16 | 21:13,20 |
| **Brooklyn (21)** | 26:1 27:1 | **carte (2)** | 28:8,16,23 | 25:23 30:4 |
| 3:16,24 12:4 | 28:1 29:1 | 17:8 18:2 | 29:4,15,20 | 32:25 33:9 |
| 12:22 13:11 | 30:1 31:1 | **Case (1)** | 30:4,23 31:6 | 34:7 35:16,25 |
| 17:9 18:9 | 32:1 33:1 | 1:6 | 31:15,20,25 | 36:5,9,12 |
| 20:14,15 21:3 | 34:1 35:1 | **caseload (1)** | 32:7 33:2 | 40:16,24 41:3 |
| 26:18 33:11 | 36:1 37:1 | 67:4 | 36:10,14 37:4 | 41:6,11 64:20 |
| 34:12 43:14 | 38:1 39:1 | **cases (3)** | 39:22 40:20 | **complicit (1)** |
| 46:9 50:24 | 40:1 41:1 | 66:17,21,25 | 41:7,15 44:4 | 11:2 |
| 64:7,15 65:10 | 42:1 43:1 | **cash (8)** | 44:22 | **compound (2)** |
| 66:23 67:5 | 44:1 45:1 | 25:12 26:12 | **clients (5)** | 21:7 64:12 |
| **building (3)** | 46:1 47:1 | 27:3,21 29:15 | 25:15 40:16,19 | **compulsion (2)** |
| 5:6 59:11 61:7 | 48:1 49:1 | 32:15 39:21 | 40:25 41:4 | 63:21,25 |
| **Bureau (2)** | 50:1 51:1 | 40:3 | **closed (1)** | **concerned (3)** |
| 2:16 25:11 | 52:1 53:1 | **cell (1)** | 59:7 | 67:15,16,18 |

concerning (...)
8:18,22 9:18
9:24,25 10:3
10:5 16:15,22
36:15,16
38:18 39:8,10
43:24 48:22
53:6
concluded (1)
69:5
conclusion (1)
61:3
conduct (6)
30:20,22 31:5
31:10,13
44:17
consulting (1)
55:14
context (2)
56:20,21
contribute (1)
28:19
control (1)
18:8
conversation...
4:13 7:11 8:24
9:20 58:17
correct (3)
4:3 13:22 70:9
corrupt (1)
25:11
corruption (3)
24:3,4,5
Counsel (1)
3:3
COUNTY (1)
73:5
couple (2)
3:19 25:5
court (7)
1:2 36:21
47:11 48:2,9
48:11 71:17
covering (1)
66:21
cross (1)

15:15
cup (3)
41:22,23 42:5
curtail (2)
15:5 65:8
cut (2)
48:15 56:17
CV (1)
1:6

—————
**D**
D (3)
3:5 70:2 72:2
daily (1)
13:5
Danielle (76)
1:9,17 2:10
3:13 4:1 5:1
6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1,12 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1,9
60:1 61:1
62:1 63:1

64:1 65:1
66:1 67:1
68:1 69:1
70:15 71:1
72:1 73:1
date (7)
1:13 22:25
23:23 31:20
31:25 32:11
42:4
dated (1)
71:9
David (3)
1:10 2:11
58:10
day (12)
4:15 26:14
42:12,16,23
47:25 60:6,19
60:25 61:10
70:19 73:20
day-to-day (4)
13:10,17,21
29:7
December (8)
1:13 15:12
16:5,6 38:2
39:11 41:21
73:20
decide (3)
6:7 31:9 53:14
decided (2)
5:25 61:20
decision (8)
4:19,20,21 7:3
7:15,22 34:17
55:6
decisions (1)
14:15
defendant (55)
1:16 2:17 5:10
5:17,22 6:3
8:21 9:23
10:3,20,24
11:6,9,10
12:3,5,11,13

12:21 14:2,9
14:16,20
15:12,17 16:4
16:6,15,21,22
17:7,16,25
18:21 19:7,24
20:2,25 57:9
57:25 58:2,3
58:11,12
59:21,21 65:4
65:16,20
66:10,15,21
67:4 68:10,17
Defendants (2)
1:12 2:9
defense (1)
26:12
deficient (1)
25:15
demanded (1)
48:11
department (4)
37:18 44:11
54:17 62:13
depends (3)
14:6 22:4 47:6
DEPOSITIO...
1:16
description (2)
58:7 71:7
different (4)
12:8 56:14,20
56:21
direct (7)
24:10 25:15
26:8 30:2
36:13 37:6,10
directed (1)
5:2
Directing (2)
25:8 30:10
directly (3)
15:14 18:14
23:10
DISTRICT (2)
1:2,2

division (1)
62:12
DMV (12)
1:10 2:12,16
2:17 24:16
39:17 45:3
46:9,9 52:5
63:17 71:8
DOCUMEN...
72:8,9
doing (12)
27:24 34:23
51:4 56:6,10
64:23 66:17
67:17 68:10
68:18,20,23
drive (1)
18:15
duly (3)
3:6 70:5 73:11

