

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MARIO H. CAPOGROSSO,                                    18 CV 2710

                    Plaintiff

        -against-

ALAN GELBSTEIN, in his official and individual capacity;
IDA TRASCHEN, in her official and individual capacity;
DANIELLE CALVO, in her official and individual capacity;
SADIQ TAHIR, in his individual capacity;
PEC GROUP OF NY, INC.;
DAVID SMART,
and MARK SCHROEDR Commissioner of the
New York State Department of Motor Vehicles
Defendants

RECEIVED IN PRO SE OFFICE

FEB 14 2022

## OBJECTIONS TO REPORT & RECOMMENDATION DATED FEBRUARY 1, 2022 (ECF 278)

Mario H. Capogrosso hereby declares the following pursuant to 28 U.S.C.A. §1746:

1. I am the Plaintiff in the above-captioned matter.

2. I submit this Declaration in support of my Objections to the Report & Recommendation of Magistrate Bloom (Hereinafter "Report") dated February 1, 2022 (ECF 278)..

3. My specific Objections to the foregoing Recommendations are as follows:


4. The Report states In 2009, DMV began to receive complaints about plaintiff's behavior at the TVB. I received more complaints about plaintiff than I received about any other attorney in My entire time at DMV (describing plaintiff yelling obscenities at clerks and other attorneys." (Report, page 3) I object to these facts. The record evidence creates a genuine issue as to material facts.

1

There was no proper investigation by defendants Gelbstein, Traschen or Calvo as to any complaint as to their truth or as to what facts actually constituted the complaints. They are allegations only with no factual support. Without receiving my response in reply to any complaint, there was no proper investigation to any complaint against me.

6.  The Report states, "After receiving the petition, then Administrative Law Judge )"ALJ") Alan Gelbstein and Supervising ALJ Vahadatlamas advised plaintiff that if he did not conduct himself appropriately he would not be allowed to appear on behalf of motorists. (Report, pages 3 and 4). I object to these facts. The record evidence creates a genuine issue as to material facts.

7.The Report states, "On December 21, 2011, plaintiff was involved in another incident in which he used anti_Semitic language towards another attorney and then punched the air near another attorneys face (email from ALJ Vahadatlamas memorializing the investigation following the event), (statements from four attorneys who witnessed the incident. Plaintiff admits to using threatening language and throwing a punch at the wall. After obtaining plaintiff's version of events, Gelbstein, Vahadatlamas and Neil Schoen, the Deputy Commissioner for legal Affairs, determined that plaintiff would be suspended from practicing at any TVB location for three months, and from practicing at the Brooklyn South location indefinitely. (Report, page 4). I object to these facts. The record evidence creates a genuine issue as to material facts.

2

8.The Report states, Plaintiff was allowed to resume practice at the TVB on the condition that he strictly adhere to the standards of conduct requires of attorneys appearing before State courts. Further, the DMV warned plaintiff that in the event that MR. Capogrosso commits an act of physical violence, he shall be immediately and permanently barred from appearing on behalf of DMV licensees at TTVB offices. (Report pages 4-5) I object to these facts. The record evidence creates a genuine issue as to material facts.

9.The Report states, "Plaintiff returned to the Brooklyn South TVB mid-2012 and soon after, he and David Smart, a security guard at TVB employed by the private security firm PEC Group of NY, Inc. ("PEC") made complaints against one another (Workplace Violence report stating plaintiff accused Smart of looking at him and that a police officer had to intervene. (Smart complains that plaintiff deliberately walked into him) Others also filed complaints about plaintiff's aggressive behavior at the TVB. (Report page 5) I object to these facts. The record evidence creates a genuine issue as to material facts.

10.The Report states, "On March 20, 2015 plaintiff sent a letter (hereinafter the AG letter) to Assistant Attorney General ("AAG") complaining inter alia, Smart was tampering with plaintiff's files, that Smart had gotten in his face and stated and glared and that Smart had gestured in plaintiff's direction." (Report page 5)  I object to the incomplete and partial recitation of the facts presented. The record evidence creates a genuine issue as to material facts.

3

11. The Report states that "Gelbstein and Traschen became aware of the letter but did not respond to it or take any action because, in their view, the letter contained stale claims that plaintiff previously cited to Gelbstein" (Report pages 5-6) I object to these facts. The record evidence creates a genuine issue as to material facts.

12. The Report states, "On May 5, 2015 plaintiff was involved in another incident at the TVB. Reports of the incident state that plaintiff began yelling when Sadiq Tahir, another lawyer at the TVB, touched his bag" (Report, page 6) I object to these facts. The record evidence creates a genuine issue as to material facts.

13. The Report states "Less than a week late on May 11, 2015, plaintiff and Smart got into another argument and plaintiff shoved Smart" (Report, page 6) I object to these facts. The record evidence creates a genuine issue as to material facts.

14. The Report states, "Danielle Calv, a supervising Motor Vehicle Representative, called Gelbstein to inform him of the incident." (Report page 6). I object to these facts. The record evidence creates a genuine issue as to material facts.

15. The Report states, "Later that day, Gelbstein and Traschen discussed the incident and concluded that plaintiff should be permanently barred from the TVB considering the history of aggressive behavior, the fact that his suspension and anger management classed had not tempered his outbursts, and that plaintiff had already been warned that any incident

of physical violence would lead to his permanent bar from the YVB." (Report, page 6) .I object to these facts. The record evidence creates a genuine issue as to material facts.

16. The Report states, "Gelbstein and Traschen state that plaintiff's letter to the AG played no role in this decision to par the plaintiff from (TVB) practice." (Report, page 7) I object to these facts. The record evidence creates a genuine issue as to material facts. The record evidence demonstrates that there are triable issues as to material fact, which are not undisputed

17. The Report states "Plaintiff requested that the Court order defendant Commissioner Schroeder be produced for a deposition and that defendant Smart be ordered to respond to his interrogatories." (Report, page 8).I object to these facts. The record evidence creates a genuine issue as to material facts.

18. The Report concludes, "Defendants move from summary judgment on the ground that the decision to bar plaintiff from practice at TVB offices was attorney discipline, a judicial act, and thus the State Defendants are protected by judicial and quasi judicial immunity." (Report, page 10). I oppose this conclusion, it is not true.

19. The Report concludes, "Administrative Law Judges (ALJs) have absolute judicial immunity. (Report, page 11). I oppose this conclusion, it is not true.

20. The Report concludes, "Both defendants Traschen and Calvo were thus immune from suit when performing functions closely associated with judicial functions." (Report page 12). I oppose this conclusion, it is not true.

21. The Report concludes, with respect to an attorney surviving a motion for summary judgment on a First Amendment claim, "plaintiff an attorney practicing before a State administrative tribunal, does not fall squarely into either category. However, the Court need not resolve which standard applies here since plaintiff's for First Amendment retaliation fails under either standard." (Report, page 14). I oppose this conclusion, it is not true.

22. The Report concludes. "there is no evidence of a casual relationship between plaintiff's letter and the plaintiff's permanent bar from the TVB. Similarly, as to the second element of the private citizen test, the plaintiff has proffered no evidence of defendants' improper motive beyond his own conclusionary statements." (Report, page 15). I oppose this conclusion, it is not true.

23. The Report states, "State Defendants proffer a litany of complaints about plaintiff's aggressive behavior. Although plaintiff wishes to litigate the who said what of the interpersonal disputes in federal court (plaintiff responds tote State Defendants' exhibits giving his side of each complaint made against him) the record demonstrates that many individuals reported feeling unsafe at the TVB because of plaintiff's behavior. One report states the plaintiff was more often than not a menace to the office, another describes plaintiff as creating an atmosphere of fear. Moreover, plaintiff's behavior was deteriorating. It was not one incident, but the culmination of many incidents and complaints

that led to plaintiff's bar from the TVB." (Report, page 16). I object to these facts. The record evidence creates a genuine issue as to material facts.

24. The Report states, "Prior to plaintiff sending his letter to AAG Pricket Morgan, plaintiff was suspended from practice at TVB due to his aggressive and harassing behavior. Plaintiff was explicitly warned that he would be barred from the TVB if he commits and act of physical violence. (Report, page 16). I object to these facts. The record evidence creates a genuine issue as to material facts.

25. The Report states, "Plaintiff only offers his suspicion that the AG letter was the true cause of his bar." (Report, page 16). I object to these facts. The record evidence creates a genuine issue as to material facts.