—————
**E**
E (9)
2:2,2 3:5,5
70:2 71:2
72:2 73:2,2
Eamon (2)
44:12,16
EASTERN (1)
1:2
Eddie (1)
26:10
effect (1)
66:13
eight (1)
63:2
either (2)
34:11 58:22
EK (1)
1:6
Empire (1)
2:18
employee (1)
52:6
employees (1)
25:12

empty (1)
41:22
erase (1)
19:11
escort (1)
55:3
ESQ (2)
2:14,19
ethnic (1)
32:5
event (1)
48:22
events (1)
58:8
everybody (1)
64:8
evidence (3)
18:20 19:5,17
exact (3)
7:10,11,12
exactly (9)
7:9 8:13 22:4
23:23 30:23
32:2 34:25
56:9 59:25
examination ...
3:9 69:4 72:4
73:10,12
examined (1)
3:8
exchange (1)
26:12
excuse (4)
23:14 42:12,13
42:16
exercise (1)
65:9
exhibit (19)
24:10,11,12
30:3,5,5,6,7
30:11,11,16
37:6,7 45:24
45:25 57:13
57:14 71:6,6
exhibited (2)
30:22 31:5

exhibits (3)
3:2 71:4,17
experienced ...
22:16
explained (1)
56:9
extent (2)
12:25 13:24

_____
F
F (1)
73:2
face (2)
16:24,24
fact (1)
5:16
facts (1)
46:12
factually (1)
9:5
fair (19)
8:5 10:5 17:17
18:3 20:16,17
20:19,24
21:24 32:16
33:12 34:2,12
37:4 49:8
52:13,16
59:17,22
false (1)
49:6
familiar (12)
24:2,4,15,20
24:21,25
30:15 41:25
45:13,14,21
46:4
far (3)
13:15 61:20
62:9
February (1)
46:9
Federal (1)
1:18 56:17
fee (2)
16:7,9

feel (3)
31:10 54:8
63:20
felt (4)
20:21 33:19
34:14 63:25
file (4)
2:20 38:4
41:12 67:21
filed (4)
14:20 15:17
45:18,20
find (1)
57:12
fine (2)
30:14 50:18
FIRM (1)
2:4
first (5)
3:6 25:9 57:18
63:24 70:5
fist (1)
59:7
fix (1)
25:2
fixing (4)
24:17,22 25:12
25:23
floor (2)
2:13 6:20
followed (2)
12:4 61:8
following (1)
59:2
follows (1)
3:8
food (1)
28:25
foregoing (1)
70:8
form (63)
5:12 6:5 7:2,19
8:7 9:8 10:8
10:14 11:18
12:24 13:13
14:5,23 15:8

15:20 16:11
17:12 18:11
18:24 19:20
20:6 21:7
22:3 23:5,20
24:7 25:21
27:6 28:13
29:17 31:2
32:19 33:14
34:10,18
35:22 38:20
41:9 42:25
43:9,19 44:14
45:11 47:14
49:10 51:3,14
51:21 52:15
54:6,21 57:21
59:19 60:15
61:16 62:6
63:8 64:17
65:12,22
67:11,25 68:8
former (1)
26:10
Fort (1)
3:15
forth (2)
28:11 73:11
found (3)
25:7,10 48:7
four (1)
41:18
Four-page (1)
71:12
fourth (1)
26:9
freedom (2)
18:2 65:9
fuck (3)
17:2 42:13,16
further (2)
70:8 73:14

_____
G
garbage (1)
41:23

garner (1)
25:14
GE (2)
66:11,16
Gelbstein (38)
1:8 2:9 5:4,5
6:8 7:16,21
7:23 10:3,20
10:25 11:6,9
12:5 14:9,20
15:18 16:15
16:22 20:3,25
28:18 55:15
58:3,12,23
59:4,8,12,21
61:24 62:16
66:11,16,22
67:4 68:10,18
Gelbstein's (2)
65:16,20
general (4)
2:8 22:7 25:16
26:22
general's (1)
11:15
getting (1)
41:7
gifts (5)
25:14 26:2
27:2,12 40:11
give (24)
23:3,6,17,21
28:19,22 30:6
35:6 36:3,8
38:3,13 41:14
43:6 51:9,18
51:23 52:9
53:8 54:24
55:2 59:20
64:24 65:2
given (8)
17:8 28:15
29:9 31:3
35:17 60:3
70:10 73:13
giving (6)

27:11,20 28:8
32:15 39:21
40:3
go (12)
11:3 14:3 26:7
30:3,5 42:13
42:16 46:16
54:15 57:5
59:9 68:20
goes (1)
61:21
going (13)
3:19 8:10
10:16 26:22
28:11 48:15
55:4,5 58:16
60:2 65:16
68:3,13
governed (3)
13:10,17,21
gratuities (4)
29:20,23 40:3
40:12
grievance (4)
44:3,5,6,24
grieve (2)
44:20,22
grieved (3)
44:2,10,17
GROUP (2)
1:10 2:11
guilty (1)
66:12