26. The Report states, "there is no record evidence that plaintiff's letter to the AG motivated defendants to bar him from the TVB" (Report, page 16). I object to these facts. The record evidence creates a genuine issue as to material facts.

27. The Report states, "There is nothing in the record that reflects an Article 78 proceeding was unavailable to plaintiff regarding his bar from the TVB. AS he did not seek declaratory relief, his demand for injunctive relief should be denied." (Report. Page 17) I object to these facts and conclusion. The record evidence creates a genuine issue as to material facts.

28. The report states, "Defendant Smart moves for summary judgment on the grounds that he is not a state actor. The Court agrees, Smart, a private security guard, did not act under color of state law." ( Report, page 17). ). I oppose this conclusion, it is not true. The record evidence creates a genuine issue as to material facts.

29. The Report states, "Mere participation is an event that led to a state action does not confer the authority of state law on Smart." (report, page 18). I oppose this conclusion, it is not true.

30. The Report states, "plaintiff fails to establish that Smart was involved in the decision to bar plaintiff from the TVB. Indeed was not even involved with removing plaintiff from the TVB. Plaintiff fails to show that Smart was compelled to act by the state on May 11, 20`5 or hat any public function was delegated to Smart. Plaintiff provides no evidence to the support his theory that Smart was involved in the decision to bar him from the TVB." (Report, page 19). ). I oppose this conclusion, it is not true. The record evidence creates a genuine issue as to material facts

31. The Report sates, "Here there are no exceptional circumstances, and the Court should decline to exercise its supplemental jurisdiction over plaintiff's state law claims." (report, page 20). I object to these facts and conclusion of law. The record evidence creates a genuine issue as to material facts

My opposition with respect to complaints made against by the Brooklyn South TVB,
supervisory personnel, its clerical staff, and those attorneys with whom I had to interact.
There are triable issues of material fact demonstrated by the record evidence which are not
undisputed.


There was no proper investigation of any of the complaints made against me.

Gelbstein's deposition, ECF-235-2, page  10

> Q: Did you observe the videotape of the alleged push?
> A: I don't recall whether I did or not.
> Q. So you don't recall ever observing the videotape?
> A. I don't recall
> Q. Did you keep possession of the videotape ?
> A. I personally did not
> Q. At any point in time did you view tat videotape?
> A. I don't recall


Gelbstein's deposition, ECF 235-2, page 11

Q. Did you have me removed from the Brooklyn TVB based on that videotape, did you?
A. I would have – assuming that I saw it, which I don't recall I did, it would have been
probably well after the fact


Gelbstein's deposition, ECF 235-2, page 24

Q. You (ever) present(d) me with  a written complaint and asked me to respond
A. No I never gave you a written complaint to respond to.


Gelbstein's deposition, ECF 235-2, page 26

When questioning defendant Gelbstein upon anyone specific complaints, he answers
Q. But you don't recall the date you called me in or the complaint that you asked me to
address?
A. Right
Q. And you never asked me for a written reply to any complaint; is that fair
A. That's fair

Gelbstein's deposition, ECF 235-2, page 27

Q. And you just accepted all those complaints as true without asking for my affidavit in response; I is that a fair statement?
A. I did not ask for an affidavit in response.

Gelbstein's deposition, ECF 235-2, page 29

Q. Did you investigate that complaint, Defendant Gelbstein (referring to clerk supervisor Melanie's documentation of Mr. Perez' complaint )
A. I don't recall if I specifically investigated this complaint
Q. So you don't know the voracity or truthfulness of that complaint, is that a fair statement
A. I don't recall at this time

With respect to threatening conduct or verbal abuse, there are triable issues of material fact. Reference, Exhibit F, Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and ECF 41.

In this opposition and response to all allegations of wrongdoing. I repeatedly state and do hereby affirm there was never any threatening conduct or verbal abuse.

I affirm I have never harassed threatened or been aggressive towards women. The record is devoid of any actual words of threat or acts of threat. Reference Attachment F.

I affirm I like women, I like women, I like women. I affirm, woman make the party. I am dating two women currently and they both call me to take them out – so I must be doing something right.

I also affirm that when they act improperly, Tanya Rabinovich calling and acting as a lawyer or Agnes Paez soliciting motorist at the TVB, and both of these individuals were removed from the Brooklyn TVB because of their behavior, I affirm I will call the District Attorney or choose not to associate with them, respectively.

I affirm that I am an aggressive attorney but not a threatening attorney. I state the truth. I don't stay quiet. I am not ashamed of this, though it is what the TVB and specifically its lead ALJ  Bushra Vahdat wanted me to do. Reference Exhibit G, Letter from McDonough & McDonough, LLP to Barbara J. Fiala, Commr of Motor Vehicles, "if Mr. Capogrosso "was good" and "stayed quiet" she would reconsider the determination three months later."

I affirm, I am an aggressive attorney, I am going to do what is right, not what is good. If I wanted choose what was good for me I would not be before this Court.

With respect to my interaction with Tanya Rabinovitch. There are triable issues as to material facts, which are not undisputed. Reference my Response to Exhibit 1 and Response to Exhibit 2, , of Exhibit F of  Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF  40 and 41)

It provides, and I again affirm that I  have personal knowledge that,

My defense – Tanya Rabinovitch approached me that day after I   complained to the District Attorney concerning her continuous representation of herself as an attorney at the Brooklyn South DMV TVB. After admitting to her that I filed such report with the District Attorney, she accosted me that day with a verbal tirade. Defendant Gelbstein's response to my complaint to the District Attorney was – "Who are you Don Quixote." I attempted to walk away from her that day and avoid her verbal tirade.

and

Again, Tanya Rabinovitch approached me complaining of my complaint to the District Attorney's Office – I did tell her to "get away from me." She was verbally

accosting me due to my complaint to the District Attorney's Office. I see nothing wrong with the comment "get away from me" and then attempting to avoid interacting with her.

I affirm, upon personal knowledge, that Tanya Rabinovich approached me yelling and screaming at me. Reference Response to Exhibit 1 and Response to Exhibit 2, , of Exhibit F of Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF  40 and 41)

I affirm, upon personal knowledge, that I got up in order to get away from Tanya Rabinovich who approached me yelling and screaming at me. Reference Response to Exhibit 1 and Response to Exhibit 2 of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41)

I affirm, upon personal knowledge, bumping into this woman. I do affirm that she approached me I do recall getting up and trying to walk away, and I do recall telling her to Get away from me get away from me. Reference Response to Exhibit 1 and Response to Exhibit 2 of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41)

Also Capogrosso deposition. ECF 236, page 146

"And she approaches me that day and sys did you call – did you call the District Attorney? I said yes, I did it I admitted it to her and she starts yelling and berating me and tried walking away from her."

I did not bump her, See Exhibit E, of Capogrosso, ECF 236, page 147

I testify "I wasn't charged .I wasn't arrested. I didn't do anything wrong but tried to get away from the situation and telling the truth. I told her what happened and what I did

I testify that I wan not screaming and yelling profanities See Exhibit E, Capogrosso deposition, ECF 236, page 147: 16-25, Page 148:1-15

When asked whether I used profanity it, I respond No I did not. I was telling her to get away from me , but I yelled no profanity and no obscenity."

Upon being asked whether I made contact with Tanya Rabinovich, I testify

"No, not that I recall, no" Capogrosso deposition, ECF 236, page 150 :2"I know I didn't bump into anybody" Capogrosso deposition, ECF236, page 153 :14

I tell Tanya to get away from me, "he stated get away from me, which is what I'm telling Tanya. To get away. Capogrosso deposition, ECF 236, page 155 :24-25

There are inconsistencies in the two complaints,

"there is no indication that I bumped into her because I didn't bump into her "That's Roy's version of the story. Capogrosso deposition, ECF 236, page 156 :2-4

"I don't recall touching this woman at any point." Capogrosso deposition, ECF 236, page 159,3-4

In opposition to any complaint by Marisol Cervoni, There is a triable issue as to material fact, it is not undisputed.

In support, reference my response to Exhibit 3, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41.