_____
**H**

H (3)
1:3 2:4 71:2
Hamilton (1)
3:15
hand (4)
15:14 59:6,7
73:20
handled (4)
64:7,9,14,19
hands (2)
36:22 61:20

happen (2)
8:10 10:16
happened (23)
6:9,11,20,24
9:18 37:25
38:5,24 42:23
43:7 47:21,25
48:22,25
53:10 59:22
60:2,6,8,16
61:9 62:9,18
happening (1)
27:22
harassment (1)
17:16
hard (1)
18:15
hater (2)
42:14,17
heard (1)
40:23
held (1)
1:19
hereinbefore...
70:11 73:11
hereunto (1)
73:19
hired (1)
48:6
Hold (1)
36:21
holiday (1)
29:2
holidays (2)
28:23 32:15
home (1)
48:7
hoping (1)
56:14

_____
**I**

Ida (15)
1:8 2:10 4:7,13
4:21,24,25
7:22,24 10:4
11:9 20:8

54:25 55:12
58:18
idea (5)
8:9 43:22 45:2
58:25 59:24
identify (1)
37:2
IG (1)
25:16
illegal (1)
27:9
illicited (2)
38:16,23
impossible (1)
36:23
improper (5)
25:14 29:14,19
29:19,24
improperly (1)
40:18
inappropriat...
44:17
incapable (1)
11:3
inches (1)
16:24
incident (44)
5:9,16,25 6:18
8:18,19,22
9:4,18,22,24
10:3,5 19:23
23:7 32:11
33:20 37:21
37:22,23 38:5
38:18 39:10
41:20 42:4,8
43:15,24
45:20 46:5,12
46:14 47:20
52:18 54:2
56:25 57:2,3
57:23 58:8
62:17 63:18
71:13,15
incidents (6)
17:21 22:6,7

31:17 33:17
35:11
incompetent ...
11:3
indicate (1)
37:20
indicates (1)
57:24
individual (6)
1:8,8,9 2:9,10
2:11
information ...
32:12 54:25
72:8,9
Inspector (1)
25:16
instance (4)
22:25 23:18,22
37:3
instances (1)
35:7
instruct (1)
58:16
interested (1)
73:17
introduced (5)
24:14 30:9
37:9 46:3
57:16
investigate (1...
17:4 21:18
46:11,22
48:20 49:24
50:19 51:8
52:9 63:18
investigated ...
47:4
investigation...
16:17 25:7,10
32:25 33:6,25
35:15 62:11
63:17
investigator (...
50:21 62:14
63:16
involved (2)

54:18,22
involvement ...
54:24
issue (2)
36:5 53:13
issues (1)
36:14
items (1)
28:25

_____
**J**

JAMES (1)
2:14
james.thomp...
2:14
Jamie (3)
1:20 73:7,23
January (2)
46:21 47:9
Jeffrey (1)
27:15
Jew (2)
42:14,17
job (1)
63:16
judge (12)
5:4,5 6:8 7:15
7:21,23 21:3
28:18 48:5
55:14 59:4,8
June (4)
14:16 16:4
31:3 71:10

_____
**K**

Kalker (1)
28:22
keep (5)
19:4,11 53:21
53:23 56:11
kept (3)
18:17,19 20:25
kind (2)
51:6 54:7
KINGS (1)
73:5

73:5
knew (1)
15:9
knife (2)
48:14,16
know (52)
6:9,18,19 7:6
9:15,16 10:12
10:23 11:19
11:20 12:7
13:8 15:9,10
19:9,21 21:21
21:22,23 22:5
22:7 23:24
27:14 28:4
30:17 35:12
35:13,14,19
36:11,12
42:15 43:20
44:18 45:2,5
46:14 47:2,8
47:11,12,15
47:17,18
48:10,12,13
52:24 55:3
62:9 63:24
65:17
knowledge (7)
11:8,24 12:15
24:18 66:12
66:20 67:3
knowledgeab...
11:13,16 12:2
12:6 14:10
known (2)
12:19 29:22
Kosher (1)
28:25

___ L ___

L (4)
3:5,5,5 70:2
laud (1)
53:24
law (4)
2:4 8:4 52:8

59:16
lawfully (2)
60:19,21
lawyers (1)
26:12
LB (1)
1:6
leading (1)
58:8
Leahy (1)
25:16
leave (5)
3:25 4:16
42:18 59:11
61:6
legal (3)
2:16 61:3
62:12
let's (2)
45:13 46:16
letter (3)
11:14 31:3
71:9
Levine (3)
45:14,15 49:15
Liberty (1)
2:13
license (2)
48:4,8
line (2)
58:9 72:17
look (6)
6:13,16 24:20
52:23 61:9,13
looking (2)
58:6 62:3
lot (2)
12:7,8
louder (2)
56:13,13
lunch (1)
27:16