It provides, and I again affirm that I have personal knowledge that,

I am accused at belligerently yelling. I was called to the counter by a paralegal working for me at that time, and I asked, "what was the problem." There is nothing wrong with that. I did not curse. Marisol Cervine provides no indication of what curse word was used, because none was used. As I remember it I asked only "What was the problem" Further she indicates "that my aggressive behavior escalated. I have no idea what that means. What exactly am I being accused of doing to her. She indicates I made comments and smirked. My response, what comments were made. None were made. I was an aggressive litigator in this courtroom, but I made no aggressive action against her person at any point in time.

I affirm upon personal knowledge that I did not yell scream or insult Marisol Cervoni.

When questioned whether I cursed or insulted, I testify, "I never cursed or insulted the woman, absolutely not." Capogrosso deposition, ECF 236, page 169 13-16

I admit I might have been loud. Capogrosso deposition. page 169, because I want people to hear me when I speak . Capogrosso, ECF 236, deposition. page 169.

I testify, "I don't curse or insult women. It's snot something I do." Capogrosso deposition, ECF 236, page 170, 3-4.

I testify that "I never cursed yelled or insulted, absolutely not. Absolutely not."

14

Capogrosso deposition ECF 236. page 171, 2.3-25.

I testify, "Was I cursing and insulting, absolutely not." Capogrosso Deposition. page 173, 23-25.

I affirm I advocated on behalf of my client, to which I have taken oath to do. Let this Court we all have all taken our oaths before our respective Bars. I affirm based on that oath I have a duty to resolve my clients legal issues..

So I testify, when I am accused of not leaving the clerks' counter, "well, wait a second, wait. Wait a second. Maybe I wanted the issue resolve and I wanted some explanation of the issue, which is my duty to do. I have a duty to my client, not to a clerk, but to my client to make sure the issue is resolve, whatever the issue was." Capogrosso deposition. ECF 236 page 175, 12-19.

I affirm, upon personal knowledge, I was good at what I was doing in traffic court. I provide proof. Reference client reviews of my practice, see ECF 238, Exhibit J. .

I affirm, upon personal knowledge, that I had a very large case load, and kept a meticulous calendar, Reference my calendar and docket, see ECF 238, Exhibits L and M.

I affirm, upon personal knowledge, that if I did anything to violate the Rules of Professional Conduct, I would have been brought before the Grievance Committee , and the Department of Motor Vehicles never did so. Though they are not averse to doing so, reference Matter of Teague, attached herein as Exhibit K. though albeit the fact their lawyers acting as an administrative law judge possess their own history of misconduct, reference Exhibits H, an article referencing th4 misconduct of the supervising ALJ Bushra Vahdat. And Exhibit I, where ALJ Vahdat has violated Agency Rules on Outside Employment.

In sum and I affirm upon personal knowledge, that when Department of Motor Vehicles cannot grieve you, they send a security guard to harass and provoke the incident of May 11, 2015 so as to have me removed.

Refence my letter of Complaint seeing relief from such harassment, ECF 238, Exhibit O , and affidavits of threat and harassment upon my person by defendant Smart while I was at the Brooklyn TVB, reference ECF 238 Exhibits P, Q, and R.

With respect to the allegation of fear I affirm, that I was there at the TVB to do a job. I testify, I''I did not yell and I did not curse and I did not insult for what reason she is fearful I do not know. I didn't schmooze with her in the morning and ask how she' doing and is she okay and how is your weekend and how's all this. I didn't think about all that stuff. I was there to do a job" Capogrosso deposition . Page 181.

I testify, that if I was told that there was  problem or a complaint, I would attempt to rectify it immediately. Capogrosso Deposition. Page 183.

I was never aware of any complaints made against me,. I testify, "I've neve seen these complaints. I Judge Gelbstein was doing his job or his clerical supervisor we doing their job, they would have brought this complaint to my attention immediately and I would have resolved it..." Capogrosso deposition. ECF, 236, page 186.

I further testify, "All of these complaints. Judge Gelbstein never presented to me one of these complaints, not one" Capogrosso Deposition, ECF 236, page 189 16-19.

In opposition to any complaint by Agnes Paez there is a triable issue as to material fact, it is not undisputed.

In support, reference my response to Exhibit 4, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41)

It provides, and I again affirm that I have personal knowledge that,

I at no point told my paralegal at any time to follow this person. It is true she was NOT an attorney but it is true that she was soliciting motorists on a continuous basis in the Brooklyn South TVB court. She was eventually thrown out of the DMV due to her relentless soliciting of motorists not only on the floor of the DMV but in its parking lot by Defendant Gelbstein. She provides no indication specifically of "the variety of profane and vulgar names" used because none were ever said. I do not curse at women.

I affirm upon personal, that I did not approve of this woman Agnes Paez soliciting clients. Capogrosso deposition. ECF 236, page 198., 9-25, page 199, lines 4-10.
I testify, "I didn't like what she was doing so I let her go." Capogrosso Deposition. Page 197.

I testify, that I did not recall any incident with Ms. Paez, I testify, ""I know I didn't like what she was doing there .Judge Gelbstein approved it. But did I ever approach her, absolutely not." Capogrosso deposition. ECF 236, page 197.

I testify, that I did not call her a variety of vulgar and profane names. The record is devoid of any proof of what names were used. I testify, "You can' make these blatant accusations about people and don't give the specifics. Exactly what was said?"
Capogrosso deposition, ECF 236, page 204

I testify that I do not recalling having an altercation with this woman, . ."
Capogrosso deposition, ECF 236, page 206.

I testify affirm and reaffirm, this is upsetting. This is an unrelenting attack on my character. I testify, "I did not threaten a woman. I would never threaten a woman in my life." Capogrosso deposition. ECF 236, page 207.

But I also affirm, that you do not get a pass in my estimation just because you area woman. Therefore, I will report the actions of Tanya Rabinovich to the District Attorney, and I will refuse to associate with Agnes Paez and the attorney, Diantha Fuller, who she worked for,. Capogrosso deposition. ECF 236, page 206.

In opposition to any complaint of me being an aggressive litigator and accusations of confrontation, there is a triable issue as to material fact, it is not undisputed.

In support, reference my response to Exhibit 6, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41)

It provides, and I again affirm that I have personal knowledge that,

I am accused of confrontations. There are no specific facts, only allegations,  so I do not know how to respond. I am a litigator. I was at this tribunal to argue cases and win cases on behalf of my clients. I was not engaging with the clerks of this court as other attorneys did. I was not giving them gifts for Christmas and the holidays, I was not giving them parties, I was not buying them breakfast and coffee. In response my clients often paid the price. I would put the summons in the courtroom, and as it was my understanding the standing rule of the Court was that the first to appear was to the first party to be heard. Often this was not the case. Because I did not indulge the clerks with gifts, presents,  coffee, and parties my clients would suffer. I would put the case in first and be called last But I refused to the play their game. If I did, to me there was an appearance of impropriety and I did not want to play that game. I was upset for my client's sake, not mine. I was there for the whole day. I worked predominantly at the Brooklyn South TVB. I see no actual allegations of misconduct to which I need to respond.

In response, with respect to threat of physical safety, the record, the complaint,  is devoid of evidence.

I testify, "Tell me the specifics, I have no idea. You can't make allegations against a man and his reputation if you don't give specifics" Capogrosso deposition. ECF 236, page 206..

I attach two exhibits of your review Exhibits S and Exhibit T. This is an incident dealing with George Hon. First an foremost I affirm I sought no altercation with George Hon. I provide my description in the events See Capogrosso deposition, ECF 236, page 217-219 I testify, Look at the description of the events,

Supervising ALJ writes, Exhibit S,ECF 238. third paragraph, "He followed a clerk with his car and stopped the clerk's car from moving" and compare it with what

George Hon writes, "C was waiting at the entrance of the parking in his car. G stopped behind him, both got out of their car"

I affirm, upon proof and personal knowledge, Bushra Vahdat is a lying lawyer acting as a judge making up stories to get me removed from the practice of law at the Brooklyn TVB.

In opposition to my interaction with Yaakov Brody,

There is a triable issue as to material fact, it is not undisputed

In support, reference my response to Exhibit 7 of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41.