___ M ___

making (5)
39:14 49:2,22

50:16 53:23
Manhattan (1)
26:19
March (1)
11:15
Mario (3)
1:3 2:4 3:18
Mark (4)
1:10 2:12,17
3:4
marked (8)
3:3 24:13 30:8
37:8 46:2
57:15 71:4
72:16
marriage (1)
73:16
matter (1)
73:18
meals (8)
26:13 27:12
29:3,15 32:15
39:21 40:3,12
mean (1)
20:24
Melanie (3)
45:14,15 49:14
memory (1)
37:5
mine (1)
40:17
minute (1)
30:6
minutes (2)
64:25 65:3
mired (1)
25:11
misconduct (2)
33:10 37:3
moment (1)
10:15
money (9)
26:2 27:12,21
28:8,11 29:15
41:15 48:12
48:13

monitor (2)
18:13 19:16
MONTENA ...
2:19
morning (14)
3:23 4:8,12 5:6
11:11 13:7
27:17 54:23
55:8,15 56:23
57:3,9 65:5
Motor (3)
37:18 44:11
62:13
motorist (1)
41:4
motorists (6)
26:11 40:16,19
40:25 66:11
66:17

___ N ___

N (4)
2:2 3:5 70:2
72:2
name (6)
3:11 7:7 22:21
22:23,24
45:15
named (1)
44:12
names (1)
22:21
nature (2)
7:10 9:4
need (1)
38:15
needed (1)
56:7
never (21)
9:3 23:12,13
35:24 38:23
42:6 45:7
47:10,10,19
47:25 48:24
50:15 56:9
58:22 60:12

60:13 61:8
62:21 63:4
65:6
new (22)
1:2,21 2:5,5,8
2:13,13,19
3:7,16 8:4
10:12 24:3,5
24:22 25:14
44:4,7 52:8
59:16 73:4,8
Newman (3)
1:20 73:7,23
nine (1)
63:2
Northern (1)
26:19
Notary (4)
1:21 3:7 70:22
73:7
notice (2)
1:18 5:15
now's (1)
39:5
Number (2)
63:11 71:7
NY (2)
1:10 2:11

___ O ___

O (2)
3:5 70:2
Object (17)
10:7,13 14:4
15:7 16:10
18:10 21:6
23:19 27:6
29:16 51:14
52:15 54:5,20
57:20 60:14
63:7
objection (92)
5:11 6:4,25
7:18 8:6,15
8:20 9:7
11:17 12:16

12:23 13:12
13:19,23
14:22 15:19
17:11,18 18:4
18:23 19:8,19
20:5 21:17
22:2 23:4
24:6 25:20
26:5 27:5,6
28:12 29:6,21
30:25 31:7,22
32:3,8,18
33:13 34:3,9
36:6,18 38:19
38:25 39:18
39:23 40:6,21
41:8,17 42:9
42:24 43:8,18
44:13 45:10
45:11 47:13
48:17 49:9
50:11 51:2,13
51:14,15,20
52:11,14
53:20 55:19
56:3 59:18
61:2,11,15,16
62:5,6,19,24
63:23 64:11
64:16 65:11
65:21 67:10
67:24 68:4,7
**observation (2)**
6:23 7:25
**observe (6)**
6:10 20:2,8,9
65:15,19
**occasions (1)**
36:13
**occurred (2)**
9:6 28:4
**occurrence (3)**
23:18 29:7
32:2
**offering (1)**
25:13

**office (23)**
2:8 5:18 11:15
13:6 14:3
16:18 17:10
18:13 20:13
40:17 45:17
49:7 50:8
51:12 53:17
54:4,11 65:17
65:20 66:2,5
67:8 68:21
**officer (1)**
57:17
**officers (2)**
3:25 59:9
**official (3)**
1:11 2:12,18
**Officials (1)**
26:13
**okay (3)**
43:5 68:25,25
**One-page (1)**
71:9
**open (1)**
59:6
**opening (1)**
13:15
**opinion (1)**
61:22
**opportunity ...**
34:6 35:18
36:4,8 38:4
43:16,21
51:10,18,23
52:10 53:9
57:7
**order (1)**
56:8
**outcome (1)**
73:17
**outside (2)**
13:3 45:4
**oversight (1)**
25:16
**owed (1)**
16:9

| P |
|---|

**P (2)**
2:2,2
**P.M (2)**
1:14 69:3
**page (8)**
26:8 46:16
52:23 54:16
71:6 72:4,9
72:17
**paragraph (9)**
25:9 26:9
37:11,14,20
39:5 57:18
58:7 59:3
**Parkway (1)**
3:15
**part (2)**
46:15 63:15
**particular (1)**
8:24
**particularly ...**
12:9
**particulars (1)**
9:22
**parties (4)**
28:15,22 29:2
73:15
**party (3)**
28:19,20 63:24
**payments (1)**
25:14
**PEC (2)**
1:9 2:11
**people (5)**
12:8 19:16
28:25 64:20
68:20
**Perez (4)**
46:20 47:9
48:2,4
**person (4)**
7:6,10 17:17
44:19
**personally (5)**
23:8 44:6