It provides, and I again affirm that I have personal knowledge that,

Attorney Yaakov Brady's accusations – incredulous statement by a lying lawyer who precipitated all these events. This event happened on December 11, 2011 in the attorney's room at the Brooklyn South TVB. Once again, I came and I placed my coffee down under the bench. "I said excuse me can I get my coffee" to Brody. Brody responded, "excuse yourself go f--- yourself you Jew hater anti-Semite." I then proceed that morning to do a hearing. I come back once again Brody is standing in front of my coffee, I asked Brody "excuse me can I get my coffee." His response again was "excuse yourself go F--- yourself you Jew hater anti Semite" I was required to take an anger management class, Brody was given a pass. I argue, I am an Italian American in Jewish community making too much money. My colleagues wanted me out. In addition, please let this Court note, Brody states that I said I am going to "Hit you with my briefcase" Incredulous statement from a lying lawyer. If it comes to the point where I need to defend my life or my family's life because of threat of assault by a knife or gun or serious physical assault I will defend myself – but " I am not going to "Hit you with my briefcase" Incredulous statement by a lying lawyer. Let Brody know that I am not an anti-Semite. Please let this Court note that in all the accusations brought against me, there is not accusation from any client or motorist that I used racial slur whether they be Jewish or any other nationality or religion. Please review this record. Where is there proof I am an anti-Semite. There is none. These are the

actions of an attorney, Brody, who provoked an incident, who was looking to get to get me removed and accomplished it.

I testify, to the events of this day, Capogrosso deposition. ECF 236, page 217-239.

I affirm that I was mad. Capogrosso Deposition. Page 243 -244. .

When asked whether I said the place is run Jews, I testify, "I don't recall" . Capogrosso Deposition. ECF 236, page 246.

I affirm and will reaffirm and testify, "No I don't care who you are. I treat everybody the same. I treat everyone respectfully" Capogrosso deposition. ECF 236, page 246-248.

In further support, reference my response to Exhibit 10, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41)

In support, reference my response to Exhibit 10, of Exhibit C

It provides, and I again affirm that I have personal knowledge that,

The events of December 21, 2011 again. One event one day, all occurring outside the tribunal. Initiated by Brody telling me to "Go f--- myself" twice and "that I am a Jew hater anti-Semite" for what reason I still don't know, only because I am an Italian American in Jewish community making too much money. Brody set me up. I took an anger management course because I did throw a punch in the direction of a wall, not hitting the wall in the attorney's room and not in the vicinity of any other attorney. I was not arrested nor charged.

I affirm that I liked Jeff Meyers. Capogrosso deposition, ECF 236, page 273-274.

I testify that I would ever hurt Jeff Meyers. Capogrosso deposition. ECF 236, page 273.

I testify that I never hit any wall. Capogrosso deposition. ECF 236,page 273. 13-15.

In opposition to any claim by the TVB that I was given to explain my version of any complaint against me, there is a triable issue as to material fact, it is not undisputed. I dispute the factual allegations presented in paragraph 18;, these allegations are not true, they are false, they are inconsistent.

In support, reference Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECFs 40 and 41. I affirm, I am a witness to the events. I have personal knowledge and involvement. My statement. was never taken. The record is devoid of any proof of my witness statement.

I testify that Gelbstein met with me, and I affirm I was told to leave the building after the incident with Yakov Brody, and I testify "Gelbstein told me you're not welcome here anymore." Capogrosso deposition, ECF 236, page 295. .

In opposition to and complaint of verbal ranting there is a triable issue as to material fact, it is not undisputed.

I affirm the petition, attached as ECF 238, Exhibit S,  stands for itself, I dispute the use of the words verbal rant and agitated speech and physically intimidating behavior, those words were never used in the petition. The petition is devoid of such language.

In opposition to any belief that I was treated on an equal footing with other attorneys at the Brooklyn TVB, there is a triable issue as to material fact, it is not undisputed.

I affirm upon personal knowledge that the TVB wanted me out for any behavior, even if it were not violent or aggressive behavior. I a adamantly disagree the association of sneezing the wrong way with violent and aggressive behavior. McDonough never trusted Gelbstein and neither should I have, that is the meaning of this phrase. I affirm this upon personal knowledge. See Capogrosso deposition. ECF 236, page 339, "he didn't trust Gelbstein at all."

Further, I affirm, and reference In support, reference Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41, to which I respond in kind to all the allegations made against, there is no proof of verbal abuse or threatening physical conduct as asked of me in my letter of re-entry, Exhibit T, ECF 40 and 41. .

In opposition to the State defendants' claims that there was a full and proper investigation of any of the complaints made against me, there is a triable issue as to material fact, it is not undisputed

Further, I affirm, and reference In support, reference Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41, to which I respond in kind to all the allegations made against, there is no proof of verbal abuse or threatening physical conduct as asked of me in my letter of re-entry, Exhibit T. ECF 40 and 41. .

Further, and for brevity, I refer to my response and opposition herein to paragraph 4, herein there was never a full and proper investigation of the veracity truthfulness of any of the complaints lodged against me.

I further cite in support, Exhibit C, Calvo deposition, ECF 235-5, page 21, 18-25.

Q. Did you ever investigate at any point the voracity of truthfulness of any of these complaints?
A. I may have, I don't know.
Further, I cite ins support, Exhibit C, Calvo deposition, page 23, 21-25.
Q. Can you give me one specific instance of where I verbally abused one of your clerks, the date, time and exactly what I said, I'd like to know?
A. No, I can't
I further cite in support, Exhibit C, Calvo deposition, page 31, 13-17
Q. Well, what threatening conduct was ever reported to you by one of your clerks, tell me?
A. I don't recall specific incidents. .

I further cite in support, Exhibit C, Calvo deposition, ECF 235-5 page 31, 24-25, page 32 1-125., page 33 page 1-8

Q. tell me one time I verbally abused one of your clerks, the date, the time, the occurrence, exactly what I said?
A. No, I cannot tell you.
Q. Can you tell me what ethnic slur I ever made with respect to one of your clerks?

A. I can't tell you specifically any incidents, ,date, time, I don't have tat information

Q. Did you ever make an investigation to any of these complaints against me by one of these clerks?

A. If I did, I don't recall, but I may have.

Q. Can you tell me the results of that investigation.

A.I can't tell you because I don't recall.


I further cite in support, Exhibit B, Traschen deposition, ECF 235-3, page 14, 9-

12, when she is questioned as to whether she spoke to the people who wrote complaints

about me she testifies,

A.  Do you mean, did I talk to them and question them?

Q. Yes

A. No, I did not. .


I further cite in support, Exhibit B, Traschen deposition, ECF 235-3, page 19 15-

20

Q. Do you review any police reports or the work violence reports that were submitted

A. I don't recall

Q. You don't recall

A. I don't

In opposition to any complaint of me staring at defendant Smart, there is a triable issue as to material fact, it is not undisputed.

The facts are inconsistent. The complaint states at the bottom that my affidavit in reply is attached. It is not attached. Th Court must take judicial notice. I affirm upon personal, I am being given no opportunity to respond.

I affirm here, based upon personal knowledge, what happened on this day. I am standing up for the 10 am morning calendar waiting for my clients to come in. A former client walks in - I remember ss if it were yesterday - and states "Hi Mario nice suit." I respond, "Well I'm making a few bucks I can afford it." Defendant Smart is sitting on a bench about 30 feet away and over hears this comment. As I have stated, this is not the first time this man has approached me, Reference Exhibits O, P, Q, R and S to ECF 239 and comes within a couple of inches of my face, ducking his head and obscuring his hand. I tell him to back up and keep walking. That is all I said. If my statement is never taken, how can I be complained that Smart is staring. My statement is never taken, security cameras are never looked, the veracity and truth of this complaint is never investigated. For brevity, I reference my response to paragraph 4 and 23, ECF 40 and 41.

In opposition to any complaint that I gave someone an attitude, there is a triable issue as to material fact, it is not undisputed.

In support, reference my response to Exhibit 12, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41.

It provides, and I again affirm that I  have personal knowledge that, "give somebody an attitude" sound alike a paranoid clerk who perhaps needs a vacation. I really don't know how to respond. Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs"  conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof.

When questioned as to whether I have knowledge as to this incident, I testify, "I wouldn't know how tell a motorist to give a clerk an attitude" See Capogrosso deposition. ECF, 236, page  350.

In opposition to any complaint that I gave someone an attitude, there is a triable issue as to material fact, it is not undisputed.

In support, reference my response to Exhibit 14, of Exhibit F  to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41.