54:18,22 55:7
**petition (3)**
37:15,19 71:11
**phone (4)**
10:2,10 14:18
19:15
**phonetic (2)**
27:15 48:5
**physical (1)**
31:19
**physically (1)**
36:23
**pick (1)**
64:12
**place (4)**
2:5 50:17 56:8
70:11
**Plaintiff (3)**
1:4,17 2:4
**Plaintiff's (6)**
24:12 30:7
37:7 45:25
57:14 71:4
**Plaza (1)**
2:18
**pleading (1)**
66:11
**please (3)**
3:11 22:11
56:18
**point (10)**
9:2 21:19
45:17 51:17
51:22 52:17
59:5 61:19
63:2,6
**pointed (1)**
15:14
**police (7)**
3:25 55:2 57:8
57:12,17
59:10 63:19
**pontificate (1)**
68:13
**portion (1)**
57:23

**position (4)**
6:19 35:21
50:14 66:9
**possible (1)**
14:25
**practice (4)**
8:4 10:11 11:4
59:16
**practices (1)**
25:11
**practicing (1)**
52:8
**prefacing (1)**
48:19
**preferential (...**
29:10
**presence (4)**
3:25 10:20
20:4,10
**presents (2)**
32:14 39:21
**preserve (3)**
19:5,15,17
**preserved (1)**
18:17
**pretty (2)**
17:7 51:10
**previously (7)**
3:3 24:13 30:8
37:8 46:2
57:15 71:4
**prior (1)**
52:18
**privilege (1)**
58:19
**privy (3)**
11:13 21:17
28:6
**PRO (1)**
2:4
**problem (10)**
16:25 17:3
22:22 23:9,12
23:15 34:14
35:14,20
36:17

problems (4)
22:9,11,16
  35:10
Procedure (1)
1:19
proceeding (1)
37:17
process (1)
45:3
proof (2)
65:24 67:19
public (5)
1:21 3:7 25:12
  70:22 73:7
pull (1)
45:24
pursuant (1)
1:18
pushed (1)
14:17
put (1)
59:7

**Q**

question (51)
4:11 5:12 6:5
  7:2,19 8:7 9:8
  17:12 18:24
  21:7 22:14
  24:7 25:21
  28:13 29:17
  32:19 33:14
  35:23 36:19
  38:20 41:9
  42:25 43:23
  44:14 48:19
  49:10 52:3
  56:12,21,23
  56:25 57:6,21
  58:15,20
  59:19 63:2,8
  63:10 64:4,13
  64:22 65:12
  66:4,6,9
  67:25 68:8,12
  68:16 72:17

questioned (3)
45:7 60:12,13
questions (3)
3:19 68:14
  72:16

**R**

R (3)
2:2 70:2 73:2
reaching (1)
14:18
read (4)
10:25 11:23
  25:5 57:7
reads (1)
25:9
reason (3)
4:17 33:18
  40:9
reasons (1)
32:20
recall (45)
5:14,21,23
  6:15 8:12,17
  8:23 9:11,21
  9:23 10:24
  11:5 12:18
  14:24 15:21
  15:22,24 16:3
  16:16,20 17:6
  17:20 18:18
  19:10,25 20:7
  31:16 33:3,8
  34:5,8 37:22
  37:23 39:13
  41:5 43:3
  45:23 47:16
  48:23 50:2
  53:7 57:11
  58:21 59:11
  59:14
receive (5)
13:25 29:15,20
  40:24 41:3
received (1)
26:2

receiving (3)
27:2 29:23
  40:11
record (3)
3:12 36:22
  73:12
recorded (1)
60:8
referrals (1)
26:15
refused (1)
59:20
regards (1)
50:3
related (1)
73:15
remember (22)
7:8 9:19 11:25
  15:4 17:24
  22:6 23:7
  36:2 37:24
  38:21,22 39:3
  39:14 41:12
  42:3 43:4,25
  46:7 47:22
  54:14 60:17
  61:18
removal (3)
52:19 54:19,23
removed (17)
3:22 4:18 8:3
  9:14,16 33:10
  33:24 34:16
  43:14 50:24
  52:7 59:15
  61:14 62:2
  65:10 67:23
  68:5
repeat (1)
19:2
report (42)
13:4 26:7
  43:11,11,12
  43:13,16
  45:20 46:13
  47:5,20 48:25