In support, reference my response to Exhibit 14, of Exhibit C dated February 3, I never intentionally walked into Defendant Smart. Deliberately walked – ridiculous. Is this an assault or threat of violence, verbal abuse? We are working in the same environment. I routinely would have to go the docket on the courtroom wall to look and determine the hearing room for the motorist's hearing. Paranoid security guard but not an assault or threat of physical violence. Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs"  conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof.

I testify, that I did not deliberately walk into defendant Smart, See Capogrosso deposition, ECF 236, page  355.

In opposition to any complaint that with respect to Mr. Perez, there is a triable issue as to material fact, it is not undisputed.

In support, reference my response to Exhibit 15, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41.

It provides, and I again affirm that I have personal knowledge that,

I do remember this incident . Mr. Perez retained me to represent him on an appeal on a traffic ticket that he had lost. I took the appeal . The following day Mr. Perez came in and told me the judge has suspended his license. He came in verbally abusing me. I said I will give you your money back on the appeal, which I did. I did not argue his case. I did not get his license suspended. I was the lawyer hired to write the appeal. At which time Mr. Perez threatened to cut me with a knife and then slash the tires of my car. Welcome to the Brooklyn TVB. I was told by Defendant Gelbstein if there is an unruly client motorist you are to speak to him outside the courthouse which I intended to do with Mr. Perez as per Defendant Gelbstein order. As I understand it, all the attorneys were told the same. I was just threatened with a knife. The security guard defendant Smart was nowhere to be found and the Police did not get involved,  as such I followed Defendant Gelbstein order and indicated to Mr. Perez that we needed to speak outside. Once again, where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs" conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof.

I affirm, based on personal knowledge, I was not the aggressor, and affirm and reaffirm that we needed to speak outside as I was directed to do so by defendant Gelbstein when I encountered an unruly client. . See Capogrosso Deposition. Page  363 "Gelbstein

told me if you have a bad client, unruly client, you are to go outside the courthouse, and speak to him outside, which I proceeded to do"

I testify, "I said let's go talk outside, which is what I did." See Capogrosso deposition, ECF 236, page 363

In opposition to any complaint with respect to Sadiq Tahir, there are triable issue as to material fact, it is not undisputed.

In support, reference my response to Exhibit 17, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41.

It provides, and I again affirm that I have personal knowledge that,

I say "shit" I do not say shit at any time. I do not curse. I do hear Defendant Tahir say "Mother F---ker" very often in my presence as well as the presence of other attorneys and clients, to which he takes no offense. I have no idea of what Defendant Tahir is talking about. I do say "Eee – shah" occasionally, quietly to myself. It is a KENPO expression (once again I have trained in the martial arts for many years) and it is something that keeps me motivated, in and out of the gym, when I lose energy but it is not the word "shit" and was never directed at any attorney, client or motorist, If Defendant had questioned me concerning it, he might have understood. I think Defendant Tahir is paranoid. I mumbled "psycho" – ridiculous. This is verbal abuse. Sounds simply like attorney paranoia. I am accused of punching. Absolutely ridiculous – where is the proof. Where is the admonition by Defendant Gelbstein to me, concerning such behavior. Anything recorded on tape. I have seen none. I am accused of "grabbing my ankles and walking in a fast threatening manner: Nonsensical. Where is it written I cannot touch my toes or walk fast. Nonsensical. An old attorney's paranoia. The "near fight" Defendant Tahir speaks about concerns a client, Mr. Perez threatening to slice me with a knife, and security guard Smart being nowhere to be found, Police Officers not responding, and Defendant's Gelbstein's order to me to speak to unruly clients outside the courtroom. Explained above. Further, what you do hear in this statement from Defendant Tahir is that it he responds, "loudly in a barrage

swear words, stating that he (M. Capogrosso)was crazy and I was sick of him saying "shit" to me." By his own admission, I am being verbally abused by Defendant Tahir. In response I did shake my shoulder and laugh. This is nonsensical.

Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs" conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof.

I testify, with that I do not say the word "shit", See Capogrosso deposition. ECF 236, page 398, 1-25, page 399, 1-18., page 404, 8-9.

I testify, "I did not verbally abuse" See Capogrosso deposition, ECF 236, page 406, 9-12.

In opposition to any claim that defendant Smart was not operating as a state actor, there is a triable issue as to material fact, it is not undisputed

In support, I cite, Calvo deposition, ECF 235-5, page 13

Q. Who governed his day to day activities at the Brooklyn YVB?
A. We would tell him what we wanted him done as far a opening, closing thigs like that
Q. Clerical staff the clerical staff governed his day-to-day activities, is that correct.
A. To some extent yes.

In support, I cite, Gelbstein Deposition ECF 235-2, page 14

Q. Do you have authority over the actions of Defendant Smart at the TVB.
A. I do

In opposition to my interaction with defendant Smart on the morning of May 11, 2015 there is a triable issue as to material fact, it is not undisputed

I affirm these claims were not stale. The defendant Smart approached me unproved on May 11, 2015 and created the incident which led to my removal.

I testify, I wrote the Attorney General because I was fearful that another incident with Smart would occur. See Capogrosso Deposition. ECF 236, pages 415, 416.

I testify, "then the incident happens. On May 11, this guy comes again. He comes, he gets in my face again. I put up my hand. I tell him back up back up. See Capogrosso deposition, ECF 236, page 416 14-17.

I testify, "I saw this guy Smart was not backing off. I saw it he didn't want to stop." See Capogrosso deposition, ECF 236, page 421.

In opposition to any complaint of verbal abuse or incident with defendant Sadiq Tahir, there is a triable issue as to material fact, it is not undisputed.

In support, reference my response to Exhibit 18, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41.

It provides, and I again affirm that I have personal knowledge that,

At no point in time did I yell and curse at Defendant Tahir. Tahir by his own admission , item 6, above admits responding to me "loudly in a barrage of swear words." I am being yelled at, cursed at, by Tahir. I am being accused of cursing. What curse words did I use. Please explain I see none presented. There was no incident on May 5, 2015. There was an incident of May 8, 2015. There was a verbal disagreement on May 8, 2015 between me and Defendant Tahir. I placed my briefcase on a chair in the attorney room for a moment while I took a phone call from a client. It was Defendant Tahir who verbally assaulted me with a tirade of expletives saying I was not allowed to sit or put anything on his chair. Why, I do not know. This was a common attorney room where we all had a right to sit and share. Nonsensical accusations. Putting my briefcase on a chair. I am accused of " obscenities and threats." My question what threat was uttered and what obscenity used. Absolutely none. Not by me anyway. Tahir does admit to swearing at me. Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs" conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof.

I put my briefcase on a chair in the attorney's room which I am allowed to do. This was not Defendant Tahir's personal chair, so therefore he cannot direct me as to how to

use it. He indicates in his statement that "that chair is to sit, not for your bag." Who is provoking this incident. Tahir is, I am not. Attorneys routinely lay out their briefcase on the two benches that occupy this attorney's room. Except of course when it came to Tahir's chair, that he claims as his own. I put my briefcase on this chair for a moment, in order to take a phone call. Tahir provoked, escalated and contributed to the whole incident yet he goes unpunished, I get banned. Further, Defendant Tahir began screaming, by his own admission, he states "then of Course I raised my voice too." Yet in the work violence report submitted it is only me who (Siegmund's Exhibit 6, page 13 of 23) who is described as yelling. Defendant Gelbstein and Calvo mischaracterize the evidence purposefully to get me banned from the DMV TVB. I was given no opportunity to state my position on this incident with Tahir. Defendants Gelbstein and Calvo did approach me after this incident. Defendant Gelbstein in the presence of Defendant Calvo stated to me, "Can't you go practice somewhere else I saw what you wrote about me that I am complicit and incapable" Reference my letter to Defendant Prickett Morgan, ECF 40 and 41, Exhibit D. Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs" conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof.

Work place violence report – the hard evidence upon which this Court has indicated to me pursuant to my Foil request, as to why I was banned from the DMV TVB. With respect to the Workplace Violence Report, there is no work violence or threat of work violence shown in this report. A report in which I was given no opportunity to respond. As I stated previously I placed by briefcase on a chair that Defendant Tahir claimed as his own

in the attorney's room. Tahir began to move it I said give me a minute I will be leaving shortly and which Point Defendant Tahir grabbed the briefcase sending files scattering. I was given no opportunity to explain nor respond by Defendants Gelbstein and Calvo. There is no proof of violence in this report though it is labelled as a work violence report and it is one of the primary reasons for me being banned." Defendant Gelbstein did approach me after this incident, in the presence of Defendant Calvo and stated, "Can't you go practice somewhere else I saw what you wrote about me that I am complicit and incapable" Reference my letter to Defendant Prickett Morgan, ECF 40,Exhibit D.  Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs"  conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof

See also Capogrosso Deposition, ECF 236, pages 462-463.