49:3,4,6,12
49:13,20,22
50:3,4,17,20
51:11,19,24
52:2,5,18,22
53:12,13 54:2
54:10,15 57:8
57:12,23
59:15 60:3
61:23 63:19
reported (11)
7:5 16:23 26:6
  27:9 29:24
  31:12,14
  33:17,19,21
  62:8
Reporter (2)
36:21 71:17
reporting (2)
8:10 45:4
reports (9)
35:12 45:8
  49:25 50:23
  51:5,6 53:2,3
  53:11
represented (...
46:20,24 47:9
  48:2
request (1)
18:16
REQUESTE...
72:8
rescheduling...
66:16
resolve (1)
36:5
respect (15)
14:2 15:23
  16:19 17:9,16
  32:6 37:3
  38:5 42:7,23
  47:19 50:8
  56:22,24 57:2
respond (10)
15:6 17:2 34:7
  35:18 36:4,9

51:10,18,23
  52:10
response (5)
15:3 16:2,14
  17:14,23
restrain (1)
30:20
result (1)
10:10
results (1)
33:5
retained (1)
71:17
review (2)
54:4,11
reviewing (1)
15:22
rid (1)
39:6
right (39)
3:17 4:2 6:11
  6:14,24 7:16
  10:12 21:5,14
  29:25 30:14
  34:7,16 38:10
  38:18,24
  39:16 41:13
  42:8 43:17
  45:9,23 47:11
  49:16,21
  51:12 53:2
  55:8,16 56:2
  60:13,24 64:9
  65:18 66:2
  67:21 68:6,18
  68:24
ring (1)
45:15
Rochelle (1)
2:5
room (5)
2:18 10:19
  59:10 66:11
  66:16
routine (1)
67:9

rudely (1)
40:18
rules (2)
1:19 56:17
RULINGS (1)
72:16
Rumor (1)
65:23

_____
S

S (2)
2:2 71:2
SADIQ (2)
1:9 2:11
saw (6)
11:20 63:4
    65:25 68:2,9
    68:17
saying (2)
4:2 10:25
says (4)
26:19 39:5
    42:20 64:8
schemes (2)
24:17,22
SCHROEDE...
1:10 2:12,17
Scott (1)
25:17
SE (1)
2:4
second (2)
46:16 58:8
security (1)
19:16
see (11)
37:13 45:14
    46:15 52:18
    58:5 59:25
    66:10,15,17
    67:22 68:20
seen (2)
30:17 46:6
send (1)
53:15
sent (6)

44:2 49:13,16
    52:22,25 53:2
set (2)
73:11,20
Sheldrake (1)
2:5
show (1)
24:11
shown (1)
18:20
sign (1)
15:15
sitting (2)
15:13 41:24
situation (1)
42:19
slash (1)
48:16
slur (1)
32:6
Smart (33)
1:10 2:12 5:10
    5:17,22 6:3
    8:22 9:23
    11:10 12:4,11
    12:13,22 14:2
    14:17 15:13
    16:5,6,22
    17:7,16,25
    18:22 19:7,24
    57:9,25 58:4
    58:10,13,24
    60:12 65:4
somebody (3)
60:11 61:25
    63:22
somebody's (1)
6:22
sooner (1)
34:19
South (1)
26:19
speak (3)
20:22 23:10
    32:23
speaking (1)

23:7
spear (1)
15:14
specific (15)
22:6,7,21,25
    22:25 23:6,17
    23:18,21
    31:16 33:18
    35:6,11 37:2
    40:15
specifically (7)
12:9,14,18
    14:7 32:10
    36:11 42:3
specifics (1)
37:24
specified (1)
70:11
speech (1)
65:9
spoke (2)
15:10 36:12
SS (1)
73:4
stab (1)
48:15
staff (4)
13:20 20:15
    22:17 34:15
state (10)
1:21 2:8,18 3:7
    3:11 44:3,7
    59:3 73:4,8
statement (21)
11:5 20:17,19
    21:25 32:16
    38:10,12,12
    39:7,12 46:22
    46:23 47:19
    48:24 49:8
    52:13,16
    53:24 54:8
    59:23 60:6
statements (3)
25:6 38:17
    54:3

states (2)
1:2 41:22
stay (1)
26:18
steering (1)
26:11
stole (2)
16:6,9
stood (1)
15:13
stop (4)
34:22,25 49:21
    56:5
stopped (1)
34:23
story (2)
53:10 62:3
Street (1)
2:13
submitted (4)
13:7 14:8
    37:16 49:7
Subscribed (1)
70:18
supervision (2)
21:5,10
supervisor (20)
4:6 8:11 14:3
    16:19 23:11
    24:24 26:25
    40:4 45:16
    46:8,13,17
    47:7 49:2,19
    50:22 55:9
    60:9 61:4
    66:8
supervisor's ...
4:20
supervisors (3)
4:5 13:21 61:5
supervisory (1)
12:20
supplied (1)
28:25
supply (1)
53:9

supplying (1)
29:3
sure (5)
8:25 21:15
    39:9 53:5
    65:2
suspended (2)
48:5,8
suspicious (3)
67:7,12,14
sworn (4)
3:6 70:5,18
    73:11