I testify in support of my statement, See Capogrosso deposition. ECF 236, page 450-453.

I testify that I did not curse. See Capogrosso deposition. ECF 236, page  453, 20-25.

I testify,  I am not here to harass a lawyer . See Capogrosso deposition, ECF 236, page  454 and testify he has insecurities . See Capogrosso deposition, ECF 236, page  454.

The record and complaint are devoid of any threatening conduct and speech.

**T** In opposition to any complaint of verbal abuse or incident with defendant Gelbstein, there is a triable issue as to material fact, it is not undisputed.

In support, reference my response to Exhibit 19, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41).

It provides, and I again affirm that I have personal knowledge that,

I have no idea who wrote this, my files were being tampered with at one point in time. I did observe Defendant Smart do it often. I complained to Defendant Gelbstein with no response. It was Smart's continue attempt to harass. I never stated that Defendant Gelbstein "should put a gun to his head." My question, who made this statement and who corroborates me making it. However, I do remember making a statement concerning a former attorney who also improperly expelled from the DMV TVB by Defendant Gelbstein and who later committed suicide. When I was asked about this matter by a client concerning Defendant Gelbstein's actions, expelling an attorney from the DMV without a due process hearing, I stated in response " I would have a hard time sleeping at night. " That is all I said, everything else is total fabrication. Let this person come forward. They will not. Their statement goes unsigned. Once again, where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs" conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof.

See Capogrosso deposition, ECF 236, page 464-468..

I testify, "But I never said the judge should put a gun to his head,. That's ridiculous" . See Capogrosso deposition, ECF 236, page 466.

I testify, "That's absolutely ridiculous, it's a total lie" See Capogrosso deposition.

ECF 236, page 467.

In opposition to any altercation with defendant Smart, there is a triable issue as to material fact, it is not undisputed.

I affirm the truthfulness and veracity of he complaints lodged have never been fully and accurately investigated. I affirm, based upon personal knowledge, that there was no altercation with defendant Smart. I told defendant Smart to "back up back up" refence Exhibit T, Work Violence Report, and Exhibit U, Work Violence Report,  ECF 239. I affirm I am seeking not to engage, I am not seeking an altercation.

Reference Exhibit V, Work Violence, Memorandum, ECF 239, that provides no pictorial proof of  any altercation.

In further opposition to any altercation with defendant Smart, there is a triable issue as to material fact, it is not undisputed

In support, reference my response to Exhibit 22 and 23, of Exhibit F to Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF 40 and 41. Also reference refence Exhibit T, Work Violence Report, and Exhibit U, Work Violence Report,  ECF 239. attached. There was no fight, there was no altercation. I am trying to avoid contact with defendant Smart.

It provides, and I again affirm that I have personal knowledge that

Work place violence report – My response to the approach of Defendant Smart was "back up back up" indicating I am not looking for an altercation. My hand went up in self-defense. Defendant Smart approached me for no reason. A paranoid security guard who said, "You are looking at me."I said nothing to Defendant Smart that morning other than "back up, back up" I did not provoke this incident. This is what did happen. When I walked into the DMV that day and got on the line to get summonses, I did turn around because Defendant Smart was pacing back and forth. He was grumbling and mumbling and shaking his head side to side.  At which point he approached me in a hostile and aggressive manner. I told him "back up, back up" and he refused. I put my hand up in self-defense. Please look at the "Additional Comments" on the Work Violence report submitted. Defendant Gelbstein gives me no opportunity to respond to the incident. He has me escorted out and then permanently banned from the DMV TVB. Defendant Gelbstein provides no indication that he did any formal investigation of this incident, yet he bans me for life from practicing at the DMV TVB. There is no indication that he reviewed security tapes, questioned me or investigated the incident as he did not question me concerning the incident with Defendant

Tahir concerning me placing a briefcase on a chair in an attorney's room. I was given the phone number by Defendant Calvo of Defendant Traschen, who indicated to me that I was permanently banned from the TVB. Once again for placing a briefcase on a chair in an attorney's room that Defendant Tahir claims as his own and for telling a security guard Smart "back up back up" after his approach upon my person in an angry hostile manner and accusing me of looking at him. Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs" conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof.

My hand went up in defensive posture. Defendant Smart was in my personal space, and this was not for the first time. Reference my letter to Defendant Prickett Morgan Exhibit D, ECF 40 and 41, where I sought relief from such behavior form Defendant Smart. As shown in my Complaint, dated May 8, 2018, Defendant Smart has pushed me from behind of for no apparent reason, gave me the sign of the cross and spear hand while standing on the clerk entry summons line (an I believe was removed from his duties at the Brooklyn South SMV TVB for approximately two weeks after such incident by Defendant Gelbstein), to get the summons for a day's hearings, got in my face several times in a threatening aggressive manner between June 20, 2012 and May 111, 2015 and when I asked what was the problem his response was "F--k you, you are the problem, and has admitted to taking money from one of my clients while at some point in time between December 11, 2011 to June 20, 2012 when I was required to take an anger management. He has admitted to taking $80 owed from a client on a $150 fee. He admits he took this money because he indicates that I authorized him to do so. An outright lie. He indicated that he gave this money to me. A lie. Simple and plain. During the time when defendant

Smart took this money between December 11, 2011 and June 20, 2012 I had no communication with the DMV and specifically with a security guard who worked at the DMV. I reported this abuse and theft to Defendant Gelbstein, he performed an investigation and let Defendant Smart remain at the Brooklyn TVB. After which time a series of threats and assaults began by Defendant Smart against my person at the Brooklyn DMV TVB which culminated in the incident of May 11, 2015. I have no motive for having any type of altercation with a security guard. I was there to represent clients and make my living. . Where is the proof of "verbal threats of physical violence, and verbal abuse, including the use of ethnic slurs" conditions set to pursuant to the June 20, 2012 re-entry letter to my Office. There is none, I see no proof. The defendant Smart approached me unproved on May 11, 2015 and created the incident which led to my removal.

I testify, I wrote the Attorney General because I was fearful that another incident with Smart would occur. See Capogrosso deposition. ECF 236, page 415, 416.

I testify, that I am not the aggressor, "then the incident happens. On May 11, this guy comes again. He comes, he gets in my face again. I put up my hand. I tell him back up back up. See Capogrosso deposition. pages 416 14-17.

I testify, "I saw this guy Smart was not backing off. I saw it he didn't want to stop." See Capogrosso deposition. page 421.

Defendant Smart lies concerning the events of May 11, 2015. Reference Work Violence Report, Exhibit T and Exhibit U, ECF 239, which claims an open palm,

I cite Smart Deposition, attached as Exhibit D ECF 235-6, Smart deposition, page 7, lines 22-23, Smart testifies, "I was shocked He just punched me in the chest." Smart

lies. This is inconsistent testimony with respect to the statements given to the police by Smart. Smart files the police report which become the basis for the Work Violence Reports, Exhibits U and Exhibit V, ECF 239. Smart testifies, " my response was  well go 61on him, so I went to 60, I got 61 on him and two police officer came with me." Smart deposition, ECF 235-6, page 8.

Smart tells two different stories. He lies to this Court and such lies have formed the basis for my removal from the New York TVBs.

In opposition to any claim by the State defendants' that I was given a full and fair opportunity to explain the incident with defendant Smart on May 11, 2015 and that the State defendants had a fair and true knowledge as to this incident, there is a triable issue as to material fact, it is not undisputed.

I affirm I was told to call Ida Traschen. by Daniel Calvo, I was told to leave ethe building immediately. Exhibit T, Work Violence Report, Exhibit U, Work Violence Report, ECF 239.

No pictorial evidence exists as to the alleged altercation. Reference Exhibit V, Memorandum., ECF 239.

Defendant Gelbstein was not present at the Brooklyn TVB on the morning of May 11, 2015 so as to observe the incident, question witnesses, observe videotape with myself an defendant Smart. Gelbstein deposition, ECF 235-2, pages 4 and 5.