_____
T

T (4)
70:2 71:2 73:2
    73:2
TAHIR (2)
1:9 2:11
take (5)
15:2,25 16:13
    42:22 60:6
taken (1)
1:17
talk (2)
8:21 9:25
talking (3)
9:23 22:5 45:6
tape (1)
18:14
Teague (2)
44:12,16
telephone (1)
4:13
tell (37)
7:9,12 13:14
    21:10 22:10
    22:11,12,15
    22:17,20,23
    22:24,25
    30:21,23 31:4
    31:15,18,20
    31:24 32:4,5
    32:10,20,22
    33:5,7 34:25

December 17, 2020

Page 83

35:4,5,10
47:24 58:2,11
59:10 60:2
65:4
**telling (5)**
30:19 58:23
59:12 62:15
62:16
**tells (1)**
10:4
**Terry (1)**
28:22
**testified (1)**
3:8
**testify (1)**
70:5
**testifying (1)**
48:18
**testimony (6)**
5:24 7:14 8:2
70:6,10 73:13
**texted (1)**
26:13
**thank (1)**
68:25
**theft (3)**
16:15,19,23
**thing (2)**
12:12 51:7
**things (6)**
13:2,16 26:22
27:9 45:4
55:23
**think (4)**
29:13 41:18
67:7 68:21
**third-party (1)**
8:3
**THOMPSO...**
2:14 4:10 5:11
6:4,25 7:18
8:6,15,20 9:7
10:7,13 11:17
12:16,23
13:12,19,23
14:4,22 15:7

15:19 16:10
17:11,18 18:4
18:10,23 19:8
19:19 20:5
21:6,17 22:2
22:13 23:4,19
24:6 25:20
26:5 27:5
28:12 29:6,16
29:21 30:25
31:7,22 32:3
32:8,18 33:13
34:3,9 35:22
36:6,18 38:19
38:25 39:18
39:23 40:6,21
41:8,17 42:9
42:24 43:8,18
44:13 45:10
47:13 48:17
49:9 50:11
51:2,13,20,25
52:11,14
53:20,23 54:5
54:20 55:19
56:3,11 57:5
57:20 58:14
59:18 60:14
61:2,11,15
62:5,19,24
63:7,23 64:3
64:11,16,21
65:11,21
67:10,24 68:4
68:7,11
**threat (2)**
15:6 31:18
**threatened (5)**
31:11 34:15
40:18,25
48:14
**threatening (5)**
30:20,22 31:5
31:10,13
**threats (1)**
17:15

**three (4)**
36:24 46:20
48:3 64:25
**Three-page (2)**
71:8,14
**threw (1)**
41:22
**ticket (8)**
24:17,21 25:22
65:15,17,18
65:19 67:8
**tickets (2)**
25:2,13
**time (23)**
1:14 8:9 9:11
12:19 13:7
14:25 21:15
23:7,23 31:21
31:24 32:2,11
36:25 47:3
50:3 51:17,22
52:17 54:14
63:6,11 70:10
**times (4)**
22:8 23:11
41:18 63:3
**tires (1)**
48:16
**today (1)**
37:4
**told (35)**
4:4,5,7 5:19
7:5,23 8:11
8:13 11:20
14:13 19:13
23:11 27:19
38:15 42:13
42:15 47:7
54:25 55:9,13
58:4,22 59:4
59:8,12 60:9
60:11 61:5,25
62:8,22 63:5
63:13,22 65:6
**tone (1)**
56:13

**top (5)**
46:15 52:23
54:16 57:23
58:7
**Traffic (2)**
25:10 26:20
**transcript (2)**
70:9,9
**Traschen (20)**
1:8 2:10 4:7,14
4:24,25 7:22
7:24 10:4
11:9 20:9
54:25 55:12
58:3,12,18,23
59:21 61:24
62:17
**Traschen's (1)**
4:21
**treatment (1)**
29:10
**trial (2)**
46:20,25
**true (10)**
33:25 47:18
49:12 53:15
53:18 54:3
55:18 62:22
70:9 73:12
**truth (14)**
3:20,21 6:24
7:4 45:8 47:5
49:8 50:7,19
51:9,11 52:9
64:8 70:5
**truthful (2)**
21:24 63:13
**truthfulness ...**
21:19 46:23
49:25 63:21
**try (1)**
15:5
**turned (1)**
25:4
**TVB (26)**
3:24 10:12

12:4,22 13:11
17:9 18:9
20:14,15 21:4
24:3,22 25:19
25:23 26:19
26:21 27:13
33:11 34:12
43:15 50:24
64:7,15 65:10
66:23 67:5
**TVBs (5)**
8:4 24:5 33:11
52:8 59:17
**twice (1)**
42:16
**type (1)**
18:14