Defendant Gelbstein was called by defendant Calvo on the morning of May 11, 2015, Gelbstein deposition, ECF 235-2, pages 9-10 and was not to be able to observe the incident, question witnesses, observe videotape with myself and defendant Smart

Defendant Gelbstein had me removed "I must have told her to have you removed and to give you legal counsel's phone number" Gelbstein deposition, ECF 235-2,   page 9 17-19.

Defendant Gelbstein testifies, when questioned

Q. So, you don't recall ever observing the videotape?
A. I don't recall.
Q. Did you keep possession of the videotape.

A. I personally did not.

Q. At any point in time did you view the videotape
A. I don't recall

48

I affirm, without observing the incident, questioning witnesses, observing videotape tit is impossible to ascertain the nature of the incident between myself and defendant Smart.

I further support, Traschen deposition, ECF 235-3, page 10,

Q. Did you view or revie ay of the videotape of the alleged incident on May 11, 2015?
A. No

Defendant Traschen did not view any videotape.

She was not present at the Brooklyn TVB on the morning of May 11, 2015 to observe the incident, question witnesses, observe videotape. I was told to call legal counsel. Reference Exhibits T and U, ECF 239. I ask the Court to take judicial notice legal counsel office, represented by defendant Traschen, is in Albany NY and not Brooklyn New York. I affirm, without observing the incident, questioning witnesses, observing videotape tit is impossible to ascertain the nature of the incident between myself and defendant Smart.

Further in support, I cite Calvo deposition, ECF .235-5.

Defendant Gelbstein was not at the Brooklyn TVB, Calvo deposition, ECF 235-5, page 5.

Defendant Calvo cannot identify the witness who told her there was an incident between myself and defendant Smart, Calvo deposition, ,ECF 235-5, page 5.

Defendant Calvo cannot identify that defendant Smart e witness who told her there was an incident between myself and defendant Smart, Calvo deposition, ECF, 235-5 page 5.

Defendant Calvo did not observe the incident between myself and defendant Smart on the morning of May 11, 2015.

> Q. But you did not observe what happened, right?
> A. No I did not.
> Q. And you didn't look at any videotape, right?
> A. Not that I recall.

Calvo deposition, ECF 235-5, page 6.


Defendant Calvo testifies, "I didn't make any decision whether it was the truth or not, I just reported what I was told." Calvo deposition, ECF 235-5, page 7.

I affirm, without observing the incident, questioning witnesses, observing videotape tit is impossible to ascertain the nature of the incident between myself and defendant Smart.

In opposition to any claim that defendant Calvo, was not personally involved in having me banned from the TVB, there is a triable issue as to material fact, it is not undisputed.

I affirm defendant Calvo had everything to do with my removal. She was present at the Brooklyn TVB. On the morning of May 11, 2015.

Defendant Calvo cannot identify that defendant Smart as the witness who told her there was an incident between myself and defendant Smart, Calvo deposition, ECF 235-5, page 5.

Defendant Calvo did not observe the incident between myself and defendant Smart on the morning of May 11, 2015.

Q. But you did not observe what happened, right?
A. No I did not.
Q. And you didn't look at any videotape, right?
A. Not that I recall.

Calvo deposition ,ECF 235-5, page 6.

Defendant Calvo testifies, "I didn't make any decision whether it was the truth or not, I just reported what I was told." Calvo deposition, ECF 235-5, page 7.

I affirm, without observing the incident, questioning witnesses, observing videotape tit is impossible to ascertain the nature of the incident between myself and defendant Smart. She made a phone call to defendant Gelbstein.

Defendant Calvo testifies, "I just called Judge Gelbstein and let him know what happened and then that was it" Calvo deposition, ECF 235-5, page 6.

I affirm, without observing the incident, questioning witnesses, observing videotape tit is impossible to ascertain the nature of the incident between myself and defendant Smart so as toto relay such information to defendant Gelbstein.

In opposition to any claim that defendant Gelbstein did not act in retaliation for my letter of Prickett Morgan, Exhibit D, ECF 40 and 41, there is a triable issue as to material fact, it is not undisputed

I affirm that on May 8, 2015 defendant Gelbstein approached me while I as in the attorneys room at the Brooklyn South TVB and stated , "That's exactly what this man said to me, can't you go somewhere else? I saw what you wrote about me, I'm complicit, incapable and incompetent." Capogrosso deposition, ECF 236, page 444.

Those words, "I saw what you wrote about me, I'm complicit, incapable and incompetent" are found in my letter of complaint, dated March 20, 2015, Exhibit O, ECRF 40 and 41.

Defendant Gelbstein was in possession of my letter of Complaint to Prickett Morgan. See Gelbstein deposition, ECF 235-2, page 16.

In her Memorandum and Order, ECF 271, page 21, J. Brodie concludes that Gelbstein's comment "cant you go practice somewhere else, I saw what you wrote about me, that I am complicit and incapable" were comments that not only indicate that Gelbstein and Calvo were aware of Plaintiff's letter and its contents, but that also "may be viewed as directly reflecting the alleged retaliatory attitude." citing McAvey, 805 F. Supp. At 40. The Court further concludes, "Based on the circumstances of this case as alleged in the Complaint, the temporal proximity between Plaintiff's March 2015 Complaint and being banned from representing clients at all TVB locations is sufficient, on a motion to dismiss, to establish causation between Plaintiff's protected First Amendment activity and the State Defendants' actions." ECF 71, page 21.

53

In further opposition with respect to the State defendants' claim that   a full and

proper investigation was made with respect to complaint that was made against me,  or

proof of one specific instance where I verbally abused one of the clerks, the date the time

and exactly what was said there are triable issue as to material fact, they are not

undisputed.

Gelbstein's deposition, ECF 235-2, page 27

Q. And you just accepted all those complaints as true without asking for my affidavit in
        response; I is that a fair statement?
A. I did not ask for an affidavit in response.

Gelbstein's deposition, ECF 235-2, page 29

Q. Did you investigate that complaint, Defendant Gelbstein (referring to clerk supervisor
Melanie's documentation of Mr. Perez' complaint )
A. I don't recall if I specifically investigated this complaint
Q. So you don't know the voracity or truthfulness of that complaint, is that a fair statement
        A. I don't recall at this time

 I further cite in support,  Calvo deposition, ECF 235-5, page 21, 18-25.

Q. Did you ever investigate at any point the voracity of truthfulness of any of these
complaints?
A. I may have, I don't know.

Further, I cite ins support, Exhibit C, Calvo deposition, page 23, 21-25.
Q. Can you give me one specific instance of where I verbally abused one of your clerks,
the date, time and exactly what I said, I'd like to know?
A. No, I can't

        I further cite in support, Exhibit C, Calvo deposition, page 31, 13-17
Q. Well, what threatening conduct was ever reported to you by one of your clerks, tell
me?
A. I don't recall specific incidents. .

In further opposition with respect to my interaction with defendant Smart there are triable issue as to material fact, they are not undisputed.

I affirm that I had no knowledge of no complaint filed against me by defendant Smart.

I affirm and testify that defendant Smart was harassing my person after I report a theft of $80 on a $150 fee. Exhibit M. Capogrosso deposition, ECF 236, page 355-357.

Reference Exhibits B, C, and, D Affidavits of harassment, and Exhibit E, ECF 239 Letter of Complaint dated March 20, 2015, Exhibit D, ECF 40 and 41.

In further opposition with respect to any claim by State defendants' that defendant Smart is not a state actor or acting under color of state law,  there are triable issue as to material fact, they are not undisputed.

Defendant Calvo and defendant Gelbstein both directed the actions of defendant Smart at the Brooklyn TVB.

In support, I cite, Calvo Deposition ECF 235-5,  page 13

Q. Who governed his day to day activities at the Brooklyn TVB?
A. We would tell him what we wanted him done as far a opening, closing thigs like that
Q. Clerical staff the clerical staff governed his day-to-day activities, is that correct.
A. To some extent yes.


In support, I cite, Gelbstein Deposition ECF 235-2, page 14

Q. Do you have authority over the actions of Defendant Smart at the TVB.
A. I do

In further opposition with to any claim by State defendants' that there were witnesses to the alleged incident between myself and defendant Smart on May 11, 2015, there are triable issue as to material fact, they are not undisputed.