———————
**U**

**um (1)**
18:12
**understand (2)**
19:3 26:21
**unit (1)**
63:17
**UNITED (1)**
1:2

———————
**V**

**V (1)**
3:5
**validity (2)**
46:22 47:5
**Vehicles (3)**
37:19 44:11
62:13
**verbal (1)**
31:18
**verbally (3)**
23:22 31:24
41:2
**verified (3)**
62:21 63:4
71:11
**verify (6)**
62:2,10 63:13
63:14,21 64:2

version (2)
53:9 59:22
versus (1)
37:18
VIDEOCON...
1:20
videotape (13)
5:9 6:14,17
15:23 18:9,17
19:5,23 20:3
20:9 61:9,13
62:3
videotaped (2)
6:19 19:10
view (2)
5:8 19:22
viewing (1)
20:3
Violation (2)
25:10 26:20
violations (2)
46:21 48:3
violence (13)
17:15 31:19
45:20 46:5
50:17 52:25
53:3,11,12
54:9 57:23
71:13,15
voice (1)
56:14
voracity (3)
21:19 35:16
45:8

___ W ___
waiting (1)
63:12
Waltrus (1)
48:5
want (17)
3:20,20 22:11
38:7,13 39:20
40:2,8 49:5
49:23 50:5,7
50:10 53:15

53:18 54:2,4
wanted (14)
13:15 17:8
18:3 34:13,16
34:20,22 39:4
39:16 43:10
43:12 55:25
56:5 63:18
wants (1)
38:11
wasn't (7)
4:19 27:15
32:14 39:21
40:3 41:16
66:8
way (8)
15:6 18:2
19:11 34:19
40:19 56:6
64:6 73:17
we're (1)
22:5
went (3)
45:3 48:7 59:4
weren't (2)
27:20 28:10
whatsoever (1)
36:14
WHEREOF ...
73:19
witness (10)
3:6 6:23,23
39:25 51:16
56:16 69:4
73:10,13,19
woefully (1)
25:15
words (2)
7:11,13
work (10)
27:24,25 45:20
47:20 50:16
52:18,25 53:3
53:11 54:2
workday (1)
26:15

worked (2)
13:2 44:10
working (2)
55:17 66:22
workplace (6)
46:5 53:12
54:9 57:22
71:12,14
wouldn't (3)
28:17 29:5
34:24
write (5)
21:11 38:7
50:9 53:18,25
writing (4)
12:13 46:18
57:18 59:8
written (7)
11:22 20:13
37:16 49:14
49:18 51:11
57:8
wrong (1)
67:17
wrote (2)
11:2,14

___ X ___
X (4)
1:3,12 71:2
72:2

___ Y ___
Yakov (7)
37:21 38:9
39:11 41:21
42:8,11,15
yeah (2)
22:15 68:22
years (1)
24:17
yelling (2)
22:19 35:8
York (19)
1:2,21 2:5,8,13
2:13,19 3:7
3:16 8:4

10:12 24:3,5
24:22 44:4,7
59:16 73:4,8

___ Z ___
Zift (1)
27:15
Zoom (2)
1:19 36:23

___ 0 ___

___ 1 ___
1:24 (1)
1:14
10 (1)
63:11
10005 (1)
2:13
10804 (1)
2:5
11 (17)
3:23 4:8,12
11:11 16:5
18:22 30:6,8
30:11 41:21
52:19 54:19
54:23 57:3,9
65:5 71:9
11-page (1)
71:11
11209 (1)
3:16
11228 (1)
2:19
11th (3)
18:17 55:8
56:23
12 (1)
16:6
13 (4)
37:11,14,20
39:5
150 (1)
16:7
17 (1)
1:13

17th (1)
2:13
18 (1)
1:6
18CV2710 (1)
2:20

___ 2 ___
2 (1)
26:8
2:37 (1)
69:3
20 (3)
11:15 70:19
71:10
2011 (4)
16:5 38:2
39:11 41:21
2012 (5)
14:16 16:4,6
31:4 71:10
2014 (1)
15:12
2015 (16)
3:23 4:8,12
10:22 11:11
11:15 18:22
46:9,21 47:10
52:19 54:19
54:23 57:4,10
65:5
2020 (2)
1:13 73:20
21 (2)
2:5 47:9
22 (2)
39:11 46:21
24 (1)
71:8
2710 (1)
1:6
28 (1)
2:13

___ 3 ___
3 (1)

72:5
**30 (1)**
71:10
**31st (1)**
73:20
**35 (1)**
30:3
**37 (1)**
71:11

---
**4**

**4 (4)**
24:10,11,13
71:8
**45 (1)**
71:13

---
**5**

**5 (1)**
46:9
**522A (1)**
2:18

---
**6**

**6 (3)**
2:18 30:5,5
**67 (4)**
57:13,15 71:14
71:15

---
**7**

**7 (3)**
37:6,8 71:11
**78 (1)**
37:17

---
**8**

**8 (1)**
10:22
**80 (2)**
16:7,9
**85 (3)**
45:24 46:2
71:12
**86 (1)**
3:2
**8th (1)**

10:19

---
**9**

**9952 (1)**
3:15