Defendant Calvo cannot identify the witness who told her there was an incident between myself and defendant Smart, Calvo deposition, ,ECF 235-5, page 5.

In further support that defendant Smart is lying to this Court so as to create a triable issue as to material fact, they are not undisputed.

I cite Smart Deposition, ECF 235-6, page 7, lines 22-23, Smart testifies " I was shocked He just punched me in the chest." Smart lies. Tis is inconsistent testimony with respect to the statements given to the police by Smart. Smart files the police report which become the basis for the Work Violence Reports, Exhibits U and Exhibit V, ECF 239, . Smart testifies, " my response was  well go 61on him, so I went to 60, I got 61 on him and two police officer came with me." Smart deposition, page 8.

Smart tells two different stories. He lies to this Court and such lies have formed the basis for my removal from the New York TVBs.

**Opposition to Dismissal of Claims Judicial Immunity and Quasi-Judicial Immunity**

Absolute judicial immunity, however, does not apply to purely administrative acts of a judge, such as employment decision. *See, generally, Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538 (U.S. 1988) (ruling that a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and first assistant district attorneys, or from any other Executive Branch official who is responsible for making such employment decisions).

In *Butz v. Economou*, 438 U.S. 478, 511-13 (1978), the Court established a three-part test for determining whether judicial immunity applies to officials other than judges: (1) Whether the functions of the official in question are comparable to those of a judge; (2) whether the nature of the controversy is intense enough that future harassment or intimidation by litigants is a realistic prospect; and (3) whether the system contains safeguards which are adequate to justify dispensing the private damages suits to control unconstitutional conduct. *Wagshal v. Foster*, 28 F.3d 1249 (D.C. 1994), *cert. denied*, 514 U.S. 1004 (1995).

In determining whether an act by a judge is "judicial," thereby warranting absolute immunity, the Second Circuit takes "a functional approach, for such immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). The factors determining whether an act by a judge is a judicial one relate to the nature of the act itself (whether an act by a judge is a judicial one relates to the nature of the act itself—whether normally performed by a judge—and the expectations of the parties—whether they dealt with the judge in his judicial capacity).

A judge's administrative decisions, even though potentially "essential to the very functioning of the courts, have not similarly been regarded as judicial acts." *Id.* at 511. "Such administrative actions include demoting or dismissing a court employee, . . . ." *Id.* "Similarly, judges are not entitled to judicial immunity for promulgating a code of conduct for attorneys, . . . ." *Id.  And see, Parent v. New York*, 786 F.Supp.2d 516 (N.D.N.Y. 2011) (administrative actions such as terminating court employees do not fall within range of judicial actions protected by absolute immunity).

The actions taken here against me were not "judicial" in nature—but administrative—and hence do not fall under the "privilege" umbrella. The actions, in fact, were not technically "attorney discipline," as the Plaintiff's alleged actions were taken outside of judicial proceedings, unrelated to the Plaintiff's duties as an attorney, and, in fact, related to general administration of the building.

Authority is not to the contrary.  For example, *Jackson v. Pfau*, 523 F. Appx. 736 (2d Cir. 2013) (State's Brief, pp. 19-20), fails to give any detail into what "judicial action" was engaged in).  And *McKeown v. N.Y. State Commn. On Judicial Conduct*, 377 Fed. Appx. 121 (2d Cir. 2010) (State's Brief, p. 20), specifically references attorney disciplinary proceedings—not administrative termination of an individual's right to present in a building. *Id.* at 124.

Significantly, *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106 (2d Cir. 2020) (State's Brief, p. 20), underscores the Plaintiff's argument.  In that case, the court specifically stated that "the act of disbarring an attorney as a sanction for the attorney's contumacious conduct *in connection with a particular case* is a judicial act, . . . ." *Id.* at 124 [*emphasis added*].  Indeed, the actions taken herein are unlike "attorney disciplinary

proceedings" (*c.f.*, State's Brief, p. 20) (referring to attorney disciplinary proceedings in case law).

Because the actions taken here were administrative and not judicial, the argument that the "individual defendants" are all immune from liability fails. My ban from practicing law at all TVBs was not a judicial determination. To find a judicial determination, I had to be afforded the ability to present evidence, cross examine witnesses, call witnesses on behalf. None of these right were afforded to me. The decision to ban me from the TVB was purely administrative.

### Opposition to Dismissal of Claims based on First Amendment Retaliation

There is evidence that the AG Letter was a motivating factor in the decision. I have affirmed that defendant Gelbstein approached me on May 8, 2015, and states" Can't you go practice somewhere else, I saw what you wrote about me that I am complicit and incapable" (Complaint page 3). Defendant Gelbstein was conveniently, if not purposefully, not present in the Brooklyn TVB on the morning of May 11, 2015 Gelbstein deposition, ECF 235-2,  pages 4-5.

Further, in her Memorandum and Order, ECF 271, page 21, J. Brodie concludes that Gelbstein's comment "cant you go practice somewhere else, I saw what you wrote about me, that I am complicit and incapable" were comments that not only indicate that Gelbstein and Calvo were aware of Plaintiff's letter and its contents, but that also "may be viewed as directly reflecting the alleged retaliatory attitude." citing McAvey, 805 F. Supp. At 40. The Court further concludes, "Based on the circumstances of this case as

alleged in the Complaint, the temporal proximity between Plaintiff's March 2015

Complaint and being banned from representing clients at all TVB locations is sufficient,

on a motion to dismiss, to establish causation between Plaintiff's protected First

Amendment activity and the State Defendants' actions." ECF 71, page 21.


### Opposition to Dismissal of Claims based on Injunctive Relief

There is evidence to establish that an Article 78 would not afford me the relief I

sought. I testify that I that " I had $122,715.oo (dollars) in lost representing approximately

15 months of projected receipts" Capogrosso, ECF 236, page 99.Also see ECF 238, Exhibit

M. An Article 78 proceeding would not afford me the ability to recover this lost revenue

as well as monies lost south as a result to damages  my reputation as an attorney practicing

at the TVB.


### Opposition of Claims Against Defendant Smart

Courts within this Circuit have recognized that a private security guard may act as

a state actor if he or she has been granted certain police powers by the state or local

government." *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1980).

*See, e.g., Brooks v. Santiago*, 1994 WL 529865, 1 (S.D.N.Y.) (where the private security

officer bears some additional imprint of public authority, his conduct may constitute state

action).

Any argument that defendant Smart was neither given the authority of state law, nor willfully participated in the joint activity of the State is factually incorrect. The record is rife with allegations that the Defendant participated directly in the alleged violations.

If the Defendant was in fact a participant in the occurrences and decision that led to the Plaintiff's administrative removal and preclusion from return to the TBV building, his conduct is automatically considered as part of the State's.

In *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), the Supreme Court of the United States held that a physician who was under contract with the state to provide medical services to inmates at a state prison hospital on a part-time basis acted under color of state law within the meaning of 1983 when he treated the inmate.

There is evidence of retaliation. I report the theft of $80 on a $150 fee to defendant Gelbstein in 2012. I affirm that an investigation is made by defendant Gelbstein. Gelbstein admits to me that Smart said he took the money and he gave it to me, which is a lie, Smart is allowed to remain at the Brooklyn TVB. I affirm that I believe that defendant Smart had a grudge and would not let it go. When asked whether I believed the defendant Smart wanted to get rid of you I affirm "Absolutely." (Capogrosso deposition, ECF 236, pages 356-357).

The Court has already ruled that there was a sufficient nexus in time between the AG letter of March 20, 2015, and the incident of May 11, 2015. (See Memorandum and Order, Dkt 71, page 21) Defendant Smart was a contributing factor to my ban from the TVB for but for his unprovoked approach and continual prior attempts at harassment I would not have been removed. There is sufficient proof to establish that defendants Gelbstein and Calvo directed the action of defendant Smart. (Gelbstein deposition, ECF

did not want Officer Smart fired, as she felt the incident was not his fault and that he was a very good guard." Defendants Calvo, Gelbstein, and Calvo took sides against me on the morning of May 11, 2015, without any thought of due process.

**Opposition of State Law Claims Defendants PEC Group of NYC, Inc. and Sadiq Tahir**

In opposition, there is no evidence in the docket ordering the dismissal of my Complaint.

Dated:      February 14, 2022
            New Rochelle, New York


Mario H. Capogrosso
21 Sheldrake Place
New Rochelle, NY 10804